

TO: Brownsburg School Corporation HR Director Jodi Gordon
FROM: John Kluge
Date: Friday, May 25, 2018

<u>WITHDRAWAL OF INTENTION TO RESIGN AND REQUEST FOR CONTINUATION OF ACCOMODATION</u>

    I requested a meeting with you, HR Director Jodi Gordon, and BHS building principal Dr. Bret Daghe that was scheduled for Friday, May 25, 2018 at 1:30pm at BCSC Central Office. I arrived on time and Dr. Daghe told me that, contrary to what had been planned, he said "We have everything we need. We don't need to meet. Go back to the high school." When I insisted that I had set up this meeting to talk to HR and Dr. Daghe and that I needed to talk to you about something new, Dr. Daghe ordered me not to go upstairs to your office and to instead return to the high school. I'm confused how "We have everything we need," as Dr. Daghe claimed, since you had agreed to not take any action on my forced intent to resign. I'm also confused as to why Dr. Daghe thinks he is entitled to prohibit me from accessing you, the school corporation's HR director, even at our appointed meeting time. What I was going to present to you was the following:

    Today I am WITHDRAWING my emailed intention to resign sent to you April 30, 2018 for which you had agreed to withhold processing at my specific request. The time that you have given me to consider this intended action has been helpful for me to realize that there was no choice for me and my family. Effectively, a gun was placed to my head forcing my signature. I now see that this effort by the administration was a means to compel me to deny my religious beliefs, and to punish me for these beliefs. It is infringing on my protections of free speech by compelling me to demonstrate and embrace core personal-development values for youth that are totally in opposition to my actual heartfelt beliefs. In previously agreeing to an Accommodation for my use of last names only for all of my students, I relied upon a good faith effort by the administration to be sensitive to my faith and my adherence to a respectful means of working with my employer as well as equally honoring my students. This approach was



KLUGE V. BCSC
**EXHIBIT**
**C**
5.25.18 JK RESCISSION OF RESIGNATION

successful, in that it demonstrated a teacher's commitment to personal values, even while individual students, both within the transgender population and outside of it, as well as the classes as a whole, advanced in measureable ways. Plus there is no burden on Brownsburg School Corporation in maintaining my Accommodation. Accordingly, if the Brownsburg School Corporation retracts the Accommodation afforded me this year, it does so without just cause. In threatening me with rescission of my rights to be compensated through the summer, the administration has acted in a high-handed, arbitrary, illegitimate, and most likely, illegal manner. I request that the School Corporation maintain my employment for the upcoming school year, and renew the present Accommodation that will allow me to continue to perform my job.

What follows is a timeline that I believe reflects the facts leading up to the administration's effort to squeeze me out of the school, along with some of the reasons for my NOT agreeing to this effort to force my resignation.

- January 23, 2017 – Administration invited Craig Lee, the teacher sponsor of the LGBT "Equality Alliance" club at school, also a union representative of the teacher's union (the union which I have opted to not join) to speak at a faculty meeting. In "starting a dialogue" about transgenderism, Lee solicited questions/concerns that the faculty had about transgenderism, asking faculty to write them down on an index card for the administration to look over. Lee said they were doing this because he claimed to have been receiving at least 1 or 2 emails a month asking him for advice regarding transgender students in their classes. At this meeting, I asked the question out loud about how the school will handle diverse worldviews such as those who believe transgenderism is sin/sexual immorality. The moderator thanked me for the question, asserting that those were good questions to ask, but my question went unanswered.

- February 27, 2017 – Administration again invited Craig Lee as well as Lori Mehrtens, one of our guidance counselors, to give a presentation on what transgenderism is, why we need to encourage students in it who have these feelings, why it is sometimes good to keep the information from their parents and cultivate it secretly at school (because of the possibility of their parents abusing them), and they stated that the #1 goal as teachers was to make our students "comfortable."

- May 15, 2017 – I met with BHS building principal Dr. Bret Daghe to read out loud a letter that had been previously written, and I, accompanied by other faculty, discussed the

contents. I pleaded with Daghe to not pursue the transgenderism path that was being presented. In this meeting, Daghe indicated that he had resisted changing the names in the online PowerSchool database up to this point. The three other teachers and I left that meeting in disagreement, and I was dejected by the tension of the school leadership in pushing us to call students by names other than the sexually correct birth names. I soon returned to Daghe's office and told him that if he had been able to resist changing the students' names in the online database, good for him and he should keep on resisting.

- Summer 2017 – High School Guidance Counselor Lori Mehrtens announced that the students were now permitted to change their first name in the official school database, "PowerSchool", and stated that their parents were on board with it. They also informed only these students—not the student body at large—that they could use the general bathroom of the opposite sex if they wanted to. Otherwise they needed to use the nurse's single-stall bathroom. They would not be incorporated into the opposite sex's changing room, but would be provided with a separate changing area for gym and for performing arts concerts. Up to this point, the students who were uncomfortable using the bathroom that matched their biological sex had been given the option of using the single-stall bathroom in the nurse's office.

- July 18, 2017 – I receive a couple of emails from Mehrtens supposedly informing me and other teachers having 2 transgender students in our classrooms, in light of this summer's changed policy. We were also instructed on a reporting process as to other students who were not in compliance with these developing policies, policies which had not been made known to either the general student body or the general body of parents.

- July 27, 2017 – On the first day of school I planned to take roll call using the students' legal first names, because the email of July 18 used language that was permissive, not mandatory, stating, "feel free to call them their transgender names." I planned to do this because my conscience would not allow me to encourage students in transgenderism. To protect myself from encouraging what my faith states is sinful behavior, I opted to adhere to the stated words in the email and to call the 2 students by their legal names. I met with Daghe briefly and told him that I could not in good conscience call these students by their transgender names. Daghe told me to hold tight in my office till he could discuss it with Superintendent Dr. Jim Snapp. Later that morning, Snapp and Daghe met with me for about 2-3 hours. During this meeting, I explained my Christian convictions and urged them not to pursue this path. During the meeting, Snapp gave me three options: (1) comply with calling students transgender names, (2) say that I was "forced to resign," or (3) get fired. I told them that I would rather get fired than resign because I wanted to teach at the school and didn't want to quit on the kids. If they were going to end my job, I wouldn't do it for them. With that, we ended the meeting. Because I had chosen option 3, Snapp initiated an administrative leave of absence beginning immediately, pending termination procedures.

- July 31, 2017 – After giving prayerful consideration to my plight, I met with Snapp and asked to be given an Accommodation. I suggested that I use last-names-only like coaches generally use when addressing the students. I also requested that I not be required to handle the uniform responsibility, and Snapp agreed to this, and agreed that another school employee would distribute the uniforms to the students, which actually had been the practice previously. This Accommodation was agreed upon by both of us, and we both signed an agreement to that effect.

- August 7, 2017 – Despite our agreement, I was given an Administrative leave of absence from July 27-28, 2017, a suspension, at the BCSC School Board meeting. It has never been made clear to me as to why this occurred.

- August 14, 2017 – Assistant Superintendent Kat Jessup presented what she submitted to be new transgender policies to the high school faculty at a faculty meeting.

- November 6, 2017 – Teachers from our school were asked at a faculty meeting to write down any questions/concerns/scenarios-they-had-questions-about on an index card. The administration collected them and told the faculty that Jessup would work on answering these questions with counsel from the school's lawyer and report back at our December 2018 meeting. I later learned that Brownsburg East Middle School and Brownsburg West Middle School were presented with the same scenario as was our faculty.

- December 2017 – Jessup postponed this presentation on transgenderism by another month because answers had not been formulated to all the questions that had been submitted by faculty in November.

- December 13, 2017 – Daghe scheduled a meeting with me to ask me how the year was going and to tell me that my last-name-only Accommodation was creating tension in the students and faculty. He said the transgender students reported feeling "dehumanized" by my calling all students last-name-only. He said that the transgender students' friends feel bad for the transgender students when I call the transgender students, along with everyone else, by their last-name-only. He said that I am a topic of much discussion in the Equality Alliance Club meetings. He said that a number of faculty avoid me and don't hang out with me or include me as much because of my stance on the issue.

    Daghe said that parents complain about me. He stated that a transgender student's mother complained to the principals about my orchestra policy, that it was an unfair and unwarranted policy that should be removed. The building principal asked if the other teachers had this same policy. I told him "yes" and sent him their policies and mine. He responded to the parent and the parent backed down. This was a policy by my entire performing arts department that students must have natural-colored hair for performances so they don't distract from the music being played.

Daghe referred to this parent complaint in this meeting as being evidence of me being singled out while other teachers with the same policies did not receive any complaints.

I explained to Daghe that this persecution and unfair treatment I was undergoing was a sign that my faith as witnessed by my using last-names-only to remain neutral was not coming back void, but was being effective. He didn't seem to understand why I was encouraged. He told me he didn't like things being tense and didn't think things were working out. He said he thought it might be good for me to resign at the end of the year. I told Daghe that I was now encouraged all the more to stay.

- January 17, 2018 – Daghe scheduled a meeting with me because he said he didn't think he was direct enough in our December 13 meeting. He told me in this meeting plainly that he really wanted to see me resign at the end of this school year. I told him that it was simply because he didn't like the tension and conflict. But I used examples in scripture to point to why this is a sign that I should stay. I referenced Acts 19:11-41 with Paul's conflict in Ephesus and 1 Corinthians 16:8-9 when Paul was encouraged by the opportunity, saying "a wide door for effective service has opened to me, and there are many adversaries."

  Daghe asked me if I was going to resign. He offered to write me letters of recommendation, etc. I told him I'd have a clearer picture if I would stay or leave after the January 22, 2018 faculty meeting where the new transgender policies would be announced. I told him I'd meet with him after those policies were announced and we could follow up with this meeting.

- January 22, 2018 – Jessup presented the faculty with a Q and A document she and the lawyer had come up with. These policies were not being announced to the general student population, to the parents or community. They went into effect immediately except for the last-name-only Accommodation which had been permitted under my Accommodation, was to be withdrawn next school year. The document provided in part that (1) transgender students could now use the restroom of their choice, i.e. men's, women's, single-stall nurse's office; (2) "fully transitioned" transgender students could now change in the opposite sex's locker-room (gym) and changing room (performing arts concerts) instead of changing in a separate changing area—"fully transitioned" was not defined.

- January 31, 2018 – I scheduled a meeting with Daghe because I had told him I'd get back with him after the faculty meeting that occurred January 22, 2018, regarding his question as to whether I would resign at our January 17, 2018 meeting. I asked Daghe to elaborate on details of what resignation would look like, which he did.

- February 4, 2018 – I sent an email to Snapp and Daghe reminding them that it was my understanding that, per our signed agreement, I would be allowed to use last-names-only indefinitely, and inquired as to whether this was correct understanding.

- February 6, 2018 – HR director Jodi Gordon and Daghe scheduled a meeting with me. During this meeting, Daghe told me that, in response to my February 4, 2018 email, the answer was "no," I would not be allowed to continue using last-names-only. It was said in the meeting that I would be fired starting in the summer if I intended to use last names only. They said my Accommodation was unreasonable because students were "offended" at me using last-names-only. I told Gordon and Daghe they were acting illegally and discriminating against their Christian employees in violation of Title VII. In this meeting, I told Gordon that Daghe wants me to resign at the end of the school year. Gordon informed me that I would be paid over the summer if I resign.

- March 15, 2018 – Gordon scheduled a meeting with me. She told me that I would have to hand in a resignation letter by May 1, 2018 if I wanted to resign. If I failed to do that, the termination process would start May 1, 2018 so that I could be out the door by June, 2018. Gordon called it a "contract cancellation" for the following school year.

- April 30, 2018 – I sent an email to Gordon. In the email I indicate that I intend to resign at the end of the school year with reference to the ultimatums with which I had been presented. I asked that my email not be processed or anyone told about its contents before May 29, 2018. Gordon responded that she would honor this request. By today's letter, I am now RESCINDING that April 30, 2018 email stating an intention to resign.

I am quite concerned that the compelled speech in which BHS has engaged itself is a threat to my own right of expression. As a teaching professional, I have never experienced such effort at blackmailing me and students with threats of repercussions should we voice dissent with the latest and evolving policy towards the faculty and students insofar as references to transgender students.

I greatly object to the stifling of my religious beliefs as well as those of others who are in my charge. What follows are a few of my concerns.

I adhere to a biblically-based belief regarding the inherent dignity of every individual, that we are all created in the image of God and that, as a result, each person is entitled to be treated with dignity and respect.

The Bible teaches that there were created two distinct, complementary sexes, not subject to human change, and that I, as a teacher, cannot tell someone that their gender is something different than what God biologically created them to be.

There is no conflict between my heart for finding and exercising dignity towards another and my differing beliefs. Christians may not agree with the religious beliefs of a Hindu or Muslim, but that does not mean that a Christian cannot peacefully work cooperatively with someone of a different faith. In fact, we do it every day. But a Christian could not be required to affirm the truth of a Hindu or Muslim's beliefs, as that would conflict with the Christian's own beliefs.

I see no difference in the gender identity conflict. Christians can and should be able to peacefully work and interact with those who assert a gender identity different from their biological sex. But the Christian must not be required to affirm as truth a person's mistaken gender identity.

Without an Accommodation, the Brownsburg School Corporation's continually changing policies, which appear to be based upon the shifting sands, make impossible a congruence between the two world views of my own and others' faiths and the compelled speech of gender alteration.

For the numerous reasons that I have stated here and over the past year, I request that the School Corporation continue my employment and maintain the present Accommodation that will allow me to continue to perform my work, which I hope that you will agree has brought positive recognition and favorable results to the school.

Respectfully,

John Kluge

Submitted to Jodi Gordon on Friday, May 25, 2018