## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JOHN M. KLUGE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1: 19-cv-2462-JMS-DLP |
| | ) | |
| BROWNSBURG COMMUNITY | ) | |
| SCHOOL CORPORATION, | ) | |
| DR. JAMES SNAPP, Superintendent | ) | |
| of Brownsburg Community School | ) | |
| Corporation, in his official capacity; | ) | |
| PHIL UTTERBACK, President of the | ) | |
| Brownsburg Community School | ) | |
| Corporation School Board, in his | ) | |
| official capacity; JODI GORDON, | ) | |
| Human Resources Director of | ) | |
| Brownsburg Community School | ) | |
| Corporation, in her official capacity; | ) | |
| and DR. BRET DAGHE, Principal of | ) | |
| Brownsburg Community School | ) | |
| Corporation High School, in his | ) | |
| official capacity, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM IN SUPPORT OF INDIANA YOUTH GROUP, INC.'S
## MOTION TO INTERVENE AS A DEFENDANT

# TABLE OF CONTENTS

I.      INTRODUCTION.................................................................................................. 1

II.     BACKGROUND ................................................................................................... 3

    A.   Plaintiff's Refusal to Comply with BCSC's School Records Policy. .................. 3

    B.   IYG Represents and Serves the Brownsburg High School LGBTQ
        Community.................................................................................................. 6

III.    ARGUMENT......................................................................................................... 8

    A.   IYG Satisfies the Requirements for Intervention as of Right. ............................ 8

        1.   IYG's Motion to Intervene Is Timely...................................................... 8

        2.   IYG Has a Direct Interest in this Action that May Be Impaired
            Absent Intervention.................................................................................. 9

        3.   Defendants May Not Adequately Represent IYG's Interests.................12

    B.   IYG Satisfies the Requirements for Permissive Intervention. ............................15

    C.   IYG Should Be Permitted to Move to Dismiss Plaintiff's First Amended
        Complaint. ..........................................................................................17

IV.     CONCLUSION....................................................................................................17

# TABLE OF AUTHORITIES

**Cases**

*Builders Ass'n of Greater Chi. v. City of Chi.*, 170 F.R.D. 435 (N.D. Ill. 1996) ............. 10, 12, 13

*City of Chi. v. FEMA*, 660 F.3d 980 (7th Cir. 2011) ...................................................... 12, 15, 16

*Dave's Detailing, Inc. v. Catlin Ins. Co.*, No. 11-cv-1585,  2012 WL 5377880,  at *2 (S.D. Ind. Oct. 31, 2012) ........................................................................................................................... 8

*Doe, et al. v. Boyertown Area Sch. Dist., et al.*, No. 17-cv-1249 (E.D. Pa. May 24, 2017) ..... 3, 16

*Flying J, Inc. v. Van Hollen*, 578 F.3d 569 (7th Cir. 2009) ........................................................ 10

*In re Disc. Zone Sec. Litig.*, 181 F.R.D. 582 (N.D. Ill. 1998) ............................................... 14, 15

*Kleissler v. U.S. Forest Serv.*, 157 F.3d 964 (3d Cir. 1998) .................................................. 13, 16

*Levin v. Miller*, No. 11-cv-1264, 2012 WL 1982287 (S.D. Ind. June 1, 2012) ........................... 8

*Meriwether v. Trustees of Shawnee State University*, No. 18-cv-753,  2019 WL 2052110  (S.D. Ohio May 9, 2019) .......................................................................................... 3, 9, 11, 14

*Miami Tribe of Okla. v. Walden*, 206 F.R.D. 238 (S.D. Ill. 2001) ........................................ 8, 12

*Parents for Privacy, et al. v. Sessions, et al.*, No. 17-cv-1813 (D. Or. Apr. 19, 2018) ............ 3, 16

*Reich v. ABC/York-Estes Corp.*, 64 F.3d 316, 321 (7th Cir. 1995) ......................................... 7, 8

*Sec. Ins. Co. of Hartford v. Schipporeit, Inc.*, 69 F.3d 1377 (7th Cir. 1995) .................. 14, 15, 16

*Trbovich v. United Mine Workers of Am.*, 404 U.S. 528 (1972) ................................................ 12

*Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034  (7th Cir. 2017) ................................................................................................................................. 13

**Rules**

Fed. R. Civ. P. 24(a)(2) ........................................................................................................... 2, 7

Fed. R. Civ. P. 24(b)(1) .............................................................................................................. 14

Fed. R. Civ. P. 24(b)(3) ...................................................................................................14

Fed. R. Civ. P. 24(c) .......................................................................................................17

Indiana Youth Group, Inc. ("IYG") moves to intervene as a defendant as of right pursuant to Rule 24(a)(2) or, alternatively, for permissive intervention under Rule 24(b)(1). Counsel for Plaintiff John Kluge has informed IYG that Plaintiff opposes IYG's request for intervention. Counsel for Defendants Brownsburg Community School Corporation ("BCSC"), Dr. James Snapp, Phil Utterback, Jodi Gordon, and Dr. Brett Daghe has informed IYG that Defendants do not object IYG's request for intervention as of right or IYG's request for permissive intervention.

## I.    INTRODUCTION

IYG is a nonprofit organization whose primary mission is to promote the safety and healthy development of LGBTQ youth in Indiana schools and communities. As a part of that mission, IYG manages a network of student-run groups across Indiana that provide safe spaces for LGBTQ students, including a member student group at Brownsburg High School (the "Equality Alliance"). An order granting Plaintiff the relief he seeks would undermine IYG's core mission and harm transgender and gender nonconforming students at Brownsburg High School (including those who are members of the Equality Alliance). It would also force IYG to divert resources from its other programs to provide counseling and support for transgender students who will be negatively affected. Accordingly, IYG requests that the Court grant its motion to intervene pursuant to Rule 24.

Defendant BCSC is an Indiana community school corporation that operates Brownsburg High School. Before the 2017–2018 school year, BCSC adopted a policy and practice allowing a student's name and gender to be corrected in the official school database upon the request of the student's parent that is accompanied by a letter from a healthcare professional ("School Records

Policy" or "Policy").  Aidyn Sucec[1]—a transgender student who was enrolled at Brownsburg High School, a member of the student-run Equality Alliance, and an active participant with IYG—had his name and gender corrected in the database pursuant to the Policy.  Although his other teachers complied with the School Records Policy and accurately referred to Aidyn by the name recorded in the school's database, Plaintiff John Kluge refused to use the name Aidyn because of his personal belief that doing so "promote[d] a destructive lifestyle" and "contradicts … his sincerely-held religious beliefs."  [Filing No. 15 at 7 (First Amended Complaint ("FAC") ¶ 37).]  Following Plaintiff's resignation from Brownsburg High School, Plaintiff filed this lawsuit alleging religious discrimination under Title VII of the Civil Rights Act of 1964[2] ("Title VII"), violations of the First and Fourteenth Amendments of the United States Constitution, and various state-based claims.

IYG respectfully requests that the Court grant its motion to intervene.  Under Rule 24, a party may intervene when (among other things) it has an interest in the lawsuit that may be impaired and the existing parties do not adequately represent that interest.  *See* Fed. R. Civ. P. 24(a)(2).  Here, IYG represents the interests of transgender and gender nonconforming students at Brownsburg High School.  Plaintiff seeks to demean these students, deprive them of dignity, humiliate them in front of their peers, and interfere with their education by refusing to refer to them by their names or otherwise treat them in a nondiscriminatory manner, simply because they are transgender.  The relief Plaintiff seeks will therefore hamper IYG's mission of promoting the safety and healthy development of LGBTQ youth in Indiana schools and diminish the resources IYG needs to fulfill its mission.  Defendants do not adequately represent those interests because

---

[1] Pursuant to Fed. R. Civ. P. 5.2(h), Aidyn Sucec, a minor, waives the privacy protections afforded by Fed. R. Civ. P. 5.2(a).  Both Aidyn Sucec and his mother, Laura Sucec, are represented by undersigned counsel.

[2] 42 U.S.C. § 2000e *et seq.*

the motivations of a public school district—answering to multiple stakeholders—are different from the motivations of IYG as an organization dedicated solely to protecting LGBTQ youth and the transgender students it represents. For instance, IYG intends to argue that Plaintiff's claims should be dismissed because transgender students have the *right* to be called by correct names and pronouns under federal law. Defendants, by contrast, may be reluctant to advance such arguments because that could expose them to future obligations beyond this lawsuit.

Federal courts around the country have granted intervention in similar circumstances. For example, in *Meriwether v. Trustees of Shawnee State University*, No. 18-cv-753, 2019 WL 2052110, at *13 (S.D. Ohio May 9, 2019), the Southern District of Ohio granted intervention to a campus LGBTQ organization under virtually identical facts. A professor sued a state university challenging the university's policy requiring employees to refer to transgender students using pronouns that aligned with the students' gender identity. The court granted the campus LGBTQ organization intervention as of right because the organization had significant interests in the school's policy and the university did not adequately represent those interests. Other federal courts have likewise allowed LGBTQ organizations to intervene when the plaintiff's requested relief threatened their core mission and the students they sought to protect. *See, e.g.*, Filing No. 65, *Parents for Privacy, et al. v. Sessions, et al.*, No. 17-cv-1813 (D. Or. Apr. 19, 2018); Filing No. 29, *Doe, et al. v. Boyertown Area Sch. Dist., et al.*, No. 17-cv-1249 (E.D. Pa. May 24, 2017). IYG respectfully requests that the Court grant this motion for the same reasons.

## II.    BACKGROUND

### A.    Plaintiff's Refusal to Comply with BCSC's School Records Policy.

Before the start of the 2017–2018 academic year, BCSC began requiring that its employees address each student using the name listed in the school's "PowerSchool" database and the pronouns reflecting the student's gender in PowerSchool. [Filing No. 15 at 7 (FAC ¶¶ 38–39);

Filing No. 15-4 at 4, 6.] A student's name and gender can be corrected in PowerSchool "with a letter from the student's parent(s) and a letter from a health care professional." [Filing No. 15-4 at 6.] BCSC stated that the purpose of the policy is "to make all students feel welcome and accepted in the public school environment." [Filing No. 15-4 at 9.]

Aidyn Sucec enrolled as a freshman at Brownsburg High School in fall 2017, the first school year the School Records Policy was in effect. [Filing No. 22-3 at 3–4 (Declaration of Aidyn Sucec ("Aidyn Decl.") ¶¶ 8, 11).] Aidyn is transgender: although he was assigned "female" at birth, his gender identity is male. [Filing No. 22-3 at 2 (Aidyn Decl. ¶¶ 5, 6).] In March 2017, before his freshman year at Brownsburg High School, Aidyn came out as transgender and also was medically diagnosed with gender dysphoria. [*Id.*] During the spring of 2017, as part of treatment for gender dysphoria, Aidyn began socially transitioning to male.[3] [*Id.*] He corrected his name to "Aidyn" instead of the traditionally feminine name he was assigned at birth. [Filing No. 22-3 at 2 (Aidyn Decl. ¶ 6).] Almost immediately, Aidyn's gender dysphoria significantly improved. [Filing No. 22-3 at 3 (Aidyn Decl. ¶ 7).]

To help ensure a positive and healthy introduction to high school, Aidyn's mother wanted Brownsburg teachers to know her child as Aidyn. [Filing No. 22-2 at 2 (Declaration of Laura Sucec ("Laura Decl.") ¶ 5).] Before the school year began, and in accordance with BCSC's standard procedure, Aidyn's mother formally requested that BCSC change Aidyn's name in the PowerSchool database to "Aidyn" and his gender to "male." [Filing No. 22-2 at 2 (Laura Decl. ¶ 6).] BCSC complied with the request. [*Id.*] When Aidyn started at Brownsburg High School in

---

[3] Social transition describes the process by which transgender people adopt (among other things) names, pronouns, grooming habits, and clothing that more accurately correspond with their gender identity. It is at this time that many transgender people also express their desire to be treated in a manner consistent with their gender identity to family, friends, and peers.

4

fall 2017, all of his teachers called him Aidyn—except for Plaintiff. [Filing No. 22-2 at 2–3 (Laura Decl. ¶¶ 7, 8).]; *see also* Filing No. 22-3 at 3 (Aidyn Decl. ¶ 9).] Plaintiff claims that he refused to use Aidyn's name because his "religious beliefs include a belief that it is sinful to promote gender dysphoria." [Filing No. 15 at 5 (FAC ¶ 23).]

During the 2017–2018 school year, Aidyn was enrolled in Plaintiff's orchestra class. From the beginning, however, Plaintiff refused to call Aidyn by his correct name. [Filing No. 22-3 at 4 (Aidyn Decl. ¶ 12).] Rather, on the first day of class, Plaintiff left folders of course materials for the substitute teacher to distribute to students, and Aidyn's folder was labeled with his prior and incorrect name (*i.e.*, his "dead name"). [Filing No. 22-3 at 3–4 (Aidyn Decl. ¶ 11).] When the substitute teacher called out Aidyn's dead name, Aidyn was humiliated. [*Id.*] In the weeks that followed, Plaintiff addressed Aidyn by only his last name, without using any honorific such as "Mr." [Filing No. 22-3 at 4 (Aidyn Decl. ¶ 12).] For instance, he referred to Aidyn as "Sucec" rather than "Aidyn" or even "Mr. Sucec." [*Id.*] However, Plaintiff would sometimes refer to other non-transgender students in the same class by their last names with honorifics (such as "Mr. Smith" or "Ms. Smith"), and less frequently, by their first names. [*Id.*]

Plaintiff's behavior was deeply upsetting to his students. Transgender students felt "stigmatized, singled out and excluded by Mr. Kluge's refusal to address them by their names, correct pronouns and honorifics." [Filing No. 22-1 at 6 (Declaration of Christine Paulsen ("Paulsen Decl.") ¶ 19); *see also* Filing No. 22-3 at 4 (Aidyn Decl. ¶ 13).] Aidyn was so traumatized that he decided to quit orchestra class altogether and abandon playing an instrument that once brought him joy. [Filing No. 22-3 at 4 (Aidyn Decl. ¶ 14); *see also* Filing No. 22-2 at 3 (Laura Decl. ¶ 9).]

Before the start of the 2018–2019 school year, Plaintiff resigned. [Filing No. 15 at 11–12 (FAC ¶¶ 58–62).] When Aidyn returned to school, his peers harassed and bullied him, calling him "the fag that got [Plaintiff] fired." [Filing No. 22-3 at 4–5 (Aidyn Decl. ¶ 15).] In light of Plaintiff's treatment and the harassment it precipitated, Aidyn and his mother decided that it was in his best interest to withdraw from Brownsburg High School. [Filing No. 22-3 at 5 (Aidyn Decl. ¶ 16); *see also* Filing No. 22-2 at 4 (Laura Decl. ¶ 12).]

### B.   IYG Represents and Serves the Brownsburg High School LGBTQ Community.

IYG is a not-for-profit organization whose primary mission is to promote the safety and healthy development of LGBTQ youth in Indiana schools and communities, including BCSC students. [Filing No. 22-1 at 2 (Paulsen Decl. ¶ 4).] For example, IYG provides services and programs to support the mental health and wellness of LGBTQ youth, including services and programs that are offered exclusively to transgender youth. [Filing No. 22-1 at 2–4 (Paulsen Decl. ¶¶ 5–10).] IYG also educates Indiana school officials, parents, and community members about transgender inclusivity and "work[s] with Indiana schools to develop school policies requiring school officials to treat students in a manner consistent with the students' gender identity, including name and pronoun usage policies for transgender students." [Filing No. 22-1 at 4 (Paulsen Decl. ¶ 12).] When Indiana school employees have refused to address transgender students by their correct names and pronouns, the students have frequently reported to IYG that they feel "ostracized, stigmatized, and unsafe at school[]." [Filing No. 22-1 at 2–3 (Paulsen Decl. ¶ 21).] IYG staff members have helped these students cope with these painful feelings. [*Id.*]

6

IYG is also responsible for managing the Indiana GSA Network,[4] an association of over 50 youth-led organizations that seek to create safe spaces for LGBTQ youth and address anti-LGBTQ harassment and discrimination. [Filing No. 22-1 at 5 (Paulsen Decl. ¶¶ 14–15).] At Brownsburg High School, the student-run GSA is known as the "Equality Alliance" and is a member of the Indiana GSA Network. [Filing No. 22-1 at 6 (Paulsen Decl. ¶ 17).] IYG has worked directly with the Brownsburg Equality Alliance and its student members since 2011, and students from the Brownsburg Equality Alliance have regularly participated in IYG's programs. [*Id.*] Aidyn Sucec was the freshman representative of the Brownsburg Equality Alliance and still participates actively in IYG's programs and services. [Filing No. 22-3 at 5 (Aidyn Decl. ¶ 18).] The Equality Alliance continues to be active at Brownsburg High School.

In addition to managing the Brownsburg Equality Alliance, IYG has developed close ties with transgender student members at Brownsburg High School. IYG's Indianapolis headquarters is near Brownsburg, and transgender students from Brownsburg High School and other BCSC schools regularly visit IYG's LGBTQ Youth Activity Center and take part in IYG's programs and services. [Filing No. 22-1 at 2–3, 6 (Paulsen Decl. ¶¶ 5, 7, 17); *see also* Filing No. 22-3 at 6 (Aidyn Decl. ¶ 20).] IYG staff has spent time counseling transgender students from Brownsburg High School who described feeling stigmatized and excluded by Plaintiff's refusal to address them in a manner consistent with their gender identity. [Filing No. 22-1 at 3 (Paulsen Decl. ¶ 7).] Through these experiences and working regularly with LGBTQ youth, IYG has become familiar with Plaintiff's conduct, the harm it caused Brownsburg High School students, and the critical importance of calling transgender students by correct names and pronouns.

---

[4] GSA stands for "gender sexuality alliance" and sometimes are referred to as an "equality alliance." [Filing No. 22-1 at 5 (Paulsen Decl. ¶ 14).]

## III.     ARGUMENT

### A.     IYG Satisfies the Requirements for Intervention as of Right.

Under Rule 24, a party may intervene as of right if (1) the party files a "timely motion" to intervene, (2) the party "claims an interest relating to the property or transaction that is the subject of the action," (3) the party "is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest," and when (4) "existing parties" do not "adequately represent that interest." Fed. R. Civ. P. 24(a)(2). In evaluating a motion to intervene, courts "must accept as true the non-conclusory allegations of the motion." *Reich v. ABC/York-Estes Corp.*, 64 F.3d 316, 321 (7th Cir. 1995). "Courts should construe Rule 24(a)(2) liberally and should resolve doubts in favor of allowing intervention." *Miami Tribe of Okla. v. Walden*, 206 F.R.D. 238, 241 (S.D. Ill. 2001). As demonstrated below, IYG satisfies each requirement to intervene as of right.

### 1.     IYG's Motion to Intervene Is Timely.

"The test for timeliness is essentially one of reasonableness: 'potential intervenors need to be reasonably diligent in learning of a suit that might affect their rights, and upon so learning they need to act reasonably promptly.'" *Reich*, 64 F.3d at 321. Courts "also consider the prejudice to the original parties if intervention is permitted and the prejudice to the intervenor if his motion is denied." *Id.* Here, IYG's motion is timely because IYG acted with reasonable diligence, filing its motion shortly after Plaintiff initiated this action. Furthermore, this litigation is still in its early stages: Defendants have not responded to Plaintiff's Amended Complaint and discovery has not commenced. There is thus no possibility of prejudice to the original parties if intervention is permitted. *See, e.g., Dave's Detailing, Inc. v. Catlin Ins. Co.*, No. 11-cv-1585, 2012 WL 5377880, at *2 (S.D. Ind. Oct. 31, 2012) (granting motion to intervene filed shortly after defendant filed answer); *Levin v. Miller*, No. 11-cv-1264, 2012 WL 1982287, at *2 (S.D. Ind. June 1, 2012)

8

(granting motion to intervene filed six months after plaintiff filed complaint and fifteen days after plaintiff filed sur-reply to defendants' motion to dismiss).

### 2.   IYG Has a Direct Interest in this Action that May Be Impaired Absent Intervention.

IYG also has a "direct, significant legally protectable" interest in this case that could be impaired absent intervention. *Reich*, 64 F.3d at 322 (internal quotation marks omitted). IYG's mission is to protect and support LGBTQ youth in Indiana schools and communities. Plaintiff's requested relief undermines and frustrates that core mission by (i) ostracizing the very students at Brownsburg High School that IYG represents and seeks to protect and (ii) requiring IYG to divert resources from its other programs and services to provide counseling and support for transgender students who will be negatively affected. *See Meriwether*, 2019 WL 2052110, at *6, *12 (allowing LGBTQ organization to intervene because it "represents transgender students" and "advocates for and engages in public education efforts on issues affecting LGBTQ people").[5]

*Plaintiff's Requested Relief Threatens Harm to Transgender Students at Brownsburg.* Christine Paulsen, the CEO of IYG, explains that "[r]eferring to a student using the name and pronouns that align with the student's gender identity is essential to . . . creating a safe environment that promotes the healthy development of transgender students and allows them to realize their full

---

[5] IYG is not required to establish Article III standing in order to intervene because it does not intend to "pursue relief that is different from" the relief sought by Defendants—dismissal of this lawsuit. *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1651 (2017). Even if standing were required, IYG has both direct and associational standing for the same reasons that it has a "direct, significant legally protectable" interest in this action. *See, e.g., Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (an organization has "suffered [an] injury in fact" for purposes of direct standing when the conduct at issue has "perceptibly impaired" the organization's ability to provide its programs and services); *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977) (an association has standing when "(1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation in the lawsuit of each of the individual members").

9

potential in school." [Filing No. 22-1 at 7 (Paulsen Decl. ¶ 21).] When teachers refuse to use correct names and pronouns, "transgender students in Indiana schools frequently report to IYG staff feeling ostracized, stigmatized, and unsafe at school[]." [*Id.*]; *see also* Stephen T. Russell, et al., *Chosen Name Use Is Linked to Reduced Depressive Symptoms, Suicidal Ideation, and Suicidal Behavior Among Transgender Youth*, 63 Journal of Adolescent Health 503–505, 505 (2018) (concluding that "[t]ransgender youth who were able to use their chosen names in multiple contexts reported fewer depressive symptoms and less suicidal ideation and behavior").

Aidyn Sucec's experience with Plaintiff underscores the critical importance to transgender students of being called by correct names and pronouns. When Plaintiff insisted on calling Aidyn by his prior and incorrect name, and later called Aidyn solely by only his last name in a transparent effort not to use his correct name, Aidyn was so humiliated and traumatized that he decided to stop enrolling in orchestra. [Filing No. 22-3 at 3–4 (Aidyn Decl. ¶¶ 11, 14); Filing No. 22-2 at 3 (Laura Decl. ¶ 9).]

IYG's mission is to protect students like Aidyn, and ensure a healthy environment for LGBTQ youth by, for instance, helping Indiana schools develop "policies to ensure school officials treat students in a manner consistent with the students' gender identity, including policies addressing student names, pronouns, and school records." [Filing No. 22-1 at 4 (Paulsen Decl. ¶ 12).] This mission would be seriously impaired if Plaintiff prevailed and teachers were permitted to single out transgender students in the classroom for differential treatment, and humiliate them by refusing to refer to them by their names. Additionally, IYG represents the interests of transgender and gender nonconforming students at Brownsburg High School because it manages and administers the Brownsburg Equality Alliance which is dedicated to serving the interest of transgender students (among others). [Filing No. 22-1 at 8 (Paulsen Decl. ¶ 23).] In prior years

10

the Equality Alliance has included transgender student members and it is expected to have transgender student members in the ongoing school year. [Filing No. 22-3 at 1–2 (Aidyn Decl. ¶ 2).] Courts routinely permit organizations to intervene to defend a policy when, as here, the organizations' members directly benefit from a challenged policy and would be harmed if the policy were invalidated. *See Flying J, Inc. v. Van Hollen*, 578 F.3d 569, 572 (7th Cir. 2009) (association of gasoline retailers had right to intervene to defend a state law because its members were "the statute's direct beneficiaries" and members would be harmed if the law were invalidated); *Builders Ass'n of Greater Chi. v. City of Chi.*, 170 F.R.D. 435, 440-41 (N.D. Ill. 1996) (associations representing the interests of minority- or women-owned businesses had the right to intervene to defend a city program because their members were the "direct beneficiaries" of the program and would suffer "significant" harms if the program were invalidated).

   *Plaintiff's Requested Relief Threatens to Divert IYG's Resources.* In addition to harming transgender students whose interests IYG represents, the outcome of this case would also constrain how IYG allocates its resources. After Plaintiff refused to call transgender students by correct names and pronouns, IYG was required to devote resources to supporting affected students at Brownsburg High School. For instance, IYG staff spent time counseling transgender Brownsburg High School students who felt stigmatized and excluded by Plaintiff's refusal to address them in a manner consistent with their gender identity. [Filing No. 22-1 at 6 (Paulsen Decl. ¶ 19).] If Plaintiff prevails in this litigation, IYG would be required to devote additional time and resources to supporting transgender and gender nonconforming students at BCSC who are negatively affected. [Filing No. 22-1 at 7–8 (Paulsen Decl. ¶ 22).] Those resources would come at the expense of IYG's other programs and services for LGBTQ youth across Indiana. [*Id.*]

11

Courts have found direct, significant legally protectable interests under circumstances similar to IYG's. Notably, the recent *Meriwether* decision allowed an LGBTQ organization to intervene as of right in a suit challenging a university policy requiring employees to refer to transgender students using pronouns that align with their gender identity. The court determined that the organization "represents transgender students" and "advocates for and engages in public education efforts on issues affecting LGBTQ people." *Meriwether*, 2019 WL 2052110, at *6, *12. The organization had the right to intervene because the organization and its transgender members "have a significant interest in seeing that the [school's] Non-discrimination Policy is not struck down on its face and as applied," and "[a]n adverse ruling could subject them to disparate treatment and cause other detrimental impacts." *Id.* at *9-10. IYG has the right to intervene for the same reason: IYG and the transgender students whose interests it represents have a significant interest in BCSC's requirement that staff refer to students by correct names and pronouns, and a ruling for Plaintiff would subject transgender students to serious psychological harm. *See also Builders Ass'n of Greater Chi.*, 170 F.R.D. at 440–41 (allowing associations to intervene as of right to defend a city program that benefited the businesses whose interests the associations represented).

### 3.    Defendants May Not Adequately Represent IYG's Interests.

A party seeking to intervene as of right must show that the existing parties' representation of its interest "may be" inadequate, and "the burden of making that showing should be treated as minimal." *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972). "[T]he applicant should be treated as the best judge of whether the existing parties adequately represent his or her interests, and . . . any doubt regarding adequacy of representation should be resolved in favor of the proposed intervenors." *Miami Tribe of Okla.*, 206 F.R.D. at 243 (quoting 6 James Wm. Moore et al., Moore's Federal Practice § 24.03[4][a] (3d ed.)). "A proposed intervenor has made a sufficient showing that representation may be inadequate under Rule 24(a)(2) if it

demonstrates that the existing parties' interests are not completely identical to and may come into conflict with its own interests." *Id.* (citing *Trbovich*, 404 U.S. at 538 n.10). This requirement is satisfied, for instance, if the original party "does not advance a ground that if upheld by the court would confer a tangible benefit on an intervenor who wants to litigate that ground." *City of Chi. v. FEMA*, 660 F.3d 980, 985 (7th Cir. 2011).

Here, for at least two reasons, Defendants may inadequately represent IYG's interests. *First*, Defendants and IYG may advance different legal arguments in the litigation. IYG intends to argue that transgender students have the *right* to be called by correct names and pronouns under federal law, including Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et. seq.* ("Title IX") and the Due Process and Equal Protection Clauses of the Fourteenth Amendment. By contrast, Defendants may decide that advancing such arguments is unnecessary to secure a dismissal of Plaintiff's claims. Moreover, Defendants may be reluctant to advance legal arguments that could acknowledge legal obligations on them beyond this lawsuit. Seeking to avoid that outcome, Defendants may pursue a legal strategy that is narrowly focused on the dismissal of Plaintiff's claims rather than protecting the broader rights of transgender students. *See Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1049 (7th Cir. 2017) ("A policy that . . . punishes [an] individual for his or her gender non-conformance . . . violates Title IX.").

*Second*, IYG and Defendants have different priorities that will affect their respective litigation strategies. Whereas IYG is focused squarely on the safety and healthy development of LGBTQ youth in Indiana schools and communities, Defendants might balance the interests of transgender students against the interests of teachers, parents, and other stakeholders who may be unaware of or hostile to the needs of LGBTQ youth, and uninformed about the ways in which an

inclusive school environment both improves educational attainment and fosters a sense of security and well-being for all students. For instance, Defendants might seek to settle this case or modify BCSC's records policy in a way that strikes a balance between the many interests they represent, but is not in the best interests of their transgender students. By contrast, IYG will be focused on protecting the interests of transgender students at BCSC schools and demonstrating how Plaintiff's conduct—and requested relief—presents a serious risk of harm to those students. *See Builders Assoc. of Greater Chi.*, 170 F.R.D. at 441 (associations representing the interests of minority- or women-owned businesses were not adequately represented by the city because the associations "are likely to supplement the City's evidence of past and present discrimination with anecdotal evidence of the experiences of their members"); *Kleissler v. U.S. Forest Serv.*, 157 F.3d 964, 973–74 (3d Cir. 1998) ("the government represents numerous complex and conflicting interests," and "[t]he straightforward business interests asserted by intervenors here may become lost in the thicket of sometimes inconsistent governmental policies").

Similar concerns persuaded the court in *Meriwether* that the university did not adequately represent the interests of the campus LGBTQ organization. The court observed that the university "argues that [the professor] did not engage in protected speech, follow university directives, and comply with his obligations as an employee of a public university," but "does not defend against plaintiff's claims on the ground plaintiff violated [the student]'s constitutional rights, and [the university] does not otherwise defend the rights of [the student] and other transgender students which are at issue in this lawsuit." *Meriwether*, 2019 WL 2052110, at *12. By contrast, the LGBTQ organization had an "interest in protecting the rights of transgender students" and was likely to assert those rights in defense of the university's policy. *Id.* Moreover, there was "a reasonable probability" that the university would "emphasize different harms" than the LGBTQ

14

organization would.  *Id.*  Thus, the court found that the organization "ha[d] articulated specific and reasonable concerns that [the university] will not present [its] relevant defenses under Title IX, the Equal Protection Clause, and other anti-discrimination laws that bar disparate treatment of students solely because they are transgender."  *Id.*

### B.    IYG Satisfies the Requirements for Permissive Intervention.

IYG also satisfies the requirements for permissive intervention.  Under Rule 24(b), "[o]n timely motion, the court may permit anyone to intervene who . . . has a claim or defense that shares with the main action a common question of law or fact."  Fed. R. Civ. P. 24(b)(1).  "In exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights."  Fed. R. Civ. P. 24(b)(3).  Courts in this Circuit have observed that this Rule "boils down to three requirements: (1) the applicant must share a common question of law or fact with a party, (2) its application must be timely, and (3) the court must have independent jurisdiction over its claims."  *In re Disc. Zone Sec. Litig.*, 181 F.R.D. 582, 598 (N.D. Ill. 1998) (citing *Sec. Ins. Co. of Hartford v. Schipporeit, Inc.*, 69 F.3d 1377, 1381 (7th Cir. 1995)).  "Other than these requirements, 'intervention under 24(b)(2) is entirely discretionary. . . . In exercising that discretion, the court must give some weight to the impact of the intervention on the rights of the original parties.'"  *Id.* (quoting *Sec. Ins. Co. of Hartford*, 69 F.3d at 1381) (alteration in original).  The Seventh Circuit has also noted that permissive intervention is fundamentally "about economy in litigation."  *City of Chi.*, 660 F.3d at 987.

IYG satisfies each requirement for permissive intervention.  First, IYG's defenses share common questions of law and fact with the main action.  For example, Plaintiff has alleged that Defendants' conduct and Student Records Policy violate Title VII, the First Amendment, and Indiana law.  IYG intends to argue that Defendants did not violate these laws and that Plaintiff's claims should be dismissed.  Second, as discussed above, IYG's request to intervene is timely.

15

Third, IYG does not intend to assert any counterclaims in this action, so there is no need for any independent showing of jurisdiction. Thus, IYG satisfies all three requirements for permissive intervention.

Permitting intervention would also promote judicial economy. "Perhaps the most obvious benefits of intervention in general are the efficiency and consistency that result from resolving related issues in a single proceeding," rather than "creat[ing] additional litigation and the possibility of conflicting results." *Sec. Ins. Co. of Hartford*, 69 F.3d at 1381. Here, if the Court denied intervention and granted judgment for Plaintiff (or the parties settled), Plaintiff could be reinstated at Brownsburg High School and allowed to refuse to call students by correct names and pronouns. Other BCSC employees might also refuse to use students' correct names and pronouns. IYG or other affected parties might then sue Defendants for discrimination. If the court in the second action entered judgment barring such discrimination, its decision could be in tension, or outright conflict, with the Court's decision in this action. To avoid such serial and potentially conflicting litigation, this Court should permit IYG to intervene and thus "enable[] the court to address [the] important issues in this case once, with fairness and finality." *Id.*; *see also City of Chi.*, 660 F.3d at 986–87 ("[W]e have no basis for thinking that it would be as efficient to litigate this three-cornered dispute in two lawsuits rather than one.").

In other cases involving challenges to school policies protecting transgender students, courts have regularly permitted intervention by LGBTQ-focused public interest organizations and associations of GSA clubs.[6] *See, e.g.*, Filing No. 65, *Parents for Privacy, et al. v. Sessions, et al.*,

---

[6] Similarly, courts have routinely granted permissive intervention to transgender students to argue, for example, that their rights under Title IX and the Equal Protection Clause protect them from discrimination based on sex. *See, e.g.*, *Privacy Matters v. U.S. Dep't of Educ.*, No. 16-cv-3015, 2016 WL 6436658, at *2–4 (D. Minn. Oct. 27, 2016); *Bd. of Educ. of the Highland Local Sch. Dist. v. U.S. Dept. of Educ.*, No. 16-cv-524, 2016 WL 4269080, at *4 (S.D. Ohio Aug. 15, 2016).

No. 17-cv-1813 (D. Or. Apr. 19, 2018) (granting permissive intervention to Basic Rights Oregon in lawsuit challenging school policy allowing transgender students to use restroom and locker facilities that correspond with their gender identity); Filing No. 29, *Doe, et al. v. Boyertown Area Sch. Dist., et al.*, No. 17-cv-1249 (E.D. Pa. May 24, 2017) (granting intervention to Pennsylvania Youth Congress in lawsuit challenging school policy allowing transgender students to use restroom and locker facilities consistent with their gender identity).   Indeed, because IYG represents transgender students at Brownsburg High School who have a strong interest in being called by correct names and pronouns, permitting IYG to intervene would vindicate "a major premise of intervention—the protection of third parties affected by pending litigation." *Kleissler*, 157 F.3d at 971.

## C.    IYG Should Be Permitted to Move to Dismiss Plaintiff's First Amended Complaint.

Rule 24 requires that a motion to intervene "be accompanied by a pleading that sets out the claim or defense for which intervention is sought." Fed. R. Civ. P. 24(c).  Accordingly, IYG has submitted a Conditional Answer to the Court.  [*See* Filing No. 22-4 (Conditional Answer).] Nonetheless, IYG intends to move to dismiss Plaintiff's First Amended Complaint under Rule 12(b)(6).  IYG therefore respectfully requests that, if its motion to intervene is granted, the Court permit it to file a motion to dismiss and refrain from entering its Conditional Answer on the docket.

## IV.    CONCLUSION

For the foregoing reasons, IYG's motion for intervention as of right or, in the alternative, permissive intervention should be granted.

August 22, 2019

Respectfully submitted,

*/s/ Barbara J. Baird*

Barbara J. Baird
The Law Office of Barbara J. Baird
445 N. Pennsylvania St.
Indianapolis, IN 46204
Phone: (317) 854-5400
bjbaird@bjbairdlaw.com

Paul Castillo♦
Camilla Taylor*♦
Taylor Brown**♦
Lambda Legal
3500 Oak Lawn Avenue
Suite 500
Dallas, TX 75219-6722
Phone: (214) 219-8585
pcastillo@lambdalegal.org
ctaylor@lambdalegal.org
tbrown@lambdalegal.org
*Chicago Office
** Atlanta Office

D. Jean Veta♦
Henry Liu♦
William Isasi♦
Isaac Belfer♦
COVINGTON & BURLING, LLP
One CityCenter
850 Tenth St., N.W.
Washington, D.C. 20001
Phone: (202) 662-6000
Fax: (202) 662-6291
jveta@cov.com
hliu@cov.com
wisasi@cov.com
ibelfer@cov.com

♦ *Pro hac vice* motion forthcoming

*Counsel for Indiana Youth Group, Inc.*

18