IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JOHN M. KLUGE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:19-cv-02462-JMS-DLP |
| | ) | |
| BROWNSBURG COMMUNITY | ) | |
| SCHOOL CORPORATION, | ) | |
| DR. JAMES SNAPP, Superintendent | ) | |
| of Brownsburg Community School | ) | |
| Corporation, in his official capacity; | ) | |
| PHIL UTTERBACK, President of the | ) | |
| Brownsburg Community School | ) | |
| Corporation School Board, in his | ) | |
| official capacity; JODI GORDON, | ) | |
| Human Resources Director of | ) | |
| Brownsburg Community School | ) | |
| Corporation, in her official capacity; | ) | |
| and DR. BRET DAGHE, Principal of | ) | |
| Brownsburg Community School | ) | |
| Corporation High School, in his | ) | |
| official capacity, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' BRIEF IN SUPPORT OF
MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**

I.    *Introduction and overview of Kluge's factual allegations.*

Plaintiff John Kluge filed this lawsuit after resigning his position as a music and orchestra

teacher at the high school of Defendant Brownsburg Community School Corporation

("Brownsburg") in the Spring of 2018. (Dkt. 15-2.) Kluge claims he resigned because

Brownsburg threatened termination if he did not address his students by their names as listed in

Brownsburg's student database. (Dkt. 15, ¶¶51-57.) Kluge asserts that following this directive

makes him complicit in "communicating a community school corporation-mandated ideological

message regarding gender dysphoria that he does not believe . . . and would force him to violate [] his sincerely-held religious beliefs." (*Id.*, ¶37.)

Kluge taught music and orchestra at Brownsburg high school since August 2014. (Dkt. 15, ¶21.) Kluge is a Christian whose faith "governs the way he thinks about human nature, marriage, gender, sexuality, morality, politics, and social issues . . . ." (*Id.*, ¶32.) Kluge believes that gender "is fixed in each person from the moment of conception, and that it cannot be changed, regardless of an individual's feelings or desires." (*Id.*, ¶34.) In addition, Kluge's faith prohibits him from endorsing ideas and concepts he considers untrue and sinful, for to do so "would violate Biblical injunctions against dishonesty, lying, and effeminacy." (*Id.*, ¶35.) Kluge disavows the psychiatric diagnosis of gender dysphoria because it promotes a destructive lifestyle. (*Id.*, ¶37.) He believes that any endorsement of gender dysphoria or related transgender concepts contradicts his religious beliefs. (*Id.*)

The events giving rise to Kluge's Spring 2018 resignation go back to the start of the 2017-2018 school year. (Dkt. 15, ¶¶38-39.) According to Kluge, around that time Brownsburg "began to allow students experiencing gender dysphoria to use the bathroom of their choice and to change their legal birth names on the [Brownsburg] database (known as 'Power School') to a new, transgender name, which was not the students' legal names." (*Id.*, ¶38.) In fact, Brownsburg allowed any high school student to change the name listed in the database if the student provided letters from a parent and a health care professional.[1] (Dkt. 15-4, at 6.) This practice provided a straightforward, easy-to-follow rule for the high school faculty when

---

[1] Kluge attached several exhibits to his Amended Complaint, which means the Court need not follow his factual allegations when the exhibit states otherwise: "Where an exhibit and the complaint conflict, the exhibit typically controls." *Forrest v. Universal Savings Bank, F.A.*, 507 F.3d 540, 542 (7th Cir. 2007).

addressing students, namely, faculty need only "call students by the name listed in

PowerSchool." (*Id.*)

Kluge thought that following this rule would cause him to address some students by

names that were changed due to gender dysphoria. (Dkt. 15, ¶39.) Because addressing students in

this manner was incompatible with his religious beliefs, Kluge told Superintendent James Snapp

that he would not comply. (*Id.*, ¶40.) In response, Brownsburg accommodated Kluge by allowing

him "to use last name only to address students."[2] (Dkt. 15-1.)

The last-name accommodation created problems from its inception, and those problems

continued through the Fall 2017 semester and beyond. (Dkt. 15, ¶46.) Notwithstanding these

problems, Brownsburg continued the last-name accommodation through the Fall 2017 semester,

while at the same time alerting Kluge to the problems it was causing. (*Id.*) Specifically, in

December 2017 Principal Bret Daghe told Kluge that

> the transgender students reported feeling "dehumanized" by my calling all
> students last-name-only. [Daghe] said that the transgender students' friends feel
> bad for the transgender students when I call the transgender students, along with
> everyone else, by their last-name-only. He said that I am a topic of much
> discussion in the Equality Alliance Club meetings. He said that a number of
> faculty avoid me and don't hang out with me or include me as much because of
> my stance on the issue.

(Dkt. 15-3, at 4.)

Daghe and Human Resources Director Jodi Gordon met with Kluge several times during

the Spring 2018 semester. (Dkt. 15-3, at 6-7.) During those meetings, Daghe and Gordon

reiterated that the last-name accommodation was offensive to some students and was disrupting

the learning environment. (*Id.*) Gordon also indicated that although Brownsburg would allow

---

[2] Although Kluge does not mention it in his Amended Complaint, Brownsburg also
accommodated Kluge by assigning a colleague to pass out uniforms to his students. (Dkt. 15-1.)

Kluge to continue the last-name accommodation through the 2017-2018 school year, there would be changes for the next school year. (Dkt. 15-1.) Kluge interpreted this as an ultimatum: "Because my Christian conscience does not allow me to call transgender students by their 'preferred' name and pronoun, you have said I am required to send you a resignation letter by May 1, 2018 or I will be terminated at that time." (*Id.*)

Accordingly, in an email to Gordon dated April 30, 2018, Kluge resigned his employment effective at the end of the 2017-2018 school year. (*Id.*) Kluge attempted to rescind his resignation approximately one month later, claiming an agreement with Gordon that she would "withhold processing" of his resignation "at my specific request." (Dkt. 15-3, at 1.) Notwithstanding Kluge's attempted rescission, Brownsburg's board accepted Kluge's resignation "as if it was submitted unconditionally." (Dkt. 15, ¶62.)

II.   *The nature of Kluge's legal claims.*

In his Amended Complaint, Kluge challenges various aspects of what he refers to as Brownsburg's "transgender policies." (Dkt. 15, ¶¶83-90.) In several overlapping claims, Kluge also asserts that Brownsburg unlawfully discriminated and retaliated against him in violation of Title VII, violated his constitutional rights, and committed several state-law tort violations. (*Id.*, ¶¶91-173.)

In making these claims, Kluge contends that Brownsburg's alleged unlawful conduct occurred *only* within the context of the parties' employment relationship—indeed, the common thread running through his claims is that each is limited to the classroom and Kluge's workday more generally. (*See, e.g.*, dkt. 15, ¶78 (alleging that Brownsburg's "speech code policies" apply to "all interactions faculty members have with students in the classroom or within the school"); *id.* ¶100 ("Defendants effectively told Mr. Kluge to leave his religion *outside of the classroom* or

4

get out." (emphasis added)); *id.*, ¶105 ("When Mr. Kluge communicated his views regarding

gender dysphoria through his choice of names and pronouns *in his prospective interactions with

students and in his classroom*, he was speaking on a matter of public concern . . . ." (emphasis

added)); *id.*, ¶106 (asserting that his interest as a teacher at a public high school to address

students' wellbeing "outweighs Defendants' interest in the efficient provision of services").

### III.   Argument.[3]

Kluge's Amended Complaint fails to allege an objective conflict between his teaching

duties and his sincerely-held religious beliefs, does not state a viable claim for deprivation of any

constitutional right, and fails to state a claim for any state law tort violation. Accordingly, the

Court should dismiss Kluge's Amended Complaint in its entirety.

#### A.   Standard of review.

Surviving a motion to dismiss requires the plaintiff to plead "enough facts to state a claim

for relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Those facts must consist of "more than labels" or "a formulaic recitation of a cause of action's

elements." *Id.* at 556. Instead, the pleading must "contain either direct or inferential allegations

respecting all the material elements necessary to sustain recovery under some viable legal

theory." *Id.* at 562. In addition, "the tenet that a court must accept as true all of the allegations

contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662,

---

[3] Four days before this Motion was filed, Magistrate Judge Karen L. Litkovitz issued a report and recommendation that the plaintiff's amended complaint in *Meriwether v. Trustees of Shawnee State University*, No. 1:18-cv-753 (S.D. Ohio Sept. 5, 2019), be dismissed in its entirety. The claims in *Meriwether* are substantially similar to the claims brought by Kluge in his Amended Claims, including many allegations that are verbatim. Although the following adequately establishes Defendants' entitlement to dismissal, the Court may find Magistrate Litkovitz' reasoning helpful in resolving this Motion.

678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

> **B.** *The individually-named defendants should be dismissed.*

School Board President Phil Utterback should be dismissed from the lawsuit.

Kluge has not alleged that Utterback was involved in any of the circumstances that give rise to his legal claims, let alone that Utterback was even aware of them. In his 175-paragraph Amended Complaint, Kluge makes one factual allegation concerning Utterback, namely, that he was the President of Brownsburg's school board "at all times relevant." (Dkt. 15, ¶20.) Beyond that, Utterback is referenced collectively with the other Defendants throughout the remainder of the Amended Complaint. These references include legal conclusions, such as Defendants "are 'persons' under 42 U.S.C. § 1983 and subject to suit" and "each and all of the acts and policies alleged herein were attributed to Defendants who acted under color of a statute, regulation, or custom of the State of Indiana (i.e., under color of state law and authority)." (*Id.*, ¶¶20, 83.) Assertions such as these are the extent of Kluge's allegations concerning Utterback. They are nothing more than boilerplate legal conclusions that fail to connect Utterback's conduct to any of the circumstances giving rise to Kluge's claims. As such, Kluge has failed to plead a case against Utterback, and the Court should dismiss him as a party.

Dismissal is also required for Defendants Dr. James Snapp, Jodi Gordon, and Dr. Bret Daghe:

- Regarding the Title VII claims (dkt. 15, ¶¶91-102), Kluge alleges that Brownsburg is his employer, not any other defendant. (*Id.*, ¶¶18, 21.) It is axiomatic that Title VII only extends liability to employers, not co-workers or supervisors. *See Williams v. Banning*, 72 F.3d 552, 552 (7th Cir. 1995). As such, none of the individual defendants are liable to Kluge under Title VII.

- Regarding the constitutional claims (dkt. 15, ¶¶103-166), because Kluge has named Brownsburg as a defendant, his inclusion of the other defendants in

their official capacities is nothing more than a redundancy. They should be dismissed. *See Jones v. Anderson Community School Corporation*, 2017 WL 4315132, at *3 (S.D. Ind. Sept. 28, 2017).

- Regarding the state law tort claims (dkt. ¶¶167-173), Kluge has not alleged that the individually-named defendants acted outside the course and scope of their duties. Accordingly, they should be dismissed. *See* Ind. Code § 34-13-3-5; *Barnett v. Clark*, 889 N.E.2d 281, 283 (Ind. 2008).

      C.      *Kluge fails to state a claim upon which relief can be granted against any Defendant.*

In addition to his misplaced claims against the individually-named Defendants, each of Kluge's claims fails to state a claim upon which relief can be granted. Accordingly, the Amended Complaint should be dismissed in its entirety.

      i.      *Kluge's Title VII failure-to-accommodate claim fails because there is no objective conflict between his teaching duties and his sincerely-held religious beliefs.*

Kluge alleges the Defendants failed to accommodate his sincerely-held religious beliefs by agreeing to and later withdrawing the last-name accommodation. (Dkt. 15, ¶92.)

Title VII prohibits an employer from discriminating in the terms, conditions, or privileges of employment because of an employee's religion. 42 U.S.C. § 2000e-2(a). Title VII also requires an employer to provide reasonable accommodation for an employee's religious belief unless it would cause undue hardship to the employer's business. 42 U.S.C. § 2000e(j).

Prior to *E.E.O.C. v. Abercrombie & Fitch, Inc.*, 135 S.Ct. 2028 (2015), the Seventh Circuit required the following proof to sustain a prima facie case based on failure to accommodate: (1) the employee's religious belief conflicted with an employment requirement; (2) the employer was aware of the employee's religious belief; and (3) the need for an accommodation of that religious belief was the basis for the employer's adverse employment action. *Porter v. City of Chicago*, 700 F.3d 944, 951 (7th Cir. 2012). District courts within the

Seventh Circuit have noted that the Supreme Court's decision in *Abercrombie & Fitch* reduced the employee's prima facie case to the first and third elements. *See Summers v. Whitis*, 2016 WL 7242483, at *4 (S.D. Ind. Dec. 15, 2016); *Schwingel v. Elite Prot. & Sec., Ltd.*, 2015 WL 7753064, at *5 (N.D. Ill. Dec. 2, 2015). If the employee establishes a prima facie case, the burden shifts to the employer to show that the reasonable accommodation would have resulted in undue hardship.[4] *Porter*, 700 F.3d at 951.

Regarding the first element, "the fact that an employee subjectively perceives a conflict between [his] religious beliefs and [his] job duties is not, in and of itself, conclusive." *Summers*, 2016 WL 7242483, at *5. Instead, the reviewing court must objectively determine whether a genuine conflict exists between the employee's religious belief and his job duties. *Id.* Applying this standard to Kluge's allegations demonstrates there is no objective conflict.

Brownsburg required the high school faculty to address students by the name that was listed in the PowerSchool database. (Dkt. 15-4, at 6.) Although Brownsburg allowed students to change the name listed in PowerSchool, such a change required letters from a parent and a healthcare professional. (*Id.*) Brownsburg did not require Kluge to express approval for the reasons underlying any particular name change, nor is there any indication in the Amended Complaint that such reasons were disclosed to faculty. Similarly, Kluge does not claim that Brownsburg required the high school faculty to endorse or otherwise show support for transgender issues. In short, Brownsburg required the high school faculty to practice a basic act of human decency that is so commonplace most take it for granted, namely, to call people by their chosen name. Moreover, Brownsburg imposed this requirement not to advance transgender

---

[4] Defendants' undue hardship defense is outside the scope of this Motion, though Defendants reserve the right to raise and argue it at a later date if warranted.

issues or coerce others to do so, but rather to provide faculty with an easy-to-follow rule for addressing students.

Courts have noted that purely administrative duties do not create genuine conflict with an employee's religious belief. In this respect, *Summers v. White* forecloses Kluge's failure-to-accommodate claim. *Summers* involved a deputy clerk's refusal to process marriage licenses for same-sex couples. 2016 WL 7242483, at *3. The deputy clerk asserted that her sincerely-held religious beliefs prohibited her from processing such licenses and requested an accommodation to that effect. *Id.* In response, the employer denied the accommodation request and terminated the deputy clerk for insubordination, citing her refusal to process a marriage license. *Id.*

In concluding there was no objective conflict between the deputy clerk's duties and her religious opposition to same-sex marriage, Judge Young noted the "purely administrative" nature of her duties when issuing marriage licenses: "Summers' job merely required her to *process* the licenses by entering data and handing out information. Specifically, she had to pull up the application, verify that certain information was correct, collect a statutory fee, print a form, and record the license in a book for public record." *Summers*, 2016 WL 7242483, at *5 (emphasis in original). Judge Young also noted what the deputy clerk was *not* required to do:

> To be clear, Summers did not perform marriage ceremonies or personally sign marriage licenses or certificates. She was not required to attend ceremonies, say congratulations, offer a blessing, or pray with couples. Her employer did not make her express religious approval or condone any particular marriage. Summers remained free to practice her Christian faith and attend church services. She was even free to maintain her belief that marriage is a union between one man and one woman. Thus, she was not forced to "choose between [her] religious convictions and [her] job." *Abercrombie & Fitch Stores*, 731 F.3d at 1120.

*Id.* at *6.

Brownsburg's requirement that Kluge, like any other high school faculty member, address students by the names listed in the PowerSchool is no different from the duties in

*Summers* that Judge Young concluded were purely administrative. If anything, Brownsburg required far less of Kluge than the employer in *Summers* because he did not have to make any determination about whether the information in PowerSchool was accurate. Instead, he merely needed to use the name that was listed when addressing students.

Likewise, Judge Young's reasoning applies with equal force regarding what Brownsburg was *not* requiring of Kluge—congratulating transgender students on their transition, expressing support for their decision, and so on. Kluge's failure-to-accommodate is best summarized by Judge Young's observation that "Title VII is not a license for employees to perform only those duties that meet their private approval." *Summers*, 2016 WL 7242483, at *7; *see also Rodriguez v. City of Chicago*, 156 F.3d 771, 776 (7th Cir. 1998) ("Title VII . . . requires only reasonable accommodation, not satisfaction of an employee's every desire.").

The Court should conclude that Kluge's failure-to-accommodate claim fails for lack of an objective conflict between Brownsburg's name requirement and Kluge's religious belief.

  ii. *Kluge's Title VII retaliation claim fails for reasons similar to his failure-to-accommodate claim, and because there is no causal connection between the protected activity and the adverse employment action.*

Kluge's retaliation claim is based on the same factual allegations as his failure-to-accommodate claim—he asserts that by agreeing to the last-name accommodation and later withdrawing it under threat of termination, Brownsburg unlawfully retaliated against him. (Dkt. 15, ¶95.) For reasons stated in Part III.C.i. above, because Kluge's failure-to-accommodate claim fails, his retaliation claim based on the same accommodation request must also fail. But even if one were to put that point aside for argument's sake, Kluge's retaliation claim still fails to state a prima facie case.

Retaliation based on a reasonable accommodation request requires the employee to establish the following: (1) he engaged in statutorily protected activity; (2) he suffered an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse employment action. *Contreras v. Suncast Corp.*, 237 F.3d 756, 765 (7th Cir. 2001). If the employee establishes a prima facie case, the burden shifts to the employer to articulate a legitimate nondiscriminatory reason for its actions, which the employee must show to be a pretext for unlawful retaliation.[5] *Id.* at 765.

Kluge cannot establish a prima facie case of retaliation because there is no causal connection between it and his request for an accommodation. It defies logic that Brownsburg would accommodate Kluge in several ways from the outset, then somehow concoct student complaints as an excuse to rescind the last-name accommodation, all because Brownsburg harbored discriminatory animus toward Kluge from the beginning. In analyzing the adequacy of a pleading, the reviewing court need not indulge in allegations that create the "sheer possibility" for relief, but rather must allow only those claims that are facially plausible to survive. *Iqbal*, 556 U.S. at 678. The causal connection that Kluge asserts is a bridge too far.

The Court should conclude that Kluge's retaliation claim fails for the same reasons as his failure-to-accommodate claim, as well as for the lack of causal connection between his protected activity and adverse employment action.

> iii. *Kluge has not pled adequate facts to support a Title VII hostile work environment claim.*

---

[5] Defendants' articulation of a legitimate reason for its actions, as well as the pretext analysis, is outside the scope of this Motion, though Defendants reserve the right to raise and argue it at a later date if warranted.

Kluge bases his hostile work environment entirely on Brownsburg's alleged demand that "Kluge address students with gender dysphoria by their preferred names, resign, or be terminated." (Dkt. 15, ¶ 98.) In fact, Brownsburg required that Kluge, along with the rest of the high school faculty, address all students by the name listed in PowerSchool. (Dkt. 15-4, at 6.) Regardless, Kluge's hostile work environment claim still fails.

A violation of Title VII based on hostile work environment requires proof of a workplace "permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe of pervasive to alter the terms and conditions of the victim's employment . . . ." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 23 (1993) (internal quotations and citations omitted). Title VII does not enact a "general civility code for the American workplace." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998). A prima facie hostile work environment claim requires the employee to establish that: (1) the work environment was subjectively and objectively offensive; (2) a protected characteristic was the cause of the harassment; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability. *Chaib v. Indiana*, 744 F.3d 974, 985 (7th Cir. 2014). Courts have explained that the workplace environment sufficient to sustain a prima facie case must be "hellish" for the employee. *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1013 (7th Cir. 1997).

Requiring Kluge to follow a commonsense method for addressing students that applied to all high school faculty does not constitute a hostile work environment. Garden-variety workplace harassment claims describe "hellish" scenes replete with derogatory comments and other over-the-top behavior such as physical aggression. *See, e.g.*, *Dawson v. Monaco Coach Corp.*, 2005 WL 3005347, at 11 (N.D. Ind. Nov. 9, 2005) (religious harassment included statements from co-workers for plaintiff to get his "fucking Christian ass" out of the building and "we don't need

your kind around here," as well as religiously-tinged provocation such as referring to plaintiff as a "sinner" and a "beast"). Kluge has not alleged any facts that come close to meeting this standard.

The Court should conclude that Kluge has failed to plead adequate facts to support a hostile work environment claim.

> iv.   *Kluge's Section 1983 retaliation claim fails because his refusal to address students in class by the names listed in PowerSchool is not protected First Amendment speech.*

Kluge's allegations relating to speech arise in the context of his classroom instruction and as a teacher during the workday more generally. (Dkt. 15, ¶105; *see also supra*, Part II.) Although Kluge asserts that "his choice of names and pronouns" when addressing students constitutes speech on a matter of public concern (dkt. 15, ¶105), controlling case law establishes that such speech is not protected by the First Amendment.

A Section 1983 retaliation claim based on the First Amendment (as incorporated against the States through the Fourteenth Amendment) requires a public employee to prove: (1) his speech was constitutionally protected; (2) he suffered an adverse employment action because of the constitutionally protected speech that was sufficiently adverse so as to deter the exercise of further free speech; and (3) his constitutionally protected speech was a substantial factor for the adverse employment action. *Graber v. Clarke*, 763 F.3d 888, 894-95 (7th Cir. 2014).

Regarding the first element, "[P]ublic employees do not surrender all their First Amendment rights by reason of their employment. Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). There are two prongs to this inquiry, namely, whether the public employee was (1) speaking as a citizen (2) on a matter of

public concern. *Graber*, 763 F.3d at 895. If the answer to either is "no," then that ends the analysis, as the speech in question is not protected by the First Amendment. *Spiegla v. Hull*, 481 F.3d 961, 965 (7th Cir. 200&). If the answer to both is "yes," the reviewing court must determine whether the public employee's interest in speaking as a citizen on a matter of public concern is outweighed by the government's interest in controlling the speech to promote the efficiency and effectiveness of serving the public through its employees. *Garcetti*, 547 U.S. at 417. In addition, "Whether a government employee's speech is protected by the First Amendment is a question of law" and therefore particularly appropriate for resolution on a motion to dismiss. *Gustafson v. Jones*, 290 F.3d 895, 906 (7th Cir. 2002).

The Seventh Circuit has stated consistently that a teacher's classroom instruction and other workday interactions with students does not involve speech as a citizen. *Mayer v. Monroe County Community School Corporation*, 474 F.3d 477, 478 (7th Cir. 2007), involved a high school teacher's termination based on a single answer to a student's question, specifically the teacher's admission to the student that she honked at Iraq war protestors as a sign of support while driving her vehicle. The court rejected the teacher's argument that "principles of academic freedom supersede *Garcetti* in classrooms," relying instead on *Webster v. New Lenox School District No. 122*, 917 F.2d 1004 (7th Cir. 1990), for the proposition that not only can public schools require that teachers follow prescribed curriculum, "but also the prescribed perspective on that subject matter." *Id.* at 479. The Court further noted that departing from this commonsense rule would undermine a public school's paramount mission of controlling its overall educational mission: "A teacher hired to lead a social-studies class can't use it as a platform for a revisionist perspective that Benedict Arnold wasn't really a traitor, when the approved program calls him one . . . ." *Id.*

Similar to *Mayer*, and more similar to Kluge's alleged protected speech, the Seventh Circuit has recognized a public school employer's interest *in controlling a teacher's interactions with students*. In *Piggee v. Carl Sandburg College*, 464 F.3d 667, 668-69 (7th Cir. 2006), a public college declined to renew a cosmetology instructor's contract based on a complaint from a homosexual student that the instructor had provided the student with several religious pamphlets that, in the student's view, degraded homosexuals. Characterizing the legal issue as "whether the college had the right to insist that Piggee refrain from engaging in that particular speech while serving as an instructor of cosmetology," the court concluded the answer was "yes." *Id.* at 672. Critical to the court's conclusion was the college's "interest in ensuring that its instructors *stay on message* while they were supervising the beauty clinic, just as it had an interest in ensuring that the instructors do the same while in the classroom" (emphasis added). The court also noted that it was reasonable for the college to consider the impact of Piggee's speech on her students: "if it did anything, it inhibited her ability to perform that job by undermining her relationship with [students] who disagreed with or were offended by her expressions of her beliefs." *Id.*; *see also Wozniak v. Adesida*, 932 F.3d 1008, 1010 (7th Cir.) (observing, in the context of a professor's First Amendment claim after he was terminated for making demeaning public comments about two students who the professor thought were responsible for not selecting him for a teaching award, that "how faculty members relate to students *is* part of their jobs, which makes [*Garcetti v.*] *Ceballos* applicable" and therefore renders the speech in question not constitutionally protected (emphasis in original)).

These cases establish that Kluge's speech is not constitutionally protected. *Mayer* recognizes a public school's paramount interest in not only controlling its curriculum, but also dictating the appropriate perspective for that curriculum. *Piggee* and *Wozniak* recognize a further

interest that logically follows from *Mayer*, namely, that a public school also has a substantial interest in controlling how teachers interact with students, particularly where the nature of a teacher's interaction threatens the learning environment. Because Kluge conceded that his alleged speech only arises in the context of his duties as a teacher, the Court should follow the reasoning of *Mayer*, *Piggee*, and *Wozniak* and conclude that his speech is not constitutionally protected.

Kluge's Section 1983 retaliation claim also fails because his speech is not a matter of public concern. This inquiry requires the reviewing court to consider the "content, form, and context" of the statement. *Bivens v. Trent*, 591 F.3d 555, 560 (7th Cir. 2010) (internal quotation marks and citations omitted). Kluge's speech is a far cry from the quintessential type of public-concern speech recognized in *Pickering v. Board of Education of Township High School District 205, Will County*, 391 U.S. 563, 564 (1968), namely, a teacher's letter to a newspaper expressing criticism of a school board's funding priorities. In contrast, Kluge's speech concerns the manner he addresses students in the classroom, which is designed to provide simplicity and in turn positively impact the learning environment. To further illustrate the chasm between Kluge's speech and the speech involved in *Pickering*, Kluge does not allege he has been punished for expressing disapproval of transgender students' rights during public comments at a school board meeting. The Seventh Circuit has concluded that speech similar to Kluge's is not a matter of public concern and therefore not constitutionally protected. *See, e.g.*, *Khuans v. Sch. Dist. 110*, 123 F.3d 1010, 1017 (7th Cir. 1997) (concluding that teacher's complaint about supervisor not holding others accountable was not a matter of public concern) *Cliff v. Bd. of Sch. Comm'rs of City of Indianapolis*, 42 F.3d 403, 410-11 (7th Cir. 1994) (teacher's complaint about classroom size and discipline was not a matter of public concern because she made the complaint in

16

response to criticism of her performance, the complaint addressed classroom issues that were limited to her personal experience, and she only requested a reduction in her own class sizes).

The Court should conclude that Kluge's speech is not on a matter of public concern and dismiss his Section 1983 retaliation claim.

> v.   *The rest of Kluge's Section 1983 claims based on speech allegedly protected by the First Amendment fail for the same reasons as his Section 1983 retaliation claim, as well as for other reasons.*

Kluge's remaining Section 1983 claims based on the First Amendment allege content and viewpoint discrimination (dkt. 15, ¶¶111-122), compelled speech (*id.*, ¶¶123-126), and an unconstitutional condition violation (*id.*, ¶¶137-144). Although each is foreclosed in the first instance because the speech in question is not constitutionally protected, *see supra* Part III.C.iv., the following addresses further reasons for dismissal that are specific to each claim:

> a.   *Content and viewpoint discrimination.*

Kluge asserts that the Defendants punished him for enforcing "their transgender policies and practices against him." (Dkt. 15, ¶115.) Kluge also makes several allegations that appear to invoke facial challenges to Brownsburg's so-called "transgender policies," specifically that "Defendants' transgender policies and practices require officials to evaluate the content and viewpoint of faculty expression to determine whether it constitutes discrimination or harassment and whether it creates a hostile environment" and that "Defendants' transgender policies and practices confer unbridled discretion upon [Brownsburg] officials to discriminate based on content or viewpoint." (*Id.*, ¶¶114, 116.)

Again, Kluge's viewpoint discrimination claim fails as an initial matter because his speech is not constitutionally protected. Moreover, to the extent Kluge attempts to raise a facial challenge to Brownsburg's so-called "transgender policies" on the grounds of overbreadth or

officials' unbridled discretion, he must do more than allege violations that are merely personal to him.

The Court should dismiss Kluge's Section 1983 viewpoint discrimination claim.

> b.    *Compelled speech.*

Kluge alleges that Defendants engaged in compelled speech when they forced him "to communicate messages about gender dysphoria that would have violated his religious beliefs." (Dkt. 15, ¶125.) Again, Kluge has not alleged that Brownsburg forced him to show support for transgender students who underwent a name change or otherwise express approval for transgender issues more generally; rather, Brownsburg merely required Kluge to address students by the names listed in the PowerSchool database. (Dkt. 15-4, at 6.) Such speech is not constitutionally protected for the reasons stated above. *See supra* Part Part III.C.iv.

Moreover, although not arising in the context of a compelled speech claim, the following observation from the Seventh Circuit regarding the nature of a teacher's in-class speech is relevant here:

> This is so in part because the school system does not "regulate" teachers' speech as much as it hires that speech. Expression is a teacher's stock in trade, the commodity she sells to her employer in exchange for a salary. A teacher hired to lead a social-studies class can't use it as a platform for a revisionist perspective that Benedict Arnold wasn't really a traitor, when the approved program calls him one; a high-school teacher hired to explicate *Moby-Dick* in a literature class can't use *Cry, The Beloved Country* instead, even if Paton's book better suits the instructor's style and point of view; a math teacher can't decide that calculus is more important than trigonometry and decide to let Hipparchus and Ptolemy slide in favor of Newton and Leibniz.

*Mayer*, 474 F.3d at 479.

The Court should dismiss Kluge's Section 1983 compelled speech claim.

c.     *Unconstitutional condition.*

Kluge asserts that the Defendants subjected him to unconstitutional conditions that implicate his First Amendment free speech rights, as well as his rights to receive state benefits, freely exercise religion, and receive due process and equal protection of the laws. (Dkt. 15, ¶¶139-140, 142-143.) Again, Kluge's First Amendment free speech claim is foreclosed for reasons stated above. *See supra* Part Part III.C.iv.

In addition, none of Kluge's allegations that the Defendants imposed unconstitutional conditions can survive. Although the Supreme Court of the United States has held that "to fire a public employee as a penalty for refusing a request for political and financial support would impose an unconstitutional condition on governmental employment," *O'Hare Truck Serv. v. City of Northlake*, 518 U.S. 712, 720 (1996), there is no indication that this doctrine has been extended beyond the context of political patronage. If anything, the authority is to the contrary: "In order to state a claim under [Section] 1983, the employee's association, or refusal to associate, must be political in nature or implicate some other constitutional concerns." *Romano v. Bd. of Educ. for Bloom Twp. High Sch. Dist. 206*, 2016 WL 2344581, at *4 (N.D. Ill. May 4, 2016). Because Kluge has not made any such allegation, his claim fails.

The Court should dismiss Kluge's Section 1983 unconstitutional condition claim.

vi.     *Kluge's Section 1983 free exercise of religion claim fails because Brownsburg's so-called "transgender policies" are neutral and generally applicable.*

Kluge's First Amendment free exercise claim challenges Brownsburg's co-called "transgender policies." (Dkt. 15, ¶¶127-136.) Kluge asserts that "Defendants' transgender policies and related practices are neither neutral nor generally applicable because they represent a system of individualized assessments." (*Id.*, ¶132.) Kluge also alleges that "Defendants'

transgender policies and related practices are under-inclusive, prohibiting some expression while allowing other expression equally harmful to the Defendants' asserted interests." (*Id.*, ¶133.) Beyond this boilerplate legal conclusion, however, Kluge does not identify the "equally harmful" expression that Defendants allow. Regardless, Kluge's free exercise claim fails because Brownsburg's requirement that high school faculty address students by the names listed in the PowerSchool database is neutral and generally applicable.

The Free Exercise Clause of the First Amendment does not prohibit laws that incidentally burden religious practices so long as such laws are neutral and generally applicable. *Employment Div. v. Smith*, 494 U.S. 872, 879 (1990). The Seventh Circuit has extended *Smith*'s holding to the context of a public employer's workplace policies. *See Ryan v. U.S. Dept. of Justice*, 950 F.2d 458 (7th Cir. 1991). To sustain a Section 1983 free exercise claim challenging a public employer's work requirement, the plaintiff must show: (1) the requirement is not generally applicable; or (2) the requirement is not neutral because either (a) the public employer created the employment practice with an intent to discriminate; or (b) the employment practice adversely impacts the employee's religious practices and has no legitimate purpose. *Filinovich v. Claar*, 2006 WL 1994580, at *4 (N.D. Ill., July 14, 2006).

The only aspect of Brownsburg's so-called "transgender policies" that Kluge challenges is the requirement that high school faculty address students by the names listed in the PowerSchool database. That requirement is generally applicable for the simple reason that it applies to all high school faculty. There is no indication, for example, that only Christian or Muslim faculty need to comply. In addition, the requirement is neutral. There is no indication that in imposing the requirement, Brownsburg intended to discriminate based on Kluge's religion or any other religion. Rather, the purpose is to provide the high school faculty with an easy-to-

follow rule when addressing students, namely, use the names listed in PowerSchool. Moreover, Kluge does not claim that the requirement lacks a legitimate purpose. It should not be alarming or suspicious that a public school would want to create a uniform system for teachers to address students, as such a system helps the learning environment by promoting certainty and avoiding confusion.

The Court should conclude that Kluge's Section 1983 free exercise of religion claim fails because Brownsburg requirement that the high school faculty address students by the names listed in PowerSchool is neutral and generally applicable.

> vii.   *Kluge's Section 1983 due process claim fails for the same reasons as his Section 1983 viewpoint discrimination claim, and because requiring Kluge to address students by the names listed in the PowerSchool database is not a directive that is unconstitutionally vague.*

Kluge's Section 1983 due process claim makes the same allegations regarding overbreadth and unbridled discretion as his Section 1983 viewpoint discrimination claim. (*Cf.* dkt. 15, ¶¶118, 120, and 117 with ¶¶147, 148, and 151, respectively.) Accordingly, Kluge's overlapping due process claims fail for the same reasons as his viewpoint discrimination claims fail. *See supra* Part III.C.v.a. In addition, Kluge asserts a void-for-vagueness challenge: "The lack of objective criteria, factors, or standards in Defendants' transgender policies and practices renders these policies and practices unconstitutionally vague and in violation of Mr. Kluge's right of due process law under the Fourteenth Amendment." (*Id.*, ¶152.)

"Condemned to the use of words, we can never expect mathematical certainty from our language." *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972). Nevertheless, the Supreme Court of the United States has held that if a statute fails to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited," or lacks "fair warning" of

prohibited conduct, then it is void for vagueness. *Id.* at 108. The Seventh Circuit has applied this rule in the context of a public employer's workplace rules, though "the government acting in the role of employer enjoys much more latitude in crafting reasonable work regulations for its employees." *Greer v. Amesqua*, 212 F.3d 358, 369 (7th Cir. 2000).

Kluge's allegations defeat his void-for-vagueness challenge. Although he purports to challenge Defendants' so-called "transgender policies" as a whole, he admits he was well aware of the consequences for continuing to use the last-name accommodation: "On February 6, 2018, Director of Human Resources, Defendant Gordon, told Mr. Kluge his religious accommodation was being withdrawn, since students were offended at the use of last names . . . ." (Dkt. 15, ¶50.) This is but one allegation among many demonstrating that Kluge was well aware of the requirements Brownsburg expected of him when addressing students. (*See also, e.g.*, ¶¶79, 81, 105.) As such, Kluge cannot legitimately claim he did not understand what Brownsburg expected of him.

The Court should dismiss Kluge's Section 1983 due process claim.

> viii.   *Kluge's Section 1983 equal protection claim fails because his "class of one" theory is not viable in the employment context, and because he has failed to allege that similarly-situated employees were treated differently.*

Kluge's equal protection claim appears to be two-fold, namely, (1) that "Defendants' transgender policies and related practices . . . target a suspect class (i.e., religion)" and (2) that they lack any rational basis. (Dkt. 15, ¶158.) Kluge identifies the disparate treatment to support this two-fold claim as follows: "Defendants take no disciplinary action against employees who support and endorse the concepts of gender dysphoria, but they take disciplinary action against teachers, like Mr. Kluge, who refuse to endorse these concepts." (*Id.*, ¶156.)

"The Equal Protection Clause of the Fourteenth Amendment most typically reaches state action that treats a person poorly because . . . the person has exercised a 'fundamental right,' or because the person is a member of a group that is the target of irrational government discrimination." *Abcarian v. McDonald*, 617 F.3d 931, 938 (7th Cir. 2010). In addition, Section 1983 equal protection claims based on disparate treatment in the employment context require the same analysis as Title VII disparate treatment claims. *Rodgers v. White*, 657 F.3d 511, 516-17 (7th Cir. 2011).

Kluge's contention that Defendants' so-called "transgender policies" lack any rational basis invokes the "class of one" theory of equal protection claims. *See Srail v. Village of Lisle*, 588 F.3d 940, 943 (7th Cir. 2009). However, the "class-of-one theory of equal protection has no place in the public employment context." *Engquist v. Oregon Dept. of Agriculture*, 553 U.S. 591, 594 (2008).

Kluge's disparate treatment claim also fails for the simple reason that he has failed to allege that the Defendants have similarly-situated employees differently. Kluge asserts that the appropriate distinction is between him and other "employees who support and endorse the concepts of gender dysphoria." (Dkt. 15, ¶156.) But the so-called "transgender policies" make no such distinction. (Dkt. 15-4.) Rather, the appropriate similarly-situated employees are either of the following: (1) high school faculty who, like Kluge, refused to follow the requirement that faculty address students by the names listed in the PowerSchool database and, despite student complaints, were not disciplined; and (2) high school faculty who were not required to address students by the names listed in the PowerSchool database because they received a reasonable accommodation for reasons other than religious belief. Because Kluge fails to allege that

similarly-situated employees were treated more favorably, he has not alleged a viable equal protection violation based on disparate treatment.

The Court should dismiss Kluge's Section 1983 equal protection claim.

> ix.   *Kluge's claims for violations of the Indiana Constitution should be dismissed.*

Kluge assert violations of Article I, Sections 2 and 3 of the Indiana Constitution based on the same allegations that support his other alleged constitutional violations. (Dkt. 15, ¶¶161-166.) Those provisions provide as follows:

> Section 2. All people shall be secured in the natural right to worship ALMIGHTY GOD, according to the dictates of their own consciences.

> Section 3. No law shall, in any case whatever, control the free exercise and enjoyment of religious opinions, or interfere with the rights of conscience.

Ind. Const. Art. I, §§ 2 and 3.

The Indiana Supreme Court has interpreted these provision as "advance[ing] core values that restrain government interference with the practice of religious worship, both in private and in community with other persons." *City Chapel Evangelical Free Inc. v. City of South Bend*, 744 N.E.2d 443, 450 (Ind. 2001). However, research has not disclosed any Indiana case that applies these provisions to the public employment context. The Court should decline to do so here and dismiss Kluge's alleged violations of the Indiana Constitution, as they failure to state a claim for relief.

> x.   *Kluge has not stated a claim for intentional infliction of emotional distress.*

In a rehash of most of the foregoing claims, Kluge alleges in a single paragraph that those claims also give rise to tort liability for intentional infliction of emotional distress ("IIED"). (Dkt. 15, ¶168.)

As an initial matter, the Court should dismiss this claim because Kluge does not allege several elements of an IIED claim, even in boilerplate fashion. Regardless, the claim still fails.

IIED requires the plaintiff to show the defendant (1) engaged in extreme and outrageous conduct that (2) intentionally or recklessly (3) caused (4) severe emotional distress to the plaintiff. *Bradley v. Hall*, 720 N.E.2d 747, 752-53 (Ind. Ct. App. 1999). IIED is limited to instances "where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (citation omitted). Moreover, regarding the second element, "It is the intent to harm one emotionally that forms the basis for the tort." *Id.*

Put simply, none of Defendants' alleged actions constitutes extreme and outrageous conduct. Kluge's IIED claim should be dismissed.

> xi.    *Kluge's has not stated a claim for fraud.*

Finally, Kluge attempts to undo the legal effect of his written resignation by alleging fraud. (Dkt. 15, ¶¶169-173.) Specifically, Kluge contends that "Defendants intentionally and knowingly falsely misrepresented to Mr. Kluge material facts, i.e., that he could submit a conditional resignation with the intent that Mr. Kluge rely upon those misrepresentations to his detriment." (*Id.*, ¶170.) Kluge does not identify the condition that forms the basis for his fraud claim, but presumably it is Gordon's alleged agreement with Kluge "that he could withdraw his resignation prior to" the effective date of his resignation. (Dkt. 15, ¶58.) However, in his written resignation Kluge does not attempt to condition his resignation in this manner. (Dkt. 15-1.) Regardless, Kluge's fraud claim fails.

Kluge's fraud claim is foreclosed to the extent he relies on the statement from Gordon cited above, for it is hornbook law that "actual fraud may not be based on representations

regarding future conduct, or on broken promises, unfulfilled predictions, or statements of existing intent which are not executed." *Comfax v. North American Van Lines*, 587 N.E.2d 118, 125 (Ind. Ct. App. 1992). By allegedly agreeing with Kluge that he could withdrew his resignation before its effective date, Gordon was at best making a mere broken promise that cannot form the basis for an actionable fraud claim.

Moreover, although not central to Kluge's fraud claim, it is worth noting Kluge had no legal right to withdraw his resignation.

Indiana Code section 5-8-4-1 states in relevant part,

> Whenever any . . . employee of . . . any . . . school corporation . . . shall submit in writing his . . . resignation . . . at some future fixed date, with the proper . . . person or persons or authority of government to receive such resignation, the person so submitting such written resignation shall have no right to withdraw . . . without the consent of the . . . person or persons of authority of government having power by law to fill such vacancy."

Courts addressing this statute are unsympathetic to claims arguments for rescission. *See, e.g., Guzik v. Town of St. John*, 875 N.E.2d 258, 269 (Ind. Ct. App. 2007) (rejecting validity of employee's attempted withdrawal); *Crabtree v. Lee*, 469 N.E.2d 476, 478-79 (Ind. Ct. App. 1984) (rejecting arguments related to duress, tender to proper official, requisite intent, and validity of conditions other than effective date).

IV.      *Conclusion.*

For reasons stated, Defendants respectfully request that the Court dismiss Kluge's

Amended Complaint in its entirety.

Respectfully submitted,

/s/ Brent R. Borg
Brent R. Borg, Attorney No. 27415-29
Alexander P. Pinegar, Attorney No. 26543-49
Church Church Hittle + Antrim
10765 Lantern Road, Suite 201
Fishers, IN  46038
317-773-2190

Attorneys for Defendants

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 9th day of September 2019, a true and exact copy of the

foregoing was filed electronically via the Court's Electronic filing system.  Notice of this filing

was sent to the following persons by operation of the Court's Electronic filing system:

Kevin E. Green
Kevin Green Associates
456 N. Meridian Street, #1517
Indianapolis, IN  46204
keglegal@aol.com

Michael J. Cork
Michael J. Cork, Esq.
5754 N. Delaware St.
Indianapolis, IN  46220-2528
cork0@icloud.com

Roscoe Stovall, Jr.
Roscoe Stovall, Jr. & Associates
2 West Main Street
Mooresville, IN 46158
rstovall@roscoelaw.com

Barbara J. Baird
Law Office of Barbara J. Baird
445 Northwest Pennsylvania Street, Suite 401
Indianapolis, IN  46204
bjbaird@bjbairdlaw.com

Isaac C. Belfar
William Isasi
Henry Liu
D. Jean Veta
Covington & Burling LLP
One City Center
850 Tenth Street, NW
Washington, DC 20001-4956
ibelfer@cov.com
wisasi@cov.com
hliu@cov.com
jveta@cov.com

Paul D. Castillo
Lambda Legal Defense and Education Fund, Inc.
3500 Oak Lawn Avenue, Suite 500
Dallas, TX  75219
pcastillo@lambdalegal.org

Camilla B. Taylor
Lambda Legal Defense and Education Fund,
Inc.
10 W Adams, Suite 2600
Chicago, IL  60603
ctaylor@lambdalegal.org

/s/ *Brent R. Borg*
Brent R. Borg, Atty No: 27415-29