# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| **JOHN M. KLUGE,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:19-cv-2462-JMS-DLP |
| | ) | |
| **BROWNSBURG COMMUNITY** | ) | |
| **SCHOOL CORPORATION**, | ) | |
| **DR. JAMES SNAPP**, Superintendent | ) | |
| of Brownsburg Community School | ) | |
| Corporation, in   his official capacity; | ) | |
| **PHIL UTTERBACK**, President of the | ) | |
| Brownsburg Community School | ) | |
| Corporation School Board, in his | ) | |
| official capacity; **JODI GORDON**, | ) | |
| Human Resources Director of | ) | |
| Brownsburg Community School | ) | |
| Corporation, in her official capacity; | ) | |
| and **DR. BRET DAGHE**, Principal of | ) | |
| Brownsburg Community School | ) | |
| Corporation High School, in his | ) | |
| official capacity, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S RESPONSE BRIEF IN OPPOSITION
## TO DEFENDANTS' MOTION TO DISMISS

TABLE OF CONTENTS

PRELIMINARY STATEMENT............................................................... 8

ARGUMENT ....................................................................................... 10

    I. Applicable Standards for a Fed. R. Civ. P. 12(b)(6) Motion to Dismiss...............10

    II. Plaintiff's Claims..............................................................................11

        A. Individual Defendants in Official Capacity.......................................11

        B. Kluge States Valid Claims Under Title VII of the Civil Rights Act ......... 12

            1. Religious Discrimination-Failure to Accommodate...................... 12

            2. Retaliation.............................................................. 16

            3. Hostile Environment Based on Religion................................... 17

        C. Kluge States Valid First Amendment Claims............................................. 19

            1. Freedom of Speech – Retaliation................................................. 23

            2. Freedom of Speech – Content and Viewpoint Discrimination.......... 26

            3. Freedom of Speech – Compelled Speech................................... 26

            4. Free Exercise of Religion......................................................... 27

            5. Unconstitutional Conditions.................................................... 28

        D. BCSC's Transgender Policies Are Vague................................... 29

        E. Equal Protection Claim............................................................ 31

        F. Kluge's Religious Discrimination Claims Under the Indiana
           Constitution Should Be Acknowledged or Certified to the
           Indiana Supreme Court........................................................ 32

G.  Kluge Has Stated Valid Tort Claims Under
Indiana Common Law……………………………………………   33

1.  Intentional Infliction of Emotional Distress…………………………   33

2.  Fraud………………………………………………………………..   33

CONCLUSION ................................................................................   35

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. U.S.F. Logistics, Inc.,*
    274 F.3d 470 (7th Cir. 2001) …………………………………………………… 12

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) …………………………………………………………….. 10

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) …………………………………………………………….. 10

*Brown v. Entm't Merchs. Ass'n,*
    564 U.S. 786 (2011) …………………………………………………………….. 30

*City Chapel Evangelical Free Inc. v. City of South Bend,*
    744 N.E.2d 443 (Ind. 2001) …………………………………………………… 32

*City of Chi. v. Morales,*
    527 U.S. 41 (1999) …………………………………………………………….. 29

*Connally v. Gen. Constr. Co.,*
    269 U.S. 385 (1926) …………………………………………………………… 31

*Contreras v. Suncast Corp.,*
    237 F.3d 756 (7th Cir. 2001) ………………………………………………… 16, 17

*Crabtree v. Lee,*
    469 N.E.2d 476 (Ind. Ct. App. 1984) …………………………………………. 35

*Dawson v. Monaco Coach Corp.,*
    No. 3:02-CV-830, 2005 U.S. Dist. LEXIS 28243 (N.D. Ind., Nov. 9, 2005) …. 19

*E.E.O.C. v. Abercrombie & Fitch, Inc.,*
    135 S.Ct. 2028 (2015) ………………………………………………………… 12

*E.E.O.C. v. Bridgestone/Firestone, Inc.,*
    95 F. Supp. 2d 913 (C.D. Ill. 2000) …………………………………………….. 12

*E.E.O.C. v. United Parcel Serv.*,
   94 F.3d 314 (7th Cir. 1996) ……………………………………………….. 12

*Employment Div. v. Smith*,
   494 U.S. 872 (1990) ………………………………………………… 27

*Filinovich v. Claar*,
   2006 WL 1994580 (N.D. Ill., July 14, 2006) ………………………………… 28

*Garcetti v. Ceballos*,
   547 U.S. 410 (2006) …………………………………………… 19, 20, 22, 23, 25, 26

*Gates v. Bd. of Educ. of Chi.*,
   916 F.3d 631 (7th Cir. 2019) ……………………………………………... 17, 18

*Grayned v. City of Rockford*,
   408 U.S. 104 (1972) ………………………………………………… 30

*Harris v. Forklift Systems, Inc.*,
   510 U.S. 17 (1993) ………………………………………………… 17

*Jackson v. County of Racine*,
   474 F.3d 493 (7th Cir. 2007) ……………………………………………... 17

*Janus v. Am. Fed'n of State, Cty., & Mun. Emps.*,
   138 S. Ct. 2448 (2018) …………………………………………………… 21, 26

*Johnson v. Advocate Health and Hospitals Corp.*,
   892 F.3d 887 (7th Cir. 2018) ……………………………………………. 17

*Jones v. Anderson Community School Corporation*,
   2017 WL 4315132 (S.D. Ind. Sept. 28, 2017) ………………………………… 11

*Kastl v. Maricopa Cty. Cmty. Coll. Dist.*,
   2004 WL 2008954 (D. Ariz. Jun. 3, 2004) ……………………………………... 21

*Kubiak v. City of Chicago*,
   810 F.3d 476 (7th Cir. 2016) …………………………………….......................... 11

*Meriwether v. Trustees of Shawnee State University,*
No. 1:18-cv-753 (S.D. Ohio Sept. 5, 2019) …………………………………… 10

*O'Hare Truck Serv. v. City of Northlake,*
518 U.S. 712 (1996) ………………………………………………….. 29

*Pickering v. Bd. of Ed. of Township High School Dist. 205, Will Cnty.,*
391 U.S. 563 (1968) ……………………………………………………… 20

*Piggee v. Carl Sandburg College,*
464 F.3d 667 (7th Cir. 2006) …………………………………………… 25

*Porter v. City of Chicago,*
700 F.3d 944 (7th Cir. 2012) ……………………………………………….. 12

*Robinson v. Perales,*
894 F.3d 818 (7th Cir. 2018) …………………………………………. 18

*Romano v. Bd. of Educ. for Bloom Twp. High Sch. Dist. 206,*
2016 WL 2344581 (N.D. Ill. May 4, 2016) …………………………………… 29

*Rosenberger v. Rector and Visitors of Univ. of Va.,*
515 U.S. 819 (1995) …………………………………………………… 20

*Ryan v. U.S. Dept. of Justice,*
950 F.2d 458 (7th Cir. 1991) …………………………………………… 27

*Snyder v. Phelps,*
562 U.S. 443 (2011) …………………………………………………….. 21

*Summers v. Whitis,*
2016 WL 7242483 (S.D. Ind. Dec. 15, 2016) ………………………………… 13

*Trans World Airlines, Inc. v. Hardison,*
432 U.S. 63 (1977) ……………………………………………………… 15

*Vance v. Ball State Univ.,*
570 U.S. ——, 133 S.Ct. 2434 (2013) …………………………………… 18

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,*
    455 U.S. 489 (1982) ……………………………………………………    30

*Webster v. New Lenox School District No. 122,*
    917 F.2d 1004 (7th Cir. 1990) …………………………………………    24

*Wooley v. Maynard,*
    430 U.S. 705 (1977) ……………………………………………………    26

*Wozniak v. Adesida,*
    932 F.3d 1008 (7th Cir. 2019) …………………………………………    25

**Rules**

Fed. R. Civ. P. 8(a)(2) …………………………………………………………    10

Fed. R. Civ. P. 12(b)(6) …………………………………………………………    10

Indiana Rule of Appellate Procedure 64……………………………………    33

**Statutes**

Indiana Constitution, Art. I, §§ 2 and 3……………………………………..    32

Indiana Code § 5-8-4-1……………………………………………………………..    35

**PRELIMINARY STATEMENT**

Taken to its logical extension, the Defendants' argument could foreseeably result in a non-black student with no disability claiming misassignment of race and congenital able-bodiedness, attending school in blackface pending contract surgery, with teachers who know the truth yet required to embrace the student's imaginations at risk of their jobs.[1] Defendant refers to the required use of transgender names by public school teachers as an official duty and an administrative function. But it violated Kluge's conscience and sincerely-held religious beliefs. If allowed, it would exalt the protected category of biological sex over the protected category of religion. Sexual liberty does not trump religious liberty.

Requiring the use of transgender names selected by students suffering from gender dysphoria is not the only option and not a legal requirement.  In making that choice, the Brownsburg Community School Corporation (BCSC) (pressured by outside interest groups) is deciding how to treat a mental disorder—the treatment of which is the current subject of debate among medical professionals. It is best left to those professionals and not educators.

Kluge's refusal to use transgender names based upon his conscience and sincerely-held religious beliefs is a refusal to have his speech compelled by his employer

---

[1] *See, e.g.,* Rachael Revesz, *University of Michigan Student Changes Name to "His Majesty" Following New "Inclusive" Pronoun Policy*, INDEP., Sept. 30, 2016, https://ind.pn/2H6738q (last visited September 28, 2019)

regarding a matter of significant public concern. The public concern is that words, objective truth, and core beliefs matter, as shown by numerous lawsuits around the country regarding similar issues. Using transgender names is neither an official duty nor an administrative function. The speech involved is private speech, as acknowledged by BCSC when it agreed to a last-names-only accommodation for Kluge, based on his personal, private beliefs.

Kluge's accommodation satisfied the requirement of using student names listed in the PowerSchool database, since last names are listed there. The use of last names for all students was effective and did not disrupt the teaching environment. Student names are not part of the curriculum. The removal of the accommodation was not due to student complaints, but rather coincided with a new BCSC transgender policy disallowing such an accommodation and suggesting—incorrectly—that religious accommodations are not required in the employment context.

BCSC's motion to dismiss Kluge's complaint requires that his allegations be taken as true and all inferences made in his favor.

# ARGUMENT[2]

## I.   Applicable Standards for a FRCP 12(b)(6) Motion to Dismiss

Fed. R. Civ. P. 8(a)(2) requires only "a short and plain statement . . . showing that [Kluge] is entitled to relief." He is only required to give Defendants fair notice of his claims and the supporting grounds. To survive Defendants' motion to dismiss, Kluge must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955). In considering Defendants' 12(b)(6) motion, the Court must "accept as true all of the well-pleaded facts in the complaint and draw all reasonable

---

[2] Defendants' brief in support of their motion to dismiss cites *Meriwether v. Trustees of Shawnee State University*, No. 1:18-cv-753 (S.D. Ohio Sept. 5, 2019) and invites the Court's review. [Filing No. 45 at 5 n.3] *Meriwether* involves a college professor in the 6th Circuit. There are similarities—*Meriwether* also involves an intervenor that filed a 12(b)(6) motion to dismiss very similar to the same motion filed by the original defendants. But there are many differences: for example, Kluge's claims under Title VII of the Civil Rights Act; Dr. Meriwether's complaint does not contain Title VII claims. Kluge is a high school teacher who works with minors, not a college professor.

inferences in favor of the plaintiff." *Kubiak v. City of Chicago*, 810 F.3d 476, 480-81 (7th Cir. 2016).

## II. Plaintiff's Claims

### A. Individual Defendants in Official Capacity

Defendants cite *Jones v. Anderson Community School Corporation*, 2017 WL 4315132, at *3 (S.D. Ind. Sept. 28, 2017), for the proposition that, as to Plaintiff's constitutional claims, naming individual Defendants in their official capacities, in addition to Brownsburg Community School Corporation ("BCSC"), is redundant. [Filing No. 45 at 6-7.] *Jones* was decided by another judge in the Southern District of Indiana, Indianapolis Division, and is therefore not binding on this Court. But Plaintiff understands this Court may find *Jones* persuasive. Therefore, Plaintiff voluntarily dismisses the constitutional claims against Defendants Dr. James Snapp, Phil Utterback, Jodi Gordon, and Dr. Bret Daghe, in their official capacities, with prejudice.

Defendants also state correctly that Plaintiff has not alleged that the individual Defendants acted outside the course and scope of their duties regarding the state common law claims. [Id. at 7.]  And Defendant BCSC has not raised that defense in the Case Management Plan. [Filing No. 36.] Accordingly, Plaintiff dismisses the state-law official capacity claims against Defendants, Dr. James Snapp, Phil Utterback, Jodi Gordon, and Dr. Bret Daghe voluntarily, but requests the dismissal be without prejudice, in the event Defendant BCSC subsequently asserts that any of the individual

Defendants acted outside the course and scope of their duties regarding Plaintiff.

**B. Kluge States Valid Claims Under Title VII of the Civil Rights Act**

**1. Religious Discrimination - Failure to Accommodate**

Kluge establishes a prima facie case of religious discrimination based on BCSC's denial of a reasonable accommodation—last names only. Kluge (1) has sincerely-held religious beliefs that conflict with BCSC's requirement; (2) he brought those beliefs to BCSC's attention; and (3) those beliefs were the basis for an adverse employment action—BCSC told him to use transgender first names or get out and forced his resignation. [Filing No. 15 at 8-12.] *Porter v. City of Chicago*, 700 F.3d 944, 951 (7th Cir. 2012); *Anderson v. U.S.F. Logistics, Inc.*, 274 F.3d 470, 475 (7th Cir. 2001); *E.E.O.C. v. United Parcel Serv.*, 94 F.3d 314, 317 (7th Cir. 1996).

BCSC carries the ultimate burden to accommodate Kluge. The employee is only required to make some effort to cooperate with an employer's attempt to resolve the religious conflict. *E.E.O.C. v. Bridgestone/Firestone, Inc.*, 95 F. Supp. 2d 913, 921 (C.D. Ill. 2000). Whether analyzed under *E.E.O.C. v. Abercrombie & Fitch, Inc.*, 135 S.Ct. 2028 (2015) or the prior standard, there is no dispute that Kluge communicated his sincerely-held beliefs to BCSC and then proposed the accommodation that his employer agreed to in writing—last-names only. [See Filing No. 15 at 6, ¶¶ 28-30; at 7-8, ¶¶ 38-40; at 8, ¶¶ 43-44; Filing No. 15-1, Ex. A, Accommodation Agreement.]

This is not a matter of Kluge's "subjective perception" of a conflict between his

beliefs and the transgender names requirement that the Court may now revisit for objective conflict. [Filing No. 45 at 8.] BCSC acknowledged the conflict and agreed to an accommodation—in writing. [Filing No. 15-1.] BCSC is not entitled to the equivalent of a judicial "Mulligan" erasing BCSC's accommodation. The Court should decline this invitation.

The Court should also decline the invitation to treat the "transgender names" requirement as an "administrative function." [Filing No. 45 at 8-9.] *Summers v. Whitis*, 2016 WL 7242483 (S.D. Ind. Dec. 15, 2016) is not binding on this Court or any other court, except the one from which it emanated. Even if it were, that case is inapplicable on its facts. Kluge is not a civil servant issuing licenses. He was a high school music and orchestra teacher. Requiring a teacher to use a transgender name cannot, by any stretch of the imagination, be considered an administrative function similar to issuing a marriage license. Moreover, this argument is self-defeating. If using names in PowerSchool is an administrative function, Kluge's accommodation worked well, because last names must be listed in that database. Based on BCSC's own argument, the last-names accommodation satisfied all involved—an admin success story.

It is also grossly incorrect to suggest that requiring teachers to use a new name selected by an adolescent suffering from gender dysphoria is not an expression of approval, acceptance, and even celebration. Some may find that activity worth celebrating, but others may find it violates sincerely-held beliefs or rights of conscience.

Kluge falls in the latter category. In this regard, he is not alone.  Consider a Caucasian or Asian or Eskimo student claiming to be the wrongly assigned race, who comes to school in blackface pending surgical change sometime in the future, with doctor on contract & (beleaguered) parent's support.  Would black teachers or frankly teachers of any ethnic heritage be expected to go along with the ensuing disruption?  It would be a complete denial of reality & affront to historical dignity to which any teacher could rightfully take exception; black teachers in particular might have legal recourse if required to publicly support such a stance.  What about a student claiming congenital disability and any concomitant accommodation, despite able-bodied outward appearance and complete absence of objective evidence—would teachers, with the truth known, be held accountable to provide continual specific support to the student's vicissitudes?  Such examples do not reflect lack of dignity for persons truly in these categories; rather, quite the opposite—legitimate occupiers of such categories possess dignity and deserve any community support that goes with substantiated reality, i.e. the very point.  Definitive genetic fundamentals are beyond humanity's purview; a previous generation summed up outlier yearning saying, the grass seems greener on the other side.  Human beings participate in the opposite sex's existential realities, to the extent wholesome and appropriate, through relationships with parents, teachers, mentors, and at some point, their own maturity.  Given the vulnerability of young age and the burgeoning financial incentive of the erstwhile cautionary professional class, it's

a clear matter of conscience whether opposite-sex projections and life-altering surgery, with little ultimate effect on happiness, should be encouraged for minors.[3]

Finally, BCSC also cannot dispute that undue hardship requires the employer to show more than a de minimis cost to the employer's business. *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977). BCSC never stated in writing to Kluge that his accommodation was creating an undue hardship, nor offered in writing an alternative accommodation. BCSC admits that undue hardship is not an issue at this stage. [Filing No. 45 at 8 n.4.] But it also argues undue hardship in the same pleading. [See Filing No. 45 at 2 n.1, and at 3.] BCSC never told Kluge his accommodation created an undue hardship—not verbally and not in writing. No documents cited by BCSC contain a claim of undue hardship. While BCSC argues that HR Director Gordon and Principal Daghe told Kluge his accommodation was disrupting the "learning environment" [Id. at 3.], the document cited in support of that claim does not contain those words. [See Filing No. 15-3 at 6-7.]

---

[3]  Dr. Paul McHugh, Harvard-trained psychiatrist who on principle shut down the Johns Hopkins sex-change clinic in 1979, likens the mindset to anorexia, the overvalued perception of being thin, a "ruling passion" which grows more dominant and resistant to challenge over time.  The new-school practitioners of gender dysphoria, with its expensive hospital surgeries in view, affirm the patient's self-diagnosis and behavior— the opposite of historical methods.  Abigail Shrier, *"Standing Against Psychiatry's Crazes"*, Wall Street Journal Weekend Interview, May 3, 2019.

### 2.  Retaliation

Kluge is also able to establish a claim of retaliation: (1) he engaged in statutorily protected activity by identifying a sincerely-held religious belief that conflicts with his employer's work requirement and offered an accommodation for his belief, which BCSC accepted, in writing; (2) he suffered an adverse employment action when BCSC removed his last-names only accommodation and forced him to resign; and (3) there is a causal connection between the protected activity and the adverse employment action: Kluge was forced out because he refused to use transgender first names and pronouns. *See Contreras v. Suncast Corp.*, 237 F.3d 756, 765 (7th Cir. 2001).

BCSC argues that Kluge cannot establish a prima facie case of retaliation because there is no causal connection between the protected activity—his request for an accommodation—and the adverse employment action. [Filing No. 45 at 11.] However, prima facie retaliation is established with Kluge's allegation that Defendant's claim of student complaints about his use of last names, subsequent to his accommodation, was a pretext to allow the introduction of a new transgender policy, which prohibited such an accommodation by its terms. [Filing No. 15 at 12, ¶¶ 65-67; at 13-15, ¶¶ 71-76; Filing No. 15-4, Ex. D.]

At this stage, the Court must take Kluge's allegations as true and allow him the opportunity to acquire supporting evidence through discovery. If there are, indeed, student complaints about his last-names accommodation, they will be available in

discovery. But if BCSC cannot identify or produce evidence of those complaints, Kluge's theory is validated.

BCSC cannot articulate a legitimate, nondiscriminatory reason for its actions, since the only "hardship" it claims amounts to a heckler's veto. BCSC's attempt to establish a legitimate, nondiscriminatory reason is a sham, designed to hide unlawful retaliation. BCSC has failed to meet its burden. *See Contreras*, 237 F.3d at 765.


### 3.   Hostile Environment Based on Religion

BCSC's reliance on the "hellish" standard as a requirement for a hostile environment is simply incorrect. [See Filing No. 45 at 12.] The "hellish" standard "is not a standard a plaintiff must satisfy." *Gates v. Bd. of Educ. of Chi.*, 916 F.3d 631, 633 (7th Cir. 2019). (Citing *Jackson v. County of Racine* , 474 F.3d 493, 500 (7th Cir. 2007); *Johnson v. Advocate Health and Hospitals Corp.*, 892 F.3d 887, 901 (7th Cir. 2018) (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) ("Title VII comes into play before the harassing conduct leads to a nervous breakdown."))

In *Gates*, the plaintiff testified that his supervisor called him the "N-word" twice and once "threatened to write-up his 'black ass.'" *Gates*, 916 F.3d at 632. The appellate court noted the critical difference between harassment by co-workers and harassment by a supervisor. *Id.* at 638-39. Based on that evidence, the 7th Circuit reversed the entry of summary judgment for defendant on the hostile environment claim. *Id.* at 633.

BCSC is also incorrect in stating that "Kluge bases his hostile work environment entirely on Brownsburg's alleged demand that 'Kluge address students with gender dysphoria by their preferred names, resign, or be terminated.'" (Citing Dkt. 15, ¶ 98.) [See Filing No. 45 at 12.] Kluge's claim of hostile environment (as with all his claims) incorporates by reference all his factual allegations, as well as additional statements in support of his hostile environment claim. [Filing No. 15 at 18, ¶¶ 97-102.] Kluge's factual allegations also cite four exhibits to his amended complaint. [See Filing Nos. 15-1, 15-2, 15-3, and 15-4.]

"Title VII prohibits the creation of a hostile work environment." *Vance v. Ball State Univ.*, 570 U.S. ——, 133 S.Ct. 2434 2440, 186 L.Ed.2d 565 (2013). In order to prevail on such a claim, a "plaintiff must show that the work environment was so pervaded by discrimination that the terms and conditions of employment were altered." *Id*. To prove that the BCSC employment environment was actionably hostile, Kluge must show "(1) he was subject to unwelcome harassment; (2) the harassment was based on race [a protected category]; (3) the harassment was severe or pervasive to a degree that altered the conditions of employment and created a hostile or abusive work environment; and (4) there is a basis for employer liability." *Robinson v. Perales* , 894 F.3d 818, 828 (7th Cir. 2018) (citations omitted).

"[P]laintiffs' evidence need not show a descent into the Inferno." *Gates*, 916 F.3d at 637. Kluge's allegations include that he was suspended for his initial refusal to use

transgender names, requested and received a last-names only accommodation in writing, used the accommodation effectively for semester (during which his students excelled), yet despite the accommodation was asked by his principal to resign or be terminated, had his accommodation removed by the human resources director so that a new transgender policy could be introduced, was fraudulently induced into submitting a conditional resignation—the conditions of which BCSCS never intended to honor— and when he attempted to rescind that resignation prior to its effective date, BCSC processed it immediately, locked him out and posted his job as vacant. [Filing No. 15 at 5-16, ¶¶ 21-82; Filing Nos. 15-1, 15-2, 15-3, and 15-4.]

Superintendent Snapp, Principal Daghe, and Human Resources Director Gordon may not have overtly told Kluge to get his "f--king Christian ass" out of the school building (language in original), but their combined statements and actions directing him to violate his sincerely-held religious beliefs or get out are effectively the same thing. And these three are supervisors, not co-workers. *See Dawson v. Monaco Coach Corp.*, No. 3:02-CV-830, 2005 U.S. Dist. LEXIS 28243, at *30-33 (N.D. Ind., Nov. 9, 2005).

### C.  Kluge States Valid First Amendment Claims

Whether a public employee's speech is constitutionally protected depends on "whether the employee spoke as a citizen on a matter of public concern." *Garcetti v. Ceballos,* 547 U.S. 410, 418, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006). Public employee

speech does not lose First Amendment protection because it concerns the subject matter of the employee's job. *Id.* at 421. Public employees are often "the members of a community most likely to have informed and definite opinions" on issues of public concern. It is "essential that they be able to speak out freely on such questions without fear of retaliatory dismissal." *Id.* (quoting *Pickering v. Bd. of Ed. of Township High School Dist. 205, Will Cnty.*, 391 U.S. 563, 572, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)). And public employees' speech may not be restricted because it occurs inside the workplace. "Many citizens do much of their talking inside their respective workplaces." *Garcetti*, 547 U.S. at 420–421, 126 S.Ct. 1951. Speech does not "owe[ ] its existence to a public employee's professional responsibilities" under *Garcetti* simply because public employment provides the factual predicate for the expression. *Garcetti* governs speech that is made "pursuant to official duties" in the sense that it is "government employees' work product" that the employer has "commissioned or created." *Id.* at 422, 126 S.Ct. 1951 (citing *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 833, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995)).

To determine whether a public employee is speaking—or refusing to speak—as an employee or as a citizen, "[t]he proper inquiry" must be "a practical one." *Garcetti*, 547 U.S. at 424, 126 S.Ct. 1951. The issue is whether the speech (or refusal to speak) is part of the employee's "daily professional activities." *Id.* at 422, 126 S.Ct. 1951. The question is whether the public employee spoke (or refused to speak) "because that is part of what

[the public employee] was employed to do." *Id*. at 421, 126 S.Ct. 1951.

In speaking and refusing to speak on the mental disorder known as gender dysphoria, Kluge spoke as a citizen on a matter of public concern. A matter of public concern includes anything that "can be fairly considered as relating to any matter of political, social, or other concern to the community" or "is a subject of legitimate news interest." *Snyder v. Phelps*, 562 U.S. 443, 453 (2011). More recently, the Supreme Court said that "gender identity" is "undoubtedly [a] matter[] of profound 'value and concern to the public.'" *Janus v. Am. Fed'n of State, Cty., & Mun. Emps.*, 138 S. Ct. 2448, 2476 (2018); *accord Kastl v. Maricopa Cty. Cmty. Coll. Dist.*, 2004 WL 2008954, *9 (D. Ariz. Jun. 3, 2004) (finding transgender professor's "expression of her gender and change of gender" a matter of public concern). Further, Kluge requested and received from Defendants an accommodation for his religious beliefs against using transgender names [Filing No. 15 at 8-10, ¶¶ 44-57.] Therefore, Defendants cannot credibly deny that he addressed a matter of public concern.

Although some students and other faculty may have found Kluge's use of last names "inappropriate or controversial," that is "irrelevant to the question of whether it deals with a matter of public concern." *Snyder*, 562 U.S. at 453. "Such speech cannot be restricted simply because it is upsetting or arouses contempt." *Id*. at 458. It "occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Id*. at 452.

Transgender names were not part of Kluge's official duties in the sense that they were part of his work product that BCSC "commissioned or created." *Garcetti*, 547 U.S. at 422. He was hired to teach music and orchestra classes. His teaching duties did not include a school-mandated message approving "affirmance therapy" by the use of transgender names which were not students' legal names. That issue involves a medical decision which is the subject of debate in the medical profession. (Compare, for example, the positions of the American Academy of Pediatrics versus the American College of Pediatricians on the proper course of treatment for gender dysphoria.)

Moreover, student names were not part of the curriculum Kluge taught. The subject matter Kluge taught and the method of teaching it, did not hinge on the use of first names, last names, pronouns, or honorifics. Student names were not part of Kluge's official duties.

This would all be true without the added element of Kluge's sincerely-held religious beliefs against affirming gender dysphoria. BCSC does not claim those beliefs are not religious in nature or insincere. BCSC entered into a written accommodation agreement which Kluge alleges worked as intended, allowing him to honor his conscience and teach effectively. [Filing No. 15 at 8-10, ¶¶ 44-57.] Those allegations must be taken as true at this stage.

BCSC cannot now claim that the transgender student name requirement was part of Kluge's official duties. This is especially so when the official duty considered would

discriminate against Kluge based on his sincerely-held beliefs—beliefs which were accommodated by BCSC.

## 1.  Freedom of Speech – Retaliation

Kluge incorporates by reference the foregoing *Garcetti* analysis, which applies to each of his 1st Amendment claims.

For his 1st Amendment retaliation claim, Kluge alleges:

104. By punishing and threatening to punish Mr. Kluge for expressing his views regarding gender dysphoria, Defendants have retaliated and are retaliating against Mr. Kluge for exercising his First Amendment rights.

105. When Mr. Kluge communicated his views regarding gender dysphoria through his choice of names and pronouns in his prospective interactions with students and in his classroom, he was speaking on a matter of public concern, engaging in speech related to teaching and scholarship, and engaging in expression the First Amendment protects.

106. Mr. Kluge's interest, as a teacher at a public high school, in discussing matters of public concern in the context of teaching, scholarship, and concern with students' wellbeing, outweighs Defendants' interest in the efficient provision of services.

107. Mr. Kluge's speech on matters of public concern in the context of teaching and scholarship never prevented Defendants from efficiently providing services to the public (or even threatened to do so).

108. Defendants' transgender policies and practices, their enforcement of those policies and practices, and their threatened future enforcement of those policies and practices would deter a person of ordinary firmness from exercising his rights of conscience and to free speech in the future.

109. Defendants have enforced their transgender policies against Mr. Kluge because of the views he has expressed on matters of public concern in the context of teaching and scholarship, expression that the First Amendment protects.

110. Defendants' transgender policies and their enforcement of those policies violate Mr. Kluge's right to free speech as guaranteed by the First Amendment to the United States Constitution.

[Filing No. 15 at 19-20.]

BCSC asserts three arguments against Kluge's 1st Amendment retaliation claim, all of which fail. First, BCSC claims that Kluge's use of last names in addressing all students deviated from prescribed curriculum, citing *Webster v. New Lenox School District No. 122*, 917 F.2d 1004 (7th Cir. 1990). *Webster* held that public schools can require that teachers follow prescribed curriculum and "also the prescribed perspective on that subject matter." Id. at 479. But Kluge's uniform use of last names for all students was not part of the curriculum, did not deviate from BSCS's prescribed curriculum, and did not adversely affect BCSC's overall educational mission. This claim has no basis in fact.

Second, BCSC relies upon *Piggee v. Carl Sandburg College*, 464 F.3d 667, 668-69 (7th Cir. 2006), where a public college declined to renew an instructor's contract based on a complaint from a homosexual student that the instructor had provided the student with religious pamphlets that, in the student's view, degraded homosexuals. Critical to the court's conclusion was the college's "interest in ensuring that its instructors stay on message. *Piggee* has no application here. BCSC has not alleged that Kluge attempted to evangelize or counsel students. Nothing about Kluge's use of last names only in the classroom cause him to veer off message.

Finally, BCSC argues that this case is similar to *Wozniak v. Adesida*, 932 F.3d 1008, 1010 (7th Cir. 2019), where a professor was terminated for making demeaning public comments about two students who the professor thought were responsible for not selecting him for a teaching award. BCSC argues that how faculty relate to students is part of their jobs. Again, this argument is irrelevant. BCSC has not alleged that he made "demeaning public comments" about any students.

Kluge's well-pled allegations contain all the necessary elements for a 1st Amendment retaliation claim and must be considered true at this stage. He has also established that he spoke as a private citizen on a matter of public concern. The fact that Kluge refused to convey the BCSC-approved message on gender dysphoria while teaching does not change the analysis. *Garcetti*, 547 U.S. at 421. He was not employed to do that. *Id.* Public employee speech does not lose First Amendment protection because it concerns the

subject matter of the employee's job. *Id.*

### 2.   Freedom of Speech – Content and Viewpoint Discrimination

Kluge incorporates by reference the foregoing *Garcetti* analysis, which applies to each of his 1st Amendment claims. Based upon that analysis, Kluge spoke and refused to speak as a citizen on a matter of public concern.

BCSC does not challenge any of Kluge's specific allegations supporting his 1st Amendment content and viewpoint discrimination claim. Those allegations must be taken as true. [See Filing No. 15 at 20-22; ¶¶ 111-122.] Therefore, Kluge's content and viewpoint claim should survive BCSC's motion to dismiss.

### 3.   Freedom of Speech – Compelled Speech

Kluge incorporates by reference the foregoing *Garcetti* analysis, which applies to each of his 1st Amendment claims.

"When speech is compelled … individuals are coerced into betraying their convictions." *f v. Am. Fed'n of State, Cty., & Mun. Emps.*, 138 S. Ct. 2448, 2464 (2018). The state cannot force an individual "to be an instrument for fostering public adherence to an ideological point of view he finds unacceptable." *Wooley v. Maynard*, 430 U.S. 705, 715 (1977); *Janus*, 138 S. Ct. at 2463.

Kluge has alleged in relevant part:

124. By punishing and threatening to punish Mr. Kluge for refusing to communicate a school corporation-mandated ideological message regarding gender dysphoria,

Defendants have attempted to compel Mr. Kluge's speech, in violation of his rights under the First Amendment.

125. Defendants' transgender policies and practices and their enforcement of those policies compelled Mr. Kluge to communicate messages about gender dysphoria that would have violated his religious beliefs.

126. Defendants' transgender policies and practices and their enforcement of those policies and practices violated Mr. Kluge's right to free speech as guaranteed by the First Amendment to the United States Constitution.

[Filing No. 15 at 21.]

Those allegations must be taken as true at this stage and Kluge's compelled speech claim should not be dismissed for failure to state a claim.

### 4. Free Exercise of Religion

The Free Exercise Clause of the First Amendment does not prohibit laws that incidentally burden religious practices so long as such laws are neutral and generally applicable. *Employment Div. v. Smith*, 494 U.S. 872, 879 (1990). The Seventh Circuit has extended Smith's holding to the context of a public employer's workplace policies. *See Ryan v. U.S. Dept. of Justice*, 950 F.2d 458 (7th Cir. 1991). To sustain a Section 1983 free exercise claim challenging a public employer's work requirement, Kluge must show: (1) the requirement is not generally applicable; or (2) the requirement is not neutral because either (a) the public employer created the employment practice with an intent

to discriminate; or (b) the employment practice adversely impacts the employee's religious practices and has no legitimate purpose. *Filinovich v. Claar*, 2006 WL 1994580, at *4 (N.D. Ill., July 14, 2006).

Kluge sustains his free exercise claim challenging BCSC's transgender names work requirement, with allegations that:

129. Mr. Kluge's views and expression related to gender dysphoria are motivated by his sincerely-held religious beliefs, are avenues through which he exercises his religious faith, and constitute a central component of his sincerely-held religious beliefs.

130. Expressing Defendants' mandated message regarding gender dysphoria would require Mr. Kluge to violate his sincerely-held religious beliefs.

131. Defendants' transgender policies and related practices are neither neutral nor generally applicable but allow Defendants to target religious expression and activities specifically and to express hostility to such expression.

132. Defendants' transgender policies and related practices are neither neutral nor generally applicable because they represent a system of individualized assessments. [Filing No. 15 at 22.]

At this stage, those allegations must be taken as true and Kluge's free exercise claim survives BCSC's motion to dismiss.

### 5. Unconstitutional Conditions

Defendant BCSC acknowledges that a claim based on unconstitutional conditions

exists when an adverse employment action is based on political affiliation—in other words, freedom of association. The Supreme Court of the United States has held that "to fire a public employee as a penalty for refusing a request for political and financial support would impose an unconstitutional condition on governmental employment." *O'Hare Truck Serv. v. City of Northlake*, 518 U.S. 712, 720 (1996). A subsequent case suggests that this freedom of association doctrine may be extended based on other constitutional issues. *Romano v. Bd. of Educ. for Bloom Twp. High Sch. Dist. 206*, 2016 WL 2344581, at *4 (N.D. Ill. May 4, 2016). (In order to state a § 1983 claim, the employee's association, or refusal to associate, must be political or implicate some other constitutional concerns.) It is entirely logical that a similar claim could be brought under one of the other 1st Amendment freedoms: speech, religion, assembly, or petition. Here, Kluge alleges a factual basis for an unconstitutional conditions claim based upon speech and religion. Those factual allegations of the complaint must be taken as true. [See Filing No. 15 at 25, ¶¶ 139-143.]

### D. BCSC's Transgender Policies Are Vague

Restrictions are vague if they (1) fail to give fair notice of prohibited conduct; (2) lack "explicit standards for those who apply [them]," inviting arbitrary, discriminatory enforcement; and (3) chill constitutional freedoms. *City of Chi. v. Morales*, 527 U.S. 41, 56

(1999); *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972). "[A] more stringent vagueness test should apply" when policies "interfere[] with the right of free speech." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982); *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 793 (2011). BCSC's acts chill expression and their polices confer unbridled discretion. [Filing No. 15 at 12, ¶ 64.]

BCSC's policies were informal, sometimes unwritten, and when written, suggested they were subject to change. [Filing No. 15 at 12, ¶¶ 65-68; at 13, ¶ 69; Filing No. 15-4 at 1, 2, and 7 ("BCSC is working to develop policy that reflects the answers of this document.").] BCSC's policies fail to give fair notice of what they allow and what they prohibit. Demanding that teachers use names in PowerBase suggests that a teacher could use student last names uniformly, as Kluge did. But BCSC allowed it for Kluge and then changed the policy for the 2018-2019 school year, without warning. [Filing No. 15-4 at 9-10.]

The use of pronouns further highlights the vagueness. What if a student wants to be referred to as "they" and "them"? The use of plural pronouns designating one individual makes it impossible to speak or write clearly when referring to that individual in a group setting, especially an orchestra class with 40 students.

Kluge's treatment highlights the uneven fashion in which BCSC applied its unwritten and written gender dysphoria policies. BCSC cannot dispute that federal law requires it to accommodate employees' sincerely-held religious beliefs. But as Kluge's

Amended Complaint details, he requested and received an accommodation that effectively addressed the issue. [Filing No. 15 at 8-10, ¶¶ 44-57.] BCSC removed it, without offering any reasonable alternative except his resignation. [Filing No. 15-2.] BCSC introduced a new written policy, stating that employees are required to use the PowerSchool name, but explicitly rejecting the last-names only accommodation or use of student last names, although they clearly appear in PowerSchool [Filing No. 15-4 at 9.] And BCSC's new policy states—in response to a question about personal biases and beliefs—that "when you work in a public school, you sign up to follow the law and the policies and practices of that organization and that might mean following practices that are different from your beliefs." [Filing No. 15-4 at 10.] BCSC is obligated by federal law to accommodate religious beliefs, but its new gender dysphoria policy suggests— perhaps outrightly claims—that when you work at BCSC you agree to follow its rules, which may be different from your beliefs. [Id.]

Here, similarly-situated teachers must guess what BCSC's gender dysphoria policies are at any given time and supervisors will "differ as to [their] application." *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926). Kluge states a valid procedural due process vagueness claim and it should be not dismissed.

### E.  Equal Protection Claim

Kluge voluntarily dismisses his equal protection claim, with prejudice.

**F.  Kluge's Religious Discrimination Claims Under the Indiana Constitution Should Be Acknowledged or Certified to the Indiana Supreme Court**

Plaintiff Kluge asserts violations of his rights of conscience and free exercise of religion under Article I, Sections 2 and 3 of the Indiana Constitution. [Filing No. 15 at 29-30, ¶¶161- 166.] Those provisions provide:

Section 2. All people shall be secured in the natural right to worship ALMIGHTY GOD, according to the dictates of their own consciences.

Section 3. No law shall, in any case whatever, control the free exercise and enjoyment of religious opinions, or interfere with the rights of conscience.

Ind. Const. Art. I, §§ 2 and 3.

The Indiana Supreme Court has held these provisions advance "core values that restrain government interference with the practice of religious worship, both in private and in community with other persons." *City Chapel Evangelical Free Inc. v. City of South Bend*, 744 N.E.2d 443, 450 (Ind. 2001). The only ground Defendant asserts in support of its motion to dismiss Kluge's Indiana Constitution claims is that no Indiana case has applied these provisions in the public employment context. [Filing No. 45 at 24.] The language is clear in preventing any attempt to "control the free exercise and enjoyment of religious opinions, or interfere with the rights of conscience." Ind. Const. Art. I, § 3. It seems logical the protection should apply to public employment. The fact that Defendant, a community school corporation, does not want the Court to find such protection is understandable. But that's the only argument the Defendant makes, and it

is insufficient. Therefore, the Court should find such protection in the clear language of our state constitution.

Alternatively, since it appears there is no clear controlling Indiana precedent on the question of whether a claim under Article I, §§ 2 and 3 of the Indiana Constitution is applicable in the public employment context, Plaintiff Kluge requests the Court certify that question to the Indiana Supreme Court under Rule 64 of the Indiana Rules of Appellate Procedure, for a determination.

### G. Kluge Has Stated Valid Tort Claims Under Indiana Common Law

#### 1. Intentional Infliction of Emotional Distress

Kluge's Indiana common law claim for intentional infliction of emotional distress consists of a short, plain statement that contains all the elements required, except for a specific recitation that BCSC's conduct was extreme and outrageous. The claim is supported by ¶¶ 1-90 of the complaint, which are incorporated by reference. Those allegations must be taken as true. BCSC clearly understands the nature of the claim against it and this claim should not be dismissed.

#### 2. Fraud

Defendant misstates Kluge's fraud claim as one based on a misrepresentation of

future acts. [Filing No. 45 at 25-26.] But Kluge's claim is based on a material

misrepresentation of existing fact, not a future act, or a promise of future performance.

Kluge's allegations, which must be taken as true at this stage, include that Defendant

BCSC intentionally and knowingly represented that Kluge could submit a conditional

resignation; the misrepresentation was made with malice, oppression, and fraud; the

misrepresentation was made with the intention that Kluge would reply upon it to his

detriment; he did so rely upon it by submitting a conditional representation; and he

suffered damages as a proximate result. [Filing No. 15 at 31, ¶¶ 170-73.] Kluge suffered

damages because Defendant had absolutely no intention of honoring any condition that

Human Resources Director Jodi Gordon agreed to in writing. [See Filing No. 15-2 at 1,

Ex. B.] BCSC simply wanted a resignation, leading to the "fingers-crossed" false front

strategy, so it could claim Kluge resigned instead of being terminated.

Contrary to Defendant's argument, Kluge's fraud claim is not based on BCSC's

failure to honor the conditions. [See Filing No. 45 at 25-26.] But based on Defendant's

argument, the Court could find that Kluge actually submitted a resignation with a

future effective date of May 29, 2018, and not the date the resignation was submitted:

May 25th. [Id. at 26.] Human Resources Director Gordon received the resignation, with

Kluge's clear instruction not to send it to the administration before May 29th. [Filing 15-

2.] Therefore, the effective date was May 29th, not May 25th, but Gordon submitted it on

May 25th before its effective date, it was processed, Kluge was locked out, and his job

was posted. [Filing No. 15 at 10-12.]

If Gordon was the proper person to receive the resignation, there was no need to

send it to the administration and have the school board approve it. Defendant cites

Indiana Code section 5-8-4-1:

> Whenever any . . . employee of . . . any . . . school corporation . . . shall submit in
> writing his . . . resignation . . . at some future fixed date, *with the proper . . . person
> or persons* or authority of government to receive such resignation, the person so
> submitting such written resignation shall have no right to withdraw . . . without
> the consent of the . . . person or persons of authority of government having
> power by law to fill such vacancy." (Emphasis added.)

And BCSC cites *Crabtree v. Lee*, 469 N.E.2d 476, 478-79 (Ind. Ct. App. 1984) in part for

the proposition that it is a valid condition to set a future effective date. BCSC's fraud

resulted in an invalid resignation, since it was processed prior to the effective date.


## CONCLUSION

Kluge has voluntarily dismissed his claims against the individual defendants in their

official capacities and his equal protection claim. The remainder of Kluge's claims

survive the Defendants' motion to dismiss. Kluge is only required to provide a short,

plain statement of his claims and his allegations must be taken as true at this stage.

*/s/ **Michael J. Cork***

Michael J. Cork, Esq., IN Atty. 11760-49
5754 N. Delaware Street
Indianapolis, Indiana 46220-2528
317-517-4217
email: cork0@icloud.com

/s/ **_Roscoe Stovall, Jr._**
Roscoe Stovall, Jr.
456 N. Meridian Street
Suite 507
Indianapolis, IN 46204
317-831-3999
rstovall@roscoelaw.com


/s/ **_Kevin E. Green_**
Kevin E. Green
456 N. Meridian Street
Suite 1517
Indianapolis, IN 46204
317-437-5002
keglegal@aol.com


Attorneys for Plaintiff, John M. Kluge


### Certificate of Service

I certify that on this 30th day of September 2019, an accurate copy of the foregoing

Plaintiff's Response Brief in Opposition to Defendants' Motion to Dismiss the First

Amended Complaint was filed electronically. Service of this filing will be made on all

ECF-registered counsel by operation of the court's electronic filing system. Parties may

access this filing through the court's system.

/s/ **_Kevin E. Green_**
Kevin E. Green