UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JOHN M. KLUGE, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| BROWNSBURG COMMUNITY SCHOOL | ) | No. 1:19-cv-2462-JMS-DLP |
| CORPORATION, | ) | |
| JAMES SNAPP, | ) | |
| PHIL UTTERBACK, | ) | |
| JODI GORDON, and | ) | |
| BRET DAGHE, | ) | |
| | ) | |
| *Defendants*. | ) | |

**<u>ORDER</u>**

John M. Kluge, a former music and orchestra teacher at Brownsburg High School ("BHS"), filed this action against Brownsburg Community School Corporation ("BCSC") and several of its employees, alleging that he was discriminated against and ultimately forced to resign because his sincerely-held religious beliefs prevented him from following a school policy that required him to address transgender students by their preferred names and pronouns. [Filing No. 15.] Defendants have filed a Motion to Dismiss all of Mr. Kluge's claims. [Filing No. 44.] In addition, Indiana Youth Group, Inc. ("IYG"), an organization that supports LGBTQ youth in Indiana, has moved to intervene as a defendant in this action, [Filing No. 22], and has sought leave to file its own motion to dismiss, [Filing No. 55]. These motions are now ripe for the Court's decision.

# I.

## DEFENDANTS' MOTION TO DISMISS

### A.  Standard of Review

The Federal Rules of Civil Procedure require only a "short and plain statement of the claim showing that the pleader is entitled to relief." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting Fed. R. Civ. P. 8(a)(2)).  To that end, the complaint need only provide the defendant with "fair notice of what the . . . claim is and the grounds upon which it rests." *Erickson*, 551 U.S. at 93 (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007)) (internal quotation marks omitted).  In order to survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the complaint must contain allegations that collectively "state a claim to relief that is plausible on its face." *Id.* (internal quotations omitted) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

In reviewing the sufficiency of a complaint, the Court must accept all well-pled facts as true and draw all permissible inferences in favor of the plaintiff.  *Alarm Detection Sys., Inc. v. Vill. of Schaumburg*, 930 F.3d 812, 821 (7th Cir. 2019). This review is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Munson v. Gaetz*, 673 F.3d 630, 633 (7th Cir. 2012).

### B.  Background

Consistent with the standard of review described above, the following allegations from Mr. Kluge's Amended Complaint are accepted as true for purposes of deciding Defendants' Motion to Dismiss.  The allegations in this section are those common to all of Mr. Kluge's claims, and his additional, claim-specific allegations will be recounted as necessary in relation to each of his claims below.

Mr. Kluge became employed by BCSC as a music and orchestra teacher at BHS in August of 2014, and throughout his employment has received positive performance evaluations and met and exceeded BCSC's legitimate expectations.  [Filing No. 15 at 5.]  His students have received multiple awards for their musical performances.  [Filing No. 15 at 6.]

Mr. Kluge "is a professing evangelical Christian who strives to live by his faith on a daily basis," and has practiced that faith since before he was employed by BCSC.  [Filing No. 15 at 5-6.]  His "faith governs the way he thinks about human nature, marriage, gender, sexuality, morality, politics, and social issues, and it causes him to hold sincerely-held religious beliefs in these areas" that are "drawn from the Bible."  [Filing No. 15 at 6.]  Specifically, "Mr. Kluge believes that God created mankind as either male or female, that this gender is fixed in each person from the moment of conception, and that it cannot be changed, regardless of an individual's feelings or desires."  [Filing No. 15 at 6.]  "Mr. Kluge also believes he cannot affirm as true ideas and concepts that he deems untrue and sinful, as this would violate Biblical injunctions against dishonesty, lying, and effeminacy."  [Filing No. 15 at 7.]

During the summer of 2017, BCSC began to allow transgender students and students experiencing gender dysphoria[1] to use the restroom of their choice and to change their names and genders in the BCSC database known as PowerSchool.  [Filing No. 15 at 7.]  Name changes in the PowerSchool database required a letter from the student's parent(s) and a letter from a healthcare professional.  [Filing No. 15-4.][2]  BCSC employees, including Mr. Kluge, were instructed to refer to students using the names and genders listed in the PowerSchool database, which Mr. Kluge believes constitute preferred names "based upon the students' gender dysphoria."  [Filing No. 15 at 7; Filing No. 15-4 at 6.]

In July 2017, Mr. Kluge informed BCSC Superintendent Dr. James Snapp that the requirement that he use the students' names as listed in PowerSchool ("the Policy") conflicted with his religious beliefs against affirming gender dysphoria, and Dr. Snapp responded that Mr. Kluge could either "use the transgender names, say he was forced to resign from BCSC, or be terminated without pay."  [Filing No. 15 at 7-8.]  Because Mr. Kluge refused to use the names listed in PowerSchool, Dr. Snapp initiated an administrative leave of absence for Mr. Kluge and Dr. Bret Daghe, the principal of BHS, "issued Mr. Kluge an ultimatum . . . mandating the use of transgender preferred names, and giving Mr. Kluge [three days] to decide if he would comply." [Filing No. 15 at 8.]  Mr. Kluge then requested "an accommodation for his religious beliefs," and proposed the solution of "addressing all students by their last names only, similar to a sports coach."  [Filing No. 15 at 8.]  Dr. Snapp and Jodi Gordon, the BCSC Human Resources Director,

---

[1] "Gender dysphoria" is "an acute form of mental distress stemming from strong feelings of incongruity between one's anatomy and one's gender identity."  *Campbell v. Kallas*, 936 F.3d 536, 538 (7th Cir. 2019) (citing *Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders* 451 (5th ed. 2013)).

[2] The documents attached to the Amended Complaint and referenced therein are considered part of the pleadings for purposes of deciding a Rule 12(b)(6) motion to dismiss.  *Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013).

agreed in writing to allow Mr. Kluge to address all students by their last names only ("the last-names-only arrangement") and assigned someone to distribute gender-specific uniforms to students so Mr. Kluge would not have to.  [Filing No. 15 at 8; Filing No. 15-1.]  Despite this agreement, the school board retroactively administered a two-day suspension in response to Dr. Snapp's previous action.  [Filing No. 15 at 8.]

On December 13, 2017, Mr. Kluge met with Dr. Daghe, at which time Dr. Daghe informed Mr. Kluge that the last-names-only arrangement had created "tension" and that Mr. Kluge should resign by the end of the school year.  [Filing No. 15 at 9.]  However, Mr. Kluge alleges that the last-names-only arrangement created no undue hardship for Defendants, and no Defendant identified in writing any undue hardship that was purportedly caused.  [Filing No. 15 at 9.]  Instead, he asserts, "nothing dramatic occurred" between July and December 2017, and there were no student protests, written complaints, classroom disturbances, or cancelled classes.  [Filing No. 15 at 9.]  Instead, that last-names-only arrangement "worked as intended and Mr. Kluge's students excelled," with his extra-curricular program experiencing "record numbers of participation" and his students winning awards and gold ratings.  [Filing No. 15 at 9.]

According to Mr. Kluge, "Defendants simply decided not to accommodate or tolerate [his] sincerely-held religious beliefs any longer," and Ms. Gordon informed him that the last-names-only arrangement was being withdrawn because "students were offended at the use of last names."  [Filing No. 15 at 9-10.]  Mr. Kluge asserts that Ms. Gordon provided no evidence that students were offended and maintains that he "never told his students why he was referring to them by their last names."  [Filing No. 15 at 10.]  Mr. Kluge again attempted to explain "that he believes encouraging students to present themselves as the opposite sex by calling them an opposite-sex first name is sinful and potentially harmful to the students," but Ms. Gordon

advised him that he could either resign by May 1, 2018 and be paid over the summer or be fired without pay.  [Filing No. 15 at 10.]  He states that Defendants' contentions that the last-names-only arrangement created tension or offended students were not based in fact but were simply pretexts for religious discrimination.  [Filing No. 15 at 14.]

Mr. Kluge alleges that Ms. Gordon "agreed that he could submit a conditional resignation" and agreed that his resignation, which he submitted on April 30, 2018, "would not be processed or shown to anyone, including any administrator, until May 28, 2018."  [Filing No. 15 at 10-11.]  On May 25, 2018, Mr. Kluge delivered a time-stamped rescission of his resignation, and, despite receiving the rescission, Ms. Gordon "processed" Mr. Kluge's resignation anyway.  [Filing No. 15 at 11.]  Mr. Kluge alleges that when Defendants told him that he could submit a conditional resignation, then accepted his conditional resignation, "they had no intention of honoring the conditions he attached to his resignation, but instead planned on treating [his] resignation as unconditional upon receipt and claiming that he voluntarily resigned his position."  [Filing No. 15 at 11.]  BCSC and the School Board accepted Mr. Kluge's resignation as if it was submitted unconditionally.  [Filing No. 15 at 11.]  On May 25, 2018, Defendants locked Mr. Kluge out of all BCSC buildings, revoked his access to the school's internet, and posted his job as vacant.  [Filing No. 15 at 12.]

Mr. Kluge alleges that most of BCSC's policies and practices relating to students with gender dysphoria are "informal and unwritten."  [Filing No. 15 at 12.]  Furthermore, he asserts that the policies provide "few objective guidelines, standards, or criteria for school employees . . . to use when deciding what constitutes gender dysphoria or gender discrimination, thereby granting Defendants overbroad discretion to restrict expression."  [Filing No. 15 at 12.]  He states that, at a faculty meeting in early 2018, BCSC distributed an 11-page document titled

"Transgender Questions," which identifies BCSC's policies regarding transgender students and provides answers to questions submitted by faculty members.   [Filing No. 15 at 12.]   That document is attached to the Amended Complaint.   [Filing No. 15-4.]   According to Mr. Kluge, no earlier written policy with the same title was issued.   [Filing No. 15 at 12.]

Mr. Kluge asserts that the "Transgender Questions" policy is "vague and overbroad in many respects," and cites as an example the fact that the policy allows "fully transitioned" students to use the dressing room of their chosen gender but does not define "fully transitioned" or instruct faculty as to whether to require some proof from a student who claims to be "fully transitioned" or simply take the student's word.   [Filing No. 15 at 12-13.]   Mr. Kluge also points out that the policy instructs faculty to use names that the "students choose as part of their gender dysphoria" and quotes the following information from the policy, in question and answer format:

**Are we allowed to use the student's last name only?**
We have agreed to this for the 2017-2018 school year, but moving forward it is our expectation that the student will be called by the first name listed in PowerSchool;

**Can teachers refuse to call the student by his/her preferred name?**
Staff members need to call students by name in PowerSchool;

**How do teachers break from their personal biases and beliefs so that we can best serve our students?**
We know this is a difficult topic for some staff members, however, when you work in a public school, you sign up to follow the law and the policies/practices of that organization and that might mean following practices that are different than your beliefs.

[Filing No. 15 at 13-14; Filing No. 15-4 at 9-10.]   According to Mr. Kluge, the "Transgender Questions" document establishes that BCSC's "formal policy was not to allow [Mr.] Kluge's last-name only accommodation—not because it created any undue hardship but because it violated the policy."   [Filing No. 15 at 14.]

Mr. Kluge asserts that all of Defendants' formal and informal policies concerning transgender students "attempt to regulate and compel the expression of individual faculty members . . . beyond any quantifiable need in educating students." [Filing No. 15 at 15.] He alleges that "Defendants, by policy and practice, apply their speech code policies to regulate all interactions faculty members have with students in the classroom or within the school." [Filing No. 15 at 15.] He asserts that "Defendants' directive . . . that he either communicate [BCSC's] ideological message regarding gender dysphoria, resign, or be fired" left him to make an "untenable choice" between following his sincerely-held religious beliefs or maintaining his employment, and that Defendants' removal of his "successful" last-names-only arrangement based on the alleged complaints of students "does not amount to hardship, but is an impermissible 'heckler's veto.'"[3]   [Filing No. 15 at 15.]

Based on these allegations, Mr. Kluge asserts thirteen claims for relief: (1) religious discrimination based on failure to accommodate under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*; (2) retaliation under Title VII; (3) hostile work environment under Title VII; (4) retaliation under the First Amendment; (5) content and viewpoint discrimination under the First Amendment; (6) compelled speech under the First Amendment; (7) violation of his right to the free exercise of religion under the First Amendment; (8) violation of the right to be free from unconstitutional conditions; (9) violation of the right to due process under the Fourteenth Amendment; (10) violation of the right to equal protection under the Fourteenth Amendment; (11) violations of the rights of conscience and free exercise of

---

[3] The "heckler's veto" doctrine is the idea that, while the government may preserve order when unpopular speech is disruptive, it cannot restrict speech merely to prevent another party from reacting adversely. *See Ovadal v. City of Madison, Wis.*, 416 F.3d 531, 537 (7th Cir. 2005) ("The police must permit the speech and control the crowd; there is no heckler's veto.") (internal quotations and citation omitted).

religion under the Indiana Constitution; (12) intentional infliction of emotional distress under Indiana common law; and (13) fraud under Indiana common law.  [Filing No. 15 at 17-31.] Defendants have moved to dismiss all thirteen claims.  [Filing No. 44.]

### C. Discussion

At the outset, the Court notes that Mr. Kluge has conceded that dismissal of his claims against the individual Defendants in their official capacities and his equal protection claim against all Defendants is warranted.  [Filing No. 57 at 11-12; Filing No. 57 at 31.]  Accordingly, all claims against the individual Defendants in their official capacities are **DISMISSED**.  In addition, the equal protection claim against all Defendants is also **DISMISSED**.  The remaining claims against BCSC will be addressed in turn, although, in the interest of clarity, they will be in different order than presented in the Amended Complaint.

### 1. First Amendment Speech Claims (Counts 4, 5, and 6)

Mr. Kluge asserts three separate claims for violations of his right to freedom of speech under the First Amendment.  First, in Count 4, Mr. Kluge alleges that, by punishing and threatening to punish him "for expressing his views regarding gender dysphoria," BCSC retaliated against him for engaging in protected speech.  [Filing No. 15 at 19.]  Second, in Count 5, Mr. Kluge asserts that BCSC discriminated against him by disciplining him due to the content and viewpoint of his speech.  [Filing No. 15 at 20-22.]  Finally, in Count 6, he alleges that, by punishing or threatening to punish him "for refusing to communicate a school corporation-mandated ideological message regarding gender dysphoria," BCSC compelled him to communicate messages about gender dysphoria with which he disagreed.  [Filing No. 15 at 22.]

In relevant part, BCSC argues that all of Mr. Kluge's First Amendment speech claims fail because his refusal to address students by the names and genders listed in PowerSchool is not

protected speech under the First Amendment.  [Filing No. 45 at 13-18.]  Specifically, it argues that, as a matter of law, Mr. Kluge was speaking in his capacity as a public-school teacher—not as a private citizen—when addressing students.  [Filing No. 45 at 14-16.]  Furthermore, according to BCSC, addressing students in the classroom does not constitute a matter of public concern.  [Filing No. 45 at 16-17.]

Mr. Kluge responds that his speech is indeed protected under the First Amendment.  [Filing No. 57 at 21; Filing No. 57 at 26.]  Specifically, he argues that "[i]n speaking and refusing to speak on the mental disorder known as gender dysphoria, [he] spoke as a citizen on a matter of public concern."  [Filing No. 57 at 21.]  He asserts that "gender identity" is a matter of great public importance, and his official teaching duties did not include the use of "transgender names" or "a school-mandated message approving 'affirmance therapy' by the use of transgender names which were not students' legal names."  [Filing No. 57 at 21-22.]  He further asserts that neither his ability to teach music and orchestra nor his method of teaching hinged on the use of students' first or last names, pronouns, or honorifics.  [Filing No. 57 at 22.]  Mr. Kluge also argues that BCSC cannot now claim that using the first names listed in PowerSchool was part of his official duties, because it agreed to allow him to address students by last names only for a period of time.  [Filing No. 57 at 22-23.]

In reply, BCSC reiterates the arguments raised in its initial brief, and asserts in relevant part that requiring faculty to address students in a consistent manner is "plainly related to [BCSC's] pedagogical interest in having classroom instruction proceed efficiently."  [Filing No. 60 at 8-9.]

"When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom."  *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006) (citation

omitted).  Nevertheless, "[t]he [Supreme] Court has made clear that public employees do not surrender all their First Amendment rights by reason of their employment." *Id.* at 417 (collecting cases).  "Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Id.*  The determination of whether a public employee's speech is constitutionally protected is a question of law.  *E.g.*, *Kubiak v. City of Chicago*, 810 F.3d 476, 481 (7th Cir. 2016).

In *Pickering*, the Supreme Court considered whether the termination of a public-school teacher based on a letter he wrote to a local newspaper violated the First Amendment.  *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cty., Illinois*, 391 U.S. 563, 565-66 (1968).  In doing so, the Court sought to balance "the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* at 568.  The Court characterized the statements contained in the teacher's letter as concerning issues "currently the subject of public attention," which were critical of his employer but were "neither shown nor . . . presumed to have in any way either impeded the teacher's proper performance . . . or to have interfered with the regular operation of the schools," and, therefore, "the interest of the school administration in limiting teachers' opportunities to contribute to public debate [was] not significantly greater than its interest in limiting a similar contribution by any member of the general public." *Id.* at 572-73.  Accordingly, firing the teacher based on the contents of his letter violated the First Amendment.  *Id.* at 573-75.

From *Pickering* and its progeny, the Supreme Court has distilled a two-part inquiry to analyze the constitutional protection accorded to public employee speech.  *Garcetti*, 547 U.S. at 418.  The first step is to determine whether the employee spoke as a citizen on a matter of public

concern.  *Id.* (citation omitted).  If the answer is "no," the employee has no First Amendment cause of action based on the employer's reaction to the speech.  *Id.* (citation omitted).  If the answer is "yes," then the possibility of a First Amendment claim arises, and the second step is to determine whether the government entity had an adequate justification for treating the employee differently from any other member of the general public.  *Id.* (citation omitted).

When considering whether an employee spoke as a private citizen, the fact that the employee spoke inside his workplace, rather than publicly, is not dispositive.  *Id.* at 420.  Neither is the fact that the speech "concerned the subject matter of [his] employment."  *Id.* at 421. However, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."  *Id.*  Determining the official duties of an employee requires "a practical inquiry into what duties the employee is expected to perform."  *Houskins v. Sheahan*, 549 F.3d 480, 490 (7th Cir. 2008) (citation omitted).

In *Wozniak v. Adesida*, 932 F.3d 1008, 1010 (7th Cir. 2019), the Seventh Circuit Court of Appeals concluded that a university professor acted "in his capacity as a teacher" when he "interrogated" students about their failure to recommend him for an award and posted information about the students online.  *Id.* at 1010.  Recognizing that such conduct did not involve the professor's "core academic duties" such as running his classroom, grading exams, or assisting students in writing papers, the Court determined that "how faculty members relate to students *is* part of their jobs."  *Id.* (emphasis in original).

In assessing whether speech addresses a matter of public concern, courts look to the "content, form, and context" of a given statement.  *Chaklos v. Stevens*, 560 F.3d 705, 712 (7th Cir. 2009) (quoting *Connick v. Myers*, 461 U.S. 138, 147-48, 148 n.7 (1983)).  Though none of

these factors is singularly dispositive, content is the most important of the three. *Milwaukee Deputy Sheriff's Ass'n v. Clarke*, 574 F.3d 370, 377 (7th Cir. 2009) (citation omitted). Furthermore, when examining the context of speech, the employee's motive for speaking is a relevant consideration. *Id.* (citations omitted).  To that end, motive "matters to the extent that even speech on a subject that would otherwise be of interest to the public will not be protected if the expression addresses only the personal effect upon the employee, or if the *only* point of the speech was to further some purely private interest."  *Id.* (emphasis in original) (internal quotations and citation omitted).

Here, Mr. Kluge has failed to state any claim under the First Amendment because, as a matter of law, the speech at issue is not constitutionally protected.  Importantly, he is not asserting that he was disciplined for criticizing or opposing the Policy, but that he was disciplined for refusing to follow it in his classroom by refusing to call students by the first names listed in PowerSchool.  Mr. Kluge's own allegations establish that the way in which he addresses students is part of his official duties as a teacher.  Mr. Kluge expressly alleges that BCSC sought to regulate his interactions with students inside school and in the context of the school day or school activities.  [Filing No. 15 at 15 (alleging that BCSC applies its "speech code policies to regulate all interactions faculty members have with students in the classroom or within the school").]  While addressing students by name may not be part of the music or orchestra curriculum, it is difficult to imagine how a teacher could perform his teaching duties on any subject without a method by which to address individual students.  Indeed, addressing students is necessary to communicate with them and teach them the material—as the Seventh Circuit has stated, how teachers relate to students *is* part of their jobs, and running a classroom is a "core academic dut[y]." *Wozniak*, 932 F.3d at 1010.  Thus, the speech at issue was part of Mr.

Kluge's official duties, and this alone is sufficient to preclude any free speech claim under the First Amendment.

However, the Court also concludes that Mr. Kluge's choice as to how to address a given student did not involve a matter of public concern. To be sure, issues relating to the treatment of individuals based on their gender identity are of great public importance. *See Janus v. Am. Fed'n of State, Cty., & Mun. Employees, Council 31*, 138 S. Ct. 2448, 2476 (2018) (recognizing that "gender identity" is a "sensitive political topic[]" that is "undoubtedly [a] matter[] of profound value and concern to the public"). However, Mr. Kluge was not conveying a message concerning such matters when he refused to call students by their names as listed in PowerSchool or referred to students by last name only, because the act of referring to a particular student by a particular name does not contribute to the broader public debate on transgender issues. Instead, choosing the name to call a student constituted a private interaction with that individual student and a private statement about Mr. Kluge's subjective perception of that student. In addition, according to Mr. Kluge's own allegations, the only point of his speech was to address students. He did not tell students that he had opinions about using transgender students' preferred names or explain why he was using last names only. [Filing No. 15 at 10.] Thus, Mr. Kluge's speech—merely stating (or refusing to state) names and pronouns without explaining that his opposition to "affirming" transgender students was the reason for doing so— adds little to the public discourse on gender identity issues, and therefore is not the kind of speech that is valuable to the public debate. *Cf. Garcetti*, 547 U.S. at 420 (acknowledging that underlying the public concern inquiry is "the importance of promoting the public's interest in receiving the well-informed views of government employees engaging in civic discussion").

Because the speech at issue was pursuant to Mr. Kluge's official duties as a public employee and did not involve a matter of public concern, he cannot maintain a cause of action for his employer's regulation of or reaction to his speech. *See id.* at 418. Accordingly, BCSC's Motion to Dismiss is **GRANTED** as to Mr. Kluge's claims for retaliation, content and viewpoint discrimination, and compelled speech under the First Amendment, and those claims (Counts 4, 5, and 6) are **DISMISSED**.

### 2. First Amendment Free Exercise Claim (Count 7)

Mr. Kluge asserts in his Amended Complaint that his "views and expression related to gender dysphoria are motivated by his sincerely-held religious beliefs, are avenues through which he exercises his religious faith, and constitute a central component of his sincerely-held religious beliefs." [Filing No. 15 at 23.] Accordingly, he alleges, expressing BCSC's "mandated message regarding gender dysphoria" by using the names listed in PowerSchool would require him to violate his sincerely-held religious beliefs. [Filing No. 15 at 23.] Moreover, he alleges that BCSC's "transgender policies and related practices" are neither neutral nor generally applicable because they "represent a system of individualized assessments" and allow BCSC to specifically target religious expression and express hostility toward such expression. [Filing No. 15 at 23.] Mr. Kluge also asserts that the policies and practices are under-inclusive because they prohibit some expression while allowing "other expression equally harmful to [BCSC's] asserted interests." [Filing No. 15 at 23.] He alleges that BCSC's discipline of him "for communicating his views on issues related to gender dysphoria" violated his religious beliefs and his right to free exercise of religion. [Filing No. 15 at 24.]

BCSC argues that the policy requiring faculty to address students by the names listed in PowerSchool—which is the only specific policy that Mr. Kluge challenges—is both neutral and

generally applicable.   [Filing No. 45 at 20.]  Specifically, it applies to all faculty, not just to faculty members of a certain religion, and there is no indication that, in imposing the requirement, BCSC intended to discriminate based on any religion.   [Filing No. 45 at 20.]  BCSC further argues that the purpose of the policy was to provide the faculty with an easy-to-follow rule for addressing students, and Mr. Kluge does not claim that the rule lacks a legitimate purpose.   [Filing No. 45 at 20-21.]

In response, Mr. Kluge reiterates the allegations stated in his Amended Complaint, states that these allegations must be taken as true, and asserts that they state a claim for violation of his right to free exercise of religion.   [Filing No. 57 at 28.]

BCSC replies that Mr. Kluge's reiterated allegations contain legal conclusions, which the Court is not required to accept as true, and maintains that the free exercise claim should be dismissed.   [Filing No. 60 at 10.]

"[N]o Free Exercise Clause violation results where a burden on religious exercise is the incidental effect of a neutral, generally applicable, and otherwise valid regulation, in which case such regulation need not be justified by a compelling governmental interest."  *Vision Church v. Vill. of Long Grove*, 468 F.3d 975, 998 (7th Cir. 2006) (quoting *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 763 (7th Cir. 2003)) (internal quotations omitted); *see also Employment Div., Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872, 879 (1990) ("[T]he right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'") (citation omitted).

However, the Supreme Court has "been careful to distinguish such [neutral and generally applicable] laws from those that single out the religious for disfavored treatment."

*Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2020 (2017). For example, the Court has struck down "facially neutral" city ordinances prohibiting certain forms of animal slaughter after concluding that the ordinances were not in fact neutral or generally applicable but instead had a discriminatory purpose of prohibiting residents from performing sacrificial rituals integral to their practice of the Santeria religion. *Id.* at 2021 (citing *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 533-33 (1993)). Summarizing its Free Exercise Clause jurisprudence, the Supreme Court reiterated that laws may not discriminate against religious beliefs, regulate or outlaw conduct because it is religiously motived, or impose special disabilities based on one's religious status. *Trinity*, 137 S. Ct. at 2021 (citations omitted).

Here, Mr. Kluge's allegations and supporting documentation demonstrate that the Policy was neutral and generally applicable: every teacher, regardless of religious belief, was required to address every student by the name listed in PowerSchool, regardless of what that name was or why. Furthermore, Mr. Kluge does not allege that any of BCSC's policies or practices were developed to target any particular religious belief, affiliation, or activity, and, to the contrary, he alleges that these policies and practices were part of an effort to "affirm childhood gender dysphoria." [Filing No. 15 at 6.] Although he asserts that the Policy required individual assessments, is under-inclusive, and permits other "harmful" speech, these allegations are conclusory, unsupported, and inconsistent with his allegations demonstrating that the Policy was straightforward and clear in the sense that it requires teachers to refer to students by the names listed in PowerSchool—nothing more, nothing less, and without room for individualized judgments. Notably, no other BCSC policy is alleged to be the basis of his discipline. Because the Policy is neutral and generally applicable and Mr. Kluge has not alleged facts showing that it targeted or otherwise was motivated by an animus toward any particular religion or religious

belief, he has not stated a claim for violation of the Free Exercise Clause.  Accordingly, BCSC's

Motion to Dismiss is **GRANTED** as to this claim (Count 7), which is **DISMISSED**.

> ### 3.   Unconstitutional Conditions (Count 8)

In the Amended Complaint, Mr. Kluge asserts that, by conditioning his employment on

his willingness to surrender his constitutional rights, BCSC imposed an unconstitutional

condition upon him in violation of the First Amendment.  [Filing No. 15 at 24.]  Specifically, he

asserts that BCSC's "transgender policies in practices and the[] enforcement of those policies

and practices" require faculty members to surrender their constitutionally-protected rights to

freedom of speech, free exercise of religion, due process, and equal protection as a condition to

their receipt of a state benefit in the form of continuing employment as a public school teacher.

[Filing No. 15 at 25.]

BCSC asserts that the unconstitutional conditions claim fails because: (1) Mr. Kluge has

not alleged facts showing that BCSC violated the Constitution; and (2) the unconstitutional

conditions doctrine has not been extended beyond the context of political patronage as a

condition of public employment.  [Filing No. 45 at 19.]

Mr. Kluge responds that the unconstitutional conditions doctrine logically extends to

other First Amendment violations, including claims based upon speech and religious exercise.

[Filing No. 57 at 29.]  He maintains that he has stated a claim for unconstitutional conditions.

[Filing No. 57 at 29.]

In reply, BCSC asserts that the Court should decline to extend the unconstitutional

conditions doctrine beyond the political patronage context, and maintains that, in any event, the

claim fails because Mr. Kluge has not demonstrated that a First Amendment violation has

occurred.  [Filing No. 60 at 10-11.]

As a preliminary matter, BCSC's argument that the unconstitutional conditions doctrine does not apply outside the context of political patronage conditions is contrary to existing caselaw. *E.g., Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013) ("We have said *in a variety of contexts* that 'the government may not deny a benefit to a person because he exercises a constitutional right.' . . . Those cases reflect an overarching principle, known as the unconstitutional conditions doctrine, that vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up." (emphasis added) (citations omitted)).   Indeed, there is support for the specific proposition that the unconstitutional conditions doctrine prevents the government from imposing conditions that violate other provisions of the First Amendment beyond political association. *See Garcetti*, 547 U.S. at 413 ("It is well settled that 'a State cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression.'" (quoting *Connick*, 461 U.S. at 142)); *Dolan v. City of Tigard*, 512 U.S. 374, 407 n.12 (1994) ("[M]odern decisions invoking the [unconstitutional conditions] doctrine have most frequently involved First Amendment liberties.").

Nevertheless, Mr. Kluge's claim, while cognizable, fails for the simple reason that, as discussed above, Mr. Kluge has not alleged facts demonstrating that BCSC violated the Constitution.   In other words, he has not stated a claim that any of BCSC's policies or conditions on his employment were unconstitutional.   Accordingly, BCSC's Motion to Dismiss is **GRANTED** as to the unconstitutional conditions claim (Count 8), which is **DISMISSED**.

### 4.   Fourteenth Amendment Due Process Claim (Count 9)

In the Amended Complaint, Mr. Kluge alleges that BCSC violated his right to due process of law by "threatening to punish and punishing [him] under vague and overbroad

policies and practices." [Filing No. 15 at 26.]  Specifically, he asserts that the "transgender policies and related practices" are unconstitutionally vague because they grant BCSC officials "unbridled discretion in deciding what constitutes 'gender dysphoria' and 'gender discrimination,' because they utilize terms that are inherently subjective and elude any precise or objective definition that would be consistent from one official, teacher, or student to another, and because they are incapable of providing meaningful guidance to Defendants." [Filing No. 15 at 27.]  He alleges that the policies lack objective criteria, factors, or standards, rendering them unconstitutionally vague. [Filing No. 15 at 27.]

BCSC argues that the Policy is not vague or overbroad, and Mr. Kluge's own allegations defeat his vagueness claim, because he admits that he was aware of the consequences of addressing students by their last names only or by a name other than that listed in PowerSchool. [Filing No. 45 at 21-22.]

Mr. Kluge responds that he has stated a valid due process claim because "BCSC's policies were informal, sometimes unwritten, and when written, suggested they were subject to change," and, as a result, were unconstitutionally vague.  [Filing No. 57 at 30.]  He argues that such vagueness is illustrated by the fact that the requirement that teachers use students' names listed in PowerSchool suggests that a teacher could use students' last names, which appear in PowerSchool, but BCSC changed its policy without warning to prohibit that practice.  [Filing No. 57 at 30-31.]  He asserts that BCSC's policies incorrectly stated that teachers who work at public schools sign up to follow the school's rules, even if those rules conflict with their personal beliefs.  [Filing No. 57 at 31.]  Finally, he asserts that similarly-situated teachers must guess which "gender dysphoria policies" are in effect at any given time, and supervisors will differ as to their enforcement of these policies.  [Filing No. 57 at 31.]

In reply, BCSC asserts that Mr. Kluge fails to address his awareness of the consequences of not addressing students by the first names listed in PowerSchool.  [Filing No. 60 at 11.]

A public employee may challenge the rules pursuant to which he was disciplined on the basis that they are void for vagueness.  *See Greer v. Amesqua*, 212 F.3d 358, 369 (7th Cir. 2000). A government regulation, like a criminal statute, generally is impermissibly vague if people of common intelligence must guess at its meaning and could differ as to its application.  *Id.* However, "the government acting in the role of employer enjoys much more latitude in crafting reasonable work regulations for its employees" than it does in crafting regulations applicable to the general public.  *Id.*; *see also Brown v. Chicago Bd. of Educ.*, 824 F.3d 713, 717 (7th Cir. 2016) (noting that "an employee code of conduct need not be as clear as a criminal law").

Here, as a preliminary matter, although Mr. Kluge takes issue with the alleged vagueness of many of BCSC's different policies related to transgender students—as well as with the alleged overall lack of clarity concerning when and how the school enforced those different policies— the only rule pursuant to which Mr. Kluge was disciplined was the Policy requiring him to address students by the first names and pronouns listed in PowerSchool.  Thus, that is the only rule that the Court needs to consider in determining whether Mr. Kluge has stated a plausible due process claim based on vagueness.  His allegations concerning other issues—such as restrooms or changing rooms—are not relevant to this analysis.

With that limitation in mind, Mr. Kluge's allegations defeat his due process claim.  The materials attached to the Amended Complaint acknowledge that BCSC's policies related to the treatment of transgender students were in flux as the school district sought to determine workable solutions to newly-arising issues.  [*See* Filing No. 15-4 at 7 ("BCSC is working to develop policy that reflects the answers [to faculty policy questions presented in] this document.").]  However,

based on Mr. Kluge's own allegations, there can be no dispute that, after BCSC terminated the last-names-only arrangement, the Policy required him to refer to students by the first names listed in PowerSchool.  [Filing No. 15 at 7 (alleging that faculty "were instructed to use the transgender students' preferred names" listed in PowerSchool); Filing No. 15-4 at 9 (stating, in response to a question about how to address students after the last-name-only arrangement ended after the 2017-2018 school year, that "moving forward it is our expectation the student will be called by the first name listed in PowerSchool").]  Mr. Kluge's argument that the Policy was so vague that it appeared to permit the last-names-only arrangement—because students' last names are necessarily listed in PowerSchool—is illogical and disingenuous at best.  Mr. Kluge's claims are all based on his having to use "transgender names" from the PowerSchool database.  [Filing No. 15 at 7-8; Filing No. 15 at 10; Filing No. 15 at 15.]  If he was—and still is—willing to use students' last names only, then the first names alone must be the "transgender names" that he wanted to avoid.  Thus, he must have understood the Policy to require the use of first names, and he did not have to guess at its meaning.  *See Greer*, 212 F.3d at 369.  There can also be no serious dispute that Mr. Kluge's allegations demonstrate his own understanding and awareness of the Policy and its requirements long before his resignation, as he had several conversations with school administrators concerning his assertions that the Policy conflicted with his religious beliefs and addressing his desire not to follow the Policy.  [Filing No. 15 at 7-14; Filing No. 15-3 at 2-6.]  Accordingly, Mr. Kluge has failed to state a claim that the Policy was unconstitutionally vague, and BCSC's Motion to Dismiss is **GRANTED** as to this claim (Count 9), which is **DISMISSED**.

5.   Title VII Claims (Counts 1, 2, and 3)

a.   **Count 1: Religious Discrimination for Failure to Accommodate**

As to Count 1, Mr. Kluge asserts that BCSC, in violation of Title VII, discriminated against him in the terms and conditions of his employment on the basis of his sincerely-held religious beliefs by: (1) refusing to discuss an accommodation for those beliefs; (2) agreeing in writing to the last-names-only arrangement that did not result in undue hardship, then removing that arrangement without identifying any undue hardship it caused; and (3) "coercing [his] conditional resignation under threat of termination." [Filing No. 15 at 17.]

BCSC argues that Mr. Kluge has failed to state a failure-to-accommodate claim because the facts alleged do not demonstrate an objective conflict between his teaching duties and his sincerely-held religious beliefs. [Filing No. 45 at 7-10.] Specifically, BCSC asserts that referring to students by the name and gender listed in the PowerSchool database constituted a purely administrative duty and did not require Mr. Kluge to express approval for the reasons underlying any particular name change, congratulate a transgender student for transitioning, or endorse or otherwise show support for transgender issues. [Filing No. 45 at 8-10.]

Mr. Kluge responds that the allegations in his Amended Complaint establish a *prima facie* case of religious discrimination based on failure to accommodate. [Filing No. 57 at 12-15.] He asserts that addressing students by the names listed in PowerSchool is not an administrative function, as it is "grossly incorrect to suggest that requiring teachers to use a new name selected by an adolescent suffering from gender dysphoria is not an expression of approval, acceptance, and even celebration." [Filing No. 57 at 13.][4] He also appears to assert that, because BCSC

---

[4] Mr. Kluge further argues that the last-names-only arrangement did not create an undue hardship for BCSC. [Filing No. 57 at 15.] BCSC did not address this issue in its Motion to Dismiss, stating that its "undue hardship defense is outside the scope of this Motion" and reserving the

agreed to the last-names-only arrangement for a period of time, it is estopped from arguing that the Policy does not conflict with his sincerely-held religious beliefs.  [Filing No. 57 at 12-13.][5]

In reply, BCSC reiterates the argument made in its initial brief that calling students by the names listed in PowerSchool constitutes a purely administrative duty and there is no objective conflict between that duty and Mr. Kluge's religious beliefs.  [Filing No. 60 at 2-4.]  BCSC also asserts that Mr. Kluge has not identified any authority supporting his argument that BCSC is estopped from denying that an objective conflict exists between the Policy and Mr. Kluge's religious beliefs, and, in any event, nothing in the Amended Complaint reflects that, in permitting the last-names-only arrangement, BCSC affirmatively agreed that such conflict existed.  [Filing No. 60 at 2-3.]

Title VII prohibits employers from discriminating against employees on the basis of their religion, and also requires employers to accommodate employees' sincerely-held religious beliefs where they conflict with rules of employment and where providing an accommodation would not result in undue hardship.  42 U.S.C. §§ 2000e(j), 2000e-2(a)(1); EEOC v. Abercrombie & Fitch Stores, Inc., 135 S. Ct. 2028, 2031-32 (2015).  To state a prima facie case

---

right to raise it later if warranted.  [Filing No. 45 at 8 n.4.]  The Court agrees with BCSC that the undue hardship question, which is a factual determination that only becomes relevant after a plaintiff has made a prima facie case of failure to accommodate and is a matter to be proved by a defendant, is not properly before the Court at this time.  See Porter v. City of Chicago, 700 F.3d 944, 951 (7th Cir. 2012) (explaining that, after the plaintiff establishes a prima facie case, the burden shifts to the defendant to show that providing an accommodation would result in undue hardship).

[5]Also omitted from the Court's recitation of Mr. Kluge's argument is his inflammatory, hyperbolic, and irrelevant hypothetical discussion of how teachers might feel if students came to school pretending to have a disability or claiming to be of a different race than they really are.  [Filing No. 57 at 14-15.]  The Court notes that such rhetoric is an unnecessary distraction as it does not—nor does it appear intended to—further the resolution of the legal issues in dispute.  While the Court understands that the parties on both sides of this litigation may have strong convictions as to their positions, such unhelpful language and tone are inconsistent with the level of professionalism expected by this Court and shall be left out of future filings in this matter.

of religious discrimination based on failure to accommodate, a plaintiff must show that his religious belief or practice conflicted with a requirement of his employment and that his religious observance or practice was the basis for the discriminatory treatment or adverse employment action. *Porter v. City of Chicago*, 700 F.3d 944, 951 (7th Cir. 2012), *as modified by Abercrombie*, 135 S. Ct. at 2032-33.[6]

"A Title VII plaintiff need not set forth allegations of a prima facie case in the complaint." *Moranski v. Gen. Motors Corp.*, 433 F.3d 537, 539 (7th Cir. 2005) (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 (2002)).   Instead, the plaintiff alleging a violation of Title VII need only provide a "short and plain statement of the claim showing that the pleader is entitled to relief." *Id.*; Fed. R. Civ. P. 8(a).

Both parties discuss *Summers v. Whitis*, 2016 WL 7242483 (S.D. Ind. Dec. 15, 2016), which BCSC asserts dictates dismissal of this claim.   In *Summers*, plaintiff Linda Summers worked as a deputy clerk in the Harrison County, Indiana Clerk's Office until she was fired for refusing to process marriage licenses for same-sex couples based on her religious opposition to same-sex marriage. *Id.* at *1.   The Court granted summary judgment in favor of the defendants on Ms. Summers' failure-to-accommodate claim, concluding that there was no objective conflict between her religious belief and the requirement that she process marriage licenses for same-sex couples. *Id.* at *7.   The Court emphasized that the conflict inquiry must be objective, because if

---

[6] In *Porter*, the Court articulated an additional element of the *prima facie* case for failure-to-accommodate: that the employee called the religious practice to his employer's attention. 700 F.3d at 951.   However, the Supreme Court later made clear that an employee need not prove that his employer had actual knowledge of the religious belief or practice, and instead must demonstrate only that the desire not to accommodate was a motivating factor in an adverse employment action. *See Abercrombie*, 135 S. Ct. at 2032-33.   Other District Courts in this Circuit have therefore disregarded this additional element. *See, e.g., Jackson v. NTN Driveshaft, Inc.*, 2017 WL 1927694, at *1 (S.D. Ind. May 10, 2017).   This Court will do the same, although it makes no difference because Mr. Kluge's factual allegations demonstrate that BCSC was aware of his religion-based objections to the Policy.

it were purely subjective, there would be no reason to include it as a part of the *prima facie* case. *Id.* at *5.

The *Summers* Court determined that Ms. Summers was merely required to process licenses by viewing the application, verifying that certain information was correct, collecting a statutory fee, printing a form, and recording the license in a book for the public record. *Id.* at *5. "She was simply tasked with certifying—on behalf of the state of Indiana, not on her own behalf—that the couple was qualified to marry under Indiana law," a duty which the Court concluded was "purely administrative." *Id.* The Court emphasized that Ms. Summers was not required to perform marriage ceremonies, personally sign marriage certificates, attend marriage ceremonies, say congratulations, offer a blessing, pray with couples, or condone or express religious approval of any particular marriage. *Id.* Because there was no conflict between her religious belief and her job duties, the employer had no duty to accommodate Ms. Summers' beliefs. *See id.* ("If the employee fails to show a *bona fide* conflict, it makes no sense to speak of a duty to accommodate.") (quoting *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 76 (1986) (Stevens, J., concurring in part and dissenting in part)) (internal quotations omitted).

*Summers* is distinguishable from the instant case in one important respect: it was decided at the summary judgment stage with the benefit of factual development and where the plaintiff had the burden of establishing a *prima facie* case. Here, however, the Court is bound by the standard of review to accept all of Mr. Kluge's factual allegations as true and merely determine whether he has stated a plausible claim. Mr. Kluge alleges that, insofar as transgender students are concerned, using the names as listed in the PowerSchool database violates his religious belief that "encouraging students to present themselves as the opposite sex by calling them an opposite-sex first name is sinful." [Filing No. 15 at 10.] Because the Court must accept this allegation as

26

true, it follows that the Court must also conclude that Mr. Kluge has alleged a conflict between the Policy and his sincerely-held religious beliefs. To conclude otherwise would require a qualitative analysis of the Policy and Mr. Kluge's religious beliefs, which is better suited for a later stage in the litigation. The Court must also accept as true the allegations that BCSC refused to accommodate Mr. Kluge's belief where doing so would not result in undue hardship and that this conflict was the basis of BCSC's demand for his resignation, and together these allegations state a claim for failure to accommodate.[7] Accordingly, BCSC's Motion to Dismiss Mr. Kluge's Title VII failure-to-accommodate claim is **DENIED**, and that claim (Count 1) **shall proceed**.[8]

### b.   Count 2: Retaliation

Mr. Kluge asserts that BCSC retaliated against him for engaging in protected conduct by: (1) agreeing to the last-names-only accommodation and then withdrawing the accommodation without demonstrating that it caused undue hardship; and (2) telling him that he could either "use transgender names and pronouns, resign, or be terminated." [Filing No. 15 at 17-18.]

---

[7] The Court is not, as Mr. Kluge requests, giving any sort of estoppel effect to BCSC's attempt at a compromise through the last-names-only arrangement, as its efforts (or lack thereof) to cooperate with Mr. Kluge's preferences do not determine the extent of its legal obligation (or lack thereof) to accommodate his religious beliefs. Nevertheless, the allegation that there was an "accommodation" in place that was later withdrawn is indicative that there might be a question of undue hardship which, again, is a factual matter not properly resolved at this stage in the litigation.

[8] Notably, it is not inconsistent to permit Mr. Kluge's Title VII claim to proceed where he does not have a First Amendment claim concerning his exercise of religion in the workplace. Existing caselaw dictates that the Title VII inquiry is distinct from the constitutional free exercise question. *See Ryan v. U.S. Dep't of Justice*, 950 F.2d 458, 461 (7th Cir. 1991) ("Title VII requires of the [government employer] more than the Constitution in its own right. An employer may not discriminate on account of religion—that is to say, may not use an employee's religion as a ground of decision."); *Filinovich v. Claar*, 2006 WL 1994580, at *4 (N.D. Ill. July 14, 2006) ("[T]he Free Exercise Clause does not require Defendants to provide Plaintiff an accommodation from their neutral and generally applicable employment requirement.").

BCSC argues that the retaliation claim fails for the same reasons that the failure-to-accommodate claim fails: using the names listed in PowerSchool is an administrative activity that does not conflict with his religious beliefs.  [Filing No. 45 at 10.]  In addition, BCSC argues that Mr. Kluge has not adequately stated a claim for retaliation because there is no causal connection between his request for an accommodation and ultimate resignation.  [Filing No. 45 at 11.]  Specifically, BSCS asserts that "[i]t defies logic that [BCSC] would accommodate [Mr.] Kluge in several ways from the outset, then somehow concoct student complaints as an excuse to rescind the last-name accommodation, all because [BCSC] harbored discriminatory animus toward [Mr.] Kluge from the beginning."  [Filing No. 45 at 11.]

Mr. Kluge responds that the Court must accept as true his allegation that BCSC's reason for withdrawing the last-names-only accommodation—i.e., student complaints—was pretextual.  [Filing No. 57 at 16.]  He maintains that he has stated a claim for retaliation, and asserts that BCSC cannot articulate a legitimate, non-discriminatory reason for its actions.  [Filing No. 57 at 16-17.]

In reply, BCSC argues that it is apparent from Mr. Kluge's attempt to rescind his resignation that he was aware of the student complaints underlying BCSC's decision to withdraw the last-name-only accommodation, but, in any event, the Court need not accept his pretext argument because it merely establishes a possibility that he is entitled to relief, which falls short of the standard of review.  [Filing No. 60 at 5.]

To state a claim for retaliation under Title VII, the plaintiff must allege facts showing that he engaged in statutorily protected expression and was subjected to an adverse employment action as a result.  *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 828 (7th Cir. 2014) (citations omitted).  Here, for the reasons discussed above and given the standard of review on a motion to

dismiss, the Court cannot conclude that BCSC had no duty to accommodate Mr. Kluge's religious beliefs, and therefore the Court also cannot conclude that his retaliation claim fails on that basis. BCSC's alternative argument is that it "defies logic" that BCSC would first permit the last-names-only arrangement and then subsequently withdraw that arrangement based on religious animus. However, accepting Mr. Kluge's allegations as true—which the Court must do—it is plausible that school officials, over time, became less inclined to tolerate Mr. Kluge's religious beliefs and used the idea of student complaints as a pretext to withdraw the last-names-only arrangement, refuse to provide another accommodation to which Mr. Kluge was entitled, and force him to resign. Whether Mr. Kluge can produce evidence to support such a contention is another question entirely, which is not before the Court at this time.[9] Nevertheless, at this stage, the Court concludes that Mr. Kluge's allegations were sufficient to state a claim for retaliation under Title VII. Accordingly, BCSC's Motion to Dismiss is **DENIED** as to the Title VII retaliation claim, and that claim (Count 2) **shall proceed**.

### c.   Count 3: Hostile Work Environment

Mr. Kluge alleges that BCSC created a hostile work environment by "demanding that [he] address students with gender dysphoria by their preferred names, resign, or be terminated." [Filing No. 15 at 18.] He alleges that BSCS gave him an "untenable choice" between violating his conscience and sincerely-held religious beliefs or losing his job, and "effectively told [him] to leave his religion outside of the classroom or get out." [Filing No. 15 at 18.] He asserts that this hostile environment was so severe and pervasive that it adversely affected his working conditions. [Filing No. 15 at 18.]

---

[9] The Court is assuming that Mr. Kluge's allegations concerning pretext are supported by a good-faith basis for asserting them and warns that the revelation that they were not could have consequences under Federal Rule of Civil Procedure 11 and 28 U.S.C § 1927.

BCSC argues that Mr. Kluge's allegations are insufficient to state a claim for hostile work environment because BCSC merely required him, and all faculty, to address students by the names listed in PowerSchool, which does not rise to the level of the "hellish" environment necessary to state a claim under Title VII. [Filing No. 45 at 12-13.]

Mr. Kluge responds that he need not allege facts demonstrating that his work environment was "hellish." [Filing No. 57 at 17.] Instead, he argues, his allegations need only show that he was subjected to unwelcome harassment based on a protected characteristic, that such harassment was so severe or pervasive that it altered the conditions of employment and created an abusive work environment, and that there is a basis for employer liability. [Filing No. 57 at 18.] Mr. Kluge asserts that his allegations satisfy this standard because the combined actions and statements of Superintendent Snapp, Principal Daghe, and Ms. Gordon directing him to either violate his sincerely-held religious beliefs or leave his job amounted to harassment. [Filing No. 57 at 18-19.]

In reply, BCSC asserts that Mr. Kluge has not alleged facts showing that BCSC's conduct was objectively offensive or severe and pervasive and has not cited any case supporting his proposition that requiring him to address students by the names listed in the school's database can support a hostile work environment claim. [Filing No. 60 at 6.]

To state a claim for hostile work environment under Title VII, a plaintiff must allege facts demonstrating that: (1) he was subject to unwelcome harassment; (2) the harassment was based on a characteristic or category protected by Title VII; (3) the harassment was so severe or pervasive as to alter the conditions of employment and create a hostile or abusive working environment; and (4) there is a basis for employer liability. *Huri v. Office of the Chief Judge of the Circuit Court of Cook Cty.*, 804 F.3d 826, 833-34 (7th Cir. 2015) (citation omitted). In

determining whether the plaintiff has stated a claim that the work environment was "objectively hostile," the Court must consider the totality of the circumstances, including the frequency of discriminatory conduct, its severity, whether it is physically threatening or humiliating, whether it unreasonably interfered with the employee's work performance, and the relationship between the harassing party and the party being harassed. *Alamo v. Bliss*, 864 F.3d 541, 550 (7th Cir. 2017) (citations omitted). Although the workplace need not be "hellish" to state a claim for hostile work environment, it must be so pervaded by discrimination that the terms and conditions of employment are altered. *Id.* (citations omitted).

Mr. Kluge's allegations do not state a plausible claim for hostile work environment under Title VII. While he alleges that BCSC took disciplinary actions against him for his failure to follow the Policy, none of his allegations demonstrate that he was frequently harassed, threatened, or humiliated, or that his work environment became abusive as a result of this discipline. Furthermore, while he alleges that BCSC's actions were so severe and pervasive that they adversely affected his working conditions, this is a conclusory statement that the Court is not required to credit, and it is unsupported by any specific factual allegations demonstrating that he was harassed. Indeed, he does not allege that his work performance was impeded, and instead alleges that his students excelled. [Filing No. 15 at 9.] Accordingly, BCSC's Motion to Dismiss is **GRANTED** as to this claim (Count 3), which is **DISMISSED**.

### 6.   Indiana Constitutional Claims (Count 11)

Mr. Kluge asserts in the Amended Complaint that BCSC's transgender policies and the enforcement of those policies violate his rights to free exercise of religion guaranteed by Article 1, Sections 2 and 3 of the Indiana Constitution. [Filing No. 15 at 29-30.] He alleges that, by punishing him and threatening to punish him for exercising his sincerely-held religious beliefs,

BCSC infringed on his right to engage freely in his religious convictions and practices and forced him to violate his conscience.  [Filing No. 15 at 29.]  He asserts that BCSC's policies do not serve any government interest of sufficient magnitude to override his right to live according to the dictates of his faith and according to his own conscience.  [Filing No. 15 at 29-30.]

BCSC argues that this claim should be dismissed because there is no caselaw establishing that the protections created by Article 1, Sections 2 and 3 of the Indiana Constitution apply in the context of public employment.  [Filing No. 45 at 24.]

Mr. Kluge responds that, although no case has applied these provisions in the public employment context, "[i]t seems logical the protection should apply to public employment," and this Court should either conclude that it does, or, alternatively, certify the question to the Indiana Supreme Court for determination.  [Filing No. 57 at 32-33.]

In reply, BCSC maintains that the absence of controlling precedent applying the provisions in question in the employment context warrants dismissal and Mr. Kluge is "simply wrong" in asserting that logic dictates that the provisions should apply in that context.  [Filing No. 60 at 12.]  BCSC argues that certification to the Indiana Supreme Court is inappropriate because Mr. Kluge has not addressed any of the factors for determining when certification is proper.  [Filing No. 60 at 12.]

Analysis of religious freedom under the Indiana Constitution is separate from the analysis of religious freedom under the First Amendment to the United States Constitution. *City Chapel Evangelical Free Inc. v. City of S. Bend ex rel. Dep't of Redevelopment*, 744 N.E.2d 443, 446 (Ind. 2001) ("Clearly, the religious liberty provisions of the Indiana Constitution were not intended merely to mirror the federal First Amendment. We reject the contention that the Indiana Constitution's guarantees of religious protection should be equated with those of its federal

counterpart and that federal jurisprudence therefore governs the interpretation of our state guarantees.") (footnote omitted).

Instead, the Indiana Supreme Court analyzes constitutional claims using the material burden standard, which considers whether a given state action places a "material burden, in contrast to a permissible qualification" upon the core values embodied in a particular constitutional provision.  *See id.* at 447; *Price v. State*, 622 N.E.2d 954, 960 (Ind. 1993) ("[T]here is within each provision of [Indiana's] Bill of Rights a cluster of essential values which the legislature may qualify but not alienate.  A right is impermissibly alienated when the State materially burdens one of the core values which it embodies." (citations omitted)).  In this sense, the freedoms guaranteed by the Indiana Constitution, much like those guaranteed by the federal constitution, are not absolute.  *See City Chapel*, 744 N.E.2d at 446-47 (discussing that the Indiana constitutional right to freedom of religion is subject to some qualifications justified by the state's police power).  A material burden exists if, "[c]onsidering only the magnitude of the impairment and excluding any consideration for the social utility of the proposed [action], . . . the right, as impaired, would no longer serve the purpose for which it was designed."  *Id.* at 451 (internal quotations and citation omitted); *see also Clinic for Women, Inc. v. Brizzi*, 837 N.E.2d 973, 984 (Ind. 2005) ("[A] state regulation creates a material burden if it imposes a substantial obstacle on a core constitutional value serving the purpose for which it was designed; and we hold that in most circumstances, less than a substantial obstacle does not.").

The relevant constitutional provisions provide as follows:

Section 2. All people shall be secured in the natural right to worship ALMIGHTY GOD, according to the dictates of their own consciences.

Section 3. No law shall, in any case whatever, control the free exercise and enjoyment of religious opinions, or interfere with the rights of conscience.

33

Ind. Const. art. I, §§ 2, 3.

As to the core constitutional values protected by these provisions, the Indiana Supreme Court has stated that, "[b]y protecting the right to worship according to the dictates of conscience and the rights freely to exercise religious opinion and to act in accord with personal conscience, Sections 2 and 3 advance core values that restrain government interference with the practice of religious worship, both in private and in community with other persons." *City Chapel*, 744 N.E.2d at 450. "At most, the rights of conscience referred to in Article 1, Section 3 extend only to the right to hold whatever beliefs one desires." *Gul v. City of Bloomington*, 22 N.E.3d 853, 858 (Ind. Ct. App. 2014). Thus, Section 3 "protects only the right to hold one's own opinions, and does not protect the right to act on one's own opinions in contravention of the law." *Id.* To establish a violation of Sections 2 or 3, the plaintiff must show that a government action "materially burdens [his] right to worship according to the dictates of conscience, [or] the right freely to exercise religious opinions and rights of conscience." *City Chapel*, 744 N.E.2d at 451.

As a preliminary matter, BCSC asserts that this claim should be dismissed because the Indiana Supreme Court has never applied these constitutional provisions in the context of public employment. It is true that the Indiana Supreme Court has declined to decide whether the Indiana Constitution extends to public employees in the context of workplace discipline. *See Cantrell v. Morris*, 849 N.E.2d 488, 498 (Ind. 2006) ("We therefore explicitly leave open the extent to [which] public employees enjoy Indiana constitutional protection against employment action."). However, the Indiana Supreme Court has never held that the Indiana Constitution *does not* apply in the public employee context, and the mere lack of express approval of this type of claim is not a valid reason to dismiss the claim at this stage in the proceeding.

Furthermore, the Court declines to certify the question to the Indiana Supreme Court. Mr. Kluge has not developed his argument in favor of certification.  In any event, the issue is not outcome-determinative because, as explained below, Mr. Kluge's claim fails either way.  *See e.g.*, *Cedar Farm, Harrison Cty., Inc. v. Louisville Gas & Elec. Co*., 658 F.3d 807, 813 (7th Cir. 2011)* ("[C]ertification is appropriate when the case concerns a matter of vital public concern, where the issue will likely recur in other cases, where resolution of the question to be certified is outcome determinative of the case, and where the state supreme court has yet to have an opportunity to illuminate a clear path on the issue.") (internal quotations and citations omitted).

Assuming, without deciding, that public employees in Indiana are protected by the religious freedom provisions of the Indiana Constitution, Mr. Kluge nevertheless has failed to state a claim upon which relief can be granted.  Specifically, Mr. Kluge has not alleged facts demonstrating that the Policy materially burdens his right of conscience or to exercise his religion such that enforcement of the Policy would render his religious freedom entirely meaningless.  To the extent that Mr. Kluge argues that the Policy violates his right to conscience, the claim fails because Section 3 protects the right to hold opinions but does not create a right to disobey the law.  *See Gul*, 22 N.E.3d at 858.  In that sense, the Policy does not prevent Mr. Kluge from believing that affirming people who experience gender dysphoria is a sin, it merely regulates his conduct in the workplace, and therefore does not violate Section 3.

To the extent that Mr. Kluge argues that the Policy interferes with his religious exercise, he has not alleged facts showing that the Policy creates a material burden on his right, especially in light of the state's countervailing interests.  Indiana courts have stated that Indiana constitutional rights are not absolute, and the idea that they may be limited in the exercise of legitimate state police power is especially salient in the context of public employment.

Specifically, the state has recognized interests in promoting the efficiency of its public schools, protecting the rights of public-school students, and controlling the content of public employee's expression in the context of performing their official duties.  *See Pickering*, 391 U.S. at 568; *Garcetti*, 547 U.S. at 418; *Mayer v. Monroe Cty. Cmty. Sch. Corp.*, 474 F.3d 477, 479 (7th Cir. 2007) (discussing a school district's ability to dictate teachers' speech and curriculum).  The Policy controlled the way in which Mr. Kluge addressed individual students during the course of his employment, but did not otherwise affect his ability to exercise his religion in the remainder of his life.  Accordingly, to the extent that the Policy limited his religious exercise, the limitation was not so significant as to render the entire idea of free exercise of religion meaningless, because Mr. Kluge remained free to exercise his religious beliefs at other times and in other places.  *See State v. Econ. Freedom Fund*, 959 N.E.2d 794, 807 (Ind. 2011) (concluding that a statute preventing the use of automated dialing devices without the recipient's consent did not materially burden the right to engage in political speech, because plaintiffs remained free to engage in such speech without the use of an automatic dialer).  Accordingly, BCSC's Motion to Dismiss is **GRANTED** as to this claim (Count 11), which is **DISMISSED**.

7.  Intentional Infliction of Emotional Distress (Count 12)

In the Amended Complaint, Mr. Kluge alleges that BCSC intentionally caused him to suffer severe emotional distress by: (1) removing the last-names-only arrangement; (2) threatening him with termination if he did not either "use transgender names and pronouns" or resign; (3) refusing to accommodate his sincerely-held religious beliefs; and (4) violating his rights under Title VII, the United States Constitution, and the Indiana Constitution.  [Filing No. 15 at 30.]

BCSC argues that this claim should be dismissed because Mr. Kluge has failed to allege all of the elements of an intentional infliction of emotional distress ("IIED") claim, "even in boilerplate fashion." [Filing No. 45 at 24-25.] Furthermore, it argues, none of Mr. Kluge's allegations demonstrate extreme or outrageous conduct. [Filing No. 45 at 25.]

Mr. Kluge responds that his allegations contain a short and plain statement of all the required elements, except for a specific recitation that BCSC's conduct was extreme or outrageous. [Filing No. 57 at 33.] Nevertheless, he argues, the allegations were sufficient to give BCSC notice of the nature of the claim. [Filing No. 57 at 33.]

In reply, BCSC asserts that Mr. Kluge's factual allegations "fail to meet the high bar required" to sustain a claim for IIED. [Filing No. 60 at 12-13.] BCSC also argues that Mr. Kluge's allegations—including that BCSC accommodated until faced with student complaints and that Mr. Kluge was "encouraged" in response to the alleged "persecution and unfair treatment"—demonstrate that Mr. Kluge did not suffer emotional distress as a result of any extreme or outrageous conduct. [Filing No. 60 at 12-13.]

Under Indiana law, the elements of IIED are that the defendant (1) engaged in extreme and outrageous conduct (2) which intentionally or recklessly (3) caused (4) severe emotional distress to another. *E.g.*, *Lachenman v. Stice*, 838 N.E.2d 451, 456 (Ind. Ct. App. 2005) (citations omitted). It is the intent to harm the plaintiff emotionally that constitutes the basis for this tort, and the requirements are "rigorous." *Id.* (citations omitted).

In order for a defendant's conduct to be extreme or outrageous, it is not enough that "defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort." *Id.*

(citation omitted).   Instead, liability can be found "only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Id.* at 456-57.  "In the appropriate case, the question [of whether a defendant's conduct was sufficiently extreme and outrageous] can be decided as a matter of law."  *Id.* at 457 (citation omitted).

Here, Mr. Kluge has failed to state an IIED claim because, as a matter of law, his allegations do not demonstrate that BCSC's conduct was extreme or outrageous.  In fact, his claim is premised on allegations that BCSC attempted to enforce a policy that he did not agree with, but there are no factual allegations to suggest that any school official acted in an outrageous, harassing, or threatening way in doing so.  Mr. Kluge also did not allege facts from which any intent to cause emotional harm can be inferred.  Accordingly, BCSC's Motion is **GRANTED** as to the IIED claim (Count 12), which is **DISMISSED**.

### 8.   Fraud (Count 13)

Mr. Kluge alleges in the Amended Complaint that BCSC committed fraud under Indiana law when it intentionally misrepresented to him that he could submit a conditional resignation, with the intent that he rely upon such misrepresentation.  [Filing No. 15 at 31.]  He asserts that BCSC acted with "malice, oppression, and fraud," and he reasonably relied on its false representation, causing actual damage.  [Filing No. 15 at 31.]

BCSC argues that Mr. Kluge has failed to state a claim for fraud because, by allegedly agreeing that Mr. Kluge could withdraw his resignation before its effective date, Ms. Gordon was at best making a promise that she later broke, which cannot be the basis for a fraud claim.  [Filing No. 45 at 25-26.]  BCSC submits that Mr. Kluge's written resignation does not contain a condition that he could rescind it at any time prior to its effective date, and, pursuant to Indiana

law, an employee of a school corporation who submits his written resignation for some fixed future date has no right to withdraw it. [Filing No. 45 at 25-26.]

Mr. Kluge responds that his fraud claim was based on a misrepresentation of existing fact—not a promise of future conduct—because Ms. Gordon represented that he could submit a conditional resignation while knowing that he could not do so, in order to induce his resignation and avoid having to terminate him. [Filing No. 57 at 34.]  He also argues that his resignation was invalid because it was processed before its effective date. [Filing No. 57 at 34-35.]

In reply, BCSC asserts that Mr. Kluge does not acknowledge its argument that his resignation was not actually conditional because it did not include any language permitting him to withdraw it. [Filing No. 60 at 13.]  Moreover, it argues, even if the resignation was conditional, Mr. Kluge still cannot assert a claim of fraud based on a misrepresentation concerning future conduct. [Filing No. 60 at 13.]

Under Indiana law, the elements of actual fraud are: (1) a material representation of a past or existing fact by the party to be charged that; (2) was false; (3) was made with knowledge or reckless ignorance of its falsity; (4) was relied upon by the complaining party; and (5) proximately caused the complaining party's injury. *Ruse v. Bleeke*, 914 N.E.2d 1, 10 (Ind. Ct. App. 2009) (citation omitted).  "Actual fraud may not be based upon representations of future conduct, broken promises, or representations of existing intent that are not executed." *Id.* (citation omitted).

Here, Mr. Kluge argues that Ms. Gordon misrepresented that he could file a conditional resignation.  It is unclear what he means by "conditional resignation," other than his reference to being permitted to withdraw the resignation before it was "processed" or shared with the administration.  Notably, however, Mr. Kluge's written resignation, which he attached to his

Amended Complaint, was not expressly conditioned on anything, did not contain any language concerning his ability to withdraw it, and instead merely requested that the letter not be "processed" and that no one be notified until a certain date.  [Filing No. 15-2.]  Ms. Gordon stated in response, "I will honor your request and not process this letter or share with the BHS administration until May 29."  [Filing No. 15-2.]  Such statement by Ms. Gordon is nothing more than a representation of her existing intent, which was not later executed, and therefore cannot form the basis of an actionable claim for fraud under Indiana law.

To the extent that Mr. Kluge relies upon Ms. Gordon's alleged more general representation that he was allowed to submit a conditional resignation, the claim nonetheless fails.  Mr. Kluge alleges that, at a meeting on February 6, 2018, Ms. Gordon "agreed that he could submit a conditional resignation."  [Filing No. 15 at 9-10].  However, the resignation he attached to the Amended Complaint contradicts this allegation, as Mr. Kluge did not in fact submit a conditional resignation.  In any event, Ms. Gordon's purported representation that Mr. Kluge could submit a conditional resignation is another way of stating her agreement that she would allow him to withdraw his resignation at a later date, which is nothing but a representation concerning future conduct that is not actionable under a theory of fraud.  Accordingly, BCSC's Motion to Dismiss is **GRANTED** as to the fraud claim, and that claim (Count 13) is **DISMISSED**.

## II.
### IYG'S PENDING MOTIONS

#### A.  Intervention as of Right

It its Motion to Intervene as a Defendant, IYG seeks to intervene as of right, pursuant to Fed. R. Civ. P. 24(a)(2), or, alternatively, to intervene permissively under Rule 24(b)(1).  [Filing No. 22.]  IYG asserts that it is a nonprofit organization with a primary purpose of promoting the

safety and healthy development of LGBTQ youth in Indiana schools and communities.  [Filing No. 23 at 5.]   In furtherance of this mission, IYG manages a network of student-run groups across Indiana that seek to provide safe spaces for LGBTQ students, including one group at BHS called the Equality Alliance.  [Filing No. 23 at 15.]

As to intervention as of right, IYG argues that it has a direct interest in this lawsuit that might be harmed if it is not permitted to intervene.  [Filing No. 23 at 13-19.]  Specifically, IYG asserts that, if Mr. Kluge prevails and is reinstated with the last-names-only arrangement, transgender students at BHS will be harmed because they will feel ostracized, stigmatized, humiliated, and unsafe as a result of having a teacher who refuses to address them by their proper names and pronouns.  [Filing No. 23 at 13-14.]  Because IYG represents the interests of these students, who are or will be members of the Equality Alliance, and because those students will be directly affected by the outcome of this lawsuit, IYG argues that it should be permitted to intervene as a matter of right.  [Filing No. 23 at 14-15.]  In addition, IYG contends that the outcome of this action could constrain how it allocates its resources, because it would be forced to assist transgender and gender nonconforming students at BHS who are negatively affected, instead of expending resources on other issues.  [Filing No. 23 at 15-16.]

IYG argues that BCSC may not adequately protect these interests for two reasons.  [Filing No. 23 at 17.]  First, IYG asserts that it may advance different legal arguments in the litigation, including the argument that transgender students have a right to be addressed with correct names and pronouns under federal law, and BCSC may not be inclined to make such arguments because they acknowledge legal obligations beyond the scope of this lawsuit.  [Filing No. 23 at 17.]  Second, IYG argues that BCSC has different priorities that will affect its litigation strategy.  [Filing No. 23 at 17.]  Specifically, while IYG would focus on protecting transgender

students from harm, BCSC may have to balance the interests of teachers, parents, and other stakeholders and therefore may be more inclined to resolve the case by striking a balance among these interests, instead of arriving at the resolution that would be best for the students.  [Filing No. 23 at 17-19.]

IYG attaches three sworn declarations to its Motion to Intervene.  [Filing No. 22-1; Filing No. 22-2; Filing No. 22-3.]  The first is from Christine Paulsen, the Chief Executive Officer of IYG, who provides background information concerning IYG and its mission and services and the support it has provided to BCSC students.  [Filing No. 22-1 at 1-8.]  The second declaration is by a parent of a student whose transgender son, Aidyn, quit orchestra and transferred to another school after Mr. Kluge refused to use his chosen name.  [Filing No. 22-2 at 1-6.]  The third declaration is from Aidyn himself, who avers that Mr. Kluge's failure to address him by his name listed in PowerSchool was an issue that was discussed at Equality Alliance meetings, that he left BHS because the controversy surrounding Mr. Kluge subjected the student to bullying, and that IYG has provided him with valuable programming.  [Filing No. 22-3 at 1-8.]

In response, Mr. Kluge argues that this Court should disregard the declarations attached to IYG's Motion to Intervene because: (1) Aidyn is not credible, is not transgender, and, in any event, no longer attends BHS; (2) Aidyn's mother's declaration is based on inadmissible hearsay; and (3) Christine Paulsen's declaration is conclusory and lacks foundation.  [Filing No. 53 at 17-28.]  In support of his arguments, Mr. Kluge presents declarations from the following individuals: (1) himself, disagreeing with the contents of the declarations of Aidyn and his mother, [Filing No. 52-6]; (2) his teaching assistant, stating that she supported the last-names-only arrangement and never heard Mr. Kluge use incorrect names or gendered language, [Filing No. 52-2]; (3) a BHS student, asserting that she never witnessed Mr. Kluge treating transgender

students differently and that Aidyn had falsely accused her of bullying because she is a Christian who opposes affirming people who identify as transgender, [Filing No. 52-3]; (4) a second student, who confirmed that Mr. Kluge followed the last-names-only arrangement and treated everyone equally, [Filing No. 52-4]; (5) a third student, who stated that she witnessed Mr. Kluge following the last-names-only accommodation and did not hear him use first names or gendered language, [Filing No. 52-5]; and (6) a parent of a BCSC student who witnessed Aidyn speaking at a school board meeting and perceived that Aidyn had a "personal vendetta" against Mr. Kluge, and, based on secondhand accounts of others' interactions with Aidyn and Aidyn's social media posts, does not believe that Aidyn is a transgender boy, [Filing No. 52-6].

As to the elements for intervention as of right, Mr. Kluge argues that IYG cannot show that it has an interest in the litigation because it cannot demonstrate Article III standing. [Filing No. 53 at 29-32.] Specifically, Mr. Kluge asserts that, if he were successful in this lawsuit and reinstated with the last-names-only arrangement, "he would not have license to discriminate against transgender students" but would simply refer to all students by their last names. [Filing No. 53 at 31-32.] Furthermore, he argues, IYG has not shown that Mr. Kluge's previous use of the last-names-only arrangement impaired its ability to provide its programs and services and has not presented a statement from any current student, which demonstrates that it does not have any interest in the outcome of this suit. [Filing No. 53 at 30-31.] Finally, Mr. Kluge argues that IYG's interests are adequately protected by BCSC, because both entities are seeking dismissal of this lawsuit and because BCSC, through enacting policies concerning transgender students, has already demonstrated its dedication to ensuring that transgender students are addressed by the names and pronouns of their choice. [Filing No. 53 at 32-33.]

IYG replies that it has a direct interest in this matter because it provides services to LGBTQ students in the BCSC school system and a ruling in favor of Mr. Kluge would undermine its mission of helping those students, as reinstating Mr. Kluge with the last-names-only accommodation would harm transgender students and force IYG to expend its resources supporting those students.   [Filing No. 59 at 6.]   IYG asserts that Mr. Kluge failed to acknowledge other cases supporting its position, presented a wholly circular argument that intervention was unnecessary because he would prevail on the merits, and ignored the relevant standard of review.  [Filing No. 59 at 7-9.]  IYG argues that, while not required, it has both direct and associational Article III standing.  [Filing No. 59 at 9-10.]  IYG reiterates that BCSC will not adequately protect its interest and distinguishes cases cited by Mr. Kluge in his response.  [Filing No. 59 at 10-13.]  IYG attaches to its response declarations from a current transgender student at BHS and a teacher at BHS who serves as the faculty advisor for the Equality Alliance, as well as an article concerning the positive effects of calling transgender individuals by their chosen names.  [Filing No. 58-1; Filing No. 58-2; Filing No. 58-3.]

Mr. Kluge asks the Court for leave to file a sur-reply responding to the evidence attached to IYG's reply.  [Filing No. 61.]  In his proposed sur-reply, Mr. Kluge disputes the veracity of IYG's evidence and argues that the Court should disregard it.  [Filing No. 61-1.]  Mr. Kluge's Motion for Leave to File a Sur-Reply, [61], is **GRANTED** to the extent that the Court has reviewed the attached proposed sur-reply, although, as discussed below, the Court concludes that the material contained therein is irrelevant and unnecessary to the resolution of the Motion to Intervene.

To intervene as a matter of right in a federal lawsuit under Rule 24, a proposed intervenor must satisfy four criteria: "(1) timely application; (2) an interest relating to the subject matter of

the action; (3) potential impairment, as a practical matter, of that interest by the disposition of the action; and (4) lack of adequate representation of the interest by the existing parties to the action." *Planned Parenthood of Wisconsin, Inc. v. Kaul*, 942 F.3d 793, 797 (7th Cir. 2019) (internal quotations and citation omitted). "The proposed intervenor has the burden of establishing all four elements; the lack of even one requires that the court deny the motion." *Id.* (citation omitted). The Court must accept as true all non-conclusory allegations in the motion to intervene and should not deny the motion "unless it appears to a certainty that the intervenor is not entitled to relief under any set of facts which could be proved under the complaint." *Reich v. ABC/York-Estes Corp.*, 64 F.3d 316, 321 (7th Cir. 1995) (internal quotations and citations omitted).

As to the second element, the proposed intervenor must demonstrate a direct, significant, and legally protectable interest in the question at issue in the lawsuit, and such interest must be unique to the proposed intervenor. *Wisconsin Educ. Ass'n Council v. Walker*, 705 F.3d 640, 658 (7th Cir. 2013). Because this inquiry is fact-specific, "making comparison to other cases [is] of limited value." *Id.* (internal quotations and citation omitted).

In analyzing whether the named parties inadequately represent the proposed intervenor's interest, the Seventh Circuit applies a "three-tiered" standard. *Kaul*, 942 F.3d at 799. The baseline rule is liberal: the inadequacy requirement is satisfied if the proposed intervenor shows that the parties' representation of its interest "may be inadequate." *Id.* (internal quotations and citation omitted). "Where the prospective intervenor and the named party have 'the same goal,' however, there is a rebuttable presumption of adequate representation that requires a showing of 'some conflict' to warrant intervention." *Id.* (citation omitted). This presumption of adequacy is strengthened to the point of requiring a showing of gross negligence or bad faith where the

representative party is a governmental body that is charged by law with protecting the interests of the proposed intervenors. *Id.* (citations omitted). "[Q]uibbles with the [representative party's] litigation strategy" do not create a sufficient conflict of interest to warrant intervention. *Wisconsin Educ. Ass'n Council*, 705 F.3d at 659.

As a preliminary matter, this Court would like to point out that, though these issues seem to be a matter of significant focus in the parties' briefs, a motion to intervene is not the appropriate juncture or vehicle to ask the Court to decide factual disputes concerning Mr. Kluge's conduct during the last-names-only arrangement, students' reactions to that conduct, or the potential impacts of such conduct. This Court certainly will not adjudicate a dispute concerning the gender identity of a non-party minor student, and reminds the parties of their obligation to maintain a certain level of decorum that does not include assembling a group of different non-parties to criticize a child or weigh in on that child's gender identity or credibility where the child is not even involved in this action. To that end, the Court finds that the majority of the material contained in the declarations submitted by both parties is either unnecessary or irrelevant to the issue of intervention and borders on inappropriate.

Consistent with the standard of review, the Court will accept as true the non-conclusory allegations in IYG's Motion, to the extent that such allegations are relevant to the issues actually underlying the question of whether intervention is proper. Based on these allegations, the Court concludes that IYG has not demonstrated entitlement to intervene in this action as a matter of right. Although the Court recognizes IYG's interest in supporting LGBTQ youth within the BCSC community and recognizes that Mr. Kluge's actions could affect those students, that interest is only indirectly impacted by this litigation, which is now focused on Mr. Kluge's rights as an employee under Title VII.

Regardless, even if IYG has a direct interest in this litigation, it has not shown that such interest would not be adequately protected by BCSC.  IYG has conceded that it has "the same goal" as BCSC—dismissal of this action—and therefore a rebuttable presumption of adequacy arises.  *See Kaul*, 942 F.3d at 799.  To rebut this presumption, IYG offers only the fact that BCSC may advance "different legal arguments" and that BCSC has different priorities that might affect its litigation strategy.  Notably, however, BCSC enacted the policies in question, refused to back down from those policies, and is defending this action, presumably because of its desire to protect its transgender and gender nonconforming students.  The assertion that BCSC may decide that advancing the argument that transgender students have the right to be addressed by their chosen names and pronouns because such argument might not be necessary to resolution of this lawsuit is unavailing.  Specifically, an argument not necessary to the resolution of the lawsuit likely is not properly before the Court in the first place, and even if it is, IYG merely speculates that BCSC would not properly advance it.  Although BCSC has not yet raised the argument that transgender students have the right to be called by their preferred names and pronouns, in the context of this particular lawsuit, that argument is relevant only to the undue hardship portion of the Title VII claim, which, as previously noted, is not properly before the Court at this time.  Furthermore, the contention that BCSC might balance the interests of other stakeholders is conclusory, because there is no indication as to what those other interests might be or how considering those interests would harm students.  Accordingly, to the extent that IYG seeks intervention as a matter of right, the Motion is **DENIED**.

### B.  Permissive Intervention

In the alternative, IYG argues that it satisfies the requirements for permissive intervention because: (1) its defenses share common questions of law and fact with the main action; (2) its

motion is timely; and (3) it does not intend to assert any counterclaims, so there is no need for an independent showing of jurisdiction.  [Filing No. 23 at 19-20.]  IYG also argues that intervention would be in the interest of judicial economy because if Mr. Kluge were reinstated and permitted to refuse to call students by the correct names and pronouns, IYG or other affected parties might then sue BCSC for discrimination, resulting in serial and potentially conflicting litigation of the same issues.  [Filing No. 23 at 20.]  For these reasons, IYG asserts, courts have regularly permitted LGBTQ-focused public interest groups to intervene in challenges to school policies protecting transgender students.  [Filing No. 23 at 20-21 (citing cases).]

Mr. Kluge responds that IYG does not satisfy the requirements for permissive intervention because it does not present any claim or defense for which there is independent jurisdiction.  [Filing No. 53 at 33-35.]  Mr. Kluge further asserts that, even if IYG did satisfy the requirements for permissive intervention, the Court should exercise its discretion to deny the motion because granting the motion would delay the adjudication of this matter and prejudice his rights because litigating a second motion to dismiss would waste judicial resources.  [Filing No. 53 at 34-35.]

In reply, IYG argues that Rule 24(b) does not require an independent basis for jurisdiction, but instead requires only that its claims or defenses share a common question of law or fact, which is the case here.  [Filing No. 59 at 13-14.]  IYG further argues that Mr. Kluge's assertion that intervention has delayed this action and will result in prejudice to him is conclusory and baseless.  [Filing No. 59 at 14.]  In addition, IYG asserts that intervention would promote judicial economy because it would prevent IYG from having to file a separate lawsuit if Mr. Kluge prevails in this action.  [Filing No. 59 at 14-15.]

As to permissive intervention, upon a timely motion, a district court "may permit anyone to intervene who . . . has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). The decision whether to permit intervention is "wholly discretionary." *Kaul*, 942 F.3d at 803 (citation omitted). While the Federal Rules require a district court to consider whether intervention would unduly delay or otherwise prejudice the adjudication of the original parties' rights, they otherwise leave the court with ample authority to consider a wide variety of factors and manage the litigation before it. *Id.* (citing Fed. R. Civ. P. 24(b)(3)).

Here, as IYG acknowledges, it is not asserting a claim or defense independent of the defenses already asserted by BCSC and indeed is seeking only to dismiss this lawsuit. To that end, the issues it raises do indeed share common issues of law and fact with the main action because it has raised exactly the same issues. Notably, the arguments raised in IYG's proposed Motion to Dismiss, [Filing No. 55-2], are essentially the same as the arguments advanced by BCSC in its Motion, with the exception of the undue hardship argument which BCSC has correctly not raised at this juncture. In other words, judicial economy will not be served by permitting IYG to intervene because, as discussed above, its intervention would add nothing to the litigation. Thus, the Court declines to exercise its discretion to permit IYG to intervene, and its Motion is **DENIED** to the extent that it seeks permissive intervention.

As a final note, the Court emphasizes that nothing in this Order should be construed as prohibiting IYG from seeking permission to file an amicus curiae brief, should a situation arise in which doing so would be appropriate. *See e.g.*, *Monarch Beverage Co. v. Johnson*, 2014 WL 7063019, at *1 (S.D. Ind. Dec. 11, 2014) (explaining that, while the Federal Rules of Civil Procedure do not expressly contemplate the submission of amicus briefs in the district court, the

court may permit such briefs in accordance with the principles underlying Federal Rule of Appellate Procedure 29, which concerns amicus briefs at the appellate level). However, the Court reminds IYG that such filings, if permitted upon proper motion, should provide the Court with additional helpful theories or insights, not merely reiterate arguments already raised by the parties. *See Ryan v. Commodity Futures Trading Comm'n*, 125 F.3d 1062, 1063 (7th Cir. 1997) (explaining that amicus briefs that merely "duplicate the arguments made in the litigants' briefs" are "an abuse" and should not be allowed).

### C.  Motion for Leave to File a Motion to Dismiss

Given the Court's denial of IYG's Motion to Intervene, described above, the Motion for Leave to File a Motion to Dismiss, [55], is **DENIED AS MOOT**.

## III.
### CONCLUSION

Based on the foregoing, the Court makes the following rulings:

1. Defendants' Motion to Dismiss, [44], is **GRANTED IN PART** and **DENIED IN PART** as follows:

   a. The Motion is **GRANTED** to the extent that all claims against Defendants Dr. James Snapp, Phil Utterback, Jodi Gordon, and Dr. Bret Daghe individually in their official capacities are **DISMISSED WITH PREJUDICE**.

   b. The Motion is **GRANTED** to the extent that the following claims against BCSC are **DISMISSED WITH PREJUDICE**:

      i.  Count 3: Hostile Work Environment under Title VII,

      ii.  Count 4: First Amendment Retaliation,

      iii.  Count 5: Content and Viewpoint Discrimination under the First Amendment,

      iv.  Count 6: Compelled Speech under the First Amendment,

      v.  Count 7: Free Exercise of Religion under the First Amendment,

      vi.   Count 8: Unconstitutional Conditions,

     vii.   Count 9: Due Process,

    viii.   Count 10: Equal Protection,

      ix.   Count 11: Claims under the Indiana Constitution,

      x.   Count 12: Intentional Infliction of Emotional Distress, and

     xi.   Count 13: Fraud;

   c.  The Motion is **DENIED** to the extent that the following claims **SHALL PROCEED** against Defendant BCSC only:

      i.   Count 1: Failure to Accommodate under Title VII, and

     ii.   Count 2: Retaliation under Title VII.

2. Mr. Kluge's Motion for Leave to File Sur-Reply Responding to IYG's New Evidence Cited in its Reply in Support of Motion to Intervene, [61], is **GRANTED** to the extent that the Court considered the attached proposed sur-reply.

3. IYG's Motion to Intervene as Defendant, [22], is **DENIED**.

4. IYG's Motion for Leave to File a Motion to Dismiss Plaintiff's Amended Complaint, [55], is **DENIED AS MOOT.**


Date: 1/8/2020

                                     Hon. Jane Magnus-Stinson, Chief Judge
                                       United States District Court
                                       Southern District of Indiana


**Distribution via ECF only to all counsel of record**