# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| **JOHN M. KLUGE,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:19-cv-2462-JMS-DLP |
| | ) | |
| **BROWNSBURG COMMUNITY** | ) | |
| **SCHOOL CORPORATION,** *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON DEFENDANT'S LIABILITY FOR RELIGIOUS DISCRIMINATION

Plaintiff, John M. Kluge ("Kluge"), by counsel, moves the court for summary judgment against the Defendant, Brownsburg Community School Corporation ("BCSC"), under Fed. R. Civ. P. 56 and S. D. Ind. L. R. 56-1 on Kluge's claim of religious discrimination under Title VII. Kluge moves for summary judgment against BCSC on the ground that there is no genuine issue as to any material fact and he is entitled to judgment as a matter of law on BCSC's liability for failing to accommodate his sincerely held religious belief.

### I.   Summary of Argument

Kluge is an evangelical Christian who holds a sincerely-held religious belief that God created mankind in two genders, male and female, and that those genders are part

of the reflection of the image of God in each person. Kluge believes that a person's biological sex is their true, God-ordained, intended gender, and that a person cannot "change" that gender based on perceptions, feelings, or even surgical alteration. BCSC's transgender practices thus puts Kluge into conflict with his sincerely-held religious beliefs by forcing him to acknowledge by name a gender other than the students' birth gender. Kluge also sincerely believes that he cannot, without violating his religious beliefs, participate in a practice of affirming a "chosen" non-birth gender, including through the use of gendered names and pronouns.

There is no dispute that BCSC was aware of Kluge's religious beliefs or that BCSC was aware of Kluge's need for an accommodation. But BCSC never offered an accommodation to Kluge, Instead, Kluge suggested one accommodation: referring to students by last name only. On July 31, 2017, BCSC accepted this accommodation in writing, demonstrating its agreement that the accommodation does not inherently impose an undue burden.

Kluge's written accommodation was effective July 31, 2017. He used it successfully for the first semester and into the second. The only confirmed complaints were from two  transgender students, some of the parents of those students, and the faculty sponsor of the LGBTQ club at BCSC. But these complaints were not made to Kluge or reported to Kluge until long after the fact. There was no negative impact in Kluge's classroom or learning environment during the nine months he used the

accommodation. These long-after-the-fact complaints are "heckler's vetoes," not evidence of an undue burden or a negative impact on the learning environment. *See Ovadal v. City of Madison, Wis.,* 416 F.3d 531, 537 (7th Cir. 2005).

Despite extensive discovery in this case, BSCS has not identified any admissible evidence of a negative impact on the classroom environment—let alone the repetitive or pervasive disruption required to establish an undue burden. Further, BCSC never offered or discussed—verbally or in writing—any alternative accommodation. There was a complete absence of the "bilateral cooperation" accommodation law requires. *See Porter v. City of Chicago,* 700 F.3d 944, 953 (7th Cir. 2012).

In December of 2017, Principal Bret Daghe informed Kluge that his accommodation created "tension" and that Kluge should resign at the end of the year. Then in January of 2018, BCSC introduced a new transgender practice manual titled: "Transgender Questions." That document states that the continued use of student last names (Kluge's accommodation) is not allowed in the following school year. BCSC's "Transgender Questions" does not claim that the use of last names as an accommodation negatively impacts the learning environment or otherwise creates an undue hardship. It was simply a change in practice.

After attending the January 2018 faculty meeting in which the "Transgender Questions" document was introduced, Kluge sent Principal Daghe and Superintendent Jim Snapp an email reminding them he had a written accommodation with no end date

and requested confirmation that it remained effective. Two days later, Human Resources Director Jodi Gordon and Principal Daghe met with Kluge and informed him there was a change in policy and his accommodation was no longer "reasonable." Neither Gordon nor Daghe identified any change in circumstances or change in events that rendered this reasonable accommodation suddenly unreasonable. Neither stated that the accommodation negatively impacted the learning environment or created any undue hardship for the school. But Gordon did tell Kluge his accommodation was a policy violation going forward.

Gordon told Kluge that he was required to use transgender names, resign, or be terminated. When Kluge claimed BCSC was discriminating, Gordon misrepresented material facts by telling Kluge there was no discrimination—his accommodation was unreasonable and BCSC could remove it. Even though Kluge had alleged discrimination actionable under the BCSC Nondiscrimination Policy and Title VII, Gordon, the Human Resources Director and EEO Compliance Officer, never investigated, or submitted a report under the EEO policy, or referred the matter to anyone else for investigation.

Gordon also misrepresented school policy and state law by falsely telling Kluge that he could submit a conditional resignation to satisfy her demand while he considered the issue. Gordon promised to hold that conditional resignation until Kluge told her to process it. Subsequently, Kluge submitted a "conditional" resignation that Gordon

agreed to "honor," but she processed it immediately when he attempted to withdraw it,

resulting in the loss of Kluge's job.

## II. Statement of Material Facts Not in Dispute

1.  Kluge became employed by Defendant BCSC in August of 2014 as a Music and

    Orchestra Teacher. [Filing No. 71 at 8, ¶ 21.]

2.  Kluge's performance while employed at BCSC met and exceeded BCSC's

    legitimate expectations at all times, and his written performance evaluations

    were positive. [Filing No. 113-2 at 2 (Kluge Declr. at page 1, ¶ 4).]

3.  Prior to Kluge's employment at BCSC, his study of the Bible caused him to form

    a sincerely-held religious belief against promoting gender dysphoria by using

    transgender names. [Filing No. 113-2 at 2 (Kluge Declr. at page 1, ¶ 5).]

4.  Kluge's sincerely-held beliefs include not referring to transgender students by

    transgender names and pronouns. [Id. (Kluge Declr. at page 1, ¶ 6 ).]

5.  Kluge made BCSC high school principal Brett Daghe aware of his sincerely-held

    beliefs against promoting gender dysphoria by presenting Daghe a formal

    document drafted by Kluge in April of 2017, and signed by him and three other

    BCSC teachers; Kluge and those teachers then met with Daghe in May of 2017

    and read the document listing their concerns. [Filing No. 113-2 at 3 (Kluge Declr.

    at page 2, ¶ 7 ), Filing No. 113-1 at 17 (*Ex. D* Kluge Dep.).]

6.  The three other teachers who accompanied Kluge agreed to use the names listed in the school database, "Power School," but Kluge maintained his position, encouraged Daghe to continue using legal names, and left the meeting believing that he and Daghe were in agreement. [Filing No. 113-2 at 3 (Kluge Declr. at page 2, ¶ 8 ).]

7.  But thereafter, BCSC employees, including Kluge, were instructed to use the transgender students' preferred names. [Id. (Kluge Declr. at page 2, ¶ 9).]

8.  On the first day of classes for the 2017-2018 school year, Kluge announced that he would not address transgender students by the name listed in PowerSchool. [Id. (Kluge Declr. at page 2, ¶ 10).]

9.  Dr. Daghe drafted an ultimatum on Friday, July 28, 2017, mandating that Kluge use transgender preferred names, and the BCSC administration gave him until Monday, July 31st to decide if he would comply. [Id. (Kluge Declr. at page 2, ¶ 11).]

10. On July 31st, Kluge met with Superintendent Jim Snapp, and Human Resources Director Jodi Gordon, to discuss BCSC's ultimatum, and Kluge proposed a reasonable accommodation consisting of addressing all students by their last names only, similar to a sports coach. [Id. (Kluge Declr. at page 2, ¶ 12).]

11. Dr. Snapp and Jodi Gordon, on behalf of BCSC, agreed to Kluge's proposed

accommodation; inserted handwritten language in the communication dated July 28th from Dr. Daghe approving the last-names-only accommodation and indicating that Kluge would not be required to distribute student uniforms; and Gordon initialed the accommodation, while Kluge signed and dated that document. [Filing No. 113-2 at 3–4 (Kluge Declr. at pages 2–3, ¶ 13 ), Filing 15-1.]

12. Kluge, a contract teacher who worked with Kluge during the 2017–2018 school year, three students in Kluge's classes during that school year, and the parent of a BCSC student who attended the June 11, 2018, Board of School Trustees meeting concerning Kluge, all provided sworn declarations attesting to Kluge's adherence in his classes to the last-names only accommodation and no adverse behavior toward transgender students. [See Filing Nos. 52-1 through 52-6.]

13. Between July 31, 2017, and December 31, 2017 there were no student protests, there were no written complaints about Kluge's use of last names for all students, there were no classroom disturbances, and there were no cancelled classes; instead, the accommodation worked as intended and Kluge's students excelled; BCSC admits that some of Kluge's students received awards for their performances during the 2017-2018 school year. [Filing No. 113-2 at 4 (Kluge Declr. at page 3, ¶ 15), Filing No. 71 at page 14, ¶ 47.]

14. During that semester, BCSC did not claim undue hardship as a result of Kluge's accommodation, but Daghe met with Kluge on December 13, 2017, and told him

the accommodation created "tension," and that Kluge should resign by year-end. [Filing No. 113-2 at 4 (Kluge Declr. at page 3, ¶ 16).]

15. At a faculty meeting in January of 2018, attended by Kluge, BCSC distributed an 11-page document entitled, "Transgender Questions" which identifies BCSC's practices and procedures regarding childhood gender dysphoria and provides answers to faculty questions regarding transgender students. [Filing No. 113-2 at 4 (Kluge Declr. at page 3, ¶ 17), Filing No. 15-4.]

16. "Transgender Questions" addresses, in part, the use of last-names only when addressing transgender students and states that BCSC allowed the use of last names only for the 2017–2018 school year, but moving forward, BCSC expects that all teachers will use the students' first names listed in the Power School database. [Filing No. 15-4 at page 9, ¶ 5.]

17. "Transgender Questions" does not claim that the use of last-names only when addressing students created any "undue hardship" or disrupted the learning environment at BCSC; it simply addresses a change in transgender practices at BCSC. [Filing No. 113-2 at 5 (Kluge Declr. at page 4, ¶ 19 ), Filing No. 15-4.]

18. "Transgender Questions" also provides information on how teachers can break from their personal beliefs and biases, advising that "when you work in a public school, you sign up to follow the law and the policies/practices of that

organization and that might mean following practices that are different than your beliefs." [Filing No. 15-4 at page 10, ¶ 8.]

19. The "Transgender Questions" document suggests that following school policies and practices is the same as following the law, and communicates to faculty—incorrectly—that a public school teacher's religious beliefs or rights of conscience have no legal standing and must take a "back seat" to school policies and practices. [Id., Filing No. 113-2 at 5 (Kluge Declr. at page 4, ¶ 21).]

20. After the faculty meeting, Kluge contacted Superintendent Snapp and Principal Daghe and reminded them that Kluge had a signed accommodation agreement with no end date, and asked them to confirm that his last-names only accommodation was still valid. [Filing No. 113-2 at 5 (Kluge Declr. at page 4, ¶ 22).]

21. On February 6, 2018, Director of Human Resources, Jodi Gordon, and BHS Principal, Brett Daghe, met with Kluge in response to his communication to Dr. Snapp and Dr. Daghe and told him his religious accommodation was being withdrawn, since students were offended at the use of last names, although Gordon did not identify the students who were allegedly offended, and Kluge never told his students why he was referring to them by their last names. [Id. at 5–6 (Kluge Declr. at pages 4–5, ¶ 23).]

22. At the February 6th  meeting with Daghe and Gordon, neither administrator told

    Kluge that his accommodation had created an undue hardship, increased

    BCSC's cost of doing business, or disrupted the learning environment. [Filing

    No. 113-2 at 6 (Kluge Declr. at page 5, ¶ 24), Filing No. 113-4 at 20 (*Ex. 29*

    Gordon Dep.).]

23. Instead, Gordon told Kluge that his accommodation was no longer valid because

    it was a "policy violation" and when Kluge told Gordon the policy was

    discriminatory, Gordon responded that the BCSC attorneys had reviewed it and

    it was not discriminatory.  [Filing No. 113-2 at 6 (Kluge Declr. at page 5, ¶ 25),

    Filing No. 113-4 at 29, 43, 45–46 (*Ex. 29* Gordon Dep. at p. 10, lines 6–11; page 24,

    lines 5–20; page 26, lines 4–14; page 27, lines 14–17).]

24. At the February 6, 2018 meeting, Gordon and Daghe told Kluge he could follow

    the "policy," resign and be paid through the summer, or be terminated in early

    May. [Filing No. 113-2 at 6 (Kluge Declr. at page 5, ¶ 26), Filing No. 113-4 at 43

    (*Ex. 29*, Gordon Dep. at page 24, lines 5–20).]

25. Kluge submitted and Gordon accepted a "conditional" resignation from Kluge

    on April 30, 2018, after she agreed that: one condition was that his resignation

    would not be processed or shown to anyone, including any administrator, until

    May 29, 2018; and another condition was that he could withdraw his resignation

prior to that time. [Filing No. 113-2 at 6 (Kluge Declr. at page 5, ¶ 27), Filing No. 15-2.]

26. After evaluating what Gordon and Daghe told him about his accommodation and disagreeing with it, Kluge delivered to Gordon's office a time-stamped letter of rescission of his resignation showing it was received at 2:33 p.m. on May 25, 2018. [Filing No. 113-2 at 6 (Kluge Declr. at page 5, ¶ 28), Filing No. 15-3 at 1.]

27. In spite of receiving Kluge's resignation rescission, and in spite of agreeing not to share the conditional resignation letter with any Brownsburg High School administrator or make it effective until May 29, 2018, Gordon shared Kluge's resignation with BHS Principal Daghe on May 25th, they made Kluge's resignation effective the same day, and on May 25, 2018, approximately two hours after Kluge delivered his rescission, BCSC locked Kluge out of the BCSC buildings and internet database, and posted his job as vacant. [Filing No. 113-2 at 7 (Kluge Declr. at page 6, ¶ 29), Filing No. 71 at page 17, ¶ 63.]

28. The BCSC Board of Trustees accepted Kluge's resignation at its regular monthly meeting on June 11, 2018, even though he asked them not to accept it. [Filing No. 113-2 at 7 (Kluge Declr. at page 6, ¶ 30), Filing No. 71 at page 16, ¶ 58.]

29. Gordon knew that Kluge could not submit a "conditional" resignation and that any attempt to rescind it would be legally invalid; Gordon misrepresented Kluge's ability to submit a "conditional" resignation in order to obtain his

resignation. [Filing No. 113-2 at 7 (Kluge Declr. at page 6, ¶ 31), Filing No. 113-4

at 12 (Gordon Dep. at page 42, lines 16–24), Filing No. 71 at pages 16–17, ¶ 59.]

### III.Background

#### A.  Kluge holds sincere religious beliefs.

Kluge embraces sincere religious beliefs that are central to his claim. Kluge believes

that it is sinful to promote or affirm gender dysphoria. [Filing No. 113-2 at 2 (Kluge

Declr. at page 1, ¶ 5).] The foundation for that belief is built on additional beliefs. Kluge

believes that all people are made in God's image, are loved by God, and are to be loved

by him. [Filing No. 113-1 at 29–31 (*Ex. D* Kluge Dep. at pages 107–109).] He also believes

that the practice of attempting to change genders or requesting to be recognized by a

gender other than birth gender is destructive to the individual engaging the practice

and violative of that individual's role as an image-bearer of God. [Id.]

Kluge believes that the practice of transgenderism[1], and facilitating the practice of

transgenderism, are inherently sinful. He believes that knowingly referring to a person

as possessing a gender other than their birth gender, with the intention of affirming that

the person is in fact the named gender and not the birth gender, constitutes lying. [Id.]

Kluge's sincerely-held religious beliefs forbid him from knowingly, and on a

---

[1]  This case is limited to the discussion of transgenderism practiced by individuals born with a single set
of healthy reproductive organs. This discussion does not, and need not, extend to situations where
gender decisions are required due to the state of the reproductive organs at birth.

premeditated basis, participating in a practice that he believes to be destructive to others, sinful, and involving intentional lying. [Id.]

Mr. Kluge has long-standing involvement with his church, including various church leadership positions and a nuanced understanding (extending to a study of relevant Biblical terms in the original Greek) of the parts of the Bible on which his religious beliefs concerning transgenderism and the sinfulness of supporting a transgender lifestyle are based. [Filing No. 113-1 at 4–11 (*Ex. A* Kluge Dep. at pages 2–9).]

## B.  Kluge's employment and performance.

Kluge became employed by BCSC in August of 2014 as a Music and Orchestra Teacher. [Filing No. 71 at 8, ¶ 21.] Kluge's performance while employed at BCSC met and exceeded BCSC's legitimate expectations at all times, and his written performance evaluations were positive. [Filing No. 113-2 at 2 (Kluge Declr. at page 1, ¶ 4).]  During Kluge's employment, his music students received multiple awards for their performances. [Filing No. 113-2 at 4 (Kluge Declr. at page 3, ¶ 15), Filing No. 71 at page 14, ¶ 47.]

## C.  Kluge communicated his sincere religious beliefs to BCSC.

Kluge informed BCSC high school principal Brett Daghe of his sincerely-held beliefs against promoting gender dysphoria by presenting Daghe a formal document drafted by Kluge in April of 2017, and signed by Kluge and three other BCSC teachers. Kluge and those teachers then met with Daghe in May of 2017 and read the document listing

their concerns. [Filing No. 113-2 at 3 (Kluge Declr. at page 2, ¶ 7), Filing No. 113-1 at 17 (*Ex. D*, Kluge Dep.).] The three teachers who accompanied Kluge agreed to use the names listed in the school database, "Power School," but Kluge maintained his position, encouraged Daghe to continue using legal names, and left the meeting believing that he and Daghe were in agreement. [Filing No. 113-2 at 3 (Kluge Declr. at page 2, ¶ 8).]

But thereafter, immediately prior to the start of classes for the 2017-2018 school year, BCSC employees, including Kluge, were instructed to use the transgender students' preferred names listed in PowerSchool. [Id. (Kluge Declr. at page 2, ¶ 9).] On Friday, July 28, 2017,  Kluge informed Daghe that he could not address transgender students by the name listed in PowerSchool due to his religious beliefs. [Id. (Kluge Declr. at page 2, ¶ 10).] After discussion with Snapp and Daghe, Daghe drafted an ultimatum on July 28th mandating that Kluge use transgender preferred names, and the BCSC administration gave him until Monday, July 31st to decide if he would comply. [Id. (Kluge Declr. at page 2, ¶ 11).]

### D.  Kluge proposes the last-names-only accommodation and BCSC accepts it.

On July 31st, Kluge met with Superintendent Snapp, and Human Resources Director Gordon, to discuss BCSC's ultimatum, and Kluge proposed a reasonable accommodation consisting of addressing all students by their last names only, similar to a sports coach. [Id. (Kluge Declr. at page 2, ¶ 12).] Dr. Snapp and Jodi Gordon, on behalf BCSC, agreed to Kluge's accommodation; inserted handwritten language in the July 28th

communication from Dr. Daghe approving the last names only accommodation and also indicating that Kluge would not be required to distribute student uniforms; and Gordon initialed the accommodation, while Kluge signed and dated that document. [Filing No. 113-2 at 3–4 (Kluge Declr. at pages 2–3, ¶ 13), Filing No. 15-1.] Kluge was accustomed to using students' last names, since he used students' last names during the 2016-17 academic year, but with honorifics, reflecting college-level instruction, as a means of encouraging classroom respect. [Filing No. 52-1 at page 3, ¶ 12.]

### E.  Daghe requests Kluge's resignation.

During the first semester of the 2017–2018 school year when Kluge's accommodation was in place, BCSC did not identify in writing any claimed undue hardship, any classroom disruption, or any documented negative learning outcome for any student related to Kluge's use of the accommodation. And, despite extensive discovery in this case, no such burden has yet been identified. Despite the lack of any issues (at least, any issues serious enough to bring to Kluge's attention), Kluge's demonstrated success as a teacher, and the enthusiastic curricular and extra-curricular participation of his students, Dr. Daghe met with Kluge on December 13, 2017, and told him the accommodation created "tension," and that it was in Kluge's interest to resign by year-end. [Filing No. 113-5 at 8 (Daghe Dep. at page 57, lines 8–14; page 54, lines 5–9).]

Nothing dramatic occurred between July 31, 2017, and December 31, 2017; there were no student protests, there were no written complaints about Kluge's use of last

names for all students, there were no classroom disturbances, and there were no

cancelled classes; instead, the accommodation worked as intended and Kluge's students

excelled. [See Filing Nos. 52-1 through 52-6; Filing No. 71 at page 14, ¶ 47.] For example:

Kluge's extra curricular chamber ensemble and jazz program had record numbers of

participation in the 2017-2018 school year; Mr. Kluge had many students advance to the

state level at their solo and ensemble competition in the spring semester of 2018; and

Mr. Kluge's three curricular orchestras and extra-curricular jazz orchestra all received

gold ratings at their ISSMA competitions in the spring of 2018, and the Symphony

Orchestra even received a "Gold with Distinction" rating, its best ever in the history of

the program. [Filing No. 113-2 at 4 (Kluge Declr. at page 3, ¶ 15),  Filing No. 71 at page

14, ¶ 47.]

### F. BCSC presents the "Transgender Questions" practice manual at a faculty meeting on or around January 22, 2018.

Daghe met with Kluge again on January 17, 2018, and reiterated his request that

Kluge resign by the end of the school year. [Filing No. 113-4 at 32 (*Ex. 29* Gordon Dep.

at page 13, lines 20–25).] Subsequently, BCSC held a faculty meeting attended by Kluge

and BCSC distributed an 11-page document entitled, "Transgender Questions" which

identifies BCSC's practices and procedures regarding childhood gender dysphoria and

provides answers to faculty questions regarding transgender students. [Filing No. 113-2

at 4 (Kluge Declr. at page 3, ¶ 17), Filing No. 15-4.] "Transgender Questions" addresses,

in part, the use of last-names only when addressing transgender students and states that BCSC allowed the use of last names only for the 2017–2018 school year, but moving forward, BCSC expects that all teachers will use the students' first names listed in the Power School database. [Filing No. 15-4 at page 9, ¶ 5.]

After the faculty meeting, Kluge contacted Superintendent Snapp and Principal Daghe and reminded them that Kluge had a signed accommodation agreement with no end date, and asked them to confirm that his last-names only accommodation was still valid. [Filing No. 113-2 at 5 (Kluge Declr. at page 4, ¶ 22).] In response, Kluge was invited to a meeting with Principal Daghe and Human Resources Director Gordon on February 6, 2018. Gordon told him his religious accommodation was being withdrawn, because it was a "policy violation." Kluge told Gordon the policy was discriminatory and Gordon responded that the BCSC attorneys had reviewed it and it was not discriminatory.  [Filing No. 113-4 at 29, 43, 45–46 (*Ex. 29* Gordon Dep. at p. 10, lines 6– 11; page 24, lines 5–20; page 26, lines 4–14; page 27, lines 14–17).]

### G. Gordon recommends that Kluge submit a conditional resignation and agrees to certain conditions.

At the February 6, 2018 meeting, Gordon and Daghe told Kluge he could follow the "policy," resign and be paid through the summer, or be terminated in early May. [Filing No. 113-4 at 43 (*Ex. 29* Gordon Dep. at page 24, lines 5–24).] Gordon also suggested to

Kluge that he could submit a conditional resignation. [113-4 at 36–37 (*Ex. 29* Gordon

Dep. at page 17, lines 6–24; page 18, lines 6–8).]

Kluge submitted and Gordon accepted a "conditional" resignation from Kluge on

April 30, 2018, after she agreed that: one condition was that his resignation would not

be processed or shown to anyone, including any BCSC administrator, until May 29,

2018; and another condition was that he could withdraw his resignation prior to that

time. [Filing No. 113-2 at 6 (Kluge Declr. at page 5, ¶ 27), Filing No. 15-2 at page 1.]

**H.  Kluge attempts to rescind his resignation, but Gordon and Daghe process it.**

On May 25, 2018, four days prior to his resignation's effective date, Kluge delivered

to Gordon's office a time-stamped letter of rescission of his resignation showing it was

received at 2:33 p.m. on May 25, 2018. [Filing No. 113-2 at 6 (Kluge Declr. at page 5, ¶

28), Filing No. 15-3 at page 1.] Upon receipt of Kluge's resignation rescission, Gordon

shared Kluge's resignation with BHS Principal Daghe, they made Kluge's resignation

effective the same day, and on May 25, 2018, approximately two hours after Kluge

delivered his rescission, BCSC locked Kluge out of the BCSC buildings and internet

database, and posted his job as vacant. [Filing No. 113-2 at 7 (Kluge Declr. at page 6, ¶

29), Filing No. 71 at page 17, ¶ 63.] Daghe and Gordon had scheduled a meeting with

Kluge on May 25, 2018, but Daghe informed Kluge that there was no reason to meet,

since they had everything they needed—meaning Kluge's resignation. [Filing No. 113-5

at 10 (Daghe Dep. at page 63, line 24 – page 64, line 18).] Kluge was then locked-out of the building, his email disabled, and his job was posted. [Id. at page 64, lines 19–25.]

Gordon was familiar with BCSC's formal resignation policy, [Filing No. 113-4 at 11 (Gordon Dep. at page 40, lines 16–18).] That policy states that once a resignation is submitted to the superintendent, the employee cannot rescind it. [Filing No. 113-6 at 8 (*Ex. 7* Snapp Dep. at 1).] Gordon also testified that she and Superintendent Snapp are both administrators and submitting a resignation to her is the same as submitting a resignation to Dr. Snapp. [Filing No. 113-4 at 11 (Gordon Dep. at page 40, lines 16–23).]

## IV. Argument

### A.  The Summary Judgment Standard.

Under Fed.R.Civ.P. 56(c), summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *McGraw-Edison v. Walt Disney Products*, 787 F.2d 1163, 1167 (7th Cir. 1986). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). The Court should not weigh evidence or make credibility determinations, as those tasks belong to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014).

### B.  BCSC Discriminated against Kluge by Refusing to Accommodate His Sincerely Held Religious Beliefs.

Title VII prohibits discrimination against employees based on the fact, beliefs, or practices of the religion. See 42 U.S.C. § 2000e-2(a). "The term "religion" includes "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business."42 U.S.C. § 2000e(j). An employee makes a prima facie case of failure to accommodate religious belief by showing: "(1) the observance or practice conflicting with an employment requirement is religious in nature; (2) the employee called the religious observance or practice to [the] employer's attention; and (3) the religious observance or practice was the basis for [the employee's] discharge or other discriminatory treatment.'" *Adeyeye v. Heartland Sweeteners, LLC*, 721 F.3d 444, 449 (7th Cir. 2013) (internal quotations omitted) (quoting *Porter v. City of Chicago*, 700 F.3d 944, 951 (7th Cir. 2012).

If the employee makes a prima facie case, the "burden then shifts to the employer to show that it could not accommodate the employee's religious belief or practice without causing the employer undue hardship." (*Id.*). The undisputed facts show that BCSC engaged in religious discrimination by refusing to continue accommodating Mr. Kluge's known religious beliefs, refusing to seek an accommodation despite knowing he needed one, and then obtaining a coerced resignation from Kluge through threats and misrepresentation because of his religious beliefs requiring accommodation.

1. **Mr. Kluge's beliefs against using transgender names and pronouns are religious in nature.**

Under Title VII, the test for whether a belief is religious "'is whether a given belief that is sincere and meaningful occupies a place in the life of its possessor parallel to that filled by the orthodox belief in God.'" *Id*. at 448 (Quoting *United States v. Seeger*, 380 U.S. 163, 165-66 (1965)).

It is undisputed that Kluge, an evangelical Christian, sincerely holds religious beliefs. The record shows that Mr. Kluge has long-standing involvement with his church, including holding various church leadership positions and a nuanced understanding (extending to a study of relevant Biblical terms in the original Greek) of the parts of the Bible on which his religious beliefs concerning transgenderism and the sinfulness of supporting a transgender lifestyle are based. [Filing No. 113-1 at 4–11 (*Ex. A* Kluge Dep. at pages 2–9).]

It is also undisputed that Mr. Kluge is unable follow the requirements of the "Transgender Questions" practice manual—specifically the mandate to refer to transgender students by their chosen names and pronouns of a different sex than the transgender students' biological sex at birth—without violating his sincerely-held religious beliefs in at least three different ways: by participating in and affirming a practice he believes to be destructive to fellow children of God; by participating in and affirming a practice he believes to be inherently sinful; and by making statements about

gender that he believes to be untrue. [Filing No. 113-1 at 29–31 (*Ex. D* Kluge Dep. at
pages 107–109).]

### 2. Mr. Kluge communicated his religious beliefs to BCSC.

There is no dispute BSCS was aware of Kluge's religious beliefs and of his need for
an accommodation. Kluge informed BCSC high school principal Brett Daghe of his
sincerely-held beliefs against promoting gender dysphoria by presenting Daghe a
formal document drafted by Kluge in April of 2017, and signed by Kluge and three
other BCSC teachers. Kluge and those teachers then met with Daghe in May of 2017 and
read the document listing their concerns. [Filing No. 113-2 at 3 (Kluge Declr. at page 2, ¶
7), Filing No. 113-1 at 17 (Ex. D, Kluge Dep.).] Promptly after BCSC demanded that
Kluge use chosen rather than given names in 2017, Kluge met with Superintendent,
Snapp, and Human Resources Director Gordon, to discuss BCSC's ultimatum, and on
July 31st, Kluge proposed a reasonable accommodation consisting of addressing all
students by their last names only, similar to a sports coach. [Filing No. 113-2 at 3 (Kluge
Declr. at page 2, ¶ 12).] BCSC agreed to that accommodation in writing. [See Filing No.
15-1.] When BCSC issued the Transgender Questions document in January of 2018 and
then summarily rescinded the last-name only accommodation in February of 2018,
Kluge engaged in multiple conversations with Gordon and Daghe about his inability to
comply on religious grounds, including multiple requests for the accommodation to
continue. Kluge  expressly reminded BCSC of its duty to accommodate his religious

beliefs, but was met with flat refusal. [Filing No. 113-4 at 29 (*Ex. 29* Gordon Dep. at page 10, lines 6–11).]

### 3.  Mr. Kluge suffered discrimination because of his religious beliefs.

Kluge suffered discrimination based on his religious beliefs in three ways: BCSC withdrew the last-name only accommodation despite a lack of undue burden, refused to offer or discuss any other accommodation, and coerced his resignation letter through misrepresentation.

The first two forms of discrimination are clear on the face of the record. It is undisputed that BCSC withdrew the last-name only accommodation and offered no alternative accommodation. It is the employer's, not the employee's, duty to attempt accommodation. *E.E.O.C. v. Ithaca Industries, Inc.*, 849 F.2d 116, 118 (4th Cir. 1988) "An employer may fail to offer a reasonable accommodation only when offering an accommodation would cause it to incur an undue hardship." *Trans World Airlines v. Hardison*, 432 U.S. 63, 68–69, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977). As discussed below, the last-name only accommodation did not create an undue burden. And, even if it had, there is no dispute that BCSC unlawfully refused to even attempt to come up with an alternative accommodation. BCSC told Kluge that it was willing to "accommodate people who follow the policies." [Filing No. 113-4 at 29, (*Ex. 29* Gordon Dep. at page 10, lines 6–11).] BCSC's position—that it had no duty to accommodate Kluge's beliefs

unless he violated those beliefs by following the policy at issue—is both logically

circular and definitionally discriminatory.

Lastly, and independently, BCSC engaged in discrimination by coercing a

resignation letter from Kluge under false pretenses, and then processing and deeming

that letter effective in violation of the conditions it had agreed to, even after he sought

to withdraw it. A coerced resignation amounts to "outright discharge." *Patterson v.*

*Portch,* 853 F.2d 1399, 1406 (7th Cir. 1988); see also *Ulrey v. Reichhart*, 941 F.3d 255, 261

(7th Cir. 2019). "Coerced resignation is characterized by the presence of a Hobson's

choice in which the employee must resign or suffer severe consequences . . . ." *Palka v.*

*Shelton*, 623 F.3d 447, 453 (7th Cir. 2010). A "material misrepresentation that induces

resignation can constitute coercion." *Ulrey,* at 255. The employer's intent—or lack

thereof—in the misrepresentation is irrelevant to the misrepresentation's materiality

and its coercive effect. See *Spreen v. Brey*, 961 F.2d 109, 113 (7th Cir. 1992). One central

question in the context of misrepresentation is whether the employee was given

"sufficient opportunity" concerning the choice to resign and whether the employee was

given a "correct picture of what the choice was." *Id.* at 113.

BCSC coerced Kluge's resignation through several material misrepresentations. In a

February 6, 2018 meeting, Gordon told Kluge that his accommodation was no longer

valid because it was a "policy violation" and when Kluge told Gordon the policy was

discriminatory, Gordon responded that the BCSC attorneys had reviewed it and it was

not discriminatory. [Filing No. 113-4 at 29, 43, 45–46 (Ex. 29 Gordon Dep. at p. 10, lines 6–11; page 24, lines 5–20; page 26, lines 4–14; page 27, lines 14–17).] Gordon was in a conflict, because Kluge was claiming discrimination to the "Compliance Officer" for BCSC employees, under the BCSC Nondiscrimination and EEO Policy. [Filing No. 113-4 at 14 (*Ex. 6* Gordon Dep. at page 2).] Gordon arguably had a duty to investigate or ask someone else to investigate. But her goal was to obtain Kluge's resignation.

At the February 6, 2018 meeting, Gordon and Daghe told Kluge he could follow the "policy," resign and be paid through the summer, or be terminated in early May. [Filing No. 113-4 at 43 (*Ex. 29* Gordon Dep. at page 24, lines 5–20).] Gordon also suggested to Kluge that he could submit a conditional resignation. [Id. at 36–37 (*Ex. 29* Gordon Dep. at page 17, lines 6–24; page 18, lines 6–8).] BCSC presented Kluge with a Hobson's choice: resign and be paid through the summer or refuse to resign and be terminated without summer pay.

On April 30, 2018, relying on Gordon's representations, Kluge submitted a letter of conditional resignation to her, specifying that it not be processed or shown to other administrators until May 29, 2018; and another condition was that he could withdraw his resignation prior to that time. [Filing No. 113-2 at 6 (Kluge Declr. at page 5, ¶ 27), Filing No. 15-2 at page 1.] Gordon agreed to these conditions. [Filing No. 15-2 at page 1.]

On May 25, 2018, in line with the representations Gordon had made concerning the conditionality of the resignation letter, Kluge formally rescinded it with a time-

stamped, certified letter. [Filing No. 113-2 at 6 (Kluge Declr. at page 5, ¶ 28), Filing No. 15-3 at page 1.] Upon receipt of Kluge's resignation rescission, Gordon shared Kluge's resignation with BHS Principal Daghe, they made Kluge's resignation effective the same day, and BCSC locked Kluge out of the BCSC buildings and internet database, and posted his job as vacant. [Filing No. 113-2 at 7 (Kluge Declr. at page 6, ¶ 29), Filing No. 113-5 at 10 (Daghe Dep. at page 63, line 24 – page 64, line 25), Filing No. 71 at page 17, ¶ 63.] Daghe and Gordon had scheduled a meeting with Kluge that day, but Daghe informed Kluge that there was no reason to meet, since they [BCSC] had everything they needed—meaning Kluge's resignation. [Filing No. 113-5 at 10 (Daghe Dep. at page 63, line 24 – page 64, line 18).]

All of Gordon's representations concerning the resignation letter turned out to be misrepresentations. Under BCSC policy, Kluge could not submit a conditional resignation—but Gordon misrepresented that he could. Gordon did not treat the resignation as conditional—but Gordon had represented that she would. Gordon did not keep the resignation confidential from other administrators—but Gordon had represented that she would. Gordon processed the resignation and deemed it effective on May 25—but Gordon had represented that it would be held in trust until May 29.

At her deposition, Gordon admitted that the only "condition" that can be attached to a resignation is the effective date of termination, but she did not share that with Kluge. [Filing No. 113-4 at 12 (Gordon Dep. at page 42, lines 5–15).] She confirmed that she and

Superintendent Snapp are both administrators and submitting a resignation to her is the same as submitting a resignation to Dr. Snapp. [113-4 at 11 (Gordon Dep. at page 40, lines 16–23).]  Gordon testified that BCSC's main goal was to either get Kluge's resignation or force him to abandon his accommodation. [Id. at 12 (Gordon Dep. at page 42, lines 16–20).] Based on these admissions, it is clear that when Gordon and Daghe told Kluge he could submit a conditional resignation and then accepted Kluge's conditional resignation, they had no intention of honoring the conditions Mr. Kluge attached to his resignation, but instead planned on treating Kluge's resignation as unconditional upon receipt and claiming that he voluntarily resigned his position.

Superintendent Snapp testified that he is familiar with the BCSC formal resignation policy (3140) and that under state law, once an employee submits a resignation to the superintendent, it may not be withdrawn or rescinded. [Filing No. 113-6 at 5 (Snapp Dep. at page 14, line 16 – page 15, line 16), 8 (*Ex. 7*, Snapp Dep. at page 1.).] If an employee submits a resignation to the Human Resources Director, it is the same as submitting it to him as the Superintendent. [Id. at 6 (Snapp Dep. at page 19, line 24 – page 20, line 5).] Snapp was also asked what discretion, if any, the Board has with resignations and he testified that the Board accepts the resignations as submitted by the Superintendent and the Human Resources Director. [Filing No. 113-6 at 4 (Snapp Dep. at page 13 lines 12–21).]

In sum, the undisputed facts show that BCSC obtained a resignation letter from Kluge under false pretenses. The effect of Gordon's numerous misrepresentations was to lead Kluge into believing that, if he submitted a conditional resignation letter, he would have until May 29 to make a final decision concerning whether to resign or face termination proceedings. On May 25, Mr. Kluge chose to face termination proceedings rather than resign, and sent a rescission of his conditional resignation letter. Rather than honor that rescission and their prior representations, BCSC deemed the resignation immediately effective on that date. There can be little question that the resignation letter was coerced, or that the school's conduct amounts to an "outright discharge" rather than a voluntary surrender of employment. There is no dispute that Kluge's religious beliefs were the basis of BCSC's demand that he resign. [Filing No. 113-4 at 12 (Gordon Dep. at page 42, lines 16–24).]

### 4.  BCSC cannot show undue hardship.

Once Mr. Kluge establishes a prima facie case of religious discrimination, it is BCSC's burden to show that *any* accommodation would have created undue hardship. BCSC cannot meet this burden for two independent reasons. First, it is undisputed that BCSC failed to offer any accommodation after it withdrew the last-name only accommodation. BCSC cannot escape liability by claiming that one accommodation (which Kluge, not BCSC, suggested) imposes an undue burden when BCSC has failed even to attempt to offer an accommodation it considers reasonable. Accord *Ansonia Bd.*

*of Educ. v. Philbrook*, 479 U.S. 60, 69 (1986)("undue hardship on the employer's business is at issue only where the employer claims that it is unable to offer any reasonable accommodation without such hardship").

Second, even if the last-name only accommodation was the only possible accommodation, BCSC cannot show that the use of that accommodation would create an undue hardship. "[A]n accommodation causes 'undue hardship' whenever that accommodation results in 'more than a de minimis cost' to the employer. *Ansonia* 479 U.S. 60, 67 (1986) (quoting *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 74 (1977). See also *E.E.O.C. v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1576 (7th Cir. 1997) ("The Supreme Court has construed the term 'undue hardship' in 42 U.S.C. § 2000e(j) to mean a cost to the employer that is anything more than de minimis."). "Title VII requires proof not of minor inconveniences but of hardship, and "undue" hardship at that." *Adeyeye* 721 F.3d at 455.  Further, emotional discomfort should not be considered "undue hardship." See *Zamecnik v. Indian Prairie School Dist. No. 204*, 636 F.3d 874, 876 (7th Cir. 2011) ("people in our society do not have a legal right to prevent criticism of their beliefs or even their way of life"); see also *Tinker v. Des Moines Independent Community School Dist.*, 393 U.S. 503, 509 (1969)("In order for the State in the person of school officials to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint").

BCSC established the parameters of a "reasonable accommodation" on July 31, 2017, when BCSC and Kluge agreed to Kluge's proposed accommodation of last-names only. The fact that BCSC and Kluge agreed to an accommodation and used it successfully for a full semester establishes last-names only as a "reasonable accommodation" for Kluge's religious belief, and also that there was no "undue hardship" associated with that accommodation. *Ansonia Bd. of Educ. v. Philbrook,* 479 U.S. 60, 68-69, 93 L.Ed.2d 305, 107 S.Ct. 367 (1986); *EEOC v. Ilona of Hungary, Inc.,* 108 F.3d 1569, 1574 (7th Cir. 1997).

When BCSC advised Kluge his accommodation would be removed at the end of the 2017–2018 school year, BCSC did not detail any undue hardship and did not engage Kluge in any specific discussions concerning undue hardship. Gordon told Kluge his accommodation was a "policy" violation. [Filing No. 113-4 at 29, 43 (*Ex. 29* Gordon Dep. at page 10, lines 6–11; page 24, lines 5–24).] But in her deposition, Gordon admitted that "Transgender Questions" never became a formal policy. [Filing 113-4 at 10 (Gordon Dep. at page 35, line 2 – page 36, line 1).] "Transgender Questions" never became a formal BCSC policy, since it was never presented to the BCSC Board of Trustees for that purpose. Phil Utterback was the secretary and a board member of the BCSC Board of Trustees during calendar 2017, and the president and a board member of the BCSC Board during calendar 2018 and 2019. Utterback testified that, during calendar 2017 and 2018, there were no transgender issues that were the subject of a formal board meeting. [Filing No. 113-3 at 5, 8 (Utterback Dep. at page 11, lines 11–23; page 24, lines 3–10).]

Moreover, the "Transgender Questions" practice manual does not claim that the use of last-names when addressing students created any "undue hardship" or disrupted the learning environment at BCSC; it simply addresses a change in transgender practices at BCSC. [Filing No. 15-4 at page 9, ¶ 5.]

Despite extensive discovery, BCSC has failed to identify any undue hardship that rises above the *de minimis* level. BCSC has identified no economic cost or disruption to its operations from Kluge's use of the accommodation. It has not identified any classroom disruptions, rearrangements of personnel scheduling, or demonstrably impaired learning outcomes as a result of Kluge's use of last-names. It is undisputed that during this period of time Kluge's musical students and groups excelled and BCSC brought no complaints or problems related to the accommodation to his attention. [Filing No. 113-2 at 4 (Kluge Decl. at page 3, ¶ 15), Filing No. 71 at page 14, ¶ 47.]

The only supposed "hardship" identified by BCSC was the complaints of two transgender students and one teacher (not reported to Kluge until well after the fact), and references to unspecified attorneys' fees and "opportunity costs" for the management of the accommodation. Kluge served discovery, including an interrogatory and request for production, inquiring about increased costs to BCSC resulting from Kluge's accommodation. BCSC's claim of unspecified administrative and "opportunity" costs led to a discovery conference. [See Filing No. 91 (Pl's Mot. For

Discovery Conf.), Filing No. 91-1 (*Ex. 1* to Pl's Mot. For Discovery Conf.).] Kluge does not anticipate BCSC will claim administrative or opportunity costs as undue hardship.

None of these factors constitute "undue hardship." The emotional discomfort and complaints of a handful of students and a single teacher cannot justify forcing Kluge to face a choice between violating his religious beliefs and losing his job. To hold otherwise is to codify in law the "heckler's veto." If emotional discomfort constituted an undue burden, employers would be able to skirt their duty to accommodate at will, simply by finding an employee offended at the accommodation. It is telling that no evidence exists of Gordon, in her capacity as the EEO Compliance Officer, ever investigating any alleged discrimination against transgender students.

BCSC's "opportunity costs" likewise do not constitute an undue hardship. BCSC has not identified any actual monetary costs resulting from the last-name only accommodation. The cost of employees engaging in employee management or in resolving employee matters—a task that has to be performed in any event—is not "undue hardship" by definition. And, even if it could be, BCSC has not identified any actual costs beyond its normal operating costs attributable to the accommodation—let alone costs rising above a *de minimis* level.

**5. BCSC's "Transgender Questions" practice manual provides transgender accommodations to the detriment of sincere religious beliefs, which are not equally  accommodated.**

"Transgender Questions" provides information on how teachers can break from their personal beliefs and biases, advising that "when you work in a public school, you sign up to follow the law and the policies/practices of that organization and that might mean following practices that are different than your beliefs." [Filing No. 15-4 at page 10, ¶ 8.] The "Transgender Questions" document suggests that following school policies and practices is the same as following the law, and communicates to faculty — incorrectly — that a public school teacher's religious beliefs or rights of conscience have no legal standing and must take a "back seat" to school policies and practices. [Id., Filing No. 113-2 at 5 (Kluge Declr. at page 4, ¶ 21 ).]

The BCSC EEO NonDiscrimination Policy addresses discrimination based on the protected categories identified in federal nondiscrimination law. [Filing No. 113-5 at 13 (*Ex. 6* Daghe Dep. at page 1).] While the EEO Policy covers sex and religion, among others, only gender identity enjoys its own separate practice manual at BCSC in the form of "Transgender Questions." [Id., Filing No. 15-4.]  BCSC provides multiple accommodations for transgender students, including the ability to: change their first names in the school database (PowerSchool) with letters from a parent and a health care professional (this does not require a legal name change), identify their preferred choice of pronouns, dress according to the biological sex with which they identify, and wear school uniforms (such as band uniforms) that correspond to the biological sex with

which they identify. [Filing 113-5 at 4–5 (Daghe Dep. at page 29, line 14 – page 30, line 4, lines 12–23; page 31, lines 8–23).]

In comparison, the Nondiscrimination and EEO Policy is the policy that addresses discrimination based on religious beliefs. But this policy does not even contain the words "reasonable accommodation" for religious beliefs. The word "religion" appears in the Nondiscrimination and EEO Policy as a protected category, but there is no reference to how administrators should address requests for religious accommodations or how to assess potential undue hardship.  [See Filing No. 113-5 at 13 (*Ex. 6* Daghe Dep. at page 1).] And there is no "Religious Accommodation Questions" practice manual, similar to the "Transgender Questions" practice manual. [Filing No. 15-4.]

Where the application of an employer's policy is made in a discriminatory fashion, it is not a reasonable accommodation. *Ansonia Bd. of Educ.,* 479 U.S. at 71 (noting that provision of paid leave for all purposes *except* religious ones displays discrimination against religious practices that is the antithesis of reasonableness). Here, the BCSC "Transgender Questions" practice manual provides information for BCSC teachers and administrators regarding accommodations for transgender students. Included in that information is advice on how individuals can break away from existing "beliefs" in order to accommodate transgender students. [See Filing No. 15-4 at page 10, ¶ 8.] The practice manual states that when you are employed by a public school, you are required to follow the law and the law might not coincide with your beliefs. [Id.] While the

reference to "beliefs" does not specifically include religious beliefs, it also does not specifically exclude them. [Id.] The suggestion is that transgender rights overrule religious rights and that is the antithesis of reasonableness. *Ansonia Bd. of Educ.*, 479 U.S. at 71.

## VI. Conclusion

The facts are undisputed. Kluge sincerely holds religious beliefs that, for three separate reasons, prevent him from referring to transgender students by names of chosen rather than birth gender. BCSC was aware of Kluge's beliefs and permitted him to use student last names only as an accommodation. Then, in February of 2018, BCSC discriminated against Kluge by withdrawing the accommodation, failing and refusing to offer any alternative accommodation, coercing his resignation letter through a series of misrepresentations, then terminating him by processing that resignation letter when he sought to rescind it. BCSC cannot show that any accommodation would have subjected it to undue hardship—it did not even try to offer any alternative accommodation. And no record facts support the claim that the last-name only accommodation subjected BCSC to an undue hardship. The undisputed facts show religious discrimination under Title VII, and Kluge is entitled to summary judgment.

WHEREFORE, Kluge requests summary judgment in his favor against BCSC on the issue of its failure to accommodate his sincerely-held religious beliefs against using transgender names and pronouns, and for all other just and proper relief.

Respectfully submitted,

/s/ **Michael J. Cork**
Michael J. Cork, Esq.
5754 N. Delaware Street
Indianapolis, Indiana 46220-2528
317-517-4217
cork0@icloud.com

/s/ **Roscoe Stovall, Jr.**
Roscoe Stovall, Jr.
456 N. Meridian Street
Suite 507
Indianapolis, IN 46204
317-831-3999
rstovall@roscoelaw.com

/s/ **Kevin E. Green**
Kevin E. Green
456 N. Meridian Street
Suite 1517
Indianapolis, IN 46204
317-437-5002
keglegal@aol.com

Attorneys for Plaintiff, John M. Kluge

**CERTIFICATE OF SERVICE**

I certify that on January 29, 2021, an accurate copy of the foregoing was filed electronically. Service of this filing will be made on all ECF-registered counsel by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ **Michael J. Cork**
Michael J. Cork