# EXHIBIT 3

**Deposition Excerpts of John Kluge**

**(<u>Note</u>: these are excerpts that were not included in Filing No. 113-1.)**

```
            UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF INDIANA
               INDIANAPOLIS DIVISION
            CASE NO. 1:19-cv-2462-JMS-DLP
```

```
JOHN M. KLUGE                          )
                                       )
            Plaintiff(s),              )
                                       )
      -vs-                             )
                                       )
BROWNSBURG COMMUNITY SCHOOL            )
CORPORATION, et al.,                   )
                                       )
            Defendant(s).              )
```

The videoconference deposition upon oral
examination of JOHN M. KLUGE, a witness produced and
sworn before me, Brandy L. Bradley, RPR, a Notary
Public in and for the County of Hamilton, State of
Indiana, taken on behalf of the Defendants at the
remote location of the witness, Indianapolis, Marion
County, Indiana, on the 17th day of November, 2020,
pursuant to the Indiana Rules of Trial Procedure.

```
               CIRCLE CITY REPORTING
            135 N. Pennsylvania Street
                    Suite 1720
            Indianapolis, IN  46204
                 (317) 635-7857
```

JOHN M. KLUGE VS
BROWNSBURG COMMUNITY SCHOOL CORPORATION, et al.

JOHN M. KLUGE
November 17, 2020

Page 6

1    brief synopsis, please.
2 A  Work was being a -- at Indiana University I was
3    teaching undergraduate classes as an AI -- it's
4    like a teacher's assistant -- teaching music
5    theory classes to freshman and sophomores at
6    Indiana University while I was taking graduate
7    level classes.  I have also worked as a
8    substitute teacher both in New York State and in
9    Indiana.  I had worked a summer as a painter
10   with the Indiana Painting Company the summer
11   before I started my employment with Brownsburg
12   High School.
13      MR. BORG:  Rita, let's pull up Exhibit A.
14 Q  Mr. Kluge, I'm going to represent that these are
15   interrogatory responses that you provided based
16   on certain requests from Brownsburg.  If you can
17   scroll through the document and I'm going to ask
18   you to eventually get to the last page.
19 A  I need control of it, so --
20      MR. BORG:  Rita, can we get Mr. Kluge
21   access to the document?
22 A  Okay.  I don't know if I have control of the
23   screen yet.  Can someone confirm that I've been
24   given control?
25      THE MODERATOR:  Mr. Kluge, you do have

Page 7

1    control.
2 Q  So you're on Exhibit A.  I just need you to
3    scroll down to the last page on that PDF
4    document.
5 A  Page 15 of 15.  It says Certificate of Service?
6 Q  Yes.  Let's go up one more page?
7 A  One more page, okay.  I'm now on Page 14 of 15.
8    "Answer:  I have been counseled by Pastor Dave
9    Abu-Sara..."  Is that correct?
10 Q  Yes, sir.  And my question is is that your
11   signature on Page 13 and your handwritten date
12   of June 11th, 2020?
13 A  That's my signature and the date, yes.
14 Q  Okay.  And take a moment to scroll through the
15   document, if need be, but I'm just asking you to
16   confirm that these are your responses to
17   interrogatories that Brownsburg had proposed.
18 A  Okay.  These are my responses.  Brent just got
19   offline.
20      (Mr. Borg lost connection and a recess was
21   taken.)
22      MR. BORG:  For the record, I don't know
23   what happened.  I got kicked off but I didn't
24   lose Internet connection.
25 Q  If you could, please, go to your response to

Page 8

1    Interrogatory No. 10.
2 A  I'm there.
3 Q  That asks certain questions about your work
4    since you left Brownsburg.  And my question is
5    simply is that an accurate description of your
6    employment since you left Brownsburg?
7 A  It is an accurate description, yes.
8 Q  Okay.  And you submitted these interrogatories
9    on or about the date that you signed them which
10   was June 11th, 2020; correct?
11 A  Correct.
12 Q  And is there anything that has changed with
13   respect to Interrogatory No. 10 since you
14   submitted these responses?
15 A  No.
16 Q  It continues on the next page, too, if you want
17   to take a quick look.
18 A  All of that is still accurate.
19 Q  Thank you.  You're married; correct?
20 A  Correct.
21 Q  For how long?
22 A  For three and a half -- no, four years.  I
23   should know.
24 Q  Do you have children?
25 A  Yes, we have three.

Page 9

1 Q  What are their ages?
2 A  Their ages are three, one and a half, and about
3    six months.
4 Q  Do any attend school?  I suppose the
5    three-year-old might attend preschool?
6 A  None of them attend school.
7 Q  Other than this case have you ever been party to
8    a lawsuit?
9 A  Other than this case I have not been party to a
10   lawsuit.
11 Q  You are a Christian?
12 A  I am a Christian.
13 Q  You are a member of Clearnote Church on 10th
14   Street in Indianapolis; is that correct?
15 A  That is correct.
16 Q  How long have you been a member of Clearnote?
17 A  I believe for seven years, maybe six at
18   Clearnote Church in Indianapolis.
19 Q  For the entirety of the seven years
20   Clearnote located at the 10th Street address in
21   Indianapolis?
22 A  No, they had been renting from a couple of
23   buildings before the 9101 West 10th Street.
24 Q  Were those rental locations in Indianapolis?
25 A  One was in Indianapolis and one was in

JOHN M. KLUGE VS
BROWNSBURG COMMUNITY SCHOOL CORPORATION, et al.

JOHN M. KLUGE
November 17, 2020

---

Page 10

1     Brownsburg.
2 Q   For approximately how long would you say
3     Clearnote has been located at the 10th Street
4     address?
5 A   For about three years.
6 Q   How often do you attend services at Clearnote?
7 A   Every week normally.
8 Q   Do you attend services anywhere else?
9 A   Not normally.
10 Q   Where might you attend in a not normal
11     situation?
12 A   If I was visiting my family out of town, I might
13     attend their church.
14 Q   And what church might that be and where is it
15     located?
16 A   I think it's called Christ the King Church in
17     Ferry, Michigan.
18 Q   Do you hold any positions with Clearnote?
19 A   Yes, I'm an elder there.
20 Q   How long have you been an elder?
21 A   For about one and a half years.
22 Q   What is an elder?
23 A   An elder is an overseer, someone who is part of
24     the session of our board of elders who exercise
25     spiritual oversight over the church, part of the

---

Page 11

1     government of our church.
2 Q   You mentioned a board of elders; correct?
3 A   That's correct.
4 Q   How many people sit on that board?
5 A   There are three active elders right now and one
6     who is on sabbatical and our pastor is also
7     considered a teaching elder, so there's three
8     active elders right now plus our pastor.
9 Q   Are the three active laypersons?
10 A   They are elders.  They're not ordained pastors.
11     They have day jobs but they're ordained elders
12     like I am.
13 Q   Thank you for that.  Is it fair to say they're
14     selected from the laity of the church?
15 A   From among the congregation, yep.
16 Q   How does that selection occur?
17 A   To the best of my knowledge, we are nominated
18     and then the session approves that nomination
19     and the congregation votes whether they want to
20     have that person as an elder.
21 Q   You mention the session a couple times.  What is
22     that?
23 A   The session is another name for the board of
24     elders.
25 Q   So, correct me if I'm wrong, but maybe with

---

Page 12

1     respect to your process of becoming an elder, do
2     I have it correct that you believe you were
3     nominated, your nomination was submitted to the
4     session, and the session approved you as an
5     elder?
6 A   The session approved the nomination and,
7     therefore, I was put forward before the
8     congregation and they voted me to become an
9     elder.
10 Q   Okay.  Thank you.  And the vote before the
11     congregation, how did that work specifically?
12     Was it majority voting approved you?  Was it if
13     there were more yes than noes, you would be
14     approved?  Help me understand that.
15 A   Yes, it was a secret ballot vote at our normal
16     yearly meeting and a majority, yes.  Then
17     I would get elected as an elder.
18 Q   Is the board always comprised of three elders or
19     can that number change?
20 A   That number can change.
21 Q   What is the, I guess, the range, minimum and
22     maximum, in terms of how large the board of
23     elders can be?
24 A   To the best of my knowledge, at least one and
25     there's no maximum limit.

---

Page 13

1 Q   Is there any sort of document or written
2     guidance that governs the composition of the
3     board of elders and Clearnote Church more
4     generally?
5 A   Regarding -- can you say the first part of your
6     question?
7 Q   Certainly.  I think the first part is if there
8     is any sort of document or written guidance that
9     governs the board the elders or its composition.
10 A   Sir, the first document that governs the
11     composition of our board of elders is Holy
12     Scripture which stipulates what are the
13     qualifications for an overseer, for an elder.
14     Other than that, we have guidelines and rules in
15     our Book of Church Order which is the Book of
16     Church Order of Evangel Presbytery.  That is the
17     presbytery that my church belongs to.  And, so,
18     you have the Book of Church Order for Evangel
19     Presbytery and then you also have our particular
20     Clearnote Church Indianapolis's church bylaws
21     which also, I believe, talk about how the board
22     of elders is comprised and what the process is
23     to vote and elect elders.
24 Q   Other than your current position as an elder,
25     have you held any other positions with Clearnote

---

JOHN M. KLUGE VS
BROWNSBURG COMMUNITY SCHOOL CORPORATION, et al.

JOHN M. KLUGE
November 17, 2020

---

Page 14

1    Church?
2  A  Yes.  I have also been the -- I am currently and
3     have been for a period of time the worship
4     leader of the church.
5  Q  Anything else?
6  A  I'm also the head of the youth ministries and
7     Owana Program.
8  Q  I'm sorry, what did you say after head of youth
9     ministries?
10 A  Owana Program.
11 Q  Are you currently head of the youth ministry?
12 A  Yes.
13 Q  Are you also currently head of the Owana
14    Program?
15 A  Yes.
16 Q  What is the Owana Program?
17 A  It's a discipleship program that we offer on a
18    twice monthly basis to children ages
19    kindergarten through fifth grade and then we
20    also have a youth group which is sixth grade
21    through eighth grade that meets at the same
22    time.
23 Q  Are you also currently a worship group leader?
24 A  I am also currently the worship leader of
25    Clearnote Church Indianapolis, yes.

---

Page 15

1  Q  Any other positions that you hold currently or
2     have previously held that you haven't mentioned?
3  A  No official positions that I can think of.
4  Q  Do you know how long Clearnote Church has been
5     part of the Evangel Presbytery?
6  A  Clearnote Church has been part of Evangel
7     Presbytery since Evangel Presbytery formed.
8  Q  When was that?
9  A  I believe it was about one, two years ago.
10 Q  Am I using a fair label when I refer to the
11    Evangel Presbytery as a denomination?
12 A  You could describe it that way.
13 Q  What denomination was Clearnote affiliated with,
14    if any, prior to the Evangel Presbytery?
15 A  It was not affiliated with any denomination
16    before.  It was a church plant of Clearnote
17    Church Bloomington and so it was associated with
18    that sister congregation in Bloomington.
19 Q  Can you give me a brief synopsis of what process
20    was involved for Clearnote Church to become a
21    member church of the Evangel Presbytery?
22 A  Yes.  To the best of my knowledge, you have to
23    have a congregational vote that you want to
24    become a member of Evangel Presbytery and I
25    believe you have to agree to the Evangel

---

Page 16

1     Presbytery BCO, their Book of Church Order, and
2     I'm not quite sure more than that.  I would have
3     to look at the BCO to find more details.
4  Q  Fair enough.
5        MR. BORG: Rita, let's pull up Exhibit B.
6  Q  Mr. Kluge, Exhibit B is the Amended Complaint
7     that was filed in this lawsuit.  It looks like
8     it's 33 pages.  I'd just ask that you look over
9     it and my question is does it appear to be the
10    Amended Complaint filed in this lawsuit?
11 A  It does.
12 Q  Please go to Paragraph 23.  I believe that's
13    right around Page 8 of the document.  Do you see
14    Paragraph 23 there toward the bottom?
15 A  Does it say "Mr. Kluge's sincerely-held
16    religious beliefs include a belief that it is
17    sinful to promote gender dysphoria"?
18 Q  Correct.
19 A  Then I do.
20 Q  I think you've already answered it, but you
21    allege in that paragraph that your
22    sincerely-held religious beliefs include a
23    belief that it is sinful to promote gender
24    dysphoria.  Is that your allegation?
25 A  That is correct.

---

Page 17

1  Q  The American Psychiatric Association's
2     Diagnostic and Statistical Manual of Mental
3     Disorders defines gender dysphoria as "an acute
4     form of mental distress stemming from strong
5     feelings of incongruity between one's anatomy
6     and one's gender identity."  Do you agree with
7     that definition?
8  A  I do not.
9        MR. CORK: I object to the extent it calls
10    for a medical opinion.
11 Q  What do you mean by the term "gender dysphoria"
12    in Paragraph 23 of your Amended Complaint?
13 A  Let's go back to your previous question.  You
14    read me a definition of gender dysphoria and you
15    gave a medical definition is what you said.  Are
16    you asking me to say what my religious
17    convictions are regarding what gender dysphoria
18    really is?
19 Q  Well, I think you answered my question.  I asked
20    you if you agreed with the definition of gender
21    dysphoria as it appears in the American
22    Psychiatric Association's Diagnostic and
23    Statistical Manual of Mental Disorders.  I
24    believe you said you do not agree with that
25    definition; correct?

---

Case 1:19-cv-02462-JMS-DLP   Document 120-3   Filed 03/15/21   Page 6 of 36 PageID #: 1245

JOHN M. KLUGE VS
BROWNSBURG COMMUNITY SCHOOL CORPORATION, et al.

JOHN M. KLUGE
November 17, 2020

Page 18

1 A   That's correct.
2 Q   Okay.  So, if you do not agree with that
3   definition, then my question is what do you mean
4   by the term "gender dysphoria" as it appears in
5   Paragraph 23 of your Amended Complaint?
6 A   Okay.  What I mean by gender dysphoria is what
7   scripture refers to as effeminacy which is for a
8   man to play the part of a woman or a woman to
9   play the part of a man and so that would include
10   acting like/dressing like the opposite sex.
11 Q   Is there anything else that goes into your
12   definition of gender dysphoria as it's used in
13   Paragraph 23 of your Amended Complaint?
14 A   There is and I have explained it further in my
15   interrogatories.  If you want to look at that,
16   I've explained it more in-depth there.
17 Q   That's certainly fair.  If you had a couple
18   minutes to look at your interrogatory responses,
19   would you be able to direct me in those
20   responses that add to your definition of gender
21   dysphoria as it's used in Paragraph 23 of your
22   Amended Complaint?
23 A   Yes.  If you showed me the interrogatory, I
24   could show you where I lay out where effeminacy
25   is talked about and where I explain what this

Page 19

1   means.
2      MR. BORG: Okay.  Let's take a five-minute
3   break.
4      Rita, can we go back to Exhibit A?  I
5   suppose Mr. Kluge can pull it on the tab there.
6      If you need more time, sir, and I don't
7   need you to quote it for me.  Really my question
8   is just which responses further that definition.
9      Let's take five, okay?
10      THE PLAINTIFF: Okay.  Thank you.
11      (A recess was taken.)
12 DIRECT EXAMINATION CONTINUING,
13    QUESTIONS BY BRENT R. BORG:
14 Q   We just took a quick break and we were talking
15   about your definition of gender dysphoria as it
16   appeared in Paragraph 23 of your Amended
17   Complaint; correct?
18 A   Correct.
19 Q   And I think you testified that part of your
20   definition of gender dysphoria is what you
21   called effeminacy; correct?
22 A   Correct.
23 Q   And that refers generally to a man acting like a
24   woman or a woman acting like a man.  Is that a
25   fair statement?

Page 20

1 A   That's correct.
2 Q   Okay.  And I think you also said that your
3   definition includes information that you
4   provided in interrogatory responses; correct?
5 A   Correct.
6 Q   And then we took a break so you could have some
7   time to find which of those interrogatory
8   responses further your definition of gender
9   dysphoria as it's stated in Paragraph 23 of the
10   Amended Complaint; correct?
11 A   Correct.
12 Q   Please tell me what those interrogatory
13   responses are that further your definition of
14   gender dysphoria as it's used in Paragraph 23 of
15   the Amended Complaint.
16 A   So, if you look at Interrogatory No. 7, part way
17   down I reference the scripture verse 1
18   Corinthians Chapter 6, Verses 9 and 10.  "Or do
19   you not know that the unrighteous will not
20   inherit the kingdom of God?  Do not be deceived;
21   neither fornicators, not idolaters, no
22   adulterers, nor effeminate, nor homosexuals, nor
23   thieves, nor the covetous, nor drunkards, nor
24   revilers, nor swindlers, will inherit the
25   kingdom of God.  1 Corinthians 6:9.

Page 21

1      And I have a description there that talks
2   about what effeminacy is and the Greek word
3   malakoi that's specifically used in the original
4   text of 1 Corinthians 6:9-10.
5 Q   Thank you.  Anything else from Interrogatory
6   No. 7 that you wish to highlight that defines
7   your definition of gender dysphoria?
8 A   Not at this time.
9 Q   Okay.  Anything else in any of your other
10   interrogatory responses?
11 A   Not at this time.
12 Q   Go to the Amended Complaint which is Exhibit B,
13   specifically Paragraph 92.
14 A   This is statements of law and the First Cause of
15   Action, Title VII of the Civil Rights Act,
16   Religious Discrimination - Failure to
17   Accommodate.
18 Q   Correct.  And you see Paragraph 92?
19 A   I do.
20 Q   You allege in that paragraph that Brownsburg
21   discriminated against you in the terms and
22   condition of your employment on the basis of
23   your sincerely-held beliefs; is that correct?
24 A   Yes, that's what I've written.  That is what I
25   allege.

Page 22

1  Q   In that Paragraph 92 are you referring to your
2      sincerely-held religious belief that it is
3      sinful to promote gender dysphoria?
4  A   (Audio malfunction.)  Brent, did you hear my
5      answer?
6  Q   No, I did not.
7  A   Oh, okay.  I said yes, I'm referring to my
8      sincerely-held belief that it's sinful to
9      promote gender dysphoria.
10 Q   Thank you.  Are you referring to any other
11     sincerely-held religious belief in that
12     Paragraph 92?
13 A   The ones outlined in all of that scripture of my
14     interrogatory.
15 Q   Look at Paragraph 95, which is at the bottom of
16     that page and continues on to the next.
17 A   Okay.
18 Q   You allege in Paragraph 95 that you requested a
19     reasonable accommodation for your religious
20     beliefs; is that correct?
21 A   Yes.
22 Q   Is the religious belief that you're referring to
23     in that Paragraph 95 your belief that it's
24     sinful to promote gender dysphoria?
25 A   Yes.

Page 23

1  Q   Are you referring to any other sincerely-held
2      religious belief in that Paragraph 95?
3  A   The ones I outline in my Interrogatory 7.
4  Q   Any others?
5  A   No.
6  Q   Go back to Exhibit A.  Look at your response to
7      Interrogatory No. 6.
8  A   Originally formed this belief by reading Holy
9      Scripture as contained in the Bible and also see
10     No. 7.  Got it.  I see it.
11 Q   That interrogatory asks how you originally
12     formed your sincerely-held belief that it is
13     sinful to promote gender dysphoria; is that
14     correct?
15 A   That's correct.
16 Q   And I think you already stated it, but, to be
17     clear, you say you originally formed this
18     sincerely-held belief, quote, "By reading Holy
19     Scripture, as contained in the Bible," correct?
20 A   Correct.
21 Q   Other than Holy Scripture, what else informs
22     your sincerely-held belief that it is sinful to
23     promote gender dysphoria?
24 A   I think I answered that in one of the
25     interrogatories, too, and I can show you.

Page 24

1  Q   Please.
2  A   Different question, but Holy Scripture and the
3      preaching of God's word.  And as I was putting
4      that interrogatory responses together, to get
5      the Greek word and the definition of what I
6      understand to be malakoi, just to get a book to
7      help me lay out those explanations of scripture
8      in answering the Interrogatory No. 7, I used, as
9      I say in Interrogatory Answer No. 9, a book
10     called The Grace of Shame:  7 Ways the Church
11     Has Failed to Love Homosexuals.  And in that
12     they use the word malakoi, arsenokoitai, Greek
13     words.  I'm not a Greek expert, so I looked it
14     up.
15 Q   Thank you.  Anything else you haven't mentioned
16     that informs your sincerely-held belief that it
17     is sinful to promote gender dysphoria?
18 A   Not that I can think of.
19 Q   You mentioned earlier the Evangel Presbytery
20     Book of Church Order.
21 A   Is that a question?
22 Q   Yeah.  You mentioned that earlier in your
23     testimony?
24 A   Yes.
25 Q   What is that?

Page 25

1  A   It is a governing document that governs how our
2      presbytery operates.
3  Q   What are some of the type of things that it
4      governs?
5  A   It governs how to handle issues of discipline,
6      it governs how churches can enter and leave the
7      presbytery are just a couple of the several
8      things it talks about.
9  Q   There is a chapter in that book called the
10     Declaration of Doctrine and Policies Concerning
11     Sexuality.  Are you familiar with that chapter?
12 A   I'm familiar with it.  I haven't committed it to
13     memory but I'm familiar with it.
14 Q   Do you think you've read it before?
15 A   I think I have read it before.
16 Q   Let's pull up Exhibit C on your tab.  Go to the
17     next page, please.  That says The Book of Church
18     Order of Evangel Presbytery, Second Draft,
19     Revised on February 20th of 2019.  I will
20     represent to you that that includes the Table of
21     Contents and then the chapter titled Declaration
22     of Doctrine and Policies Concerning Sexuality
23     and I just ask that you look through that and
24     confirm that it appears to be correct.
25 A   Yes, it appears to be the document.

Page 26

1 Q   Now, is Clearnote, I guess, subject to this Book
2 of Church Order during your employment with
3 Brownsburg in 2017 and 2018?
4 A   Well, when was the presbytery even -- I'd have
5 to check when we even formed the presbytery.
6 Q   Well, I think you testified --
7 A   I think it was one or two years ago, so I think,
8 to the best of my knowledge, we joined Evangel
9 Presbytery after my employment terminated with
10 Brownsburg.  That's the best of my knowledge.
11 Q   Fair enough.  Let me ask you this.  Do you think
12 this chapter on Declaration of Doctrine and
13 Policies Concerning Sexuality is consistent with
14 the teaching of Clearnote Church in 2017 and
15 2018?
16 A   Absolutely.
17 Q   Okay.  Is it fair to say that this Chapter 28
18 provides members of your faith with a framework
19 for approaching issues related to sexuality?
20 A   That's fair to say.
21 Q   Under Chapter 28 it's divided into numbered
22 paragraphs.  If you could look at Paragraph 15.
23 A   Okay.
24 Q   That paragraph addresses facilities usage by men
25 including restrooms; is that correct?

Page 27

1 A   Yes.
2 Q   And the next paragraph, Paragraph 16, addresses
3 facilities use by women including restrooms;
4 correct?
5 A   Yes.
6 Q   Flip to the next page and look at Paragraph 17.
7 My question is if you're familiar with that
8 paragraph but I realize it's lengthy, so, if you
9 need to, take a minute and read it.
10 A   I am familiar with the contents of that
11 Paragraph 17.
12 Q   Tell me what you think it means.
13 A   It means that if someone who is fast bound in
14 presenting themselves as the opposite sex, they
15 come into the church, the church would not
16 immediately require them to use a multi-stall
17 restroom of their biological sex.  Instead, they
18 would sometimes say to that individual that they
19 can use a single stall, one stall individual
20 family restroom.
21 Q   What do you think is meant by these two
22 sentences -- and I'm in the same paragraph, 17.
23 A   Yes.
24 Q   "For this reason, wise and compassionate
25 pastoral discretion is necessary to apply the

Page 28

1 rules set forth in this Declaration, especially
2 concerning access to facilities.  In certain
3 instances the higher law of love will preclude
4 swift and rigid enforcement of rules."
5 A   So repeat your question, please.
6 Q   My question was what do you think was meant by
7 those two sentences I just quoted.
8 A   What was meant is if you, like I said in my
9 previous example, have someone who is headlong,
10 fast bound presenting themselves as the opposite
11 sex, you're not going to force them to start
12 using multi-stall restrooms of their biological
13 sex.  You would in some circumstances and, as
14 they say, with discretion, in some instances you
15 would instead of saying you must use a
16 multi-stall men's restroom, you would say no, a
17 single stall family restroom.
18 Q   Do you think this principle also obtains when
19 addressing a transgender person whose name
20 differs from the person's biological sex?
21 A   Can you repeat that question?  You used a word
22 that -- attains?  Say it again.
23 Q   Do you think this principle also obtains when
24 addressing a transgender person whose name
25 differs from the person's biological sex?

Page 29

1 A   In certain circumstances, which is why my
2 last-name accommodation worked so well.  It
3 didn't force anything on the student.  I was
4 able to address the student with their name in
5 PowerSchool, namely their last name, and teach
6 content.  I was able to make this whole issue a
7 nonissue by not forcing them to recognize their
8 biological sex and I wasn't forced to encourage
9 their transgender identity.  It was a great
10 accommodation that was working.
11 Q   Let's unpack that a little bit.  I think I
12 understand your testimony that says that there's
13 certain circumstances when it might be
14 appropriate to address a transgender person
15 whose name differs from the person's biological
16 sex and I think you just said that one of those
17 circumstances might be with respect to using
18 their last name only; correct?
19 A   Right.
20 Q   Might there be circumstances where it is
21 appropriate to, in your view, address a
22 transgender person by their first name when that
23 first name differs from their biological sex?
24 A   There might be.  None come to mind right now.
25 Certainly my beliefs as regards classrooms that

JOHN M. KLUGE VS
BROWNSBURG COMMUNITY SCHOOL CORPORATION, et al.

JOHN M. KLUGE
November 17, 2020

---

Page 30

1 during the course of the teaching a class of
2 students it's not appropriate and it encourages
3 gender dysphoria.
4 Q   To be clear, I understand that your testimony is
5 that there might be circumstances where it is
6 appropriate and consistent with your religious
7 belief to address a transgender student by their
8 first name where that first name differs from
9 their biological sex but you can't think of any
10 specific circumstances.  Is that fair?
11 A   That's fair.
12 Q   In your view, are there any circumstances where
13 a person's biological sex is ambiguous?
14       MR. CORK: Objection.  Foundation.
15 Q   You can answer the question if you understand
16 it.
17 A   Why are you asking this question?
18 Q   Because you filed a lawsuit against Brownsburg
19 Community School Corporation and this is
20 relevant to the issues raised in the lawsuit.
21 A   I believe that it's always clear.  Even with
22 hermaphrodites, there's always one dominant sex
23 present.
24 Q   Look at Footnote 9 of Exhibit C.
25 A   What page is that on?

---

Page 31

1 Q   Go back two pages.  Maybe around Page 8 or 9 of
2 the document.
3 A   This is not a footnote.  Is this what you're
4 talking about?
5 Q   I'm sorry.  Do you see toward the bottom how
6 they're smaller font?
7 A   Yeah.  It starts with 18.
8 Q   Yeah.  See if you can go back to Footnote 9.
9       MR. CORK: Brent, I note the absence of any
10 Bates numbers on this document.  I don't
11 remember this document ever being disclosed, nor
12 do I ever remember it being produced to us.
13 Would you confirm that, please?
14       MR. BORG: That's accurate.
15       MR. CORK: Okay.  I'm going to move to
16 strike this.  I will need a copy of it.
17       And, Rita, if you or somebody could send to
18 me via e-mail before we finish this deposition.
19 Obviously, there's nobody here present to rule
20 on that motion and I will, under objection,
21 allow my client to continue to answer the
22 questions about this document but with that
23 objection noted and then I will want to look at
24 it when we take a break and ask my own
25 questions.

---

Page 32

1       I don't think it's appropriate for you to
2 use a document that has never been identified
3 previously in the deposition of a plaintiff.
4       MR. BORG: I understand your objection.
5 For the record, I believe the witness has
6 testified that he's familiar with the document.
7 It is a document that he has confirmed via
8 testimony that is part of a governing document
9 of his church and it was consistent with his
10 beliefs in 2017 and 2018.  I'm simply making my
11 record.
12       Michael, if you'd like to, I understand you
13 want to ask some questions concerning the
14 document.
15       MR. CORK: My objection is that we've been
16 sandbagged and you waited until this deposition
17 to produce and ask questions about this document
18 when you've known about it long enough to
19 disclose it and produce it.  You may proceed.
20       MR. BORG: Thank you.
21       THE PLAINTIFF: Brent, if you look at the
22 bottom of Page 48, it is Footnote 11.  I go back
23 one page, there are no footnotes.  I go back
24 another page, there are no footnotes.  What are
25 you talking about?

---

Page 33

1       MR. BORG: Fair enough.  Let's take a
2 five-minute break.  I think I need to get you a
3 better cite before I ask my question, Mr. Kluge.
4       (A recess was taken.)
5 DIRECT EXAMINATION CONTINUING,
6       QUESTIONS BY BRENT R. BORG:
7 Q   Mr. Kluge, before the break we were talking
8 about Exhibit C and I gave you a bad cite.  If
9 you could instead look at Footnote 19 of that
10 document.
11 A   Do I have control of this document?  Footnote
12 19.  Let me see what this footnote is talking
13 about first which it looks like it's on the
14 previous page.  So Paragraph 4 says "God forms
15 each person in his mother's womb and creates the
16 unborn child male or female."
17 Q   Do you see the part of Footnote 19 where it
18 says, quote, "'Intersex' is a medical diagnosis
19 of atypical male or female anatomies not to be
20 confused with those born with typical male or
21 female anatomies who claim a 'transgender' or
22 'transsexual' identity."  Do you see that?
23 A   I see that footnote.
24 Q   Appreciating that intersex diagnoses are
25 probably quite rare, would you agree that is one

---

Page 34

1    circumstance where one's name might not align
2    with one's biological sex and yet --
3         MR. CORK: Objection.  Calls for medical
4    opinion.  You may answer if you can.
5  A   I'm not a doctor.  My sincerely-held belief is
6    that there's always a dominant biological sex
7    present.  With things that are ambiguous or
8    could be, there's always a dominant sex present.
9  Q   In which case if a person's first name did not
10   align with that dominant sex, in your view, is
11   your religious belief, that would be sinful?
12 A   To encourage someone to (audio malfunction)
13   female and presents as a male is sinful.
14        (At this time the reporter interrupts and a
15   discussion was held off the record while
16   Plaintiff adjusts his audio settings.)
17 A   Can we bring the document back in question?
18 Q   Mr. Kluge, let me try to backtrack a little.  I
19   think you had testified several moments ago that
20   it's your belief that even in cases where
21   somebody is a hermaphrodite there's what you
22   call a dominant sex for that person.  Is that a
23   fair characterization?
24 A   That's correct.
25 Q   Okay.  And my question was is it your belief

Page 35

1    that if somebody's first name deviates from what
2    that dominant sex is, that is sinful; correct?
3         MR. CORK: Objection.  Mischaracterizes his
4    testimony.  You may answer.
5  A   That's not what I was saying.  I was saying for
6    a man to present as a woman or for a woman to
7    present as a man, that is sinful, and to
8    encourage them in that (audio malfunction)
9    opposite sex, that's sinful for someone to
10   encourage that behavior.
11 Q   Okay.  Is it sinful in a case where a person has
12   a dominant sex for their first name to deviate
13   from whatever that dominant sex is?
14 A   It's sinful for them to present themselves as a
15   man if they're a woman and it's sinful for them
16   to present themselves as a woman if they're a
17   man.
18        In the case of Brownsburg, I have students
19   that are changing their name to an opposite sex
20   first name in order to present themselves as the
21   opposite sex and that's against my
22   sincerely-held religious beliefs.
23 Q   But presenting can also refer to the first name
24   that's being used; correct?
25 A   My students had specifically changed their first

Page 36

1    names in order to have an opposite sex first
2    name and, so, they were, in fact, presenting
3    themselves, in the act of changing their name to
4    an opposite sex first name, that was what my
5    sincerely-held beliefs would say is presenting
6    themselves as the opposite sex.
7  Q   From your view, that would be an instance of
8    effeminacy and therefor sinful?
9  A   That is correct.
10 Q   And is it fair to say that by addressing a
11   student by an effeminate first name, in your
12   view, you are also engaging in that person's
13   sin?
14 A   That's fair.  I'm encouraging them in sin.  I'm
15   encouraging them to sin.
16 Q   So, in that instance, it's not only --
17 A   Encouraging them to sin is sinful.
18 Q   So it's fair to say the sin in that instance is
19   twofold.  First, it's the student adopting an
20   effeminate first name and you addressing the
21   student by that name is encouraging the student
22   to engage in that sin?
23 A   I think you're conflating things.  What are you
24   saying the sin is twofold?  My sincerely-held
25   religious beliefs and the whole point of why I

Page 37

1    didn't want to call them by a name that would
2    encourage transgenderism is because I would be
3    sinning by doing that.  I would be sinning by
4    encouraging them in sin.  Maybe that answers
5    your question, but the whole point of why I
6    can't in good conscience encourage someone in
7    effeminacy is because it would be sinful for me
8    to do that and that's why we arrived at the
9    last-name accommodation.
10 Q   Thank you.  I think we're on the same page
11   there.
12 A   Okay.
13 Q   Let's go ahead and look at Exhibit D.
14 A   I'm trying to and I'm not able to.  Is there a
15   problem?
16        MR. BORG: Rita?
17 Q   Go to Page 2 of Exhibit D.
18 A   Okay.
19 Q   Exhibit D are documents that you produced in
20   response to certain discovery requests from
21   Brownsburg as indicated in the Page 2 that we're
22   looking at.  If you wouldn't mind, just look
23   through it and familiarize yourself with it.
24 A   Okay.
25 Q   Now, as I look at that --

JOHN M. KLUGE VS
BROWNSBURG COMMUNITY SCHOOL CORPORATION, et al.

JOHN M. KLUGE
November 17, 2020

---

Page 38

1 A   Wait.  I'm actually not done.

2 Q   Let me know when you're ready.

3 A   Thank you.  Alright.  I've familiarized myself
4     with the document, but, before I go on, I did
5     remember one thing, Brent, if you wouldn't mind
6     me going back to a previous document.

7 Q   Certainly.

8 A   This is Exhibit C where it's labeled Page 49 and
9     I think Paragraph 7 also helps to describe what
10    my sincerely-held religious beliefs are.  And it
11    says "The proper conception of 'sexual identity'
12    is a matter of being and obeying the genetic sex
13    God made us, either male or female.  Genetic sex
14    and sexual identity cannot be separated, and
15    they remain bound together throughout one's
16    life.  Sexuality does not admit of gradations.
17    You are either male or female, not part male and
18    part female.  Nor are there a great multitude of
19    sexual identities.  There are only two, male and
20    female.  Any attempt of a man to play the woman
21    or a woman to play the man violates God's
22    decree, attacks His created order, and
23    constitutes sin so serious that God himself
24    pronounces it an 'abomination'" in Deuteronomy
25    22:5 and 1 Corinthians 6:9-10 which I've already

---

Page 39

1     talked about.

2         So just wanted to also mention that.
3     That's also a good representation of me
4     believing that we're either male or female.

5 Q   Thank you for that.

6 A   Yep.  So Exhibit D.

7 Q   I just want to understand what we're looking at
8     with Exhibit D.  That looks to me like two
9     versions of the same document and specifically
10    what I see in the first version is that -- stay
11    on that page -- if you look at the upper
12    right-hand corner, that is dated April 7th,
13    2017.

14 A   Yep.

15 Q   And that first version is not signed at the end
16    whereas the second version removes that April 7,
17    2017 date and it appears to be signed at the end
18    by you and three others and I just ask that you
19    confirm you're looking at that the same way I
20    am.

21 A   Do you want me to tell you how this document
22    came about?

23 Q   Why don't we try it that way.  Thank you.

24 A   Okay.  So this document was important for me to
25    plead with Principal Daghe not to pursue

---

Page 40

1     encouraging transgenderism and forcing it on
2     teachers in our schools based on alarming
3     teaching we had been receiving at our faculty
4     meetings in January and then in February.  And,
5     so, I drafted a letter to give to Principal
6     Daghe and then in May of 2017 I and three other
7     teachers met with Daghe to urge him not to
8     promote transgenderism in our schools.

9         The reason there is no date in the second
10    version of it is because I wasn't -- between the
11    time of us signing the document and us actually
12    being able to arrange a meeting with Daghe, I
13    didn't know exactly what date that would be.
14    So, it was signed between April 7th, 2017,
15    somewhere between that time and the time we
16    actually met in May of 2017, me, the three other
17    teachers, and Daghe in his office.

18 Q   Okay.  Thank you for that context.  Let me ask
19    you a couple more questions to clean up.

20 A   Yes.

21 Q   The first version of this Exhibit D that has the
22    April 7, 2017 at the top right, you drafted
23    that; is that correct?

24 A   That is correct.

25 Q   Okay.  And did you present that to Mr. Daghe on

---

Page 41

1     or about April 7th of 2017?

2 A   No.

3 Q   Okay.  The second version, that's your signature
4     first if you go to Kluge 109.  Do you see in the
5     bottom right-hand corner how it's got a -- it's
6     called a Bates stamp.  That's kind of like a
7     unique page number.

8 A   That is my signature.

9 Q   Okay.  Who are the other signatures?

10 A   The other signatures are Kirk Young, Shara
11    Davis, and Rachel Jones.

12 Q   Who are they?

13 A   They were teachers at Brownsburg High School at
14    this time.  I don't know what they're currently
15    doing.

16 Q   At that time what did each person teach?

17 A   I'm not entirely sure.  I think a couple of them
18    were math teachers, one was a science teacher.

19 Q   Okay.  And is this signed version what was
20    presented to Dr. Daghe?

21 A   Yes, this signed version is what was presented
22    to Dr. Daghe when we met in May of 2017.

23 Q   Okay.  And during that meeting was there a
24    discussion among the five of you?

25 A   I read the letter out loud to Daghe and then

---

JOHN M. KLUGE VS
BROWNSBURG COMMUNITY SCHOOL CORPORATION, et al.

JOHN M. KLUGE
November 17, 2020

Page 42

1  pleaded with him, as I say in the document, to
2  not pursue promoting transgenderism in our
3  schools. We urge them, yada, yada, yada. All
4  of these, we urge, we urge, we urge not to
5  require, pressure, suggest that teachers
6  encourage transgender students in their folly,
7  that we actually encourage them to discourage
8  it. It goes against -- well, you know the
9  contents of the document. So, yeah, we were
10  urging him not to promote transgenderism in the
11  schools.
12 Q  Do you think this meeting where you presented
13  the signed version of this document occurred in
14  approximately May of 2017?
15 A  Yes, it did.
16 Q  And you indicated that you read the document out
17  loud to Principal Daghe?
18 A  That's correct.
19 Q  What response did he provide, if anything?
20 A  He had -- I don't know exactly what he said
21  before this but near the end of the meeting he
22  asked -- well, he told us that "I," Bret Daghe,
23  "have been resisting pressure that I feel to
24  change names in our PowerSchool database. I've
25  been resisting that pressure thus far and

Page 43

1  keeping legal names in PowerSchool. Would you
2  like me to change the names to transgender
3  names? Would that solve your concerns?"
4      At that point the three other teachers
5  said, yes, that would resolve our concerns. I
6  was shocked that they did an about-face and I
7  said nothing. And then the meeting ended.
8      Minutes later I walked back into Bret
9  Daghe's office and I tell him, "Look, I know
10  that those other teachers said they would be
11  happy to have the transgender names in
12  PowerSchool and that would resolve their issues,
13  but if you've been able to resist the pressure
14  you feel to change names in PowerSchool and
15  you've been successfully keeping legal names in
16  PowerSchool, keep up the good work. Do that,
17  keep using legal names."
18      I left that meeting May of 2017 thinking
19  that Bret and I were on the same page, that he
20  would keep using legal names, we would not be
21  promoting transgenderism in our school. That's
22  how I left that day.
23 Q  Well, why do you say that? Did Dr. Daghe --
24 A  Because --
25 Q  Let me finish my question. I think you're

Page 44

1  anticipating. Thank you. I think you said
2  following the meeting with the teachers you came
3  back in and had a one-on-one meeting with
4  Dr. Daghe; correct?
5 A  That is correct.
6 Q  Okay. And you just testified about the concerns
7  you expressed with respect to keeping legal
8  names and not using transgender names; correct?
9 A  Correct.
10 Q  Okay. And what, if anything, did Mr. Daghe say
11  in response to that?
12 A  He acted and he said things like "Thank you,
13  John. I appreciate it."
14 Q  And, based on his response, what was your
15  thinking with respect to how Brownsburg High
16  School would proceed as far as student names
17  were concerned?
18 A  Based on his response, my understanding is that
19  they would continue to use legal names and that
20  we would not be promoting transgenderism in our
21  schools, we would stop teaching it in our
22  faculty meetings, and that he had heeded our
23  urging.
24 Q  Do you see down at the bottom right-hand corner
25  where it says Kluge 109?

Page 45

1 A  That's correct.
2 Q  Okay. That's a Bates stamp. It's just a unique
3  identifier. I may refer to documents --
4 A  Do you care if I grab a sweater or something?
5  Just the room I'm in is a little chilly.
6 Q  Certainly.
7 A  Okay. I will be right back. You can't see it
8  but I have a blanket now, so go ahead. Proceed.
9 Q  On the pages marked Kluge 108 and 109 there is
10  some numbered requests 1 to 12. Do you see
11  that?
12 A  I see that.
13 Q  Okay. And Requests 4 to 6 have to do with not
14  requiring teachers to use transgender students'
15  preferred pronoun; is that correct?
16 A  You said 4 through what?
17 Q  Requests 4 to 6.
18 A  4 to 6. Let me read them. Those Requests 4
19  through 6 do talk about preferred pronouns.
20 Q  Okay. And by preferred pronouns, we're talking
21  about if a biological female student wanted to
22  be referred by a masculine pronoun such as he,
23  him, or his, you were asking in those requests
24  that Brownsburg not require the teachers to do
25  that; is that correct?

Page 46

1 A    That's part of what we were asking for, yes.
2 Q    Okay.  Isn't it true that Brownsburg granted
3      that request for the 2017/2018 school year by
4      allowing teachers to use the name listed in
5      PowerSchool?
6 A    That's not correct.
7 Q    Okay.  Tell me your understanding of what the
8      PowerSchool database is.
9 A    The PowerSchool database is a database that
10     tells you information about students including
11     their name and grades, their parents' names,
12     their address, phone numbers.  I think you can
13     see maybe their discipline logs, maybe not.  I
14     don't remember.
15 Q   Okay.  Do you recall during the 2017/2018 school
16     year if PowerSchool would display a student's
17     biological sex?
18 A   I believe, yes, it had male or female listed by
19     the student.
20 Q   Okay.  And, to your knowledge, could you as a
21     teacher during the 2017/2018 school year enter
22     or change any information in PowerSchool?
23 A   No, you could not.
24 Q   Okay.  Is it more accurate to simply say that
25     you as a teacher during the 2017/2018 school

Page 47

1      year simply had access to the information?
2 A    As regards to student's name and sex, yes.
3 Q    Is it your understanding that at some point
4      during the 2017/2018 school year Brownsburg
5      allowed students to change the first name listed
6      in PowerSchool provided they had approval from
7      their health care provider and a parent?
8 A    That is my understanding.
9 Q    Going back to Exhibit D, did Bret Daghe or
10     anyone at Brownsburg discipline you for writing
11     this letter and providing it to him?
12 A   Are you referring -- you said the 2017/'18
13     school year?
14 Q   At any time.
15 A   I did not get disciplined for writing this
16     letter.  They did suspend me pending termination
17     later in July based on the beliefs given in this
18     letter.
19 Q   Right.  But, as far as this letter is concerned,
20     Bret Daghe or anybody else at Brownsburg didn't
21     discipline you for providing it to Bret, for
22     voicing your views, anything like that?
23 A   That's correct.
24 Q   Take a look at the next exhibit, Exhibit E.
25     These are two e-mails from Lori Mehrtens dated

Page 48

1      July 18th of 2017 regarding two transgender
2      students; correct?
3 A    Let me look at them.  What was your question
4      now?
5 Q    These appear to be e-mails from Lori Mehrtens
6      dated July 18th of 2017 regarding two
7      transgender students; correct?
8 A    Yes.
9 Q    Do you recall receiving these e-mails on or
10     around July 18th of 2017?
11 A   I do.
12 Q   That would have been nine days before the first
13     day of classes for the 2017/2018 school year;
14     does that sound correct?
15 A   The first day of classes in the 2017/2018 school
16     year was July 27, nine days later.
17 Q   Thank you.  Is it fair to say that these e-mails
18     made you start thinking about the last-name-only
19     accommodation?
20 A   Actually, no.  I hadn't thought of that
21     accommodation until I was told I was going to be
22     terminated.  And when I saw these e-mails, you
23     see in the first bullet point it says "Parents
24     are supportive and aware - Feel free to use 'he'
25     and 'Aidyn' when communicating."  I saw that and

Page 49

1      when I first received these e-mails I say I
2      thought Daghe and I had an understanding that we
3      were not gonna be doing this.  Where is this
4      coming from?  I was actually pretty shocked and
5      surprised that the school was starting to do
6      this.  I thought Bret and I had an understanding
7      we weren't going to be doing this, but when I
8      saw the words "Feel free to use 'he' and
9      'Aidyn'" and in the other page it says "Feel
10     free to use 'he' and 'Sylar' when
11     communicating," I did not take that as a command
12     as them directing me to do this.  It was a
13     suggestion in my eyes.
14         And, so, I said I don't know why the school
15     is moving in this direction but they say "feel
16     free."  It sounds like it's more of a do this if
17     you'd like to; don't do it if you don't want to.
18         And, so, when I saw these e-mails, I
19     planned to use students' legal names the first
20     day of classes.  I could go on in the timeline
21     but I think you'll probably ask some more
22     questions about that.
23 Q   We will.  So I just want to be clear.  So it's
24     fair to say from these e-mails they didn't first
25     make you start thinking about what eventually

---

Page 50

1    became the last-name-only accommodation.  Is
2    that fair?
3  A    That's correct.
4  Q    Okay.  Now go back when you were talking.  I
5    want to be clear.  I think you touched on it
6    before, but why did you have the understanding
7    from talking with Bret, I believe, in May of
8    2017 that Brownsburg High School is not gonna
9    require you to use transgender names?
10 A   Because when Bret and I met alone after the May
11   meeting with the three teachers, myself, and
12   Bret, in that meeting minutes afterward with
13   just Bret and myself when he had said previously
14   I've resisted this pressure to change names in
15   the PowerSchool database, he said that he had
16   resisted that pressure when we were meeting with
17   all of the teachers.  Then minutes later in this
18   individual meeting between Bret and I, I tell
19   him if you've been able to successfully resist,
20   good job, keep it up, keep doing legal names,
21   and he said, "Thank you, John.  I appreciate
22   it."  To me, that was thanks for the
23   encouragement, I will continue to resist.
24 Q   Thank you.  Going back to Exhibit E.  At the
25   time you received these e-mails, did you know

---

Page 51

1    either of the students?
2  A    At the time of receiving these e-mails I had
3    been an assisting teacher to their orchestra
4    teacher when they were in eighth grade.
5  Q    Okay.  And help me with what does it mean to be
6    an assisting teacher to the eighth grade
7    orchestra teacher?  Would you attend classes?
8    Would you attend other events, that sort of
9    thing?
10 A   I would attend classes, I would help the
11   students learn their music, and I would attend
12   the concerts and help them tune their
13   instruments, so I had met both Sucec and Haskett
14   before.
15         THE PLAINTIFF: Can we pause for lunch at
16   some point soon?
17         MR. BORG: Yeah.  What sounds good, guys,
18   30 to 45 minutes?
19         MR. CORK: Yeah, that's fine with me.
20         (A recess was taken.)
21   DIRECT EXAMINATION CONTINUING,
22         QUESTIONS BY BRENT R. BORG:
23 Q   We broke for about 30 minutes for lunch.
24   Mr. Kluge, I think you testified previously that
25   July 27, 2017 was the first day of school for

---

Page 52

1    the 2017/2018 school year; is that correct?
2  A    It was the first student day of school, correct.
3  Q    And I understand that on that day you had a
4    meeting or meetings with Principal Daghe and
5    Dr. Snapp; is that correct?
6  A    That's correct.  I originally went to Daghe in
7    the morning to tell him what my plan was.  I
8    received this e-mail that says "feel free" to
9    use transgender first names.  It says "feel
10   free."  I don't think that's an obligation.  I
11   don't think they're telling me to do it, so I
12   intend to use legal names when I start teaching
13   later in the day.
14         He says to me, "Hold on, John.  Wait in
15   your office.  I'm going to get in touch with
16   Snapp and see what we should do."
17         So then he calls me into his office later
18   that day, July 27, 2017, and in that meeting
19   between me, Daghe, and Snapp in Daghe's office
20   Snapp tells me, "You can't use legal names,
21   John."
22         And I tell him my sincerely-held religious
23   beliefs, that to use a transgender first name --
24   he tells me you have to use the transgender name
25   in PowerSchool.  And I say, "I can't do that.

---

Page 53

1    That's against my sincerely-held religious
2    beliefs."
3         And he says, "Well, then you have three
4    options.  You can either, one, comply and use
5    the transgender name in PowerSchool; two, you
6    can resign, say you were forced to resign; or
7    three, you'll be suspended pending termination."
8    That's the phrase he used.
9         And I told him, "I can't use the
10   transgender first name.  It's against my
11   conscience.  It's against my sincerely-held
12   religious beliefs."
13         So he said, "Fine, then say that you were
14   forced to resign."
15         And I said, "Well, I don't want to resign.
16   I want to continue teaching here and I want to
17   continue using legal names."
18         And he said, "You can't do that."
19         And I said, "I can't quit on the students,
20   so if I'm not gonna resign, if I'm going to be
21   terminated, you're gonna have to terminate me.
22   I'm not gonna quit on my students."
23         And he said, "So you want me to terminate
24   you?"
25         And I said, "No, I want you to continue

---

**Circle City Reporting**
**317-635-7857**

Case 1:19-cv-02462-JMS-DLP   Document 120-3   Filed 03/15/21   Page 15 of 36 PageID #: 1254

JOHN M. KLUGE VS
BROWNSBURG COMMUNITY SCHOOL CORPORATION, et al.

JOHN M. KLUGE
November 17, 2020

---

Page 54

1    letting me teach here and use legal names."
2         And he says, "Again, I can't do that."  So
3    we left that meeting with him saying, "Well, if
4    you're not gonna use transgender first names and
5    you're not gonna resign, then, John, I'm sorry
6    to say this, but you are suspended pending
7    termination."  And that's how we left that
8    meeting.
9  Q    Let me backtrack on that just to make sure I
10    have the sequence.
11  A    Yeah.
12  Q    You first met with just you and Principal Daghe
13    on July 27, 2017; correct?
14  A    Just me and Daghe, yes.
15  Q    Thank you.  And I think you said you
16    communicated to Principal Daghe that since the
17    e-mail you had received with respect to the
18    transgender student was permissive regarding
19    transgender first names, it was your intention
20    to use their legal name?  Is that fair?
21  A    Because the e-mail didn't mandate us using
22    transgender names, I intended to use legal
23    names.
24  Q    Okay.  Just so we're clear, what do you mean by
25    legal names?

Page 55

1  A    The name that's on their birth certificate, the
2    one that was stored on their birth records.
3  Q    Okay.  And what do you mean by transgender
4    names?
5  A    The opposite sex first name that they had
6    switched to that was not their legal name.
7  Q    And I think we established previously that there
8    was a process where a student, to use your
9    terms, could have their legal name changed to
10    their transgender name in PowerSchool; correct?
11  A    That's correct.
12  Q    And was it your understanding that as of July
13    27, 2017 the directive to high school teachers
14    was to use the name that was listed in
15    PowerSchool?
16  A    No, it was not a directive; it was a suggestion.
17  Q    Okay.  And then back to how events transpired in
18    July 27 of 2017.  The first initial meeting with
19    Principal Daghe ended by having him say hold on,
20    let me get Dr. Snapp and we'll be in touch
21    further?
22  A    That's correct.
23  Q    Okay.  What did you do in the interim?  Did you
24    teach classes or did you go home?  Did you take
25    a break?

Page 56

1  A    I didn't have classes until later in the day.
2    My first scheduled classes, I believe, were
3    supposed to be helping with the middle school
4    teacher.  They weren't my own students.  It was
5    just helping the other teacher and so I didn't
6    actually teach any students before meeting with
7    Snapp and Daghe later in the day or later that
8    morning.  I was just sitting in my office.
9  Q    Okay.  So you did not go help the middle school
10    teacher as planned?
11  A    I did not.  I just sat in my office.  I actually
12    did not even interface with any students.  I saw
13    Daghe and he told me to go to my office.  I went
14    in my office and then he calls me to the meeting
15    with him and Snapp and then I go to that
16    meeting.
17  Q    Okay.  And you described that meeting where I
18    think you said Principal Daghe communicated
19    these three options to you; correct?
20  A    No, Snapp presented those three options.
21  Q    Snapp presented those, okay.  And then what
22    happened after the meeting with you, Principal
23    Daghe, and Dr. Snapp?
24  A    Snapp had said, "John, you are suspended pending
25    termination.  Please go home and we can arrange

Page 57

1    to have you collect your things."  And, so, I
2    went home.
3         After that, my pastor got in touch with Jim
4    Snapp.  I don't know who called who.  In that
5    meeting I had told Jim Snapp who my pastor is.
6    He asked me who is my pastor and I told him.  So
7    those two talked on the phone after that July 27
8    meeting and my pastor asked Jim Snapp, "Jim,
9    could you at least give John over the weekend to
10    think about what to do and not terminate him?"
11         And Jim Snapp agreed to my pastor's
12    suggestion.  And, so, Jim agreed to give me
13    until Monday to decide what I was gonna do.
14  Q    Okay.  The conversation that occurred between
15    Dr. Snapp and your pastor, was that also July
16    27?
17  A    I believe it was.  It could have been the next
18    day.
19  Q    And you were not privy to that conversation;
20    correct?
21  A    I was not in that conversation if that's what
22    you mean.  What do you mean by privy?  He told
23    me he talked to Snapp.
24  Q    Privy is a bad word.  You didn't participate in
25    that conversation; correct?

Page 58

1 A    I did not participate in that conversation.
2 Q    You know about that conversation because the
3      information about that was relayed from your
4      pastor; correct?
5 A    That's correct.
6 Q    And then eventually at some point did your
7      pastor relay to you that Dr. Snapp had agreed
8      to, I guess, give you the weekend to think
9      things over?
10 A   That's correct. After my pastor and Snapp got
11     off the phone, at some point between then and
12     the Monday meeting with Snapp and Gordon my
13     pastor relayed that I asked -- I, Dave Abu-Sara,
14     the pastor, asked Jim Snapp to give me the
15     weekend to think about things and Snapp has
16     agreed.
17 Q   Dr. Snapp testified in his deposition that he
18     had a one-on-one conversation with you on July
19     27, 2017. Do you recall having a meeting with
20     him like that?
21 A   I do not. It was Daghe, Snapp, and me. Never
22     Snapp and me alone.
23 Q   Do you recall ever having a one-on-one with him
24     not necessarily July 27th but at some other time
25     around then?

Page 59

1 A    No, it was Daghe, Snapp, and me. And then on
2      July 31 it (audio malfunction) --
3 Q    Mr. Kluge, I'm sorry, my screen froze up when
4      you started to say it was July 31.
5 A    So July 27 it was Snapp, Daghe, and myself. And
6      then July 31 it was Snapp, Gordon, and myself.
7 Q    Okay. But, as far as you recall around this
8      time, you never had a one-on-one conversation
9      with Dr. Snapp?
10 A   A one-on-one conversation? Now, it could be
11     possible that someone left the room to go to the
12     bathroom during that three-hour meeting we had
13     on the 27th.
14 Q   Okay.
15 A   But the meeting was between three people.
16 Q   Well, let me tell you what he shared about this
17     conversation and maybe that will jog your
18     memory. He described the conversation as
19     lasting more than an hour.
20 A   Nope.
21 Q   He described it as cordial. Let me finish my
22     question and see if it refreshes your
23     recollection. He described the conversation as
24     cordial and he said the conversation was focused
25     on religious beliefs. Is that jogging your

Page 60

1      memory at all?
2 A    You know, what date did he say this occurred?
3 Q    He testified it occurred on July 27 of 2017.
4 A    That same exact day. I have -- yeah, I have a
5      vague memory of talking to him privately about
6      religious topics. I could not testify about
7      what day it was or what it was concerning.
8 Q    Well, let me ask you this. Do you think it was
9      around this time at the start of classes for the
10     2017/2018 school year?
11 A   It's possible.
12 Q   One of the other things that Dr. Snapp testified
13     during this conversation -- and, again, I'm
14     sharing this with you to see if it refreshes
15     your recollection.
16 A   Uh-huh.
17 Q   He asked at one point during the conversation,
18     "What do you want me to do?" posing that
19     question to you. And your response was to the
20     effect that you wanted him to fire you and then
21     go to the media and tell them that this was an
22     unjust law and he disagreed with it but that he
23     had to fire you anyway. Do you recall having a
24     discussion with Dr. Snapp along those lines?
25 A   No. What I recall is that when he asked me what

Page 61

1      I want him to do, I told him "I want you to keep
2      me employed and allow me to use legal names."
3 Q    Do you ever recall telling Dr. Snapp "I want you
4      to fire me" or anything like that?
5 A    Given the Hobson's choice of resign or be fired,
6      I told him "I won't quit on the students." If
7      he's construing that I told him I want to be
8      terminated, that's a misrepresentation of what I
9      told him. I always told him I want to work here
10     and I want you to allow me to use legal names.
11     That's what I was telling him before I presented
12     the option, the accommodation, and they agreed
13     to it.
14 Q   What else do you recall your pastor sharing with
15     you about the conversation he had with
16     Dr. Snapp?
17 A   That's all I recall.
18 Q   Who was your pastor at that time?
19 A   Pastor Dave Abu-Sara.
20 Q   And he's also the current pastor at Clearnote;
21     correct?
22 A   That's correct.
23         MR. BORG: Let's look at Exhibit F, Rita.
24 Q   If you could go to Page 2, Mr. Kluge.
25 A   There it is.

Page 62

1  Q   You recognize this document; correct?
2  A   I do recognize this document.
3  Q   Okay.  Is it fair to say that the outcome of the
4      discussions with Bret Daghe and Dr. Snapp on
5      July 27, 2017 resulted in Brownsburg agreeing to
6      two reasonable accommodations?
7  A   No, that's not a correct representation of the
8      July 2017 meeting.
9  Q   Okay.  What was the result of those meetings?
10 A   I was suspended pending termination as a result
11     of the July 27th, 2017 meeting.
12 Q   Okay.  Are you familiar with the statutes that a
13     school corporation has to follow to terminate a
14     teacher's employment?
15        MR. CORK:  Objection.  Calls for a legal
16     conclusion.  You may answer if you can.
17 A   I don't have those committed to memory and I'm
18     not very familiar, no.
19 Q   Do you know that there are statutes that a
20     school corporation has to follow before it
21     terminates a teacher's employment?
22 A   I don't know what the word "statute" means in
23     terms of what you're talking about, so --
24 Q   A statute, Mr. Kluge, is a written law, in this
25     case a law passed by the Indiana General

Page 63

1      Assembly.  Do you think you ever reviewed a law
2      passed by the Indiana General Assembly that has
3      to do with the steps a school corporation has to
4      follow to terminate a teacher's employment?
5  A   No, I have not seen those.  I was just told I
6      was suspended pending termination.
7  Q   Okay.  But eventually there came a time where we
8      got to Exhibit F and what's discussed there;
9      correct?
10 A   This exhibit does exist.  What's your question?
11 Q   I guess my question is what is your
12     understanding from your perspective of how we
13     went to administrative leave pending termination
14     to this document that's depicted in Exhibit F?
15 A   So Snapp, Daghe, and I left our meeting, the
16     three of us, July 27th with the understanding
17     that they would not allow me to use legal names
18     and that I was suspended pending termination.
19        Over the weekend after carefully consider
20     what to do, I, on Monday, July 31, go to the
21     meeting where this document was presented to me.
22     I hadn't seen it before July 31.  And in that
23     meeting on July 31, it's Snapp and Gordon and
24     myself in the meeting.  Bret Daghe is not in the
25     meeting.  At that meeting on July 31 they give

Page 64

1      me this piece of paper.  It's the first time I
2      had seen this piece of paper and they say, "Do
3      you comply or will you not comply?  If you will
4      comply with this and use transgender first names
5      that are listed in PowerSchool, you can keep
6      your job.  If you will not comply, you are going
7      to be terminated.  What do you choose, John?"
8         And I said to them -- I offered at that
9      meeting on July 31 between Snapp and Gordon, I
10     said, "Well, can I use last name only like a gym
11     coach?  That way we cannot get into this issue
12     at all.  I can just teach my content and it will
13     be as if we're the orchestra team."
14        And Snapp looked at Gordon at that point in
15     the meeting and said, "Is this allowable?"  And
16     Gordon said, "Yeah, that's fine."
17        And Snapp then asked me, "Well, what would
18     you do if a student asked you outright 'Are you
19     using last names only because you think that
20     transgenderism is evil?'"
21        And I told Snapp at that point, "If a
22     student asks me that outright, I would say I'm
23     using last names only because we're a team,
24     we're an orchestra team, just like a sports
25     coach says, hey, Smith, hey, Jones.  We are one

Page 65

1      orchestra team working towards a common goal."
2         And, so, our understanding at that meeting
3      is that I would use last names only for all
4      students just like a sports coach, just like a
5      gym coach, and that's when they wrote in the
6      handwriting that I was allowed to address
7      students by last name only.
8  Q   Did you come up with that idea right on the spot
9      or had you been thinking about it?
10 A   I had thought about it over the weekend.
11 Q   What about the part at the bottom?  I believe
12     that's Jodi Gordon's handwriting.  It says, "In
13     addition, Angie Boyer will be responsible for
14     distributing uniforms to students."  What's that
15     about?
16 A   That was an accommodation for I'm not officially
17     in charge of the uniforms, Angie Boyer will be,
18     and, so, I'm not the one directly responsible
19     for giving a man's clothing item to a female
20     student.  And what that accommodation
21     accomplishes is (audio malfunction) officially
22     in charge.  The people who actually distribute
23     the uniforms is the orchestra uniform parent
24     helper.
25        And, so, after this meeting I'm given that

Page 66

1  accommodation that Angie Boyer will be
2  responsible for distributing uniforms to
3  students and I go to Angie Boyer and tell her,
4  "You are officially the one responsible for
5  distributing uniforms to students." And then I
6  tell the orchestra parent volunteers who
7  actually do the distributing that "Angie Boyer
8  is now in charge of you guys and responsible for
9  distributing uniforms. I'm no longer the one
10 officially in charge. You keep on doing your
11 work but Angie Boyer will be the one in charge
12 of you."
13 Q   Was all of that with respect to the uniform
14     accommodation proposed by you?
15 A   Yes.
16 Q   And it's fair to say that Brownsburg
17     administration agreed to allow you to address
18     students using last name only based on your
19     proposal; correct?
20 A   Yes, they agreed to that.
21 Q   And they also agreed to the uniform proposal
22     that you've just described?
23 A   Yes.
24 Q   And you signed this document and you dated it
25     July 31st, 2017?

Page 67

1  A   That's correct.
2  Q   You also checked the box there that says "Yes, I
3      will comply with this directive."
4  A   I checked the box that, yes, I will comply with
5      this directive to use -- yeah, and treat
6      students in the manner indicated on PowerSchool
7      with the understanding that I can use last names
8      only so that way I can still use the name in
9      PowerSchool but I'm only using the legal part of
10     their name, their last name.
11 Q   There's also a line there under Jodi Gordon's
12     first set of handwritten remarks. It says "You
13     are also directed to not attempt to counsel or
14     advise students on his/her lifestyle choices."
15     Was there any discussion about that part of this
16     document?
17 A   In that meeting?
18 Q   Yes.
19 A   Yes, they told me that and I agreed.
20 Q   Okay. Do you have any idea what that was about?
21     Were they saying there were student complaints
22     or concerns to that effect?
23 A   There were no student complaints to that effect.
24     Snapp said he did not want me telling
25     transgender students that they're choosing the

Page 68

1  wrong lifestyle. And that's why this last names
2  only, we're all on the same orchestra team,
3  that's why that accommodation worked so well.
4  It wasn't about sexuality as far as the students
5  were concerned. It was about creating team
6  identity as an orchestra class and that's what I
7  did tell my student if they ever asked me, "Hey,
8  why do we do last names only in your class?" I
9  told them, "Well, you know how on a sports team
10 you're all last names? Well, we're an orchestra
11 team. We're all working towards the same goal.
12 I want to foster that sense of community." And
13 they were satisfied with that answer.
14 Q   Let's focus on the I'm going to refer to it as
15     the last-name-only accommodation. Was it your
16     understanding that you would address students in
17     all of your classes by last name only as opposed
18     to just classes with a transgender student?
19 A   That was my understanding, all my classes last
20     name only.
21 Q   Was it your understanding that you would not use
22     honorifics at all when addressing students? And
23     by that I mean "Mr." followed by the last name
24     or "Ms." and followed by the last name?
25 A   Yes, that was my understanding.

Page 69

1  Q   Did you understand this last-name-only
2      accommodation to only concern working hours?
3  A   If any time I saw a student at school -- and I
4      never saw students outside of school -- I think
5      my understanding would have been that any time
6      I'm at school I'm doing this, whether it's after
7      school, during school, before school, and I
8      never saw any students outside of school.
9  Q   Okay. And, Mr. Kluge, for what it's worth, I
10     think when you lean back we're losing you in
11     audio, so if you could just keep that in mind.
12 A   Okay. That's fine.
13 Q   To drive that home, you didn't understand that
14     Brownsburg with respect to this last-name-only
15     accommodation was trying to dictate how you
16     addressed people outside the classroom or
17     outside working hours; correct?
18 A   Correct.
19 Q   Did you begin teaching classes following this
20     meeting with Dr. Snapp and Jodi Gordon on July
21     31st?
22 A   I believe that I started teaching classes that
23     very day, July 31, for the first time that
24     school year. I had not seen any students prior
25     to that during the school year. The first time

JOHN M. KLUGE VS
BROWNSBURG COMMUNITY SCHOOL CORPORATION, et al.

JOHN M. KLUGE
November 17, 2020

---

Page 70

1 I saw students in the 2017/'18 school year was
2 after this meeting.
3 Q   Okay.  And at that point in time after you had
4 concluded this meeting with Dr. Snapp and Jodi
5 Gordon, is it fair to say that Brownsburg's
6 administrators were working with you in good
7 faith to find accommodation for your
8 sincerely-held religious beliefs?
9 A   To say they were working with me to find an
10 accommodation, I think, is not representing it
11 correctly.  I presented this accommodation and
12 they agreed to it.  Does that answer your
13 question?
14 Q   It does.
15 A   They never gave the accommodation.  That was the
16 one I gave to them and they agreed to it.
17 Q   Okay.  And I'm just asking for your point of
18 view, but, again, at this point in time after
19 you concluded this meeting with Dr. Snapp and
20 Jodi Gordon, is it fair to say that Brownsburg
21 administrators did not harbor animosity toward
22 you based on your religious beliefs?
23 A   I think we had reached an agreement.  I don't
24 know what they were thinking in terms of how
25 they felt towards me.  That would be to know

---

Page 71

1 what their thoughts were.
2 Q   Well, that's fair.  But, by the same token, up
3 to this point in time was there anything that
4 they said or did or made an outward
5 manifestation that you thought they were hostile
6 toward you based on your religious belief?
7 A   Yes, Snapp was very angry in the meeting on July
8 27.
9 Q   Anything else?
10 A   Not to my knowledge at this point.  I can't
11 remember anything particularly besides just the
12 -- hostile towards?  Can you say the question
13 again?
14 Q   Sure.  I think we're talking about whether you
15 believed at this point in time, again, the
16 conclusion of the meeting with Dr. Snapp and
17 Jodi Gordon on July 31st, whether there were any
18 outward manifestations, words, body language
19 from a Brownsburg administrator that made you
20 think they were hostile toward your religious
21 beliefs.
22 A   Oh, yeah.  I think the fact that they didn't
23 provide me -- that they were hesitant to provide
24 me with even this accommodation made me suspect
25 that they were hostile towards it.

---

Page 72

1 When Dr. Snapp got the okay when he asked
2 Gordon, "I don't know.  What do you think about
3 this?" and Gordon said, "Yes, this is fine," his
4 hesitation would have been showing me that he's
5 hesitant to give me this accommodation, that
6 he's hostile towards my beliefs, yes.
7 Q   Anything else you can think of that made you
8 think Brownsburg or Brownsburg administrator
9 might be hostile toward your religious beliefs
10 at this time?
11 A   In the July 27 meeting just Snapp arguing with
12 me that my beliefs aren't what's in the Bible
13 and me explaining what my beliefs are and
14 bringing in scripture and him saying that I'm
15 wrong.  So, like, yeah, he was angry and he was
16 telling me that my beliefs weren't correct, so
17 that would have been hostile, I guess, too.
18 Q   So you did have a conversation --
19 A   That was the Snapp and Daghe meeting on July 27
20 that I'm talking about when he was angry and he
21 was saying that my beliefs are wrong.
22 Q   Okay.  Can you elaborate on that?  It sounds
23 like you're having a discussion along religious
24 lines.  Is he providing you with his reasoning
25 of why he thinks your beliefs are wrong?

---

Page 73

1 A   He said why he thinks they're wrong and then I
2 would give a scripture of why I believe what I
3 believe.
4 Q   Do you recall what he said about why he thinks
5 that the belief was wrong?
6 A   I don't remember the particulars of it but just
7 that he was arguing that my beliefs were wrong.
8 If I remember anything, I'll let you know.
9 Q   Thank you.  Let's talk about you started to say,
10 as far as you recall, you resumed teaching
11 classes on July 31st of 2017; correct?
12 A   I believe so.
13 Q   Okay.  Forgive me.  There's a saying that, you
14 know, people who have graduated from high school
15 think they know everything about high school and
16 high school was half my life ago, so I'm
17 pleading ignorance, but I want to better
18 understand your teaching schedule during the
19 2017/2018 school year.  So maybe we could start
20 by just telling me what classes that you had in
21 a school day.
22 A   Sure.  I had three orchestra classes, a
23 beginning, an intermediate, and an advanced
24 orchestra.  I helped teach classes at the middle
25 school.  I helped the middle school teacher out.

---

Page 74

1  I also had a beginning music theory class and an
2  advanced placement music theory class, and some
3  semesters I would teach piano as well, piano
4  class.
5  Q  Did you teach piano during the 2017/2018 school
6  year?
7  A  I think so. I'd have to double check on that,
8  though.
9  Q  Okay. And then let's go through these one by
10  one. The orchestra, beginning, intermediate,
11  advanced, did you teach those during the
12  2017/2018 school year?
13  A  I did.
14  Q  The help at the middle school, I think you
15  testified already that you did that during the
16  2017/2018 school year; correct?
17  A  Correct.
18  Q  And the music theory and AP music theory, did
19  you teach those during the 2017/2018 school
20  year?
21  A  Correct.
22  Q  Was Brownsburg High School on semesters,
23  trimesters during the 2017/'18 school year?
24  Help me understand that.
25  A  They were on -- we had some classes that were

Page 75

1  one semester long and other classes that were an
2  entire school year long. Does that answer your
3  question?
4  Q  I think so. To the best of your recollection,
5  take me through your teaching schedule from
6  Monday to Friday.
7  A  I believe that I had the same classes each day
8  of the week to the best of my knowledge.
9  Q  And what's the progression from morning to
10  afternoon? I think you started to say that your
11  first classes might have been helping out at the
12  middle class?
13  A  I think so, yep.
14  Q  And then what would come next?
15  A  I don't recall. I think it even changed from
16  one semester to the next possibly, so half of
17  the year. I think they might have even switched
18  up the schedule, so I couldn't give you an
19  accurate account without looking back at my
20  schedule.
21  Q  That's fair. Let's talk a little more about the
22  orchestra classes, beginning, intermediate,
23  advanced. Did that level roughly correspond to
24  a student's age, freshman, sophomore, junior,
25  senior?

Page 76

1  A  The freshman class was the beginning. There's
2  all freshman and if you're not a freshman,
3  generally, you're not in that class.
4  Intermediate was comprised of 10th through 12th
5  graders and advanced was comprised of 10th
6  through 12th graders.
7  Q  With respect to the intermediate and advanced,
8  how was it determined which student would go
9  where? Would they just sign up based on what
10  level they perceive they're at or was there a
11  process where you helped determine which level
12  they were at?
13  A  Like the band, my program you auditioned in the
14  spring semester to get into the advanced
15  orchestra if you would like to be in the
16  advanced orchestra. If you make it past the
17  audition, then you're in. If you don't audition
18  or you don't have a good audition, then you're
19  in the intermediate orchestra.
20  Q  The two transgender students that we talked
21  about previously, Sucec and Willis, tell me all
22  the classes that you recall you taught them in
23  during the 2017/2018 school year.
24  A  Sucec was in my freshman orchestra. Willis was
25  not a transgender student according to the

Page 77

1  PowerSchool database until the end of September
2  2017 and then she was a transgender student at
3  that point and she was in my intermediate
4  orchestra.
5  Q  Approximately how large was each of your
6  orchestra classes?
7  A  About 30, maybe up to 40 students in each of
8  those orchestra classes.
9  Q  With respect to your orchestra classes, was
10  there a daily attendance or a roll call or
11  anything like that during the 2017/2018 school
12  year?
13  A  There was a daily attendance taken.
14  Q  How would that work?
15  A  On the first day I was in my classes, this would
16  have been July 31 of 2017, I called the students
17  one by one through the name of the alphabet
18  using last name only. I did not give an
19  explanation why I was doing it. I didn't draw
20  attention to myself as I was doing it. I just
21  started saying their names last name only. In
22  order to take attendance they would say "here"
23  or they wouldn't say anything if they were
24  absent.
25       And then later on in the school year, as I

Case 1:19-cv-02462-JMS-DLP   Document 120-3   Filed 03/15/21   Page 21 of 36 PageID #: 1260

JOHN M. KLUGE VS
BROWNSBURG COMMUNITY SCHOOL CORPORATION, et al.

JOHN M. KLUGE
November 17, 2020

Page 78

1   had a seating chart, I would just look to see
2   who was here and who wasn't.  I didn't need to
3   call their names anymore.
4  Q
5  Q   Okay.  So it's fair to say you did, I guess, a
6   roll call, for lack of a better term, the first
7   day; is that correct?
8  A   That's correct.
9  Q   And then do you think you did roll call for the
10   orchestra classes further or you just based
11   attendance on a seating chart?
12  A   I know that once I had a proper seating chart I
13   would just look and see who was there.  I don't
14   know if it was one day or two days that I did
15   roll call.
16  Q   Did you use a similar process in your other
17   classes, essentially starting with roll call and
18   then working toward a seating chart?
19  A   Exact same process.  Last name only in all my
20   classes.
21  Q   And other than the last name only, did this roll
22   call/seating chart, was that consistent in prior
23   years that you taught as well?
24  A   Say that question again.
25  Q   Yeah, it's poorly worded.  In prior years did

Page 79

1   you have a similar process for your classes,
2   namely you would start with roll call and then
3   eventually use a seating chart?
4  A   That's correct.
5  Q   The only difference being in prior years you
6   didn't have the last-name-only accommodation;
7   correct?
8  A   That's correct.
9  Q   During the 2017/2018 school year did anyone
10   other than a Brownsburg administrator ever make
11   you aware that parents or students had
12   complained about your use of last name only when
13   addressing students?
14  A   The Brownsburg administrators didn't tell me
15   that parents had complained about my use of last
16   name only.  The only time I was told that anyone
17   was complaining was they said students were
18   complaining and teachers were complaining that I
19   was using last name only.
20  Q   Okay.  Let me break that down further then.
21  A   Yep.
22  Q   During the 2017/2018 school year did anyone
23   other than a Brownsburg administrator ever make
24   you aware that students had complained about
25   your use of last name only when addressing

Page 80

1   students?
2       MR. CORK: Object to the form of the
3   question.  It's misleading.  You may answer if
4   you understand it.
5  A   Can you repeat the question?
6       MR. BORG: Repeat the question, Brandy.
7       (The reporter read back the previous
8   question.)
9       MR. CORK: Object to the form.  Assumes
10   facts not in evidence.
11  A   What I'll tell you is that in December of 2017
12   Daghe told me that students were complaining
13   that I was using last name only and I asked him
14   who, "Who is complaining?"  And he didn't tell
15   me who.  He just said, "Students."
16       MR. BORG: Okay.  We might come back to
17   that.  Let's pull up Exhibit G, Rita.
18  Q   Exhibit G is an eight-page document.  At the top
19   on Page 2 it says "To:  Brownsburg School
20   Corporation HR Director Jodi Gordon; From:  John
21   Kluge; Date:  Friday, May 25, 2018."
22       Mr. Kluge, are you familiar with this
23   document?
24  A   Let me look at it.
25  Q   Certainly.

Page 81

1  A   I am familiar with it.
2  Q   And you signed that at the last page; correct?
3  A   That is my signature.  I did sign it.
4  Q   Okay.  And then below your signature -- stay on
5   that page, please.  So you think you, in fact,
6   submitted that to Jodi Gordon on Friday, May
7   25th of 2018?
8  A   Yes, I did and the time stamp gives the exact
9   time that I submitted it.
10  Q   You prepared this document?
11  A   What did you say?
12  Q   You prepared this document?
13  A   That's right.
14  Q   And is it fair to say that in this document you
15   request two things, first, that Brownsburg allow
16   you to withdraw your resignation; and, second,
17   that they allow you to continue the
18   last-name-only accommodation?
19  A   I requested "that the school corporation
20   continue my employment and maintain the present
21   Accommodation that will allow me to continue to
22   perform my work, which I hope that you will
23   agree has brought positive recognition and
24   favorable results to the school."
25       Where are you seeing my requests?  It's my

Page 82

1 understanding -- Gordon led me to believe that I
2 was able to rescind that conditional resignation
3 on the condition that once May 29 hit it would
4 be submitted and processed but before that date
5 it was my right and it was the condition that I
6 could take that letter off of her desk.  So I
7 wasn't --
8 Q   You were requesting; right?
9 A   Yeah.  I was stating that I have decided thank
10 you for this time to let me think about this, I
11 have decided not to resign, you can take that
12 letter and put it in the trash effectively.
13 Q   And that's why, I guess, the title, for lack of
14 a better term, at the top of Page 1 says
15 Withdrawal of Intention to Resign and Request
16 for Continuation of Accommodation; correct?
17 A   That's correct.
18 Q   The accommodation you're referring to in that
19 title, for lack of a better term, is the
20 last-name-only accommodation; correct?
21 A   That is correct.
22 Q   Okay.  And in this document you also provide a
23 timeline of some of the events that transpired
24 dating back as far as the 2016/2017 school year;
25 is that correct?

Page 83

1 A   That is correct.
2 Q   Look at the entry, the bullet point entry, for
3 December 13th of 2017.
4 A   December, okay.  So it continues to the next
5 page.  I'm there.
6 Q   Do you see the first paragraph of that -- well,
7 let's be clear.  That December 13, 2017 bullet
8 point is, I believe, three paragraphs.  Will you
9 flip to the next page?
10 A   It looks like it's four.
11 Q   Four.  I do think it's four paragraphs.  The
12 first paragraph, I think you started to testify,
13 are you describing the first time Daghe
14 referenced student complaints with respect to
15 the last-name-only accommodation?
16 A   Let me look at that entry.
17 Q   Take your time to read it.
18 A   Thank you.  Okay.  I read that entry, December
19 13, 2017.  Go ahead, Brent.
20 Q   Okay.  Is that first paragraph on the December
21 13, 2017 an accurate report of what Bret Daghe
22 conveyed to you regarding student and faculty
23 concerns?
24 A   Faculty concerns, yes, it's what he told me,
25 yep.

Page 84

1 Q   That's an accurate report of what he told you
2 when the two of you met on December 13th, 2017?
3 A   Yes, that is what he told me.
4 Q   Okay.  In the first paragraph you state that
5 Daghe told "me that my last-name-only
6 Accommodation was creating tension in the
7 students and faculty."  Do you see that?
8 A   Yes.
9 Q   Is it fair to say that this meeting was the
10 first time you heard that there were concerns
11 amongst students and faculty about the
12 last-name-only accommodation?
13 A   This is the first time that I had heard any
14 complaints about my last-name-only
15 accommodation.
16 Q   Okay.  Up to this point you hadn't heard
17 complaints from anyone; correct?
18 A   Correct.
19 Q   What is the second paragraph referencing or
20 about?
21 A   So this is not about my last-name-only
22 accommodation.  This second paragraph is Daghe
23 trying to blame my religion as the reason why a
24 student's parent complained about a policy for a
25 hair color that everybody else in my music

Page 85

1 department had.  They had the same exact hair
2 color policy.  I wasn't doing anything
3 differently for this particular student than I
4 was for my other students and I wasn't doing
5 anything as regard to this policy different than
6 any of the other teachers in my department and
7 Daghe was telling me that it's because of my
8 religion.  He's blaming my religion on why
9 parents complained about a hair color policy for
10 the entire music department.
11 Q   Okay.  Is it fair to say in that second
12 paragraph he's referencing a parent complaint
13 that is not related to the last-name-only
14 accommodation; correct?
15 A   That's correct.
16 Q   Okay.  Go to the next page.  What's that, I
17 guess, third paragraph that's a single sentence
18 at the top referring to?
19 A   The same hair color policy.
20 Q   Which, again, is, as far as you're concerned,
21 unrelated to the last-name-only accommodation;
22 correct?
23 A   Unrelated, correct.
24 Q   Thank you.  And then the last paragraph, we'll
25 get into it, but you provide some detail on how

Page 86

1 you responded to Principal Daghe making you
2 aware of these situations?
3 A   Yes.
4 Q   Okay.  Is there anything else you recall about
5 this meeting with Bret Daghe from December 13th,
6 2017 that's not included in this document?
7 A   Just that when I asked him who is complaining
8 against me, what's their complaint, he just said
9 you using last names only for all your students
10 is creating complaints among many students.  And
11 I asked him who and he didn't tell me any names
12 and I didn't hear any names for that meeting or
13 subsequent meetings with the administration.
14 They didn't tell me who, they didn't give me any
15 name.  Go ahead.
16 Q   Did Principal Daghe explain to you why he wasn't
17 providing specific names?
18 A   He didn't.  He just said a lot of people.
19 Q   Up to this point how would you describe your
20 professional relationship with Bret Daghe?
21 A   Up to this point we had an okay working
22 relationship until he decided to be forcing me
23 out of my job and then our relationship declined
24 at that point.
25 Q   As you sit here today, do you think Bret Daghe

Page 87

1 is an honest person?
2 A   Based on things that I have seen come out of the
3 lawsuit, I think there are things that are being
4 misconstrued or fabricated from multiple parties
5 in the administration.
6 Q   And does that have any bearing on whether or not
7 you think he's an honest person?
8 A   If someone is dishonest, then they're not an
9 honest person.
10 Q   I would agree with that.  I think I'll ask it
11 again because you haven't responded.  As you sit
12 here today, do you think Bret Daghe is an honest
13 person?
14 A   The reason I'm -- I'd like to say no, he's not
15 an honest person if he was saying things that
16 are untrue and I'll be talking later about
17 things that are untrue, so I can't bring up
18 every little detail of things that were
19 misconstrued.  If I say he's an honest person,
20 that's a blanket statement that I think that
21 what he's saying is true and you're gonna use
22 that against me, so I'm not gonna say he's an
23 honest person.  I will say that there are
24 certain things coming from multiple people in
25 the administration that are not true and I'll

Page 88

1 leave it at that.
2 Q   That first paragraph on the December 13th bullet
3 point.
4 A   Yep, go ahead.
5 Q   When Bret Daghe shared that information with you
6 about student and faculty concerns, did you
7 think he was lying and making it up?
8 A   I suspected.  That's why I asked who and he
9 didn't tell me who.  I did not witness any
10 faculty animosity toward me.  I was still eating
11 lunch with my music faculty and we seemed to get
12 along great.  I rarely interacted with any other
13 faculty besides the performing arts faculty, so
14 nothing seemed out of the ordinary.  And, so,
15 regarding the faculty, I didn't witness anybody
16 avoiding me.  And, regarding the students, he
17 didn't tell me any names even when I asked him,
18 so I suspected that this seems fishy.
19 Q   As you sit here today, do you think he was lying
20 or making up the information --
21 A   I do.
22 Q   What specifically do you think he lied about or
23 made up?
24 A   I think the student complaints.  He continually
25 told me in that meeting that he had received

Page 89

1 student complaints.  He said there were lots of
2 students and yet I haven't seen things produced
3 that show that there were lots of students
4 complaining.  I think there's been evidence of
5 one student complaining maybe.  So, as far as
6 I'm concerned, if he's not giving names, then he
7 could have been fabricating, could have been
8 misinformed himself, or it could have been
9 exaggerating.  I don't know.
10 Q   Other than him not providing you the names at
11 the time you met, is there anything else that
12 leads you to believe that he was lying or making
13 things up with respect to student complaints?
14 A   Well, he says that it's creating tension in the
15 students and faculty.  I did not witness this
16 tension.  My classes were performing very well
17 during that school year.  The students were
18 responding well to my teaching.  I didn't see
19 animosity from students towards me, and, so, to
20 say that there was tension, I didn't experience
21 that myself.
22     We performed better than ever in our
23 orchestra competitions.  Students' grades on
24 their AP exam were great.  There was a lot of
25 participation in the extracurricular programs, a

Case 1:19-cv-02462-JMS-DLP   Document 120-3   Filed 03/15/21   Page 24 of 36 PageID #: 1263

JOHN M. KLUGE VS
BROWNSBURG COMMUNITY SCHOOL CORPORATION, et al.

JOHN M. KLUGE
November 17, 2020

Page 90

1  lot of students performing in the voluntary
2  extra stuff that you can do in orchestra.  So,
3  yeah, that was suspect, too, the fact that it
4  wasn't my experience of this tension.
5 Q  Flip to the next page to the fourth paragraph on
6  this December 13th meeting.  I think we started
7  and as far as we got is that this paragraph
8  reports, I guess, your response to Daghe during
9  this meeting; is that fair?
10 A  It's my response to the hair color paragraph,
11  that if it's true, Daghe, that I'm being singled
12  out for my religion, then I guess that's a
13  positive that -- the fact that I'm pushing for
14  equal treatment of all students and not pushing
15  an agenda.  And he says I'm being singled out
16  for my Christian witness.  Well, that's a sign
17  that I should continue to endeavor to keep
18  calling all my students by the same treatment,
19  the same last name only, and it's working.  It
20  was a sign to me that I should not give up, that
21  I should continue treating all my students
22  equally.
23 Q  The first sentence says, "I explained to Daghe
24  that this persecution and unfair treatment I was
25  undergoing was a sign that my faith as witnessed

Page 91

1  by my using last-names-only to remain neutral
2  was not coming back void, but was being
3  effective."  What do you mean by that?
4 A  If I'm endeavoring to be fair and I'm having
5  false accusations railed against me, well, then
6  I should keep on endeavoring to be fair.  That's
7  what that means.  If I'm trying to remain
8  neutral on an issue and I'm being attacked,
9  well, that's a sign that I should keep on
10  endeavoring to be neutral.
11 Q  Then you say, "He didn't seem to understand why
12  I was encouraged."  What do you mean by that?
13 A  He didn't understand why I would continue -- why
14  I was encouraged to continue pursuing neutrality
15  with last name only.  If there was people
16  complaining about hair color policy while they
17  didn't complain about other teachers for the
18  hair color policy, he saw that as unfair
19  treatment of me.  And if it was unfair treatment
20  of me, then that's a sign that I should continue
21  pursuing neutrality and I shouldn't give up this
22  work.
23  As I say in the last sentence there or the
24  second to last sentence, "He said he thought it
25  might be good for me to resign at the end of the

Page 92

1  year."  That's what I'm talking about.  He
2  thought, "Oh, John, you're being singled out
3  even though your policies are the same as other
4  teachers.  You should quit."
5  I said, "No, if I'm being singled out, it's
6  a sign that I shouldn't give up pursuing
7  neutrality with last names only."
8 Q  Are you using the phrase "pursuing neutrality,"
9  that's in reference to the last-name-only
10  policy?
11 A  Right.  I'm not pushing my religion on people
12  and I'm not encouraging the sinful behavior of
13  my students.  I'm neutral.  Last name only, I'm
14  able to teach my content without conceding my
15  own beliefs and without (audio malfunction) my
16  beliefs on others.
17 Q  During the December 17th, 2017 meeting with
18  Daghe, did you propose any further
19  accommodation?
20 A  Why would I?  The accommodation was working and
21  he didn't tell me -- he didn't tell me that I
22  would be needing any other one.  Why would I
23  need another accommodation if I already had an
24  accommodation for my beliefs that was working?
25 Q  Well, correct me if I'm wrong, but I think he's

Page 93

1  relaying to you that there's some
2  student/faculty concerns with respect to the
3  last-name-only accommodation; correct?
4 A  He's telling me that there are student and
5  faculty complaints, a heckler's veto, but the
6  law says that unless there's undue hardship
7  shown, which none was shown, that an employee is
8  entitled to a reasonable accommodation and it
9  was reasonable, so there is no reason to need
10  another accommodation.  This one was reasonable
11  and he didn't show me -- I got no written
12  document showing any undue hardship, so it was a
13  valid accommodation that worked.  It was
14  reasonable and so why would I pursue something
15  else?
16 Q  Okay.  In light of the student and faculty
17  concerns that Daghe had shared on December 13th,
18  2017, you thought it was appropriate to continue
19  the last-name-only accommodation?
20 A  You say concerns; he said creating tension.
21 Q  Tension, concern, complaint, issues among
22  student and faculty.
23 A  Yes, it was appropriate to continue using
24  last-name-only accommodation, yes.
25 Q  And I guess my question is how do you reconcile

JOHN M. KLUGE VS
BROWNSBURG COMMUNITY SCHOOL CORPORATION, et al.

JOHN M. KLUGE
November 17, 2020

---

Page 94

1 that with the fact that he is sharing that there
2 are student/faculty tension, complaint, concern,
3 et cetera?
4 A   That's not undue hardship.  It's a reasonable
5 accommodation.  He showed me no undue hardship.
6 It's a heckler's veto.  And he didn't even
7 identify any names of who was complaining.  For
8 all I knew, he could be making it up.
9        Let's say that a teacher had some other
10 accommodation, they take off for a Hindu holiday
11 and a student complains.  Is that accommodation
12 for them taking off work for that Hindu holiday
13 now unreasonable?  No, that's a heckler's veto.
14 So, if it's a reasonable accommodation and he
15 hasn't shown undue hardship, why would I change?
16 Q   Do you think he was required to tell you the
17 names of the student and faculty for it to
18 potentially be undue hardship in your view?
19 A   I think so, yes.
20 Q   That would have been a start for continuing the
21 discussion, I guess?
22 A   I don't think it would have been undue hardship
23 in itself.  It would have been a complaint.  He
24 would've had to show undue hardship that this is
25 not reasonable.

---

Page 95

1 Q   The next meeting you reference in this document
2 is between you and Daghe on January 17th, 2018.
3 Do you see where you state that Daghe wanted to
4 see you resign at the end of the school year?
5 A   Let me read it.
6 Q   Fair enough.
7 A   Okay.  I've read it.  Go ahead.
8 Q   Again, the reference where you state Daghe
9 wanted to see you resign at the end of the
10 school year, do you see that?
11 A   "He really wanted to see me resign at the end of
12 this school year," yes, I see that.
13 Q   Okay.  To your knowledge, is that because of the
14 student and faculty concerns about the
15 last-name-only policy?
16 A   Yes, because of the complaints he alleged he had
17 received.
18 Q   You go on in the January 17 bullet point.  You
19 state that you responded and referenced "tension
20 and conflict."  Do you see that?
21 A   "He didn't like the tension and conflict," I see
22 that.
23 Q   What tension and conflict are you referring to?
24 A   The purported tension and conflict that he
25 claimed there was.  It was not that I really

---

Page 96

1 witnessed this.  I'm just hearing it from him
2 and I'm telling him if there is tension and
3 conflict, well, that's encouragement that I
4 shouldn't quit but I should continue to pursue
5 neutrality.
6        MR. BORG: Let's take a break.
7        (A recess was taken.)
8 DIRECT EXAMINATION CONTINUING,
9        QUESTIONS BY BRENT R. BORG:
10 Q   Mr. Kluge, let's stay on Exhibit F, I believe.
11 A   Wait a second.  That's Exhibit G.
12 Q   It's G.  I'm mistaken.
13 A   Okay.  Go ahead.
14 Q   Let's go to the next page.  There should be a
15 bullet point for a meeting on February 6th of
16 2018.
17 A   Okay.  I see it.
18 Q   That references a meeting you had on the date
19 indicated with Bret Daghe and Jodi Gordon;
20 correct?
21 A   That's correct.  Can I read that first?
22 Q   Certainly.  Let me know when you're ready for
23 the question.
24 A   Alright.  Go ahead, Brent.
25 Q   You audio recorded this meeting with Bret Daghe

---

Page 97

1 and Jodi Gordon on February 6th of 2018; is that
2 correct?
3 A   That's correct.
4 Q   Did you tell Bret and Jodi that you were
5 recording the meeting?
6 A   I did not.
7 Q   Why not?
8 A   Because I was afraid of them.  In the January
9 '17 meeting Daghe is telling me that he didn't
10 say it plainly enough but he really wants me to
11 resign at the end of this school year.  I took
12 that as hostile.  It was distressing to hear my
13 administrator say he wants me out of here, and I
14 did not trust him.  I did not trust my HR
15 director and I was afraid.  It was mentally and
16 emotionally distressing and I didn't trust them.
17 That's why I didn't tell them I was recording
18 it.  I wanted some protection from them in case
19 they lied about what they were telling me.
20 Q   And you also audio recorded another meeting with
21 Daghe and Gordon in March of 2018; is that
22 correct?
23 A   That's correct.
24 Q   Why didn't you record --
25 A   Can you say that last question?  The March 15

---

Case 1:19-cv-02462-JMS-DLP Document 120-3 Filed 03/15/21 Page 26 of 36 PageID #: 1265
JOHN M. KLUGE VS
BROWNSBURG COMMUNITY SCHOOL CORPORATION, et al.
JOHN M. KLUGE
November 17, 2020

Page 98

1    was that Gordon and myself.  Is that what you
2    said?
3  Q   No.  I'll rephrase.  So the March 15, 2018 is
4    the meeting that you audio recorded?
5  A   I did and it was just Gordon and myself.
6  Q   Thank you.  And I think I previously stated that
7    I thought Daghe was in that meeting but you're
8    saying he was not?
9  A   He was not.  On February 6th it's Jodi Gordon,
10   Daghe, and myself, and then on March 15th it's
11   just Gordon and myself.
12 Q   Why didn't you audio record the prior meetings
13   with Daghe, specifically December 13th of 2017
14   and January 17 of 2018?
15 A   Because there was no reason to.  I thought
16   things were -- I thought that they weren't going
17   to -- I wasn't afraid of them to be lying about
18   me and to be discriminating against me, but when
19   I heard that Daghe really wanted me to resign at
20   the end of the school year and then when I hear
21   on January 22 that the school district is not
22   going to allow a last-name-only approach from
23   teachers starting the 2018/'19 school year,
24   which I say is discrimination, when I see these
25   things, my administrator hostilely telling me

Page 99

1    that he wants me gone and a faculty meeting
2    where they're telling me teachers are not going
3    to be allowed to use last name only starting
4    next school year 2018/'19, I'm feeling
5    threatened.  I didn't feel threatened before
6    these meetings and so that's why I didn't record
7    them.  I didn't think they were out to get me
8    like they were.
9  Q   I think you already said it, but, to be clear,
10   during the, for example, February 6, 2018
11   meeting, did Gordon and Daghe inform you that
12   you could continue using the last-name-only
13   accommodation until the end of the current
14   school year but after that it would no longer be
15   available?
16 A   That was all of -- that was what they told me.
17 Q   At the February 6, 2018 meeting?
18 A   Yes.
19 Q   Was it also reiterated at the February 6, 2018
20   meeting that students had complained about the
21   last-name-only accommodation?
22 A   They, again, purported that students were
23   complaining and they still didn't identify
24   anybody.
25 Q   Similar nature to what Daghe had shared with you

Page 100

1    on December 17th of 2017?
2  A   That's correct.
3  Q   And they also gave you three options at the
4    February 6, 2018 meeting.  Namely those three
5    were, first, resign; second, continue to use the
6    last-name-only accommodation in which case
7    Brownsburg would initiate termination
8    procedures; or, third, stop using the last-name
9    only-accommodation.  Is that a fair
10   characterization of the options?
11 A   Yeah, they told me either in 2018/'19 school
12   year start using transgender first names or
13   resign, except they didn't say resign.  They
14   said -- they misconstrued material information.
15   They didn't tell me resign.  They said the
16   option was I could give to Jodi a conditional
17   resignation that wouldn't be processed until a
18   date I specified, that she had done that in the
19   past, that she had held onto resignations and
20   not processed them before and she would honor
21   any such requests.
22     And, so, the ultimatum was either comply in
23   the 2018/'19 school year and agree to do it
24   right now, agree that you will comply in the
25   2018/'19 school year or be fired or give me a

Page 101

1    piece of paper that won't be processed until a
2    date you specify.  You have until that time to
3    think about it but I want the piece of paper on
4    my desk, effectively.  And she clarifies in
5    March meeting what that looks like and she
6    specifies in the February meeting and the March
7    meeting that I will be paid over the summer if
8    you give me this conditional resignation.
9      She leads me to believe that I am allowed
10   to do this but then later doesn't honor it.  And
11   she says if you don't give me this conditional
12   resignation, then you will be fired May 1st of
13   2018.  And that's in my e-mail to her where I
14   tell her the conditional resignation letter, I
15   say do not process this or show it to any
16   administrator until May 29.  And, so, it's my
17   understanding she's not going to submit it to
18   Dr. Snapp as a resignation letter until May 29
19   and I have until then to be able to take it off
20   her desk and say, actually, no, I've decided to
21   continue teaching.
22     Instead of that, on May 25 when I give her
23   this rescission of intent to resign letter to
24   take that resignation letter off her desk saying
25   thank you for the time you've given me to think

Case 1:19-cv-02462-JMS-DLP   Document 120-3   Filed 03/15/21   Page 27 of 36 PageID #: 1266

JOHN M. KLUGE VS
BROWNSBURG COMMUNITY SCHOOL CORPORATION, et al.

JOHN M. KLUGE
November 17, 2020

---

Page 102

1   about this, instead of honoring that request
2   which she said I will honor, I won't process it,
3   I won't show it to any administrator, instead of
4   honoring that request where she led me to
5   believe that she would honor it, she instead
6   processes this conditional resignation as if it
7   was given unconditionally.  She submits it to
8   Snapp and, therefore, she's mischaracterizing or
9   misrepresenting material information, that she
10  did not intend to actually allow me to have a
11  conditional resignation, the condition being I
12  could take it off her desk before May 29.
13 Q  We'll get to that in a moment, but thank you for
14     that.
15 A   Yep.
16 Q   Was it your understanding around the time of
17     February or March that there was a process to go
18     through to terminate your employment as a
19     teacher as opposed to just saying you're fired
20     and that's it?
21 A   Yes.  She said in the February and March
22     meetings that my termination process would begin
23     May 1 and would be finished when the school year
24     ended and it would be a contract cancellation
25     and if I gave them a resignation letter, then I

---

Page 103

1   would be paid over the summer.
2  Q  Did you understand that that termination process
3     included a hearing before the board?
4  A   I did not understand that.
5  Q  Did you understand that that termination process
6     had a right to present evidence?
7  A   I did not.
8  Q  Did you understand that that termination process
9     gave ultimate discretion to the board to decide
10    whether or not to cancel your employment?
11 A   I did not.
12 Q   And I think previously you testified that you
13     haven't consulted with laws passed by the
14     Indiana General Assembly that pertain to teacher
15     termination; correct?
16 A   Right.  I was trusting what she said was what
17     would happen.
18     MR. BORG:  Let's go to Exhibit H, Rita.
19 A   First, Brent, when you say I would have a right
20     to present material information or whatnot to
21     state my case, no, I was not aware of that.  I
22     might have been aware that the board would
23     approve the termination.  I don't know or not.
24 Q   You don't know one way or the other?
25 A   Yeah, I don't know if I was aware of that or

---

Page 104

1   not.  It wasn't significant in my mind.  I
2   thought that termination was termination and
3   they were going to process it.  It was just an
4   administrative type deal that was going to
5   happen, if that makes sense, that I wasn't
6   (audio malfunction) to present evidence.  Does
7   that make sense?
8  Q   It does.  Let's go to H.
9  A   H, okay.
10 Q   And I think you're kind of anticipating my next
11     question, but, just so we're clear, this is a --
12     I don't want to put words in your pain.  I know
13     you're taking pains -- a conditional resignation
14     you submitted via e-mail to Jodi Gordon dated
15     April 30 of 2018; correct?
16 A   Yes.
17 Q   Why did you opt to send this e-mail to Jodi
18     Gordon as opposed to the other option of
19     termination?
20 A   I have a family to feed and to be terminated
21     before the school year is out and to lose my job
22     and to not get paid was effectively putting a
23     gun to my head and saying if you want to get
24     paid, you have to put this piece of paper on my
25     desk.  You have to give me this conditional

---

Page 105

1   resignation.  You have until a date that you
2   specify to make your final decision but I need
3   this paper sitting on my desk if you want to get
4   paid and not be terminated before the school
5   year is up.
6  Q   On Exhibit H, look at the first sentence of the
7     last paragraph.
8  A   Yep.
9  Q   You write, "Please do not process this letter
10    nor notify anyone, including any administration,
11    about its contents before May 29, 2018."  What
12    did you mean by "Please do not process"?
13 A   Don't submit it as a letter of resignation,
14    don't give it to Snapp.  This is not me
15    resigning.  This is a piece of paper on your
16    desk and if I decide before that time that I've
17    made my final decision to continue employment
18    here, you can take that piece of paper off your
19    desk.
20 Q   Submit it to whom?
21 A   To Snapp.
22 Q   Okay.
23 A   That's why I say "including any administration."
24    Snapp is the head administrator.  If it gets to
25    him and it's submitted to him, that's submitted,

JOHN M. KLUGE VS
BROWNSBURG COMMUNITY SCHOOL CORPORATION, et al.

JOHN M. KLUGE
November 17, 2020

Page 106

1    but if it's a piece of paper laying on her desk
2    that can be thrown away, that's not submitted.
3 Q  In your prior communication with Jodi Gordon,
4    did she explain to you that she would have to
5    share a resignation with Bret and Dr. Snapp?
6 A  She did not share that she would have to. She
7    said that she would honor any requests and, on
8    the contrary, when I asked her not to show this
9    to anybody including any administrator, she
10    agreed to that. So, if she was never intending
11    to acquiesce that request, then she should have
12    said so, but she agreed to not show it to any
13    administration. So, if she intended fully on
14    showing it to the administration, then she was
15    lying and misrepresenting what she was going to
16    do with this conditional letter.
17 Q  Do you recall that Jodi Gordon replied to this
18    e-mail?
19 A  I do recall that.
20 Q  And do you recall that her reply included a
21    reference that she would not show the e-mail to
22    any BHS administrator?
23 A  Yes, and as part of not showing it to any
24    administration, she agreed to my request and
25    also said I won't process this and show it to

Page 107

1    any BHS administration, but she agreed to my
2    request which says "any administration."
3 Q  Well, did you understand her reference to a BHS
4    administrator to mean any Brownsburg High School
5    administrator but not a Central Office
6    administrator such as Dr. Snapp?
7 A  I did not understand. If that was her intention
8    in that e-mail, then I did not understand it
9    that way. I understood her reply to mean she
10    would do my request and not show it to any
11    administration and she would not process it
12    including the BHS but not limited to the BHS
13    administration. It wasn't a qualifier of her
14    agreement to accept my request. It was just a
15    for example.
16 Q  So, just to be clear, when you saw in Jodi
17    Gordon's reply that she wouldn't show to any BHS
18    administrator, you never reached out to her
19    further to express concern about her reference
20    to BHS administrator as opposed to any
21    administrator?
22 A  No, I understood that -- she didn't say "namely
23    BHS administration." She said -- do you have
24    the exact reply that we're talking about? Is it
25    one of these exhibits?

Page 108

1 Q  It is not.
2 A  Do you have it handy?
3       MR. BORG: Yeah, we can take five and pull
4    it up. I knew you were gonna ask that. Let's
5    go off the record. I'll track it down.
6       (A recess was taken.)
7 DIRECT EXAMINATION CONTINUING,
8    QUESTIONS BY BRENT R. BORG:
9 Q  Thank you for referencing Plaintiff's 17. This
10    is the e-mail we've been discussing. I guess
11    I'll restate my question, Mr. Kluge, now that
12    you have the benefit of this e-mail, but it was
13    really to the effect of if Jodi Gordon
14    referenced BHS administration in this e-mail,
15    whether you reached out to her further to
16    express concern about her reference to BHS
17    administration as opposed to any Brownsburg
18    administrator.
19 A  I took this, her saying "I will honor your
20    request," to mean I will honor your request.
21    And it's a compound sentence, not process this
22    letter, share it with BHS administration. That
23    did not change her honoring my request or her
24    obligation to honor my request to not process
25    it, not send it to Snapp for (audio malfunction)

Page 109

1    process of resignation. It was just to be a
2    piece of paper on her desk for her to hold it
3    until the date I specified as she led me to
4    believe that I could do.
5 Q  Thank you. Was your last day of classes May
6    25th of 2018?
7 A  I believe it was.
8 Q  And I understand there may have been a couple
9    more days after that where faculty entered the
10    building but they weren't teaching classes; is
11    that correct?
12 A  That's correct.
13 Q  Do you know if that was one day or two days or
14    three days?
15 A  Maybe one or two.
16 Q  Okay. What are the purpose of those days?
17 A  The purpose of those days is to finish your
18    grading and organize any paperwork you need to.
19 Q  After May 25th of 2018, is it fair to say that
20    you had no further teaching responsibilities for
21    the 2017/2018 school year?
22 A  I wouldn't tie it to a date. Once I finished my
23    grading which I did -- I'm not exactly sure when
24    I finished the grading, if it was on the 25th or
25    if it was on the 26th, but once I finished my

JOHN M. KLUGE VS
BROWNSBURG COMMUNITY SCHOOL CORPORATION, et al.

JOHN M. KLUGE
November 17, 2020

---

Page 110

1 grading and closed up my classroom, I didn't
2 have any more responsibilities.  I actually got
3 locked out before I was able to finish that.
4 Q  What is that, your grading or your classroom or
5 both?
6 A  At least closing up the classroom, maybe grading
7 as well.
8 Q  Is there any reason you would have needed a
9 Brownsburg e-mail account after May 25th of
10 2018?
11 A  To communicate with the administration, to
12 communicate with other teachers, communicate
13 with parents as regards students.  I mean, the
14 same purpose that I would need it before that
15 date, too.
16 Q  I think you might have said, but as of May 25th
17 of 2018, had you finished all your grading
18 responsibilities?
19 A  I don't know that to be a fact.  I don't know if
20 I finished my grading responsibilities on the
21 25th, 26th, 27th.  I could not definitively say.
22 Q  Is there any reason you needed access to the
23 building after May 25th of 2018?
24 A  Yes, to close up my classroom and potentially to
25 finish grading.  I actually had not closed up my

---

Page 111

1 classroom and there was still papers lying
2 around that needed to be filed and instruments
3 that needed prepped for the summer and -- yeah.
4 Q  You participated in a hearing before the board
5 in June of 2018; is that correct?
6 A  I wouldn't call it a hearing.  I tried to make
7 it a hearing but it wasn't.
8 Q  I'm sorry.  A board meeting in June of 2018;
9 correct?
10 A  What was your question?
11 Q  I interrupted you.  I'm sorry.  I need to
12 rephrase my question.  You participated in a
13 board meeting in June of 2018; is that correct?
14 A  Participate is a strong word.  I expressed as a
15 member in the community comment section, I
16 pleaded with them to -- I had asked to
17 participate in the meeting and they ignored that
18 request.  And then in the
19 let's-hear-from-the-community section, I then
20 expressed my claims of discrimination and
21 pleaded with them to reconsider reinstating me
22 and to let me continue working in the school.
23 Q  And you say that was during the community
24 section of the board meeting?
25 A  Right.

---

Page 112

1 Q  It's fair to say that there's essentially an
2 opportunity for public comment, anybody can
3 submit their name and they're allotted an amount
4 of time; is that fair?
5 A  That's right.  And they didn't respond.  They
6 just heard me and then the next person.  They
7 said, "Alright.  Next person."
8 Q  Okay.  And you just testified to some things
9 that you shared during your allotted time;
10 correct?
11 A  Yes, namely a brief account of what had
12 transpired the previous year and a plea that
13 they would let me teach there.
14 Q  Did you also request that they, I guess, not
15 accept or rescind your resignation or allow you
16 to withdraw it, something along those lines?
17 A  To the effect of let me teach here next year.
18 This was not -- this was coerced.  This was not
19 legitimate.  This was retaliatory.
20    I'd have to look at a tape to see what I
21 exactly said but something to the effect of let
22 me teach here and don't process the resignation.
23 Please, yeah, rescind it.  Please let me teach
24 here.  That was not a valid resignation.  It was
25 coerced.

---

Page 113

1 Q  Do you also recall during the meeting that many
2 people were allowed to address the board and
3 show their support for you?
4 A  I recall that many people were allowed to speak.
5 Q  Approximately how many people do you think
6 showed support for you at the board meeting?
7 A  That would be a guess.  I'm not gonna guess.
8 There were I would say many people who showed
9 support, but I'm not gonna guess.  It would be a
10 wild guess.
11 Q  You don't need to.
12 A  I was pretty distressed at the time.  I wasn't
13 paying attention to numbers.
14 Q  Do you recall also that some people addressed
15 the board who did not support you?
16 A  Yes, I was aware.
17 Q  Same question if you know.  You don't need to
18 guess.  Approximately how many people do you
19 think that was?
20 A  Fewer than showed support.
21 Q  Are you aware that the June 2018 board meeting
22 was recorded?
23 A  I was aware that there were news cameras.  What
24 do you mean recorded?
25 Q  Media recordings.

---

Case 1:19-cv-02462-JMS-DLP  Document 120-3  Filed 03/15/21  Page 30 of 36 PageID #: 1269

JOHN M. KLUGE VS
BROWNSBURG COMMUNITY SCHOOL CORPORATION, et al.

JOHN M. KLUGE
November 17, 2020

Page 114

1 A    Yep.
2 Q    Are you also aware that after the board had
3    received this information from you and others it
4    voted 5/nothing to accept your resignation?
5 A    Restate that question. Am I aware what?
6 Q    Are you also aware that after the board had
7    received this information you just testified
8    from you and others it voted 5/nothing to accept
9    your resignation?
10 A    That's not what happened in my understanding.
11 Q    Okay. What is your understanding?
12 A    My understanding is that they already received
13    my resignation and then the community section
14    happened. I was not allowed to speak and
15    address the board in the meeting. They ignored
16    my requests and near the beginning of the
17    meeting they processed the, quote/unquote,
18    "resignation," and then after that people from
19    the community were allowed to speak. That's my
20    recollection. If I saw a videotape or saw the
21    minutes from the meeting, I believe it would
22    show that.
23 Q    During the 2017/2018 school year did any
24    Brownsburg administrator direct you to use a
25    transgender student's preferred pronoun when

Page 115

1    addressing that student?
2 A    No, not during the school year. They said you
3    would have to do it -- now, okay, that's a
4    general -- yeah, of course, in July 27 of 2017
5    Snapp did say that or else I would be fired, so,
6    yes, they did direct me to use transgender
7    pronouns or else I would be fired. That's a
8    very broad questions. A lot of things happened
9    and, yes, Snapp did tell me I had to use
10    transgender pronoun or else I would be fired.
11 Q    Okay. Other than Snapp stating that on July
12    27th, any other time that you can think of?
13 A    Any time before?
14 Q    Any time during the 2017/2018 school year.
15 A    Can you narrow it down? Can we narrow it to
16    starting with when the last-name accommodation
17    went into effect and, from that time forward, I
18    was allowed to use the last-name accommodation
19    and was not directed to use pronouns except
20    coming from the guidance counselors. When they
21    would announce students in your classes, they
22    would say feel free to use he, him, his and I
23    was using last names anyway. And, so, when I
24    saw things like that, I was able to continue
25    using my accommodation and I was able to

Page 116

1    continue using the accommodation without going
2    against their directive or their suggestion.
3 Q    Is it fair to say the last-name-only
4    accommodation began on July 31st of 2017?
5 A    That's correct.
6 Q    Okay. And these "feel free to use" references
7    that you received from guidance, did any of
8    those occur after July 31st of 2017?
9 A    Yeah. To my knowledge, I got an e-mail late
10    September of 2017 that Willis had switched in
11    PowerSchool from female to male.
12 Q    Okay. Any others that you can think of after
13    July 31st of 2017?
14 A    No, no more of my students switched in
15    PowerSchool. Was that the intent of your
16    question? Any more guidance counselor e-mails
17    saying use these pronouns? Is that what you're
18    asking?
19 Q    Yes, I think you've answered my question.
20 A    Okay.
21    During the 2017/2018 school year did Brownsburg
22    ever require you to make positive statements
23    regarding transgender students' lifestyles?
24 A    Require me to make positive statements? When
25    they required me to use their transgender first

Page 117

1    names, yes, they were requiring me to make
2    positive statements about their lifestyle.
3 Q    Okay. And they would have required that before
4    the last-name-only accommodation on July 31st of
5    2017; correct?
6 A    They did require that before the July 31
7    meeting, yes.
8 Q    But they did not require that after?
9 A    They did require it after when they said that
10    you have to agree to do this. Let's go back to
11    -- do I have control of the documents here?
12    Okay. Exhibit G in the February 6, 2018
13    meeting and the March 5th, 2018 meeting they
14    tell me either I need to agree to use
15    transgender first names or submit this
16    conditional resignation or be terminated before
17    the school year is up, so I would say that is
18    them telling me, yes, you need to approve the
19    lifestyle of transgender students -- that's what
20    I would take that as -- against my religious
21    convictions. Does that answer your question?
22 Q    It does. During the 2017/2018 school year
23    Brownsburg never required you to attend an
24    Equality Alliance Club or similar LGBT student
25    group; is that correct?

JOHN M. KLUGE VS
BROWNSBURG COMMUNITY SCHOOL CORPORATION, et al.

JOHN M. KLUGE
November 17, 2020

Page 118

1 A    No, they never required me to attend the
2    Equality Alliance Club or a student LGBT club,
3    correct.  They did require me to hear and be
4    taught the propaganda promoting transgenderism
5    in faculty meetings, so they did require that.
6 Q    Did the fact that you were subjected to that
7    information in faculty meetings conflict with a
8    sincerely-held religious belief?
9 A    You gotta rephrase that question.  I didn't
10    think attending the meeting was sinful.
11    Attending a meeting that I'm required to go to
12    is not me promoting transgenderism in the way
13    that saying a first name transgender name is
14    promoting transgenderism.  I'm required to go to
15    a meeting where they're talking about a number
16    of things and one of those things is this is
17    what we think about transgenderism.  Me hearing
18    that information is not me giving my stamp of
19    approval to their agenda.
20 Q    You may not have agreed with some of the
21    information that was presented with respect to
22    transgenderism at these faculty meetings but you
23    didn't understand your attendance of those as
24    necessarily indicating approval of it or
25    anything like that?

Page 119

1 A    It did not indicate an approval of it, of
2    transgenderism.
3 Q    So, by the same token, you wouldn't have thought
4    to request an accommodation such as please
5    relieve me from the obligation of attending
6    these faculty meetings or anything like that?
7 A    Correct, and that's why I did not request an
8    accommodation.  In fact, at these meetings they
9    were rolling out what they were claiming were
10    policies of the school, things that were not
11    actually policies, things that were not policies
12    approved by the school board.  These were just
13    practices of the school and if I didn't attend
14    these meetings, I wouldn't be told what the
15    school, quote/unquote, "policies" are.  And, so,
16    in fact, not attending these meetings would be a
17    great detriment to me because they're rolling
18    out these so-called policies in these meetings
19    and they seem to be evolving as the school year
20    is progressing.
21 Q    Had you not been afforded the last-name-only
22    accommodation, is it your understanding that all
23    you would have had to do when addressing
24    students was use the first and last name in
25    PowerSchool?

Page 120

1 A    You're starting to break up in your question.
2    Can you say that again?
3 Q    I can.  Had you not been afforded the
4    last-name-only accommodation, is it your
5    understanding that all you would've had to do
6    when addressing students was use the name in
7    PowerSchool?
8 A    Are you saying that if in July 31 of 2017 they
9    did not allow me to have the last-name
10    accommodation that would have meant I would have
11    been forced to use the first and last name in
12    PowerSchool including transgender names?  Is
13    that what you're asking me?
14 Q    Yes.
15 A    Yes, they told me either use the first and last
16    name, the transgender name in PowerSchool, or
17    quit or we're going to fire you.
18 Q    Let's look at Exhibit I.
19 A    Here's I.  This is April 30th, Dear, Ms. Gordon?
20    Is that Exhibit I?
21 Q    Nope, go one over.
22 A    Okay.  Yep.  This is Plaintiff's Response to
23    Defendant's First Request for Production.  Go
24    ahead.
25 Q    And I'll give you time to look over this, but I

Page 121

1    guess let me ask an initial question.  You filed
2    a Charge of Discrimination with the U.S. Equal
3    Employment Opportunity Commission; is that
4    correct?
5 A    Yes.
6 Q    And is it your understanding that Brownsburg
7    responded to that charge?
8 A    Yes, it is my understanding.
9 Q    And is it also your understanding that you, in
10    turn, were afforded an opportunity to submit a
11    rebuttal?
12 A    I believe we did submit a rebuttal.  Did we not?
13 Q    Well, let me help you there.  My question is to
14    look at the rest of Exhibit I and ask if that's
15    the rebuttal statement.
16 A    Yes, I think this is rebuttal.
17 Q    And, more specifically, it's a letter your
18    attorney submitted to the EEOC on your behalf;
19    is that correct?
20 A    Let me get to the last page here.  .
21 Q    Without getting into communication you may have
22    had with your attorneys concerning this exhibit,
23    my question is whether you reviewed it before
24    your attorney submitted it to the EEOC.
25 A    I believe I did.

Page 122

1  Q    And, again, without getting into communications
2       with your attorneys, do you recall that you
3       approved your attorney sending it to the EEOC?
4  A    I believe I did.
5  Q    Is it fair to say then that this is an accurate
6       account of the factual incidents that are
7       described in this document?
8  A    I believe it is.
9  Q    Look at Kluge 298.  It's got those Bates stamps
10      in the bottom right.
11 A    Here we go.
12 Q    At the very top, one of the factual incidents
13      that's described is a May 15th, 2017 meeting
14      that you had with Daghe and three other faculty
15      members.  My question is simply are the three
16      other faculty members the ones who signed the
17      document that we looked at earlier?
18 A    That is the three other faculty members who
19      signed the document, yes.
20 Q    And, to be clear, that was Exhibit D as in David
21      that we talked about earlier?
22 A    Yes, Exhibit D.  Hey, Brent, I just skipped to
23      D.  What exhibit are we talking about right now?
24 Q    You can go back to I when you're ready.
25 A    I.  Got it.  Go ahead.

Page 123

1  Q    In that first full paragraph about halfway down
2       it says, "Daghe asked the teachers" -- and this
3       is in reference to the May 15th, 2017 meeting --
4       "if they would use transgendered first-names if
5       he changed students' first names in PowerSchool.
6       The three other teachers in the meeting
7       acquiesced to these terms, while Kluge did not."
8       You testified to that earlier.  Is this
9       consistent with what your testimony was earlier?
10 A    Yes.
11 Q    Okay.  Help me understand.  How did you not
12      acquiesce?
13 A    I already told you.
14 Q    Fair enough.
15 A    Do you have another question about that?
16 Q    I do.  Sit tight.  Go to the next page.  The
17      third full paragraph references a July 27, 2017
18      meeting that you had with Bret Daghe and
19      Dr. Snapp.  We've already talked about that at
20      length, but my question is the next paragraph.
21      It says, "Later that day Dr. Snapp and Kluge's
22      pastor talked..."  That's the same discussion we
23      already talked about that occurred on or around
24      July 27th; correct?
25 A    Yeah, and so it must have been later that day.

Page 124

1       When I said on or around, looking at this it was
2       on July 27.
3  Q    Okay.  And, to be clear, I'm just trying to make
4       sure we're talking about the same things that we
5       talked about previously.
6  A    Go ahead.
7  Q    Go to Kluge 300, which is the next page.
8  A    Okay.
9  Q    And there's a heading there under Roman Numeral
10      V that references an orchestra award ceremony.
11      Do you recall that ceremony?
12 A    Let me read this.
13      MR. BORG:  Why don't we go off the record
14      and just say five minutes and you can take your
15      time to read that and acclimate yourself because
16      I have some questions about that.
17      THE PLAINTIFF:  Okay.
18      MR. BORG:  Thank you.
19      (A recess was taken.)
20 DIRECT EXAMINATION CONTINUING,
21      QUESTIONS BY BRENT R. BORG:
22 Q    We're on I, specifically the page Kluge 300.
23 A    It was the Subsection Roman Numeral V; correct?
24 Q    Correct.  Have you had a chance to look over
25      that?

Page 125

1  A    I have, yep.
2  Q    And I think we started to talk about that it
3       references an orchestra award ceremony; correct?
4  A    That is correct.
5  Q    And, just generally speaking, what is that
6       ceremony?
7  A    That ceremony is when the orchestra students at
8       the end of the year get awards for merit as well
9       as for their participation in the program.  We
10      recognize our seniors and kind of like a
11      graduation ceremony for them.
12 Q    You alluded to it, but do you recall -- you said
13      it was toward the end of the 2017/2018 school
14      year.  Do you recall what month maybe?
15 A    I think around May of 2018 is when my orchestra
16      award ceremony at the 2017/'18 school year
17      happened.
18 Q    Okay.  And what's in this paragraph under
19      Roman Numeral V on Kluge 300 an accurate report
20      of what transpired at the orchestra ceremony?
21 A    Yes.
22 Q    Was the orchestra award ceremony a
23      school-sponsored event?
24 A    Yes.  Sponsored?  It was part of my curriculum.
25      I wasn't doing this as part of my out-of-school

JOHN M. KLUGE VS
BROWNSBURG COMMUNITY SCHOOL CORPORATION, et al.

JOHN M. KLUGE
November 17, 2020

---

Page 126

1   -- yeah.
2   Q   And, by the same token, it was your
3   understanding that you were participating in the
4   ceremony as an employee of Brownsburg Community
5   School Corporation?
6   A   Absolutely.
7   Q   Am I correct that what you're describing here is
8   that during this ceremony you addressed all
9   students by their first and last names?
10  A   That is correct.
11  Q   Okay. Am I also correct that transgender
12  students were participants in the ceremony?
13  A   That is correct.
14  Q   Am I also correct that you addressed transgender
15  students by their first and last names, more
16  specifically their transgender first name?
17  A   That is correct.
18  Q   Okay. Tell me why you did that.
19  A   I say it even in this paragraph that it would
20  have been unreasonable and conspicuous to
21  address students in such an informal manner at
22  such a formal event as opposed to the classroom
23  setting where teachers refer to students by last
24  names as a normal form of address. And, so, me
25  saying last names only in the classroom is what

---

Page 127

1   a gym teacher would do, but at such a formal
2   event it would have been conspicuous and
3   unreasonable to give such an informal address to
4   students at a graduation ceremony. And, like I
5   say at the end, it brought into doubt my stated
6   rationale for the usage of last names only.
7       Remember that Snapp and I had agreed that
8   we're gonna use last names only and if someone
9   asks you why, you'll start talking about gym
10  teachers, sports coaches. Well, they wouldn't
11  use a last name only at a formal event, so
12  neither did I.
13  Q   Did we establish earlier that you calling
14  students by transgender name is sinful? Is that
15  accurate?
16  A   Yes.
17  Q   Okay. Help me understand how you reconcile
18  calling transgender students by their
19  transgender first name in this context versus a
20  classroom context.
21  A   Uh-huh. I'm making a good faith effort to work
22  within the bounds of my accommodation in this
23  context, that it's a reasonable accommodation to
24  allow me in the classroom to address by last
25  name only and it would be unreasonable,

---

Page 128

1   conspicuous, as I say, in such a formal event to
2   use last name only and use such an informal
3   address. I don't agree. It didn't indicate
4   that I agreed with their policy but I was making
5   a good faith effort to do what was reasonable.
6   Q   In your view, is it inconsistent with your
7   sincerely-held belief to address students by
8   their transgender name during this type of
9   ceremony?
10  A   It was a good faith effort. I don't believe
11  that -- what's it called? I don't believe that
12  promoting and encouraging transgenderism is
13  allowed in the Bible and I believe it's sinful,
14  and, in this context, I was making a good faith
15  effort to work with the school to do what was a
16  reasonable accommodation and to abide by our
17  agreement.
18  Q   If you were to call a student by their
19  transgender name during the classroom
20  environment, do you think that's promoting a
21  transgender lifestyle?
22  A   Yes.
23  Q   When you called transgender students by a
24  transgender name at the orchestra awards
25  ceremony, do you think that was promoting a

---

Page 129

1   transgender lifestyle?
2   A   It was part of our agreement to treat this as a
3   sports coach. It was not me agreeing that
4   transgenderism is okay. It was assuring a good
5   faith effort to work with the administration,
6   like I've said, to do what was reasonable. Our
7   agreement was, John, treat it like you're a
8   sports coach. You can use last names only, but
9   if someone asks, you're treating the orchestra
10  like a team. So this was the good faith effort
11  to work with the administration to do what was
12  reasonable.
13  Q   Mr. Kluge, I'm not certain you answered my
14  question. It was whether you think you're
15  promoting a transgender lifestyle when you
16  address students by a transgender first name at
17  the orchestra awards ceremony.
18  A   I don't believe I was as this wasn't my habit,
19  if that makes sense, that I'm not going to say
20  that -- this was not my habit to be regularly
21  calling students by transgender names, and, so,
22  for a teacher to refer to a student in a formal
23  title at a formal event is not them promoting
24  the lifestyle. It's a special event. It's a
25  formal event. It's not normal. It's not

---

Page 130

1  ordinary behavior.  But for me to every day be
2  given the accommodation to use the last name
3  only and to be regularly -- if I was to
4  regularly be using transgender names, that
5  would, by all means, yes, be promoting
6  transgenderism.  So the formal nature of this
7  makes it exceptional and that's why I behaved
8  exceptionally in trying to work with the
9  administration.
10 Q  Did you have any discussions with any Brownsburg
11    administrator prior to the orchestra awards
12    ceremony about how you would address students at
13    this event?
14 A  I did not.  It was just a good faith effort
15    based on my understanding of the nature of the
16    event and the nature of the accommodation, that
17    it was reasonable to use last names only as a
18    gym coach would, and a gym coach would not have
19    done this.
20    And that's what I was telling the students,
21    that we're a team.  In fact, I, throughout the
22    year, didn't tell the students why I was doing
23    it except one time when one student asked me why
24    I was doing it, that's when I said that, "Well,
25    you know, we're all a team and a sports coach

Page 131

1  calls their team members by last name only.  I
2  want to foster that community and we're all
3  working towards one goal."
4     And, so, I wasn't regularly referencing or
5  bringing attention to my use of last name.  It's
6  just something I did.  And, so, to -- I lost my
7  train of thought.
8 Q  Do you agree with me that you were not following
9    the last-name-only accommodation at the
10   orchestra awards ceremony?
11 A  No, I don't agree with that.  I believe that it
12   was actually perfectly in accordance with what
13   we understood, namely that I would address the
14   students as a sports coach would.  And the
15   formal nature of the event, like I said, led me
16   to address students with a formal first name,
17   last name.  It would have been unreasonable,
18   conspicuous, and not in accordance with the
19   accommodation.  And the understanding of the
20   accommodation coming from the angle of sports
21   coach, it would have been not consistent to do
22   something so conspicuous and informal at such a
23   formal event, like I've said in that paragraph.
24 Q  Who is Natalie Gain?
25 A  Natalie Gain is a violin teacher that taught

Page 132

1  private lessons during my classes and would
2  teach sectionals.  All of the violins section
3  would get coaching from her during my classes.
4 Q  So she participated in all of the beginning,
5    intermediate, and advanced orchestra sections
6    during the 2017/2018 school year?
7 A  Yeah, she would teach during all of those
8    classes, I believe.
9 Q  Would she have been present during all the
10   orchestra classes Monday to Friday during
11   2017/2018?
12 A  It's the same classes Monday, Tuesday,
13   Wednesday, Thursday, Friday.  It depends on what
14   her private lesson teaching schedule for my
15   students was.  It could have been any number of
16   those days any number of weeks.
17 Q  Is it fair to say it depended on her schedule
18   and kind of an as-needed basis?
19 A  Yeah, it depends on her schedule.  She would
20   regularly be in several of my classes.  I don't
21   know exactly which ones and it would have been a
22   smattering of all of them.
23 Q  But, to be clear, we're talking the orchestra
24   classes as opposed to the music theory or
25   anything like that?

Page 133

1 A  It was the orchestra classes, high school
2    orchestra, yes.
3 Q  Okay.  And when she was in an orchestra class, I
4    think you started to say it, but might she take
5    one or two violinists and pull them off to the
6    side and work on specific instruction?
7 A  That's correct.
8 Q  And you, in turn, in that scenario would be
9    instructing the remainder of the class?
10 A  That's correct.
11 Q  And then there might also be times where she was
12   providing instruction to the entire violin
13   section?
14 A  That's correct.
15 Q  Okay.  When she was providing instruction to a
16   small group of violinists, would she go in
17   another room or something like that?
18 A  That is correct, unless there were times if she
19   was helping while I was teaching.  So, yes, that
20   happened sometimes.  Other times there were
21   times where she was helping during instruction.
22 Q  When she was helping out with the orchestra
23   classes during the 2017/2018 school year, what
24   percentage of time would you estimate she was
25   with you in the class versus the percentage of

Page 134

1  time in a separate room working with a small
2  group of violinists?
3  A   I don't know.  I think it would depend.  I'd
4  have to look back at the schedule.  Some
5  instructors would actually be helping in class
6  and playing along with the sections.  It would
7  just be a guess at this point.
8  Q   Do you think a school has an interest in being
9  concerned with the mental health of its
10  students?
11  A   Does a school have an interest -- say that
12  again.
13  Q   Do you think a school has an interest in being
14  concerned with the mental health of its
15  students?
16  A   Yes.
17  Q   Other than your situation, do you have personal
18  knowledge of any instance during the 2017/2018
19  school year where a Brownsburg High School
20  teacher did not address students by the name
21  listed in PowerSchool?
22  A   I did address students by the last name listed
23  in PowerSchool, so can you clarify your
24  question?
25  Q   Yeah.  I think you may have missed the first

Page 135

1  part, so I'll just repeat it.  Other than your
2  situation, do you have personal knowledge of any
3  instance during the 2017/2018 school year where
4  a Brownsburg High School teacher did not address
5  students by using the name listed in
6  PowerSchool?
7  A   You're gonna have to specify.  That's a bad
8  question because -- are you talking about do I
9  know of any other teachers that used last name
10  only?  Because you're saying that I didn't use
11  the name listed in PowerSchool but I did use the
12  last name in PowerSchool, so you're gonna have
13  to clarify what you mean by that.
14  Q   Mr. Kluge, I'm not talking about your situation.
15  I'm talking about your personal knowledge of
16  what other high school teachers might have done.
17  A   You're saying "any other" which presumes that I
18  didn't use what was in PowerSchool but I did use
19  the last name in PowerSchool, so --
20  Q   Okay.  Well, I'm referring to the first and the
21  last name listed in PowerSchool, if that helps.
22  I understand you used the last name only listed
23  in PowerSchool.
24  A   Okay.  I vaguely remember hearing that other
25  teachers might have been using it but I couldn't

Page 136

1  definitively say.
2  Q   Okay.  But if you heard it --
3  A   Specifically the last name only I'm talking
4  about.
5  Q   Okay.  But you didn't personally observe another
6  high school teacher using last name only or
7  anything like that when addressing students?
8  A   I actually did.
9  Q   You personally observed it?
10  A   Yeah.
11  Q   Okay.  Tell me about that incident or incidents.
12  A   When I was working in the musical, it would be
13  normal for students to be referred to by other
14  teachers by last name only.
15  Q   And that was during the 2017/2018 school year?
16  A   Yes.
17  Q   Any other instances that you personally
18  observed?
19  A   No, because that's the only class that I was
20  co-teaching and that there was a number of
21  different -- that's the only instance where I
22  would have been working alongside other teachers
23  at all.  Other times I'm in my own classroom.  I
24  don't see what other teachers do.  Does that
25  make sense?

Page 137

1  Q   It does.  In the musical example that you cite,
2  do you have any personal knowledge of whether
3  those students complained about being referred
4  to by their last name only?
5  A   I do not have knowledge that there were
6  complaints about that.
7  Q   Okay.  And you've also alluded on several
8  occasions to a coach's use of last name when
9  addressing students.  Do you recall mentioning
10  that a few times?
11  A   Yes.
12  Q   Do you have any personal knowledge of that
13  occurring during the 2017/2018 school year?
14  A   I wasn't on the football field.  I was in the
15  music classroom, so --
16  Q   So no?
17  A   No, I didn't observe any gym classes, period, to
18  hear what they were saying or not saying, but it
19  was certainly an understanding of Gordon and
20  Snapp and myself that it is a regular occurrence
21  on sports teams.  Otherwise, why would they have
22  agreed to it and specifically mention that
23  scenario in that July 31, 2017 meeting if it
24  wasn't a normal occurrence in schools, in
25  general?  Do you get what I'm saying?

Page 138

1 Q   I do.  So I'll ask this question.  It's similar
2     to the musical question.  You're not personally
3     aware of an instance of a student complaining
4     that a coach called him or her by last name only
5     during the 2017/2018 school year; is that
6     correct?
7 A   No, I'm not.  The only complaints that were
8     purported is when Daghe purported to say there
9     were complaints about me by students but that's
10    the only time I had heard anything and he didn't
11    even say who was doing it.  He just said lots of
12    people.
13 Q   I understand and we've talked about that already
14    and that was the December 2017 meeting with you
15    and Dr. Daghe; correct?
16 A   That's correct.
17 Q   Do you recall that you withdrew from the
18    Brownsburg Teachers Association in early Summer
19    of 2017?
20 A   Yes.  I don't know the exact date but I remember
21    during my employment at BCSC withdrawing from --
22    you said the Teachers Association?
23 Q   Correct, the teachers union, for lack of a
24    better term.
25 A   That's right.  They support the national union

Page 139

1     which supports Planned Parenthood and so I
2     didn't want to be supporting Planned Parenthood.
3 Q   Okay.  Thank you.  You answered my next
4     question.  But is that the entirety of the
5     reason that you withdrew from the association?
6 A   That's the entirety of the reason.  I didn't
7     want to be giving money even indirectly to
8     Planned Parenthood.
9 Q   Thank you.  Let's look at Exhibit J.
10 A   This is Declaration of Aidyn Sucec in Support of
11    -- okay, yep.
12 Q   Do you recognize this document?  Have you seen
13    it before?
14 A   I do recognize it.
15 Q   Do you think you've read it before?
16 A   I think I have.
17 Q   Go to Paragraph 12.  Do you see that?
18 A   I see Paragraph 12.
19 Q   Okay.  I'm just gonna read it.  "The problems
20    continued from there.  During the fall semester,
21    Mr. Kluge refused to call me Aidyn.  Instead,
22    Mr. Kluge either referred to me as 'Sucec' (my
23    last name) or he avoided calling me by any name
24    and instead simply nodded or waved in my
25    direction.  Moreover, while Mr. Kluge referred

Page 140

1     to me by my last name only, he would sometimes
2     refer to other students in the same class using
3     Mr. or Ms. (Last Name), and less frequently, by
4     their first names."
5     Do you agree with what Aidyn is asserting
6     there in Paragraph 12?
7 A   No.
8 Q   What parts do you dispute?
9 A   Starting with the problems.  So you're referring
10    to Paragraph 12, was it?
11 Q   Correct.
12 A   So "The problems continued from there," I would
13    dispute that there was no problem.  From Day 1 I
14    was consistent in using last names only and
15    using it for all students.  I didn't target
16    students.
17    "During the fall semester, Mr. Kluge
18    refused to call me Aidyn."  That's a
19    mischaracterization of my
20    last-name-only-for-all-students policy.  I
21    wasn't refusing to call her Aidyn.  I was
22    calling all my students by last name only, and,
23    so, that's a misrepresentation of what happened.
24    Next sentence, "Instead, Mr. Kluge either
25    referred to me as 'Sucec' (my last name) or he

Page 141

1     avoided calling me by any name and simply nodded
2     or waved in my direction."  I don't recall ever
3     avoiding her or doing as she says.  I called her
4     Sucec just like I referred to my other students
5     by last name only, so that's misrepresented,
6     fabricated.
7     Next sentence, "Moreover, while Mr. Kluge
8     referred to me by my last name only, he would
9     sometimes refer to other students in the same
10    class using Mr. or Ms. (Last Name), and less
11    frequently, by their first names."  I called all
12    my students by last name only, so I think that's
13    a misrepresentation of what happened in the
14    classroom.
15 Q   I understand you dispute what's alleged in
16    Paragraph 12, but assuming that what is alleged
17    in Paragraph 12 is accurate, do you agree that
18    it could interfere with a well-run classroom?
19 A   If a teacher was avoiding a student and treating
20    them differently than other students, that would
21    not be a good teacher.  That's not what (audio
22    malfunction).
23 Q   And, again, I'm not asking you to agree.  I
24    understand you dispute what's in Paragraph 11,
25    but if you were to say for argument sake that