# EXHIBIT 5

## Deposition Excerpts of Dr. Bret Daghe

## (<u>Note</u>: these are excerpts that were not included in Filing No. 113-5.)

```
              UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF INDIANA
                  INDIANAPOLIS DIVISION
              CASE NO. 1:19-cv-2462-JMS-DLP

JOHN M. KLUGE                              )
                                           )
          Plaintiff(s),                    )
                                           )
     -vs-                                  )
                                           )
BROWNSBURG COMMUNITY SCHOOL                )
CORPORATION, et al.,                       )
                                           )
          Defendant(s).                    )
```

   The videoconference deposition upon oral examination of BRET L. DAGHE, EdD, a witness produced and sworn before me, Brandy L. Bradley, RPR, a Notary Public in and for the County of Hamilton, State of Indiana, taken on behalf of the Plaintiff at the remote location of the witness, Brownsburg, Hendricks County, Indiana, on the 12th day of November, 2020, pursuant to the Indiana Rules of Trial Procedure.

```
              CIRCLE CITY REPORTING
           135 N. Pennsylvania Street
                   Suite 1720
            Indianapolis, IN  46204
                 (317) 635-7857
```

Case 1:19-cv-02462-JMS-DLP   Document 120-5   Filed 03/15/21   Page 3 of 10 PageID #: 1294

JOHN M. KLUGE VS
BROWNSBURG COMMUNITY SCHOOL CORPORATION, et al.

BRET L. DAGHE, EdD
November 12, 2020

Page 6

1 in again. You're still under oath even after we
2 take a break, okay?
3 A   Uh-huh.
4 Q   Since we're participating in a Zoom deposition
5 it's important that we obtain your undertaking
6 not to engage in any communication with your
7 counsel or any third party or anyone wholly
8 unrelated to the case via another device such as
9 a telephone or a tablet or another computer.
10 That means no texting, no chatting, no e-mailing
11 with the understanding that when we take a break
12 and we go off the record you may speak with
13 whoever you want, but while we're on the record,
14 I'm asking you questions and you're answering
15 questions, we need you to agree not to engage in
16 communication with anybody else including
17 counsel, okay? You can't nod your head.
18 A   Yes, I understand.
19 Q   Thank you. That happens. As we were discussing
20 earlier with the court reporter, sometimes when
21 we say to witnesses "It's helpful if you
22 verbalize your answers. Do you understand
23 that?", they will nod their head in affirmation.
24 So that's okay. It takes a little getting used
25 to.

Page 7

1    You are visible on the screen and you look
2 healthy and able to testify today. Is there any
3 reason that you are not able to hear my
4 questions and understand them and testify?
5 A   No, no reason.
6 Q   Okay. You're not under the influence of any
7 legal or illegal drugs that would impair your
8 ability to testify?
9 A   No, I am not.
10 Q   Very good. You understand that it is illegal --
11 this is not just to you, so don't think that I
12 am challenging your credibility. I am not. I
13 say this to everybody. It's important to
14 remember that it's illegal to not testify
15 truthfully when you know that you aren't
16 testifying truthfully or to testify that you
17 don't know the answer when you do know or to
18 testify that you don't remember something when,
19 in fact, you do remember, okay?
20 A   Okay.
21 Q   As I noted, your testimony will be put into an
22 electronic or a hard copy booklet form called a
23 deposition transcript. You will have the
24 ability to read that and to make any
25 nonsubstantive changes/corrections in your

Page 8

1 testimony on what's called an errata sheet and
2 your attorney can help you when that time comes.
3 You'll have, as I said, 30 days in which to
4 review your deposition and to make changes and
5 then sign it and return it. If you fail to
6 return the deposition within that time period,
7 your testimony will be deemed accurate as stated
8 without any changes.
9    By nonsubstantive changes, I mean if you
10 review your deposition and I have, for example,
11 asked you for a number of something and you say
12 it was 9 and then subsequently you remember it
13 was actually 10, that's the kind of things that
14 you can change on an errata sheet. An errata
15 sheet is not for wholesale changes in your
16 testimony. You can't go back and change
17 substantive answers.
18    Your deposition transcript when it's final
19 can be used for any purpose at trial or at a
20 hearing or in dispositive motions that is
21 permissible under the Rules of Procedure.
22    Can you give me a brief idea of what you
23 did in order to prepare for your deposition,
24 what documents you might have reviewed, and who
25 you spoke with? I understand you probably spoke

Page 9

1 with the school's counsel and I'm not asking you
2 to tell me what you were told and what you said,
3 but just identify the people you spoke with.
4 A   I spoke with Brent Borg and I spoke with Alex
5 Pinegar about this case in preparation for it.
6 Q   Did you review any documents?
7 A   The documents I reviewed, interrogatory? Is
8 that the right --
9 Q   That's correct.
10 A   Okay. Looked that over. I reviewed -- there
11 were two audio tapes of meetings that occurred,
12 one with myself, HR director, and John, and
13 another one with, I think, just the HR director
14 and John.
15 Q   By John you mean John Kluge?
16 A   That is correct.
17 Q   Okay. Did you also see the transcripts of those
18 audio recordings?
19 A   Yes, I did.
20 Q   Okay. Just wanted to make sure you had those.
21 Did you speak with any administrators at
22 Brownsburg Community School Corporation such as
23 Superintendent Snapp or Jodi Gordon or board
24 member Phil Utterback, or actually former board
25 member, Assistant Superintendent Kat Jessup, any

Case 1:19-cv-02462-JMS-DLP   Document 120-5   Filed 03/15/21   Page 4 of 10 PageID #: 1295

JOHN M. KLUGE VS
BROWNSBURG COMMUNITY SCHOOL CORPORATION, et al.

BRET L. DAGHE, EdD
November 12, 2020

Page 10

1  teachers in preparation?
2  A  We met with Brent Borg to go over what it would
3     take to have the depositions. We were in the
4     room together. He told us that we would be
5     deposed and that we would find dates to have
6     this meeting and then therefor we went our own
7     ways about the case and waiting for the
8     depositions to happen.
9  Q  Okay. Thank you.
10        MR. CORK: Alex, just for the sake of
11     clarity and correctness, is your last name
12     pronounced Pinegar or Pinegar?
13        MR. PINEGAR: It's Pinegar, rhymes with
14     vinegar.
15        MR. CORK: Okay. Very good. I just wanted
16     to confirm that the way I have been saying it is
17     accurate or close to accurate. Thank you.
18 Q  Dr. Daghe, since you are a doctor, I assume that
19     means you have a PhD; right?
20 A  I have an EdD.
21 Q  EdD, okay. That means you've had some
22     education, graduate, postgraduate. Without
23     going into excruciating detail, tell me about
24     where you went to school after high school, when
25     you graduated, what you studied, that sort of

Page 11

1     thing.
2  A  Okay. After high school I graduated from the
3     University of Illinois in 1990 with a B.A. in
4     Mathematics Education. I then went to IUPUI,
5     got my administrative license in 1995. Then I
6     attended Indiana State University and in 2009 I
7     got my EdS, an education specialist. And then
8     in 2018 I went to Ball State and finished up my
9     EdD program.
10 Q  And what does EdD stand for?
11 A  Educational doctorate.
12 Q  You have been the principal at Brownsburg High
13     School for a period; right?
14 A  Yes.
15 Q  For what time period? What's the duration of
16     your occupying that position?
17 A  This is my 15th year at Brownsburg High School
18     as the principal.
19 Q  Did you have a job in the education field before
20     Brownsburg?
21 A  Yes.
22 Q  Where was that and what was your title?
23 A  Moving forward, I was a math teacher from 1990
24     to '92 in Illinois in a district Leroy,
25     Illinois. From '92 to '97 I was a math teacher

Page 12

1     at Northwest High School, an IPS High School,
2     and then in '97 to 2006 I was an assistant
3     principal at Brownsburg High School for nine
4     years and now since the 2006 year I have been
5     the principal at Brownsburg High School for the
6     last 15 years.
7  Q  Very good. Thank you. In your current position
8     as principal at Brownsburg High School who do
9     you report to?
10 A  I would report to the superintendent.
11 Q  That would be Dr. Snapp?
12 A  That is correct.
13 Q  S-n-a-p-p; right?
14 A  Yes.
15 Q  You were the principal at Brownsburg High School
16     during the time period that the plaintiff, John
17     Kluge, was employed there; right?
18 A  That is correct.
19 Q  Based on your experience as principal at
20     Brownsburg High School -- and let me digress for
21     just a second. As principal you would be or you
22     are considered to be an administrator; correct?
23 A  Yes.
24 Q  Define for me, if you would, please, to the best
25     of your knowledge, what a school administrator

Page 13

1     is.
2  A  In my role as the high school principal I
3     oversee a staff. I take care of the students
4     that attend Brownsburg High School, Grades 9 to
5     12, and make sure that the parents are informed
6     of what goes on in schools to take care of their
7     kids while they're in high school.
8  Q  Your position, I assume, correct me if I'm
9     wrong, has provided some experience with the
10     various policies that the school corporation has
11     published; right?
12 A  Correct.
13 Q  And those policies come through the Board of
14     School Trustees for the school corporation?
15 A  Yes.
16 Q  Do you know if the school -- and when I say
17     "school," just for shorthand reference, I will
18     not continue to say Brownsburg Community School
19     Corporation. I'll just say the school, okay?
20 A  Okay.
21 Q  Does the school have a policy against
22     discriminating against teachers based on their
23     religious beliefs?
24 A  Yes.
25 Q  Do you know what the name of that policy is?

Case 1:19-cv-02462-JMS-DLP   Document 120-5   Filed 03/15/21   Page 5 of 10 PageID #: 1296

JOHN M. KLUGE VS
BROWNSBURG COMMUNITY SCHOOL CORPORATION, et al.

BRET L. DAGHE, EdD
November 12, 2020

Page 14

1  A   Offhand, I do not know.
2  Q   I notice that the policies for the school
3      corporation are designated also by numbers. Do
4      you happen to know what number that would be?
5  A   I do not.
6  Q   There is a policy referred to by No. 3122 which
7      is titled Nondiscrimination and Equal Employment
8      Opportunity Policy. Is that the policy that you
9      are referring to?
10 A   I'm not sure. Yes, I guess.
11 Q   That's fair. That's fine. What about a policy
12     that prohibits discrimination based on religious
13     practices in addition to beliefs or other than
14     beliefs?
15 A   I think that's all part of that same policy. I
16     couldn't quote you the policy right now.
17 Q   Okay. I understand. Do you know if the school
18     has a practice of discriminating against
19     teachers based on their religious beliefs?
20 A   No, we do not.
21 Q   What about a practice of discriminating against
22     teachers based on religious practices?
23 A   No, we do not.
24 Q   Do you know if the school makes reasonable
25     accommodations for employees based on their

Page 15

1      religious beliefs?
2  A   Yes, I do.
3  Q   Does the school make reasonable accommodations
4      for teachers with religious beliefs?
5  A   Yes, I believe it does.
6  Q   Do you know what the procedure is for a teacher
7      who believes he or she has a sincerely-held
8      religious belief or practice that needs to be
9      accommodated in some fashion?
10 A   The policy would indicate that they would meet
11     with our HR director and our assistant
12     superintendent, HR Director Jodi Gordon,
13     Assistant Superintendent Kat Jessup.
14 Q   They would meet to initiate the process and then
15     what?
16 A   From there I don't know. That's where the
17     process is and then is determined at that level.
18 Q   Okay. Have you personally responded, excluding
19     Mr. Kluge, have you responded to any employee
20     requests for accommodations of religious beliefs
21     since you've been principal?
22 A   No, I have not.
23 Q   What about a request for accommodations based on
24     religious practices?
25 A   Are you asking other than John?

Page 16

1  Q   Correct, yes.
2  A   Okay. No, I have not.
3  Q   Do you know if the school publishes in the form
4      of a policy from the board or otherwise any kind
5      of materials, written materials, to help
6      administrators decide what accommodations for
7      religious beliefs are reasonable?
8  A   They're the policies that get approved at school
9      board level and then anything that may happen
10     would go to the assistant superintendent and the
11     HR director and so that's how we would handle
12     it. It would go to that level.
13 Q   Okay. Based on your experience, do you have a
14     working knowledge of what a sincerely-held
15     religious belief is?
16 A   Yes.
17 Q   What is that?
18 A   That because of the person's beliefs they cannot
19     be held discriminatory against them.
20 Q   In an employment context?
21 A   Yes.
22 Q   And when we speak of a reasonable accommodation
23     for an employee's sincerely-held religious
24     beliefs, what does the phrase "reasonable
25     accommodation" mean to you?

Page 17

1  A   Reasonable to me would mean that it meets the
2      needs of the teacher and of the students in the
3      school.
4  Q   And what about accommodation?
5  A   A reasonable accommodation would be that
6      education would be able to move forward in a
7      classroom with the teacher and the students in
8      that room.
9  Q   Are you familiar with the phrase "undue
10     hardship" as it relates to reasonable
11     accommodations for religious beliefs?
12 A   Yes.
13 Q   What does that phrase "undue hardship" mean to
14     you in that regard?
15 A   Undue hardship would mean that the situation
16     that a person is put in is above and beyond a
17     circumstance that works in the classroom for our
18     students and the teacher.
19 Q   When you say the circumstance that a person is
20     put in, are you referring to employees?
21 A   Probably employees and students, and so --
22         MR. CORK: Diana, I am going to jump out of
23     order just for a second. Could you put up
24     Exhibit 6, please.
25 Q   In just a minute, Dr. Daghe, you're going to see

Case 1:19-cv-02462-JMS-DLP   Document 120-5   Filed 03/15/21   Page 6 of 10 PageID #: 1297

JOHN M. KLUGE VS
BROWNSBURG COMMUNITY SCHOOL CORPORATION, et al.

BRET L. DAGHE, EdD
November 12, 2020

Page 30

1     court having jurisdiction over the student and
2     file the necessary documents in order to legally
3     change the student's name?
4 A   I would say no.
5 Q   The PowerSchool approach simply required a
6     letter from a parent and a health care
7     professional and a student previously known by,
8     as a hypothetical, Roberta could change the
9     first name to Robert or some other name;
10     correct?
11 A   Correct.
12 Q   Would the student also be able to via
13     PowerSchool change the pronouns that were
14     previously associated with biological sex?
15 A   Yes.
16 Q   So, in other words, if a biological male wanted
17     to transition to a transgender female, that
18     could be accommodated in PowerSchool via name
19     change and the biological male instead of being
20     referred to as him or his could request be
21     referred to as her or hers, something to that
22     nature?
23 A   Yes.
24 Q   Okay. Those accommodations, to the best of my
25     understanding, were adopted as a practice or

Page 31

1     guidelines provided by the school corporation
2     and they were never actually submitted to the
3     board for approval and published as a school
4     board policy; right?
5 A   I don't know. That's what I was told to follow
6     and that's what we did, so where it got with the
7     board I can't answer.
8 Q   Okay. In addition to the name change/pronoun
9     change in PowerSchool, transgender students were
10     also allowed to use the restroom of their
11     choice; right?
12 A   That's correct.
13 Q   They were allowed to dress according to the
14     gender with which they associated; right?
15 A   That is correct.
16 Q   And that would include any school-related
17     uniforms such as orchestra uniforms? If
18     previously a student received a uniform for
19     biological males, the student might
20     subsequently, based on a transition to
21     transgender female, request a female uniform;
22     right?
23 A   Correct.
24 Q   Did you participate with other administrators in
25     this transgender accommodation process?

Page 32

1 A   Could you give further clarity? I mean, I don't
2     -- no. Other administrators in my building or
3     other administrators higher than me?
4 Q   Maybe the best way is to ask a different
5     question. What administrators were responsible
6     for instituting those transgender
7     accommodations?
8 A   Still hard. We would put them in PowerSchool at
9     the building level. The policy or the
10     procedures or the approach and the FAQ were
11     developed at a level above me.
12 Q   The level above you being?
13 A   Sorry. Dr. Jodi Gordon, Dr. Kat Jessup, Dr. Jim
14     Snapp.
15 Q   So, in order, you're referring to the Human
16     Resources director, the assistant
17     superintendent, and the superintendent?
18 A   That is correct.
19 Q   During the summer of calendar 2017, do you
20     recall meeting with Mr. Kluge regarding his
21     objection to using transgender first names or
22     pronouns?
23 A   Yes, I remember.
24 Q   There was a meeting in July of 2017 involving
25     you and I believe Dr. Snapp and Mr. Kluge;

Page 33

1     correct?
2 A   That's correct.
3 Q   Tell me what you remember about that meeting, if
4     you would, please.
5 A   Well, the first accommodation with the
6     PowerSchool approach I thought was the
7     accommodation that would work. That's what the
8     group of teachers had asked me for. And then
9     when John, surprisingly, the day before school
10     came to me and said "I can't follow that," I
11     called the superintendent right away and said
12     "Please, come join us at the meeting." And he
13     and I met about that being an appropriate
14     accommodation for how we were gonna move
15     forward. And from that meeting I think there
16     was a follow-up meeting between John Kluge and
17     Dr. Snapp later on that I was not a part of and
18     so that's where it was discussed.
19 Q   Go ahead. I'm sorry.
20 A   So what was discussed is why he couldn't follow
21     that accommodation that we had made.
22 Q   What accommodation are you referring to?
23 A   We had made -- the first accommodation was that
24     we were gonna change the name in PowerSchool, so
25     the PowerSchool approach as we described, and

Case 1:19-cv-02462-JMS-DLP   Document 120-5   Filed 03/15/21   Page 7 of 10 PageID #: 1298

JOHN M. KLUGE VS
BROWNSBURG COMMUNITY SCHOOL CORPORATION, et al.

BRET L. DAGHE, EdD
November 12, 2020

Page 34

1    then that was what the group of teachers that
2    met with me in May had asked for. And, so, that
3    accommodation worked for the staff and then John
4    alerted me the day before school to try to find
5    an orchestra teacher that that didn't work for
6    him, and, so, again, I called the superintendent
7    in to meet.
8  Q  What teachers did you meet with in May of that
9    year?
10 A  Specific names?
11 Q  Do you recall?
12 A  Yeah. Shara Davis, Kirk Jones, Rachel Jones.
13   She no longer works at Brownsburg. Her husband
14   got transferred and so she's not an employee.
15   Those are the ones that I remember and John
16   Kluge was there. And the two I aforementioned,
17   Shara and Kirk, are still employees at
18   Brownsburg High School under that accommodation.
19 Q  And the accommodation that you believe was
20   reached was using the first name in PowerSchool?
21 A  All that group in May wanted to make sure so
22   they weren't confused is could we go by the name
23   that's in PowerSchool, and I said if that's the
24   direction we go and that's where we are, I can
25   talk and I can make that happen or I can try to

Page 35

1    figure out if that's what will be there. That's
2    what occurred that summer and those teachers
3    have taught for the next three years at
4    Brownsburg High School.
5  Q  Did the meeting in May result from any written
6    communication from the teachers to the school?
7  A  I think it was a result of just having the
8    dialogue between staff to staff in March and
9    April or February and March of that year and
10   then they brought a document into that meeting
11   that I looked at and so I don't know if the
12   document went any farther than that.
13       MR. CORK: Diana, could you -- and this
14   isn't an exhibit that I noted but it should be
15   easy to find. Exhibit 1, will you put that up,
16   please.
17 Q  Exhibit 1 is a communication from, I believe,
18   the teachers you just identified to the
19   Brownsburg Community School Corporation.
20   Unfortunately, it's not dated but I believe is
21   the document you just referenced having reviewed
22   at the meeting in May. Take a moment to review
23   this document and tell me if you're familiar
24   with it, please.
25 A  Yeah, this is the document that they brought to

Page 36

1    me in that meeting, those four teachers.
2  Q  Had you seen this document prior to the meeting?
3  A  No, I had not.
4  Q  Did you review it during the course of that
5    meeting and then discuss it with those teachers?
6  A  Yes, we discussed it.
7  Q  Based upon your meeting you were of the
8    understanding that all four of the teachers had
9    agreed to use the PowerSchool names, at least
10   the first name listed in PowerSchool; is that
11   right?
12 A  That was the accommodation that we were going to
13   move forward with, the PowerSchool approach,
14   yes.
15 Q  And then in July of the same year Mr. Kluge came
16   to you and said I can't do that; correct?
17 A  That is correct.
18 Q  And he said that his inability to use the
19   transgender first names and pronouns was based
20   on his religious beliefs; right?
21 A  Yes.
22 Q  And Exhibit 1, in fact, contains a number of
23   references to scripture beginning on Page --
24   down at the bottom -- 107 continuing over to
25   108. And then on 108 and 109 above the

Page 37

1    signatures there are a series of numbers
2    paragraphs in which the teachers identify the
3    course they would like the school to take. Is
4    that fair?
5  A  That's fair.
6        MR. CORK: Diana, could we see Exhibit 14,
7    please.
8  Q  Exhibit 14 is a one-page document. Take a
9    moment to look at that and tell me if you're
10   familiar with it, please.
11 A  Yes.
12 Q  This appears to be a memo or an e-mail -- I'm
13   not sure how you would describe it -- that you
14   sent to John Kluge on July 28th of 2017. Is
15   that accurate?
16 A  Yes.
17 Q  And it contains typewritten language and then
18   also handwritten language that has the initials
19   JG by it and one just above the beginning of the
20   second paragraph and then other handwritten
21   words down at the bottom. Do you know if JG are
22   the initials for Jodi Gordon?
23 A  They are.
24 Q  And she dated the statement at the bottom of the
25   page 7/31/17; right?

Case 1:19-cv-02462-JMS-DLP   Document 120-5   Filed 03/15/21   Page 8 of 10 PageID #: 1299

JOHN M. KLUGE VS
BROWNSBURG COMMUNITY SCHOOL CORPORATION, et al.

BRET L. DAGHE, EdD
November 12, 2020

Page 38

1  A   That's correct.
2  Q   And this also appears to have been signed by
3      John Kluge on July 31st of 2017 as well. Would
4      you agree with that?
5  A   Yes, I would.
6  Q   You sent this communication to Mr. Kluge on July
7      28th of that year and you state, quote, "You are
8      directed to recognize and treat students in a
9      manner using the identity indicated in
10     PowerSchool. This directive is based on the
11     status of a current court decision applicable to
12     Indiana."
13         This communication was sent after your
14     initial meeting with Mr. Kluge in which he said
15     he could not use transgender first names; is
16     that right?
17 A   That is correct.
18 Q   Had Mr. Kluge met with Dr. Snapp at that point
19     regarding this issue?
20 A   I'm not sure if he met or he had talked with
21     Dr. Snapp over the phone.
22 Q   Did you participate in the communication between
23     Mr. Kluge and Dr. Snapp?
24 A   Not that second communication, no, I did not.
25 Q   Was there a first communication in which you

Page 39

1      participated?
2  A   Yeah, that was the July what, 27th, where he
3      indicated he couldn't use that accommodation and
4      so I got Dr. Snapp over to my office. That was
5      the first communication and then there was a
6      second communication that I think John contacted
7      Dr. Snapp at a later time.
8  Q   Was it your directive as contained in Exhibit 14
9      or did Dr. Snapp direct you to issue this?
10 A   Which part?
11 Q   The first two sentences of the Exhibit 14
12     communication, "You are directed to recognize
13     and treat students in a manner using the
14     identity indicated in PowerSchool. This
15     directive is based on the status of a current
16     court decision applicable to Indiana."
17 A   That would be a statement that was written and
18     then a statement was added based on a
19     conversation, I think, between Dr. Snapp and
20     John that was handwritten in there. So, yes, I
21     would indicate the first part and then Jodi, the
22     HR director, through communication with our
23     superintendent, added the new part.
24 Q   Do you recall if after your meeting with
25     Mr. Kluge there was an intervening weekend and

Page 40

1      he was directed to consider this and to return
2      the document signed no later that noon on
3      Monday, July 31 of 2017?
4  A   Yes, I remember.
5  Q   You do not remember?
6  A   I do remember, yes. I'm sorry. I do remember.
7  Q   And what do you remember? Is that accurate?
8  A   Yes, that would be accurate based on what's
9      written here.
10 Q   So John Kluge was provided this communication
11     and he was given until noon on Monday, July 31st
12     to return it and he returned it checking the box
13     "Yes, I will comply with this directive," but at
14     some point either after your meeting or on the
15     31st -- and since he signed it, it appears, on
16     the 31st the handwritten statement was added by
17     Jodi Gordon; correct?
18 A   Correct.
19 Q   And the handwritten statement reads, quote, "We
20     agree that John may use last name only to
21     address students."
22 A   That is correct.
23 Q   That's accurate?
24 A   Yes.
25 Q   And then John Kluge signed that, dated it July

Page 41

1      31st of '17, and Jodi Gordon at that point also
2      added the language at the bottom of the document
3      which reads, quote, "In addition, Angie Boyer
4      will be responsible for distributing uniforms to
5      students."
6  A   That is correct.
7  Q   And a reference to uniforms, I assume, would be
8      to allow Mr. Kluge the ability not to provide a
9      male uniform to a biological female and vice
10     versa; right?
11 A   That was an additional accommodation, yes.
12 Q   Okay. There's also a statement on this exhibit
13     that reads, quote, "You are also directed to not
14     attempt to counsel or advise students on his/her
15     lifestyle choices." Was that something you
16     included or did Dr. Snapp direct you to include
17     that? What was the genesis of that statement?
18 A   Well, I included it and his job was to teach the
19     students, not to make sure he was letting them
20     know his opinion one way or the other. And, so,
21     just to make sure, I did not want one of my
22     teachers counseling or advising students on
23     their choices, so I just wanted to make sure
24     that was there.
25 Q   So that statement was what I would refer to as

Case 1:19-cv-02462-JMS-DLP   Document 120-5   Filed 03/15/21   Page 9 of 10 PageID #: 1300

| JOHN M. KLUGE VS | BRET L. DAGHE, EdD |
| --- | --- |
| BROWNSBURG COMMUNITY SCHOOL CORPORATION, et al. | November 12, 2020 |

Page 54

 1  both transgender, and their parents, one being
 2  Aidyn Sucec, one being a student going by the
 3  name of Sam Willis.
 4  A   Yes.
 5  Q   Did you suggest to Mr. Kluge during any of the
 6      meetings reflected in your calendar entries
 7      contained on Exhibit 9 that it might be in his
 8      interest to consider resigning?
 9  A   Yes.
10  Q   The last page of Exhibit 9 is Page 139.  If you
11      go there, please.  There you are.  And, as I
12      indicated previously, this is from Mr. Kluge to
13      you and Dr. Snapp.
14  A   Okay.
15  Q   And subject indicated is "Question about next
16      year" and he references the 1/3/18 version of
17      the document known as Transgender Questions,
18      said it was received at the January faculty
19      meeting, and then he cites an item from that
20      document, No. 5, in which apparently somebody
21      asked if teachers/staff were allowed to use the
22      student's last name only.  And the response is,
23      quote, "We have agreed to this for the 2017-2018
24      school year, but moving forward it is our
25      expectation the student will be called by the

Page 55

 1      first name listed in PowerSchool."
 2          Mr. Kluge goes on to say that the document
 3      we reviewed previously, which I will refer to as
 4      the last-name-only accommodation, doesn't
 5      contain any indication that it only applies to
 6      the '17/'18 school year -- that's Exhibit 14, by
 7      the way -- and wants to know if he's going to be
 8      allowed to continue using last names only.  Did
 9      you receive this communication from Mr. Kluge?
10  A   Yes.
11  Q   Did you respond to it?
12  A   No, I responded by calling a meeting with him on
13      the 6th with Jodi Gordon.
14  Q   Was the language that he quoted in the last page
15      of Exhibit 9, Page 139, to the best of your
16      knowledge, was that an accurate description of
17      the portion of Transgender Questions that he
18      quotes?
19  A   Yes, that was where we were moving forward, so,
20      yes, what he has quoted is correct.
21  Q   Prior to the January '18 faculty meeting in
22      which he saw that Transgender Questions document
23      and the change indicated therein affecting his
24      last-name-only accommodation, did anybody
25      provide Mr. Kluge with any written notice of a

Page 56

 1      change or removal of his last-name-only
 2      accommodation?
 3  A   In the January meetings?
 4  Q   I'm asking if prior to the faculty meeting in
 5      which he saw the document entitled Transgender
 6      Questions.
 7  A   No, I believe no one said anything about the
 8      policy prior to that January meeting.
 9  Q   Okay.  And I'm not aware of any written notice
10      to him claiming that his last-name-only
11      accommodation was creating any undue hardship at
12      the school.  Are you aware of such a document?
13  A   I'm aware of conversations that he and I had
14      when we were meeting about my concerns and
15      oftentimes we didn't just talk about the
16      transgender students, the two that you named.
17      I'm talking about the class of students to him.
18      I'm talking about the uncomfortableness of
19      adults in my building around him with similar
20      students in theater, in band, in choir, and
21      orchestra that those teachers share and it was a
22      concern that kids didn't know how to behave,
23      didn't know how to address.  And that was the
24      temperament or the way I was addressing the
25      meetings ahead of time and saying can you follow

Page 57

 1      this second accommodation because we're going to
 2      be changing that, as he heard in January, for
 3      the following year and I needed this to move
 4      forward as a high school principal in a way that
 5      he would follow the accommodations and that my
 6      conversation with him was not happening the way
 7      it was written.
 8  Q   Well, that's a lengthy answer but did not answer
 9      my question which was I'm not aware of any
10      written claim of undue hardship communicated to
11      Mr. Kluge at any point in time prior to the
12      January 2018 faculty meeting.  That's because
13      none exists; right?
14  A   Correct.
15  Q   You also referenced complaints by teachers.  Can
16      you tell me what teachers complained to you
17      about Mr. Kluge's use of last names only?
18  A   Two department heads in Fine Arts, Tracy Runyon,
19      Melissa Stainbrook.  I would have discussions
20      with Mr. Lee and that was just in the Equality
21      Alliance Club but that's not where the majority
22      of the continued issues became.  It was within
23      his own department, within his own student body
24      that were in the classes.
25  Q   Who in the department complained about him, what

Case 1:19-cv-02462-JMS-DLP Document 120-5 Filed 03/15/21 Page 10 of 10 PageID #: 1301

JOHN M. KLUGE VS
BROWNSBURG COMMUNITY SCHOOL CORPORATION, et al.

BRET L. DAGHE, EdD
November 12, 2020

Page 58

1 other teachers?
2 A Say that again, please.
3 Q What other teachers within his own department
4 complained about him?
5 A They're the department heads, so anybody that
6 would complain as a teacher there would be
7 probably directed to the department heads, so
8 those are the two that I spoke to most.
9 Q Mr. Lee, Craig Lee, is a government teacher at
10 the high school; right?
11 A He's not part of that department, correct. He's
12 a government teacher, correct.
13 Q And he is also until recently, within the last
14 year or so he was the faculty advisor for an
15 organization you referenced, a club at the
16 school known as the Equality Alliance Club; is
17 that right?
18 A He's still an advisor for that.
19 Q Okay. Would you describe the Equality Alliance
20 Club as a club providing a voice for LGBTQ
21 students?
22 A I would describe it as a club voicing social and
23 emotional issues that all students are having
24 within the building. It certainly did not
25 consist of only LBGTQ students in any way,

Page 59

1 shape, or form and it was a club to try to make
2 a culture and climate of Brownsburg High School
3 the best it could be.
4 Q The Equality Alliance Club was attended by a
5 number of transgender students; right?
6 A I don't have the actual number of students but,
7 yes, there would be some in attendance of the
8 overall number, yes.
9 Q The two students that I referenced, Sam Willis
10 and Aidyn Sucec, they attended the Equality
11 Alliance Club meetings; right?
12 A I cannot say. I never attended the Equality
13 Alliance Club meetings, so I don't know if they
14 were there in attendance.
15     MR. CORK: Diana, could we see Exhibit 29,
16 please.
17 Q This is a lengthy document which I will
18 represent to you is a transcript of the audio
19 recording of the meeting between you and Jodi
20 Gordon and John Kluge on February the 6th of
21 2018.
22 A Correct.
23 Q And I think you said you've had an opportunity
24 to review this; right?
25 A That's correct.

Page 60

1 Q Okay. I'm not going through the entire document
2 but I wanted to direct your attention to certain
3 pages. First of all, if you go to Page 491,
4 please. Just at the top of the page there's
5 conversation between you and Kluge, Line 1 and 2
6 through Line 5 and you're just identifying that
7 this meeting is part of the same conversation
8 which happened in December, conversations in
9 January, now you're in February. You're
10 referring to the prior meetings with Mr. Kluge;
11 right?
12 A Correct.
13 Q And then on Page 476, if you would go there,
14 please.
15 A Okay.
16 Q 476 toward the bottom of the page, Line 20, John
17 is saying "Bret had -- we had met December,
18 January." Jodi Gordon responds, "Right. Those
19 were the issues you mentioned." Kluge says, "He
20 had said," meaning you, "he would like me to
21 resign at the end of the year, and I was asking
22 what -- what are you asking me to do? What does
23 that even look like?"
24     Is that accurate? Did you ask him to
25 resign at the end of the year?

Page 61

1 A I was talking to him about a resignation if the
2 accommodation that he was following was not
3 working, was not going well, he was not
4 following it, and, so, how could I help.
5 That's, again, my purpose and if that
6 accommodation doesn't work, then let's talk
7 about what a resignation might look like if you
8 don't want to follow that accommodation or that
9 accommodation is not afforded to you.
10 Q Okay. On Page 487, if you would go there,
11 please.
12 A Okay.
13 Q You're there; right?
14 A Yes, I am. Sorry.
15 Q Beginning on Line 5 Kluge states, "So let's say
16 I come back next year and I can't do the first
17 name. Then I would just be terminated?"
18     Gordon responds, "You would."
19     Kluge says, "Okay." And then he states
20 beginning Line 11, "that seems -- it seems
21 illegal, what you're doing, to -- to not allow
22 that accommodation. Is there -- is there
23 precedent for that being legal?"
24     Gordon responds on Line 15, "There's
25 nothing illegal about that." She then states on