# EXHIBIT 6

# Deposition Excerpts of Dr. Kathryn Jessup

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION
CASE NO. 1:19-cv-2462-JMS-DLP

JOHN M. KLUGE                              )
                                           )
         Plaintiff(s),                     )      ORIGINAL
                                           )
    -vs-                                   )
                                           )
BROWNSBURG COMMUNITY SCHOOL                )
CORPORATION, et al.,                       )
                                           )
         Defendant(s).                     )

The videoconference deposition upon oral examination of KATHRYN JESSUP, a witness produced and sworn before me, Brandy L. Bradley, RPR, a Notary Public in and for the County of Hamilton, State of Indiana, taken on behalf of the Plaintiff at the remote location of the witness, Brownsburg, Hendricks County, Indiana, on the 6th day of November, 2020, pursuant to the Indiana Rules of Trial Procedure.

CIRCLE CITY REPORTING
135 N. Pennsylvania Street
Suite 1720
Indianapolis, IN 46204
(317) 635-7857

Case 1:19-cv-02462-JMS-DLP   Document 120-6   Filed 03/15/21   Page 3 of 8 PageID #: 1304

JOHN M. KLUGE VS
BROWNSBURG COMMUNITY SCHOOL CORPORATION, et al.

KATHRYN JESSUP
November 6, 2020

Page 10

1 Q   Can you give me a brief idea of what you did to
2     prepare for your deposition in terms of
3     reviewing documents, speaking to other people?
4     I assume you spoke one or more attorneys for the
5     school corporation and I'm not asking you to go
6     into the substance of your discussions with
7     counsel, but if you talked with other people,
8     for example, Mr. Utterback, Mr. Snapp,
9     Mr. Daghe, Jodi Gordon, Ms. Lingelbaugh, or
10    anybody else at the school, I'm entitled to know
11    that.  So, in response to that rather lengthy
12    question, could you tell me what kind of
13    documents you looked at to prepare for your
14    deposition?
15 A   Yes.  I talked with Alex on Monday and we
16    reviewed just what a deposition was going to be
17    like and then I also reviewed the
18    interrogatories.  Is that right?  The
19    interrogatories.
20 Q   Questions that were posed by Plaintiff to the
21    school corporation?
22 A   Yes.
23 Q   Okay.  And the responses to those, more
24    particularly, I assume; is that right?
25 A   Yes.

Page 11

1 Q   And by Alex, you're referring to the school's
2     attorney, Mr. Pinegar?
3 A   Yes.
4 Q   I assume you understand that it's illegal to not
5     testify truthfully or to say that in response to
6     a question that you don't know or you don't
7     remember when, in fact, you do know or you do
8     remember; correct?
9 A   Correct.
10 Q  Great.  Do you live in or around Brownsburg?
11 A   I live in Brownsburg.
12 Q  Okay.  I assume you're a high school graduate;
13    is that right?
14 A   Yes.
15 Q  And also a college grad probably?
16 A   Yes.
17 Q  Where did you go to college, when did you
18    graduate, and what did you study?
19 A   I graduated in '93 from Butler University with
20    an elementary education degree.  I graduated
21    from Ball State University in 2005 with a
22    Master's of Art in Building Administration.  I
23    graduated in 2017 from Ball State University
24    with an educational doctorate.
25 Q  So you're actually Dr. Jessup?

Page 12

1 A   Yes.
2 Q   Okay.  Would you prefer that I call you
3     Dr. Jessup?
4 A   No.
5 Q   Okay.  In your educational experience did you
6     acquire any specific discrete education having
7     to do with the subject of gender dysphoria or
8     transgender students?
9 A   No.
10 Q  Do you have in any of your work-related
11    experience other than at Brownsburg Community
12    School Corporation, any experience dealing with
13    transgender or gender dysphoria issues?
14 A   No.
15 Q  You testified that you provided or you sat for
16    one deposition previously.  What kind of a
17    matter was that in?
18 A   It was a case against the school.
19 Q  A lawsuit filed by someone against Brownsburg
20    Community School Corporation?
21 A   Yes.
22 Q  Can you be a little more specific?  Do you
23    remember who the plaintiff was?
24 A   Yes.
25 Q  What's the plaintiff's name?

Page 13

1       MR. PINEGAR: You can answer.
2 A   The family's last name was Bates.  No, the
3     family's last name was Helm.
4 Q   Helm?
5 A   Helm, H-e-l-m.
6 Q   Okay.  And a husband/wife or family?
7 A   Family.
8 Q   What was the nature of the lawsuit?  Why did
9     they file suit against the school?
10 A   They filed -- their child had been part of an
11    after-school program and there were issues with
12    their child at the after-school program.
13 Q  What kind of issues?
14       MR. PINEGAR: Dr. Jessup, do you feel
15    uncomfortable talking about this or do you need
16    to consult with me?
17       MR. CORK: I did not understand a word of
18    that.
19       MR. PINEGAR: The problem is if I put my
20    mic on it echoes.  I simply asked her if she
21    felt like she needed to consult with counsel
22    about whether she could go into detail about
23    this matter.
24 Q  Would you like to take a break to speak with
25    your attorney?

Case 1:19-cv-02462-JMS-DLP   Document 120-6   Filed 03/15/21   Page 4 of 8 PageID #: 1305

JOHN M. KLUGE VS
BROWNSBURG COMMUNITY SCHOOL CORPORATION, et al.

KATHRYN JESSUP
November 6, 2020

Page 14

1  A   Yes.
2  Q   What's the basis of that?  There is a question
3      pending, so I just ask simply the nature of the
4      issue in the after-school program.
5          MR. CORK: Alex, the reason I'm asking is
6      you haven't stated any objection based on
7      privilege, so what's the need to speak to
8      counsel?
9          MR. PINEGAR: Well, I'm not posing an
10     objection but I can make a logical assumption
11     that there might be some privacy or FERPA
12     concerns and I just need -- I think the witness
13     needs to make sure she's not violating any type
14     of privacy rules in answering your question.
15         MR. CORK: That's why we have a protective
16     order in place.
17         MR. PINEGAR: I believe the protective
18     order would cover issues relating to this
19     lawsuit with respect to students.  I don't know
20     that it would go beyond anything dealing with
21     this lawsuit.  So, at this point, I'm not posing
22     an objection but I feel like the witness has the
23     right to make sure she's not violating the law
24     in answering your question if there's something
25     that I'm not aware of with respect to this

Page 15

1      particular lawsuit you're asking her about.
2  Q   Did the Helm lawsuit have anything to do with
3      gender dysphoria or transgender issues?
4  A   No.
5  Q   Did the Helm lawsuit have anything to do with
6      religious accommodation?
7  A   No.
8  Q   You're currently the assistant superintendent;
9      correct?
10 A   Yes.
11 Q   How long have you held that position?
12 A   This is my 11th year.
13 Q   And you've been the assistant superintendent for
14     11 straight years?
15 A   Yes.
16 Q   Give me a brief idea, and I understand it's
17     probably varied, but what are your duties like
18     in the course of any given workweek?
19 A   I oversee everything with curriculum and
20     instruction at the district level, so that
21     involves our students in preschool through 12th
22     grade.  Of course, I have different people who
23     work under me, for instance, special education,
24     our programs for students with ENL, our English
25     as a New Language students, our high ability

Page 16

1      students, et cetera.  And, within that scope, I
2      oversee our data department, student data, and
3      things that deal with students and learning.
4  Q   Has Dr. Snapp, Jim Snapp, been the
5      superintendent for the entirety of your 11-year
6      tenure as assistant superintendent?
7  A   Yes.
8  Q   Do you have a working relationship with the
9      Human Resources director, Jodi Gordon?
10 A   Yes.
11 Q   Briefly describe that, if you would, please.
12     What kind of interaction do you have with
13     Ms. Gordon?
14 A   Jodi and I work together with hiring of staff.
15     She puts together the list of candidates that I
16     will be seeing for interviews.  I also speak
17     with her when I need to hire people within my
18     department.  And we are part of the Central
19     Office Leadership Team so we meet with the
20     Central Office Leadership Team on issues across
21     the district.
22 Q   And Mr. Bret Daghe, the Brownsburg High School
23     principal, you're familiar with him, I take it?
24 A   Yes.
25 Q   I would assume you have a working relationship

Page 17

1      with Mr. Daghe as well?
2  A   Yes.
3  Q   What kind of interaction do you have with
4      Mr. Daghe as principal of the high school?
5  A   I talk with Bret about things having to do with
6      students and curriculum and instruction.
7  Q   And since you're the assistant superintendent
8      you obviously work probably closely with the
9      superintendent, Dr. Snapp; correct?
10 A   Yes.
11 Q   Are you involved with the Brownsburg Board of
12     School Trustees on a regular basis?
13 A   I make recommendations at board meetings to
14     them.
15 Q   Board meetings occur monthly; is that right?
16 A   Once a month.
17 Q   And what kind of recommendations do you make to
18     the board?
19 A   So, for instance, at this upcoming board meeting
20     I will make recommendations about new
21     neighborhoods that are coming on and school
22     placements for those neighborhoods.
23 Q   When you say new neighborhoods, new
24     neighborhoods that are being absorbed, for lack
25     of a better description, into the Brownsburg

Case 1:19-cv-02462-JMS-DLP   Document 120-6   Filed 03/15/21   Page 5 of 8 PageID #: 1306

JOHN M. KLUGE VS
BROWNSBURG COMMUNITY SCHOOL CORPORATION, et al.

KATHRYN JESSUP
November 6, 2020

Page 18

1     Community School Corporation?
2  A  No, new neighborhoods that are being built in
3     Brownsburg Community School Corporation.
4  Q  Within the corporation?
5  A  Yes.
6  Q  Did you have a previous position at Brownsburg
7     Community School Corporation?
8  A  Yes.
9  Q  Before you became assistant superintendent?
10 A  Yes.
11 Q  And tell me about -- just go back through
12    whatever number of positions you had with
13    Brownsburg prior to becoming assistant super.
14 A  So I started as a student teacher in Brownsburg
15    Community School Corporation, then I became a
16    teacher in Brownsburg, then I became an
17    assistant principal, and then I became a
18    principal before I became the assistant
19    superintendent.
20 Q  And your very first experience with Brownsburg
21    was in what year?
22 A  1993.
23 Q  Was that straight out of Butler?
24 A  That was during student teaching at Butler.
25 Q  Brownsburg has been your only employer then

Page 19

1     since you left college?
2  A  Yes.
3  Q  Are you familiar with an entity by the name of
4     Indiana Youth Group, Inc.?
5  A  Yes.
6  Q  How do you know that company?
7  A  Their name was in the interrogatory information.
8     I don't know a lot about that company.
9  Q  Do you have any regular interaction with anyone
10    at Indiana Youth Group or anybody representing
11    Indiana Youth Group?
12 A  No.
13 Q  Were you aware that Indiana Youth Group filed a
14    motion to intervene in this lawsuit?
15 A  Yes.
16 Q  How did you become aware of that?
17 A  I don't remember.
18 Q  Was it through your employment or some other
19    personal or private?
20 A  It would have been through employment but I
21    don't remember who told me.
22 Q  Okay. Are you acquainted with a teacher at
23    Brownsburg by the name of Craig Lee?
24 A  Yes.
25 Q  You work with Mr. Lee in your capacity as

Page 20

1     assistant superintendent?
2  A  Yes.
3  Q  What kind of interaction do you have with
4     Mr. Lee?
5  A  When the social studies team comes over to
6     Central Office for professional development I
7     would see Mr. Lee then.
8  Q  Are you also familiar with a club at Brownsburg
9     Community School Corporation or Brownsburg High
10    School, I guess, called the Equality Alliance
11    Club?
12 A  Yes.
13 Q  What do you know about that organization?
14 A  That group meets under the leadership or
15    oversight by Mr. Lee and it is a group of
16    students who support LGBTQ students.
17 Q  Is Mr. Lee, to the best of your knowledge, still
18    the faculty advisor for the Equality Alliance
19    Club?
20 A  I'm not certain.
21 Q  Are you aware that Mr. Lee filed a sworn
22    statement in support of Indiana Youth Group's
23    motion to intervene in this case?
24 A  No.
25 Q  Are you aware that Mr. Lee is currently

Page 21

1     represented by a Washington DC law firm by the
2     name of Covington & Burling, attorneys from that
3     firm represented Indiana Youth Group in the
4     motion to intervene?
5  A  No.
6  Q  You became involved with Brownsburg Community
7     School Corporation's effort or let me refer to
8     it as introduction of certain guidelines, I'll
9     refer to them as, written guidelines, concerning
10    transgender students; correct?
11 A  Yes.
12 Q  When did that first become part of your duties?
13 A  I would say prior to the '17/'18 school year.
14 Q  2017?
15 A  Yes.
16 Q  Okay. You're referring to the school year
17    beginning in the fall, August, September?
18 A  Yes.
19 Q  And then running through to the next spring of
20    the following calendar year; right?
21 A  Yes.
22 Q  So, when you say 2017/'18 school year, you're
23    referring to the school year that would start in
24    late summer or early fall of '17 and run through
25    May or June of '18; right?

Case 1:19-cv-02462-JMS-DLP   Document 120-6   Filed 03/15/21   Page 6 of 8 PageID #: 1307

JOHN M. KLUGE VS
BROWNSBURG COMMUNITY SCHOOL CORPORATION, et al.

KATHRYN JESSUP
November 6, 2020

Page 38

1  Q   What kind of feedback did he provide to the best
2      of your memory?
3  A   He would have provided feedback such as making
4      the wording more smooth, correcting grammatical
5      and contextual changes.  As for which specific
6      questions he made comments on, I don't recall.
7          MR. CORK: Why don't we take a five-minute
8      break if that's okay.
9          (A recess was taken.)
10  DIRECT EXAMINATION CONTINUING,
11      QUESTIONS BY MICHAEL J. CORK:
12 Q   You understand you're still under oath; right,
13     ma'am?  Is your mic muted?  I couldn't hear you.
14 A   Can you hear me now?
15 Q   I can.  Thank you.
16         MR. CORK: Diana, could you put up Exhibit
17     5, please.  And give the witness control of
18     that, please.
19 Q   This is similar to the previous exhibit in that
20     it is a response to one of our requests for
21     production and, simply stated, the request was
22     for all drafts, versions, and revisions of
23     documents similar to the one that was attached
24     to our amended complaint and it's a document
25     that appeared in the prior exhibit that was

Page 39

1      titled Transgender Questions.  So, more simply
2      stated, Exhibit 5 consists of about six or seven
3      different versions of the Transgender Questions
4      document, one of which was the January 3rd, 2018
5      document in the prior exhibit.
6          With that in mind, take a moment to flip
7      through these and see if you agree with that
8      characterization.
9  A   So, yes, that looks like many variations of the
10     questions and answers.
11 Q   Transgender questions?
12 A   Yes.
13 Q   Based on my review of Exhibit 5, there appear to
14     be dated versions and then at least two undated
15     versions and I'm referring to the date that
16     appears at the bottom right corner of many of
17     the pages with your initials.  There's a
18     December 18th of 2017 version; a 1/3/18 version,
19     which I believe is the same version that appears
20     in the previous exhibit, Exhibit 4; a February
21     2nd, '18 version; there appear to be two
22     versions or perhaps they're just duplicate
23     copies of the May 1st, 2018 version; and then
24     there are two totally undated versions.  To the
25     best of your memory, did you create all of

Page 40

1      these?
2  A   Yes.
3  Q   Did the Human Resources Director Jodi Gordon
4      participate in that process with you?
5  A   Yes.
6  Q   Did anyone else?
7  A   We would have shown these to Dr. Snapp as well.
8  Q   And Dr. Snapp would have provided the same type
9      of input that you described in response to my
10     question with regard to the previous exhibit?
11 A   Correct.
12 Q   Why did you create six or seven different
13     versions of this document?
14 A   I would imagine there were things that were
15     changed within the document and, rather than
16     just typing over, kept a new copy of it.
17 Q   Is the version that's dated May 1st of 2018 the
18     most recent version of the Transgender Questions
19     document?
20 A   Yes.
21 Q   Were any of the versions after the January 3rd
22     2018 version ever presented to the board for
23     formal approval and adoption as a policy?
24 A   No.
25 Q   Does the school corporation have any plans to

Page 41

1      present any version of the Transgender Questions
2      document to the board for formal approval?
3  A   No.
4  Q   All of the various versions of the document
5      titled Transgender Questions include a question
6      regarding the use of student's last name only.
7      And, just for quick reference, if you go to Page
8      178 of Exhibit 5, I'll direct you to what I'm
9      referring to.
10 A   Okay.
11 Q   Just above the middle of the page it reads "Are
12     we allowed to use the student's last name only?"
13     And the response is "We have agreed to this for
14     the 2017-2018 school year, but moving forward it
15     is our expectation the student will be called by
16     the first name listed in PowerSchool."
17         Do you recall who raised that question?
18 A   No.
19 Q   And the practice of allowing teachers to use a
20     student's last name only, how wide was that
21     practice to the best of your knowledge?
22 A   Not wide.
23 Q   Not wide?
24 A   No.
25 Q   Would it have been used by Mr. Kluge only?

Case 1:19-cv-02462-JMS-DLP   Document 120-6   Filed 03/15/21   Page 7 of 8 PageID #: 1308

JOHN M. KLUGE VS
BROWNSBURG COMMUNITY SCHOOL CORPORATION, et al.

KATHRYN JESSUP
November 6, 2020

Page 42

1  A   Yes.
2  Q   How much discussion went into this change in the
3      document Transgender Questions?
4  A   I don't remember.
5  Q   Do you recall whether this was a decision made
6      by you and Jodi Gordon and Dr. Snapp
7      collectively or just by Dr. Snapp or was it made
8      by somebody else?
9  A   I would believe it's a collective decision.
10 Q   Collective?
11 A   Correct.
12 Q   And the reason that it was allowed for Mr. Kluge
13     in the 2017/2018 school year was what, to your
14     knowledge?
15 A   Because while he had agreed to use the names in
16     PowerSchool at the end of the 2016/2017 school
17     year, at the start of the 2017/2018 school year
18     he said that he could not use the names in
19     PowerSchool.
20 Q   Well, the students' last names appear in
21     PowerSchool; right?
22 A   Correct.  He was not going to use the first
23     names as they appeared in PowerSchool.
24 Q   Do you know whether or not he asked to use
25     students' last names only as an accommodation

Page 43

1      for his sincerely-held religious beliefs?
2  A   I don't know why he asked to use them but it's
3      my understanding he did ask to use them.
4  Q   I'm sorry, your understanding that he did or did
5      not ask to use them?
6  A   That he asked to use them but I don't know why
7      he asked to use them.
8  Q   Okay.  And what do you know about the reasons
9      behind the decision not to allow teachers like
10     Mr. Kluge to use student's last name after the
11     2017 and '18 school year?
12 A   I believe it was based on the feedback that we
13     had from students that students felt singled out
14     by the use of their last names.
15 Q   Do you know whether all students were referred
16     to by their last names by Mr. Kluge or --
17 A   Based on conversation I had with students and
18     with staff members, not all students were called
19     by their last name by Mr. Kluge.
20 Q   What students do you recall having conversations
21     with?
22 A   Students in the Equality Alliance.
23 Q   Those would be LGBTQ students?
24 A   Not necessarily.
25 Q   Didn't you describe the Equality Alliance Club

Page 44

1      as a club designed for LGBTQ students?
2  A   I believe I described it as students who were in
3      support of LGBTQ.
4  Q   Who were what?
5  A   Who were in support of LGBTQ.
6  Q   Okay.  Do you recall any specific student names?
7  A   No.
8  Q   Do you recall when you had those conversations?
9  A   I met with the Equality Alliance Club in the
10     Fall of 2017.
11 Q   Did you meet with them just once or more than
12     once?
13 A   Just once.
14 Q   What was the reason for your meeting with the
15     Equality Alliance Club at that point?
16 A   There had been concerns shared from counselors
17     that students were feeling uncomfortable in some
18     of their classes with regards to transgender and
19     so I asked Mr. Lee if he was okay with me
20     attending the meeting and he said yes, so I
21     attended the meeting.
22 Q   That was the only meeting of the Equality
23     Alliance Club you attended?
24 A   Yes.
25 Q   Did you speak with any students outside of the

Page 45

1      Equality Alliance Club about that issue?
2  A   Not that I remember.
3  Q   So you didn't go to the specific classes in
4      question and speak with any students who were
5      unrelated to the Equality Alliance Club?
6  A   Correct.
7  Q   Was there any other reason that you haven't told
8      me about that the school decided not to allow
9      the use of last names going forward?
10 A   No.
11         MR. CORK: Diana, could we see Exhibit 6,
12     please.
13 Q   Exhibit 6 is a multi-page document.  This also
14     is a response to one of our requests for
15     production.  Specifically, Request for
16     Production No. 15 asks for the school to provide
17     documents consisting of or referencing any
18     written policy maintained by the school
19     corporation during John Kluge's employment
20     regarding requests for religious accommodations.
21     And this was produced in response to that
22     request.
23         With that in mind, take a moment to look at
24     it and tell me if you are familiar with this
25     document, please.

Case 1:19-cv-02462-JMS-DLP   Document 120-6   Filed 03/15/21   Page 8 of 8 PageID #: 1309

JOHN M. KLUGE VS
BROWNSBURG COMMUNITY SCHOOL CORPORATION, et al.

KATHRYN JESSUP
November 6, 2020

Page 46

1  A   Yes, I'm familiar with this document.
2  Q   This is a formal part of the policy manual for
3      the school corporation; correct?
4  A   Correct.
5  Q   And it is specifically Policy No. 3122 titled
6      Nondiscrimination and Equal Employment
7      Opportunity; right?
8  A   Correct.
9  Q   This policy went through the procedure of
10     submission to the board and approval by the
11     board to become a formal policy; right?
12 A   Yes.
13 Q   Does this appear to be an accurate copy of the
14     policy as you remember it?
15 A   Yes.
16 Q   The last page of this document, Page 146, right
17     on the bottom just before you get into the Legal
18     area, there are some revision dates, 9/12/05,
19     11/14/11 and 8/12 of '13.  There's another
20     document available on the school corporation's
21     web site.
22        MR. CORK: Diana, could we see Exhibit 7,
23     please.
24 Q   If you want to scroll to the first page of that,
25     it's 227.  This is titled Bylaws Re:

Page 47

1      Resignation, but if you scroll down a little bit
2      there is Policy 3122, Nondiscrimination and
3      Equal Employment Opportunity, which is the same
4      policy we looked at in the prior exhibit; right?
5  A   Appears to be.
6  Q   Except this has some additional language
7      concerning Americans with Disability Act
8      accommodations, as an example, on Page 228.
9  A   Okay.
10 Q   Then on the last page of this document -- pardon
11     me, not the last page.  Page 234.
12 A   Okay.
13 Q   There are some revision dates and I only go
14     through this process to point out that this
15     appears to have been revised at a later point in
16     time, 4/11/16, so this appears to be a more
17     recent version than the previous exhibit,
18     Exhibit 6.  Would you agree with that?
19 A   Based on the dates, it appears to be so.
20 Q   Okay.  I'm interested in the addition of the
21     reasonable accommodation language under the ADA.
22     Do you recall why that was added to this
23     version?
24 A   No.  The way -- no.
25 Q   Are you able to explain the iteration of these

Page 48

1      revisions?
2  A   So, on some of these pages, so right on the page
3      that we're looking at right now, if you see
4      where it says "Neola 2015."
5  Q   Yes.
6  A   Neola is a company that we use that provides us
7      with updates to the policy.  When the updates
8      are provided to us, we determine whether or not
9      we are going to accept the updates and make the
10     revisions that they provide or whether we're
11     going to stick with the policies that we have.
12        The 3,000s, which is what these are, we
13     refer to policies by what thousands they are.
14     So, for instance, 3,000s are going to deal with
15     employees.  I would deal with 2,000s which is
16     program.  So 3,000 would be Jodi Gordon would
17     deal with these and then she would go through
18     the Neola recommendations to make policy
19     recommendations for changes that would then go
20     the school board.
21 Q   The previous Exhibit 6, as I said earlier, was
22     in response to our request for a document
23     regarding religious accommodations and Exhibit 6
24     and Exhibit 7 refer to the same policy number,
25     3122, Nondiscrimination and Equal Employment

Page 49

1      Opportunity, but neither one appears to contain
2      any reference to religious accommodations
3      specifically.  Would you agree with that?
4  A   I'm not that familiar with this policy.
5  Q   Are you aware of any other formal policy in
6      existence at Brownsburg Community School
7      Corporation that addresses religious
8      accommodations more specifically?
9  A   I don't know.
10 Q   Both of these policies as revised, and
11     particularly Exhibit 7, would be
12     nondiscrimination and EEO policies in effect
13     during Mr. Kluge's employment at Brownsburg
14     Community School Corporation; right?
15 A   I don't know.
16 Q   Do you know who would have a better idea of the
17     answer to that?
18 A   Yes, information about employees would be best
19     addressed by Jodi Gordon.
20 Q   Jodi Gordon?
21 A   Correct.
22 Q   And, just for the sake of clarity, you're
23     referring to the Human Resources director;
24     right?
25 A   Correct.