# EXHIBIT 14

# Excerpts of Deposition of Craig Lee

```
              UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF INDIANA
                 INDIANAPOLIS DIVISION
             CASE NO. 1:19-cv-2462-JMS-DLP

JOHN M. KLUGE                              )
                                           )
           Plaintiff(s),                   )
                                           )
    -vs-                                   )
                                           )
BROWNSBURG COMMUNITY SCHOOL                )
CORPORATION, et al.,                       )
                                           )
           Defendant(s).                   )
```

The videoconference deposition upon oral examination of CRAIG LEE, a witness produced and sworn before me, Brandy L. Bradley, RPR, a Notary Public in and for the County of Hamilton, State of Indiana, taken on behalf of the Plaintiff at the remote location of the witness, Indianapolis, Marion County, Indiana, on the 11th day of December, 2020, pursuant to the Indiana Rules of Trial Procedure.

```
                  CIRCLE CITY REPORTING
                135 N. Pennsylvania Street
                         Suite 1720
                  Indianapolis, IN  46204
                      (317) 635-7857
```

Case 1:19-cv-02462-JMS-DLP Document 120-14 Filed 03/15/21 Page 3 of 17 PageID #: 1336

JOHN M. KLUGE VS
BROWNSBURG COMMUNITY SCHOOL CORPORATION, et al.

CRAIG LEE
December 11, 2020

Page 18

1   policies would be. My understanding would be
2   that they would but I am not completely familiar
3   with if there was that circumstance what's in
4   writing, for example. I'm just not completely
5   familiar with that, but I would think they
6   would, but, again, I'm just not completely
7   familiar with what it looks like in writing.
8 Q  Okay. Do you know if the school has a policy
9   against discriminating against students or
10  teachers based on their religious beliefs?
11 A  I'm not aware of an exact policy.
12 Q  Okay. Do you know whether or not based on your
13  experience at the school it accommodates
14  individuals with religious beliefs?
15 A  Can I just ask for some clarification with that
16  question?
17 Q  Sure. Let's use a hypothetical. Say an
18  individual has a sincerely-held religious
19  belief, perhaps Jewish and they celebrate Yom
20  Kippur or Rosh Hashanah and they want what would
21  otherwise be a normal school day, they want to
22  have that off in order to celebrate their
23  religious holiday. Do you know if the school
24  provides for that?
25 A  I am not familiar with what the school's policy

Page 19

1   is relating to that.
2 Q  Okay. You're aware, I believe -- tell me if
3   you're not -- that Mr. Kluge who was formerly
4   employed by Brownsburg High School had a
5   sincerely-held religious belief against
6   referring to transgender students by their new
7   transgender name. Do you understand that?
8        MR. LANOSA: Objection to form.
9        MR. CORK: You may answer.
10       THE WITNESS: I didn't quite hear what the
11  objection was. Can you repeat that?
12       MR. LANOSA: I just objected to the form of
13  the question.
14       THE WITNESS: Oh.
15       MR. LANOSA: You can answer or you can ask
16  him to repeat it if you need him to.
17       THE WITNESS: Mr. Cork, will you repeat the
18  question, please.
19 Q  I will, yes. And if your counsel objects, as he
20  might during the course of the deposition,
21  unless he instructs you not to answer based on
22  some privilege or for another reason, you're
23  able to respond.
24 A  I understand, yeah.
25 Q  Okay. My question was -- and I'll try to

Page 20

1   simplify it -- are you aware that Mr. Kluge when
2   he was employed at Brownsburg professed
3   sincerely-held religious beliefs against calling
4   transgender students by their new transgender
5   names and associated pronouns?
6 A  That's my understanding.
7 Q  Did you ever have a conversation with Mr. Kluge
8   about that?
9 A  I only ever had, to my knowledge, one
10  conversation with Mr. Kluge. I wouldn't
11  describe the conversation as being about that.
12  It was a very brief conversation where Mr. Kluge
13  told me that I was -- that God made me a male
14  and that was kind of what I recall the focus of
15  the conversation being about rather than a
16  general say conversation about what you just
17  described.
18 Q  Do you recall the context of the conversation
19  you're describing, approximately when it
20  occurred and where it occurred and how that
21  subject came up in conversation?
22 A  I can't remember the dates of the faculty
23  meeting. It was after -- it was towards the end
24  of the meeting and, again, I can't remember when
25  the meeting was but it was a faculty meeting and

Page 21

1   I think it was right at the end of the faculty
2   meeting, and I don't remember a huge amount
3   about the conversation other than pretty much
4   what I just described.
5 Q  Were you also aware that the school provided
6   Mr. Kluge with an accommodation for his
7   religious beliefs that involved using last names
8   only for students?
9        MR. LANOSA: Objection to form.
10 A  My understanding was that Mr. Kluge wasn't using
11  his students' first names. I didn't know the
12  details or what the discussions involved that
13  related to him doing that. I wasn't present for
14  those discussions.
15 Q  Okay. Assuming, if you will, please, that such
16  an accommodation existed for Mr. Kluge or for
17  that matter any other teacher with similar
18  sincerely-held religious beliefs involving
19  transgender students and the use of transgender
20  names, do you believe that that would be a
21  reasonable accommodation for all involved, using
22  last names only?
23       MR. LANOSA: Objection to form.
24 A  It's our responsibility as teachers to make our
25  students feel safe and comfortable in our

Case 1:19-cv-02462-JMS-DLP   Document 120-14   Filed 03/15/21   Page 4 of 17 PageID #: 1337

JOHN M. KLUGE VS
BROWNSBURG COMMUNITY SCHOOL CORPORATION, et al.

CRAIG LEE
December 11, 2020

Page 22

1  classroom and I think that that's a priority and
2  that should always be a priority and Mr. Kluge's
3  students were not being made to feel that way,
4  quite the opposite. That's my understanding
5  based on what you just described.
6  Q  Students were not being made to feel comfortable
7  in their classroom by the teacher referring to
8  all of them by their last names?
9  A  That what you described as policy was causing a
10  huge amount of emotional distress and harm to at
11  least two of the students that he had in
12  classes.
13  Q  Were those two students transgender students to
14  the best of your knowledge?
15  A  Yes, and also a student who I had a conversation
16  with who did not identify as LGBTQ who was a
17  student in Mr. Kluge's class that told me he
18  felt uncomfortable and other students did, too,
19  because of this name policy.
20  Q  In addition to your duties as a government and
21  sociology teacher at the school, you have also
22  been a faculty advisor for a club by the name of
23  the Equality Alliance Club; is that right?
24  A  Yes, I guess the title is a sponsor. The club
25  was called the Gay-Straight Alliance Club for

Page 23

1  about four or five years and then it changed its
2  name to Equality Alliance and, with the
3  exception of one year, I have been the sponsor.
4  Q  What difference do you make between the
5  description I used faculty advisor and sponsor?
6  Is there any or just semantics?
7  A  One of the roles at school is I sit on something
8  called the Faculty Advisory Committee which
9  basically I'm a union representative and we
10  regularly meet with the principal, and, so, when
11  I hear the words "faculty advisor," I think I
12  tend to automatically think of being a faculty
13  advisory representative. And my position, my
14  understanding of since, well, from when I first
15  sponsored the club was the club sponsor, so
16  that's why I kind of separate the two.
17  Q  Okay. As the sponsor of the Equality Alliance
18  Club, what are your duties?
19  A  To really make sure that the club meetings are
20  organized and run in a smooth fashion and if the
21  students who lead the club have questions or
22  need help with something in the club, I'm there
23  to basically assist them. That's how I have
24  seen my position as the sponsor of that club
25  over the years.

Page 24

1  Q  You're familiar with an entity that I described
2  or I named earlier Indiana Youth Group, Inc.;
3  correct?
4  A  Yes.
5  Q  How did you first become acquainted with that
6  entity?
7  A  I think it was maybe our first year or second
8  year running as a club and a man called Graham
9  Brinklow, he used to be the I understood like
10  the head of Indiana Youth Group. He reached out
11  to me, I think, because he learned that we had
12  just started this club and basically wanted to
13  offer to support or come in and present. That,
14  to my knowledge, is the first time that I think
15  he reached out to me.
16  Q  Are you involved with Indiana Youth Group staff
17  on a regular basis during the course of the
18  school year?
19  A  Do you mean me personally?
20  Q  Yes, correct.
21  A  I don't have many interactions with Indy Youth
22  Group. There may be or may have been over the
23  years an exchange of e-mails, but there was a
24  year when we were invited to present at an
25  annual event, but, so, other than that, there

Page 25

1  isn't what I would describe as a huge amount of
2  communication.
3  Q  I have read that Indiana Youth Group is referred
4  to as an affiliate of Parents, Friends, and
5  Families of Lesbians and Gays which goes by the
6  acronym PFLAG. Are you aware of that?
7  A  IYG? I wasn't familiar with that. If you said
8  IYG, that's what I refer to them as, IYG.
9  Q  Okay. Indiana Youth Group, IYG, is described in
10  some material I've seen as an affiliate of
11  another organization called Parents, Friends,
12  and Families of Lesbians and Gays. Are you
13  aware of that?
14  A  I am not familiar with that relationship that
15  they have.
16  Q  Are you familiar with the entity Parents,
17  Friends, and Families of Lesbians and Gays?
18  A  It's possible that at some point I was aware of
19  it but right now I'm not familiar with them.
20  Q  Have you ever been employed by Indiana Youth
21  Group?
22  A  No.
23  Q  Have you ever been in any kind of an independent
24  contractor relationship with Indiana Youth
25  Group?

Case 1:19-cv-02462-JMS-DLP   Document 120-14   Filed 03/15/21   Page 5 of 17 PageID #: 1338

JOHN M. KLUGE VS
BROWNSBURG COMMUNITY SCHOOL CORPORATION, et al.

CRAIG LEE
December 11, 2020

Page 26

1  A   As far as relationship goes, like what I just
2      described where our club once did a presentation
3      at Indy Youth Group and there have been some
4      occasions where a representative or somebody
5      working for Indy Youth Group has come to our
6      club, I would say that's the extent of the
7      relationship.
8  Q   Have you ever volunteered for Indiana Youth
9      Group in any capacity?
10 A   I have not volunteered for them.
11 Q   Have they ever provided you with anything of
12     value, whether monetary or otherwise tangible or
13     intangible, for any reason?
14 A   I would describe their support particularly in
15     the early days of when it was the Gay-Straight
16     Alliance as being very valuable.  The
17     conversations I had with Graham Brinklow, I
18     don't know -- I can't remember how long he
19     worked for Indy Youth Group but he was somebody
20     who over the years I may have e-mailed a
21     question or questions, but he just best kind of
22     just being there to answer those questions if
23     they could or when they invited us to do a
24     presentation or when Graham came in to present
25     and talk to our club along with another

Page 27

1      representative they had, I considered that to be
2      of significant support.
3  Q   Has Indiana Youth Group ever provided you with
4      anything of value, you individually?
5  A   As the sponsor of the club, I guess I would say
6      that -- when I say "we," the club, I would
7      consider myself to be a part of that entity, but
8      on an individual basis when there has been an
9      exchange of e-mails about something, I mean, I
10     would describe that as support and being
11     valuable.
12 Q   Right, I understand.  Has Indiana Youth Group
13     ever provided the Equality Alliance Club or you
14     individually with anything other than support
15     that you would consider to have some tangible
16     value, in other words, money or something like
17     money, something of value?
18 A   I can't recall money but when Graham would come
19     and present to the club, that I considered or
20     the things that he would discuss or present to
21     students or discussing some of the things that
22     Indy Youth Group does, I really consider that to
23     be of great value to the kids in the club and
24     for me to know about that stuff.  I consider
25     that to be valuable, but I can't, to my

Page 28

1      knowledge, remember like a donation as such.
2  Q   Have you ever contributed money or time or
3      anything to Indiana Youth Group?
4  A   When our club did a presentation that I
5      supported them with and interacted -- I
6      interacted with I think it was Graham at the
7      time at the club -- of Indy Youth Group, sorry,
8      I would consider that to be kind of spending my
9      time like interacting with them, but I never
10     volunteered or worked for them as such but I did
11     spend time talking to organize our presentation,
12     for example.
13          MR. CORK:  I understand.  Diana, could you
14     put Exhibit 35 on the screen, please.
15 Q   Diana is going to make available on your screen
16     an exhibit and then she will give you control of
17     the document so that you're able to scroll
18     through it.
19          This Exhibit 35 is a document, a pleading
20     actually, that was filed in this lawsuit earlier
21     and it is titled Declaration of Craig Lee in
22     Support of Indiana Youth Group, Inc.'s Motion to
23     Intervene as Defendant.  Take a moment to scroll
24     through the document because it's multiple pages
25     and tell me if you are familiar with this.

Page 29

1  A   Is there a way that this can be made bigger?
2  Q   Yes.  If you go up to the top, if you see the
3      circles, one with a minus, one with a plus.
4  A   Oh, yeah.  Okay.
5  Q   There you go.
6  A   Okay.
7  Q   And you figured out how to scroll through it,
8      so --
9  A   Okay.  I think I'm done.  I'm just going to read
10     the first bit just one more time.
11 Q   Okay.  Take your time.
12 A   Okay.  I have read that document.
13 Q   Are you familiar with the document?
14 A   I am.
15 Q   The document appears to have your signature on
16     the fifth page dated October the 2nd of 2019.
17     Is that indeed your signature?
18 A   It is, yes.
19 Q   And it was signed under the penalty of perjury.
20     You signed it on the date indicated?
21 A   Yes.
22 Q   How did you come about submitting or signing
23     this declaration in support of Indiana Youth
24     Group's motion to intervene?  Did you volunteer
25     or were you requested?

Case 1:19-cv-02462-JMS-DLP   Document 120-14   Filed 03/15/21   Page 6 of 17 PageID #: 1339

JOHN M. KLUGE VS
BROWNSBURG COMMUNITY SCHOOL CORPORATION, et al.

CRAIG LEE
December 11, 2020

Page 30

1 A   I can't recall the exact circumstances or
2     conversation and with whom it took place with as
3     being why I specifically signed this document.
4     I understand to receive representation where I
5     am now, that was a part of that process, so I
6     guess that would be my answer, to have
7     representation as counsel.
8 Q   Indiana Youth Group is and was at the time
9     represented by the firm that represents you
10    today, Covington & Burling, and Brownsburg is
11    and was represented by a firm and, more
12    specifically, Attorneys Brent Borg and Alex
13    Pinegar, the firm Church Church Hittle & Antrim.
14    Did you have conversations with either or both
15    of those firms about this declaration?
16        MR. LANOSA: I caution the witness if you
17    can answer yes or no.
18 Q   I'm not asking you about the substance of your
19    conversations, just whether you had
20    communication with counsel about the
21    declaration.
22 A   I can't remember the specific person I talked to
23    but I remember having conversations relating to
24    Indy Youth Group's rep -- how they are or who
25    would represent them and myself.

Page 31

1 Q   During the course of this litigation have you
2     had communication with attorneys?  And, again,
3     I'm not asking you about the substance of the
4     communications, just whether or not you have
5     communicated with attorneys from Covington &
6     Burling and also Church Church Hittle & Antrim.
7 A   Yes.
8 Q   Okay.  Did anyone offer you anything of value
9     for providing this declaration?
10 A   Can you describe what you mean by anything of
11    value?  Being represented, I consider that to be
12    a value, but if that's what you mean, then being
13    represented, yes.
14 Q   You're being represented today but unless -- let
15    me ask it a different way.  When you were asked
16    to provide the declaration or when you
17    volunteered, whichever the case may be, did you
18    do so because someone told you or suggested that
19    if you became involved or had to sit for a
20    deposition that they would represent you?
21 A   I can't remember the specific conversation that
22    took place.  Again, I think it was, if I recall,
23    I think that there was something to do with it
24    but I cannot remember those specific
25    conversations.

Page 32

1 Q   Okay.  In any event, nobody paid you for your
2     declaration; right?
3 A   No.
4 Q   Do you recall whether you drafted the
5     declaration or whether someone else drafted it
6     for your signature?
7 A   I did not draft this declaration.
8 Q   I presume that you reviewed it before you signed
9     it; right?
10 A   Yes.
11 Q   And did you believe it to be accurate when it
12    was signed?
13 A   Yes.
14 Q   And do you still find it accurate?
15 A   I do.  I do.  It was some time ago that I signed
16    it and at the time, absolutely, yes, I
17    considered it to be accurate and I still do.
18 Q   If I could direct your attention to the second
19    page of the declaration, Paragraph 4.  It
20    states, "The Equality Alliance is a club that
21    gathers on a weekly basis to discuss issues that
22    impact the LGBTQ community, and also serves as a
23    safe space for students who identify as LGBTQ."
24    What did you mean by a "safe space for
25    students"?

Page 33

1 A   It's an environment where students can be open
2     with regard to conversation, who they are.
3     There have been a lot of times in the past where
4     LGBTQ students are being bullied by other
5     students at school and it's an environment where
6     those kids don't have to be concerned about
7     sharing or discussing certain topics and fearing
8     any kind of like bullying or anything like that.
9     That's what I mean by a safe space.
10 Q   Okay.  Where does the club meet?
11 A   Usually it meets in my classroom.  Over the last
12    few years we have had kind of two sponsors and
13    so sometimes the club has met in a different
14    teacher's room and there have been periods where
15    we have had so many people attend the meetings
16    that we have had to host them in other rooms
17    that were large enough to accommodate them but
18    usually my classroom.
19 Q   In Paragraph 4 you refer to the number of
20    students who attend the Equality Alliance Club,
21    anywhere from 12 to 40; is that right?
22 A   Yes.
23 Q   And you say there are at least four transgender
24    students at Brownsburg High School who attend
25    the meetings on a regular basis.  The four

Case 1:19-cv-02462-JMS-DLP Document 120-14 Filed 03/15/21 Page 7 of 17 PageID #: 1340

JOHN M. KLUGE VS
BROWNSBURG COMMUNITY SCHOOL CORPORATION, et al.
CRAIG LEE
December 11, 2020

Page 34

1 transgender students who attend, this was back
2 in 2019; right?
3 A  Yes.
4 Q  Okay. And the transgender students who attended
5     at that point in time I would assume to be Sam
6     Willis and Aidyn Sucec and a couple others; is
7     that right?
8 A  It's changed over time. There have been
9     different transgender students that have
10    attended the meetings. I know that Aidyn left
11    the school at some point and so I can't remember
12    the date when Aidyn like left the high school so
13    it's possible that for a period there were
14    different transgender students present and it
15    wasn't necessarily say him.
16 Q  Okay. Aidyn used to attend and you're familiar
17    with a transgender student or you were familiar
18    with a transgender student by the name of Sam
19    Willis; right?
20 A  Yes.
21 Q  And did Sam Willis also attend the Equality
22    Alliance Club?
23 A  Yes.
24 Q  Do you recall the names of the other two
25    transgender students?

Page 35

1 A  I can't.
2     MR. CORK: Can we take a quick break? I
3     need to catch the door for a second.
4     MR. LANOSA: Sure.
5     (A recess was taken.)
6  DIRECT EXAMINATION CONTINUING,
7     QUESTIONS BY MICHAEL J. CORK:
8 Q  We are back on the record and you understand,
9     Mr. Lee, that you are still under oath; right?
10 A  Yes.
11 Q  Exhibit 35 we were discussing before we took a
12    break and I was asking you questions about
13    Paragraph 4. The next paragraph, Paragraph 5,
14    refers to Equality Alliance as a member of the
15    Indiana GSA Network administered by the Indiana
16    Youth Group. What is, to the best of your
17    knowledge, the GSA Network and how is it
18    administered by Indiana Youth Group?
19 A  My understanding is that it includes different
20    schools or potentially organizations that are
21    members of this network. That's my
22    understanding.
23 Q  What exactly is the GSA Network? That's
24    Gay-Straight Alliance; is that right?
25 A  I think, yeah, that would be my assumption here.

Page 36

1     That's what we used to be, yeah.
2 Q  Okay. This is your sworn declaration.
3 A  Yeah, yeah, the Gay-Straight Alliance, yes.
4 Q  Paragraph 6 you indicate that during the 2017
5     and '18 school year you heard students discuss
6     how they were being treated in orchestra class
7     or by the orchestra teacher and, based on your
8     statement, nobody identified Mr. Kluge per se
9     but you assumed that's who they were referring
10    to; right?
11 A  That is correct.
12 Q  Do you recall what students discussed how they
13    were being treated in orchestra class or by the
14    orchestra teacher?
15 A  Aidyn Sucec and Sam Willis were the ones that
16    described that during the meetings.
17 Q  Okay. And those are both transgender students;
18    right?
19 A  Yes.
20 Q  In Paragraph 7 it refers to Mr. Kluge's behavior
21    being a frequent topic of conversation during
22    the Equality Alliance meetings. By frequent, do
23    you mean weekly?
24 A  Yes, pretty much, yes. I can't -- yes.
25 Q  And, again, it refers to students in Mr. Kluge's

Page 37

1     class saying that they found not being called by
2     their first names to be insulting and
3     disrespectful. Were these the same two students
4     you just identified?
5 A  Sam and Aidyn, yes.
6 Q  Any other students?
7 A  I can't recall any other students specifically
8     talking about the -- who are transgendered being
9     made to feel like Aidyn and Sam were.
10 Q  And you go on to state in Paragraph 7 that the
11    students felt like it was their presence that
12    caused Mr. Kluge's behavior.
13 A  Yes.
14 Q  That would be the same students, Aidyn and Sam?
15 A  Aidyn and Sam, yes.
16 Q  And toward the end of Paragraph 7 you state that
17    "These students also felt like it was their
18    presence that caused Mr. Kluge's behavior, which
19    made them feel isolated and targeted."
20 A  Yes.
21 Q  Is that your description, "isolated and
22    targeted," or did the students use those words?
23 A  The students expressed how they were being -- at
24    the meetings. It was clearly visible the
25    emotional distress and the harm that was being

Case 1:19-cv-02462-JMS-DLP Document 120-14 Filed 03/15/21 Page 8 of 17 PageID #: 1341

JOHN M. KLUGE VS
BROWNSBURG COMMUNITY SCHOOL CORPORATION, et al.

CRAIG LEE
December 11, 2020

Page 38

1 caused towards them. It was very, very clear,
2 and, so, that was clear for everyone to see but
3 that is also what they described as well.
4 Q And you indicate that you relayed the students'
5 concerns to the principal at Brownsburg High
6 School. That would be Dr. Daghe; right?
7 A Correct, yes.
8 Q And you also relayed the students' concerns to
9 the assistant superintendent of the Community
10 School Corporation who is Kat, Kathryn Jessup;
11 correct?
12 A Yes.
13 Q And did you identify the students who complained
14 to Dr. Daghe and Dr. Jessup?
15 A I don't recall specifically telling them it was
16 Aidyn and Sam but my assumption was that they
17 absolutely knew that it was Aidyn and Sam. And
18 (inaudible) that at some point I was asked who
19 the students were. I just can't remember word
20 for word, but, yes, that may well have happened
21 but my assumption was that they absolutely knew
22 who the students were as well.
23 Q Was it your interpretation that Aidyn and Sam,
24 Aidyn Sucec and Sam Willis, felt as if they were
25 being discriminated against by Mr. Kluge?

Page 39

1 A I wouldn't describe it so much as an
2 interpretation. It was just very, very clear at
3 the meetings to see how much emotional harm was
4 being caused towards Sam and Aidyn. It was
5 clear for everyone at the meetings just to see
6 how much of an impact it was having on them.
7 So, when I say like I wouldn't call it an
8 interpretation, I mean, it was so clearly
9 visible that I don't feel like there was
10 anything to necessarily interpret.
11 Q What time frame did you communicate this
12 information to Dr. Daghe and Dr. Jessup? Was
13 this in 2017, 2018?
14 A There was a conversation I had with Dr. Jessup
15 at a school event and I can't remember the date
16 of that conversation and there was a meeting, a
17 faculty advisory meeting, where it was shared
18 with Dr. Daghe and I think that meeting was at
19 the end of August in the 2018 year, I think
20 '17/'18, but, again, I can't remember when it
21 was that I had that conversation with
22 Dr. Jessup, the specific date.
23 Q After you communicated that information to
24 Dr. Daghe and Dr. Jessup, to your knowledge, did
25 either of them initiate an investigation?

Page 40

1 A Dr. Jessup attended one of the Equality Alliance
2 meetings and my understanding was that based on
3 what she witnessed at the meeting from listening
4 to Aidyn and Sam talk amongst other students as
5 well that some kind of process would have been
6 followed, yes.
7 Q But do you know for a fact whether an
8 investigation was initiated?
9 A I don't know exactly what Dr. Jessup or
10 Dr. Daghe did afterwards.
11 Q Were you ever contacted by an employee by the
12 name of Dezarn-Lynch who is the compliance
13 officer for the EEO Nondiscrimination Policy?
14 A Can you repeat that name, please.
15 Q Sure. Are you familiar with a woman by the name
16 of -- her first name escapes me -- last name
17 Dezarn-Lynch? She is the so-called compliance
18 officer at Brownsburg Community School
19 Corporation under the EEO, the Equal Employment
20 Opportunity Nondiscrimination Policy?
21 A The name sounds familiar but I cannot recall
22 specifically talking to her, but, again, I just
23 can't remember.
24 Q If she spoke to you as a result of a complaint
25 being filed on behalf of the students Aidyn

Page 41

1 Sucec or Sam Willis, it would have been in
2 conjunction with an informal or formal
3 investigation of discrimination and, from what
4 you said, I take it that never happened;
5 correct?
6 A I can't remember. I'm not saying it didn't
7 happen. I just can't -- over the course of a
8 year I have so many conversations with so many
9 different people related to school like classes
10 or parents and so I'm not saying I didn't. I'm
11 just saying I can't remember if I did.
12 Q Okay. But what you do remember is communicating
13 the concerns of Aidyn Sucec and Sam Willis to
14 Dr. Daghe and Dr. Jessup and you left it in
15 their hands; right?
16 A Yes.
17 Q And in Paragraph 8 you say, "Multiple times the
18 Equality Alliance members mentioned that
19 Mr. Kluge would occasionally slip up and use
20 first names or gendered honorifics rather than
21 last names and some students felt that Mr. Kluge
22 avoided acknowledging transgender students who
23 raised their hands in class." Are you referring
24 to the same students, Aidyn Sucec and Sam
25 Willis?

Case 1:19-cv-02462-JMS-DLP Document 120-14 Filed 03/15/21 Page 9 of 17 PageID #: 1342

JOHN M. KLUGE VS
BROWNSBURG COMMUNITY SCHOOL CORPORATION, et al.

CRAIG LEE
December 11, 2020

Page 42

1 A Yes.
2 Q Are you referring to anyone besides those two
3   students?
4 A I can't recall the content of every conversation
5   surrounding Mr. Kluge and him not calling on
6   students. It's possible that there were other
7   students at some of the meetings who had been in
8   his class who had observed it and said that it
9   did happen, but, again, I can't remember so I'm
10  not going to categorically say it was just them
11  two. It's possible that someone else may have
12  been at a meeting and shared that and that I
13  just don't remember.
14 Q You can't recall any additional students besides
15  Aidyn and Sam as we sit here today; right?
16 A Correct.
17 Q Paragraph 9 refers to one student who was not a
18  member of Equality Alliance but was in one of
19  Mr. Kluge's classes, an orchestra class. He or
20  she approached you regarding Mr. Kluge's use of
21  last names. Do you recall who that student was?
22 A I can't remember the student's name.
23 Q At the time that you signed this sworn
24  declaration in October of 2019, do you know
25  whether or not you knew what student that was?

Page 43

1 A I did not recall who the student was.
2 Q You say in Paragraph 9 again the student was
3   fairly certain that all students knew Mr. Kluge
4   had switched to using last names and that it
5   made the transgender students in the orchestra
6   class stand out. Were you referring to the
7   student believing that Mr. Kluge was using last
8   names as an accommodation for his religious
9   beliefs regarding transgenderism?
10      MR. LANOSA: Objection to form.
11 A Can you repeat that question, please, Mr. Cork.
12 Q When you say that this unidentified student said
13  that he found Mr. Kluge's use of last names very
14  awkward, was the student referring to
15  Mr. Kluge's use of last names based on the
16  student's belief that he was using it simply to
17  avoid referring to transgender students by their
18  first names?
19 A Yeah, him using their last names, yeah, as
20  detailed there, yes.
21 Q Okay. And this unidentified student apparently
22  told you there were other students who felt this
23  way as well. Are you able to identify any of
24  these other students?
25 A I am not.

Page 44

1 Q Did anyone in the Brownsburg School
2   Administration ever communicate to you why
3   Mr. Kluge was using last names?
4 A I can't recall the specific content of a
5   conversation. It's possible when I was talking
6   to Mrs. Jessup or Dr. Daghe that that was
7   detailed. It was definitely my understanding
8   that it related to his religious beliefs, and,
9   so, at some point that had been relayed so I
10  just can't remember specifically who but it had
11  been at some point relayed to me.
12 Q That Mr. Kluge was using last names based on his
13  sincere religious beliefs?
14 A That was my understanding.
15     MR. LANOSA: Objection to form.
16 A Can you repeat that question again, please.
17 Q Oh, okay. I thought you had answered.
18 A Sorry.
19 Q You said it was your understanding that
20  Mr. Kluge was using last names based on what he
21  professed to be his sincerely-held religious
22  beliefs; is that right?
23 A That was my understanding.
24 Q Okay. There appears to have been a difference
25  at the school in how they communicated

Page 45

1   accommodations for transgender students and an
2   accommodation for a teacher with professed
3   sincerely-held religious beliefs. And by that I
4   mean the transgender accommodations that we
5   discussed earlier such as using the bathroom of
6   their choice and dressing as they chose and
7   changing first names and pronouns, dress, those
8   were all communicated very openly regarding
9   transgender students; right?
10      MR. LANOSA: Objection to form.
11      MR. BORG: Same objection.
12 Q Can you answer?
13 A That I wouldn't necessarily describe as being
14  relayed like clearly. The understanding was
15  that, yes, those students would be treated the
16  same as other students, nontransgender students,
17  and that those accommodations were made.
18 Q Right. I was referring to accommodations for
19  all transgender students. The accommodations
20  that the school provided for transgender
21  students were communicated openly to teachers
22  and employees; right?
23      MR. LANOSA: Objection to form.
24      MR. BORG: Same objection.
25 A I can't recall there being say like a meeting

Case 1:19-cv-02462-JMS-DLP   Document 120-14   Filed 03/15/21   Page 10 of 17 PageID #: 1343

JOHN M. KLUGE VS
BROWNSBURG COMMUNITY SCHOOL CORPORATION, et al.

CRAIG LEE
December 11, 2020

Page 46

1 where the administration as you described like
2 clearly detailed what these students could do
3 but it was relayed to us. I just can't
4 specifically remember what that process was when
5 they did it.
6 Q  The accommodation, the last-names-only
7 accommodation provided to Mr. Kluge, on the
8 other hand, was not clearly communicated to you
9 as a teacher; right?
10    MR. LANOSA: Objection to form.
11 A  I can't remember a date or who the specific
12 person was and what they specifically said
13 relating to Mr. Kluge and him not using
14 students' first names but it was relayed to me
15 at some point that it related to his -- my
16 understanding was it related to his religious
17 beliefs.
18 Q  How was that communicated to you and who do you
19 recall communicating it to you?
20 A  I can't recall the specific like who it was or
21 how it was or when it was.
22 Q  I've seen e-mails that were sent by
23 administrators, counselors at Brownsburg
24 Community School Corporation, to teachers and
25 other administrators regarding transgender

Page 47

1 students and new names, et cetera. To my
2 knowledge, there was no such e-mail regarding
3 Mr. Kluge's accommodation. Do you recall ever
4 seeing one?
5 A  I can't recall seeing one.
6 Q  In Paragraph 10 you state in relevant part that
7 the Equality Alliance members would report being
8 called homophobic slurs by other students on a
9 fairly regular basis and that at one of the more
10 recent meetings a student complained that
11 another student had called him a homophobic
12 slur. Do you recall who reported that to you?
13 A  This is something that's happened a lot over the
14 years, less now, much less now than it used to
15 be, and so I can't remember who the specific
16 student was that reported that, though, at that
17 recent meeting that I described.
18 Q  You said initially that members reported being
19 called homophobic slurs and that a single
20 student complained more recently about similar
21 treatment. When that happened, did you ever
22 report it to the administration, Dr. Daghe or
23 Dr. Jessup?
24 A  When a student reports something like this, then
25 my question to them is what happened afterwards

Page 48

1 or did you talk to your counselor or did you say
2 something to the teacher. And, quite often, if
3 it say it happens during a class, there have
4 been times when a student has said "I got called
5 a homophobic slur" and I'll say, "Well, when did
6 it happen?" They'll say during a particular
7 class. And then my question would be, "Well,
8 did the teacher know? Did you share that with
9 the teacher?"
10    So it varies from kind of person to person
11 and so I would have asked those questions and it
12 could have been that the student said, well, I
13 told the teacher, the teacher spoke to the other
14 student. It could be that they -- I can't
15 remember with this specific student what that
16 conversation was in terms of who they spoke to
17 afterwards, but it tends to vary depending on
18 the circumstance or I should say where it
19 happened or when it happened and I can't
20 remember with that specific student.
21 Q  When the events you describe in Paragraph 10 of
22 Exhibit 35 occurred, did you ever report them as
23 discrimination to the compliance officer named
24 in the school EEO and Nondiscrimination Policy?
25 A  Are you referring to the student where I say at

Page 49

1 one of the most recent meetings that the student
2 complained? This is the student you're
3 referring to; right?
4 Q  Any of the students who reported to you that
5 they were called homophobic slurs by other
6 students. I'm just asking when that occurred if
7 you reported it to administration and/or
8 reported it directly to the nondiscrimination
9 compliance officer.
10    MR. LANOSA: Objection to form.
11 A  I can't remember with every specific student who
12 I reported it to. It depended on the
13 circumstances and so I just can't remember
14 specifically with each time it's happened who I
15 would have reported it to or if I had reported
16 it or if it was dealt with by a teacher or
17 already in the process of being dealt with which
18 is also possible.
19 Q  If it had been reported to the nondiscrimination
20 compliance officer, there would be a record of
21 that, wouldn't there?
22 A  I'm not familiar with what that process is with
23 the nondiscrimination officer, I think you said,
24 and so I just don't know what that exact process
25 is.

Case 1:19-cv-02462-JMS-DLP Document 120-14 Filed 03/15/21 Page 11 of 17 PageID #: 1344

JOHN M. KLUGE VS
BROWNSBURG COMMUNITY SCHOOL CORPORATION, et al.

CRAIG LEE
December 11, 2020

Page 50

1 Q Have you ever reported a matter of potential
2   discrimination to the compliance officer?
3 A I can't recall having a specific conversation
4   with this compliance officer. I just can't
5   remember.
6 Q Okay. When these students made expressed
7   concerns about Mr. Kluge, did you ever approach
8   him and have a conversation about this student's
9   concerns, what they told you and his use of last
10  names?
11 A I can't recall -- when you described students,
12   it sounded like you were saying specifically
13   talking about Mr. Kluge. They were talking
14   about their experiences in the orchestra class,
15   how they were being harmed by him. We have a
16   policy of not using teachers' names if something
17   comes up at a meeting. I don't recall ever
18   talking to Mr. Kluge or approaching him to talk
19   to him about this.
20 Q In Paragraph 11, the last paragraph of your
21   sworn declaration, you identify Aidyn Sucec
22   specifically and the fact that Aidyn was
23   publicly known to be transgender and you say
24   that Aidyn was deeply hurt by the way Mr. Kluge
25   treated him but you don't indicate that Aidyn

Page 51

1   was one of the students that you were referring
2   to in other parts of your sworn declaration and
3   you have today made that connection. Is there
4   any other student that you would reference or
5   any other students besides Aidyn and Sam as
6   allegedly being deeply hurt?
7 A Aidyn and Sam who were in Mr. Kluge's class,
8   they shared regularly at the meetings that they
9   were deeply impacted by him but I can't name
10   another student who was in his class who is
11   transgender.
12 Q Aidyn and Sam's main concern was the fact that
13   Mr. Kluge wouldn't address them by their new
14   transgender first name; right?
15 A I wouldn't describe it as a concern. I would
16   describe it as they were just really harmed
17   emotionally by Mr. Kluge not calling them by
18   their name, deeply emotionally hurt.
19 Q Have you had any formal training in psychology
20   or psychiatry?
21 A I have not.
22 Q So, when you make this claim that these students
23   were deeply emotionally hurt by Mr. Kluge,
24   that's not based on anything other than a
25   layman's opinion; right?

Page 52

1 A I would disagree. At the meetings seeing two
2   kids so deeply upset and so distressed and just
3   so emotionally harmed by this, I wouldn't say
4   layman's. It was abundantly clear to anybody at
5   the meetings how much emotional distress and
6   pain it was causing Aidyn and Sam.
7 Q But that's your interpretation as a layperson
8   and not a professional; correct?
9       MR. LANOSA: Objection to form.
10      THE WITNESS: Can I just ask a question?
11 When you object it kind of in my headphones when
12 you say what the objection is, I don't hear that
13 abundantly clear. I feel like I should be able
14 to and it's important that I should and so it
15 just is kind of not incredibly clear.
16      MR. LANOSA: Okay. I can try to speak
17 louder for you. Sorry about that. Objection to
18 form of the question.
19      THE WITNESS: Okay. Thank you. So, I'm
20 sorry, I thought I needed to say that. Can you
21 repeat the question, Mr. Cork?
22 Q Let's strike that question. You were engaged in
23   a narrative anyway not responsive to my
24   question.
25      You've already confirmed that you don't

Page 53

1   have any formal training in psychology or
2   psychiatry; correct?
3 A That is correct.
4 Q So you don't have any professional basis to
5   diagnose a student or anyone else as deeply
6   emotionally hurt?
7      MR. LANOSA: Objection to form.
8 A As a teacher it's one of the things that you
9   learn as a teacher is being able to tell when
10  your students are upset or are suffering in one
11  way, shape, or form and it could be for a number
12  of different reasons. Although we don't receive
13  like the training like you just described, when
14  you teach you can often tell when students are
15  upset, distressed by something, and it's your
16  responsibility to kind of interact with that
17  student to some degree to --
18 Q If I understand -- and you're engaged in a
19   narrative that's not responsive to my question.
20   My question is simply for you to confirm that
21   you don't have any professional basis to make a
22   diagnosis like that. Either you do or you
23   don't.
24      MR. LANOSA: Objection to form.
25 A I guess I see as a teacher the ability to tell

Page 54

1  when someone is upset. It's very, very clear.
2 Q Okay. I understand your experience as a teacher
3  and not any professional training.
4 A Not professional psychology training that you
5  described.
6 Q Okay. Very good. That was simple. And the
7  reason that you perceived these two students,
8  Aidyn Sucec and Sam Willis, to be emotionally
9  hurt was the fact that a teacher would not use
10  their new transgender first names; correct?
11 A There were other reasons why these students felt
12  hurt which I detailed in this declaration. They
13  felt like they were being singled out and
14  sometimes they felt that he would avoid calling
15  on them to answer questions and sometimes he
16  would use the first names of other students.
17  And, so, in response to your question, if I was
18  to say yes, that would almost just indicate that
19  it was only the names, him using last names that
20  was causing them harm, but there were other
21  reasons based on his conduct during class that
22  made them upset.
23 Q But it all related to whether or not he
24  identified them by their transgender names;
25  correct?

Page 55

1 A Yeah, it would relate to that, yeah.
2 Q You never visited one of Mr. Kluge's classes;
3  right?
4 A I did not observe him teaching.
5 Q And you don't have any firsthand knowledge of
6  any of the allegations made by Sam Willis or
7  Aidyn Sucec; right?
8 A Can you just repeat that question, please.
9 Q I said you don't have any firsthand knowledge of
10  any of Aidyn Sucec's or Sam Willis's allegations
11  regarding Mr. Kluge; correct?
12     MR. LANOSA: Objection to form.
13 A When you say allegations, can you elaborate,
14  please?
15 Q By allegations I mean their claims regarding
16  Mr. Kluge's conduct in his orchestra class. You
17  never attended one so they were reporting things
18  to you that you didn't have firsthand knowledge
19  of; right?
20 A It was clear at the meetings how they were being
21  harmed. I would consider that to be firsthand
22  knowledge.
23 Q Firsthand knowledge. Do you understand what
24  firsthand knowledge is?
25 A Perhaps if you define that, then I can answer

Page 56

1  the question more clearly.
2 Q Firsthand knowledge would be something that
3  viewed, you participated in. If you never
4  attended one of Mr. Kluge's classes where the
5  things that Aidyn Sucec and Sam Willis alleged
6  occurred, then you don't have any firsthand
7  knowledge of it. You're just going on what they
8  told you.
9     MR. LANOSA: Objection to form.
10 A I observed and participated in the discussions
11  at the meetings and where they were -- I did not
12  observe Mr. Kluge in class but --
13 Q Okay, you've answered my question.
14 A -- I participated in what you described.
15 Q And I don't want any more narratives, okay? I
16  understand you're trying to add some things to
17  the record but that's not helpful. All you're
18  doing is making the deposition longer than it
19  needs to be.
20     And you don't have any recollection of ever
21  reporting any of the claims made by students in
22  the Equality Alliance Club to the Brownsburg
23  Community School Corporation EEO compliance
24  officer for investigation; correct?
25 A Yeah, I can't recall specifically talking to

Page 57

1  them.
2     MR. CORK: I'm finished with Exhibit 35.
3  You mentioned wanting to get some lunch. Do you
4  want to take half an hour and get something?
5     THE WITNESS: If that's okay, that would be
6  great.
7     MR. CORK: That's fine. It's 1:46. We'll
8  resume about 2:15.
9     (A lunch recess was taken.)
10 DIRECT EXAMINATION CONTINUING,
11  QUESTIONS BY MICHAEL J. CORK:
12 Q Mr. Lee, we're back on the record. You
13  understand you're still under oath; right?
14 A I do.
15     MR. CORK: Diana, could we have Exhibit 6,
16  please.
17 Q Mr. Lee, Exhibit 6, the first page indicates
18  it's a partial response to a request for
19  production and you don't need to pay particular
20  attention to that. Look at the document that
21  follows that green sheet.
22 A Okay.
23 Q Which purports to be the policy manual of the
24  Brownsburg Community School Corporation
25  Nondiscrimination and Equal Employment

Case 1:19-cv-02462-JMS-DLP   Document 120-14   Filed 03/15/21   Page 13 of 17 PageID #: 1346

JOHN M. KLUGE VS
BROWNSBURG COMMUNITY SCHOOL CORPORATION, et al.

CRAIG LEE
December 11, 2020

Page 70

1     the school corporation's initial response to
2     Interrogatory 18 and then I had some back and
3     forth with Alex Pinegar.
4         MR. LANOSA: Who is the school's lawyer, so
5     then the red is you and then the blue is BCSC's
6     lawyer; is that right? I understand. Thank
7     you.
8         MR. CORK: The last blue is from me.
9 A  So I've just finished reading the blue. Am I
10    reading this whole -- it seems like it's really
11    lengthy. Am I reading the whole thing?
12 Q  You may if you wish. There's not a need in my
13    opinion. I intend to ask you questions about
14    the supplemental information that appears on the
15    page you're looking at and by the bullet points.
16 A  Okay.
17 Q  The last part of this are the original
18    interrogatories in their entirety and you may
19    read it if you wish but I don't see any need.
20 A  Did you say that the questions would relate to
21    these bullet points? Did you just say that?
22 Q  Right.
23 A  Okay.
24 Q  Yes. So, whenever you're ready, I will ask
25    questions.

Page 71

1 A  Okay. I want to read the bullet points.
2 Q  Yes, please do.
3 A  Okay. I have finished reading the bullet
4    points.
5 Q  Okay. Did you participate in providing the
6    supplemental information contained in the bullet
7    points to counsel for the school corporation?
8        MR. LANOSA: I would object to the extent
9    that calls for privileged information. You may
10   answer yes or no.
11       MR. LANOSA: Same objection.
12 A  Can you repeat the question again? I'm sorry.
13 Q  The question is if you participated in providing
14   the supplemental information contained in the
15   bullet points to the school corporation's
16   attorney.
17       MR. LANOSA: Same objection. I would
18   caution you not to reveal the substance of
19   conversations with the school's attorney. You
20   may answer yes or no.
21 A  No.
22 Q  No, you did not participate. If you'd look at
23   the first bullet point, please.
24 A  Yes.
25 Q  It refers to a November 7, 2017 meeting of the

Page 72

1     Equality Alliance Club and at that meeting
2     purportedly the assistant superintendent, Kat
3     Jessup, appeared. And it goes on to indicate
4     that someone named "unnamed students" addressed
5     Ms. Jessup regarding Mr. Kluge's use of last
6     names when addressing students. Do you recall
7     that?
8         MR. LANOSA: Objection to form.
9 A  At the club meetings, the students at the
10   meetings, the club members, were pretty upset
11   with this and they would -- not just Aidyn and
12   Sam -- they would express how upset they were
13   about this, yes.
14 Q  Okay. My question was simply do you recall
15   that, and I guess by way of your answer you do;
16   right?
17 A  Yes.
18 Q  But you can't remember anybody other than Aidyn
19   Sucec and Sam Willis; right?
20 A  The specific names of the students, I can
21   remember the name of a couple of students who
22   were regulars who did.
23 Q  Who is that?
24 A  One student called Andy Tharp.
25 Q  Andy Knob? Do you know how to spell Andy Knob's

Page 73

1     name?
2 A  I don't know how to spell his last name. It's
3    Andy but I can't remember the names of other
4    students, specific names, but Andy I do.
5 Q  Okay. Was Andy a transgender student?
6 A  Yes.
7 Q  You can't recall anyone else; is that right?
8 A  Correct, the names.
9 Q  The second bullet point refers to 20 to 25
10   separate occasions during the 2017/2018 school
11   year in which various students who attended the
12   Equality Alliance Club complained to you about
13   Plaintiff's use of last names. Do you recall
14   those incidents?
15 A  They weren't specific. They were at the meeting
16   where students would complain about it at the
17   meeting, so it was like in general at those
18   meetings. Yes, I remember those complaints.
19 Q  Do you recall who made the complaints besides
20   Aidyn Sucec and Sam Willis?
21 A  I don't remember the specific names of the
22   students. It varied from meeting to meeting who
23   attended but generally the club members.
24 Q  And the third bullet point indicates that you
25   shared student complaints you were receiving

Case 1:19-cv-02462-JMS-DLP   Document 120-14   Filed 03/15/21   Page 14 of 17 PageID #: 1347

JOHN M. KLUGE VS
BROWNSBURG COMMUNITY SCHOOL CORPORATION, et al.

CRAIG LEE
December 11, 2020

Page 74

1 from the Equality Alliance Club meetings and you
2 shared them at a faculty advisory committee
3 meeting. Do you recall that?
4 A Is this the one that starts "Craig Lee met with
5 Kat Jessup"?
6 　　MR. LANOSA: Are you talking about the one
7 that begins "Craig Lee shared"?
8 　　MR. CORK: Yes, correct.
9 A Oh, okay. Yeah, I remember. I remember -- I
10 can't remember exactly when the meeting was but
11 I do remember that.
12 Q The information indicates that you didn't
13 disclose the identities of students who
14 complained but you did relay their concerns and
15 his impressions based on their concerns. And
16 previously in the bullet point it indicates Bret
17 Daghe and Stacey Lingelbaugh were two
18 administrators at the meeting, so I take it you
19 shared their complaints with them?
20 　　MR. CORK: Objection to form.
21 A Can you repeat that question, please?
22 Q Sure. Let me break it down. This bullet point
23 indicates that you shared student complaints you
24 were receiving from Equality Alliance Club
25 meetings and you shared the complaints at a

Page 75

1 faculty advisory meeting. It doesn't indicate
2 exactly when the meeting, the faculty meeting,
3 took place, just that it occurred during the
4 2017/'18 school year. And I asked you if you
5 recalled a meeting like that and I think you
6 said yes; is that right?
7 A I recall that meeting, yeah.
8 Q Okay. And do you recall Bret Daghe and Stacey
9 Lingelbaugh attending that meeting?
10 A I remember Bret being there. Stacey was usually
11 at the meetings. I don't specifically remember
12 her being present but certainly Bret. Sometimes
13 there would be a different assistant
14 administrator present.
15 Q The supplemental information further indicates
16 that you didn't disclose the identities of the
17 students who complained at the faculty meeting;
18 is that right?
19 A Repeat that. I don't think I understood your
20 question.
21 Q At the faculty meeting you didn't disclose the
22 identity of the students who complained; is that
23 right?
24 　　MR. LANOSA: I think to clarify, you mean
25 faculty advisory meeting; is that correct,

Page 76

1 Counselor? I think there's a difference between
2 a faculty meeting and a faculty advisory
3 committee meeting and that might be where the
4 confusion is.
5 Q This bullet point refers to one faculty advisory
6 committee meeting.
7 A Yes.
8 　　MR. LANOSA: I think you said faculty
9 meeting a moment ago.
10 　　MR. CORK: Yeah, okay. Yeah, I referred to
11 that as a faculty meeting.
12 Q There was just one meeting and at that meeting
13 we've established that Bret Daghe you remember
14 being in attendance. You're not sure about
15 Stacey Lingelbaugh; correct?
16 A Correct.
17 　　MR. LANOSA: Objection to form.
18 A At that faculty advisory meeting.
19 Q And you did not disclose the identities of any
20 of the students who you claimed had complained
21 at the Equality Alliance Club meetings?
22 A I don't, as far as I remember, I did not share
23 their names.
24 Q Okay. As we sit here today, can you identify
25 any of those students?

Page 77

1 A Which students? Are you talking about the ones
2 at the club meetings who --
3 Q The students who you claimed had alleged
4 complaints at the Equality Alliance Club
5 meetings.
6 A Pretty much all of the students present at the
7 meetings were unhappy and complained about this
8 and I can't remember the students at the
9 meetings' names other than Sam and Aidyn who
10 were two of the club leaders.
11 Q Okay. The fourth bullet point references a
12 meeting that you had with Kat Jessup, the
13 assistant superintendent, and the Human
14 Resources Director Jodi Gordon which occurred in
15 approximately mid spring of 2018. Did you
16 attend that meeting to the best of your
17 knowledge?
18 A Yeah.
19 Q So you do recall that; right?
20 A Recall meeting them. I don't recall the content
21 of the meeting or what the specifics were for us
22 actually. We talked about what it describes
23 there but I can't remember anything else about
24 that meeting.
25 Q The bullet point information indicates that you

Case 1:19-cv-02462-JMS-DLP Document 120-14 Filed 03/15/21 Page 15 of 17 PageID #: 1348

JOHN M. KLUGE VS
BROWNSBURG COMMUNITY SCHOOL CORPORATION, et al.

CRAIG LEE
December 11, 2020

Page 78

1    shared student complaints you had received
2    throughout the year at Equality Alliance Club
3    meetings and, again, that you didn't disclose
4    the identities of the students who complained.
5    Is that accurate to the best of your
6    recollection?
7  A  Well, I didn't write this. I can't remember the
8    specifics about the meeting. It was very -- I
9    remember it being very informal. I remember it
10   being in the Media Center and I remember it
11   being at the end of the day. I don't remember
12   very much about the meeting at all.
13 Q  Okay. And, again, you didn't provide any of
14   this information directly to counsel for the
15   school corporation; right?
16      (Zoom malfunction and a recess was taken.)
17      MR. LANOSA: Craig didn't answer the
18   question, I don't think, so maybe the best thing
19   to do would be to reask it and if I have an
20   objection, I'll make it again.
21      (The reporter read back the previous
22   question.)
23 A  I don't recall specifically when I said this. I
24   met with Mr. Borg.
25      MR. LANOSA: I would caution the witness

Page 79

1    not to reveal the substance of his
2    communications with counsel, but you can answer
3    whether or not you provided information as
4    reflected in this document.
5  A  Oh, okay. Yes.
6  Q  Let's approach it this way, Mr. Lee. Previously
7    I asked whether you provided any of the
8    information contained in this supplemental
9    response to counsel and your attorney told you
10   you should only answer yes or no and you
11   indicated that you did not provide this
12   information. Now I'm hearing you say that you
13   did provide this information; is that right?
14 A  When you first asked the question I couldn't
15   remember. In the last couple of minutes when I
16   recall, I believe that I did share what is in
17   the bullet point.
18 Q  Do you recall when?
19 A  When I said this?
20 Q  No. Do you recall when you shared the
21   information?
22 A  I can't remember when I said this or when the
23   meeting was.
24 Q  Let's go to the fifth bullet point, please.
25 A  Can you tell me what it starts with?

Page 80

1  Q  Second to last. It's the "At some point during
2    the 2017-2018 school year." It indicates, just
3    paraphrasing, that a student in your class
4    complained to you in passing that she did not
5    agree with Plaintiff's use of last names. Do
6    you recall who that student is?
7  A  I don't remember the student's name.
8  Q  And you state further that you did recall that
9    she was a senior at the time and your impression
10   was that she did not attend Equality Alliance
11   Club meetings and further that she was not a
12   student of Plaintiff's. What do you mean --
13      MR. LANOSA: Objection to form.
14 A  I believe it was a male student, so I didn't
15   type this, I didn't type this paragraph, so I
16   don't know if something was misheard but it was
17   a male student.
18 Q  A male student as opposed to a female?
19 A  Yeah. But a student did approach me as
20   described.
21 Q  And you indicate that it was your impression
22   that the student did not attend the Equality
23   Alliance Club meetings. What did you mean by
24   impression?
25      MR. LANOSA: Objection to form.

Page 81

1  A  I had never seen this particular student at a
2    Equality Alliance meeting before. That's what I
3    meant.
4  Q  Was it also your impression that the student was
5    not one of Plaintiff's students?
6  A  I cannot remember who the student was.
7  Q  No. You indicate that the student who allegedly
8    complained was not a student of Plaintiff's
9    meaning Mr. Kluge.
10 A  Oh.
11      MR. LANOSA: Objection to form. Just to be
12   clear, I believe you said you didn't write this
13   document; correct?
14      THE WITNESS: Correct.
15 A  The student that complained was one of my
16   students and also they said they were in
17   Mr. Kluge's class.
18 Q  In Mr. Kluge's class?
19 A  Correct.
20 Q  But this indicates that it was not a student in
21   Plaintiff's class.
22 A  I couldn't remember you actually saying what you
23   just said. I think when you said Plaintiff, I
24   think of the plaintiffs -- and this is my lack
25   of knowledge with legal speak -- I think of the

Case 1:19-cv-02462-JMS-DLP   Document 120-14   Filed 03/15/21   Page 16 of 17 PageID #: 1349

JOHN M. KLUGE VS
BROWNSBURG COMMUNITY SCHOOL CORPORATION, et al.

CRAIG LEE
December 11, 2020

Page 82

1    school corporation or Mr. Willis or Mr. Sucec.
2    Again, my lack of knowledge, my naivety with
3    legal terms. When you say "Plaintiff,"
4    obviously now I realize you're saying
5    Mr. Kluge's class. This student was a student
6    in Mr. Kluge's class. I apologize for my error.
7  Q  No, I'm not picking at you.
8  A  Yeah, okay. Yeah, it was a student in
9    Mr. Kluge's class.
10 Q  But this indicates that the student was not a
11   student of Mr. Kluge. So this is incorrect;
12   right? This bullet point, the last --
13 A  Right, right. Yeah, the student that came and
14   complained to me was a student and, again, I
15   didn't write this document but it was a student
16   that was in Mr. Kluge's class and obviously in
17   my class, too.
18 Q  Right. And you think did not attend the
19   Equality Alliance Club?
20 A  I had never seen this student at an Equality
21   Alliance meeting.
22 Q  Okay. But you can remember all that but you
23   can't remember the identity of the student?
24 A  I have about 300 students a year that ask me
25   questions or they might share things about

Page 83

1    various things they experience in school, and,
2    so, no.
3  Q  The final bullet point. Let's go back. The
4    fifth bullet point. There was a student in your
5    class but instead of a she, it was a he; right?
6  A  Correct.
7  Q  And you don't think the student attended
8    Equality Alliance Club meetings?
9  A  I had never seen this student at an Equality
10   Alliance meeting before.
11 Q  Okay. And the student was a student of
12   Mr. Kluge as opposed to not being a student of
13   Mr. Kluge's; correct?
14 A  That is correct. They told me they were in his
15   class.
16 Q  And do you recall anything about the
17   conversation that you describe as a complaint in
18   passing that the student didn't agree with
19   Kluge's use of last names when addressing
20   students?
21       MR. LANOSA: Objection to form.
22 A  I can describe in passing. At the end of class
23   often when the bell goes, students will approach
24   me or their teacher for a number of different
25   reasons and so that's what I mean when I say in

Page 84

1    passing. It wasn't during class. It was after
2    the bell had gone that they approached me and
3    they told me -- they were sharing basically --
4    well, confused, I think, as to seemingly some
5    kind of name policy for Mr. Kluge and they told
6    me that it made them feel very uncomfortable,
7    that everybody in his class knew that he had
8    some kind of reason and it related to the
9    transgender students in his class and they felt
10   really bad for those transgender students
11   because of how he was -- basically how he was
12   conducting himself in the class.
13 Q  Did you have any discussion about that issue
14   during your class, during your sociology or
15   government class?
16 A  No.
17 Q  And had you previously discussed this issue with
18   the student in question on another occasion?
19 A  No.
20 Q  How is it that this student at the end of the
21   class decided to talk to you about that?
22 A  I have I guess my colleagues call it a
23   reputation for students feeling comfortable
24   talking to me about a variety of different
25   issues. I think they just feel I can be

Page 85

1    approached or I'm approachable. I think that's
2    why or I'd like to think that was why, but they
3    felt comfortable sharing that.
4  Q  The 6th and last bullet point refers generally
5    to various occasions throughout the 2017/2018
6    school year and it indicates that your
7    colleagues would complain to you about Kluge's
8    use of last names when addressing students.
9  A  Yes, I see that.
10 Q  Okay. "Various occasions" is not very specific.
11   Do you recall how often that occurred?
12 A  It was throughout the year. I can't tell you
13   how many times like a week or something it was,
14   but they had -- yeah, so I can't remember
15   specifically how often it was but they would ask
16   out of concern for the students' welfare.
17 Q  The colleagues are identified as Jason Gill,
18   Melinda Lawrie, and Justin Bretz. Who are they?
19 A  They are teachers that teach on the same floor
20   of the building where I teach.
21 Q  They're not teachers in the same area as
22   Mr. Kluge; right?
23 A  Correct.
24 Q  Do you recall specifically what they said to you
25   or just, as you describe, more generally?

Case 1:19-cv-02462-JMS-DLP   Document 120-14   Filed 03/15/21   Page 17 of 17 PageID #: 1350

JOHN M. KLUGE VS
BROWNSBURG COMMUNITY SCHOOL CORPORATION, et al.

CRAIG LEE
December 11, 2020

Page 86

1 A   It was concern that students talk to each other,
2     students share things in all different classes
3     about things that are happening in the school,
4     and I think when students had basically -- they
5     had heard or heard students talking that they
6     relayed or just basically would ask me, like
7     would tell me that this was, you know, they felt
8     very strongly that this was harming students,
9     not just Sam and Aidyn but just students in
10    general who would potentially be in Mr. Kluge's
11    class.
12 Q   Did any of the three colleagues identified tell
13    you that they had visited Mr. Kluge's class and
14    witnessed this firsthand?
15 A   No.
16 Q   Mr. Lee, I believe you still have control of the
17    mouse; is that correct?
18 A   Yes, I think so. Yep.
19 Q   Would you, please, go up to the bar at the top
20    and click on Plaintiff's Dep Exhibit 33.
21 A   Yes.
22 Q   Exhibit 33 is a three-page document. The big
23    black rectangle at the top was redacted by
24    counsel for the school corporation under claim
25    that it contains attorney/client privileged

Page 87

1     information.
2         MR. LANOSA: I would just note for the
3     record the document appears to have seven pages.
4         MR. CORK: Seven?
5         MR. LANOSA: At least the PDF based on the
6     little numbers at the top.
7 A   Yeah, I think there are seven pages here. Am I
8     looking at one document here or both of these?
9 Q   Go ahead. I think that this contains the -- go
10    ahead and scroll down through that, please.
11 A   Okay. Both documents or just the first one?
12 Q   Well, go through the first three pages and I
13    believe this has the referenced interrogatory
14    responses attached to it because the third page
15    of this is an e-mail to me from Brent Borg
16    indicating that the first two pages are
17    supplements to Interrogatory No. 7 on Request
18    for Production No. 7.
19 A   Okay. So I've read from "Hi Bret" --
20        MR. LANOSA: Can you just scroll down to
21    the third page, Craig?
22        MR. CORK: Yeah, go ahead and go through
23    it.
24        MR. LANOSA: So I don't see an e-mail from
25    Brent. It appears that the first two pages are

Page 88

1     an e-mail and then Page 3 begins with
2     Defendant's Responses to Plaintiff's First Set
3     of Interrogatories.
4         MR. CORK: Okay. I have an e-mail to me
5     from Brent simply indicating that the first two
6     pages are supplements to Plaintiff's
7     Interrogatory 7 and Request for Production 7.
8         MR. BORG: Michael, if it helps for the
9     record, I have no reason to dispute that. I do
10    know that the e-mail that's, I believe, at the
11    first two pages of this exhibit was a supplement
12    to BCSC's discovery responses.
13        MR. CORK: Okay. And the interrogatories
14    and I'm guessing the request for productions
15    were attached to that as well. That's the
16    reason they're attached to this.
17 A   So am I, just to clarify, am I reading from
18    where it begins "Hi Bret" to where it ends for
19    "Cheers for now Craig"?
20 Q   My interest in Exhibit 33 is only the first two
21    pages that are marked Brownsburg 248 and 249.
22 A   Okay. Just let me take a moment.
23 Q   Go ahead and read through that.
24 A   Okay.
25 Q   I will not be asking you any questions about

Page 89

1     anything else that's attached.
2 A   Okay. Okay. I have read that document or those
3     two pages I should say.
4 Q   Did you draft this e-mail to Dr. Daghe --
5 A   I did.
6 Q   -- on the date indicated, August 29th of 2017?
7 A   Yes.
8 Q   Do you recall receiving any kind of a response
9     from Dr. Daghe?
10 A   I can't recall receiving a response. That's not
11    to say I didn't. I can't recall receiving a
12    response.
13 Q   Your e-mail doesn't identify any teacher by name
14    but it seems to refer to Mr. Kluge. Is that
15    accurate?
16 A   That's accurate.
17        MR. LANOSA: Objection to form. It appears
18    the document refers to multiple teachers. Are
19    you referring to the part that begins No. 1?
20 Q   Paragraph 1 and Paragraph 2. The first
21    paragraph talks about a student who had their
22    name changed in PowerSchool and it goes on to
23    state that the teacher refuses to call the
24    student by their new name and Paragraph 2 refers
25    to students going through the process of having