IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

JOHN M. KLUGE,               )
                              )
        Plaintiff,        )
                              )
        v.             )      CASE NO. 1:19-cv-02462-JMS-DLP
                              )
BROWNSBURG COMMUNITY     )
SCHOOL CORPORATION,      )
                              )
        Defendant.    )

**DEFENDANT'S BRIEF IN SUPPORT OF**
**CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO**
**<u>PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**

**Table of Contents**

**Introduction** ................................................................................................................4

**Statement of Material Facts Not in Dispute** ........................................................5

I.     *The parties and procedural background.* ...........................................................5

II.    *The nature of Kluge's alleged sincerely-held religious belief.* .......................5

III.   *Brownsburg's organizational structure, policies, and practices.* ...................7

     a.    *Board-level policies.* ...........................................................................7

     b.    *Practices related to transgender high school students* .......................8

IV.   *Kluge disapproves of the administration's approach
to transgender students and, in response, Brownsburg works
with him, resulting in two agreed-upon accommodations* ...............................9

V.    *Students, parents, and teachers complain about the
last-name-only accommodation.* ..................................................................12

VI.   *Brownsburg meets with Kluge to discuss complaints about the last-name-only
accommodation and, in response, Kluge characterizes the complaints
as a "heckler's veto" and announces he intends to continue using
the accommodation, complaints notwithstanding.* ..........................................16

VII.  *In response to Kluge's refusal to stop using the last-name-only
accommodation, Brownsburg gives Kluge three options, and
Kluge chooses the option to resign effective at the end of the school year.* ...................18

VIII. *Despite Brownsburg allowing the last-name-only accommodation
to continue until the end of the 2017-2018 school year,
Kluge abandons it during an orchestra awards ceremony.* ............................20

IX.   *Brownsburg's board accepts Kluge's resignation at
its regular monthly board meeting in June 2018.* ..........................................21

**Statement of Material Facts in Dispute** ................................................................22

**Summary of Argument** ................................................................................24

**Argument** .................................................................................................26

I.      *Standard of review.* ...........................................................................26

II.     *Kluge cannot establish a prima facie case of unlawful discrimination*
        *because, as a matter of law, there was no objective conflict*
        *between his alleged sincerely-held religious belief and*
        *addressing students by their first names.* ...........................................27

        a.      *Unlawful discrimination for failure to accommodate generally.* ..........27

        b.      *Addressing students by their first names was "purely administrative"*
                *and therefore created no objective conflict.* ..................................28

III.    *Brownsburg's decision to withdraw the last-name-only accommodation was*
        *appropriate because, as evidenced by complaints from the high school*
        *community, the accommodation negatively impacted student learning,*
        *which in turn impeded Brownsburg's mission to educate students and*
        *therefore caused undue hardship.* .......................................................32

        a.      *Undue hardship analysis generally* ................................................32

        b.      *For purposes of undue hardship analysis, Brownsburg's "business"*
                *was a constitutional and statutory obligation to educate students.* .....34

        c.      *The last-name-only accommodation frustrated Brownsburg's efforts*
                *to educate students, which constitutes undue hardship as a matter of law.* ........35

        d.      *Courts have routinely found undue hardship where a religious*
                *accommodation threatens the classroom learning environment.* .......................36

        e.      *Kluge's arguments for lack of undue hardship are meritless.* ...........................38

IV.     *The last-name-only accommodation imposed an undue hardship on*
        *Brownsburg because it exposed Brownsburg to a significant risk of liability* ...............41

V.      *Kluge cannot establish a prima facie case of retaliation and,*
        *even if he could, he cannot demonstrate pretext.* .............................................43

VI.     *If the Court denies summary judgment in Brownsburg's favor on Kluge's*
        *unlawful discrimination claim, it should also deny summary judgment*
        *in Kluge's favor regarding the sincerity of his religious belief.* .....................47

**Conclusion** ...............................................................................................50

**Certificate of Service** ................................................................................50

**Introduction**

Defendant Brownsburg Community School Corporation required its high school faculty to address students by the first and last names listed in its student database. On the first day of classes for the 2017-2018 school year, Plaintiff John Kluge, a member of the high school faculty, told administrators that he would not address students in this manner because some of his students had "transgender" first names, and doing so would violate his alleged sincerely-held religious belief that prohibited him from promoting gender dysphoria.

Brownsburg and Kluge reached an accommodation that let Kluge address students by last name only. But the accommodation made members of the high school community complain, including most prominently Kluge's students, some of whom reported that his use of last names negatively impacted their learning. When Brownsburg told Kluge about the complaints, he did not think anything was wrong and told the administration that he intended to continue using the last-name-only accommodation. When Brownsburg told Kluge that it would not continue the accommodation past the 2017-2018 school year, Kluge resigned.

Kluge claims that Brownsburg unlawfully discriminated and retaliated against him based on his religious belief and seeks summary judgment on liability for unlawful discrimination, as well as summary judgment on Brownsburg's affirmative defense of undue hardship.

For reasons discussed in much more detail below, the designated evidence establishes as a matter of law that Kluge cannot make a prima facie case on either claim. Moreover, even if Kluge could establish a prima facie case for unlawful discrimination, the affirmative defense of undue hardship applies as a matter of law and forecloses that claim.

Accordingly, the Court should grant summary judgment in favor of Brownsburg and enter final judgment in its favor.

**Statement of Material Facts Not in Dispute**

I.      *The parties and procedural background.*

1.      Brownsburg is a school corporation under Indiana Code section 20-18-2-16 and is governed by a five-member elected board. [Filing No. 71 at 6, ¶16]; [Filing No. 120-1 at 2 (Exhibit 1 – Affidavit of Dr. Kathryn Jessup, ¶2)].

2.      Kluge is a former employee of Brownsburg, having worked in the performing arts department at Brownsburg High School from August 2014 to June 2018. [Filing No. 71 p. 8, ¶21]; [Filing No. 120-2 at 3 (Exhibit 2 – Affidavit of Bret Daghe, ¶¶6, 7)]. During his tenure, Kluge taught orchestra, beginning music theory, and advanced music theory and was the only teacher at Brownsburg High School who taught any sections of these classes. [Filing No. 120-2 at 3 (Exhibit 2 – Affidavit of Bret Daghe, ¶7)].

3.      Kluge originally sought relief on thirteen claims. [Filing No. 15 at 17-31, ¶¶91-173.] Brownsburg moved to dismiss. [Filing No. 44.] Kluge conceded one claim warranted dismissal, and the Court dismissed ten of the remaining twelve. [Filing No. 56 at 31]; [Filing No. 70 at 50-51]. The claims that remain and that are subject to this Motion are unlawful discrimination and retaliation, which both arise under Title VII. [Filing No. 70 at 50-51.] In addition, Kluge seeks summary judgment for liability on his unlawful discrimination claim, as well as summary judgment on Brownsburg's affirmative defense of undue hardship. [Filing No. 112 at 3-4.]

II.     *The nature of Kluge's alleged sincerely-held religious belief.*

4.      Kluge is a Christian and a member of an Indianapolis church that is under the Evangel Presbytery denomination. [Filing No. 120-3 at 3 (Exhibit 3 – Kluge Dep. at p. 9, lines 11-15; p. 15, lines 4-12)]. In addition to the Bible, the Evangel Presbytery Book of Church Order governs how Kluge and other members of his church conduct themselves on many aspects of

5

life, including discipline, church participation, and sexuality. [Filing No. 120-3 at 4 (Exhibit 3 – Kluge Dep. at p. 13, lines 7-23; p. 24, line 19 to p. 25, line 25)].

5.      Kluge asserts that his sincerely-held religious beliefs include a belief that it is sinful to promote gender dysphoria and that this belief is the basis for his unlawful discrimination and retaliation claims. [Filing No. 15 at 15, ¶¶23, 92, 95]; [Filing No. 120-3 at 6-7 (Exhibit 3 – Kluge Dep. at p.21, line 12 to p. 23, line 5)]. According to Kluge, gender dysphoria "is what scripture refers to as effeminacy which is for a man to play the part of a woman or a woman to play the part of a man and so that would include acting like/dressing like the opposite sex." [Filing No. 120-3 at 6 (Exhibit 3 – Kluge Dep. at p. 18, lines 2-10)]. Kluge believes it is sinful for a person to act effeminate and also sinful to encourage someone to act effeminate. [Filing No. 120-3 at 10 (Exhibit 3 – Kluge Dep. at p. 35, line 11 to p. 37, line 12)].

6.      Kluge's denomination recognizes that there are circumstances where effeminacy might warrant tolerance, notwithstanding its sinful nature. [Filing No. 120-3 at 8-9 (Exhibit 3 – Kluge Dep. at p. 26, line 11 to p. 30, line 11)]. For example, the Evangel Presbytery Book of Church Order instructs that

> if a female has transitioned to a male in appearance, *it may be best that she not use the bathroom of her birth sex* until she has been presented with pastoral counsel concerning God's calling of manhood and womanhood and she begins to learn of Jesus' Lordship over her sexuality and the implications it has for her sexual identity and its public expression. In this case, the female would be asked not to use the men's restroom, but instead a single-stall restroom available to either sex.

[Filing No. 120-4 at 12 (Exhibit 4 – Evangel Presbytery Book of Church Order ¶17) (emphasis added)].

7.      Consistent with this instruction, according to Kluge there are instances where it is appropriate and consistent with his religious beliefs to address a transgender student by the

student's first name, even if the first name differs from the student's biological sex. [Filing No. 120-3 at 8-9 (Exhibit 3 – Kluge Dep. at p. 29, line 11 to p. 30, line 11)].

III.     *Brownsburg's organizational structure, policies, and practices.*

8.     The facts relevant to Kluge's claims are limited to the 2017-2018 school year and preceding months. [Filing No. 15, at 6-16, ¶¶28-82.] During that time, Dr. Bret Daghe was Brownsburg High School's principal and Kluge's supervisor. [Filing No. 120-5 at 4 (Exhibit 5 – Daghe Dep. at p. 11, line 22 to p. 13, line 7)]. Dr. Daghe reported to the Superintendent, Dr. Jim Snapp. [Filing No. 120-5 at 4 (Exhibit 5 – Daghe Dep. at p. 12, lines 7-14)]. Dr. Kathryn Jessup served as the Assistant Superintendent, and Jodi Gordon was the Human Resources Director. [Filing No. 120-6 at 4 (Exhibit 6 – Jessup Dep. at p. 15, lines 8-15); [Filing No. 120-7 at 4 (Exhibit 7 – Gordon Dep. at p. 10, lines 13-18)].

a.     *Board-level policies.*

9.     During the 2017-2018 school year, Brownsburg maintained a board-level policy, 3122—Nondiscrimination and Equal Employment Opportunity, that prohibited discrimination in employment based on religion. [Filing No. 113-4 at 14.] The policy also prohibited retaliation against any "person in the exercise or enjoyment of any right granted or protected by" certain antidiscrimination laws, including Title VII. [Filing No. 113-4 at 16-17.] The policy included informal and formal complaint processes, which allowed employees to make such complaints according to the procedures specified in the policy. [Filing No. 113-4 at 16-18.]

10.     During the 2017-2018 school year, Brownsburg maintained a board-level policy, 3140—Resignation, that applied to teacher resignations and stated in relevant part that "[p]ursuant to State law, following submission of a resignation to the Superintendent, the employee may not withdraw or otherwise rescind that resignation" and "[a] resignation, once

submitted, may not then be rescinded unless the Board agrees." [Filing No. 120-8 at 2 (Exhibit 8 – Brownsburg's policy "3140—Resignation")]. Another board-level policy, 0100—Definitions, defines "Superintendent" to include "a delegate unless the law, policy or guideline specifically prohibits the delegation." [Filing No. 120-9 at 4 (Exhibit 9 – Brownsburg's policy "0100—Definitions")].

       *b.*     *Practices related to transgender high school students.*

     11.     Before the start of 2017-2018 school year, Brownsburg's high school community was experiencing a growing awareness of and attentiveness to the needs of transgender students. [Filing No. 120-1 at 3 (Exhibit 1 – Affidavit of Dr. Kathryn Jessup, ¶6)]. In the opinion of Brownsburg's administration, transgender students face significant challenges at school, including diminished self-esteem and heightened exposure to bullying. (*Id.*) Brownsburg's administration also thought that these challenges threaten transgender students' classroom experience, academic performance, and overall well-being. (*Id.*) Brownsburg's administration had heightened attention to these issues before the start of the 2017-2018 school year because several transgender students had enrolled as high school freshmen. (*Id.*)

     12.     A very practical and important question that arose for the Brownsburg administration was how staff should address transgender students in class. [Filing No. 120-1 at 3 (Exhibit 1 – Affidavit of Dr. Kathryn Jessup, ¶7)]. A high school classroom cannot function without teachers addressing students directly. (*Id.*) The practice Brownsburg's administration developed to help transgender students, teachers, and other members of the high school community was to allow any student to change the name listed in the high school's "PowerSchool" database, but only if the student provided letters from a parent and a healthcare professional. (*Id.*) Staff were then required to use the name in PowerSchool. (*Id.*)

13.     Brownsburg's administration thought that this practice furthered two primary

goals. First, it provided high school faculty with a straightforward, easy-to-follow rule when

addressing students—that is, faculty need only "call students by the name listed in

PowerSchool." [Filing No. 120-1 at 4 (Exhibit 1 – Affidavit of Dr. Kathryn Jessup, ¶8)]; [Filing

No. 15-4 at 6]. Second, and more important in the administration's view, the practice afforded

dignity and showed empathy toward transgender students, as well as those who were considering

or in the process of gender transition. (*Id.*) Stated differently, Brownsburg's administration

considered it important for transgender students to receive, like any other student, respect and

"official" affirmation of their preferred identity, provided they go through reasonable channels

such as receiving parent permission and a healthcare professional's approval. (*Id.*)

IV.     *Kluge disapproves of the administration's approach to transgender students and, in response, Brownsburg works with him, resulting in two agreed-upon accommodations.*

14.     In a letter he read and provided to Dr. Daghe in May 2017 that was signed by

three other teachers, Kluge expressed concern over his perception of the administration's

approach to transgender students at recent high school faculty meetings. [Filing No. 120-3 at 11-

12 (Exhibit 3 – Kluge Dep. at p. 39, line 7 to p. 42, line 18)]. Kluge stated in the letter that

"encouraging gender dysphoria is harmful to the individual" and "dangerous to the rest of the

community." [Filing No. 113-1 at 28.] Kluge cited "research documents" that he claimed

demonstrated the "devastating effects of transgenderism" and quoted several Bible passages.

[Filing No. 113-1 at 26-30.] Kluge concluded the letter with twelve requests, including that the

administration not "suggest that teachers encourage transgender students in their folly by playing

along with their psychiatric disorder in referring to them by their preferred pronoun." [Filing No.

113-1 at 30-31]; [Filing No. 120-3 at 12-13 (Exhibit 3 – Kluge Dep. at p. 44, line 24 to p. 46, line

1)].

9

15.     When Dr. Daghe met with Kluge and the three other teachers who signed the letter, he perceived that their main concern was they wanted an easy-to-follow rule when addressing students. [Filing No. 120-5 at 7 (Exhibit 5 –  Daghe Dep. at p. 34, line 8 to p. 35, line 4); at p. 36, lines 7-14)]. Dr. Daghe proposed that the teachers use the name listed in PowerSchool, and the other three teachers agreed. [Filing No. 120-3 at 12 (Exhibit 3 – Kluge Dep. at p. 42, line 12 to p. 43, line 22)]. Kluge said nothing in response, but was "shocked" the other teachers agreed to Dr. Daghe's proposal and concluded they had done an "about-face." (*Id.*, [Filing No. 120-3 at 12 (Exhibit 3 – Kluge Dep. at Plaintiff Dep. at p. 42, line 19 to p. 43, line 22)].

16.     Minutes after the meeting concluded, Kluge spoke one-on-one with Dr. Daghe and encouraged him to resist changing the PowerSchool database from "legal names" to "transgender names."[1] [Filing No. 120-3 at 12 (Exhibit 3 – Kluge Dep. at p. 42, line 19 to p. 43, line 22), 15 (Exhibit 3 – Kluge Dep. at p. 54, line 24 to p. 55, line 6)]. Based on this conversation, Kluge thought that the administration "would continue to use legal names and that we would not be promoting transgenderism in our schools, we would stop teaching it in our faculty meetings, and that [Dr. Daghe] had heeded our urging." [Filing No. 120-3 at 12 (Exhibit 3 – Kluge Dep. at p. 44 lines 14-23), 14 (Exhibit 3 – Kluge Dep. at p. 50, lines 4-23)].

17.     Nine days before the start of the 2017-2018 school year, a guidance counselor emailed Kluge to inform him that two transgender students had enrolled in his class and that

---

[1] Kluge explained that by "legal names," he meant "[t]he name that's on their birth certificate, the one that was stored on their birth records." [Filing No. 120-3 at 15 (Exhibit 3 – Kluge Dep. at p. 54, line 24 to p. 55, line 2)]. By "transgender names," Kluge meant "[t]he opposite sex name that they had switched to that was not their legal name." [Filing No. 120-3 at 15 (Exhibit 3 – Kluge Dep. at p. 55, lines 3-6)]. At least two transgender students in Kluge's classes legally changed their birth name to their "transgender name." [Filing No. 22-3 at 2, ¶6]; [Filing No. 58-1 at 2, ¶3].

those students' first names had been changed in PowerSchool. [Filing No. 120-3 at 13 (Exhibit 3 – Kluge Dep. at p. 47, line 24 to p. 49, line 22]; [Filing No. 120-10 at 2 (Exhibit 10 – Lori Mehrtens email to Plaintiff dated 7.18.17 at 758am)]; [Filing No. 120-11 at 2 (Exhibit 11 – Lori Mehrtens email to Plaintiff dated 7.18.17 at 755am)]. Because the guidance counselor stated that Kluge should "feel free" to use the students' preferred first name and pronoun, Kluge did not consider this a directive. [Filing No.120-3 at 13 (Exhibit 3 – Kluge Dep. at p. 48, line 17 to p. 49, line 22)].

18.     On the first day of classes for the 2017-2018 school year, Kluge met with Dr. Daghe and told him that because the guidance counselor's email was not a directive, his plan was to use "legal names when I start teaching later in the day." [Filing No. 120-3 at 14 (Exhibit 3 – Kluge Dep. at p. 51, line 23 to p. 52, line 13)]. Dr. Daghe contacted Dr. Snapp and, in a meeting later that day, Kluge told them that his sincerely-held religious belief prohibited him from using a "transgender" first name when addressing students. [Filing No. 120-3 at 14 (Exhibit 3 – Kluge Dep. at p. 52, line 14 to p. 53, line 2)]. Dr. Snapp provided three options—address students by the name in PowerSchool, resign, or face suspension pending termination. [Filing No.120-3 at 14 (Exhibit 3 – Kluge Dep. at p. 53, lines 3-8)]. After a separate telephone conversation between Dr. Snapp and Kluge's pastor, the administration agreed to the pastor's request that Kluge have the weekend to consider his options. [Filing No. 120-3 at 15-16 (Exhibit 3 – Kluge Dep. at p. 56, line 20 to p. 57, line 18; p. 58, lines 2-16)].

19.     The following Monday, Kluge met with Dr. Snapp and Gordon and proposed that Brownsburg allow him to address students by the last name listed in PowerSchool. [Filing No. 120-3 at 17 (Exhibit 3 – Kluge Dep. at p. 63, line 11 to p. 65, line 10)]. The administration

agreed to Kluge's proposal as an accommodation, as well as another accommodation that Kluge proposed. [Filing No. 120-3 at 17-18 (Exhibit 3 – Kluge Dep. at p. 65, line 11 to p. 66, line 23)].

20.     Both accommodations are memorialized in a memorandum from Dr. Daghe to Kluge dated July 28, 2017:

- First, the administration agreed that Kluge "may use last name only to address students."

- Second, the administration relieved Kluge from passing out orchestra uniforms to students.

[Filing No. 15-1.]

21.     Kluge signed the memorandum on July 31, 2017, agreeing to comply with these accommodations. [Filing No. 15-1.]

22.     Regarding the first accommodation, Kluge understood that he would address all of his students by last name, as opposed to only transgender students. [Filing No. 120-3 at 18 (Exhibit 3 – Kluge Dep. at p. 68, line 14 to p. 69, line 18)]. To illustrate, Kluge would address Heather Williams as "Williams" or Lucas Jones as "Jones." [Filing No. 120-2 at 4 (Exhibit 2 – Affidavit of Bret Daghe, ¶10)]. In addition, Kluge understood that he would not use honorifics when addressing students. [Filing No. 120-3 at 18 (Exhibit 3 – Kluge Dep. at p. 68, line 14 to p. 69, line 18)].

23.     After his meeting with Dr. Snapp and Gordon, Kluge began teaching. [Filing No. 120-3 at 18-19 (Exhibit 3 – Kluge Dep. at p. 69, line 19 to p.70, line 2)].

V.     *Students, parents, and teachers complain about the last-name-only accommodation.*

24.     During the Fall 2017 semester, Brownsburg's administration received complaints about Kluge's use of last names. *See infra*, Statement of Material Facts Not in Dispute ("SMF") ¶¶25-31. In a letter to the administration dated September 1, 2017, the parents of a transgender

student wrote that "[o]ur medical providers agree that it is in our child's best interest to socially transition as a male. We fully support and love our child, and want to help him live the best life that he can live." [Filing No. 120-12 at 2 (Exhibit 12 – Letter to Brownsburg Administration dated 9.1.17)]. Although the parents noted that "most of the staff at Brownsburg High School have been very supportive and have willingly made the transition to using [our child's] male name and pronouns," they were concerned about a teacher who called their child "Miss." routinely. (*Id.*) In the parents' view, this "causes understandable confusion for other students, and leads to students reverting to using female pronouns." (*Id.*) Subsequently, the mother sent an email to the school counselor stating that Kluge was continuing to call her child "Miss [    ]" and that it was causing her child "a lot of distress." [Filing No. 120-13 at 2 (Exhibit 13 – Email to Brownsburg Administration dated 9.21.17)].

25.     Another source of complaints about Kluge's use of last names was the Equality Alliance Club, a high school extracurricular club that met weekly to discuss issues impacting the LGBTQ community. [Filing No. 120-14 at 32 (Exhibit 14 – Lee Dep. at p. 32, line 18 to p. 33, line 9)]; [Filing No. 58-2 at 2, ¶4]. Craig Lee, a teacher at the high school, was the club's faculty advisor. [Filing No. 120-14 at 4 (Exhibit 14 – Lee Dep. at p. 22, line 20 to p. 23, line 3)]; [Filing No. 58-2 at 1-2, ¶¶2-3]. Lee's duties as faculty advisor included serving as a resource for the students and supervising the meetings. [Filing No. 120-14 at 4 (Exhibit 14 – Lee Dep. at p. 23, lines 17-25)]. Attendance at the club's weekly meetings ranged from twelve to forty students, and at least four of its regular participants were transgender. [Filing No. 120-14 at 6-7 (Exhibit 14 – Lee Dep. at p. 33, line 19 to p. 35, line 1)]; [Filing No. 58-2 at 2, ¶ 4].

26.     Students who attended the meetings complained weekly about Kluge's use of last names. [Filing No. 120-14 at 7-8 (Exhibit 14 – Lee Dep. at p. 36, line 20 to p. 38, line 3)]; [Filing

No. 120-14 at 13 (Exhibit 14 – Lee Dep. at p. 73, lines 9-23)]; [Filing No. 120-14 at 14 (Exhibit 14 – Lee Dep. at p.76, line 19 to p.77, line 10)]; [Filing No. 58-2 at 7-8, ¶7]. Sam Willis and Aidyn Sucec, two transgender students in Kluge's orchestra class during the 2017-2018 school year, were among the students who complained. [Filing No. 22-3 at 3-4, ¶¶7, 11, 14]; [Filing No. 58-1, at 2-3, 7-10]. Based on Lee's observations, "It was just very, very clear at the meetings to see how much emotional harm was being caused towards Sam and Aidyn. It was clear for everyone at the meetings just to see how much of an impact it was having on them." [Filing No. 120-14 at 8 (Exhibit 14 – Lee Dep. at p. 39, lines 2-6)]; [Filing No. 120-14 at 11 (Exhibit 14 – Lee Dep. at p. 51, line 12 to p. 52, line 6)]. According to Lee, students felt hurt because Kluge would not use their preferred first names. [Filing No. 58-2 at 2-3, ¶7]. Lee also reported that transgender students felt "isolated and targeted" because they understood that their presence in class was the reason Kluge changed the way he addressed students. (*Id.*)

27.     Sucec explained that "Kluge's behavior made me feel alienated, upset, and dehumanized. It made me dread going to orchestra class each day, and I felt uncomfortable every time I had to talk to him one-on-one." [Filing No. 22-3 at 4, ¶¶13-14.] Sucec's experience in Kluge's class influenced his decision not to enroll in orchestra after the 2017-2018 school year and, ultimately, to stop attending Brownsburg High School. [Filing No. 22-3 at 4-5, ¶¶14-16.]

28.     Willis observed that "Kluge's use of last names in class made the classroom environment very awkward" and led him to conclude "that I was being targeted because of my transgender identity." [Filing No. 58-1 at 3-4, ¶11.] Willis further explained, "Even now, it hurts to think about how Mr. Kluge treated me that year." [Filing No. 58-1 at 4, ¶14.] Willis opined that "if everyone in my life had refused, like Mr. Kluge, to use my corrected name, I would not be here today." [Filing No. 58-1 at 5, ¶16.]

29.     In the Fall of 2017, Jessup attended an Equality Alliance Club meeting based on concerns she received from counselors. [Filing No. 120-6 at 7 (Exhibit 6 – Jessup Dep. at p. 44, lines 9-24)]. Approximately forty students attended. [Filing No. 120-1 of 4 (Exhibit 1 – Affidavit of Dr. Kathryn Jessup, ¶9)]. Approximately four or five students complained specifically about a teacher using last names only to address students and, in Jessup's view, the other students in attendance appeared to agree. (*Id.*) While students did not identify Kluge by name, Jessup had no doubt he was the teacher in question, for he was the only teacher employed by Brownsburg who had been permitted to use last names only instead of using the names stated in PowerSchool. (*Id.*)

30.     Lee shared the Equality Alliance Club's student complaints with Dr. Daghe and Jessup. [Filing No. 58-2 at 2-3, ¶7.] For example, in an email to Dr. Daghe dated August 29, 2017, Lee reported that there was a teacher who refused to call a student by the student's new name in PowerSchool and that "this is a serious issue and the student/parents are not exactly happy about it." [Filing No. 120-15 at 2 (Exhibit 15 – Craig Lee email to Dr. Bret Daghe dated 8.29.17)]. While Lee did not identify Kluge by name in this email, Dr. Daghe knew it was Kluge, as Kluge was the only teacher who had received such an accommodation and, in any event, Lee later confirmed to Daghe that the teacher was Kluge. [Filing No. 120-2 at 4 (Exhibit 2 – Daghe Affidavit, ¶11)]. At faculty advisory meetings that occurred twice per month during the Fall 2017 semester, Lee continued to share with Dr. Daghe the complaints and concerns he was hearing. [Filing No. 120-2 at 4 (Exhibit 2 – Daghe Affidavit, ¶12)]. Lee also shared the complaints with Jessup during a mid-Spring 2018 meeting. [Filing No. 120-14 at 14-15 (Exhibit 14 – Lee Dep. at p. 74, line 22 to p. 79, line 17)].

31.     Beyond students in the Equality Alliance Club, others in the high school community complained about Kluge using last names:

- One of Lee's students, who was also in one of Kluge's classes but did not attend Equality Alliance Club meetings, complained to Lee that Kluge's use of last names made the student feel "very uncomfortable" and that the student "felt really bad for those transgender students because of how [Kluge] . . . was conducting himself in class." [Filing No. 120-14 at 15-16 (Exhibit 14 – Lee Dep. at p. 79, line 4 to p. 84, line 12)].

- Three of Lee's teaching colleagues told Lee that they had received complaints from students and that based on those complaints, they thought Kluge's use of last names was harming students. [Filing No. 120-14 at 16-17 (Exhibit 14 – Lee Dep. at p. 85, line 4 to p. 86, line 15)].

- The two performing arts department heads told Dr. Daghe during regular meetings in Fall 2017 that they had received complaints about Kluge's use of last names. [Filing No. 120-2 at 4 (Exhibit 2 – Daghe Affidavit, ¶13)]. The department heads also shared with Dr. Daghe they perceived that Kluge was making students uncomfortable by using last names and that the tension this was causing was affecting the overall functioning of the department. [Filing No. 120-5 at 9-10 (Exhibit 5 – Daghe Dep. at p. 57, line 15 to p. 58, line 8)]; [Filing No. 120-2 at 4 (Exhibit 2 – Daghe Affidavit, ¶13)]. Dr. Daghe received more complaints from these department heads than the complaints Lee shared from students at the Equality Alliance Club meetings. [Filing No. 120-5 at 9 (Exhibit 5 – Daghe Dep. at p. 57, lines 18-24)].

VI.    *Brownsburg meets with Kluge to discuss complaints about the last-name-only accommodation and, in response, Kluge characterizes the complaints as a "heckler's veto" and announces he intends to continue using the accommodation, complaints notwithstanding.*

32.     As Dr. Daghe heard these concerns throughout the Fall of 2017, he wanted to be fair to Kluge, give the situation some time, and determine if the problems and student concerns resolved themselves. [Filing No. 120-2 at 4 (Exhibit 2 – Daghe Affidavit, ¶14)]. When they did not, by December 2017, Dr. Daghe realized he needed to address these issues directly with Kluge. (*Id.*) On December 13, 2017, Dr. Daghe met with Kluge to tell him about the complaints he received regarding Kluge's use of last names. [Filing No. 120-3 at 22 (Exhibit 3 – Kluge Dep.

at p. 83, line 6 to p. 84, line 8)]. Kluge claims this was the first time he heard such complaints.

[Filing No. 120-3 at 22 (Exhibit 3 – Kluge Dep. at p. 84, lines 9-18)]. According to Kluge,

> Daghe scheduled a meeting with me to ask how the year was going and to tell me
> that my last-name-only [a]ccommodation was creating tension in the students and
> faculty. He said the transgender students reported feeling "dehumanized" by my
> calling all students last-name-only. He said that the transgender students' friends
> feel bad for the transgender students when I call the transgender students, along
> with everyone else, by their last-name-only. He said that I am a topic of much
> discussion in the Equality Alliance Club meetings. He said that a number of
> faculty avoid me and don't hang out with me or include me as much because of
> my stance on the issue.

[Filing No. 120-3 at 22 (Exhibit 3 – Kluge Dep. at p. 83, line 20 to p. 84, line 3)]; [Filing

No. 15-3 at 4].

   33.   Kluge responded to the complaints as follows:

> I explained to Daghe that this persecution and unfair treatment I was undergoing
> was a sign that my faith as witnessed by my using last-names-only to remain
> neutral was not coming back void, but was being effective. He didn't seem to
> understand why I was encouraged. He told me he didn't like things being tense
> and didn't think things were working out. He said he thought it might be good for
> me to resign at the end of the year. I told Daghe that I was now encouraged all the
> more to stay.

[Filing No. 120-3 at 24 (Exhibit 3 – Kluge Dep. at p. 90, lines 5-22)]; [Filing No. 15-3 at

5].

   34.   According to Kluge, after learning about the student complaints from Dr. Daghe

at the December 13, 2017, meeting, Kluge still believed that the last-name-only accommodation

should continue and there was no reason to consider an alternative. [Filing No. 120-3 at 24

(Exhibit 3 – Kluge Dep. at p. 92, line 5 to p. 93, line 24)]. Kluge also thought the complaints did

not demonstrate undue hardship and instead were a "heckler's veto." [Filing No. 120-3 at 24-25

(Exhibit 3 – Kluge Dep. at p. 93, line 25 to p. 94, line 6)]. As Kluge put it, "[W]hy would I

change?" [Filing No. 120-3 at 25 (Exhibit 3 – Kluge Dep. at p. 94, line 4 to p. 95, line 15)].

Further, Kluge suspected that Dr. Daghe was lying about student and faculty complaints because Kluge had not experienced animosity with faculty, Dr. Daghe did not identify by name any students or faculty who complained, Kluge did not perceive any tension in his classes, and his students performed "better than ever" at orchestra competitions. [Filing No. 120-3 at 23 (Exhibit 3 – Kluge Dep. at p. 88, line 5 to p. 90, line 4)].

VII.    *In response to Kluge's refusal to stop using the last-name-only accommodation, Brownsburg gives Kluge three options, and Kluge chooses the option to resign effective at the end of the school year.*

35.     During their next meeting on January 17, 2018, Dr. Daghe told Kluge that he wanted him to resign at the end of the school year. [Filing No. 120-3 at 25 (Exhibit 3 – Kluge Dep. at p. 95, line 8-12)]; [Filing No. 15-3 at 5]. Dr. Daghe cited the student and faculty complaints about the last-name-only accommodation as the reason for his request. [Filing No. 120-3 at 25 (Exhibit 3 – Kluge Dep. at p. 95, lines 13-17)]. Kluge responded that "if there is tension and conflict, well, that's encouragement that I shouldn't quit but I should continue to pursue neutrality," by which he meant using last names when addressing students. [Filing No. 120-3 at 25 (Exhibit 3 – Kluge Dep. at p. 95, line 18 to p. 96 at line 5)].

36.     In an email to Dr. Snapp and Dr. Daghe dated February 4, 2018, Kluge referenced an FAQ from a recent faculty meeting indicating that next school year, Brownsburg expected faculty to address students by the first name listed in PowerSchool. [Filing No. 120-16 at 2 (Exhibit 16 – Plaintiff's email to Snapp and Daghe 2.4.18)]. Kluge concluded the email by asking if it was "correct that I would be allowed to continue to use last-names-only when addressing students next school year and beyond?" (*Id.*)

37.     Dr. Daghe and Gordon met with Kluge on February 6, 2018, to respond to Kluge's question. [Filing No. 120-3 at 25 (Exhibit 3 – Kluge Dep. at p. 96, lines 10-21)]; [Filing

No. 15-3 at 6]. They told Kluge that although Brownsburg would continue the last-name-only accommodation for the remainder of the 2017-2018 school year, it would not be available for the next school year. [Filing No. 120-3 at 26 (Exhibit 3 – Kluge Dep. at p. 99, lines 9-24)]; [Filing No. 113-4 at 24, lines 4-12]. They reiterated to Kluge that students were offended by being called by their last names only. [Filing No. 113-4 at 26, lines 16-19.] Kluge acknowledged in this conversation that he understood that an employer is not obligated to accommodate all religious beliefs. [Filing No. 113-4 at 27, lines 9-11.] Dr. Daghe also stated that the last-name-only accommodation was not reasonable because it was detrimental to students. [Filing No. 113-4 at 28, lines 8-13.] They gave Kluge three options: resign, continue to use the last-name-only accommodation and face termination procedures, or stop using the last-name-only accommodation. [Filing No. 120-3 at 26-27 (Exhibit 3 – Kluge Dep. at p. 100, line 3 to p. 102, line 12)].

38.    On April 30, 2018, Kluge tendered his resignation, effective at the end of the 2017-2018 school year. [Filing No. 120-17 at 2 (Exhibit 17 – Emails between Plaintiff and Gordon dated April 30, 2018)]. Kluge concluded his resignation with the following requests: "Please do not process this letter nor notify anyone, including any administration, about its contents before May 29, 2018. Please email me to acknowledge that you have received this message and that you will grant this request." (*Id.*) In response, Gordon stated, "I will honor your request and not process this letter or share with the BHS administration until May 29." (*Id.*) Kluge did not follow up with Gordon to clarify what she meant by the term "BHS administration." [Filing No. 120-3 at 28 (Exhibit 3 – Kluge Dep. at p. 108, line 9 to p. 109, line 4)].

VIII. *Despite Brownsburg allowing the last-name-only accommodation to continue until the end of the 2017-2018 school year, Kluge abandons it during an orchestra awards ceremony.*

39.     In May 2018, Kluge participated in an orchestra awards ceremony that honored graduating students and others for their achievements during the school year. [Filing No. 120-3 at 32 (Exhibit 3 – Kluge Dep. at p. 125, lines 2-17)]. The ceremony was part of the curriculum, and Kluge was participating as a Brownsburg employee. [Filing No. 120-3 at 32-33 (Exhibit 3 – Kluge Dep. at p. 125, line 22 to p. 126, line 6)].

40.     According to Kluge, the following is an accurate report of the ceremony:

> During classes, Kluge addressed students by last names, as a reasonable accommodation for his sincerely held Christian beliefs. But during the orchestra awards ceremony, because of its formal nature, he used the full names for students as listed in PowerSchool to address all students as they were receiving their awards—including transgender students—because he was trying to work with the school in only requesting what was reasonable. Kluge thought it unreasonable and conspicuous to address students in such an informal manner at such a formal event, as opposed to the classroom setting where teachers refer to students by last names as a normal form of address. Kluge's Christian faith required that he do no harm to his students, and this acquiescence to the administration's position was done solely out of sincerely-held beliefs, and not in agreement with the policy. Otherwise, Kluge would have created a scene that would bring into doubt his stated rationale for usage of last names only.

[Filing No. 120-3 at 32 (Exhibit 3 – Kluge Dep. at p. 125, lines 18-21)]; [Filing No. 120-19 at 7 (Exhibit 19 – Plaintiff's Response to RPD No. 6)].

41.     Kluge did not tell Brownsburg before the ceremony that he intended to address all students by the first and last names listed in PowerSchool. [Filing No. 120-3 at 34 (Exhibit 3 – Kluge Dep. at p. 130, line 10 to p. 131, line 4)]. Kluge thought that he was promoting a transgender lifestyle when he addressed students by their "transgender names" during class, but not when he did so during the ceremony. [Filing No. 120-3 at 33-34 (Exhibit 3 – Kluge Dep. at p. 128, line 6 to p. 130, line 9)].

42.     Kluge justified a different approach in each setting because addressing students in the classroom occurs more frequently and is less formal. [Filing No. 120-3 at 33-34 (Exhibit 3 – Kluge Dep. at p. 128, line 6 to p. 130, line 9)]. Further, Kluge analogized the classroom setting to a high school coach's habit of addressing student-athletes by last names, but he lacked personal knowledge whether this actually occurred at the high school during the 2017-2018 school year or whether any student-athlete complained about such a habit. [Filing No. 120-3 at 33 (Exhibit 3 – Kluge Dep. at p. 127, line 7-12; p. 129, lines 2-12), 35-36 (Exhibit 3 – Kluge Dep. at p. 137, line 7 to p. 138, line 12)]. Other than his classroom experience, the only instance where Kluge claims that he observed teachers addressing students by last name was during work on the school musical. [Filing No. 120-3 at 35 (Exhibit 3 – Kluge Dep. at p. 134, line 17 to p. 136, line 25)]. Kluge did not know whether any musical student complained about being addressed by last name. [Filing No. 120-3 at 35 (Exhibit 3 – Kluge Dep. at p. 137, lines 1-6)].

IX.     *Brownsburg's board accepts Kluge's resignation at its regular monthly board meeting in June 2018.*

43.     At its regular monthly meeting on June 11, 2018, Brownsburg's board unanimously approved Kluge's resignation, effective at the end of the 2017-2018 school year. [Filing No.120-18 at 2, 8 (Exhibit 18 – June 2018 Regular Board Meeting Minutes)]. Kluge's resignation was one of ten teacher resignations that the board approved during that meeting. (*Id.*) Several dozen people spoke about Kluge's resignation during the public comment session. [Filing No.120-18 at 8-13 (Exhibit 18 – June 2018 Regular Board Meeting Minutes)]. The comments included statements that supported Kluge, statements that were critical of Kluge's use of last names, and citizens' opinions on transgender issues more generally. (*Id.*)

## Statement of Material Facts in Dispute

Brownsburg submits that the foregoing Statement of Material Facts Not in Dispute establishes all material facts for the Court to enter summary judgment in its favor on Kluge's two remaining claims.

Nevertheless, it is worth briefly addressing Kluge's characterization of the events leading up to his resignation and explaining why that characterization is immaterial, misstated, or both. Ultimately, the material facts relevant to those events are that Kluge submitted a written resignation effective at the end of the 2017-2018 school year and that the Board accepted it unanimously at its regular monthly meeting on June 11, 2018. *See supra*, SMF ¶¶38, 43.

First, Kluge claims as undisputed fact that one of the conditions of his April 30, 2018, resignation was that he could withdraw it before May 29, 2018. [Filing No. 114 at 10-11, ¶25.] Kluge's resignation, however, said nothing of the sort, and the Court recognized this when it dismissed Kluge's fraud claim: "Notably, however, Mr. Kluge's written resignation, which he attached to his Amended Complaint, was not expressly conditioned on anything, did not contain any language concerning his ability to withdraw it, and instead merely requested that the letter not be 'processed' and that no one be notified until a certain date." [Filing No. 70 at 40.] In fact, the only condition Kluge did place on his resignation was the only one that was legally valid, namely, the effective date. *See* Ind. Code 5-8-4-1 (stating that a public employee who submits a written resignation effective at a future fixed date has no right to withdraw it); [Filing No. 120-8 at 2 (Exhibit 8 – Brownsburg's policy "3140—Resignation")].

Second, Kluge asserts that "[a]fter evaluating what Gordon and Daghe told him about his accommodation and disagreeing with it," he had a change of heart and attempted to rescind his resignation. [Filing No. 114 at 11, ¶26.] Kluge goes on to claim as undisputed fact that

Brownsburg's actions in response to his attempted rescission were somehow invalid, including the board unanimously accepting his resignation. [Filing No. 114 at 11, ¶¶27-28.] These claims are premised on Kluge's assertion that Gordon originally "misrepresented Kluge's ability to submit a 'conditional' resignation in order to obtain his resignation." [Filing No. 114 at 11-12, ¶29.]

None of this is material for the simple reason that Gordon did not represent that Kluge could submit a "conditional" resignation, a term Kluge uses to mean that Gordon told him he could withdraw his resignation. The only evidence Kluge cites to support Gordon's alleged representation is his subjective belief, specifically that he thinks Gordon "knew when she agreed to the 'conditions' of my resignation that I could submit a 'conditional' resignation and that I could not rescind it . . . ." [Filing No. 113-2 at 6, ¶31.] But this puts the cart before the horse, for again Gordon did not state that Kluge could withdraw his resignation whenever he pleased.[2] Moreover, as the Court has noted in dismissing Kluge's fraud claim, however Kluge may have interpreted what Gordon told him in their meetings leading up to his resignation, the fact remains that his actual April 30, 2018, written resignation does not state that he could withdraw it. [Filing

---

[2] Elsewhere in his brief, Kluge writes that Gordon "suggested" that Kluge could submit a conditional resignation, and cites as support excerpts from the transcript of his meeting with Dr. Daghe and Gordon on February 6, 2018. [Filing No. 114 at 17-18.] The gravamen of Gordon's statements in the cited excerpt is that she references past instances where teachers did not want their resignation announced publicly until the end of the school year. [Filing No. 113-4 at 36-37 (p. 17, lines 6-24, page 18, lines 6-8)]. Nowhere does Gordon state that Kluge could withdraw his resignation, nor can one reasonably infer from her statements that she "suggested" it. Lest there be any doubt, Gordon goes on to explain her preference that she have a reasonable amount of time to find a replacement when a teacher submits a resignation. [Filing No. 113-4 at 36-37 (p. 18, lines 13-24)]. If Gordon had told Kluge that he could withdraw his resignation, then it seems odd that she would mention needing to find a replacement, for a withdrawal could result in the administration having two teachers for one position. In short, this is but one piece of additional evidence demonstrating that Gordon never told Kluge he could withdraw his resignation in the first place.

23

No. 70 at 40 ("Mr. Kluge alleges that, at a meeting on February 6, 2018, Ms. Gordon 'agreed that he could submit a conditional resignation.' However, the resignation he attached to the Amended Complaint contradicts this allegation, as Mr. Kluge did not in fact submit a conditional resignation.")].

In sum, the only facts that are material to Kluge's resignation are that he submitted his resignation on April 30, 2018, with an effective date at the end of the 2017-2018 school year and that the board unanimously accepted this resignation. Kluge's attempt to suggest misrepresentations by Gordon based on "processing" and "conditions" have no support in the designated record beyond Kluge's subjective belief.

## Summary of Argument

Summary judgment in favor of Brownsburg is appropriate on Kluge's two remaining claims. Moreover, assuming for argument's sake that Kluge's unlawful discrimination claim survives, genuine issues of material fact preclude summary judgment in Kluge's favor regarding the sincerity of his religious belief.

Regarding Kluge's unlawful discrimination claim, Kluge cannot establish a prima facie case because there is no objective conflict between his alleged sincerely-held religious belief and Brownsburg's requirement that all high school teachers address students by the first names listed in PowerSchool. Brownsburg did not require Kluge to promote or otherwise support transgender issues. Rather, Brownsburg required Kluge to reference a database of student names and address students accordingly. Courts have characterized such requirements as "purely administrative" and therefore lacking any objective conflict with the employee's religious belief. As such, Kluge cannot establish a prima facie case and summary judgment is appropriate for this reason alone.

Kluge's unlawful discrimination claim also fails because, as a matter of law, the last-name-only accommodation would have caused Brownsburg undue hardship. It is undisputed that Brownsburg received complaints from members of the high school community about Kluge's last-name-only accommodation, including that the accommodation was having a negative impact on the classroom and student learning. When Kluge became aware of the complaints, he refused to acknowledge that anything was wrong and instead announced his intention to continue addressing students by last names. Case law establishes that schools experience undue hardship as a matter of law when an accommodation negatively impacts student learning, the classroom environment, and the like. That is particularly true for Brownsburg, whose mission is to educate students.

Undue hardship has also been established as a matter of law because continuing the last-name-only accommodation would have exposed Brownsburg to a significant risk of liability. Title IX protects transgender students from discriminatory treatment, and Seventh Circuit case law establishes that undue hardship results when an accommodation places an employer on the "razor's edge" of liability.

Finally, even if Kluge could establish a prima facie case of unlawful discrimination and the Court were to deny Brownsburg summary judgment on Kluge's unlawful discrimination claim, Kluge is not entitled to summary judgment regarding the sincerity of his religious belief. The designated evidence demonstrates that Kluge's use of the last-name-only accommodation was inconsistent, and that alone precludes summary judgment on this fact-sensitive issue.

## Argument

I.   *Standard of review.*

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party need not positively disprove the opponent's case; rather, it may prevail by "showing—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "A party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007), *overruled on other grounds by Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).

The Seventh Circuit has described summary judgment as the "'put up or shut up' moment in litigation," which means "the non-moving party is required to marshal and present the court with the evidence she contends will prove her case. And by evidence, we mean evidence on which a reasonable jury could rely." *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010) (internal citations omitted). In conducting this review, the court construes all relevant facts and reasonable inferences in the non-moving party's favor. *Porter v. City of Chicago*, 700 F.3d 944, 950 (7th Cir. 2013).

In cases such as this one that involve cross-motions for summary judgment, the "usual Rule 56 standard of review applies . . . ." *Int'l Brotherhood of Elec. Workers v. Balmoral Racing Club, Inc.*, 293 F.3d 404, 404 (7th Cir. 2002). "Cross-motions must be evaluated together, and the court may not grant summary judgment for either side unless the admissible evidence as a

whole—from both motions—establishes that no material facts are in dispute." *Bloodworth v.*

*Village of Greendale*, 475 Fed.Appx. 92, 94-95 (7th Cir. 2012).

II.   *Kluge cannot establish a prima facie case of unlawful discrimination because, as a matter of law, there was no objective conflict between his alleged sincerely-held religious belief and addressing students by their first names.*

Kluge's unlawful discrimination claim requires summary judgment in Brownsburg's

favor because the "purely administrative" act of addressing students by the names listed in

PowerSchool does not objectively conflict with his alleged sincerely-held religious beliefs.

a.   *Unlawful discrimination for failure to accommodate generally.*

Kluge alleges in Count I of his Amended Complaint that Brownsburg discriminated

against him in violation of Title VII by withdrawing the last-name-only accommodation and

allegedly coercing him to resign. [Filing No. 15 at 17.]

Title VII prohibits an employer from discriminating in the terms, conditions, or privileges

of employment because of an employee's religion. 42 U.S.C. § 2000e-2(a). Title VII also

requires an employer to provide reasonable accommodation for an employee's religious belief

unless it would cause undue hardship to the employer's business. 42 U.S.C. § 2000e(j).

Prior to *E.E.O.C. v. Abercrombie & Fitch, Inc.*, 135 S.Ct. 2028 (2015), the Seventh

Circuit required the following proof to sustain a prima facie case based on failure to

accommodate: (1) the employee's sincerely-held religious belief conflicted with an employment

requirement; (2) the employer knew of the employee's religious belief; and (3) the need for an

accommodation of that religious belief was the basis for the employer's adverse employment

action. *Porter v. City of Chicago*, 700 F.3d 944, 951 (7th Cir. 2012). District courts within the

Seventh Circuit have concluded that the Supreme Court's decision in *Abercrombie & Fitch*

reduced the employee's prima facie case to the first and third elements. *See Summers v. Whitis,*

2016 WL 7242483, at *4 (S.D. Ind. Dec. 15, 2016); *Schwinger v. Elite Prot. & Sec., Ltd.*, 2015

WL 7753064, at *5 (N.D. Ill. Dec. 2, 2015). If the employee establishes a prima facie case, the

burden shifts to the employer to show that the reasonable accommodation would have resulted in

undue hardship. *Porter*, 700 F.3d at 951.

> b.   *Addressing students by their first names was "purely administrative" and
> therefore created no objective conflict.*

Regarding the first *Abercrombie* element, "the fact that an employee subjectively

perceives a conflict between [his] religious beliefs and [his] job duties is not, in and of itself,

conclusive." *Summers*, 2016 WL 7242483, at *5. Instead, the reviewing court must objectively

determine whether a genuine conflict exists between the employee's religious belief and his job

duties. *Id.* Applying this standard to the designated evidence demonstrates there is no objective

conflict.

Brownsburg provided its high school faculty with a straightforward, easy-to-follow rule

when addressing students in that faculty need only "call students by the name listed in

PowerSchool." *See supra*, SMF ¶13. This approach satisfied the three teachers who met with Dr.

Daghe before the start of the school year to express concern about the administration's approach

to transgender students. *See supra*, SMF ¶¶15. In providing guidance to high school faculty

regarding transgender students, Brownsburg did not require that faculty show approval or

positive support for transgender students or transgenderism more generally. In fact, one of

Brownsburg's stated goals in providing such guidance was "not to change your personal beliefs

but to ensure appropriate school place treatment and to provide a safe, inclusive environment for

all students." [Filing No. 120-20 at 4 (Exhibit 20 – Document Titled "Transgender

Considerations" dated January 22, 2018)]. Moreover, when Kluge received notice about two

transgender students in his class who had changed their names, the guidance counselor

disavowed using the name change as a vehicle for positive support: "We do NOT want [the student] used as a model for teaching tolerance or anything else." [Filing No. 120-10 at 2 (Exhibit 10 – Lori Mehrtens email to Plaintiff dated 7.18.17 at 758am]; [Filing No. 120-11 at 2 (Exhibit 11 – Lori Mehrtens email to Plaintiff dated 7.18.17 at 755am)].

In Kluge's view, aside from initially requiring him to address students by their "transgender names" and telling him later on that it would not continue the last-name-only accommodation into the next school year, Brownsburg did not require Kluge to make positive statements about transgender students' lifestyles. [Filing No. 120-3 at 30 (Exhibit 3 – Kluge Dep. at p. 116, line 21 to p.117, line 21)]. Brownsburg also did not require Kluge to attend Equality Alliance Club meetings or meetings for any similar LGBTQ group. [Filing No. 120-3 at 30-31 (Exhibit 3 – Kluge Dep. at p. 117, line 22 to p. 118, line 5)]. Brownsburg did require Kluge to attend faculty meetings where transgender issues were discussed, but Kluge did not think his attendance meant that Brownsburg was forcing him to agree with what was presented. [Filing No. 120-3 at 31 (Exhibit 3 – Kluge Dep. at p. 118, line 6 to p. 119, line 8)]. In fact, Kluge understood that by attending the faculty meetings, "[i]t did not indicate approval of . . . transgenderism." [Filing No. 120-3 at 31 (Exhibit 3 – Kluge Dep. at p. 119, line 1-2)].

Seen in this light, it is apparent that requiring Kluge, like all high school faculty, to address students by the first and last names listed in PowerSchool was a purely administrative duty, which in turn means there is no objective conflict between his alleged sincerely-held religious belief and addressing students in such manner. In this respect, *Summers v. Whitis* provides the rule of decision:

*Summers* involved a deputy clerk's refusal to process marriage licenses for same-sex couples. 2016 WL 7242483, at *3. The deputy clerk asserted that her sincerely-held religious

beliefs prohibited her from processing such licenses and requested an accommodation to that effect. *Id.* In response, the employer denied the accommodation request and terminated the deputy clerk for insubordination, citing her refusal to process a marriage license. *Id.*

In concluding there was no objective conflict between the deputy clerk's duties and her religious opposition to same-sex marriage, Judge Young noted the "purely administrative" nature of her duties when issuing marriage licenses: "Summers' job merely required her to *process* the licenses by entering data and handing out information. Specifically, she had to pull up the application, verify that certain information was correct, collect a statutory fee, print a form, and record the license in a book for public record." *Summers*, 2016 WL 7242483, at *5 (emphasis in original). Judge Young also noted what the deputy clerk was *not* required to do:

> To be clear, Summers did not perform marriage ceremonies or personally sign marriage licenses or certificates. She was not required to attend ceremonies, say congratulations, offer a blessing, or pray with couples. Her employer did not make her express religious approval or condone any particular marriage. Summers remained free to practice her Christian faith and attend church services. She was even free to maintain her belief that marriage is a union between one man and one woman. Thus, she was not forced to "choose between [her] religious convictions and [her] job." *Abercrombie & Fitch Stores*, 731 F.3d at 1120.

*Id.* at *6.

Brownsburg's requirement that Kluge, like any other high school faculty member, address students by the first and last names listed in the PowerSchool is no different from the duties in *Summers* that Judge Young concluded were purely administrative. If anything, Brownsburg required far less of Kluge than the employer in *Summers* because he did not have to determine whether the information in PowerSchool was accurate. Instead, Kluge merely needed to use the name listed when addressing students.

Likewise, Judge Young's reasoning applies with equal force regarding what Brownsburg was *not* requiring of Kluge. There is no evidence that Brownsburg required Kluge to

congratulate transgender students on their transition, express support for their decision, or other similar actions. The evidence, in fact, is to the contrary, as one of Brownsburg's stated goals in providing guidance to faculty about transgender students was "not to change your personal beliefs but to ensure appropriate school place treatment and to provide a safe, inclusive environment for all students." [Filing No. 120-20 at 4 (Exhibit 20 – Document Titled "Transgender Considerations" dated January 22, 2018).]. Kluge's failure-to-accommodate claim is best summarized by Judge Young's observation that "Title VII is not a license for employees to perform only those duties that meet their private approval." *Summers*, 2016 WL 7242483, at *7; *see also Rodriguez v. City of Chicago*, 156 F.3d 771, 776 (7th Cir. 1998) ("Title VII . . . requires only reasonable accommodation, not satisfaction of an employee's every desire.").

In denying Brownsburg's motion to dismiss this claim, the Court reasoned that *Summers* was "distinguishable from the instant case in one important respect: it was decided at the summary judgment stage with the benefit of factual development and where the plaintiff had the burden of establishing a *prima facie* case." [Filing No. 70 at 26.] The Court further reasoned that it was bound to accept Kluge's factual allegations as true, including his assertion that "using the names as listed in the PowerSchool database violates his religious belief . . . ." (*Id.*)

Factual development has demonstrated that the *only* relevant thing Brownsburg was requiring Kluge to do is identify a student by the first name in the school's official records. As stated above, Kluge admitted in his deposition that Brownsburg never required him to express a positive opinion or judgment about a student's lifestyle, nor offer or hold any opinion about "transgenderism." These facts are undisputed. Thus, the only thing Kluge has to support his prima facie case is his subjective assertion that using names listed in the PowerSchool database violates his religious belief. But the analysis in *Summers* forecloses this argument. The Court

should determine that requiring an orchestra and music theory teacher to use a student's name as listed in a *school's official database* does not objectively conflict with his beliefs regarding transgender students, "no matter how sincerely espoused." *Summers*, 2016 WL 7242483, at *7.

III.   *Brownsburg's decision to withdraw the last-name-only accommodation was appropriate because, as evidenced by complaints from the high school community, the accommodation negatively impacted student learning, which in turn impeded Brownsburg's mission to educate students and therefore caused undue hardship.*

Assuming Kluge can establish a prima facie case of unlawful discrimination, his claim still fails because, as a matter of law, continuing the last-name-only accommodation would have caused Brownsburg undue hardship. It is undisputed that Brownsburg received complaints from members of the high school community. These complaints went to the heart of Brownsburg's mission—namely, to educate students. Moreover, case law supports that schools experience undue hardship as a matter of law where the accommodation negatively impacts the learning environment, and Kluge's arguments to the contrary are meritless.

a.     *Undue hardship analysis generally.*

Title VII relieves an employer of the obligation to provide reasonable religious accommodation if the employer cannot do so "without undue hardship on the conduct of the employer's business." 42 U.S.C. 2000e(j).

The Supreme Court has construed the term "undue hardship" in 42 U.S.C. 2000e(j) "as anything more than a *de minimis* cost to the employer." *Baz v. Walters*, 782 F.2d 701, 706 (7th Cir. 1986) (citing *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977).) "The relevant costs may include not only monetary costs but also the employer's burden in conducting its business." *E.E.O.C. v. Oak-Rite Mfg. Corp.*, No. IP 99-1962-C H/G, 2001 WL 1168156, at *10 (S.D. Ind. Aug. 27, 2001). As the term "de minimus" suggests, undue hardship is easy for an employer to establish: "The Seventh Circuit's decisions applying the undue hardship standard

. . . make clear that the 'more than *de minimis*' standard allows imposition of only the most modest burdens on employers." *Id.* at *11; *accord United States v. Bd. of Educ. for Sch. Dist. of Philadelphia*, 911 F.2d 882, 890 (3d Cir. 1990) ("[The] undue hardship test is not a difficult threshold to pass."). In addition, "an employer can be subjected to an undue hardship (a burden that is more than *de minimis*) if the proposed accommodation would create any significant . . . legal *risks*. *Oak-Rite*, 2001 WL 1168156, at *12 (emphasis in original).

The Seventh Circuit further instructs that undue hardship analysis must focus on the particulars of the employer and employee in question: "The issue of undue hardship will depend on close attention to the specific circumstances of the job and the [accommodation] the employee believes is needed." *Adeyeye v. Heartland Sweeteners, LLC*, 721 F.3d 444, 455 (7th Cir. 2013); *accord Anderson v. General Dynamics Convair Aerospace Div.*, 589 F.2d 397, 400 (9th Cir. 1978) ("These decisions must be made in the particular factual context of each case because the decision ultimately turns on the reasonableness of the conduct of the parties under the circumstances of each case."). Stated more succinctly, "[t]he inquiry ultimately boils down to whether the employer acted reasonably." *Oak-Rite*, 2001 WL 1168156, at *10. However, this does not mean that the employer must show that its actions were "objectively better" than the path the plaintiff-employee would have preferred; the employer only need show that it would be a hardship to accommodate that preferred path. *Baz v. Walters*, 782 F.2d 701, 706 (7th Cir. 1986) ("The defendants are not required to show that their philosophy . . . is objectively better than that espoused by [the plaintiff]; they need only show that it would be a hardship to accommodate his theology in view of their established theory and practice.")

Finally, although courts analyze undue hardship as a question of fact, given the circumstances of a particular case it is appropriate to resolve the issue as a matter of law. *Oak-*

*Rite*, 2001 WL 1168156, at \*10-11 (citing cases that concluded undue hardship was established as a matter of law where the accommodation increased safety risks or exposed the employer to legal liability).

> b.   For purposes of undue hardship analysis, Brownsburg's "business" was a constitutional and statutory obligation to educate students.

In many Indiana communities, public school corporations employ, transport, and feed more people than any other organization in the community, yet none of these is the reason schools exist. Rather, public school corporations exist to advance Hoosiers' constitutional right to a free public education: "it shall be the duty of the General Assembly to encourage, by all suitable means, moral, intellectual, scientific, and agricultural improvement; and to provide, by law, for a general and uniform system of Common Schools, wherein tuition shall be without charge, and equally open to all." Ind. Const. Art. 8, §1. To further this constitutional right, the General Assembly has devoted Title 20 of the Indiana Code to primary education.

Many if not most undue hardship cases involve employers that are corporations or non-profits, and the analysis tends to focus on costs common to those enterprises, whether monetary, operational, or otherwise. But Brownsburg's interest is different. It does not exist to maximize shareholder investment or raise money for a cause. Brownsburg exists to educate students and, unlike a corporation or non-profit, that *raison d'être* has constitutional and statutory dimensions.

*Baz v. Walters* is a helpful touchstone in this regard. *Baz* concerned a chaplain employed by the Veterans Administration at its medical center in Illinois. Baz's religious convictions compelled him to adopt a proselytizing style that clashed with the Veterans Administration's "multi-disciplinary approach to patient health care." *Baz*, 782 F.2d at 704. After the Veterans Administration terminated his employment, Baz sued under Title VII. Even though the district court found that the "primary reason for Reverend Baz's discharge lay in his 'view of his

34

ministry and his call to preach the Gospel,'" both the district court and the Seventh Circuit determined that the Veterans Administration had shown that continuing to employ Baz would have been an undue hardship. *Id.*at 706. Central to this determination was that the Veterans Administration had produced evidence showing their primary motivation in terminating Baz "was to further the primary purpose of the hospital, which is the overall well-being of the patients." *Id.* Thus, central to the panel's analysis of undue hardship was the hospital's mission, not the financial or other costs associated with accommodating Reverend Baz's preferred ministry style.

This is analogous to Brownsburg's constitutional and statutory duty to provide a free public education. Consistent with *Baz*, it is important to keep Brownsburg's "business" purpose in mind when analyzing the undue hardship caused by Kluge's requested accommodation.

    *c.*    *The last-name-only accommodation frustrated Brownsburg's efforts to educate students, which constitutes undue hardship as a matter of law.*

It is undisputed that during the 2017-2018 school year, Equality Alliance Club students complained on a weekly basis about Kluge's use of last names. *See supra*, SMF ¶¶24-25. According to Craig Lee, it was "very, very clear" that Kluge's use of last names was causing emotional harm to two of his students in particular, Sam Willis and Aidyn Sucec. *Id.*, ¶26. Sucec "dread[ed] going to orchestra class each day" and "felt uncomfortable" when he talked with Kluge one-on-one. *Id.*, ¶27. Perhaps most significant, Sucec's experience in Kluge's class resulted in him not enrolling in orchestra and leaving Brownsburg high school altogether. *Id.* Similarly, Kluge's class was "very awkward" for Willis due to Kluge's use of last names and made him feel "targeted." *Id.*, ¶28. Moreover, the complaints from others in the high school community were consistent with Sucec and Willis' experiences. *Id.*, ¶31.

Coupling these complaints with Brownsburg's constitutional and statutory obligation to educate students, by now it should be apparent that the costs to Brownsburg continuing the last-name-only accommodation was, as a matter of law, much more than de minimus. To use but one example that alludes to Sucec's experience, if a student reported that he not only wanted to withdraw from a class, but also enroll elsewhere based on the harm associated with an accommodation, does that alone not demonstrate that it was reasonable for Brownsburg to discontinue the accommodation? The Court should answer this question with a resounding "yes." Moreover, Kluge acknowledged that Brownsburg has an interest in the mental health of its students, and students were not the only members of the high school community who complained. [Filing No. 120-3 at 35 (Exhibit 3 – Kluge Dep. at p. 134, lines 13-16)]; *see supra*, SMF ¶¶24, 31.

> d. *Courts have routinely found undue hardship where a religious accommodation threatens the classroom learning environment.*

The conclusion that the last-name-only accommodation caused Brownsburg undue hardship as a matter of law is consistent with the reasoning of other district courts that have addressed the issue in similar circumstances. Those district court cases are discussed below. Moreover, the Seventh Circuit has stated in the context of a Title VII religious disparate treatment claim that a school employer's legitimate, non-discriminatory reason for its action can include concern about student learning: "It is not unreasonable for Columbia to expect that its instructors will teach classes in a professional manner that does not distress students." *Smiley v. Columbia College Chicago*, 714 F.3d 998, 1002 (7th Cir. 2013).

In *Erlach v. New York City Bd. of Educ.*, No. CV 94 4239 (RJD), 1996 WL 705282, at *11 (E.D.N.Y. Nov. 26, 1996), *aff'd*, 129 F.3d 113 (2d Cir. 1997), the district court granted summary judgment in favor of a school based on undue hardship. The teacher requested that the

school accommodate her religious belief by relieving her of the obligation to teach Friday afternoon classes. *Id.* In concluding that undue hardship applied as a matter of law, the district court favorably cited the principal's affidavit that it was "educationally unsound" to cancel such classes and that no other teachers were available during that time. The district court reasoned that summary judgment was appropriate because "*interference with students' learning* need not be undertaken because it constitutes 'undue hardship' for the employer." *Id.* (emphasis added).

Like *Erlach* is *Slocum v. Devezin*, 948 F.Supp.2d 661 (E.D. La. 2013). It involved a teacher's request to take off every Tuesday for religious observance. *Slocum*, 948 F.Supp.2d at 663. In granting the school's motion to dismiss, the district court reasoned that accommodating the teacher "would require her students to sit with another teacher's class—overloading the student-teacher ratio" and thus impeding student learning. *Id.* at 669. The district court characterized such an accommodation as "even more burdensome than [the accommodation] contemplated in *Hardison*," which established the "more than de minimis" undue hardship standard. *Id.*

*Wagness v. Watertown School Dist. No. 14-4 of Codington Cty., S.D.*, 541 F.Supp. 332, 334, 337-39 (S.D. 1982), serves as an interesting corollary to *Erhlach* and *Slocum*. In that case the school denied a teacher's request for a seven-day absence to attend a religious observance and, when the teacher went anyway, the school terminated him. *Wagness*, 541 F.Supp. at 334, 337-39. After a bench trial, the district court concluded that the school had not proved undue hardship. *Id.* at 337-39. The district court's analysis included assessing "complaints or negative comment from students or parents" about the teacher's absence, noting there was none. *Id.* at 338. The district court also accepted the school's premise that a substitute teacher's lack of preparation, inability to control discipline, and lack of knowledge of individual students all "have

an adverse effect on the learning environment," which in turn can support undue hardship. *Id.* at 338-39. The district court concluded, however, that the evidence supporting such negatives was lacking: "The hypothetical hardship which defendant school district feared would be caused by [plaintiff's] absence did not materialize." *Id.* at 339.

The common thread running through *Erhlach*, *Slocum*, and *Wagness* is that disruptions to the classroom learning environment, impediments to student learning, and similar burdens imposed on students can establish undue hardship as a matter of law. In contrast to *Wagness*, and consistent with *Erlach* and *Slocum*, Brownsburg's hardship was not hypothetical, but based on actual student experiences with Kluge's use of last names. *Cf., Draper v. U.S. Pipe & Foundry Co.*, 527 F.2d 515, 520 (6th Cir. 1975) ("The employer is on stronger ground when he has attempted various methods of accommodation and can point to hardships that actually resulted.").

In this regard, Brownsburg's interest is akin to the Veterans Administration's interest in *Baz v. Walters*. There, the plaintiff-chaplain's religious convictions were compelling him to actions that could not be squared with the V.A.'s philosophy of patient health care. *Baz*, 782 F.2d at 704. The Seventh Circuit agreed with the district court's ruling that continued employment of the chaplain under those circumstances was an undue hardship for the hospital. This Court should analogize *Baz*'s holding to this case and determine that Kluge's desire to call students by last names is an undue hardship in light of the undisputed evidence that such accommodation was disrupting the learning environment and negatively impacting students.

> e.    *Kluge's arguments for lack of undue hardship are meritless.*

Kluge intersperses several arguments against undue hardship throughout his brief. None has merit, and the following addresses each as it appears in the brief:

First, Kluge cites *Ovadal v. City of Madison, Wis.*, 416 F.3d 531 (7th Cir. 2005), for the proposition that the complaints Brownsburg received are "heckler's vetoes," which is how Kluge himself characterized the complaints. [Filing No. 114 at 3]; *see supra* SMF, ¶34; [Filing No. 120-3 at 24-25 (Exhibit 3 – Kluge Dep. at p. 93, line 4 to p. 94, line 8)]. Although Kluge does not explicitly say so, he appears to argue that if a complaint is a mere "heckler's veto," that alone does not create undue hardship. That is not the law and, perhaps more to the point, *Ovadal* is a Section 1983 case based on a municipality's alleged First Amendment free speech violations. Its reasoning does not apply to Title VII undue hardship analysis.

Second, Kluge writes, "Despite extensive discovery in this case, BCSC has not identified any admissible evidence of a negative impact on the classroom environment—let alone the repetitive or pervasive disruption required to establish an undue burden." [Filing No. 114 at 3.] Putting to the side that repetitive or pervasive disruption is not required for undue hardship to apply, this is a remarkable statement. To use but one example that contradicts Kluge's assertion, Sucec reported that Kluge's use of last names made him "dread going to orchestra class each day" and influenced his decision not to enroll in orchestra the next year. *See supra*, SMF ¶27. Moreover, Lee observed Equality Alliance Club students complain weekly about Kluge's use of last names, and he shared that information with Dr. Daghe. *Id.*, ¶¶26, 30. Further, Kluge acknowledged that when Dr. Daghe first approached him about problems with the last-name-only accommodation, one of the reasons was that "transgender students reported feeling 'dehumanized' by my calling all students last-name-only." [Filing No. 15-3 at 4.]

In short, Kluge's argument engages in the same "nothing-to-see-here" attitude that Kluge himself displayed with Dr. Daghe when he first learned of the complaints. *See supra*, SMF ¶¶33-34. The Court should disregard Kluge's assertion that there is no admissible evidence of a

negative impact on the classroom environment because the foregoing designated evidence is undisputed and to the contrary.[3]

Third, Kluge asserts that Brownsburg "cannot escape liability by claiming that one accommodation . . . imposes an undue burden when [Brownsburg] has failed to even attempt to offer an accommodation it considers reasonable." [Filing No. 114 at 28.]. That is not the law. To establish undue hardship, Brownsburg is not required to offer a reasonable accommodation; rather, it must demonstrate as a matter of law it cannot reasonably accommodate the employee's religious observation or practice without undue hardship. 42 U.S.C. § 2000e(j) *Adeyeye*, 721 F.3d at 455 (stating employer must show "that any and all accommodations would have imposed an undue hardship."). Brownsburg has done so. It is obvious that a high school classroom can only function when teachers address students directly. [Filing No. 120-1 at 3 (Exhibit 1 – Affidavit of Dr. Kathryn Jessup, ¶7)]. Kluge was the only high school orchestra teacher and, when confronted with complaints from students and others that the last-name-only accommodation was disrupting the classroom and impacting students negatively, Kluge announced that he intended to continue doing the same thing. [Filing No. 120-3 at 24 (Exhibit 3 – Kluge Dep. at p. 92, line 5 to p. 93, line 24)].

---

[3]     To the extent Kluge argues that the evidence of student complaints is hearsay, the Court should decline to consider it as such for several reasons. First, designated in evidence are two declarations of students who voiced concerns with how Kluge treated them and how he conducted his classroom. Second, the student complaints are primarily statements regarding their then-existing emotional and mental conditions. Finally, the out-of-court statements at issue (*e.g.*, a student complaining to Brownsburg staff about Kluge) are not being offered for the truth stated in the complaint (*i.e.*, that Kluge was or was not doing certain things). Instead, the evidence regarding students' complaint are offered to show the state of mind of Brownsburg's administration in determining that the last-name-only accommodation was causing undue hardship. *Cf. Baz v. Walter*, 782 F.2d at 705 n.2 (addressing a hearsay objection raised by the plaintiff-employee to testimony from the employer about reports the employer received about the plaintiff-employee's actions).

Under such circumstances, Brownsburg has established as a matter of law that any accommodation would have imposed undue hardship. No accommodation would have resolved the problem because Brownsburg's fundamental mission to educate students in efficiently-run classrooms was incompatible with Kluge's subjective beliefs and stated intentions. There was also no accommodation available because Kluge was the only teacher for the orchestra and music theory classes. Unlike, say, a math or English teacher, there was no way to move Kluge's schedule around to avoid having classes with certain students.

Finally, Kluge cites *Zamecnik v. Indiana Prairie School Dist. No. 204*, 636 F.3d 874, (7th Cir. 2011), and *Tinker v. Des Moines Independent Community School Dist.*, 393 U.S. 503 (1969), for the proposition that emotional discomfort cannot support undue hardship. [Filing No. 114, at 29.] That is wrong on two counts. Similar to Kluge's reliance on *Ovadal* discussed above, *Zamecnik* and *Tinker* involve student First Amendment free speech claims, not Title VII undue hardship. Moreover, although the designated evidence demonstrates that students suffered emotional discomfort, Brownsburg's undue hardship is based on much more, most prominently the negative impact to student learning that Kluge's use of last names caused. Stated differently, Kluge's argument relies on cases that have no application to undue hardship, and he ignores that the hardship to Brownsburg is much more than students' emotional discomfort.

IV.    *The last-name-only accommodation imposed an undue hardship on Brownsburg because it exposed Brownsburg to a significant risk of liability*

Because continued use of the last-name-only accommodation created significant legal risks, Brownsburg did not violate Title VII when it informed Kluge that it intended to withdraw the accommodation. *See E.E.O.C. v. Oak-Rite Mfg. Corp.*, No. IP 99-1962-C H/G, 2001 WL 1168156, at *12 (S.D. Ind. Aug. 27, 2001); *Matthews v. Wal-Mart Stores, Inc*., 417 F. App'x 552, 554 (7th Cir. 2011) (an employer is not required to adopt "an accommodation [that] could

place [it] on the 'razor's edge' of liability"); *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d

826, 830 (9th Cir. 1999) ("an employer is not liable under Title VII when accommodating an

employee's religious beliefs would require the employer to violate federal or state law").

It is undisputed that Kluge's actions caused students to believe he was using last names to

avoid transgender names and pronouns. [Filing No. 15 at 15, ¶81.] It is also undisputed Kluge

refused to use transgender names because of some students' transgender identities. [Filing No.

15 at 5, ¶¶23-24; at 7, ¶37.] Thus, Kluge's requested accommodation placed Brownsburg

between the proverbial—and here, legal—rock and a hard place. *See Chalmers v. Tulon Co. of*

*Richmond*, 101 F.3d 1012, 1021 (4th Cir. 1996) (noting that "where an employee contends that

she has a religious need to impose personally and directly on fellow employees, invading their

privacy and criticizing their personal lives, the employer is placed between a rock and a hard

place").

Moreover, by the Spring of 2018, when Kluge's employment ended, the Seventh Circuit

had held that the constitution and Title IX prohibited a school from implementing a policy that

discriminated against transgender students. *Whitaker By Whitaker v. Kenosha Unified Sch. Dist.*

*No. 1 Bd. of Educ.*, 858 F.3d 1034 (7th Cir. 2017) (holding that a transgender student may bring

sex-discrimination claims under Title IX and the equal protection clause); *see also J.A.W. v.*

*Evansville Vanderburgh Sch. Corp.*, 396 F. Supp. 3d 833, 842 (S.D. Ind. 2019) ("The mandate

issued in *Whitaker* on June 21, 2017, and the decision thus became binding on that date. EVSC

thus should have known that it was required to conform its practices to Seventh Circuit law as of

that date."). Other courts, both before and after Spring 2018, had also concluded that Title IX

protects transgender students from discriminatory treatment. *See, e.g.*, *Grimm v. Gloucester*

*County School Board*, 972 F.3d 586 (4th Cir. 2020), *Adams ex rel. Kasper v. Sch. Bd. of St.*

*Johns Cnty.*, 968 F.3d 1286 (11th Cir. 2020); *M.A.B. v. Bd. of Educ. of Talbot Cnty.*, 286 F.

Supp. 3d 704 (D. Md. 2018); *Bd. of Educ. of the Highland Local Sch. Dist. v. U.S. Dep't of*

*Educ.*, 208 F. Supp. 3d 850, 868–70 (S.D. Ohio 2016). And of course, the Supreme Court of the

United States held in 2020 that Title VII's prohibition on sex discrimination forbids

discrimination against an employee based on transgender status. *Bostock v. Clayton Cty.,*

*Georgia*, 140 S. Ct. 1731, 1737, 207 L. Ed. 2d 218 (2020).

It is therefore apparent that the continued use of the last-name-only accommodation

would have placed Brownsburg on the "'razor's edge' of liability." *Wal-Mart*, 417 Fed. App'x at

554. As a matter of law, Brownsburg was not required by Title VII to accept this risk. *Id.*

Kluge's requested accommodation was therefore an undue hardship for this reason as well.

V.   *Kluge cannot establish a prima facie case of retaliation and, even if he could, he cannot demonstrate pretext.*

Kluge alleges in Count II of his Amended Complaint that Brownsburg retaliated against

him in violation of Title VII for engaging in protected conduct by (1) agreeing to the last-names

only accommodation then withdrawing it without demonstrating undue hardship; and (2) telling

Kluge that he could either "use transgender names and pronouns, resign, or be terminated."

[Filing No. 15 at 17-18.]. Neither assertion has merit and the Court should grant summary

judgment for Brownsburg on this claim.

Retaliation based on a reasonable accommodation request requires the employee to

establish the following: (1) he engaged in statutorily protected activity; (2) he suffered an

adverse employment action; and (3) there is a causal connection between the protected activity

and the adverse employment action. *Contreras v. Suncast Corp.*, 237 F.3d 756, 765 (7th Cir.

2001). If the employee establishes a prima facie case, the burden shifts to the employer to

articulate a legitimate nondiscriminatory reason for its actions, which the employee must show to be a pretext for unlawful retaliation. *Id.*

Pretext is a high bar for a plaintiff to clear: "Pretext involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is [a] 'lie, specifically a phony reason for some action.'" *Argyropoulos v. City of Alton*, 539 F.3d 724, 736 (7th Cir. 2016) (quoting *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 737 (7th Cir. 2006)). The Seventh Circuit has instructed that when "assessing a plaintiff's claim that an employer's explanation is pretextual, we do not . . . second-guess[ ] an employer's facially legitimate business decisions." *Id.* (internal quotation marks omitted). An employer's reason can be "foolish or trivial or even baseless," but so long as it is a reason "honestly believed," then pretext has not been established. *Hartley v. Wisconsin Bell, Inc.*, 124 F.3d 887, 890 (7th Cir. 1997).

As a matter of law, Kluge cannot establish a prima facie case because no reasonable jury could find a causal connection between the protected activity—seeking religious accommodations in July 2017, before the school year began—and the adverse employment action, which occurred in June 2018, after the school year ended, and after Brownsburg had evidence demonstrating that the last-name-only accommodation was not working. The undisputed evidence demonstrates Brownsburg began receiving complaints early in the 2017-2018 school year, yet Kluge's supervisor, Dr. Daghe, waited until December 2017 to bring to Kluge's attention the problems his last-name-only approach was taking. Dr. Daghe hoped time would allow things to smooth over, but it did not. An employer seeking retaliation would have acted more swiftly, and certainly would not have held multiple meetings with the employee in an attempt to find common ground.

Moreover, it is undisputed that Brownsburg never rescinded Kluge's request for an accommodation regarding student uniforms, and there is no evidence that members of the high school community complained about that accommodation. This further demonstrates the absence of a causal connection because the common thread running through both accommodations is that Brownsburg's decision to withdraw one and not the other turned on the presence or absence of complaints, not hostility to Kluge's religious beliefs.

But even if the Court determines that Kluge can establish a prima facie case, summary judgment should be granted to Brownsburg on Kluge's retaliation claim, for Brownsburg has articulated legitimate and nondiscriminatory reasons for its action and Kluge has no evidence on which a reasonable jury could find pretext.

Complaints from the high school community are a legitimate, nondiscriminatory reason for Brownsburg's decision to withdraw the last-name-only accommodation. Brownsburg received complaints that the accommodation was not conducive to a well-run classroom and negatively impacted students. Dr. Daghe made Kluge aware of these concerns in December 2017, several months before he submitted his resignation. Kluge does not deny that Principal Daghe alerted Kluge to these concerns. [Filing No. 120-3 at 21 (Exhibit 3 – Kluge Dep. at p. 80, lines 11-15), 23 (Exhibit 3 – Kluge Dep. at p. 86, lines 4-15)]. This is plainly a legitimate, nondiscriminatory reason under Seventh Circuit precedent: "It is not unreasonable for Columbia to expect that its instructors will teach classes in a professional manner that does not distress students." *Smiley*, 714 F.3d at 1002.

Regarding pretext, Kluge was asked in his deposition why he thought Dr. Daghe may have been lying about receiving complaints—that is, what basis he had to believe Brownsburg's actions were pretextual. Kluge stated he thought Dr. Daghe might have lied because he did not

identify the students who complained. [Filing No. 120-3 at 23 (Exhibit 3 – Kluge Dep. at p. 86, lines 4-15; at p. 88, line 22 to p. 89, line 9)]. No reasonable jury could find that this was evidence of pretext. Discovery has shown Brownsburg *did* receive complaints. Two students even filed declarations in this case regarding how Kluge's actions harmed them. Moreover, Brownsburg submits it was reasonable and wise for Dr. Daghe to withhold from Kluge who exactly had complained, given the concerns those students were expressing.

Kluge also stated in his deposition that Dr. Daghe may have been lying about the complaints because Kluge himself did not observe tension with students or faculty. [Filing No. 120-3 at 23 (Exhibit 3 – Kluge Dep. at p. 89, lines 10-19)]. But Kluge's subjective observations cannot create a genuine issue of material fact regarding whether Brownsburg's proffered justification for withdrawing the accommodation (and later informing Kluge that he would be terminated if he persisted in calling students by last names) was pretext. *Cf. Johnson v. University of Wisconsin–Eau Claire,* 70 F.3d 469, 481 (7th Cir.1995) (noting that a plaintiff's subjective belief that she was more qualified than other employees does not demonstrate that the employers evaluation of her was a pretext for discrimination), *abrogated on other grounds by Spiegla v. Hull*, 371 F.3d 928 (7th Cir. 2004); *Johnston v. Amax Coal Co.*, 963 F. Supp. 758, 767 (S.D. Ind. 1997) (stating that plaintiff's "conclusory statements" in her deposition about her job performance did not create a genuine issue of fact on whether her employer's stated reasons for termination were pretext).

Finally, the reasons Kluge pled as evidence of retaliation fail. Kluge alleged that the proof of retaliation is that (1) Brownsburg first agreed to the last-names only accommodation and then withdrew it without demonstrating undue hardship and (2) Brownsburg told Kluge he could either use transgender names and pronouns, resign, or be terminated. [Filing No. 15 at 17-18.]

46

The first allegation begs the question: It assumes Brownsburg could not demonstrate undue hardship. Brownsburg has demonstrated above that the accommodation caused undue hardship as a matter of law. The second allegation is true, but it is not evidence of retaliation. It is evidence that Brownsburg, like any competent employer, advised its employee in advance that the accommodation it had previously provided was causing undue hardship and that the employee therefore would have to abide by its directives. Here, that directive was straightforward—identify students by the first names in the school's official records. Requiring a teacher to comply with that directive cannot constitute retaliation, particularly when the school employer had evidence that its educational mission was disrupted when that directive was not followed.

In conclusion, it is difficult to escape the conclusion that the foundation of Kluge's theory of discrimination and retaliation is his profound disagreement with Brownsburg on how Brownsburg should have balanced his objections with the concerns raised about how the last-name-only accommodation was disrupting its educational mission. But this philosophical disagreement is not evidence of discrimination or retaliation. Even a "bad" decision made by an employer—and Brownsburg of course does not concede its decision was "bad"—does not violate Title VII if the basis of the decision was neither discriminatory nor retaliatory. *Johnson*, 70 F.3d at 481.

VI.   *If the Court denies summary judgment in Brownsburg's favor on Kluge's unlawful discrimination claim, it should also deny summary judgment in Kluge's favor regarding the sincerity of his religious belief.*

If the Court grants summary judgment in Brownsburg's favor on Kluge's unlawful discrimination claim, it need not address Kluge's argument that he has established the sincerity

of his religious belief as a matter of law. [Filing No. 112 at 1-2.] Nevertheless, it is worth closing this Brief by noting that genuine issues of material fact preclude such a determination.

Kluge cannot legitimately reconcile his use of last names in class with his decision to abandon that accommodation during the May 2018 orchestra awards ceremony. Kluge used the full names for students as listed in PowerSchool to address all students as they received their awards, including transgender students. *See supra*, SMF ¶40. Kluge thought that addressing students by their "transgender names" promoted a transgender lifestyle and was therefore sinful, yet he somehow thought it was appropriate to use such names during the ceremony but not in class because the latter occurs more frequently and is less formal. *Id.*, SMF ¶41.

Ironically, Kluge acknowledged that by addressing students by their "transgender names" during the ceremony, he was seeking to avoid the same type of negative consequences that resulted from his use of last names only in class. *See supra*, SMF ¶40. Kluge stated his "Christian faith required that he do no harm to students," yet Sucec "dread[ed] going to orchestra class each day," and Willis felt "very awkward" and "targeted" in Kluge's class, among other complaints. *Id.* Kluge also sought to avoid appearing "unreasonable and conspicuous" and "creat[ing] a scene" during the ceremony, but at the same time, according to Sucec, his classroom "behavior was noticeable to other students in the class" and, as Kluge acknowledged when he first learned of the complaints from Dr. Daghe, by December 2017 he had become "a topic of much discussion in the Equality Alliance Club meetings." [Filing No. 15-3 at 4.] In short, everything Kluge was trying to avoid by using "transgender names" during the ceremony *actually resulted* when he did the opposite in class.

Reasonable religious accommodation should not be based on an employee's inconsistent and unilateral say-so regarding when the accommodation applies. To that end, "[I]f the religious

beliefs that apparently prompted a request are not sincerely held, there has been no showing of a religious observance or practice that conflicts with an employment requirement." *E.E.O.C. v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1575 (7th Cir. 1997). Moreover, "Evidence tending to show that an employee acted in a manner inconsistent with his professed religious belief is, of course, relevant to the factfinder's evaluation of sincerity." *EEOC v. Union Independiente de la Autoridad de Acueductos y Alcantarilladoes de Puerto Rico*, 279 F.3d 49, 57 (1st Cir. 2002).

There is more. Kluge testified at his deposition that there are instances where it is appropriate and consistent with his religious beliefs to address a transgender student by the student's first name, even if the first name differs from the student's biological sex. [Filing No. 120-3 at 8-9 (Exhibit 3 – Kluge Dep. at p. 29, line 11 to p. 30, line 11)]. Although he did not provide an example, it is apparent that the orchestra awards ceremony was one such instance. Moreover, Kluge's denomination does not take a hardline approach when it comes to restroom use for a transgender child, instructing instead that "it may be best that she not use the bathroom of her birth sex until she has been presented with pastoral counsel concerning God's calling of manhood and womanhood . . . ." *See supra*, SMF ¶6. It would seem, then, that the same principle that allows a child to deviate from her biological sex when using a bathroom might also apply to the child's name. And that in turn calls into question the sincerity of Kluge's belief, or at least a reasonable juror could so conclude.

The Court should conclude that Kluge's inconsistent use of addressing students by last names creates a genuine issue of material fact regarding the sincerity of his religious belief.

**Conclusion**

For reasons stated, the Court should grant summary judgment in favor of Brownsburg and against Kluge on his remaining claims of unlawful discrimination and retaliation. The Court should also deny Kluge's partial motion for summary judgment and enter final judgment in Brownsburg's favor and against Kluge.

Respectfully submitted,

/s/ Brent R. Borg
Alexander P. Pinegar, Attorney No. 26543-49
Brent R. Borg, Attorney No. 27415-29
Church Church Hittle + Antrim
10765 Lantern Road, Suite 201
Fishers, IN  46038
317-773-2190

Attorneys for Defendant
Brownsburg Community School Corporation

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 15th day of March, 2021, a true and exact copy of the foregoing was filed electronically via the Court's Electronic filing system. Notice of this filing was sent to the following persons by operation of the Court's Electronic filing system:

Kevin E. Green
Kevin Green Associates
456 N. Meridian Street, #1517
Indianapolis, IN  46204
keglegal@aol.com

Michael J. Cork
Michael J. Cork, Esq.
5754 N. Delaware St.
Indianapolis, IN  46220-2528
cork0@icloud.com

Roscoe Stovall, Jr.
Roscoe Stovall, Jr. & Associates
2 West Main Street
Mooresville, IN 46158
rstovall@roscoelaw.com

/s/ Brent R. Borg
Brent R. Borg, Attorney No. 27415-29