**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| **JOHN M. KLUGE,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:19-cv-2462-JMS-DLP |
| | ) | |
| **BROWNSBURG COMMUNITY** | ) | |
| **SCHOOL CORPORATION, *et al.,*** | ) | |
| | ) | |
| Defendants. | ) | |

**KLUGE'S FIRST AMENDED REPLY IN SUPPORT OF HIS MOTION FOR
SUMMARY JUDGMENT ON THE ISSUE OF BROWNSBURG'S FAILURE TO
ACCOMMODATE AND HIS RESPONSE TO BROWNSBURG'S CROSS-MOTION
FOR SUMMARY JUDGMENT**

## Table of Contents

I.    **Summary of Argument**………………………………………………… 1

II.   **Kluge's Statement of Material Facts in Dispute**………………………… 2

III. **Argument**………………………………………………………… 7

    A.  There was an Objective Conflict Between Kluge's
        Sincerely-Held Religious Beliefs and Brownsburg's
        Transgender Name Requirement………………………………………. 7

    B.  Kluge's Accommodation Was Reasonable and Did Not Harm
        the Learning Environment—Brownsburg Simply Decided to
        Exalt Transgender Rights Over Religious Rights………………………….. 11

        1.  Kluge's last-name-only accommodation was reasonable,
            it worked as intended, and it facilitated student learning……………. 11

        2.  Brownsburg never told Kluge his accommodation was
            causing undue hardship—Gordon told him it was a
            policy violation………………………………………………….. 13

        3.  There were no widespread complaints from
            the high school community………………………………………. 14

        4.  Kluge's last-name-only accommodation did not cause a
            negative impact on the learning environment………………………… 19

        5.  Brownsburg's claim that it was exposed to significant risk of
            liability has no factual basis and is undercut by its complete
            failure to investigate any alleged claim of discrimination……………. 23

            a.   The cases Brownsburg cites do not support its claim……………… 23

            b.  Brownsburg's claim of threatened litigation is undercut
               by its failure to conduct any investigation…………………………. 26

    C.  After Kluge Requested His Accommodation be Continued,
        Gordon and Daghe—Brownsburg Administrators—Retaliated
        Against Him by Misrepresenting Material Facts in Order
        to Secure His Resignation……………………………………………. 27

    D.  Brownsburg's Argument that Kluge's Religious Beliefs Are
        Insincere Has No Basis in Fact and Kluge is Entitled to
        Summary Judgment on His Failure to Accommodate Claim……………. 29

**IV.  Conclusion**………………………………………………………...     **32**

**Certificate of Service**…………………………………………………….     **34**

# I. Summary of Argument

This is a case of competing accommodations for protected categories: religion and sex. Individuals protected under either category can claim freedom from discrimination based on their religion or sex. Kluge claims an accommodation to avoid using transgender first names and associated pronouns, and transgender students desire affirmation through the use of those transgender names and pronouns. BCSC cannot legally exalt one accommodation over the other—but that is exactly what it did.

BCSC established the parameters of a "reasonable accommodation" on July 31, 2017, when BCSC and Kluge agreed to Kluge's proposed accommodation of last-names only. The fact that BCSC and Kluge agreed to an accommodation and used it successfully for a full semester establishes last-names-only as a "reasonable accommodation" for Kluge's religious belief, and also that there was no "undue hardship" associated with that accommodation.

BCSC has failed to identify any undue hardship that rises above the *de minimis* level. BCSC has identified no economic cost or disruption to its operations from Kluge's use of the accommodation. It has not identified any classroom disruptions, rearrangements of personnel scheduling, or demonstrably impaired learning outcomes as a result of Kluge's use of last-names. It is undisputed that during this period of time Kluge's musical students and groups excelled and BCSC brought no complaints or problems related to the accommodation to his attention.

Brownsburg claims that it was justified in removing Kluge's last-name-only accommodation based upon complaints "from the high school community" which evidenced a negative impact on "student learning," "which in turn impeded Brownsburg's mission to educate students and therefore caused undue hardship." This tenuous argument does not withstand scrutiny.

Brownsburg's "Transgender Questions" practice manual does not claim that the use of last-names created any "undue hardship," or that it disrupted the learning environment, or that it impeded BCSC's "mission" to educate students; it simply addresses a change in transgender practices that removed Kluge's last-name-only accommodation. Human Resources Director Gordon did not tell Kluge that his accommodation created undue hardship; she told him it was a policy violation. Brownsburg simply made the decision to exalt transgender rights over religious rights. The school's contrary argument is mere sophistry.

## II. Kluge's Statement of Material Facts in Dispute

1.   Kluge disputes BCSC's claim that his church denomination permits "tolerance" for transgender individuals, even though their lifestyle is considered sinful. [Filing No. 121 at 6, ¶ 6.] The word "tolerance" does not appear in the record evidence. [Filing No. 120-4 at 12 (Exhibit 4 – Evangel Presbytery Book of Church Order ¶ 17).] The Evangel Presbytery Book of Church Order is intolerant of the transgender lifestyle, since a transgender individual is not allowed to use the restroom of his or her choice, but is directed to use a "single-stall" restroom, until Church leadership has the opportunity to present "pastoral counsel concerning God's calling of manhood and womanhood and she begins to learn of Jesus's Lordship over her sexuality and the implications it has for her sexual identity and its public expression." [*Id.*] The Book also notes that genetic sex and sexual identity cannot be separated, and that it is sinful to reject one's sex and "to adopt characteristics of the opposite sex." [Filing No. 120-4 at 10 (Exhibit 4 – Evangel Presbytery Book of Church Order at page 49, ¶¶ 7–8).] FRE 106 requires that the entire document be considered.

2.   Similarly, Kluge never testified that, "there are instances where it is appropriate and consistent with his religious beliefs to address a transgender student by the student's first name,

even if the first name differs from the student's biological sex. [Filing No. 121 at 6–7, ¶ 7; *citing* Filing No. 120-3 at 8-9 (Exhibit 3 – Kluge Dep. at p. 29, line 11 to p. 30, line 11)].  The record evidence cited does not support BCSC's claim. Brownsburg's counsel asked Kluge if there might be circumstances where it is appropriate to address a transgender person by their first name when that name differs from their biological sex. Kluge answered, "There might be.  None come to mind right now.  Certainly my beliefs as regards classrooms that during the course of the teaching a class of students it's not appropriate and it encourages gender dysphoria." [Filing No. 120-3 at 8–9 (Kluge Dep. at page 29, line 20 through page 30, line 3).] The Evangel Presbytery Book of Church Order does not condone the use of transgender names for any purpose.

3.   The BCSC board-level policy, 3122 Nondiscrimination and Equal Employment Opportunity, names Human Resources Director, Jodi Gordon, as the Compliance Officer to receive and investigate complaints concerning BCSC staff employees. BCSC failed to acknowledge this fact. [*See* Filing No. 121 at 7, ¶ 9; Filing No. 113-4 at 14.]

4.   Kluge disputes BCSC's reliance upon [Filing No. 120-8 (BCSC Pol. 3140 Resignation).] [*See* Filing No. 121 at 7–8, ¶ 10.] BCSC did not include this defense in its Statement of Defenses for Trial. [Filing No. 110.] Accordingly, BCSC should be precluded from claiming it now.

5.   Kluge disputes BCSC's claim that: "At least two transgender students in Kluge's classes legally changed their birth name to their 'transgender name.'" [Filing No. 121 at 10, ¶ 16 n.1.] This statement misstates record evidence, suggesting that the two transgender students, Aidyn Sucec and Sam Willis, legally changed their birth names while in Kluge's classes at BCSC. The evidence relied upon proves that is incorrect. Aidyn Sucec submitted a sworn statement dated August 22, 2019, in support of Indiana Youth Group, Inc.'s motion to intervene. [Filing No. 22-3.] In her statement, Sucec states "I also recently corrected my legal name on my birth certificate

and my social security card." [Filing No. 22-3 at 2, ¶6.] There is no record evidence that Sucec changed her legal name while she was attending Kluge's class—which would not have been "recent" in any event. Similarly, on October 3, 2019, Sam Willis provided a sworn statement in support of IYG's motion to intervene. [Filing No. 58-1.] In her statement, Willis states "I legally changed my name to 'Samuel' and my gender marker to male on June 11 of this year." That would be June 11, 2019, long after Willis attended Kluge's class. [Filing No. 58-1 at 2, ¶ 3.]

6.    Kluge disputes that he referred to Sam Willis as "Miss" Willis as opposed to using her last name, as his accommodation required. [*See* Filing No. 121 at 12–13, ¶ 24.] Kluge, a contract teacher who worked with Kluge during the 2017–2018 school year, and three students in Kluge's classes during that school year, all provided sworn declarations attesting to Kluge's adherence in his classes to the last-names-only accommodation and no adverse behavior toward transgender students. [*See* Filing Nos. 52-1 through 52-6.] BCSC has not even attempted to controvert these sworn statements.

7.    Kluge disputes the alleged complaints attributed to unnamed persons who attended the Equality Alliance Club—the LGBTQ organization at BCSC. [Filing No. 121 at 13–16, ¶¶ 25– 31.] Kluge also disputes the alleged complaints from teachers who did not submit sworn statements. For a detailed analysis of the evidentiary issues surrounding these allegations, *see infra* at 18–24. None of these alleged complaints were made known to Kluge until after his termination. None were investigated. There is ample undisputed evidence that the last-name-only accommodation worked as designed. For example, Kluge, a contract teacher who worked with Kluge during the 2017–2018 school year, three students in Kluge's classes during that school year, and the parent of a BCSC student who attended the June 11, 2018, Board of School Trustees meeting concerning Kluge, all provided sworn declarations attesting to Kluge's

adherence in his classes to the last-names only accommodation and no adverse behavior toward

transgender students. [*See* Filing Nos. 52-1 through 52-6.]

8.   Kluge disputes the allegations regarding his meeting with Dr. Daghe and Jodi Gordon on

February 6, 2018. [Filing No. 121 at 18–19, ¶ 37.] In the February 6, 2018 meeting, Gordon told

Kluge that his accommodation was no longer valid because it was a "policy violation" and when

Kluge told Gordon the policy was discriminatory, Gordon responded that the BCSC attorneys

had reviewed it and it was not discriminatory. [Filing No. 113-4 at 29, 43, 45–46 (Ex. 29 Gordon

Dep. at p. 10, lines 6–11; page 24, lines 5–20; page 26, lines 4–14; page 27, lines 14–17).] BCSC

told Kluge that it was willing to "accommodate people who follow the policies." [Filing No.

113-4 at 29, (Ex. 29 Gordon Dep. at page 10, lines 6–11).] Gordon was in a conflict, because

Kluge was claiming discrimination to the "Compliance Officer" for BCSC employees, under the

BCSC Nondiscrimination and EEO Policy. [Filing No. 113-4 at 14 (Ex. 6 Gordon Dep. at page

2).] Gordon had a duty to investigate or ask someone else to investigate. But her goal was to

obtain Kluge's resignation. At the February 6, 2018 meeting, Gordon and Daghe told Kluge he

could follow the "policy," resign and be paid through the summer, or be terminated in early May.

[Filing No. 113-4 at 43 (Ex. 29 Gordon Dep. at page 24, lines 5–20).] Gordon also suggested to

Kluge that he could submit a conditional resignation. [*Id*. at 36–37 (Ex. 29 Gordon Dep. at page

17, lines 6–24; page 18, lines 6–8).] But she did not tell him that the only permissible condition

was the effective date of his termination. [Filing No. 113-4 at 11–12 (Gordon Dep. at page 41,

line 24 through page 42, line 24).] And Gordon did not tell Kluge that she and Dr. Snapp were

both administrators, so submitting his resignation to her was the same as submitting it to Dr.

Snapp. [*Id*. at 11 (Gordon Dep. at page 40, line 16 through page 41, line 3).]

9.   Kluge disputes the allegations and argument concerning his conduct at the year-end awards ceremony. [Filing No. 121 at 20–21, ¶¶ 39–42.] The awards ceremony occurred in May of 2018, at the end of the 2017–2018 school year and involved transgender students. Kluge identified all of his students by using their first and last names, instead of just their last names, based on the formality of the occasion and in accord with the agreement that treated the accommodation as a sports coach. [Filing 120-3 at 32–33 (Kluge Dep. at page 125, line 2 through page 128, line 17).] Kluge's decision was based on his desire to be reasonable and his belief that a sports coach would use complete names as opposed to last names only. [Id. at 33 (Kluge Dep. at page 127, lines 7–12).] Kluge's accommodation was based on the sports coach analogy, as acknowledged by Kluge, Jodi Gordon, Principal Daghe, and Superintendent Snapp. [Id. at 17 (Kluge Dep. at page 64, line 8 through page 65, line 7); Filing 148-1 at 5 (Snapp Dep. at page 24, line 23 through page 25, line 19).] Whether Brownsburg coaches actually refer to students by their last names is irrelevant. Snapp understood that what Kluge was saying was a more stereotypical understanding that this does take place in certain settings and so Kluge's use of last names would not be an unusual accommodation. [Filing 148-1 at 5 (Snapp Dep. at page 25, lines 10–19).]

10.   Kluge disputes that the August 29, 2017 email from Craig Lee to Bret Daghe is evidence of discrimination by Kluge against transgender students. [Filing No. 120-15.] Daghe testified that Kluge's last-name-only accommodation was effective at that point in time and Kluge was required to use last names for all students. [Filing No. 148-2 at 9–10 (Daghe Dep. at page 73, line 1 through page 75, line 5).] Daghe did not address the issue with Kluge, because he was following the last-name-only accommodation. And Daghe did not communicate further with

Lee, or the students involved, or the students' parents. [*Id.* at 10 (Daghe Dep. at page 75, lines 6–15).]

11. Kluge disputes any attempt by BCSC to attribute to Kluge statements made by BCSC administrators, based upon the fact that Kluge included such statements in his amended complaint or exhibits thereto. [Filing Nos. 15, 15-1–15-4.]

### III. Argument

#### A. There was an Objective Conflict Between Kluge's Sincerely-Held Religious Beliefs and Brownsburg's Transgender Name Requirement.

Brownsburg maintains an official database for student information known as "PowerSchool." [Filing No. 148-1 at 4 (Snapp Dep. at page 21, lines 10-11).] One of the accommodations provided Brownsburg's transgender students is to change their legal first name to a "transgender" name and to choose "preferred pronouns" that correspond to their preferred gender. [*Id.* at 5 (Snapp Dep. at page 23, lines 7-23).] This process does not require any legal action, just a letter from a parent and a health care professional. [*Id.* at 6 (Snapp Dep. at page 27, lines 1–5).] But students' legal surnames remain in PowerSchool.

At the time of Kluge's employment, Brownsburg did not have any official policy regarding transgender name and pronoun changes in PowerSchool. [Filing No. 113-3 at 5, 8 (Utterback Dep. at page 11, lines 11–23; page 24, lines 3–10).] An official policy would require submitting the proposed policy to the BCSC Board of School Trustees for publication and discussion at an official Board meeting. [Filing No. 148-3 at 5 (Gordon Dep. at page 20, lines 6–14).] In fact, at the time of Kluge's employment, Brownsburg did not have any board-approved policies regarding its accommodation of transgender students, because none had been submitted for approval. [Filing No. 113-3 at 8 (Utterback Dep. at page 24, lines 3–10).]

Presumably, a Brownsburg transgender student may choose whatever name suits him or her, since there is no policy preventing it. And according to Brownsburg, teachers are required to use the name in PowerSchool, since it is nothing more than an administrative function that cannot result in any objective conflict between the requirement and a teacher's sincerely-held religious beliefs. [Filing 121 at 28–32.] That means a student could require a Jewish teacher to call him "Mein Fuhrer" without violating the teacher's sincerely-held beliefs or creating a hostile environment based on religion—according to Brownsburg. After all, it's just an administrative function, similar to processing a marriage license. [*Id.*]

This is not meant to be inflammatory—Kluge's counsel cannot even take credit for the hypothetical. Judge Thapar of the Sixth Circuit Court of Appeals posed that question, almost verbatim, to counsel for Shawnee State University at oral argument in the appeal of *Meriwhether v. Hartop, et al.*, No. 20-3289 (6th Cir. March 26, 2021) [*See* No. 20-3289 *Nicholas Meriwether v. Francesca Hartop et al*, at 27:00, 11-19-2020, opn.ca6.uscourts.gov, last visited April 14, 2021.] That option suggests others. A Brownsburg transgender student could adopt the name Allah and force a Muslim teacher to address him accordingly. Or a student could adopt the name Jesus or Christ or Jesus Christ and require a Christian teacher to address him by that name. Since it's just an administrative act, no objective conflict with sincerely-held beliefs results—at least according to Brownsburg.

Brownsburg's position ignores the tremendously important role that names play. No better evidence of this fact exists then the proposed brief submitted by the proposed *amici curiae*. [Filing 131-1.] The proposed *amici* spend twenty-two pages arguing that transgender students must be called by their transgender names and pronouns in order to affirm them and prevent depression, anxiety, and suicidal ideation. [*Id.*] Yet Brownsburg argues that Kluge, a Christian

with sincerely-held beliefs against affirming gender dysphoria, suffers no objective conflict when Brownsburg tells him he must affirm transgender students by using transgender first names—or he must resign.

Moreover, the claim that using names in PowerSchool is just an administrative act that cannot create any objective conflict works against the school and its transgender students. Kluge's use of last names for all students is nothing more than an administrative act—one that uses names appearing in the Brownsburg PowerSchool database. Based on Brownsburg's own reasoning, no objective conflict results and no transgender student has reason to complain.

Brownsburg's argument is premised on the "marriage license" decision by Judge Young in *Summers v. Whitis,* 2016 WL 7242483 (S.D. Ind. December 15, 2016). *Summers* has not been cited by any other court for the proposition Brownsburg advocates. That's because it's a step too far. Processing a marriage license requires no affirming speech; using transgender first names and pronouns does.

Kluge identified the "objective conflict" resulting to him by being required to use transgender first names, and being faced with the Hobson's choice of using transgender names, or resigning, under threat of termination. Brownsburg was trying to force him to approve the lifestyle of transgender students and he was forced to sit through faculty meetings which did exactly that, without being able to voice a contrary opinion. [Filing 120-3 at 30–31 (Kluge Dep. at page 116, line 21 through page 118, line 5).] Effectively, if Kluge was forced to use transgender first names and pronouns, he was congratulating transgender students on their transition and expressing support for their decision.

In *Meriwether, supra*, Shawnee State University argued that its rule requiring professors to address transgender students by their preferred pronouns and titles was simply "ministerial,"

similar to BCSC's "administrative act" claim. *Meriwether,* slip opin. at 16.   But the Sixth Circuit held that "… titles and pronouns carry a message.  The university recognizes that and wants its professors to use pronouns to communicate a message:  People can have a gender identity inconsistent with their sex at birth.  But Meriwether does not agree with that message, and he does not want to communicate it to his students.  That's not a matter of classroom management; that's a matter of academic speech." *Id.*  Like Meriwether, Kluge has a sincerely-held religious belief against affirming gender dysphoria by the use of transgender names and pronouns. And Kluge's beliefs were accommodated by the use of last names only. [Filing No. 15-1 (Ex. A to Amended Compl.-Accommodation Agrm).]

Brownsburg cites the document titled, "Transgender Considerations" for the claim that the school was not trying to force anyone to change his beliefs, but rather to ensure a safe environment. [*See* Filing 121 at 31; *citing* Filing 120-20 at 4 (Exhibit 20 - Document Titled "Transgender Considerations" dated January 22, 2018).] But the same document (six pages later) provides evidence of how the school exalts transgender rights over religious liberty:

> **How do teachers break from their personal biases and beliefs so that we can best serve our students?** We know this is a difficult topic for some staff members, however, when you work in a public school, you sign up to follow the law and the policies/practices of that organization and that might mean following practices that are different than your beliefs.

[Filing 120-20 at 10 (Exhibit 20 - Document Titled "Transgender Considerations" dated January 22, 2018).]

FRE 106 requires that all of the document be considered. Here, Brownsburg is suggesting, if not stating, that school policies override state and federal law protecting sincerely-held religious beliefs. That is incorrect.

**B.  Kluge's Accommodation Was Reasonable and Did Not Harm the Learning Environment—Brownsburg Simply Decided to Exalt Transgender Rights Over Religious Rights.**

**1.  Kluge's last-name-only accommodation was reasonable, it worked as intended, and it facilitated student learning.**

BCSC established the parameters of a "reasonable accommodation" on July 31, 2017, when BCSC and Kluge agreed to Kluge's proposed accommodation of last-names only. [Filing No. 15-1 (Ex. A to Amended Compl.-Accommodation Agrm).] The fact that BCSC and Kluge agreed to an accommodation and used it successfully for a full semester establishes last-names-only as a "reasonable accommodation" for Kluge's religious belief, and also that there was no "undue hardship" associated with that accommodation. *Ansonia Bd. of Educ. v. Philbrook,* 479 U.S. 60, 68-69, 93 L.Ed.2d 305, 107 S.Ct. 367 (1986); *EEOC v. Ilona of Hungary, Inc.,* 108 F.3d 1569, 1574 (7th Cir. 1997).

BCSC has failed to identify any undue hardship that rises above the *de minimis* level. BCSC has identified no economic cost or disruption to its operations from Kluge's use of the accommodation. It has not identified any classroom disruptions, rearrangements of personnel scheduling, or demonstrably impaired learning outcomes as a result of Kluge's use of last-names. It is undisputed that during this period of time Kluge's musical students and groups excelled and BCSC brought no complaints or problems related to the accommodation to his attention. [Filing No. 113-2 at 4 (Kluge Declr. at page 3, ¶ 15), Filing No. 71 at page 14, ¶ 47.]

There is ample undisputed evidence that the last-name-only accommodation worked as designed. For example, the following Statements of Material Facts Not in Dispute ("SMF") submitted by Kluge have not been controverted by Brownsburg:

12. Kluge, a contract teacher who worked with Kluge during the 2017–2018 school year, three students in Kluge's classes during that school year, and the parent of

a BCSC student who attended the June 11, 2018, Board of School Trustees

meeting concerning Kluge, all provided sworn declarations attesting to Kluge's

adherence in his classes to the last-names only accommodation and no adverse

behavior toward transgender students. [See Filing Nos. 52-1 through 52-6, Filing No. 114 at

7 (Pl.'s SMF, ¶ 12).]

13. Between July 31, 2017, and December 31, 2017 there were no student protests,

there were no written complaints about Kluge's use of last names for all

students, there were no classroom disturbances, and there were no cancelled

classes; instead, the accommodation worked as intended and Kluge's students

excelled; BCSC admits that some of Kluge's students received awards for their

performances during the 2017-2018 school year. [Filing No. 113-2 at 4 (Kluge

Declr. at page 3, ¶ 15), Filing No. 71 at page 14, ¶ 47, Filing No. 114 at 7 (Pl.'s SMF, ¶ 13).]

The undisputed evidence shows that Kluge's accommodation worked quite well and actually

enhanced his ability to educate students in music and orchestra.

Like Kluge, Professor Meriwether has sincerely-held religious beliefs against promoting

gender dysphoria. *Meriwether*, *supra,* slip opin. at 3. Also like Kluge, when Meriwether's

employer demanded that he refer to a transgender student using female pronouns, Meriwether

proposed that he use the transgender student's last name only. *Id.* at 5. Meriwether did not use

last names only for all students, just the transgender student in question. *Id.* The Sixth Circuit

found it difficult to see how the use of the student's surname would "create a hostile learning

environment that ultimately thwarts the academic process." *Id. at 21, citing Bonnell v. Lorenzo,*

241 F.3d 800, 824 (6th Cir. 2001). Similarly, there is no evidence that Kluge's use of last names

for all students created "undue hardship" at BCSC by disrupting the learning environment.

Kluge's "last-name-only" accommodation consisted of speech. And on the record evidence, his speech cannot "be presumed to have in any way either impeded [Kluge's] proper performance of his daily duties in the classroom or to have interfered with the regular operation of [BCSC]." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 572–73 (1968). The mere "fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 508 (1969). At the very least, there is an issue of fact about whether Kluge's speech—his last-name-only accommodation—inhibited his classroom duties or hampered BCSC's educational environment, thus creating an "undue hardship." The transgender students and supporters may not like it, but "[t]olerance is a two-way street." *Ward v. Polite,* 667 F.3d 727, 735 (6th Cir. 2012).

### 2. Brownsburg never told Kluge his accommodation was causing undue hardship—Gordon told him it was a policy violation.

Start with the fact that Brownsburg cannot point to any written communication to Kluge advising him that his use of last names is creating an "undue hardship" which may cause the removal of his accommodation. Next, when BCSC advised Kluge verbally that his accommodation would be removed at the end of the 2017–2018 school year, it did not detail any undue hardship—based upon disruption of the learning environment or any other reason—and it failed to engage him in any specific discussions concerning undue hardship.

BCSC's removal of Kluge's last-name-only accommodation was stated clearly in the January 3, 2018 Transgender Questions practice manual. [Filing No. 15-4 at 9, ¶ 5.] But neither the Transgender Questions manual, nor any other BCSC document states that the last-names-only accommodation is being removed because it disrupts the learning environment or causes any other "undue hardship." BCSC never used the term "undue hardship" until after this litigation began. Jodi Gordon told Kluge his last-names-only accommodation was being removed because

it was a "policy violation," not because it disrupted the learning environment. And when Kluge asked Gordon if the policy was discriminatory, Gordon responded that the BCSC attorneys had reviewed it and it was not discriminatory. [Filing No. 113-2 at 6 (Kluge Declr. at page 5, ¶¶ 24–25), Filing No. 113-4 at 29, 43, 45–46 (Ex. 29 Gordon Dep. at p. 10, lines 6–11; page 24, lines 5–20; page 26, lines 4–14; page 27, lines 14–17).]

In February of 2018, Gordon told Kluge that his accommodation was a "policy" violation. [Filing No. 113-4 at 29, 43 (*Ex. 29* Gordon Dep. at page 10, lines 6–11; page 24, lines 5–24).] But Gordon testified at her deposition that "Transgender Questions" never became a formal policy. [Filing 113-4 at 10 (Gordon Dep. at page 35, line 2 – page 36, line 1).] "Transgender Questions" never became a formal BCSC policy, since it was never presented to the BCSC Board of Trustees. [Filing No. 148-3 at 5 (Gordon Dep. at page 20, lines 6–14).] In fact, Brownsburg cannot identify any transgender issue that was the subject of a formal board meeting during calendar 2017 and 2018. [Filing No. 113-3 at 5, 8 (Utterback Dep. at page 11, lines 11–23; page 24, lines 3–10).] The "Transgender Questions" practice manual does not claim that the use of last-names created any "undue hardship," or that it disrupted the learning environment, or that it impeded BCSC's "mission" to educate students; it simply addresses a change in transgender practices. [Filing No. 15-4 at 9, ¶ 5.] Brownsburg simply made the decision to exalt transgender rights over religious rights.

### 3. There were no widespread complaints from the high school community.

There is no admissible evidence that any students, except two transgender students—Aidyn Sucec and Sam Willis—complained about Kluge's use of last names only. Those two students submitted sworn statements in support of Indiana Youth Group, Inc.'s ("IYG") Motion to Intervene as a Defendant. [*See* Filing Nos. 22, 22-3 (Sworn Stmt. of A. Sucec in Supp. IYG Mot.

Intervene), 58-1 (Sworn Stmt. of S. Willis in Supp. IYG Mot. Intervene).] Kluge identified

credibility issues associated with Sucec's statement. [*See* Filing No. 53 at 17–25.] Willis admits

that Kluge referred to all students by their last names and that Willis's data was not changed in

PowerSchool until late September or early October of 2017. [Filing No. 58-1 at 3, ¶¶ 9–10.] No

other BCSC students submitted sworn statements or written complaints of discrimination by

Kluge against BCSC transgender students.

The only testimony by a Brownsburg teacher is from Craig Lee, faculty advisor of the

Brownsburg Equality Alliance Club—the school's LGBTQ club. [Filing No. 58-2.] The only

complaints about Kluge by parents were from Laura Sucec, mother of Aidyn Sucec, and Laura

Willis, mother of Sam Willis. Laura Sucec's complaint came after Kluge was coerced into

resigning. [*See* Filing No. 22-2.] Moreover, Laura Sucec's statement lacks personal knowledge

and is replete with inadmissible hearsay. [Filing No. 53 at 26–28.]

Sam Willis's mother, Laura Willis, sent Kluge an email on July 28, 2017, advising Kluge

that "Emily" Willis was now going by the nickname, "Sam." [Filing No. 61-2.] Mrs. Willis said

nothing about Emily becoming a transgender male named "Sam" and added that if Kluge slipped

and called her daughter by another name, it was understandable. [*Id*.] For reasons known only to

the Willises, they did not effect the name and gender change in Brownsburg's PowerSchool

database until late September of 2017. [Filing No. 120-12 at 2 (Ex. 12 September 1, 2017 Letter

to BCSC Administration from Parents of Transgender Student at page 2).] This exhibit is heavily

redacted, although it is clear that it refers to Sam Willis and Brownsburg previously produced an

unredacted copy. In this exhibit, Willis's parents are requesting for the first time that BCSC

change her data in PowerSchool. [*Id*. at 2.]

The complaints from Aidyn Sucec and Sam Willis are "heckler's vetoes," not evidence of an undue burden or a negative impact on the learning environment. *See Ovadal v. City of Madison, Wis.*, 416 F.3d 531, 537 (7th Cir. 2005). Brownsburg's attempt to distinguish this case based upon the fact it concerns a First Amendment claim fails. Both situations concern speech—whether in the form of speech protected by the First Amendment or speech in the form of a last-name-only accommodation under Title VII. In both cases, the "hecklers"—whether transgender or cisgender—do not like the speech because it does not align with their worldview. Transgender students attempted to exercise a heckler's veto in this case. They are biased in favor of being addressed by their transgender first names and preferred pronouns, and prejudiced against being addressed in a way that does not include those names and pronouns. Brownsburg admits that transgender students want to be affirmed by being addressed with their transgender first names and desired pronouns. [Filing No. 120-1 at 4, ¶ 8 (Aff. of Kathryn Jessup at page 3, ¶ 8).]

The emotional discomfort and complaints of two students and a single teacher cannot justify forcing Kluge to face a choice between violating his religious beliefs and losing his job. To hold otherwise is to codify in law the "heckler's veto." If emotional discomfort constituted an undue burden, employers would be able to skirt their duty to accommodate at will, simply by finding an employee offended at the accommodation. It is telling that no evidence exists of Gordon, in her capacity as the BCSC EEO Compliance Officer, ever investigating any alleged discrimination against transgender students.

The law does not allow educational institutions to discipline teachers and students because others find their speech offensive. *See Street v. New York*, 394 U.S. 576, 592 (1969) ("[T]he public expression of ideas may not be prohibited merely because the ideas are themselves

offensive to some of their hearers."). Non-discrimination policies cannot be used to transform institutions of learning into "enclaves of totalitarianism." *Tinker*, 393 U.S. at 511.

Further, there were no written complaints by either Sucec or Willis on a weekly basis—or any other basis—during the time Kluge used the accommodation: July 31, 2017 through May 25, 2018. In fact, there were no written complaints by either student until well after-the-fact, when they submitted sworn statements supporting IYG's intervention in Kluge's lawsuit. [*See* Filing Nos. 22-3, 58-1.]

Brownsburg's claim that Sucec left Brownsburg High School based upon Kluge's conduct in class is a canard that misstates the record evidence. [*See* Filing No. 121 at 35.] Sucec returned to Brownsburg High School after Kluge's employment ended. Therefore, Sucec's decision to leave, subsequently, was not based on Kluge's conduct in any class Sucec attended, because he was not teaching. Moreover, Sucec also attributed her decision to "ongoing health struggles." Sucec's sworn statement declares: "The controversy around Mr. Kluge's resignation during the summer of 2018 is why I no longer attend Brownsburg High School. When I returned for my sophomore year, several students made negative and derogatory remarks towards me and suggested that I had been responsible for Mr. Kluge leaving the school. For example, during Sophomore convocation, a student called me 'the fag that got Kluge fired.'" "These incidents, in combination with my ongoing health struggles, made me feel that I could not return to school at Brownsburg High School. I left Brownsburg High School in August 2018." [Filing No. 22-3 at 4–5, ¶¶ 15–16 (Sucec Declr. at pages 4–5, ¶¶ 15–16).] It is undisputed that Kluge was not present when Sucec decided to leave school. Therefore, Brownsburg's claim that Kluge's classroom demeanor motivated Sucec's departure should be struck.

The only evidence of other complaints is the claim by Craig Lee, the Equality Alliance Club faculty advisor, that unnamed students attending the Club—the LGBTQ organization—complained. Such complaints—if they ever existed—constitute inadmissible hearsay and hearsay within hearsay. *See* FRE 801, 805. BCSC's attempt to rely upon alleged complaints by unidentified persons does not qualify under FRE 602 as being based on personal knowledge and does not fall under any hearsay exception. For example, Brownsburg claims that the unidentified attendees at the Equality Alliance Club meetings who voiced complaints or indicated that they seemed to agree with the complaints voiced about Kluge (or the unnamed orchestra teacher) should be admissible under FRE 801(c) to establish a basis for Brownsburg's removal of Kluge's accommodation. [Filing No. 121 at 40 n.3.] BCSC cites *Baz v. Walter*, 782 F.2d at 705 n.2 in support of this argument. But B*az* does not support the claim, since the cited footnote makes it clear that *Baz* waived any hearsay objection by testifying to the same occurrence. *Id.* Further, in *Baz* the person who complained was identified as a staff physician. In *Emich Motors Corp. v. General Motors Corp*., 181 F.2d 70, 82 (7th Cir. 1950), *rev'd on other grounds* 340 U.S. 558, 71 S.Ct. 408, 95 L.Ed 534, the court found letters of complaint from customers admissible, not for the truth of the complaints, but as a reason for cancellation of the dealer's franchise. But in *Emich*, the court had confirmation that the complaints existed, including the identities of the complainants, based upon the letters. Here, there were no written complaints from students.

Lee also submitted a sworn statement claiming that Aidyn Sucec was offended by Kluge's use of last names. [Doc. 58-2 at 3–4 (Declr. Craig Lee Supp. IYG Mot. Intervene at pages 3–4, ¶ 11).] Lee alleged that other unnamed students attending the Club also complained about Kluge. [*Id*. at 2–3 (Declr. Lee at pages 2–3, ¶¶ 7–9).] But Lee did not identify any other students. Lee's inability to identify any other students reflects negatively on his credibility. Moreover, his claim

that these alleged students voiced complaints at the Equality Alliance Club brings into question their personal knowledge of Kluge's actions in the classroom or elsewhere.

FRE 602 requires that a witness have personal knowledge of an event as opposed to hearing one or more persons in a group meeting claim knowledge of the event and then have the witness assume the event occurred without any personal knowledge. More specifically, attendees at an Equality Alliance Club meeting who were not students in one of Kluge's classes could not have personal knowledge of what occurred there. Those unidentified students—who allegedly heard Sucec or Willis repeat Kluge's alleged classroom statements at the EAC meeting—cannot offer the statements under FRE 801(c), for the fact it was made, but not for the truth, or under 803(3) for its effect on the mental or emotional state of mind of the hearer, because they do not know the statement was ever made. If the unidentified students obtained that information from Sucec or Willis, it is classic hearsay, offered for the truth of what was stated—Kluge said or did something that upset them.

Conversely, Kluge submitted sworn statements by several of his students, a parent of students, and a contract teacher who was present in his classroom during the period he used the last-name-only accommodation, rebutting claims of discrimination by Kluge against transgender students or any negative effect on the learning environment in Kluge's classes. [*See* Filing Nos. 52-2, 52-3, 52-4, 52-5, and 52-6.] These sworn declarations are unchallenged by Brownsburg. The school had the opportunity to depose any or all of the declarants, but chose not to do so.

The parent, Jeff Gracey, attended the board meeting on June 11, 2018, concerning Kluge's resignation. Gracey affirmed that Aidyn Sucec spoke at the meeting and that she admitted that Kluge only used last names for students. [*See* Filing No. 52-6 at 4, ¶ 14.]

**4. Kluge's last-name-only accommodation did not cause a negative impact on the learning environment.**

Brownsburg claims that it was justified in removing Kluge's last-name-only accommodation based upon complaints "from the high school community" which evidenced a negative impact on "student learning," "which in turn impeded Brownsburg's mission to educate students and therefore caused undue hardship." [Filing No. 121 at 32.] This tenuous line of reasoning does not withstand scrutiny.

Brownsburg admits that courts analyze undue hardship as a question of fact, but then claims it is appropriate to resolve the issue as a matter of law given certain circumstances. [Filing No. 121 at 33–34.] Brownsburg argues those "circumstances"are where the accommodation increases safety risks or exposes the employer to legal liability. *Citing E.E.O.C. v. Oak-Rite Mfg. Corp.*, No. IP 99-1962-C H/G, 2001 WL 1168156, at *10–11 (S.D. Ind. Aug. 27, 2001). In *Oak-Rite,* the plaintiff's religion required her to wear skirts, instead of pants, which violated the defendant's safety requirements in its metal-working factory. *Id.* Kluge's last-name-only accommodation created no safety risk.

Kluge's accommodation also did not threaten the learning environment. No uncontested evidence exists in support of the school's claim that Kluge's use of last names for all students impeded the school's efforts to educate students. As noted above, the Sixth Circuit Court of Appeals found that Professor Meriwether's use of last names for transgender students was a reasonable compromise that did not adversely affect the learning environment. *Meriwether, supra,* slip opin. at 21. Brownsburg's reliance upon *Baz v. Walters*, 782 F.2d 701, 704 (7th Cir. 1986) is misplaced, since there the plaintiff's religious convictions compelled him to adopt a proselytizing style that clashed with the Veterans Administration's chosen approach to patient care. *Id*. Kluge never engaged in proselytizing—he simply used last names for all students.

Kluge's use of last names was a reasonable compromise similar to Professor Meriwether's use of last names.

The undisputed facts and the cases Brownsburg cites do not support its contention that Kluge's last-name-only accommodation created an undue hardship because it threatened the classroom learning environment. The cases Brownsburg cites are easily differentiated on the facts. None of the cases involves a "last-name-only" accommodation or any similar accommodation. The cases involve teachers' requests to miss instruction time for religious reasons—something Kluge never requested.

For example, *Erlach v. New York City Bd. of Educ.*, No. CV 94 4239 (RJD), 1996 WL 705282, at *11 (E.D.N.Y. Nov. 26, 1996), *aff'd*, 129 F.3d 113 (2d Cir. 1997), involved a teacher's request to miss every Friday afternoon. The school principal submitted an affidavit stating it was "educationally unsound" to cancel those classes and there was no other teacher available. Accordingly, the court found undue hardship. *Id.* Similarly, *Slocum v. Devezin*, 948 F.Supp.2d 661 (E.D. La. 2013), involved a teacher's request to take off every Tuesday for religious observance. *Slocum*, 948 F.Supp.2d at 663. The court held that accommodating the teacher "would require her students to sit with another teacher's class—overloading the student-teacher ratio" and impeding student learning. *Id*. at 669. And in *Wagness v. Watertown School Dist. No. 14-4 of Codington Cty., S.D.*, 541 F.Supp. 332, 334, 337-39 (S.D. 1982), the school denied a teacher's request for a seven-day absence to attend a religious observance—the teacher went anyway—and the school terminated him. *Wagness*, 541 F.Supp. at 334, 337-39. But even after that—and a bench trial—the district court concluded that the school had not proved undue hardship. *Id*. at 337-39. The district court assessed evidence of "complaints or negative comment from students or parents" about the teacher's absence, and found none. *Id*. at 338. The court

accepted the school's claim that a substitute teacher's lack of preparation, inability to control

discipline, and lack of knowledge of students "have an adverse effect on the learning

environment," which can support undue hardship. *Id*. at 338-39. But the district court concluded

that "The hypothetical hardship which defendant school district feared would be caused by

[plaintiff's] absence did not materialize." *Id*. at 339.

*Wagness* supports Kluge's right to summary judgment on his claim of Brownsburg's failure

to accommodate his sincerely-held religious beliefs, because Brownsburg has not shown any

undue hardship from Kluge's simple use of last names. At the very least, Kluge is entitled to a

trial to determine whether the adverse affect on the learning environment alleged by Brownsburg

actually existed. As noted, Kluge has submitted sworn statements from himself, his former

students, and a contract teacher in his classroom, stating that there was no such adverse effect,

and those statements are unrebutted. At the very least, they create a genuine issue of material fact

as to whether any undue hardship existed from Kluge's use of last names. [*See* Filing Nos. 52-1

through 52-5.]

Conversely, Kluge's last-name-only accommodation did not require that any classes be

cancelled or otherwise disrupted. Kluge never asked to take any teaching time off because of his

sincerely-held religious beliefs. Instead, Kluge's students thrived and his music and orchestra

students won more awards than they ever did previously. [Filing No. 113-2 at 4 (Kluge Declr. at

page 3, ¶ 15), Filing No. 71 at page 14, ¶ 47 (Answer to Amended Compl.).]

Finally, BCSC cites *Draper v. U.S. Pipe & Foundry Co*., 527 F.2d 515, 520 (6th Cir. 1975)

for the proposition that: "The employer is on stronger ground when he has attempted various

methods of accommodation and can point to hardships that actually resulted." *Draper* is

dissimilar, since it involved a proposed shift-substitution accommodation—not an

accommodation involving speech as Kluge's. *Draper*, 527 F.2d at 521. Here, BCSC is on weaker ground, since Kluge suggested the last-names-only accommodation, and BCSC never offered Kluge any alternate accommodation. [Filing No. 148-2 at 5 (Daghe Dep. at page 46, line 24 through page 47, lines 1, 12–15).] And Brownsburg cannot point to any hardship that resulted from Kluge's accommodation because there was no hardship. Brownsburg simply decided to exalt transgender accommodations over religious accommodations.

BCSC's intention to remove the last-name-only accommodation was stated clearly in the Transgender Questions practice manual of January 3, 2018. [Filing No. 15-4 at 9, ¶ 5.] But the Transgender Questions manual does not state that the removal of the last-names-only accommodation is based on disruption of the learning environment or any other form of undue hardship.

There were no written complaints received from any Brownsburg student about Kluge's use of last-names-only from July 31, 2017, when the accommodation began, through May 25, 2018, when Gordon and Daghe processed Kluge's resignation and posted his job. Brownsburg's reliance upon undocumented complaints from unidentified attendees of the LGBTQ club at Brownsburg in support a claim of undue hardship/disruption of the learning environment is sophistry.

   5. **Brownsburg's claim that it was exposed to significant risk of liability has no factual basis and is undercut by its complete failure to investigate any alleged claim of discrimination.**

      a. **The cases Brownsburg cites do not support its claim.**

Start with *Bostock*. Neither *Bostock v. Clayton Cty., Georgia, 140 S. Ct. 1731, 207 L. Ed. 2d 218 (2020),* nor any other case holds that a transgender student's claim of discrimination under Title VII overrides the accommodation of sincerely-held religious beliefs also required under

Title VII. *Bostock* specifically declined to rule on the interaction between transgender rights and religious liberties. But *Bostock* did confirm that the Court is "deeply concerned with preserving the promise of the free exercise of religion enshrined in our Constitution; that guarantee lies at the heart of our pluralistic society." *Id.* at 1754.

Brownsburg cannot cite any evidence that Kluge's last-name-only accommodation created any significant legal risk, and the cases it cites for that proposition are inapposite. In *Matthews v. Wal-Mart Stores, Inc.*, 417 F. App'x 552 (7th Cir. 2011), Matthews made disparaging comments to a homosexual co-worker, allegedly based on her religious beliefs and was terminated for violating Wal-Mart's internal policies. The court held Wal-Mart fired her because she violated company policy when she harassed a coworker, not because of her religious beliefs, and employers need not relieve workers from complying with neutral workplace rules as a religious accommodation if it would create an undue hardship, such as exposing Wal-Mart to claims of permitting work-place harassment. *Id.* at 554. Kluge did not disparage any student, he simply called them by their last names. Using someone's legal surname does not create any risk of liability.

Next, in *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 830 (9th Cir. 1999), St. Joseph Medical Center refused to hire plaintiff Sutton after he failed to provide a social security number as required by federal law. Kluge has not refused to comply with federal law in any respect, as no federal law requires him to use transgender names, and using legal surnames does not create any risk of liability for BCSC.

In *Chalmers v. Tulon Co. of Richmond*, 101 F.3d 1012, 1021 (4th Cir. 1996), the plaintiff claimed a right, based on her religious beliefs, to send personally disturbing letters to co-workers. The court disagreed. Here, Kluge claims no such right, but only the use of legal last

names as an accommodation for all students. Kluge notes that BCSC badly misstates the allegations of certain paragraphs of his amended complaint and invites the Court to review those paragraphs. [*See* Filing No. 15 at 5, ¶¶ 23–24; at 7, ¶ 37; at 15, ¶ 81.]

Brownsburg then cites *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034 (7th Cir. 2017) (holding that a transgender student may bring sex-discrimination claims under Title IX and the equal protection clause); and *J.A.W. v. Evansville Vanderburgh Sch. Corp.*, 396 F. Supp. 3d 833, 842 (S.D. Ind. 2019) (same). But there is no cogent argument. There is no basis under Title IX for a student to file suit because a school provides an accommodation under Title VII. The Sixth Circuit rejected a similar claim in *Meriwether, supra,* slip opin. at 20, n.4. Again, BCSC offers no cogent argument. *Whitaker* has nothing to do with a religious accommodation under Title VII or even the use of names for transgender students. Neither does *J.A.W.*

Next, BCSC cites several Title IX cases for the proposition that transgender students are protected from discrimination. *See, e.g., Grimm v. Gloucester County School Board*, 972 F.3d 586 (4th Cir. 2020), *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 968 F.3d 1286 (11th Cir. 2020); *M.A.B. v. Bd. of Educ. of Talbot Cnty.*, 286 F. Supp. 3d 704 (D. Md. 2018); *Bd. of Educ. of the Highland Local Sch. Dist. v. U.S. Dep't of Educ.*, 208 F. Supp. 3d 850, 868–70 (S.D. Ohio 2016). But there is no explanation of how these cases are connected to the issues at hand.

BCSC closes this desultory argument by claiming, based upon *Wal-Mart, supra,* that it was required to remove Kluge's accommodation as a matter of law, because the threat of litigation created undue hardship. Brownsburg is effectively arguing that transgender rights and transgender accommodations supersede religious rights and accommodations. This statement of the law is incorrect, as previously noted.

**b.  Brownsburg's claim of threatened litigation is undercut by its failure to conduct any investigation.**

If BCSC felt it might be sued, why did the administration fail to conduct any investigation upon learning of the alleged complaints by unidentified students? BCSC has not claimed that any transgender student threatened to file a lawsuit based on Kluge's religious accommodation. There was no transgender "policy" instituted that discriminated against transgender students. A "last-name-only" accommodation was granted that treated all students the same.

BCSC maintains a board-approved policy manual containing a Nondiscrimination and Equal Employment Opportunity Policy designated as "po3122." ("BCSC EEO Policy") [See Filing No. 113-4 at 14 (Ex. 6 Gordon Dep.).] The EEO Policy designates two employees as Compliance Officers: Jodi Gordon, Director of Human Resources for Staff, and Jennifer Dezarn-Lynch, Director of Special Education for Students. [Filing No. 113-4 at 14 (Ex. 6 Gordon Dep. at page 1).] The EEO Policy provides for direct reporting by aggrieved individuals and also states that: "Any administrator, supervisor, or other Corporate-level official who receives such a complaint shall file it with a Compliance officer within two business days." [*Id.*] Upon receipt of a complaint, either directly or indirectly, through an administrator, supervisor, or other official, the Compliance Officer is obligated to begin a formal or informal complaint process, or to designate an individual to begin that process. [Filing No. 113-4 at 15 (Ex. 6 Gordon Dep. at page 2).]

Even though the Director of Human Resources, Gordon, was one of the Compliance Officers listed in the EEO Policy, she did not begin an investigation after Principal Daghe shared with her information about alleged student complaints over Kluge's last-name-only accommodation. [Filing No. 148-3 at 7 (Gordon Dep. at page 57, lines 13–22).] Principal Daghe received information about alleged student complaints from his Assistant Principal, Stacey Lingelbaugh, and the Brownsburg Equality Alliance Club faculty advisor, Craig Lee, but Daghe failed to

investigate. [Filing No. 148-2 at 8–9, 12–19 (Daghe Dep. at page 67, line 3 through page 71, line 18; Ex. 32 Daghe Dep.).] And Craig Lee cannot remember ever reporting discrimination alleged by students over Kluge's accommodation to the Compliance Officer, Jodi Gordon. [Filing No. 120-14 at 11–12 (Lee Dep. at page 50, lines 1–5; page 56, line 20 through page 57, line 1).]

Gordon, Lingelbaugh, Daghe, and Lee had a duty under the EEO Policy to report the alleged discrimination. [Filing No. 113-4 at 14 (Ex. 6 Gordon Dep. at page 1).] No one did.

### C.  After Kluge Requested His Accommodation be Continued, Gordon and Daghe— Brownsburg Administrators—Retaliated Against Him by Misrepresenting Material Facts in Order to Secure His Resignation.

Kluge establishes a claim for retaliation under Title VII by showing that he engaged in statutorily protected expression and was subjected to an adverse employment action as a result. *Carlson v. CSX Transp., Inc*., 758 F.3d 819, 828 (7th Cir. 2014). Kluge (1) engaged in statutorily protected activity by identifying a sincerely-held religious belief that conflicts with his employer's work requirement—identifying transgender students by their birth names, instead of their "new" transgender names—and by offering an accommodation for his belief, which BCSC accepted, in writing, effective July 31, 2017; and in February of 2018, Kluge asked the BCSC administration to confirm that his last-name-only accommodation was still valid; (2) Kluge suffered an adverse employment action when BCSC removed his last-names only accommodation without even claiming any undue hardship, demanded his resignation unless he violated his beliefs, refused to investigate his allegations of discrimination, and coerced him into submitting a conditional resignation they promised not to process until a certain date; and (3) there is a causal connection between the protected conduct and the adverse employment action. *See Contreras v. Suncast Corp*., 237 F.3d 756, 765 (7th Cir. 2001).

Kluge's written accommodation was effective July 31, 2017. [Filing No. 15-1 (Ex. A to Amended Compl.-Accommodation Agrm).] BCSC's intention to remove the last-name-only accommodation was stated clearly in the Transgender Questions practice manual of January 3, 2018. [Filing No. 15-4 at 9, ¶ 5.] After attending the faculty meeting in which the "Transgender Questions" document was introduced, Kluge sent Principal Daghe and Superintendent Snapp an email reminding them he had a written accommodation with no end date and requested confirmation that it was still effective. [Filing No. 120-16 at 2 (February 4, 2018 Kluge email to Snapp, Daghe at page 1).] In a February 6, 2018 meeting, Gordon told Kluge that his accommodation was no longer valid because it was a "policy violation" and when Kluge told Gordon the policy was discriminatory, Gordon responded that the BCSC attorneys had reviewed it and it was not discriminatory. [Filing No. 113-4 at 29, 43, 45–46 (Ex. 29 Gordon Dep. at page 10, lines 6–11; page 24, lines 5–20; page 26, lines 4–14; page 27, lines 14–17).] Gordon was in a conflict, because Kluge was claiming discrimination to the "Compliance Officer" for BCSC employees, under the BCSC Nondiscrimination and EEO Policy. [Filing No. 113-4 at 14 (Ex. 6 Gordon Dep. at page 2).] Gordon had a duty to investigate or ask someone else to investigate. At the February 6, 2018 meeting, Gordon and Daghe told Kluge he could follow the "policy," resign and be paid through the summer, or be terminated in early May. [Filing No. 113-4 at 43 (Ex. 29 Gordon Dep. at page 24, lines 5–20).] Gordon also suggested to Kluge that he could submit a conditional resignation. [*Id.* at 36–37 (Ex. 29 Gordon Dep. at page 17, lines 6–24; page 18, lines 6–8); Filing No. 15-2 at 1.] BCSC presented Kluge with a Hobson's choice: resign and be paid through the summer or refuse to resign and be terminated without summer pay.

Relying on Gordon's representations, Kluge submitted a letter of conditional resignation to her on April 30, 2018, specifying that it not be processed or shown to other administrators until

May 29, 2018; and another condition was that he could withdraw his resignation prior to that time. [Filing No. 113-2 at 6, ¶ 27 (Kluge Declr. at page 5, ¶ 27), Filing No. 15-2 at 1.] Gordon indicated her agreement to these conditions. [Filing No. 15-2 at 1.] When Gordon agreed not to process Kluge's resignation before May 29, 2018, it was reasonable for Kluge to assume that he could withdraw it before that time. Gordon never informed Kluge that he could not withdraw his resignation once it was submitted, or that submitting it to her was the same as submitting it to the Superintendent, Dr. Snapp. [Filing No. 113-4 at 11–12 (Gordon Dep. at page 41 line 24 through page 42, line 24; at page 40, line 16 through page 41, line 3).]

On May 25, 2018, in line with the representations Gordon had made concerning the conditionality of the resignation letter, Kluge formally rescinded it with a time- stamped, certified letter. [Filing No. 113-2 at 6, ¶ 28 (Kluge Declr. at page 5, ¶ 28), Filing No. 15-3 at 1.] Upon receipt of Kluge's resignation rescission, Gordon shared Kluge's resignation with BHS Principal Daghe, they made Kluge's resignation effective that day, BCSC locked Kluge out of the BCSC buildings and internet database, and posted his job as vacant. [Filing No. 113-2 at 7 (Kluge Declr. at page 6, ¶ 29), Filing No. 113-5 at 10 (Daghe Dep. at page 63, line 24 – page 64, line 25), Filing No. 71 at page 17, ¶ 63.]

### D. Brownsburg's Argument that Kluge's Religious Beliefs Are Insincere Has No Basis in Fact and Kluge is Entitled to Summary Judgment on His Failure to Accommodate Claim.

Brownsburg claims that Kluge's religious beliefs against affirming gender dysphoria by the use of transgender names and pronouns are insincere. [Doc. 121 at 5–7, ¶¶ 4–7; at 47–49.] Brownsburg's claim is based on Kluge's actions at an award ceremony and a document entitled the "Evangel Presbytery Book of Church Order." [Filing No. 120-4 (Exhibit 4 – Evangel Presbytery Book of Church Order).] As to the document—Exhibit 4 in Kluge's deposition—

Brownsburg's counsel did not disclose it at any point prior to introducing it as a deposition exhibit. [*See* Filing 120-3 at 9 (Kluge Dep. at page 31, lines 9–14).] He then "cherry-picked" portions of the text, combined them with incomplete statements of deposition testimony, and made a tenuous connection to Kluge's use of student names at the awards ceremony to claim that Kluge's beliefs are insincere. At the same time, Brownsburg failed to controvert Kluge's statements of undisputed material facts in support of the sincerity of his religious beliefs.

The Evangel Presbytery Book of Church Order does not condone the use of transgender names for any purpose—including as a means of being tolerant. The document is intolerant of the transgender lifestyle, noting in definite terms that genetic sex and sexual identity cannot be separated, and that it is sinful to reject one's sex and "to adopt characteristics of the opposite sex." [Filing No. 120-4 at 10 (Exhibit 4 – Evangel Presbytery Book of Church Order at page 49, ¶¶ 7–8).] Brownsburg cites language from Exhibit 4 stating that a transgender individual who attends the Church should be directed to use a "single-stall" restroom as opposed to either the men's or women's restrooms, until Church leadership has the opportunity to present "pastoral counsel concerning God's calling of manhood and womanhood and she begins to learn of Jesus' Lordship over her sexuality and the implications it has for her sexual identity and its public expression." There is no reference to the use of transgender names in a similar fashion and Brownsburg's suggestion that Kluge or his church might take that approach has no support in the record evidence.

Brownsburg's counsel asked Kluge if there might be circumstances where it is appropriate to address a transgender person by their first name when that name differs from their biological sex. Kluge answered, "There might be.  None come to mind right now.  Certainly my beliefs as regards classrooms that during the course of the teaching a class of students it's not appropriate

and it encourages gender dysphoria." [Filing No. 120-3 at 8–9 (Kluge Dep. at page 29, line 20 through page 30, line 3).] Brownsburg's claim that Kluge testified that "there are instances where it is appropriate and consistent with his religious beliefs to address a transgender student by the student's first name, even if the first name differs from the student's biological sex" misstates Kluge's testimony. [Filing 121 at 49.] Brownsburg's citation to record evidence does not support its claim. [See Filing No. 120-3 at 8-9 (Exhibit 3 – Kluge Dep. at p. 29, line 11 to p. 30, line 11)].

The awards ceremony occurred in May of 2018, at the end of the 2017–2018 school year and involved transgender students. Kluge identified all of his students by using their preferred first and last names, instead of just their last names, based on the formality of the occasion and in accord with the agreement that treated the accommodation as a sports coach. [Filing 120-3 at 32– 33 (Kluge Dep. at page 125, line 2 through page 128, line 17).] Kluge's decision was based on his desire to be reasonable and his belief that a sports coach would use complete names as opposed to last names only. [*Id.* at 33 (Kluge Dep. at page 127, lines 7–12).] Kluge's accommodation was based on the sports coach analogy, as acknowledged by Kluge, Jodi Gordon, Principal Daghe, and Superintendent Snapp. [*Id.* at 17 (Kluge Dep. at page 64, line 8 through page 65, line 7); Filing 148-1 at 5 (Snapp Dep. at page 24, line 23 through page 25, line 19).]

Whether Brownsburg coaches actually refer to students by their last names is irrelevant. Snapp understood that what Kluge was saying was a more stereotypical understanding that this does take place in certain settings and so Kluge's use of last names would not be an unusual accommodation. [*Id.* at 5 (Snapp Dep. at page 25, lines 10–19).]

Kluge's statement to the EEOC rebutting Brownsburg's position statement makes the same explanation, without reference to the coach analogy. [Filing 120-19 at 7 (Charging Party's Reply

to Respondent's Position Statement at page 5).] This singular instance of Kluge's use of

transgender first names was consistent with the coach analogy supporting his last-name-only

accommodation. And even if it is deemed inconsistent with his religious beliefs, Seventh Circuit

precedent and the Equal Employment Opportunity Commission's Compliance Manual on

Religious Discrimination issued January 15, 2021, make it clear that sincerity inquiries are

limited to determining if the religious belief is in fact the employee's belief at the time. *See, e.g.,*

*Adeyeye v. Heartland Sweeteners, LLC*, 721 F.3d 444, 452 (7th Cir. 2013) (holding that inquiring

into sincerity is limited to determining if the asserted belief or practice is in fact the employee's

own religious belief); *EEOC v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1575 (7th Cir. 1997) (*en

banc*) (finding that Jewish employee proved her request for leave to observe Yom Kippur was

based on a sincerely-held religious belief even though she had never in her prior eight-year

tenure sought leave from work for a religious observance, and conceded that she generally was

not a very religious person, where the evidence showed that certain events in her life, including

the birth of her son and the death of her father, had strengthened her religious beliefs over the

years); *Anderson v. U.S.F. Logistics (IMC), Inc.*, 274 F.3d 470, 475 (7th Cir. 2001) (finding that

employee's belief that she needed to use the phrase "Have a Blessed Day" was a religious

practice covered by Title VII even though using the phrase was not a requirement of her

religion). [U.S. Equal Employment Opportunity Commission, Section 12, Compliance Manual

on Religious Discrimination, Issued 01-15-2021, https://www.eeoc.gov/laws/guidance/section-

12-religious-discrimination#_ftn74, last visited March 5, 2021.]

### IV. Conclusion

It is undisputed that Kluge holds sincere religious beliefs that prevent him from referring to

transgender students by chosen names and pronouns, rather than birth sex. BCSC was aware of

Kluge's beliefs and permitted him to use student last names only as an accommodation. Kluge

has submitted multiple sworn statements attesting to the successful use of his accommodation.

And these statements stand unrebutted. In February of 2018, BCSC discriminated against Kluge

by withdrawing his reasonable accommodation, failing and refusing to offer any alternative

accommodation, coercing his resignation letter through a series of misrepresentations, and then

terminating him by processing that resignation letter when he sought to rescind it. BCSC has not

shown that his accommodation subjected it to undue hardship—it referred to Kluge's use of last

names as a "policy" violation. The undisputed facts show that BCSC committed religious

discrimination under Title VII by failing to accommodate Kluge's sincere religious beliefs, and

he is entitled to summary judgment. Kluge has established a genuine issue of material fact

regarding whether BCSC retaliated against him when he requested the continuation of his

accommodation and school administrators coerced him into submitting a resignation, based upon

material misrepresentations.

WHEREFORE, Kluge requests summary judgment in his favor against BCSC on the issue of

its failure to accommodate his sincerely-held religious beliefs against using transgender names

and pronouns, for a trial on his retaliation claim, and for all other just and proper relief.

Respectfully submitted,

*/s/ **Michael J. Cork***
Michael J. Cork, Esq.
5754 N. Delaware Street
Indianapolis, Indiana 46220-2528
317-517-4217
cork0@icloud.com

*/s/ Roscoe Stovall, Jr.*
Roscoe Stovall, Jr.
456 N. Meridian Street
Suite 507
Indianapolis, IN 46204
317-831-3999
rstovall@roscoelaw.com

*/s/ Kevin E. Green*
Kevin E. Green
456 N. Meridian Street
Suite 1517
Indianapolis, IN 46204
317-437-5002
keglegal@aol.com

Attorneys for Plaintiff, John M. Kluge

## CERTIFICATE OF SERVICE

I certify that on May 12, 2021, an accurate copy of the foregoing was filed electronically.

Service of this filing will be made on all ECF-registered counsel by operation of the Court's

electronic filing system. Parties may access this filing through the Court's system.

*/s/ Kevin E. Green*
Kevin E. Green