UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JOHN M. KLUGE, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| vs. | ) | No. 1:19-cv-2462-JMS-DLP |
| | ) | |
| BROWNSBURG COMMUNITY SCHOOL | ) | |
| CORPORATION, | ) | |
| | ) | |
| *Defendant.* | ) | |

## ORDER

What's in a name?  William Shakespeare suggested maybe not much, for "that which we call a rose, by any other name would smell as sweet."[1]  But a transgender individual may answer that question very differently, as being referred to by a name matching one's identity can provide a great deal of support and affirmation.  This case involves the legal ramifications of a public-school corporation's practical response to that philosophical question.

Plaintiff John Kluge was formerly employed as a teacher by Brownsburg Community School Corporation ("BCSC"), but was eventually forced to resign after refusing to refer to transgender students by the names selected by the students, their parents, and their healthcare providers due to his religious objections to affirming transgenderism.  Pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*., Mr. Kluge asserts two claims against BCSC related to the end of his employment: (1) discrimination based on failure to accommodate his religious beliefs; and (2) retaliation.  Mr. Kluge has filed a Motion for Partial Summary Judgment, seeking judgment in his favor on his failure to accommodate claim.  [Filing

---

[1]  WILLIAM SHAKESPEARE, ROMEO AND JULIET act 2, sc. 2, available at http://shakespeare.mit.edu/romeo_juliet/romeo_juliet.2.2.html.

No. 112.]  BCSC has filed a Cross-Motion for Summary Judgment, seeking judgment in its favor on both claims.  [Filing No. 120.]  In addition, a group of medical, mental health, and transgender youth support organizations have filed a Motion for Leave to File Brief of Amici Curiae in support of BCSC's summary judgment motion.  [Filing No. 131.]  All three of these motions are ripe for the Court's consideration.

## I.
### SUMMARY JUDGMENT STANDARD

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits.  Fed. R. Civ. P. 56(c)(1)(A).  A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1)(B).  Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated.  Fed. R. Civ. P. 56(c)(4).  Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment.  Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision.  A disputed fact is material if it might affect the outcome of the suit under the governing law.  *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009).  In other words, while there may be facts that are in dispute, summary judgment is appropriate if those

facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them." *Johnson*, 325 F.3d at 898. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

"The existence of cross-motions for summary judgment does not, however, imply that there are no genuine issues of material fact." *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Engineers*, 335 F.3d 643, 647 (7th Cir. 2003). Specifically, "[p]arties have different burdens of proof with respect to particular facts; different legal theories will have an effect on which facts are material; and the process of taking the facts in light most favorable to the non-

movant, first for one side and then for the other, may highlight the point that neither side has enough to prevail" on summary judgment. *Id.* at 648.

## II.
### BACKGROUND

#### A. The Parties

BCSC is a public-school corporation in Brownsburg, Indiana, and is governed by an elected Board of Trustees ("the Board"). [Filing No. 120-1 at 2.] At all relevant times, Dr. Jim Snapp was the Superintendent, [Filing No. 120-1 at 3]; Dr. Kathryn Jessup was the Assistant Superintendent, [Filing No. 120-1 at 2]; Jodi Gordon was the Human Resources Director, [Filing No. 113-4 at 5]; and Phil Utterback was the President of the Board, [Filing No. 113-3 at 5]. Brownsburg High School ("BHS") is the sole high school within BCSC. [Filing No. 120-2 at 2.] At all relevant times, Dr. Bret Daghe was the principal of BHS. [Filing No. 120-5 at 4.]

Mr. Kluge was hired by BCSC in August 2014 to serve as a Music and Orchestra Teacher at BHS. [Filing No. 113-2 at 2; Filing No. 120-2 at 3.] He was employed in that capacity until the end of the 2017-2018 academic year. [Filing No. 120-2 at 3.] Mr. Kluge taught beginning, intermediate, and advanced orchestra, beginning music theory, and advanced placement music theory, and was the only teacher who taught any sections of those classes during his time at BHS. [Filing No. 120-2 at 3; Filing No. 120-3 at 19-20.] Mr. Kluge also assisted the middle school orchestra teacher in teaching classes at the middle school. [Filing No. 120-3 at 19-20.]

#### B. Mr. Kluge's Religious Beliefs

Mr. Kluge identifies as a Christian and is a member of Clearnote Church, which is part of the Evangel Presbytery. [Filing No. 113-1 at 4.] He serves as a church elder, meaning he is a member of the board of elders, which "exercise[s] spiritual oversight over the church" and is "part of the government of [the] church." [Filing No. 120-3 at 3-4.] In addition, Mr. Kluge serves as

4

head of the youth group ministries, head of the Owana Program (a discipleship program for children), and a worship group leader. [Filing No. 120-3 at 5.]

Mr. Kluge's religious beliefs "are drawn from the Bible," and his "Christian faith governs the way he thinks about human nature, marriage, gender, sexuality, morality, politics, and social issues." [Filing No. 15 at 6.] "Mr. Kluge believes that God created mankind as either male or female, that this gender is fixed in each person from the moment of conception, and that it cannot be changed, regardless of an individual's feelings or desires." [Filing No. 15 at 6.] He also believes that "he cannot affirm as true ideas and concepts that he deems untrue and sinful." [Filing No. 15 at 7.] As a result of these principles, Mr. Kluge believes that "it is sinful to promote gender dysphoria."[2] [Filing No. 15 at 5; Filing No. 120-3 at 5.] In addition, according to Mr. Kluge, transgenderism "is a boringly old sin that has been repented for thousands of years," and because being transgender is a sin, it is sinful for him to "encourage[] students in transgenderism." [Filing No. 113-1 at 8-9; *see also* Filing No. 120-3 at 10.]

### C. BCSC's Policies and Practices Regarding Transgender Students

According to Dr. Jessup, BCSC's Assistant Superintendent, prior to the start of the 2017-2018 academic year, "the high school community at BCSC began to become more and more aware of the needs of transgender students," and "[s]everal discussions were held by and between school leadership at both the high school level and the corporation level about addressing these needs." [Filing No. 120-1 at 3.] Mr. Kluge and other BCSC staff first became aware of these discussions

---

[2] According to the American Psychiatric Association, "gender dysphoria" is "an acute form of mental distress stemming from strong feelings of incongruity between one's anatomy and one's gender identity." *Campbell v. Kallas*, 936 F.3d 536, 538 (7th Cir. 2019) (citing *Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders* 451 (5th ed. 2013)). Mr. Kluge disagrees with this definition, and instead defines gender dysphoria to be "what scripture refers to as effeminacy which is for a man to play the part of a woman or a woman to play the part of a man and so that would include acting/dressing like the opposite sex." [Filing No. 120-3 at 5-6.]

in January 2017, when administrators invited Craig Lee, a BHS teacher and faculty advisor of the Equality Alliance Club, to speak about transgenderism at a faculty meeting. [Filing No. 15-3 at 2; Filing No. 58-2 at 1-2.] At another faculty meeting in February 2017, Mr. Lee and a BHS guidance counselor, Lori Mehrtens, gave a presentation on what it means to be transgender and how teachers can encourage and support transgender students. [Filing No. 15-3 at 2.]

BHS Principal Dr. Daghe testified that during the second semester of the 2016-2017 academic year, BHS faculty and staff members approached him seeking direction about how to address transgender students. [Filing No. 113-5 at 4.] In May 2017, Mr. Kluge and three other teachers called a meeting with Dr. Daghe, during which they presented a signed letter expressing their religious objections to transgenderism and other information supporting their position that BHS should not "promote transgenderism." [Filing No. 113-1 at 19-32; Filing No. 113-5 at 6; Filing No. 120-3 at 11.] The letter specifically asked that BCSC faculty and staff not be required to refer to transgender students using their preferred pronouns and that transgender students not be permitted to use the restrooms and locker rooms of their choice. [Filing No. 113-1 at 30-31.]

In response to these various competing concerns, BCSC implemented a policy ("the Name Policy"),[3] which took effect in May 2017 and required all staff to address students by the name

---

[3] Mr. Kluge repeatedly emphasizes that the Name Policy was not a formal BCSC policy in that it was not formally reviewed or adopted by the Board. [*E.g.*, Filing No. 153 at 17]. That appears to be true. [*See* Filing No. 113-4 at 6 (Ms. Gordon testifying that "It actually wasn't really a policy. It was a direction. It was guidelines that we had given to the staff."); Filing No. 113-4 at 6 (Ms. Gordon acknowledging that, in order to become a policy, an issue must be presented to the Board for discussion, review, and approval at a formal Board meeting); Filing No. 113-3 at 8 (Mr. Utterback testifying that the subject of transgender students changing their names was never formally addressed by the Board).] However, that distinction is irrelevant given that it is undisputed that the Name Policy and BCSC's other practices, such as those concerning uniforms and restrooms—whether formally adopted by the Board or not—were directives that BCSC staff members were required to follow. The Court uses the term "policy" to refer to the Name Policy and the other practices colloquially and as a matter of convenience, not to imply that the any of these matters were formally ratified by the Board.

that appears in PowerSchool, a database that BCSC uses to record and store student information, including grades, attendance, and discipline. [Filing No. 113-3 at 6; Filing No. 113-5 at 4; Filing No. 113-6 at 7.] Transgender students could change their first names in PowerSchool if they presented a letter from a parent and a letter from a healthcare professional regarding the need for a name change. [Filing No. 113-5 at 4-5; Filing No. 120-1 at 4-5.] Through the same process, students could also change their gender marker and the pronouns used to refer to them. [Filing No. 113-5 at 5.] In addition to the Name Policy, transgender students were permitted to use the restrooms of their choice and dress according to the gender with which they identified, including wearing school-related uniforms associated with the gender with which they identified. [Filing No. 113-5 at 5.] The three other teachers who initially expressed objections to "promot[ing] transgenderism" accepted the Name Policy, while Mr. Kluge did not. [Filing No. 120-3 at 12.]

BCSC's practices regarding transgender students were based on BCSC's administrators' ultimate conclusion that "transgender students face significant challenges in the high school environment, including diminished self-esteem and heightened exposure to bullying" and that "these challenges threaten transgender students' classroom experience, academic performance, and overall well-being." [Filing No. 120-1 at 3.] Regarding the Name Policy specifically, Dr. Jessup explained:

> The high school and BCSC leadership thought that this practice furthered two primary goals. First, the practice provided the high school faculty a straightforward rule when addressing students; that is, faculty need and should only call students by the name listed in PowerSchool. Second, it afforded dignity and showed empathy toward transgender students who were considering or in the process of gender transition. Stated differently, the administration considered it important for transgender students to receive, like any other student, respect and affirmation of their preferred identity, provided they go through the required and reasonable channels of receiving and providing proof of parental permission and a healthcare professional's approval.

[Filing No. 120-1 at 4.] Dr. Jessup further opined that the BCSC and BHS leaders gave "heightened attention to these issues prior to the start of the 2017-2018 school year because several transgender students were enrolled as high school freshman for that school year." [Filing No. 120-1 at 3.]

### D. Mr. Kluge's Religious Objections to BCSC Policies and His Initial Accommodations

In July 2017, Mr. Kluge informed Dr. Daghe that he could not follow the Name Policy because he had a religious objection to referring to students using names and pronouns corresponding to the gender with which they identify, rather than the biological sex that they were assigned at birth.[4] [Filing No. 113-2 at 3; Filing No. 113-5 at 5-6.] Dr. Daghe called a meeting with Mr. Kluge and Dr. Snapp to discuss the situation. [Filing No. 120-3 at 14-17; Filing No. 120-5 at 6.] At the meeting, Dr. Daghe gave Mr. Kluge three options: (1) comply with the Name Policy; (2) resign; or (3) be suspended pending termination. [Filing No. 120-3 at 14.] Mr. Kluge refused to either follow the Name Policy or resign, so he was suspended. [Filing No. 120-3 at 14-17.]

---

[4] Mr. Kluge and his counsel often use the terms "transgender names" and "transgender pronouns" to refer to the first names and pronouns chosen by transgender students and affirmed by their parents to reflect the gender with which they identify. [*See* Filing No. 120-3 at 15 (Mr. Kluge testifying that he uses "transgender names" to mean "[t]he opposite sex first name that [the transgender students] had switched to that was not their legal name").] They use terms like "legal names" to refer to the names and gender that the students were assigned at birth. [*See* Filing No. 120-3 (stating that "legal names" refers to "[t]he name that's on their birth certificate, the one that was stored on their birth records").] The Court finds this terminology imprecise and often confusing. People can be transgender, but names and pronouns cannot. Relatedly, transgender individuals can and often do change their "legal" names and gender markers to reflect the gender with which they identify. Accordingly, the Court will refer to the names and pronouns chosen by transgender students to reflect the gender with which they identify as "preferred" names and pronouns.

The following week, on July 31, 2017, another meeting was held between Dr. Snapp, Ms. Gordon, and Mr. Kluge. [Filing No. 120-3 at 17.] At the July 31 meeting, Mr. Kluge proposed that he be permitted to address all students by their last names only, similar to a sports coach ("the last names only accommodation"), and the administrators agreed. [Filing No. 113-2 at 3-4; Filing No. 113-6 at 7; Filing No. 120-3 at 17.] Mr. Kluge signed a document that stated the following, including a handwritten notation initialed by Ms. Gordon:

> You are directed to recognize and treat students in a manner using the identity indicated in PowerSchool. This directive is based on the status of a current court decision applicable to Indiana.
> We agree that John may use last name only to address students.
> You are also directed not to attempt to counsel or advise students on his/her lifestyle choices.

[Filing No. 15-1 at 1.] Another handwritten note, also initialed by Ms. Gordon, further stated: "In addition, Angie Boyer will be responsible for distributing uniforms to students." [Filing No. 15-1 at 1.]

Mr. Kluge understood the last names only accommodation to mean that he would refer to all students—not just transgender students—by their last names only, not use any honorifics such as "Mr." or "Ms." to refer to any student, and if any student were to directly ask why he used last names only, he would respond that he views the orchestra class like a sports team and was trying to foster a sense of community. [Filing No. 120-3 at 18.] He also understood that he would not be required to distribute gender-specific orchestra uniforms to students. [Filing No. 120-3 at 17-18.]

### E. BCSC Receives Complaints About Mr. Kluge's Use of Last Names Only

Dr. Daghe "first learned of concerns with Mr. Kluge and how he was addressing students in class" in an August 29, 2017 email from another teacher, Craig Lee. [Filing No. 120-2 at 4.] In addition to teaching classes at BHS, Mr. Lee was one of three teachers on the BHS Faculty

Advisory Committee and the faculty advisor of the Equality Alliance, a student club that meets on a weekly basis to discuss issues that impact the LGBTQ community and provides a safe space for students who identify as LGBTQ. [Filing No. 120-2 at 4; Filing No. 120-14 at 6.] In relevant part, the email stated:

> I wanted to follow up regarding the powerschool/students changed name discussion at the Faculty Advisory [meeting] as some issue have arisen in the last few days that need to be addressed. . . . There is a student who has had their name changed in powerschool. They are a freshman who this teacher knew from 8th grade. The teacher refuses to call the student by their new name. I see this is a serious issue and the student/parents are not exactly happy about it.

[Filing No. 120-15 at 2.] Although the email did not mention Mr. Kluge by name, Dr. Daghe believed and was later able to confirm that the teacher discussed in the email was Mr. Kluge. [Filing No. 12-2 at 4.]

Regarding the Equality Alliance, between 12 and 40 students generally attend each meeting, and in 2019 there were at least four transgender students who regularly attended meetings. [Filing No. 120-14 at 6-7; *see also* Filing No. 58-1 at 2 (estimating that there are "approximately five to ten transgender students currently in the Equality Alliance").] Aidyn Sucec and Sam Willis were two transgender students who regularly attended Equality Alliance meetings during the relevant time. [Filing No. 120-14 at 7.] According to Mr. Lee, both Aidyn and Sam discussed during Equality Alliance meetings how Mr. Kluge was referring to them by their last names only, and they found that practice to be insulting and disrespectful. [Filing No. 120-14 at 7.] Mr. Lee testified that: "It was clearly visible the emotional distress and the harm that was being caused towards them. It was very, very clear, and, so, that was clear for everyone to see but that is also what they described as well." [Filing No. 120-14 at 7-8; *see also* Filing No. 120-14 at 8 ("Q: Was it your interpretation that Aidyn and Sam . . . felt as if they were being discriminated against by Mr. Kluge? A: I wouldn't describe it so much as an interpretation. It was just very, very

clear at the meetings to see how much emotional harm was being caused towards Sam and Aidyn. It was clear for everyone at the meetings just to see how much of an impact it was having on them. So, when I say like I wouldn't call it an interpretation, I mean, it was so clearly visible that I don't feel like there was anything to necessarily interpret.").]

In his declaration, Mr. Lee stated the following:

> During Equality Alliance meetings, we have a policy of not using names when discussing offensive or insensitive behavior of other students and faculty. During the 2017-2018 school year, I heard students discuss how they were being treated "in orchestra class," or "by the orchestra teacher." I understood these to be references to John Kluge, the orchestra teacher at [BHS].
>
> Mr. Kluge's behavior was a frequent topic of conversation during Equality Alliance meetings. Students in Mr. Kluge's class said that they found not being called by their first names to be insulting and disrespectful. Transgender students felt strongly that they wanted others to acknowledge their corrected names, and Mr. Kluge's refusal to do so hurt them. These students also felt like it was their presence that caused Mr. Kluge's behavior, which made them feel isolated and targeted. I relayed the students' concerns to the principal of [BHS] and the assistant superintendent of [BCSC].
>
> Multiple times, Equality Alliance members mentioned that Mr. Kluge would occasionally "slip-up," and use first names or gendered honorifics (e.g., "Mr." or "Miss") rather than last names. Some students also expressed that they felt that Mr. Kluge avoided acknowledging transgender students who raised their hands in class.
>
> Mr. Kluge's behavior was also the subject of discussion outside of the Equality Alliance. One student who was not a member of the Equality Alliance, but was in Mr. Kluge's orchestra class, approached me to tell me that Mr. Kluge's use of last names made him feel incredibly uncomfortable, even though he did not identify as LGBTQ. The student said that he found Mr. Kluge's use of last names very awkward because he was fairly certain that all the students knew why Mr. Kluge had switched to using last names, and that it made the transgender students in Mr. Kluge's orchestra class stand out. This student told me that he felt bad for his transgender classmates. He also mentioned that there were other students who felt this way as well.

[Filing No. 58-2 at 2-3.]

Dr. Jessup confirmed that Mr. Kluge's use of last names only was a topic of discussion at Equality Alliance meetings, stating:

> I attended a meeting of the [BHS] Equality Alliance Club in Fall 2017. The purpose for my attending that meeting was concerns that had been shared from counselors of students feeling uncomfortable. Approximately 40 students attended this meeting. During the meeting, approximately four or five students complained specifically about a teacher using last names only to address students and, in my view, the other students in attendance appeared to agree with these complaints. While the students did not identify John Kluge by name in making these complaints, it was certainly implied that he was the teacher in question, and I had no doubt that it was him they were speaking of since he was the only teacher employed by BCSC who had been permitted the accommodation of using last names only instead of using the names stated in PowerSchool.

[Filing No. 120-1 at 4.]

Mr. Lee also testified that three other teachers—Jason Gill, Melinda Lawrie, and Justin Bretz—approached him during the 2017-2018 school year with concerns that Mr. Kluge's use of last names only was causing harm to students. [Filing No. 120-14 at 16-17.] In addition, the Faculty Advisory Committee met with Dr. Daghe approximately twice per month, and during those meetings, "Mr. Lee continued to relate to [Dr. Daghe] the complaints and concerns he was hearing, primarily in Equality Alliance Club meetings, . . . about Mr. Kluge's use of last-names-only with students." [Filing No. 120-2 at 4.] Dr. Daghe testified that in addition to receiving information from Mr. Lee, he received complaints from students and teachers, including teachers Tracy Runyon and Melissa Stainbrook, regarding Mr. Kluge referring to his students by last name only. [Filing No. 113-5 at 8-9; *see also* Filing No. 113-4 at 9 (Ms. Gordon testifying that she "was made aware that there had been complaints made to Dr. Daghe from students and staff that Mr. Kluge wasn't following th[e] guidelines that he had agreed to at the start of the year").]

Aidyn Sucec was a transgender student in Mr. Kluge's orchestra class during the 2017-2018 academic year. [Filing No. 22-3 at 1.] Aidyn submitted a declaration in which he stated that

after coming out as transgender, "[b]eing addressed and recognized as Aidyn was critical to helping alleviate [his] gender dysphoria," and his "emotional and mental health significantly improved once his family and friends began to recognize [him] as who [he is]." [Filing No. 22-3 at 3.] Pursuant to the Name Policy, Aidyn's mother and his therapist submitted letters requesting that his name and gender be updated in PowerSchool. [Filing No. 22-3 at 3.] According to Aidyn, Mr. Kluge referred to him by last name only or avoided referring to him by any name, instead simply nodding or waving in Aidyn's direction. [Filing No. 22-3 at 4.] However, Aidyn states that Mr. Kluge would sometimes refer to other students using the honorifics "Mr." or "Ms.," or by their first names. [Filing No. 22-3 at 4.] Aidyn believes that Mr. Kluge "avoided" him and other transgender students, and states:

> Mr. Kluge's behavior made me feel alienated, upset, and dehumanized. It made me dread going to orchestra class each day, and I felt uncomfortable every time I had to talk to him one-on-one. In addition, Mr. Kluge's behavior was noticeable to other students in the class. At one point, my stand partner asked me why Mr. Kluge wouldn't just say my name. I felt forced to tell him that it was because I'm transgender. . . . By the end of the first semester, in December of 2017, I told my mother that I did not want to continue taking orchestra during my sophomore year.

[Filing No. 22-3 at 4.] Aidyn explains that "[t]he controversy around Mr. Kluge's resignation during the summer of 2018 is why [he] no longer attend[s] Brownsburg High School." [Filing No. 22-3 at 4.] Several students made negative and derogatory remarks to Aidyn, suggesting that he had been responsible for Mr. Kluge leaving the school, and "[t]hese incidents, in combination with [his] ongoing health struggles, made [him] feel that [he] could not return to school" after August 2018. [Filing No. 22-3 at 4-5.]

Sam Willis was another transgender student in one of Mr. Kluge's orchestra classes during the 2017-2018 academic year. [Filing No. 58-1 at 2.] Prior to the start of that year, he decided to publicly transition and use the name "Samuel" or "Sam" and masculine pronouns going forward.

[Filing No. 58-1 at 2.] Although Sam's parents emailed the school counselor and Mr. Kluge directly to notify them of this change, Sam did not initially change his information in PowerSchool, because he was not aware of the Name Policy permitting him to do so. [Filing No. 58-1 at 2-3.] According to Sam, before he changed his information in PowerSchool, Mr. Kluge referred to him on several occasions as "Miss Willis," which led to confusion among other students and was "very upsetting" to Sam. [Filing No. 58-1 at 2-3.] Once Sam changed his first name and gender marker in PowerSchool, however, Mr. Kluge stopped referring to him as "Miss Willis," and Sam was permitted to wear the boys' tuxedo uniform for the fall orchestra concert. [Filing No. 58-1 at 3.] Sam states that Mr. Kluge generally used last names only to refer to students, but would occasionally use gendered honorifics or gendered pronouns with non-transgender students. [Filing No. 58-1 at 3.] Sam opines that "Mr. Kluge's use of last names in class made the classroom environment very awkward," and "[m]ost of the students knew why Mr. Kluge had switched to using last names, which contributed to the awkwardness and [Sam's] sense that [he] was being targeted because of [his] transgender identity." [Filing No. 58-1 at 3-4.] Sam states that Mr. Kluge's actions upset him and his family, and exposed him and other transgender students to "widespread public scrutiny." [Filing No. 58-1 at 5.] His declaration ends with the following statement: "I truly believe that if everyone in my life had refused, like Mr. Kluge, to use my corrected name, I would not be here today." [Filing No. 58-1 at 5.]

Mr. Kluge expressly disputes the allegations in Aidyn's declaration and the other allegations that he did not strictly comply with the last names only accommodation. [*See* Filing No. 52-1.] Natalie Gain, a teacher who led private music lessons for students during the school day, submitted a declaration stating that she never heard Mr. Kluge use gendered language in the classroom and "only heard him use last names with the students." [Filing No. 52-2 at 3.] She

further stated that she "never heard any of the students discussing the . . . use of last names" and "as far as [she] could tell, Mr. Kluge's accommodation was not common knowledge" among students. [Filing No. 52-2 at 3.] Three students who were in Mr. Kluge's orchestra class during the 2017-2018 school year also submitted declarations stating that they never heard Mr. Kluge used gendered language, that they observed him using last names only to refer to all students, and that they did not witness him treating transgender students differently than other students. [Filing No. 52-3; Filing No. 52-4; Filing No. 52-5.]

Dr. Daghe continued to hear complaints about Mr. Kluge throughout the fall 2017 semester, but was hopeful that the issue would resolve itself. [Filing No. 120-1 at 4.] It was not until December 2017 that Dr. Daghe determined it was appropriate to address these issues with Mr. Kluge directly. [Filing No. 120-2 at 4.] Mr. Kluge testified that he was not aware of any complaints until December 2017, and when Mr. Daghe informed him that complaints had been made, Dr. Daghe did not provide any specific information or disclose the names of people who had allegedly complained. [Filing No. 120-3 at 21-23.] Mr. Kluge further testified that he did not personally witness or experience any tension with his students or other faculty members. [Filing No. 120-3 at 23-24.]

### F. Mr. Kluge's Discussions with Administration and Ultimate Resignation

On December 13, 2017, Mr. Kluge met with Dr. Daghe. [Filing No. 113-2 at 4; Filing No. 120-3 at 22.] Mr. Kluge's account of this meeting, in relevant part is as follows:

> [Dr.] Daghe scheduled a meeting with me to ask me how the year was going and to tell me that my last-name-only Accommodation was creating tension in the students and faculty. He said the transgender students reported feeling "dehumanized" by my calling all students last-name-only. He said that the transgender students' friends feel bad for the transgender students when I call the transgender students, along with everyone else, by their last-name-only. He said that I am a topic of much discussion in the Equality Alliance Club meetings. He said that a number of

faculty avoid me and don't hang out with me or include me as much because of my stance on the issue.

***

I explained to [Dr.] Daghe that this persecution and unfair treatment I was undergoing was a sign that my faith as witnessed by my using last-names-only to remain neutral was not coming back void, but was being effective. He didn't seem to understand why I was encouraged. He told me he didn't like things being tense and didn't think things were working out. He said he thought it might be good for me to resign at the end of the year. I told [Dr.] Daghe that I was now encouraged all the more to stay.

[Filing No. 15-3 at 4-5.] Mr. Kluge later testified that although Dr. Daghe stated during the meeting that the use of last names only was "creating complaints among many students," he would not provide the names of the students who complained. [Filing No. 120-3 at 23.] Mr. Kluge further testified that he did not witness any tension or experience any animosity from students or other faculty, and that his students were performing better than ever in their competitions, receiving high scores on their AP exams, and participating voluntarily in extra programs. [Filing No. 120-3 at 23-24.]

On January 17, 2018, Dr. Daghe scheduled another meeting with Mr. Kluge, because he "didn't think he was direct enough in [the] December 13 meeting." [Filing No. 15-3 at 5.] At the January 17 meeting, Dr. Daghe expressed that, because of complaints about the use of last names only, Mr. Kluge should resign at the end of the school year. [Filing No. 15-3 at 5; Filing No. 120-3 at 25.] Dr. Daghe offered to write Mr. Kluge letters of recommendation to help him find a new job. [Filing No. 15-3 at 5.]

At the BHS faculty meeting on January 22, 2018, Dr. Jessup presented the faculty with a document titled "Transgender Questions." [Filing No. 15-3 at 5.] The document contained a series of questions and answers concerning BCSC policies regarding transgender students and how faculty and staff should handle matters related to transgender students. [See Filing No. 15-4.] In addition to reiterating that the staff and faculty should address students by the names and genders

listed in PowerSchool, [Filing No. 15-4 at 6; Filing No. 15-4 at 9], the document contained the following relevant questions and answers:

> **Are we allowed to use the student's last name only?** We have agreed to this for the 2017-2018 school year, but moving forward it is our expectation the student will be called by the first name listed in PowerSchool.
>
> ***
>
> **How do teachers break from their personal biases and beliefs so that we can best serve our students?** We know this is a difficult topic for some staff members, however, when you work in a public school, you sign up to follow the law and the policies/practices of that organization and that might mean following practices that are different than your beliefs.
>
> **What feedback and information has been received from transgender students?** They appreciate teachers who are accepting and supporting of them. They feel dehumanized by teachers they perceive as not being accepting or who continue to use the wrong pronouns or names. Non-transgender students in classrooms with transgender students have stated they feel uncomfortable in classrooms where teachers are not accepting. For example, teachers that call students by their last name, don't use correct pronouns, don't speak to the student or acknowledge them, etc.

[Filing No. 15-4 at 9-10 (numbering omitted).]

Following the faculty meeting, Mr. Kluge sent an email to Dr. Snapp and Dr. Daghe, referring to the "Transgender Questions" document and asking whether he was correct in believing that he would continue to be permitted to follow the last names only accommodation after the 2017-2018 school year. [Filing No. 120-16 at 2.] In response to the email, Ms. Gordon and Dr. Daghe scheduled a meeting with Mr. Kluge to take place on February 6, 2018. [Filing No. 15-3 at 6.]

Mr. Kluge recorded audio of the February 6 meeting. [Filing No. 113-4 at 20-55; Filing No. 120-3 at 25.] During the meeting, Mr. Kluge was informed that he would not be permitted to continue using last names only after the 2017-2018 school year. [Filing No. 113-4 at 24.] Ms. Gordon stated that employers are not obligated to accommodate all of their employees' religious beliefs, but instead need only provide reasonable accommodations, and the last names only

accommodation was not reasonable. [Filing No. 113-4 at 27.] Mr. Daghe agreed. [*See* Filing No. 113-4 at 28 ("Not when it's detrimental to kids it's not reasonable.").] Ms. Gordon also discussed how Mr. Kluge's pay and other logistical matters would be handled, depending on whether he finished the current school year or resigned mid-year. [Filing No. 113-4 at 33-35.] Regarding "processing" of a resignation, Ms. Gordon explained the following to Mr. Kluge:

> [S]ometimes people are very sensitive about letting their students know[] or even their colleagues knowing . . . .
>
> ***
>
> If someone – I've had one for a year now, um, that we – someone submitted a resignation or retirement letter and asked "I'd rather you just hold onto this. I'm not – I don't want it communicated. I'd rather, you know, it just wait until the school year is over and then you process it." We honor requests like that.
>
> ***
>
> How long we hold that can hold us up a little bit on being able to search for a replacement. And obviously a replacement for your position . . . is not going to be an easy one. So, you know, if that were to happen, it kind of depends on the position.
>
> ***
>
> So while we like to honor those, we also like to – to talk about, like, okay, a reasonable amount of time for us to be able to – in order to be able to find – put a – get a posting out and do a good search for someone.

[Filing No. 113-4 at 36-37.] According to Mr. Kluge, this explanation from Ms. Gordon led him to believe that he was entitled to submit a "conditional resignation." [*See* Filing No. 120-3 at 26 ("[Dr. Daghe and Ms. Gordon] said the option was I could give Jodi a conditional resignation that wouldn't be processed until a date I specified, that she had done that in the past, that she had held onto resignations and not processed them before and she would honor any such requests.").]

In March 2018, Ms. Gordon scheduled another meeting with Mr. Kluge. [Filing No. 15-3 at 6; Filing No. 113-2 at 6.] At that meeting, she informed Mr. Kluge that he could either follow the Name Policy and continue his employment, resign, or be terminated. [Filing No. 113-2 at 6.] She told him that, if he intended to resign, he would need to submit his resignation to her by May 1, 2018, otherwise the termination process would begin on that date. [Filing No. 15-3 at 6.]

On April 30, 2018, Mr. Kluge sent an email to Ms. Gordon with the subject "Request."

[Filing No. 15-2 at 1.] The email stated:

I'm writing you to formally resign from my position as a teacher, effective at the end of the 2017-2018 school year when my contract is finished, i.e., early August 2018.

I'm resigning my position because [BCSC] has directed its employees to call transgender students by a name and sex not matching their legal name and sex. BCSC has directed employees to call these students by a name that encourages the destructive lifestyle and psychological disorder known as gender dysphoria. BCSC has allowed me the accommodation of referring to students by last name only starting in August 2017 so I could maintain a "neutral" position on the issue.

Per our conversation on 3/15/18, [BCSC] is no longer allowing this accommodation. BCSC will require me to refer to transgender students by their "preferred" name as well as by their "preferred" pronoun that does not match their legal name and sex. BCSC will require this beginning in the 2018-2019 school year. Because my Christian conscience does not allow me to call transgender students by their "preferred" name and pronoun, you have said I am required to send you a resignation letter by May 1, 2018 or I will be terminated at that time.

Please do not process this letter nor notify anyone, including any administration, about its contents before May 29, 2018. Please email me to acknowledge that you have received this message and that you will grant this request.

[Filing No. 15-2 at 1.]

On the same day, Ms. Gordon replied to Mr. Kluge's email with the following:

I appreciate hearing from you.

I will honor your request and not process this letter or share with the BHS administration until May 29.

Let me know if you have any questions at all.

[Filing No. 15-2 at 1.]

Ms. Gordon believed that she was honoring Mr. Kluge's request not to "process" his resignation before May 29 by not presenting the resignation to the Board or sharing it with his colleagues and students until after that date. [Filing No. 113-4 at 12.] According to Ms. Gordon,

submitting a resignation to her is equivalent to submitting a resignation to the superintendent, and the only permissible condition for an employee to include in a resignation is the end date of employment. [Filing No. 113-4 at 11-12; Filing No. 113-6 at 6.] However, in his deposition, Mr. Kluge characterized his resignation as a "conditional resignation, the condition being I could take it off [Ms. Gordon's] desk before May 29." [Filing No. 120-3 at 27.]

Relevant to the issue of resignation, BCSC's Bylaws provide that:

Pursuant to State law, following submission of a resignation to the Superintendent, the employee may not withdraw or otherwise rescind that resignation. . . . The Superintendent shall inform the Board of the submission of that resignation at its next meeting. The Board may choose to accept that resignation, deny that resignation or take any other appropriate action relating to the termination, suspension or cancellation or employment of the person submitting the resignation. A resignation, once submitted, may not then be rescinded unless the Board agrees.

[Filing No. 113-6 at 8.] The Bylaws cite Indiana Code § 5-8-4-1, which in turn provides that:

Whenever any officer, servant or employee of . . . any . . . school corporation[] . . . shall submit in writing his or her resignation, whether to take effect at once, when accepted, or at some future fixed date, with the proper officer, person or persons or authority of government to receive such resignation, the person so submitting such written resignation shall have no right to withdraw, rescind, annul or amend such resignation without the consent of the officer, person or persons or authority of government having power by law to fill such vacancy.

In May 2018, Mr. Kluge attended an orchestra awards ceremony. [Filing No. 120-3 at 32.] At the ceremony, he addressed all students by their first and last names, including transgender students, whom Mr. Kluge addressed by their preferred first names. [Filing No. 120-3 at 33.] Mr. Kluge explained that he used first and last names because "it would have been unreasonable and conspicuous" to refer to students by last names only at a formal event. [Filing No. 120-3 at 33.] Mr. Kluge also opined that referring to students by last name only at the awards ceremony would be inconsistent with the last names only accommodation, because the accommodation was based

on the understanding that he would address students like a sports coach would, and a sports coach would likely use first and last names at a formal event. [Filing No. 120-3 at 33.]

On May 25, 2018, Mr. Kluge was scheduled to meet with Ms. Gordon and Dr. Daghe, but when he arrived for the meeting, Mr. Daghe told him that the meeting was cancelled because "We have everything we need." [Filing No. 15-3 at 1.] That same afternoon, Mr. Kluge submitted to Ms. Gordon a document titled "Withdrawal of Intention to Resign and Request for Continuation of Accommodation." [Filing No. 15-3 at 1-7.] In that document, Mr. Kluge explained that he was "confused" as to why Dr. Daghe cancelled the meeting, and asserted that at the meeting he planned to withdraw his "emailed intention to resign," which he had sent to Ms. Gordon on April 30 along with a request that the email not be processed. [Filing No. 15-3 at 1.] He outlined his version of events leading up to his forced resignation, accused BCSC of discriminating against him based on his religious beliefs, and ultimately asked that he be permitted to continue his employment using the last names only accommodation. [Filing No. 15-3 at 1-7.] Approximately two hours after Mr. Kluge submitted the purported rescission to Ms. Gordon, BCSC "locked [Mr. Kluge] out of the BCSC buildings and internet database, and posted [his] job as vacant." [Filing No. 113-2 at 7.]

At a Board meeting on June 11, 2018, Mr. Kluge asked the Board not to accept his resignation and to reinstate his employment. [Filing No. 113-2 at 7; Filing No. 120-18 at 10.] Various members of the community also spoke at the meeting, some in support of Mr. Kluge's termination, and others against it. [See Filing No. 120-18 at 9-13.] The Board accepted Mr. Kluge's resignation, thereby ending his employment with BCSC. [Filing No. 113-2 at 7; Filing No. 120-18 at 1.]

### G.  This Lawsuit

Mr. Kluge filed his Amended Complaint in this action, asserting thirteen claims against BCSC and several of its employees.  [Filing No. 15.]  Upon Defendants' Motion to Dismiss, [Filing No. 44], the Court dismissed several claims and Defendants, leaving only Mr. Kluge's claims against BCSC for failure to accommodate and retaliation under Title VII, [Filing No. 70].  As noted earlier, Mr. Kluge then filed his Motion for Partial Summary Judgment seeking judgment in his favor on his failure to accommodate claim.  [Filing No. 112.]  BCSC filed its Cross-Motion for Summary Judgment seeking judgment in its favor on the failure to accommodate claim and the retaliation claim.  [Filing No. 120.]  In addition, the National Association of Social Workers and its Indiana Chapter, the American Academy of Pediatrics and its Indiana Chapter, the American Medical Association, and Indiana Youth Group (collectively, "Movants") filed a Motion for Leave to File Brief of Amici Curiae, seeking "to offer additional insight regarding the harm of [Mr. Kluge's] proposed accommodation on the health and wellbeing of transgender students that is not discussed in the briefs submitted by the parties to this case."  [Filing No. 131 at 1.]  All three of these motions are fully briefed and ripe for the Court's decision.

### III.
### DISCUSSION

### A.  Title VII Background

"Title VII forbids employment discrimination on account of religion."  *EEOC v. Walmart Stores E., L.P.*, 992 F.3d 656, 658 (7th Cir. 2021) (citing 42 U.S.C. § 2000e–2(a)(1)).  As used in Title VII, "religion" "includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business."  42 U.S.C. § 2000e(j).

To state a prima facie case of religious discrimination based on failure to accommodate, a plaintiff must show that his religious belief or practice conflicted with a requirement of his employment and that his religious belief or practice was the basis for the discriminatory treatment or adverse employment action. *Porter v. City of Chicago*, 700 F.3d 944, 951 (7th Cir. 2012), as modified by *EEOC v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028, 2031-33 (2015).[5] "Once the plaintiff has established a prima facie case of discrimination, the burden shifts to the employer to make a reasonable accommodation of the religious practice or to show that any reasonable accommodation would result in undue hardship." *Porter*, 700 F.3d at 951.

"In addition to prohibiting discrimination, Title VII 'forbids retaliation against anyone who "has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII].""" *Id.* at 956 (quoting *Loudermilk v. Best Pallet Co.*, 636 F.3d 312, 314 (7th Cir. 2011) (quoting 42 U.S.C. § 2000e–3(a)). To survive summary judgment on a retaliation claim, the plaintiff must produce evidence showing a causal link between his protected activity and the adverse employment action. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 578 (7th Cir. 2021). "The question is: 'Does the record contain sufficient evidence to permit

---

[5] In *Porter*, the Seventh Circuit articulated an additional element of the prima facie case for failure to accommodate: that the employee called the religious practice to his employer's attention. 700 F.3d at 951. However, the Supreme Court later made clear that an employee need not prove that his employer had actual knowledge of the religious belief or practice, and instead must demonstrate only that the desire not to accommodate was a motivating factor in an adverse employment action. *See Abercrombie*, 135 S. Ct. at 2032-33. Other District Courts in this Circuit have therefore disregarded this additional element. *See, e.g., Jackson v. NTN Driveshaft, Inc.*, 2017 WL 1927694, at *1 (S.D. Ind. May 10, 2017). This Court will do the same, although it makes no difference because it is undisputed that BCSC was aware of Mr. Kluge's religion-based objections to the Name Policy.

a reasonable fact finder to conclude that retaliatory motive caused the discharge?'" *Id.* (quoting

*Lord v. High Voltage Software, Inc*., 839 F.3d 556, 563 (7th Cir. 2016)).

### B. Motion for Leave to File Brief of Amici Curiae

Movants argue that as highly regarded medical and mental health organizations and a provider of support services to transgender youth in Indiana, they are well-positioned to provide the Court with insight regarding how inclusive policies that respect the names and pronouns that match a student's gender identity have been demonstrated to reduce harm to the student's physical and mental health, including by reducing levels of depression, thoughts of suicide, and attempted suicide among transgender youth. [Filing No. 131 at 2-3.] Movants point out that other courts have routinely permitted them to file amicus briefs to offer their expertise and insight on issues of mental health and welfare, including with respect to transgender youth. [Filing No. 131 at 3 (citing cases).] Movants attach their proposed brief to the motion. [Filing No. 131-1.]

Mr. Kluge responds that "[t]he proposed *amicus* brief . . . does little more than add twenty-two additional pages to BCSC's fifty-page long brief by rehashing—at length and with additional citations—the proposition that some transgender students may experience negative emotions or psychological difficulty when they do not feel socially supported." [Filing No. 145 at 2.] According to Mr. Kluge, "[t]his is not a unique insight, it is not relevant to the salient legal issues in this case, and it will not provide any assistance to the Court not already available in the parties' briefs." [Filing No. 145 at 2.] Specifically, Mr. Kluge contends that the proposed amicus brief sheds no light on whether BCSC suffered an undue burden, what accommodation BCSC ought to have made for Mr. Kluge's religious beliefs, and whether Mr. Kluge has demonstrated retaliation. [Filing No. 145 at 7.] Mr. Kluge asserts that the cases cited by Movants, in which they were permitted to file amicus briefs, are distinguishable from the present case. [Filing No. 145 at 7-9.]

Finally, Mr. Kluge contends that the proposed amicus brief stands for the proposition that calling transgender students by their chosen names respects and affirms their gender identity, but BCSC has argued that using chosen first names is a purely administrative task, and therefore the proposed brief has no relevance to the issues in this case.  [Filing No. 145 at 9-10.]

In reply, Movants argue that the evidence presented in their proposed amicus brief concerning the importance of calling transgender students by names and pronouns that affirm their gender identity "bears directly on a central issue in this case: whether [Mr.] Kluge's proposed accommodation caused an undue hardship on [BCSC]."  [Filing No. 147 at 1.]  According to Movants, "[i]f the scientific evidence shows that Mr. Kluge's proposed accommodation would be contrary to the health and well-being of transgender students, then the accommodation undoubtedly imposed 'more than a *de minimis* cost' to BCSC whose mission is to educate and protect those students."  [Filing No. 147 at 1.]  Movants maintain that their perspective is unique because although the parties address the harm caused to two particular transgender students, Movants explain from a scientific research perspective why the last names only arrangement threatens the mental and physical wellbeing of transgender youth more broadly.  [Filing No. 147 at 2.]

The Seventh Circuit "has held that whether to allow the filing of an amicus curiae brief is a matter of 'judicial grace.'"  *Voices for Choices v. Illinois Bell Tel. Co.*, 339 F.3d 542, 544 (7th Cir. 2003) (quoting *National Organization for Women, Inc. v. Scheidler*, 223 F.3d 615, 616 (7th Cir. 2000)).  In deciding whether to permit such a brief, courts should consider "whether the brief will assist the judges by presenting ideas, arguments, theories, insights, facts, or data that are not to be found in the parties' briefs."  *Voices for Choices*, 339 F.3d at 545.  "The criterion is more likely to be satisfied in a case in which a party is inadequately represented; or in which the would-

be amicus has a direct interest in another case that may be materially affected by a decision in this case; or in which the amicus has a unique perspective or specific information that can assist the court beyond what the parties can provide." *Id.* (citing *Scheidler*, 223 F.3d at 616-17).

The Court acknowledges that Movants and other similar organizations have been permitted to submit amicus briefs in other cases, and that they have provided courts with information and perspectives that are important to addressing legal issues affecting transgender individuals. In the instant case, however, that information is not necessary. As Mr. Kluge acknowledges, the general notion that failing or refusing to affirm a transgender individual's identity using preferred names and pronouns causes psychological and emotional harm is "not a unique insight." [Filing No. 145 at 2.] Indeed, it is undisputed that BCSC accepted that premise as true and sought to alleviate potential psychological and emotional harm to students through its policies and practices concerning the treatment of transgender students. [*See* Filing No. 15-4 at 9 (BCSC's January 2018 "Transgender Questions" document stating "It is our job to make all students feel welcome and accepted in the public school environment").] Even Mr. Kluge acknowledges that failing to affirm the identities of transgender students causes "emotional harm" to those students, although he argues that such harm is insufficient to constitute an undue burden. [*See, e.g.*, Filing No. 153 at 19 ("The emotional discomfort and complaints of two students and a single teacher cannot justify forcing Kluge to face a choice between violating his religious beliefs and losing his job.").] Accordingly, the Court will resolve the pending motions by considering only the parties' briefs, and Movants' Motion for Leave to File Brief of Amici Curiae, [Filing No. 131], is **DENIED**.

### C. Summary Judgment Motions

#### 1. Failure to Accommodate Claim

Mr. Kluge argues that BCSC discriminated against him by refusing to accommodate his sincerely held religious beliefs. [Filing No. 114 at 19-35.] Specifically, he asserts that his belief against promoting transgenderism by using a transgender student's preferred name and pronouns is religious in nature, is sincerely held, and was clearly communicated to BCSC. [Filing No. 114 at 19-23.] He further argues BCSC discriminated against him based on that belief in three ways: (1) "withdr[awing] the last-name only accommodation despite a lack of undue hardship"; (2) "refus[ing] to offer or discuss any other accommodation"; and (3) "coerc[ing] his resignation letter through misrepresentation." [Filing No. 114 at 23-28.] Mr. Kluge contends that BCSC failed to offer any accommodation after it withdrew the last names only accommodation, and even if the last names only accommodation was the only possible accommodation, BCSC cannot show that use of that accommodation would cause undue hardship. [Filing No. 114 at 28-29.] He argues that students' "emotional discomfort" does not constitute undue hardship, and "[t]he fact that BCSC and [Mr.] Kluge agreed to an accommodation and used it successfully for a full semester establishes last-names only as a 'reasonable accommodation' for [Mr.] Kluge's religious beliefs, and also that there was no 'undue hardship' associated with that accommodation." [Filing No. 114 at 29-30.] According to Mr. Kluge, when BCSC informed him that he could no longer use last names only, "BCSC did not detail any undue hardship and did not engage [Mr.] Kluge in any specific discussions concerning undue hardship," but instead Ms. Gordon characterized the last names only arrangement as a "policy violation." [Filing No. 114 at 30.] Mr. Kluge contends that BCSC has not identified any hardship that rises above the *de minimis* level because it has shown no economic costs or disruption to operations and no classroom disruptions, rearrangements of

personnel scheduling, or demonstrably impaired learning outcomes as a result of his use of last names only. [Filing No. 114 at 31.] In fact, he argues, it is undisputed that his orchestra students excelled. [Filing No. 114 at 31.] Mr. Kluge contends that the only hardships identified are the complaints of two students and one teacher, which were not relayed to Mr. Kluge "until well after the fact," as well as "references to unspecified attorneys' fees and 'opportunity costs' for the management of the accommodation," which are not sufficient to constitute undue hardship within the meaning of Title VII. [Filing No. 114 at 31-32.] Finally, Mr. Kluge argues that BCSC's policies regarding transgender students provide accommodations to those students to the detriment of employees' sincere religious beliefs, which are not equally accommodated, creating the suggestion "that transgender rights overrule religious rights and that is the antithesis of reasonableness." [Filing No. 114 at 32-35.]

In its Cross-Motion for Summary Judgment and Response to Mr. Kluge's Motion for Partial Summary Judgment ("Cross-Motion/Response"), BCSC argues that Mr. Kluge cannot establish a prima facie case of discrimination based on failure to accommodate because addressing students by their preferred names and pronouns is a purely administrative task and therefore does not objectively conflict with his sincerely held religious beliefs. [Filing No. 121 at 28-32.] In support of this argument, BCSC cites *Summers v. Whitis*, 2016 WL 7242483 (S.D. Ind. Dec. 15, 2016). [Filing No. 121 at 29-32.] Even if he could establish a prima facie case, BCSC argues, Mr. Kluge's claim still fails because his use of last names only created undue hardship. [Filing No. 121 at 32-43.] Specifically, BCSC contends that its "business" comprises a constitutional statutory obligation to educate students, and Mr. Kluge's use of last names only frustrates that purpose by causing emotional harm to students and impairing BCSC's efforts to educate them. [Filing No. 121 at 34-36.] BCSC further argues that courts have routinely found undue hardship where a

religious accommodation threatens the classroom learning environment. [Filing No. 121 at 36-38 (citing cases).] BCSC asserts that Mr. Kluge's suggestion that the complaints received by the school constitute "heckler's vetoes" and therefore cannot amount to an undue burden is without merit because "[t]hat is not the law" and because the case Mr. Kluge relied upon addresses alleged First Amendment free speech violations and has no application in the Title VII context. [Filing No. 121 at 39.] BCSC also contends that it was not required to offer Mr. Kluge another reasonable accommodation, and instead is only required to demonstrate that no accommodation would be reasonable, which it has done because it is obvious that a high school classroom can only function when teachers address students directly. [Filing No. 121 at 40.] Under these circumstances, BCSC argues, it has established as a matter of law that any accommodation would impose undue hardship. [Filing No. 121 at 41.] In addition, the last names only arrangement created an undue hardship by placing BCSC on "the razor's edge of liability" by exposing it to potential lawsuits by transgender students alleging discrimination. [Filing No. 121 at 41-43.] Finally, BCSC argues that if the Court declines to grant summary judgment in BCSC's favor on the failure to accommodate claim, it should also decline to grant summary judgment in Mr. Kluge's favor on the issue of the sincerity of his religious belief against using transgender students' preferred names and pronouns. [Filing No. 121 at 47-49.] Specifically, BCSC asserts that genuine issues of material fact exist regarding whether Mr. Kluge's belief is sincerely held, given that he used transgender students' preferred names at an orchestra awards ceremony in May of 2018 and that he testified in his deposition that there may be instances in which it is appropriate and consistent with his religious beliefs to address a transgender student by the student's preferred first name. [Filing No. 121 at 48-49.]

In his combined Reply in Support of his Motion for Partial Judgment and Response in Opposition to BCSC's Cross-Motion for Summary Judgment ("Reply/Response"), Mr. Kluge

maintains that his religious belief against using transgender students' preferred names and pronouns is sincerely held. [Filing No. 153 at 32-35.] Mr. Kluge argues that the requirement that BCSC teachers address transgender students using their preferred names and pronouns objectively conflicts with his religious beliefs against affirming transgenderism, and BCSC's position to the contrary "ignores the tremendously important role that names play." [Filing No. 153 at 10-12.] He urges the Court to follow the Sixth Circuit's decision in *Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021), and conclude that using names and pronouns is more than a ministerial act and carries a specific message affirming an individual's gender identity. [Filing No. 153 at 12-13.] Mr. Kluge further reiterates that the last names only accommodation was reasonable. [Filing No. 153 at 14-30.] Specifically, he contends that "[t]he undisputed evidence shows that [Mr.] Kluge's accommodation worked quite well and actually enhanced his ability to educate his students in music and orchestra," because there were no student protests, written complaints, classroom disturbances, or cancelled classes, but rather the students excelled and received awards for their musical performances. [Filing No. 153 at 14-15.] Again relying on *Meriwether*, Mr. Kluge asserts that using students' last names only does not negatively impact the learning environment, and at the very least, an issue of fact remains as to whether the last names only accommodation created an undue hardship. [Filing No. 153 at 15-16; Filing No. 153 at 23-26.] Mr. Kluge points out that BCSC never told him specifically that the last names only accommodation was creating an undue hardship, and instead told him that it was a "policy violation." [Filing No. 152 at 16-17.] Mr. Kluge asserts that "[t]here is no admissible evidence that any students, except two transgender students—Aidyn Sucec and Sam Willis—complained about [Mr.] Kluge's use of last names only," and these complaints "are 'heckler's vetoes,' not evidence of an undue burden or a negative impact on the learning environment." [Filing No. 153 at 17-19.] According to Mr. Kluge, "[t]he

emotional discomfort and complaints of two students and a single teacher[, Mr. Lee,] cannot justify forcing [Mr.] Kluge to face a choice between violating his religious beliefs and losing his job." [Filing No. 153 at 19.]  Mr. Kluge contends that complaints by unnamed students at Equality Alliance Club meetings regarding Mr. Kluge's use of last names only "constitute inadmissible hearsay and hearsay within hearsay," and should not be considered by the Court.  [Filing No. 153 at 21-22.]  Mr. Kluge further argues that any cases cited by BCSC for the proposition that the last names only accommodation exposed it to liability for discrimination against transgender students are inapposite, and "using someone's legal surname does not create any risk of liability."  [Filing No. 153 at 26-28 (distinguishing cases cited by BCSC).]  Mr. Kluge contends that any claim that BCSC feared potential lawsuits is undercut by its failure to conduct any investigation into student complaints.  [Filing No. 153 at 29-30; Filing No. 153 at 29 ("If BCSC felt it might be sued, why did the administration fail to conduct any investigation upon learning of the alleged complaints by unidentified students?").]

In its Reply in Support of Cross-Motion for Summary Judgment ("Reply"), BCSC maintains that this case is indistinguishable from *Summers* and Mr. Kluge has failed to demonstrate an objective conflict between his religious beliefs and the requirement that he refer to transgender students by the names and pronouns listed in PowerSchool.  [Filing No. 150 at 2-6.]  BCSC argues that *Meriwether* is distinguishable because, among other things, it involved claims under the First Amendment and therefore has no application to the objective conflict analysis required for Title VII claims.  [Filing No. 150 at 6-8.]  BCSC asserts that it has established two separate grounds for undue hardship: (1) the last names only accommodation led to complaints and impeded BCSC's mission to educate students; and (2) the continued use of last names only could have resulted in BCSC being exposed to liability for discrimination.  [Filing No. 150 at 8-16.]  According to BCSC,

Mr. Kluge's argument that the last names only accommodation was successful ignores evidence of complaints from members of the BHS community, and his assertion that no undue hardship exists because his students excelled and he did not perceive any problems ignores the undue hardship standard. [Filing No. 150 at 9-10.] BCSC asserts that Mr. Kluge's accommodation did not constitute protected speech, the fact that BCSC never informed Mr. Kluge in writing or otherwise that the accommodation was causing undue hardship and instead called it a policy violation is irrelevant, and Mr. Kluge's description of Aidyn's and Sam's complaints as "heckler's vetoes" or indicative of mere "emotional discomfort" are inapt. [Filing No. 150 at 10-12.] BCSC contends that the complaints about Mr. Kluge's use of last names are not hearsay because they are offered to show their effect on BCSC's state of mind as it relates to whether the accommodation was causing undue hardship. [Filing No. 150 at 12-13.] In addition, BCSC argues that in order to show undue hardship based on potential exposure to liability, it need not prove that it would lose a lawsuit brought by a transgender student, and instead it is sufficient to show that transgender students felt targeted by Mr. Kluge's practices and that law in the Seventh Circuit during the relevant timeframe would have permitted a transgender student to assert a sex discrimination claim under federal law. [Filing No. 150 at 14-16.] Finally, BCSC reiterates that, if the Court declines to grant summary judgment in its favor as to the failure to accommodate claim, the question of the sincerity of Mr. Kluge's religious beliefs should be submitted to the factfinder. [Filing No. 150 at 18-19.]

a. Hearsay Objections

Mr. Kluge argues that the complaints received by Mr. Lee from unidentified students constitute inadmissible hearsay. [Filing No. 153 at 21-22.] "Hearsay is an out-of-court statement offered to prove the truth of the matter asserted." *Khungar*, 985 F.3d at 575 (citing Fed. R. Evid.

801(c)).  The Seventh Circuit has held in another Title VII case that complaints received by an employer do not constitute hearsay when they are not offered to show that the employee in fact engaged in the conduct complained of, but to show the employer's state of mind when making an employment decision.  *Khungar*, 985 F.3d at 575.  A case that Mr. Kluge relies on, *Emich Motors Corp. v. General Motors Corp.*, 181 F.2d 70, 82 (7th Cir. 1950), *rev'd on other grounds*, 340 U.S. 558 (1951), is over 70 years older but stands for the same proposition:  "We agree with the defendants that the complaint letters received by them should have been admitted, not for their testimonial use, to prove the facts contained therein, but to show the information on which they acted.  This is a well-established exception to the hearsay rule."  *See also Walker v. Alcoa, Inc.*, 2008 WL 2356997, at *5 (N.D. Ind. June 9, 2008) ("The Court finds, however, that Musi's testimony regarding the employee complaints he overheard about Sunday absences is not hearsay under Federal Rules of Evidence 801 and 802 because it is not offered for the truth of the matter asserted; instead, Musi's testimony is offered to show the effect of those statements on the hearer, which in this case is the employer.").

Mr. Lee's testimony that he received complaints about Mr. Kluge from students is not offered for the truth of the matter asserted in those complaints, *i.e.*, that Mr. Kluge referred to students by last names only, or that he sometimes "slipped up" and used gendered names and honorifics.  Instead, the testimony is offered to show BCSC's state of mind in considering his continued employment and the information upon which it acted in seeking his resignation.  Mr. Lee's testimony is therefore admissible to that extent.  *See Khungar*, 985 F.3d at 575; *Emich Motors*, 181 F.2d at 82; *Walker*, 2008 WL 2356997, at *5.  *See also Junior v. Anderson*, 724 F.3d 812, 814 (7th Cir. 2013) ("Testimony to what one heard, as distinct from testimony to the truth of what one heard, is not hearsay.").

In any event, Mr. Kluge does not (and could not) challenge the admissibility of the declarations provided by Aidyn and Sam, nor does he challenge the admissibility of the testimony by Dr. Daghe, Dr. Jessup, or Ms. Gordon stating that BCSC received complaints about Mr. Kluge's treatment of transgender students. Nor does he seek to exclude the minutes from the June 2018 Board meeting, which show that Mr. Kluge and BCSC's policies concerning transgender students were subjects of concern for several community members. In other words, even if the Court were to exclude Mr. Lee's testimony that he received complaints from unnamed students, the Court's analysis would remain largely unchanged.[6] Finally, it is also worth noting that while Mr. Kluge may dispute the truth of the matter asserted in the students' complaints to the extent he maintains that he strictly complied with the last names only accommodation and did not refer to any students using their first names or gendered language, that dispute is not material. As addressed more fully below, the question that is ultimately dispositive of Mr. Kluge's failure to accommodate claim is whether, assuming perfect compliance with the last names only accommodation, that accommodation resulted in undue hardship to BCSC.[7]

_____

[6] Mr. Kluge seems to imply that because he was not specifically informed of the complaints as they were being made and was not told who specifically was making the complaints, they did not exist. [*See* Filing No. 153 at 7 (stating that Mr. Kluge disputes that complaints were made by unnamed persons and teachers who did not submit sworn statements because "[n]one of these alleged complaints were made known to [Mr.] Kluge until after his termination" and "[n]one were investigated").] Mr. Kluge has identified no legal authority for his apparent belief that complaints must be relayed to an employee before they can be considered relevant to an employer's decision as to whether an undue hardship exists. Furthermore, the Seventh Circuit has previously rejected a similar argument, concluding that it was not a "justifiable" inference to conclude that complaints were illegitimate based solely on the employee's lack of knowledge of those complaints. *Khungar*, 985 F.3d at 575 ("That [plaintiff] wasn't informed of each complaint tells us only that; it does not mean they were fictitious.").

[7] To the extent that Mr. Kluge makes arguments concerning the credibility of certain witnesses or the weight their testimony should be afforded, [*see* Filing No. 153 at 18 ("Kluge identified credibility issues associated with [Aidyn]'s statement."); Filing No. 153 at 21 ("[Mr.] Lee's inability to identify any other students [who complained] reflects negatively on his credibility.")], the Court has disregarded these arguments because they are not proper at summary judgment, *see,*

b. <u>Adverse Employment Actions</u>

Mr. Kluge identifies three separate purported adverse employment actions that could form the basis of his discrimination claim based on failure to accommodate: (1) withdrawal of the last names only accommodation; (2) refusal to offer or discuss other potential accommodations; and (3) "coerc[ion of] his resignation letter through misrepresentation." [Filing No. 114 at 23.] Because it can be resolved easily, the Court will deal with the last claim first.

**i.  Coercion of Resignation Through Fraud**

Any contention that Mr. Kluge's resignation was coerced through misrepresentation is wholly without merit.  The misrepresentation, according to Mr. Kluge, is that he was led to believe that he could submit a conditional resignation.  But this argument is not supported by the evidence. In dismissing Mr. Kluge's state law fraud claim, the Court has already determined that "Mr. Kluge's written resignation . . . was not expressly conditioned on anything, did not contain any language concerning his ability to withdraw it, and instead merely requested that the letter not be 'processed' and that no one be notified until a certain date." [Filing No. 70 at 39-40.]  In other words, even if Mr. Kluge thought he was permitted to submit a conditional or rescindable resignation, he failed to actually do so.  Furthermore, the evidence presented along with the summary judgment motions demonstrates that Ms. Gordon never told Mr. Kluge that his resignation could be conditional or that he could withdraw it for any reason.  In fact, the transcript of the recorded conversation between Ms. Gordon, Mr. Kluge, and Dr. Daghe concerning "processing" of resignations shows that Ms. Gordon merely discussed the circumstances under which Ms. Gordon and the BCSC administration would respect an employee's wishes not to disclose the employee's resignation to

---

*e.g., Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704-05 (7th Cir. 2011) ("[D]istrict courts presiding over summary judgment proceedings may not 'weigh conflicting evidence,' or make credibility determinations, both of which are the province of the jury." (citations omitted)).

others.  [*See* Filing No. 113-4 at 36-37.]  Her email response to Mr. Kluge's resignation also does not state—or even imply—that Mr. Kluge could rescind his resignation.  [Filing No. 15-2 at 1.]  BCSC's Bylaws and relevant Indiana law concerning school corporation employees' resignations further demonstrates that a "conditional" resignation was not authorized.  Accordingly, to the extent that Mr. Kluge suggests that Ms. Gordon lied to him as a means to coerce his resignation, and that such lying is somehow independently actionable as discrimination, he has presented no evidence to support that theory.

### ii.  Failure to Offer or Discuss Other Potential Accommodations

To the extent that Mr. Kluge argues that BCSC discriminated against him in that it failed to propose an alternative accommodation, or to engage in further discussions regarding a potential accommodation, the law does not require it to do so.  Title VII merely requires an employer to "show, as a matter of law, that any and all accommodations would have imposed an undue hardship." *Adeyeye v. Heartland Sweeteners, LLC*, 721 F.3d 444, 455 (7th Cir. 2013).  Mr. Kluge points to no legal authority supporting his position that failure to offer an alternative accommodation or conduct discussions concerning whether an alternative accommodation may exist constitutes an adverse employment action that can serve as an independent basis for a discrimination claim.  *See Bell v. EPA*, 232 F.3d 546, 555 (7th Cir. 2000) ("Although we define 'adverse employment action' broadly, not everything that makes an employee unhappy is an actional adverse action.  For an employment action to be actionable, it must be a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities or a decision causing a significant change in benefits.'"  (quoting *Burlington Indus. V. Ellerth*, 524 U.S. 742, 761 (1998))); *cf. Bolden v. Caravan Facilities Mgmt., LLC*, 112 F. Supp. 3d 785, 791 (N.D. Ind. 2015) (observing that although the federal regulations

implementing the American with Disabilities Act require an interactive process between the employer and the employee to determine the appropriate reasonable accommodation for the employee's disability, the plaintiff could not cite any comparable regulation imposing an interactive process requirement in Title VII cases).

Similarly, Mr. Kluge has not pointed to any evidence showing that he devised or proposed an alternate accommodation—separate from the last names only accommodation—that BCSC refused to discuss with him. Accordingly, any purported discrimination claim based on a refusal to entertain discussions regarding the possibility of other accommodations is both legally unsupported and inconsistent with the evidence of record.[8]

### iii. Withdrawal of the Last Names Only Accommodation and Forced Resignation

The undisputed facts show that the last names only accommodation was withdrawn, and Mr. Kluge was given the choice to either resign or be terminated; it was not an option for Mr. Kluge to continue his employment without following the Name Policy or BCSC's other directives concerning transgender students. Although the Court has rejected as factually incorrect Mr.

---

[8] It is also significant that Mr. Kluge has not proposed or identified any alternative accommodation that BCSC could have offered, and the Court cannot conceive of any such accommodation. Without conflating the issue of whether the failure to propose or discuss an alternative accommodation constitutes an independent act of discrimination with the issue of whether any potential reasonable accommodation exists that would not result in undue hardship to BCSC, it is sufficient to say that any potential alternative accommodation would succeed or fail for the same reasons the last names only accommodation would. The central issue in this case is whether BCSC could permit Mr. Kluge to refer to students by anything other than their preferred first names as listed in PowerSchool without incurring undue hardship. It is undisputed that Mr. Kluge refused to use those names, and therefore if any other potential accommodation did in fact exist, it would necessarily involve him not using those names. It is the very refusal to use those names that caused the alleged hardships addressed below. Accordingly, if BCSC can demonstrate that the last names only accommodation results in undue hardship, it can demonstrate that any other potential accommodation would result in the same undue hardship. Mr. Kluge has suggested no alternative, and the Court can conceive of none. For those reasons, the Court need not and will not specifically address the issue of other potential accommodations any further in this Order.

Kluge's repeated assertion that his resignation was coerced through misrepresentation, his resignation was "coerced" in the sense that he had to choose between resigning and being terminated. BCSC does not dispute that the end of Mr. Kluge's employment, however it is characterized, constituted an adverse employment action for purposes of a Title VII discrimination claim based on failure to accommodate. *See Leitgen v. Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668, 673 (7th Cir. 2011) ("There is no dispute that [plaintiff's] forced resignation constitutes an adverse employment action . . . ."). The Court will therefore treat Mr. Kluge's forced resignation as the relevant adverse employment action, encompassing the withdrawal of the last names only accommodation and the ultimate end of his employment.

c. Sincerity of Mr. Kluge's Beliefs

"Title VII and courts . . . do not require perfect consistency in observance, practice, and interpretation when determining if a belief system qualifies as a religion or whether a person's belief is sincere. These are matters of interpretation where the law must tread lightly." *Adeyeye v. Heartland Sweeteners, LLC*, 721 F.3d 444, 453 (7th Cir. 2013); *see also Grayson v. Schuler*, 666 F.3d 450, 454-55 (7th Cir. 2012) ("[A] sincere religious believer doesn't forfeit his religious rights merely because he is not scrupulous in his observance; for where would religion be without its backsliders, penitents, and prodigal sons?"). Nevertheless, the sincerity of an individual's religious belief is a question of fact that is generally not appropriate for a court to determine at summary judgment. *EEOC v. Union Independiente de la Autoridad de Acueductos y Alcantarillados de Puerto Rico*, 279 F.3d 49, 56 (7th Cir. 2002). Because BCSC has shown that there are issues of fact as to whether Mr. Kluge's religious beliefs are sincerely held, the Court cannot decide that issue at this juncture. However, for purposes of this Order, the Court will

assume without deciding that Mr. Kluge's religious beliefs against referring to transgender students by their preferred names and pronouns are sincerely held.

### d. Conflict Between BCSC's Policies and Mr. Kluge's Beliefs

In *Summers v. Whitis*, 2016 WL 7242483, *1 (S.D. Ind. Dec. 15, 2016), plaintiff Linda Summers worked as a deputy clerk in the Harrison County, Indiana Clerk's Office until she was fired for refusing to process marriage licenses for same-sex couples based on her religious opposition to same-sex marriage. The Court granted summary judgment in favor of the defendants on Ms. Summers' failure to accommodate claim, concluding that there was no objective conflict between her religious belief and the requirement that she process marriage licenses for same-sex couples. *Id.* at *7. The Court emphasized that the conflict inquiry must be objective, and further determined that Ms. Summers was merely required to process licenses by viewing the application, verifying that certain information was correct, collecting a statutory fee, printing a form, and recording the license in a book for the public record. *Id.* at *5. "She was simply tasked with certifying—on behalf of the state of Indiana, not on her own behalf—that the couple was qualified to marry under Indiana law," a duty which the Court concluded was "purely administrative." *Id.* The Court emphasized that Ms. Summers was not required to perform marriage ceremonies, personally sign marriage certificates, attend marriage ceremonies, say congratulations, offer a blessing, pray with couples, or condone or express religious approval of any particular marriage. *Id.* Because there was no conflict between her religious belief and her job duties, the employer had no duty to accommodate Ms. Summers' beliefs. *See id.* ("If the employee fails to show a bona fide conflict, it makes no sense to speak of a duty to accommodate.") (quoting *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 76 (1986) (Stevens, J., concurring in part and dissenting in part)) (internal quotations omitted).

In *Meriwether v. Hartop*, 992 F.3d 492, 492-503 (6th Cir. 2021), the Sixth Circuit considered whether the district court erred in dismissing a professor's claim that the small public university where he worked violated the First Amendment by disciplining him for refusing to refer to a transgender student using the student's preferred pronouns. In concluding that the professor had stated a claim for violation of his freedom of speech, the court rejected the university's argument that using a student's preferred titles and pronouns is the "type of non-ideological ministerial task would not be protected by the First Amendment." *Id.* at 507. Instead, the court reasoned:

> [T]itles and pronouns carry a message. The university recognizes that and wants its professors to use pronouns to communicate a message: People can have a gender identity inconsistent with their sex at birth. But Meriwether does not agree with that message, and he does not want to communicate it to his students. That's not a matter of classroom management; that's a matter of academic speech.

*Id.*

The Court agrees with BCSC that *Summers* provides the relevant rule that there must be an objective conflict between an employee's religious beliefs and his duties before the employer can be expected to provide a reasonable accommodation related to those beliefs. The Court disagrees, however, with BCSC's argument that *Summers* requires a finding that no such conflict exists in this case. It is inconsistent for BCSC to argue on one hand that referring to students by the names listed in PowerSchool is a purely administrative duty that does not conflict with Mr. Kluge's religious beliefs against affirming a person's transgender identity, while arguing on the other hand that Mr. Kluge's refusal to use the names listed in PowerSchool causes harm to students—and therefore, undue hardship to BCSC—because the students do not feel affirmed in their identities. Accordingly, the Court rejects BCSC's administrative task argument and concludes that Mr.

Kluge's religious beliefs objectively conflict with the Name Policy and BCSC's other requirements concerning how faculty and staff address and refer to transgender students.

To be clear, this conclusion is not the result of the Court's reliance on *Meriwether*. Without expressing an opinion as to the correctness of that case's holding or its application to the facts of this case, the Court observes that *Meriwether* is not binding precedent in this Circuit, that it involved a First Amendment claim rather than a Title VII claim, and that courts have continually emphasized the distinction between public K-12 schools and universities in addressing speech and other constitutional issues. *See, e.g., Grutter v. Bollinger*, 539 U.S. 306, 329 (2003) (recognizing that "universities occupy a special niche in our constitutional tradition"). Having already concluded that an objective conflict exists between BCSC's policies and Mr. Kluge's religious beliefs, it is unnecessary to examine any of these distinctions more closely.

    e. <u>Undue Hardship</u>

Because Mr. Kluge has established a prima facie case of discrimination based on failure to accommodate, the burden shifts to BCSC to demonstrate that it cannot provide a reasonable accommodation "without undue hardship on the conduct of [its] business." 42 U.S.C. § 2000e(j); *Porter*, 700 F.3d at 951. Requiring an employer "to bear more than a *de minimis* cost" or incur more than a "slight burden" constitutes an undue hardship. *EEOC v. Walmart Stores E., L.P.*, 992 F.3d 656, 658 (7th Cir. 2021) (quoting *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977)). "The relevant costs may include not only monetary costs but also the employer's burden in conducting its business." *E.E.O.C. v. Oak-Rite Mfg. Corp.*, 2001 WL 1168156, at *10 (S.D. Ind. Aug. 27, 2001).

### i. Interference with BCSC's Ability to Educate Students

As an initial matter, the Court recognizes that BCSC is in the "business" of providing public education, as required by Indiana statutory and constitutional law. The Indiana Supreme Court has recognized that public schools play a "custodial and protective role," which has been codified by the legislature in passing compulsory education laws that mandate the availability of public education. *Linke v. Nw. Sch. Corp.*, 763 N.E.2d 972, 979 (Ind. 2002). The Indiana Constitution also provides that "it shall be the duty of the General Assembly . . . to provide, by law, for a general and uniform system of Common Schools, wherein tuition shall be without charge, and equally open to all." IND. CONST. art. VIII, § 1.

BCBS argues that Mr. Kluge's failure to address transgender students by the names and pronouns reflected in PowerSchool created undue hardship related to interference with its mission to educate students. To support its position, BCSC asks the Court to analogize the facts of this case to those at issue in *Baz v. Walters*, 782 F.2d 701 (7th Cir. 1986). In *Baz*, a hospital chaplain brought a claim under Title VII against his former employer, the Veterans Administration ("VA"). *Id.* at 702. The chaplain was ultimately terminated for violating the VA's regulations against proselytizing; As a result of his religious beliefs, he "saw himself as an active, evangelistic, charismatic preacher while the chaplain service and the medical staff saw his purpose as a quiescent, passive listener and cautious counselor." *Id.* at 704. The chaplain argued that the VA should be required to accommodate his religious ministry, but the Seventh Circuit disagreed, concluding that the defendants had demonstrated that they could not accommodate the chaplain's religious beliefs without undue hardship and writing:

> [Defendants] have produced evidence tending to show that Reverend Baz's philosophy of the care of psychiatric patients is antithetical to that of the V.A. To accommodate Reverend Baz's religious practices, they would have to either adopt his philosophy of patient care, expend resources on continually checking up on

what Reverend Baz was doing or stand by while he practices his (in their view, damaging) ministry in their facility. None of these is an accommodation required by Title VII.

*Id*. at 706-07.

The Court agrees that the analogy between BCSC as a public-school corporation and the VA hospital in *Baz* is an apt one as it relates to a court's determination of an organization's mission. Just as the chaplain's philosophy of patient care was directly at odds with the philosophy of his employer, Mr. Kluge's religious opposition to transgenderism is directly at odds with BCSC's policy of respect for transgender students, which is grounded in supporting and affirming those students. Under *Baz*, BCSC would not be required to adopt Mr. Kluge's views relative to the treatment of transgender students nor stand by while he expresses those views. *Baz* does not, however, squarely resolve this case, because the central issue here is whether the last names only accommodation—which presents a sort of middle ground between the opposing philosophies of Mr. Kluge on the one hand and BCSC on the other—results in undue hardship to BCSC. No such potential accommodation was addressed in *Baz*.

Nevertheless, the undisputed evidence in this case demonstrates that the last names only accommodation indeed resulted in undue hardship to BCSC as that term is defined by relevant authority. Aidyn's and Sam's declarations show that Mr. Kluge's use of last names only—assuming, only for purposes of this Order, that Mr. Kluge strictly complied with the rules of the accommodation—made them feel targeted and uncomfortable. Aidyn dreaded going to orchestra class and did not feel comfortable speaking to Mr. Kluge directly. Other students and teachers complained that Mr. Kluge's behavior was insulting or offensive and made his classroom environment unwelcoming and uncomfortable. Aidyn quit orchestra entirely. Certainly, this evidence shows that Mr. Kluge's use of the last names only accommodation burdened BCSC's

ability to provide an education to all students and conflicted with its philosophy of creating a safe and supportive environment for all students.[9]  BCSC was not required to allow an accommodation that unduly burdened its "business" in this manner.[10]  *See Erlach v. New York City Bd. of Educ.*, 1996 WL 705282, at *11 (E.D.N.Y. Nov. 26, 1996), *aff'd*, 129 F.3d 113 (2d Cir. 1997) ("interference with students' learning need not be undertaken because it constitutes 'undue hardship' for the employer").

In an attempt to show that his interference with BCSC's business did not rise above the *de minimis* level, Mr. Kluge repeatedly emphasizes that many of his orchestra students were successful during the 2017-2018 school year in that they participated in extracurricular activities and won awards for their musical performances.  He also submitted declarations from students and another teacher stating that they did not perceive any problems in Mr. Kluge's classes resulting from the use of last names only.  These facts may well be true, and are accepted as such, but they are neither dispositive of nor relevant to the undue hardship question.  BCSC is a public-school corporation and as such has an obligation to meet the needs of *all* of its students, not just a majority of students or the students that were unaware of or unbothered by Mr. Kluge's practice of using

---

[9] Interestingly, *Meriwether*, the case upon which Mr. Kluge so vehemently relies as to the objective conflict issue, could fairly be read to support the existence of an undue hardship.  In describing the relevant facts, the Sixth Circuit called the university's suggestion that the professor eliminate all gendered language "a practical impossibility that would also alter the pedagogical environment in his classroom" and noted that the professor was of the opinion that "eliminating pronouns altogether was next to impossible, especially when teaching."  *Meriwether*, 992 F.3d at 499-500.

[10] To the extent that Mr. Kluge argues that the fact that he was permitted to use the last names only accommodation for the full 2017-2018 school year demonstrates that the accommodation was not unreasonable and did not result in undue hardship, he is incorrect.  BCSC attempted in good faith to provide an accommodation to Mr. Kluge.  The fact that BCSC chose to endure the undue hardship resulting from that accommodation for the remainder of the school year, rather than ending Mr. Kluge's employment immediately when the hardship arose, does not support Mr. Kluge's position that the accommodation was reasonable and was not an undue hardship.  BCSC simply honored its agreement.

last names only. BCSC has presented evidence that two specific students were affected by Mr. Kluge's conduct and that other students and teachers complained. And, given that Mr. Kluge does not dispute that refusing to affirm transgender students in their identity can cause emotional harm, this harm is likely to be repeated each time a new transgender student joins Mr. Kluge's class (or, as the case may be, chooses not to enroll in music or orchestra classes solely because of Mr. Kluge's behavior). As a matter of law, this is sufficient to demonstrate undue hardship, because if BCSC is not able to meet the needs of *all* of its students, it is incurring a more than *de minimis* cost to its mission to provide adequate public education that is equally open *to all*.[11]

### ii. Potential for Liability

Title VII does not require employers to provide accommodations that would place them "on the 'razor's edge' of liability." *Matthews v. Wal-Mart Stores, Inc.*, 417 F. App'x 552, 554 (7th Cir. 2011) (citing *Flanagan v. Ashcroft*, 316 F.3d 728, 729-30 (7th Cir. 2003)). *See also E.E.O.C.*

---

[11] Mr. Kluge repeatedly characterizes Aidyn's, Sam's, and others' complaints about Mr. Kluge's conduct as impermissible "heckler's vetoes." [*E.g.*, Filing No. 153 at 19 ("The complaints from Aidyn Sucec and Sam Willis are 'heckler's vetoes,' not evidence of an undue burden or a negative impact on the learning environment.").] The "heckler's veto" doctrine is a concept of First Amendment law providing that although the government may take action to preserve order when unpopular speech is disruptive, it cannot restrict speech merely to prevent another party from reacting adversely. *See Ovadal v. City of Madison*, 416 F.3d 531, 537 (7th Cir. 2005) ("The police must permit the speech and control the crowd; there is no heckler's veto.") (internal quotations and citation omitted). The Court has already dismissed Mr. Kluge's First Amendment freedom of speech claim, [Filing No. 70 at 13-15], and Mr. Kluge has not provided any legal authority in support of his belief that the heckler's veto doctrine applies in the Title VII context. In any event, it makes no sense to apply that concept here. Mr. Kluge asserts that if the Court were to allow a heckler's veto and conclude that "emotional discomfort constituted an undue burden, employers would be able to skirt their duty to accommodate at will, simply by finding an employee offended at the accommodation." [Filing No. 153 at 19.] But the Title VII standard *requires* the Court to consider the impact of any proposed accommodation—including by taking into account the reaction of any so-called "hecklers"—to determine whether undue hardship exists. And, as discussed above, people were not merely "offended" by Mr. Kluge's conduct, the undisputed evidence establishes that his conduct actively interfered with BCSC's mission to provide a safe and supportive educational environment. Mr. Kluge's slippery slope argument is not persuasive.

*v. Oak-Rite Mfg. Corp.*, 2001 WL 1168156, at *10 (S.D. Ind. Aug. 27, 2001) (noting that undue

hardship can be established by showing "that the proposed accommodation would either cause or

increase . . . the risk of legal liability for the employer"); *Sutton v. Providence St. Joseph Med.*

*Ctr.*, 192 F.3d 826, 830 (9th Cir. 1999) ("[C]ourts agree that an employer is not liable under Title

VII when accommodating an employee's religious beliefs would require the employer to violate

federal or state law.").

In *Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d

1034, 1038-39 (7th Cir. 2017), the Seventh Circuit considered whether the district court erred in

granting preliminary injunctive relief to a transgender student who brought claims under Title IX

of the Education Amendments Act of 1972 and the Fourteenth Amendment's Equal Protection

Clause, alleging that his school district discriminated against him by not permitting him to use the

boys' restroom. In affirming the district court's decision, the Seventh Circuit concluded that the

student was likely to succeed on his discrimination claims, the court recognized that discrimination

on the basis of transgender status is actionable under Title IX. *Id.* at 1047-50.

In this case, continuing to allow Mr. Kluge an accommodation that resulted in complaints

that transgender students felt targeted and dehumanized could potentially have subjected BCSC to

a Title IX discrimination lawsuit brought by a transgender student.[12] Whether such lawsuit would

---

[12] Mr. Kluge emphasizes that there is no evidence that Ms. Gordon or any other BCSC employee ever investigated claims of discrimination by transgender students. [*E.g.*, Filing No. 153 at 29.] However, there was never any question that Mr. Kluge was refusing to call transgender students by their preferred pronouns or the names listed in PowerSchool, as Mr. Kluge himself initially and repeatedly informed BCSC and BHS officials of his religious objections to doing so. In other words, it is unclear why the BCSC administration would have needed to conduct any investigation into students' complaints. Mr. Kluge not only confirmed that the complained of conduct was occurring, he represented that he would not change his behavior, and expressed satisfaction when the complaints occurred. Accordingly, the failure to investigate does not undercut BCSC's claim that permitting the last names only accommodation increased its risk of being sued for discrimination.

ultimately have been successful is not for the Court to decide at this juncture, as it is sufficient that the state of the law during Mr. Kluge's employment created a risk of liability, and BCSC considered that risk in determining how to resolve Mr. Kluge's objections to the policies concerning transgender students.[13]  The increased risk of liability also constitutes an undue hardship that Title VII does not require BCSC to bear.

In sum, BCSC has demonstrated as a matter of law that it cannot accommodate Mr. Kluge's religious belief against referring to transgender students using their preferred names and pronouns without incurring undue hardship.  Accordingly, Mr. Kluge's Motion for Partial Summary Judgment is **DENIED**, and BCSC's Cross-Motion for Summary Judgment is **GRANTED** as to Mr. Kluge's failure to accommodate claim.

    *2.  Retaliation Claim*

In its Cross-Motion/Response, BCSC argues that Mr. Kluge cannot establish a prima face case of retaliation because no reasonable jury could conclude that protected activity—specifically, asking for religious accommodations in July 2017—was causally connected to Mr. Kluge's employment ending in June 2018.  [Filing No. 121 at 44-45.]  BCSC points out that it never rescinded its accommodation regarding uniforms, and there is no evidence of complaints concerning that accommodation, which demonstrates that the last names only arrangement was withdrawn because of complaints causing undue hardship, not because of hostility to Mr. Kluge's religious beliefs or because of his request for accommodations.  [Filing No. 121 at 45.]  Even if the Court determines that Mr. Kluge can establish a prima facie case of retaliation, BCSC argues,

---

[13] Although the issue was not specifically raised by the parties, the Court notes that the United States Supreme Court has recognized "the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 66 (2000).  BCSC's Name Policy clearly respected that right, allowing a name change in PowerSchool only with parental permission.

summary judgment should be granted in BCSC's favor because it has articulated a legitimate nondiscriminatory reason for its actions and Mr. Kluge has not submitted evidence from which a reasonable jury could find pretext. [Filing No. 121 at45.] According to BCSC, the fact that it did not disclose to Mr. Kluge the identity of the individuals who complained about the use of last names only is not evidence of pretext, and Mr. Kluge's subjective perceptions that there was no tension with students or faculty do not create a genuine issue of material fact as to pretext given the evidence of complaints. [Filing No. 121 at 45-46.]

In his Response/Reply, Mr. Kluge asserts that he engaged in statutorily protected activity by: (1) identifying a sincerely held religious belief that conflicted with the Name Policy; (2) offering the last names only accommodation; and (3) asking the BCSC administration to confirm in February 2018 that the last names only accommodation was still valid. [Filing No. 153 at 30.] He argues that, as a result of engaging in those activities, he "suffered an adverse employment action when BCSC removed his last-names only accommodation without even claiming any undue hardship, demanded his resignation unless he violated his beliefs, refused to investigate his allegations of discrimination, and coerced him into submitting a conditional resignation they promised not to process until a certain date." [Filing No. 153 at 30.]

In its Reply, BCSC argues that Mr. Kluge's Response/Reply "does not challenge [BCSC]'s lack-of-pretext argument or otherwise attempt to demonstrate pretext," and therefore he has waived any opposition to those arguments and such waiver is fatal to his retaliation claim. [Filing No. 150 at 17.] BCSC also contends that Mr. Kluge's argument that retaliation is evidenced by alleged misrepresentations related to Mr. Kluge's ability to submit a "conditional" resignation is based on an inaccurate recitation of the facts, because it is undisputed that Ms. Gordon never told Mr. Kluge that he could withdraw his resignation whenever he pleased, and in dismissing Mr.

Kluge's state law fraud claim the Court has already concluded that Mr. Kluge did not condition his resignation on anything. [Filing No. 150 at 17-18.]

"To succeed on a Title VII retaliation claim, a plaintiff must produce enough evidence for a reasonable jury to conclude that (1) [he] engaged in a statutorily protected activity; (2) the [employer] took a materially adverse action against [him]; and (3) there existed a but-for causal connection between the two." *Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 378 (7th Cir. 2020) (internal quotations and citations omitted) (second alteration in original). Once the plaintiff establishes a prima facie case of retaliation, the employer may produce evidence that would permit a factfinder to conclude that it had a non-discriminatory reason for taking the adverse employment action. *Id.* (citation omitted). If the employer does so, the burden shifts to the plaintiff to produce evidence that would permit a factfinder to determine that the legitimate reason offered by the employer was pretextual. *Id.*

At the outset, the Court notes that Mr. Kluge's briefing on his retaliation claim is meager, totaling less than three pages and merely reiterating his version of the facts he believes to be relevant without discussion of how those facts meet the requirements of a retaliation claim.[14] Mr. Kluge also does not address the argument raised by BCSC that there is no evidence from which a reasonable factfinder could infer pretext. These issues alone provide a sufficient basis to grant summary judgment in favor of BCSC on the retaliation claim. *See, e.g., Lee v. Chicago Youth Centers*, 69 F. Supp. 3d 885, 889 (N.D. Ill. 2014) (recognizing that Seventh Circuit precedent "consistently holds that undeveloped, unsupported, perfunctory, or skeletal arguments in briefs are

---

[14] Curiously, although Mr. Kluge did not move for summary judgment in his favor on this claim, he also did not assert or attempt to show that summary judgment in BCSC's favor is inappropriate because, for example, disputed issues of fact remain. [*See* Filing No. 153 at 30-32.]

waived"). The Court finds Mr. Kluge has waived any argument in opposition to BCSC's motion for summary judgment as to his retaliation claim, and grants its motion.

In addition, in concluding that Mr. Kluge's retaliation claim should not be dismissed for failure to state a claim, the Court reasoned that it was plausible based on the allegations contained in the Amended Complaint "that school officials, over time, became less inclined to tolerate Mr. Kluge's religious beliefs and used the idea of student complaints as a pretext to withdraw the last-names-only arrangement, refuse to provide another accommodation to which Mr. Kluge was entitled, and force him to resign." [Filing No. 70 at 29.] The Court made clear, however, that it was "assuming that Mr. Kluge's allegations concerning pretext [were] supported by a good-faith basis for asserting them and warn[ed] that the revelation that they were not could have consequences under Federal Rule of Civil Procedure 11 and 28 U.S.C § 1927." [Filing No. 70 at 29 n.9.] That warning makes Mr. Kluge's failure to attempt to produce evidence of pretext—or even address BCSC's pretext argument at all in his Response/Reply brief—all the more perplexing.

In any event, Mr. Kluge has not presented evidence from which a reasonable factfinder could conclude that a causal connection exists between Mr. Kluge's protected activity and his ultimate resignation,[15] that any of BCSC's reasons for the actions it took against Mr. Kluge were pretextual, or that any of BCSC's action were motivated by retaliatory animus. "It is not unreasonable for [a school] to expect that its instructors will teach classes in a professional manner that does not distress students," *Smiley v. Columbia Coll. Chicago*, 714 F.3d 998, 1002 (7th Cir.

---

[15] Mr. Kluge also asserts in one of the headings in his brief that BCSC retaliated against him "by misrepresenting material facts in order to secure his resignation." [Filing No. 153 at 30 (capitalization omitted).] For the reasons discussed above, the Court rejects this argument because the evidence establishes that Ms. Gordon did not make any misrepresentations and that despite his repeated assertions to the contrary, Mr. Kluge's resignation was not conditional, it merely had a delayed effective date. The adverse actions at issue are BCSC's withdrawal of the last names only accommodation and his forced resignation.

2013), and nothing in the record suggests that BCSC officials were acting with any motive other than to ensure such was the case. The undisputed evidence shows that Mr. Kluge initially sought two accommodations based on his religious objections to affirming transgenderism—the last names only accommodation and the exemption from handing out gender specific uniforms—and received what he asked for. Only after BCSC received complaints about the last names only accommodation did the administration seek to withdraw it, and even then, Mr. Kluge was not immediately terminated but was permitted to finish out the academic year. Dr. Daghe offered to write Mr. Kluge letters of recommendation to help him find a new position. BCSC never withdrew the uniform accommodation, and there is nothing in the record to suggest that any member of the school community complained about that accommodation. Furthermore, the evidence is undisputed that BCSC and BHS administrators were acting because of complaints received from the school community, and there is nothing in the record to suggest that the complaints were fabricated or that another motive was possible. "Pretext does not exist if the decision-maker honestly believed the nondiscriminatory reason for its employment action." *Id.* at 1005.

Based on the foregoing, BCSC is entitled to judgment as a matter of law on Mr. Kluge's retaliation claim, and BCSC's Cross-Motion for Summary Judgment is **GRANTED** as to that claim.

## IV.
### CONCLUSION

So, what's in a name? This Court is ill-equipped to answer that question definitively, but for the reasons articulated in this Order, it concludes that a name carries with it enough importance to overcome a public school corporation's duty to accommodate a teacher's sincerely held religious beliefs against a policy that requires staff to use transgender students' preferred names when supported by a parent and health care provider. Because BCSC did not coerce Mr. Kluge's

resignation by misrepresentation and could not accommodate Mr. Kluge's religious beliefs without sustaining undue hardship, and because Mr. Kluge has failed to make a meaningful argument or adduce evidence in support of a claim for retaliation, BCSC's Cross-Motion for Summary Judgment, [120], is **GRANTED** and Mr. Kluge's Motion for Partial Summary Judgment, [112], is **DENIED**. And because empirical data from non-parties concerning the importance of honoring a transgender student's preferred name and pronouns was not necessary to resolve the issues currently before the Court, Movants' Motion for Leave to File Brief of Amici Curiae, [131], is also **DENIED**. Finally, BCSC's Motion to Vacate and Continue Final Pre-Trial Conference and Trial, [156], is **DENIED AS MOOT**. Final judgment shall issue accordingly.

Date: 7/12/2021

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**