# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT



Everett McKinley Dirksen
United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604

Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

**CERTIFIED COPY**

### NOTICE OF ISSUANCE OF MANDATE

A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

August 7, 2023

To:  Roger A. G. Sharpe
UNITED STATES DISTRICT COURT
Southern District of Indiana
United States Courthouse
Indianapolis, IN 46204-0000

| | |
|---|---|
| No. 21-2475 | JOHN M. KLUGE, <br>          Plaintiff - Appellant <br><br> v. <br><br> BROWNSBURG COMMUNITY SCHOOL CORPORATION, <br>          Defendant - Appellee |

| **Originating Case Information:** |
|---|
| District Court No: 1:19-cv-02462-JMS-DLP |
| Southern District of Indiana, Indianapolis Division |
| District Judge Jane Magnus-Stinson |

Herewith is the mandate of this court in this appeal, along with the Bill of Costs, if any. A
certified copy of the opinion/order of the court and judgment, if any, and any direction as to
costs shall constitute the mandate.

RECORD ON APPEAL STATUS:                    No record to be returned

form name: **c7_Mandate**     (form ID: **135**)

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

July 28, 2023

**CERTIFIED COPY**

A True Copy
Teste:

ILANA DIAMOND ROVNER, *Circuit Judge*

MICHAEL B. BRENNAN, *Circuit Judge*

AMY J. ST. EVE, *Circuit Judge*

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

No. 21-2475

JOHN M. KLUGE,
        *Plaintiff-Appellant*,

    *v.*

BROWNSBURG COMMUNITY
SCHOOL CORP.,
        *Defendant-Appellee*.

Appeal from the United States District Court
for the Southern District of Indiana,
Indianapolis Division.

No. 1:19-CV-02462

Jane Magnus-Stinson, *Judge*.

## O R D E R

In light of the Supreme Court's clarification in *Groff v. DeJoy*, 143 S. Ct. 2279 (2023), of the standard to be applied in Title VII cases for religious accommodation, our opinion and judgment in this case are vacated and this case is remanded for the district court to apply the clarified standard to the religious accommodation claim in the first instance.  We leave to the district court's discretion whether to reopen discovery on remand.

No judge of the court[1] having called for a vote on the Petition for Rehearing and Rehearing En Banc, filed by Plaintiff-Appellant on April 21, 2023, and all of the judges on the original panel having voted to deny the same,

    **IT IS HEREBY ORDERED** that the Petition for Rehearing and Rehearing En Banc is **DENIED.**

---

[1] Circuit Judge Doris L. Pryor did not participate in consideration of this petition.

# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

Everett McKinley Dirksen
United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604



Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

## FINAL JUDGMENT

April 7, 2023

Before

ILANA DIAMOND ROVNER, *Circuit Judge*

MICHAEL B. BRENNAN, *Circuit Judge*

AMY J. ST. EVE, *Circuit Judge*

|  |  |
|---|---|
| No. 21-2475 | JOHN M. KLUGE,<br>        Plaintiff - Appellant<br><br>v.<br><br>BROWNSBURG COMMUNITY SCHOOL CORPORATION,<br>        Defendant - Appellee |
| **Originating Case Information:** ||
| District Court No: 1:19-cv-02462-JMS-DLP<br>Southern District of Indiana, Indianapolis Division<br>District Judge Jane Magnus-Stinson ||

The judgment of the District Court is AFFIRMED, with costs, in accordance with the decision of this court entered on this date.

Clerk of Court

In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 21-2475

JOHN M. KLUGE,

*Plaintiff-Appellant,*

*v.*

BROWNSBURG COMMUNITY
SCHOOL CORP.,

*Defendant-Appellee.*

———————————

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:19-CV-02462 — **Jane Magnus-Stinson**, *Judge.*

———————————

ARGUED JANUARY 20, 2022 — DECIDED APRIL 7, 2023

———————————

Before ROVNER, BRENNAN, and ST. EVE, *Circuit Judges.*

ROVNER, *Circuit Judge.* John M. Kluge brought a Title VII religious discrimination and retaliation suit against Brownsburg Community School Corporation ("Brownsburg") after he was terminated from his employment as a teacher for refusing to follow the school's guidelines for addressing students. Brownsburg requires its high school teachers to call all students by the names registered in the school's official

student database, and Kluge objected on religious grounds to using the first names of transgender students to the extent that he deemed those names not consistent with their sex recorded at birth. After Brownsburg initially accommodated Kluge's request to call all students by their last names only, the school withdrew the accommodation when it became apparent that the practice was harming students and negatively impacting the learning environment for transgender students, other students both in Kluge's classes and in the school generally, as well as the faculty. The district court granted summary judgment in favor of the school after concluding that the undisputed evidence showed that the school was unable to accommodate Kluge's religious beliefs and practices without imposing an undue hardship on the school's conduct of its business of educating all students that entered its doors. The district court also granted summary judgment in favor of Brownsburg on Kluge's retaliation claim. We agree that the undisputed evidence demonstrates that Kluge's accommodation harmed students and disrupted the learning environment. Because no reasonable jury could conclude that harm to students and disruption to the learning environment are *de minimis* harms to a school's conduct of its business, we affirm. Our dissenting colleague asserts that there are genuine issues of material fact regarding undue hardship but he mischaracterizes the harms claimed by the school and focuses on fact questions that are not legally relevant to the outcome of the discrimination claim, in particular suggesting that a jury should reweigh the harms using information not known to the school at the time of the occurrences in issue, and not relevant to the ultimate question.

## I.

On summary judgment, we must construe the facts in favor of the nonmovant, and may not make credibility determinations or weigh the evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *McCottrell v. White*, 933 F.3d 651, 655 (7th Cir. 2019); *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). We therefore construe the facts in favor of Kluge. Brownsburg is a public school corporation in Brownsburg, Indiana. The Indiana Constitution requires the State's General Assembly "to provide, by law, for a general and uniform system of Common Schools, wherein tuition shall be without charge, and equally open to all." Ind. Const. art. VIII, § 1. School attendance is compulsory in the State by statute. Ind. Code § 20-33-2-4. Brownsburg is governed by an elected Board of Trustees. R. 120-1, at 2. At the relevant time, the corporation and school leadership included the Board President, Phil Utterback; the Superintendent, Dr. Jim Snapp; the Assistant Superintendent, Dr. Kathryn Jessup; the Human Resources Director, Jodi Gordon; and the principal, Dr. Bret Daghe. R. 120-1, at 2–3; R. 120-2, at 3; R. 113-3, at 5; R. 113-4, at 5. Brownsburg High School was the sole public high school in the district. R. 120-2, at 2.

Brownsburg hired Kluge in August 2014 to serve as the sole music and orchestra teacher at the high school. R. 113-2, at 2; R. 120-2, at 3. In that capacity, he taught beginning, intermediate, and advanced orchestra; beginning music theory; and advanced placement music theory. He also assisted the middle school orchestra teacher in teaching classes at the middle school. R. 120-3, at 19–20. Kluge remained employed in

that capacity until the end of the 2017–2018 academic year. R. 120-2, at 3.

Prior to the start of that school year, officials at Brownsburg became aware that several transgender students were enrolled as freshmen. R. 120-1, at 3. This awareness led to discussions among the Brownsburg leadership to address the needs of these students. Gordon and Drs. Snapp, Jessup, and Daghe reached a "firm consensus" that transgender students "face significant challenges in the high school environment, including diminished self-esteem and heightened exposure to bullying." R. 120-1, at 3. According to Dr. Jessup, the Brownsburg leaders concluded that "these challenges threaten transgender students' classroom experience, academic performance, and overall well-being." R. 120-1, at 3. The group began to discuss and consider practices and policies that could address these challenges.[1] R. 120-1, at 3–4.

The staff of the school first became aware of these discussions in January 2017, when administrators invited Craig Lee, a Brownsburg teacher and faculty advisor for the high school's Equality Alliance Club, to speak about transgenderism at a faculty meeting.[2] R. 15-3, at 2; R. 58-2, at 1–2. At

---

[1]     The policies and practices eventually adopted by Brownsburg to address concerns about transgender students were not formally ratified by the Board, but they did operate as directives that teachers were required to follow. We refer to them as policies for convenience.

[2]     The Equality Alliance Club is a student club at the school that meets weekly to discuss social and emotional issues affecting all students, including LGBTQ students. R. 58-2, at 2; R. 112-5, at 9. Attendance varied from twelve to forty students at any given meeting, and often included
(continued)

No. 21-2475                                                                5

another faculty meeting in February 2017, Lee and guidance
counselor Laurie Mehrtens gave a presentation on what it
means to be transgender and how teachers can encourage and
support transgender students. R. 15-3, at 2.

After these faculty meetings, Kluge and three other teach-
ers approached Dr. Daghe on May 15, 2017, to speak about
issues related to transgender students. R. 15-3, at 2; R. 113-5,
at 6; R. 120-3, at 11. The four teachers presented Dr. Daghe
with a seven-page letter expressing religious objections to
transgenderism, taking the position that the school should not
treat gender dysphoria as a protected status, and urging the
school not to require teachers to refer to transgender students
by names or pronouns that the teachers deemed inconsistent
with the students' sex recorded at birth. R. 113-1, at 26–32.
Kluge identifies as Christian and is a member of Clearnote
Church. R. 113-1, at 4. Kluge believes that gender dysphoria
"is a type/manifestation of effeminacy, which is sinful."
R. 113-1, at 5. Kluge describes "effeminacy" as "for a man to
play the part of a woman or a woman to play the part of a
man and so that would include acting like/dressing like the
opposite sex." R. 120-3, at 6. In addition to believing that gen-
der dysphoria itself is sinful, Kluge believes that it is sinful to
"promote gender dysphoria." R. 120-3, at 7. Because the
transgender students changed their first names in order to
"present[] themselves as the opposite sex," Kluge believes

───────────

transgender students. R. 120-14, at 6. Dr. Daghe described it more broadly
as a club trying to make the culture and climate of the school the best it
could be. R. 112-5, at 9.

that calling those students by their preferred names would be "encouraging them in sin." R. 120-3, at 10.

The American Psychiatric Association has a very different view of gender dysphoria for adolescents and adults, which it defines as a "marked incongruence between one's experienced/expressed gender and assigned gender, of at least six months duration," and manifested by at least two of the six listed criteria. Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, 2013 ("DSM-5"), at 452. "The condition is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning." DSM-5, at 453. *See also Campbell v. Kallas*, 936 F.3d 536, 538 (7th Cir. 2019) (describing gender dysphoria as "an acute form of mental distress stemming from strong feelings of incongruity between one's anatomy and one's gender identity"). Kluge does not agree with the DSM-5 definition of gender dysphoria. R. 120-3, at 5–6.

At the May 15, 2017 meeting, Dr. Daghe discussed what he considered to be an accommodation to these teachers, namely, a policy that all teachers would use the names and pronouns recorded in the school's official student database, "PowerSchool." R. 112-5, at 5–6. The PowerSchool database contained names, gender markers, preferred pronouns and other data for all students at the school. R. 113-3, at 6; R. 113-5, at 4. According to Kluge, Dr. Daghe indicated that he had resisted the pressure to change the students' names in Power-School but would make this change if it would resolve the teachers' concerns regarding how to address transgender students. R. 120-3, at 12.

No. 21-2475                                                    7

The three teachers who had signed onto Kluge's letter accepted Dr. Daghe's suggested practice that they would use the PowerSchool names and pronouns, and indicated to Dr. Daghe that they would comply with it going forward. R. 120-3, at 12. Kluge was shocked that the three other teachers "did an about-face" but he said nothing at that time. R. 120-3, at 12. According to Kluge, after the meeting with all four teachers concluded, he went back into Dr. Daghe's office and told him to "keep up the good work" of resisting the pressure of changing the names in PowerSchool. R. 120-3, at 12. Dr. Daghe left these meetings believing that all four teachers had agreed to this practice. R. 112-5, at 5–6. Kluge, however, believed that he and Dr. Daghe were "on the same page," that he could continue to use the students' "legal names," and that "we would not be promoting transgenderism in our school." R. 120-3, at 12.

The Brownsburg leadership settled on the practice of requiring teachers to use the PowerSchool names and pronouns ("Name Policy") as part of the larger plan to address the needs of transgender students. R. 120-1, at 3–4; R. 112-5, at 5. In addition to the Name Policy, transgender students were permitted to use the restrooms of their choice and dress according to the gender with which they identified, wearing school-related uniforms consistent with that gender. R. 112-5, at 5. Transgender students wishing to change their names, gender markers or pronouns in PowerSchool were permitted to do so only if they first presented two letters, one from a parent and one from a healthcare professional regarding the need for the changes. R. 120-1, at 4. Dr. Jessup explained that the Name Policy furthered two primary goals:

> First, the practice provided the high school fac-
> ulty a straightforward rule when addressing
> students; that is, the faculty need and should
> only call students by the name listed in Pow-
> erSchool. Second, it afforded dignity and
> showed empathy toward transgender students
> who were considering or in the process of gen-
> der transition. Stated differently, the admin-
> istration       considered       it       important       for
> transgender students to receive, like any other
> student, respect and affirmation of their pre-
> ferred identi[t]y, provided they go through the
> required and reasonable channels of receiving
> and providing proof of parental permission and
> a healthcare professional's approval.

R. 120-1, at 4.

A little more than a week before the start of the 2017–2018
school year, Mehrtens (the guidance counselor) sent emails to
several teachers, including Kluge, informing them that they
would have a transgender student in their classrooms in the
upcoming year. R. 120-3, at 13; R. 15-3, at 3. According to one
email that Kluge received, the student was transitioning from
female to male, and had changed his name and pronouns in
the PowerSchool database. Mehrtens said:

> Parents are supportive and aware—Feel free to
> use "he" and "[student's preferred name]"
> when communicating.

R. 120-11, at 2 (student's name redacted in the record). Kluge
received two such emails, one for each of the transgender

students he would have in his classes that year. R. 120-3, at 13. At first he was shocked that the school was moving in this direction, but because the email contained the language "feel free to use," he read the emails as "permissive, not mandatory," and planned to use the students' "legal names."[3] R. 120-3, at 13–14; R. 15-3, at 3.

On July 27, 2017, the first day of classes at Brownsburg, Kluge met briefly with Dr. Daghe and informed him that he would not call the transgender students by their PowerSchool names and pronouns. He reiterated that he had a religious objection to this practice. Dr. Daghe directed him to stay in his office and consulted the Superintendent, Dr. Jim Snapp. R. 120-3, at 14; R. 15-3, at 3. Later that morning, Drs. Daghe and Snapp met with Kluge to discuss the issue. Dr. Snapp told Kluge that he was required to use the names recorded in the PowerSchool database. Kluge explained again that it was against his sincerely held religious beliefs to use anything other than the names recorded on the students' original birth certificates. Dr. Snapp then presented him with three options:

---

[3]     As was the case with the district court, we find Kluge's use of the terms "transgender names" and "legal names" imprecise. Many transgender people change their legal names and both of the transgender students in Kluge's classes did so, albeit after the school year in question. There is no evidence in the record regarding what name Kluge planned to use if transgender students changed their legal names, although much of his testimony suggests that his religious objections would remain. Although a person may be transgender, a name may not be, and so we will refer to the students' new names as their "preferred names" or "PowerSchool names." This is not to imply that this was a casual preference of the students alone; as we noted, the students' parents and healthcare providers signed off on any changes to the names in PowerSchool.

comply with the Name Policy; resign; or be suspended pending termination. When Kluge refused to comply or resign, Dr. Snapp suspended him pending termination and told him to go home. R. 120-3, at 14–16; R. 15-3, at 3.

In the course of that July 27 meeting, Kluge told Dr. Snapp the name of his pastor, Dave Abu-Sara. R. 120-3, at 15–16. Kluge did not know who initiated the contact, but soon after the July 27 meeting, Kluge believed that Dr. Snapp and Abu-Sara spoke on the phone. According to Kluge, Abu-Sara told Kluge that he had asked Dr. Snapp to give Kluge the weekend to think about his options, and Dr. Snapp had agreed. R. 120-3, at 15–16. On Monday, July 31, Kluge returned to the school and met with Dr. Snapp and Human Resources Director Jodi Gordon. Dr. Snapp and Gordon reiterated that Kluge had to choose between complying with the Name Policy or termination. R. 120-3, at 17. They presented him with a memo and draft agreement from Dr. Daghe stating:

> You are directed to recognize and treat students in a manner using the identity indicated in PowerSchool. This directive is based on the status of a current court decision applicable to Indiana.
>
> You are also directed to not attempt to counsel or advise students on his/her lifestyle choices.
>
> Please indicate below if you will comply with this directive. This document must be returned to me by noon on Monday, July 31, 2017.
>
> _____ Yes, I will comply with this directive.
>
> _____ No, I will not comply with this directive.

No. 21-2475                                                              11

_____          _____

John Kluge, teacher             Date

cc: Personnel file

R. 15-1.[4]

Kluge then presented Dr. Snapp and Gordon with two re-quested accommodations: first, that he be allowed to refer to all students by their last names only, "like a gym coach;" and second, that he not be responsible for handing out gender-specific orchestra uniforms to students. He would treat the class like an "orchestra team," he proposed. He agreed that, if

---

[4]      Kluge has never objected to the directive that he "not attempt to counsel or advise students on his/her lifestyle choices." Neither party ad-dressed this term of the agreement in the briefing, but Dr. Snapp testified that Kluge requested "the ability to talk directly to students about their eternal destination," which Dr. Snapp told him was not allowed. R. 112-6, at 6. This directive is consistent with that conversation. *See also* R. 120-5, at 8 (Dr. Daghe testifying that he included that statement because Kluge's "job was to teach the students, not to make sure he was letting them know his opinion one way or the other," and because he "did not want one of my teachers counseling or advising students on their choices."). The "cur-rent court decision applicable to Indiana" was likely our decision in *Whit-aker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034 (7th Cir. 2017), abrogated on other grounds by *Illinois Republican Party v. Pritzker*, 973 F.3d 760 (7th Cir. 2020), which had been issued two months prior to this meeting. We held there that a transgender student had a reasonable likelihood of succeeding on the merits of a Title IX sex discrimination claim based on a theory of sex-stereotyping. 858 F.3d at 1048–50. Although the dissent asserts that nothing in the record indicates that *Whitaker* was the decision to which the school referred, Kluge never contested the point and instead simply argued that any suit brought by a student on these facts under *Whitaker* would be frivolous. Because we de-cline to address the Title IX issue, we need not address this matter further.

a student asked him why he was using last names only, he
would not mention his religious objections to using transgen-
der students' first names and would explain, "I'm using last
names only because we're a team, we're an orchestra team,
just like a sports coach says, hey, Smith, hey, Jones. We are
one orchestra team working towards a common goal."
R. 120-3, at 17. Dr. Snapp and Gordon agreed that this was an
acceptable arrangement. They also agreed to assign the task
of handing out orchestra uniforms to another person so that
Kluge would not be required to hand students clothing that
he believed was inconsistent with their sex recorded at birth.
R. 120-3, at 17. To memorialize this new understanding, Gor-
don altered the document presented to Kluge: after the first
paragraph, she wrote, "We agree that John may use last name
only to address students." At the bottom of the page, she
wrote, "In addition, Angie Boyer will be responsible for dis-
tributing uniforms to students." She initialed both changes.
Kluge checked the "I will comply" line, and signed and dated
the form. R. 15-1.

Kluge then began to teach his regularly assigned classes
which included two transgender students, Aidyn Sucec and
Sam Willis.[5] R. 120-3, at 20. Within a month, Dr. Daghe began
to hear complaints about Kluge from Lee, the faculty advisor
of the Equality Alliance Club. R. 120-2, at 4; R. 58-2, at 2–3;
R. 120-14, at 7–8. Lee was also a member of the school's three-

---

[5]      As we note below, Sam Willis did not change his name and gen-
der marker in PowerSchool until the end of September 2017. R. 120-3, at
20.

No. 21-2475                                                           13

teacher Faculty Advisory Committee. R. 120-2, at 4. In an August 29, 2017 email to Dr. Daghe, Lee reported:

> I wanted to follow up regarding the pow-
> erschool/students changed name discussion at
> the Faulty Advisory as some issue[s] have
> arisen in the last few days that need to be ad-
> dressed. … There is a student who has had their
> name changed in powerschool. They are a fresh-
> man who this teacher knew from 8th grade. The
> teacher refuses to call the student by their new
> name. I see this is a serious issue and the stu-
> dent/parents are not exactly happy about it. …
> As the student said, "what more are we sup-
> posed to do?"

R. 120-15, at 2. *See also* R. 120-12 (September 1, 2017 letter to the school from parent of student noting child's transgender status and reporting problems with a teacher who uses incorrect gendered language against the wishes of the parents and medical providers of the child, leading to confusion for other students on how to address the child); R. 120-13 (August 30 through September 21, 2017 email chain between parent and school counselor regarding student's transgender status, updates to PowerSchool database, and repeated problems with Kluge using incorrect gendered language that the parent characterizes as "very disrespectful and hurtful," and which causes the child "a lot of distress."). Lee also described the situation of a student in the process of a PowerSchool name change, whose supportive parent asked the teacher to start using the new name, and the teacher refused, citing the Name

Policy. R. 120-15, at 2. Lee closed his email by turning the problem over to Dr. Daghe:

> I know that this is something that must be hard to deal with from your perspective. You are trying to do the right thing for your employees and students alike. I absolutely do not envy your position and thus far you have been incredibly supportive and it means a lot. However, there is confusion amongst some teachers and students that I think needs clarification and perhaps a teacher or two that needs to know that it is not ok to disobey the powerschool rule.

> I hope this makes sense mate. Maybe me, you and Kat need to sit down and talk about this. I am not totally sure and of course I am very biased. However, I have always admired your leadership and now look to you for the next step.

R. 120-15, at 2–3.

Lee also began to report to Dr. Daghe on comments he was hearing from students who attended the Equality Alliance meetings, where Kluge's behavior became a frequent topic of conversation. R. 58-2, at 2–4; R. 120-14, at 7–14; R. 120-2, at 4. According to Lee, both Aidyn and Sam discussed during those meetings how Kluge was referring to them by their last names only, a practice they found insulting and disrespectful. R. 58-2, at 2; R. 120-14, at 7. Lee confirmed that Aidyn and Sam attributed Kluge's last names practice to their presence in the classroom, and this made them feel isolated and targeted.

No. 21-2475                                                                          15

R. 58-2, at 2–3; R. 120-14, at 7–8. "It was clearly visible the
emotional distress and the harm that was being caused to-
wards them. It was very, very clear, and, so, that was clear for
everyone to see but that is also what they described as well,"
Lee testified. R. 120-14, at 7–8. When asked if it was his inter-
pretation that Sam and Aidyn "felt as if they were being dis-
criminated against by Mr. Kluge," Lee replied, "I wouldn't
describe it so much as an interpretation. It was just very, very
clear at the meetings to see how much emotional harm was
being caused towards Sam and Aidyn. It was clear for every-
one at the meetings just to see how much of an impact it was
having on them. … [I]t was so clearly visible that I don't feel
like there was anything necessarily to interpret." R. 120-14, at
8. Lee passed these concerns onto Dr. Jessup as well.
R. 120-14, at 8. Although Kluge asserted that he was perfectly
compliant in the use of last names only, Lee also reported that
students complained that Kluge would occasionally slip up
and use first names or gendered honorifics rather than last
names only.[6] R. 58-2, at 3; R. 120-14, at 8–9.

---

[6]      In his deposition, Kluge testified, "From Day 1 I was consistent in
using last names only and using it for all students. I didn't target stu-
dents." R. 120-3, at 36. Because we must construe the record in favor of
Kluge on summary judgment, we credit his testimony that he was per-
fectly compliant with the Name Policy and never slipped up. However, in
a letter to the Equal Employment Opportunity Commission, Kluge's law-
yer stated, "Kluge made a good faith effort to address all students by last
names and to never 'misgender' students. He admits that he may have
made occasional mistakes in referring to students he formerly called by
their first names." R. 120-19, at 7. In any case, we may also credit Lee's
statement that he conveyed to administrators that students complained
that Kluge did slip up, not for the truth of the matter but to show the state
                                                              (continued)

In addition to the complaints of the transgender students, Lee reported that he had been approached by a student who was not in the Equality Alliance but was in Kluge's orchestra class. R. 58-2, at 3; R. 120-14, at 9. That student, who did not identify as LGBTQ, told Lee that Kluge's use of last names made him feel incredibly uncomfortable. The student described Kluge's practice as very awkward because the student was fairly certain that all the students knew why Kluge had switched to using last names, and that it made the transgender students in the orchestra class stand out. The student felt bad for the transgender students, and shared with Lee that other students felt this way as well. R. 58-2, at 3; R. 120-14, at 9. Some students believed that Kluge avoided acknowledging transgender students who raised their hands in class. R. 58-2, at 3; R. 120-14, at 8–9. Kluge denied doing so, but the evidence is undisputed that these sorts of complaints were reported to school administrators.

---

of mind of the school administrators receiving these reports. In addition to Lee's testimony, as we discuss below, two transgender students in Kluge's classes averred that Kluge sometimes used gendered honorifics or first names for non-transgender students. Because Kluge denies this, we assume Kluge's perfect compliance for the purpose of the summary judgment motion. Kluge does not, however, contest that the students conveyed such complaints to teachers and administrators, and this is relevant to the administrators' state of mind. *See Khunger v. Access Cmty. Health Network*, 985 F.3d 565, 575 (7th Cir. 2021) (out-of-court complaints about an employee are admissible when offered not for their truth but to show the employer's state of mind when making a termination recommendation). Moreover, Kluge submitted no evidence that the teachers and administrators did not honestly believe the reports that Kluge was not fully compliant.

No. 21-2475                                              17

The record also contains sworn statements from Sam Willis and Aidyn Sucec memorializing their experiences in Kluge's class. R. 58-1 (Willis Affidavit); R. 22-3 (Sucec Affidavit). Sam averred that he knew Kluge from his participation in music programs in middle school. After deciding to publicly transition at the start of his sophomore year (2017–2018), Sam emailed the school counselor that he would be using the name "Samuel" and masculine pronouns going forward. His mother emailed Kluge directly about the change because Kluge had known Sam by a different name in middle school. Kluge did not respond to the email and Sam reported that Kluge referred to him as "Miss Willis" on several occasions.[7] This led to other students questioning Sam's sex, which was upsetting to him. In early fall, Sam's mother requested that he be allowed to wear a tuxedo for a fall concert. At that point, the school informed Sam's mother about the new PowerSchool Name Policy. Sam's parents then submitted the required letters from themselves and Sam's healthcare provider, and his name and gender markers were amended in PowerSchool in time to get the tuxedo. According to Sam, Kluge then stopped calling him "Miss Willis," but sometimes used gendered honorifics such as "Miss" or "Mr." and gen-

---

[7]      Although Sam did not change his name and gender markers in PowerSchool until late September 2017, Kluge's use of the term "Miss Willis" would have violated the Name Policy because of the use of the gendered honorific "Miss." Kluge understood that his accommodation required him to use last names only and refrain from using gendered honorifics in all of his classes, whether or not there were transgender students in the class. R. 120-3, at 18. Nevertheless, Kluge denies ever slipping up, and we credit that testimony as we discuss above.

dered pronouns when referring to students who were not transgender. Sam reported that Kluge's last names practice was awkward because most students knew why Kluge had made the switch, contributing to Sam's sense that he was being targeted because of his transgender identity. Sam explained that he felt hurt by Kluge's treatment, and that his family was hurt and angry that Kluge thought he knew better than they did. He averred that Kluge's actions exposed him to widespread public scrutiny in high school. R. 58-1.

Aidyn Sucec, who began high school the same year that the Name Policy went into effect, averred that, after years of struggling with depression and anxiety, he was diagnosed with gender dysphoria in the spring of 2017. While receiving treatment from medical providers for that condition, Aidyn began to take steps to socially transition, including changing his name and asking others to use male pronouns to refer to him. He explained, "Being addressed and recognized as Aidyn was critical to helping alleviate my gender dysphoria. My emotional and mental health significantly improved once my family and friends began to recognize me as who I am." R. 22-3, at 3. Prior to beginning high school, Aidyn's mother spoke to a guidance counselor to discuss steps the school could take to ensure his safety and well-being as a transgender student. Aidyn's mother and therapist subsequently submitted letters to the school requesting changes to Aidyn's name and gender marker in PowerSchool, and the change was in place at the beginning of the academic year. All of Aidyn's teachers except Kluge complied with the Name Policy. On the first day of class, Aidyn received a folder from the substitute teacher covering for Kluge with his former first

No. 21-2475                                                    19

name on it. The substitute also referred to him by his former first name in front of other students, which he experienced as "intensely humiliating and traumatizing." Throughout the fall semester, Kluge refused to call him "Aidyn," instead referring to him as "Sucec" or avoiding using any name and simply nodding or waving in his direction. Aidyn averred that Kluge sometimes used gendered honorifics with other students in the class, and less frequently called those students by their first names. Kluge's behavior left Aidyn feeling "alienated, upset, and dehumanized." He dreaded going to class each day and was uncomfortable each time he had to speak with Kluge one-on-one. Kluge's behavior was noticeable to others in the class, and at one point Aidyn's stand partner asked him why Kluge would not just say his name; Aidyn felt forced to tell him that it was because he was transgender. Aidyn discussed Kluge's behavior with his therapist as part of his ongoing treatment for gender dysphoria. He noted that Kluge's practice was also discussed multiple times at Equality Alliance meetings. By the end of the first semester, Aidyn told his mother that he did not want to continue with orchestra in his sophomore year. He did not in fact continue with orchestra the next year, and due to harassment he faced after Kluge left the school, Aidyn left Brownsburg at the end of his sophomore year.[8] R. 22-3.

---

[8]      Kluge characterizes the affidavits of Sam and Aidyn as "after-created evidence," which contained information about events that occurred after Kluge's termination. But both affidavits largely describe events that occurred before the school made the decision to terminate Kluge, and both affirm the information that Lee passed on to Dr. Daghe from Equality Alliance Meetings. The only exception is that the school was not aware that,

(continued)

Students were not the only source of concern about Kluge's practice. Lee reported that he had been approached by three teachers—Jason Gill, Melinda Lawrie, and Justin Bretz—during that academic year with concerns that Kluge's practice was causing harm to students. R. 120-14, at 16–17 ("they felt very strongly that this was harming students, not just Sam and Aidyn but just students in general who would potentially be in Mr. Kluge's class."). Dr. Daghe was approached by two additional teachers who were also department heads in Fine Arts (the department in which Kluge taught), Tracy Runyon and Melissa Stainbrook. They too conveyed complaints about Kluge's use of last names only. Dr. Daghe explained that teachers within the department who had a complaint about another teacher would convey concerns to the department heads and he was therefore most in contact with those two teachers in Kluge's department. R. 113-5, at 8–9.

After hearing about concerns from counselors that students were uncomfortable in some of their classes with regards to transgender issues, Dr. Jessup attended an Equality Alliance Club meeting to hear from students herself. R. 120-1,

---

midway through the school year, Aidyn told his mother that he did not wish to continue with orchestra the next academic year, and in fact ended up leaving Brownsburg at the end of the following year due to harassment he received from other students. Although Brownsburg did not know that Aidyn would withdraw from orchestra or leave the school, at most the affidavit confirms that the school accurately predicted the fallout from Kluge's failure to follow the Name Policy that was designed to avoid this very harm to the school's mission. We do not rely on any information from the affidavits that post-dates Kluge's termination.

No. 21-2475                                              21

at 4; R. 120-6, at 7. Approximately forty students attended the
meeting. Four or five students at the meeting complained
about a teacher using last names only to address students.[9]
The other students in attendance appeared to agree with the
complaints. R. 120-1, at 4. Dr. Jessup also heard from students
that they felt singled out by the use of their last names and
that "not all students were called by their last name by Mr.
Kluge." R. 120-6, at 7. *See also* R. 113-4, at 9 (Gordon testifying
that she was "made aware that there had been complaints
made to Dr. Daghe from students and staff that Mr. Kluge
wasn't following those guidelines that he had agreed to at the
start of the year.").

Dr. Daghe continued to hear complaints about Kluge's
last-names-only practice throughout the fall semester, but
hoped that the issue would resolve itself. R. 120-2, at 4. He
therefore did not raise the matter with Kluge until he met with
Kluge on December 13, 2017, after it became apparent that the
accommodation was not working in practice because students
were being harmed, and the learning environment was being
disrupted. R. 120-2, at 4; R. 112-5, at 7. Dr. Daghe testified that
the purpose of the meeting was to tell Kluge that the last-
names-only policy was not working in practice:

---

[9]     The Equality Alliance Club had a policy of not using teachers'
names at meetings. R. 120-14, at 11. Nevertheless, because of references to
orchestra class and because Kluge was the only teacher at the school who
had been permitted the last-names-only accommodation, both Lee and Dr.
Jessup understood the students to be referring to Kluge. R. 120-14, at 7;
R. 120-1, at 4.

> And the purpose of that meeting was to tell him
> that that's not going well. I'm getting reports
> from students, I'm getting reports from parents,
> I'm getting reports from our teams which are
> done by grade level, I'm getting reports by
> teachers in his own department that students
> are uncomfortable in his class and that they are
> bringing the conversations that occur in his
> class to other classrooms and having discus-
> sions about the uncomfortableness, whether it
> was dealing with a transgender student and last
> names only or whether it was times when last
> names weren't used or it was times when, you
> know, kids just want it all to go away and act
> like everything is normal. So I called John down
> and told him that's what's been given to me.
> And so, to me, as the high school principal try-
> ing to accommodate people and also trying to
> make sure that education can move forward, I
> just told him that.

R. 112-5, at 7.

According to Kluge's own description of the meeting:

> Daghe scheduled a meeting with me to ask me
> how the year was going and to tell me that my
> last-name-only Accommodation was creating
> tension in the students and faculty. He said the
> transgender students reported feeling "dehu-
> manized" by my calling all students last-name-
> only. He said that the transgender students'

friends feel bad for the transgender students
when I call transgender students, along with
everyone else, by their last-name-only. He said
that I am a topic of much discussion in the
Equality Alliance Club meetings. He said that a
number of faculty avoid me and don't hang out
with me as much because of my stance on the
issue.

Daghe said that parents complain about me. He
stated that a transgender student's mother com-
plained to the principals about my orchestra
[hair color] policy, that it was an unfair and un-
warranted policy and should be removed. The
building principal asked if the other teachers
had this same policy. I told him "yes" and sent
him their policies and mine. He responded to
the parent and the parent backed down. This
was a policy by my entire performing arts de-
partment that students must have natural-col-
ored hair for performances so they don't dis-
tract from the music being played.

Daghe referred to this parent complaint in this
meeting as being evidence of me being singled
out while other teachers with the same policies
did not receive any complaints.

I explained to Daghe that this persecution and
unfair treatment I was undergoing was a sign
that my faith as witnessed by my using last-
names-only to remain neutral was not coming

> back void, but was being effective. He didn't
> seem to understand why I was encouraged. He
> told me he didn't like things being tense and
> didn't think things were working out. He said
> he thought it might be good for me to resign at
> the end of the year. I told Daghe I was now en-
> couraged all the more to stay.

R. 15-3, at 4–5. *See also* R. 120-3, at 21–25. Kluge had not "wit-
ness[ed]" tension, and also had not "witness[ed]" that anyone
was avoiding him. R. 120-3, at 23; R. 112-5, at 7. Although
Kluge believed that he was singled out for complaints about
the department-wide hair color policy because of his religion,
Dr. Daghe concluded that "it was because of the way he was
handling this accommodation." R. 112-5, at 7. Because Dr.
Daghe would not name the students or faculty who com-
plained, Kluge suspected that Dr. Daghe was lying. R. 120-3,
at 23. Kluge left this meeting believing that his use of last
names only was working and that there was no evidence of
"undue hardship" arising from his practice. R. 120-3, at 23–25.

On January 17, 2018, Dr. Daghe held another meeting with
Kluge. According to Kluge's own account of the meeting:

> Daghe scheduled a meeting with me because he
> said he didn't think he was direct enough in our
> December 13 meeting. He told me in this meet-
> ing plainly that he really wanted to see me re-
> sign at the end of the school year. I told him that
> it was simply because he didn't like the tension
> and conflict. But I used examples in scripture to
> point to why this is a sign that I should stay. I

referenced Acts 19:11-41 with Paul's conflict in
Ephesus and 1 Corinthians 16:8-9 when Paul
was encouraged by the opportunity, saying, "a
wide door for effective service has opened to
me, and there are many adversaries."

R. 15-3 at 5. Kluge also reported that Dr. Daghe asked him if
he was going to resign and offered to write him letters of rec-
ommendation. Kluge deferred the decision, saying he wanted
to wait until a January 22, 2018 faculty meeting when new
transgender policies would be announced. R. 15-3, at 5.

On January 22, 2018, Dr. Jessup presented the faculty with
a document titled "Transgender Questions." R. 15-4. The doc-
ument provided policies and guidance for faculty in a ques-
tion/answer format regarding issues relevant to transgender
students. Among the questions posed and answers given
were the following:

**Are we allowed to use the student's last name
only?** We have agreed to this for the 2017–2018
school year, but moving forward it is our expec-
tation the student will be called by the first
name listed in PowerSchool.

**How do teachers break from their personal bi-
ases and beliefs so that we can best serve our
students?** We know this is a difficult topic for
some staff members, however, when you work
in a public school, you sign up to follow the law
and the policies/practices of that organization
and that might mean following practices that
are different than your beliefs.

> **What feedback and information has been received from transgender students?** They appreciate teachers who are accepting and supporting of them. They feel dehumanized by teachers they perceive as not being accepting or who continue to use the wrong pronouns or names. Non-transgender students in classrooms with transgender students have stated they feel uncomfortable in classrooms where teachers are not accepting. For example, teachers that call students by their last name, don't use correct pronouns, don't speak to the student or acknowledge them, etc.

R. 15-4, at 9–10.

After this faculty meeting, on February 4, 2018, Kluge sent an email to Drs. Snapp and Daghe quoting the language in the Transgender Questions document regarding the prohibition on the use of last names only. R. 120-16; R. 15-3, at 5. He noted that his agreement with the school was not limited to the 2017–2018 academic year, and asked if he would be allowed to use last names only going forward. R. 120-16. In response, Gordon and Dr. Daghe scheduled a meeting with Kluge for February 6, 2018. R. 15-3, at 6. Kluge secretly recorded the meeting, and the transcript appears in the record. R. 112-4, at 20–55; R. 120-3, at 25. Gordon and Dr. Daghe informed Kluge that, after the 2017–2018 school year, all teachers would be required to address students by the first name recorded in PowerSchool. R. 15-3, at 6; R. 112-4, at 24. Kluge again explained that his objection to using the PowerSchool names for transgender students was religious and that he felt this was a

No. 21-2475                                                    27

reasonable accommodation. R. 112-4, at 25–32. Gordon and
Dr. Daghe disagreed with him, explaining that he worked in
a public school and that the last-names-only practice was not
reasonable because it was "detrimental to kids." R. 112-4, at
25–28. Kluge said he felt that using the names in PowerSchool
forced him to "encourage" students "in a path that's going to
lead to destruction, to hell, I can't as a Christian be encourag-
ing students to hell." R. 112-4, at 28. He cited a study from a
doctor at Johns Hopkins that likened transgenderism to ano-
rexia. R. 112-4, at 30. Dr. Daghe and Gordon explained to him
that there were doctors on the other side of the issue and that
the administrators had conducted their own extensive re-
search in how to address the issue. R. 112-4, at 30. They held
firm on the school's Name Policy, and the conversation
turned to Kluge's resignation/termination. R. 112-4, at 32.
Gordon explained that some teachers were sensitive about let-
ting colleagues and students know that they were leaving,
and she therefore honored requests to not communicate or
process retirements or resignations until the school year con-
cluded. R. 112-4, at 35–37. She discussed the timing of his de-
parture from the school, explaining that because his position
was difficult to fill, the school would need to begin the search
as soon as possible. R. 112-4, at 35–37. Kluge interpreted this
offer as allowing him to submit a conditional resignation that
he could withdraw before some agreed date. R. 15-3, at 6;
R. 120-3, at 26. Gordon believed she was offering only to delay
notifying anyone of the resignation, not that the resignation
could be withdrawn. R. 120-17, at 2; R. 112-4, at 11–12. In fact,
Indiana law and the school's bylaws do not permit the with-
drawal of a resignation once it has been properly submitted

to the Superintendent, and Gordon was the Superintendent's agent for this purpose. R. 112-4, at 11–12; R. 120-8; R. 120-9.

Gordon met with Kluge again in March 2018 to set a date for his decision. She reiterated that Kluge had three options: comply with the Name Policy; resign; or be terminated. She explained that if he would not comply and did not resign by May 1, 2018, the termination process would begin on that date. R. 15-3, at 6; R. 113-2, at 6.

On April 30, 2018, Kluge submitted his resignation by email. R. 120-17, at 2. In the email, he said he would resign as of early August 2018 when his contract for the academic year finished. He explained that he was resigning because the school required teachers to call transgender students by a name that "encourages the destructive lifestyle and psycho-logical disorder known as gender dysphoria." R. 120-17, at 2. He noted that the school was withdrawing the last-names-only accommodation that allowed him to remain "neutral" on the issue. He was resigning because his Christian conscience "does not allow [him] to call transgender students by their 'preferred' name and pronoun," and the school had directed him to either resign by May 1, or he would be terminated. He concluded:

> Please do not process this letter nor notify any-one, including any administration, about its contents before May 29, 2018. Please email me to acknowledge that you have received this message and that you will grant this request.

R. 120-17, at 2. Gordon replied the same day, telling Kluge, "I will honor your request and not process this letter or share

with BHC administration until May 29." R. 15-2; R. 120-17, at 2.

In May 2018, as part of the curriculum, Kluge participated in an orchestra awards ceremony. R. 120-3, at 32–33. At the ceremony, he addressed the students, including the transgender students, by their first and last names as they appeared in PowerSchool. R. 120-3, at 33; R. 58-1, at 4. Kluge explained that he did this because "it would have been unreasonable and conspicuous to address students in such an informal manner at such a formal event as opposed to the classroom setting where teachers refer to students by last names as a normal form of address." R. 120-3, at 33. In his deposition, Kluge also affirmed the account that his lawyer gave to the EEOC in explaining the exception he made at this event, asserting that he did not wish to "bring into doubt my stated rationale for usage of last names only." R. 120-3, at 32–33; R. 120-19, at 7. Kluge confirmed that his lawyer's statement was an accurate account of what transpired at the orchestra award ceremony, and he adopted some of his lawyer's language as his own statement. R. 120-3, at 32–33. His attorney's statement to the EEOC explained:

> During classes, Kluge addressed students by last names, as a reasonable accommodation for his sincerely held Christian beliefs. But during the orchestra awards ceremony, because of its formal nature, he used the full names for students listed in PowerSchool to address all students as they were receiving their awards—including transgender students—because he was trying to work with the school in only

requesting what was reasonable. Kluge thought it unreasonable and conspicuous to address students in such an informal manner at such a formal event, as opposed to the classroom setting where teachers refer to students by last names as a normal form of address. Kluge's Christian faith required that he do no harm to his students, and this acquiescence to the administration's position was done solely out of sincerely-held beliefs, and not in agreement with the policy.

R. 120-19, at 7 (Letter of Michael J. Cork, Esq. to David A. Tite, EEOC Investigator). Thus Kluge acknowledged that using last names only in some settings would be unreasonable, conspicuous, and potentially cause harm to his students contrary to the requirements of his Christian faith.[10] He therefore decided to use first and last names, and in keeping with the accommodation, he used the first names from PowerSchool rather than the students' former first names.[11] Kluge conceded that a school has an interest in being concerned with the mental health of its students. R. 120-3, at 35.

---

[10]     The dissent contends that we are "constru[ing] this statement as a legal concession" that Kluge's practice would potentially harm his students. No construing is necessary; the statement speaks for itself.

[11]     Brownsburg contends that Kluge's use of the PowerSchool names at this ceremony calls into question the sincerity of his asserted religious beliefs. Because we resolve the case in favor of Brownsburg, we need not address the sincerity of Kluge's beliefs, and we assume his sincerity for summary judgment purposes.

Kluge scheduled a meeting with Dr. Daghe and Gordon on May 25, 2018, at the Brownsburg Central Office. R. 15-3, at 1. When Kluge arrived for the meeting, Gordon was not present, and Dr. Daghe told Kluge, "We have everything we need. We don't need to meet. Go back to the high school." Dr. Daghe also told Kluge not to meet with Gordon that day. R. 15-3, at 1. Kluge instead delivered a letter to Gordon's office, explaining that he had wanted to meet in order to present a written "Withdrawal of Intention to Resign and Request for Continuation of Accom[m]odation." R. 15-3. A few hours later, Brownsburg locked Kluge out of school buildings and online services, and posted his job as vacant. R. 113-2, at 7; R. 120-3, at 29.

At the June 11, 2018 school board meeting where resignations were considered, Kluge was denied a request to speak during the regular part of the meeting, but gave a brief statement during the public-comment section of the meeting. R. 120-3, at 29; R. 120-18, at 10. He explained what had happened, and asked the board to allow him to withdraw his resignation and to reinstate him. R. 120-3, at 29–30; R. 120-18, at 10. The board instead accepted his resignation without comment. R. 113-2, at 7; R. 120-3, at 30; R. 120-18, at 2.

Kluge sued the school, bringing claims under Title VII for religious discrimination/failure to accommodate; retaliation; and hostile work environment. He also brought claims under the First and Fourteenth Amendments and Indiana law. The district court dismissed the claims under the First and Fourteenth Amendments as well as the state law claims, and the Title VII claim for hostile work environment. Kluge does not appeal those dismissals. Kluge's claim for religious

discrimination/failure to accommodate (for the sake of sim-
plicity, we will call this the discrimination claim) and his re-
taliation claim proceeded to discovery. Ultimately, Kluge
filed a motion for partial summary judgment on his discrimi-
nation claim, and the school countered with a cross-motion
for summary judgment on both of the remaining claims.

The district court denied Kluge's motion, and granted
Brownsburg's cross-motion. On the discrimination claim, the
court framed the ultimate issue as "whether, assuming perfect
compliance with the last names only accommodation, that ac-
commodation resulted in undue hardship to" Brownsburg.
*Kluge v. Brownsburg Cmty. Sch. Corp.*, 548 F. Supp. 3d 814, 839
(S.D. Ind. 2021). For summary judgment purposes, the court
treated Kluge's forced resignation as an adverse employment
action. The court also accepted that his religious beliefs and
objections to using the PowerSchool names and pronouns of
transgender students were sincerely held. After finding that
there was an objective conflict between Kluge's sincerely held
religious beliefs and Brownsburg's policies for transgender
students, the court concluded that Kluge's refusal to follow
those policies created an undue hardship on Brownsburg's
mission of educating all of its students. In particular, the court
found that the last-names-only accommodation burdened
Brownsburg's ability to provide an education for all students
and conflicted with the school's philosophy of creating a safe
and supportive environment for all students. In finding that
the accommodation created an undue burden, the court relied
on the reports of Aidyn and Sam as well as those of other stu-
dents and teachers. Aidyn and Sam reported feeling targeted
and uncomfortable, and Aidyn grew to dread going to

Kluge's orchestra class, ultimately quitting orchestra entirely.
Other students and teachers complained that Kluge's practice
was offensive or insulting and made his classroom environ-
ment unwelcome and uncomfortable. The court found that
Brownsburg was not required to allow an accommodation
that unduly burdened its business of educating all students in
a supportive manner. The court found an additional undue
burden in that the accommodation opened the school up to
the threat of Title IX discrimination lawsuits that could be
brought by transgender students who felt targeted and dehu-
manized by Kluge's practice. The court concluded that
Brownsburg had demonstrated as a matter of law that it could
not accommodate Kluge's "religious belief against referring
to transgender students using their preferred names and pro-
nouns without incurring undue hardship." *Kluge*, 548
F. Supp. 3d at 846.

As for Kluge's retaliation claim, the court found that
Kluge's briefing on the matter had been meager, and that he
had simply recited his version of the facts without discussing
how those facts meet the requirements of a retaliation claim.
The court also noted that Kluge failed to address Browns-
burg's argument that there is no evidence in the record from
which a reasonable fact finder could infer that its non-dis-
criminatory explanation for its action was a pretext for reli-
gious discrimination. Without any explanation of his theory
of retaliation and without any evidence demonstrating pre-
text, the court found that Kluge had waived his claim for re-
taliation. As an alternate basis for granting judgment in favor
of the defendant, the court also noted that Kluge failed to pre-
sent any evidence from which a reasonable fact finder could

conclude that a causal connection exists between Kluge's pro-
tected activity and his resignation, any evidence of pretext, or
any evidence that Brownsburg's action was motivated by dis-
criminatory animus. The court therefore granted summary
judgment in favor of the school on the retaliation claim as
well. Kluge appeals.

## II.

On appeal, Kluge asks the court to reverse the grant of
summary judgment in favor of Brownsburg on both of his
claims. For the discrimination claim, he asks that we remand
to the district court in order to enter summary judgment in
his favor because Brownsburg withdrew a reasonable accom-
modation and forced him to resign without demonstrating
that the accommodation caused undue hardship.[12] Kluge also

---

[12]      Kluge appeals both the grant of summary judgment in favor of
Brownsburg and the denial of summary judgment in his favor. Specifi-
cally, he asks that we reverse and remand for judgment to be entered in
his favor as a matter of law. When the district court considers cross-mo-
tions for summary judgment, granting one and denying the other, the de-
nial of summary judgment "has merged into the final judgment and is
therefore appealable" as part of the appeal from the final judgment grant-
ing the opposing party's motion. *Santaella v. Metro. Life Ins. Co.*, 123 F.3d
456, 461 (7th Cir. 1997). In order to consider Kluge's request that we re-
verse the denial of summary judgment in his favor, we would be required
to review the facts in the light most favorable to the defendant, Browns-
burg, and draw all reasonable inferences in favor of the school. *See Hess v.
Reg-Ellen Machine Tool Corp.*, 423 F.3d 653, 658 (7th Cir. 2005) ("With cross-
motions, our review of the record requires that we construe all inferences
in favor of the party against whom the motion under consideration is
made."). As is apparent from our recitation of the undisputed facts, such
a review would demonstrate that Kluge is not entitled to judgment as a

(continued)

urges this court to find that he preserved his retaliation claim and presented sufficient evidence in support of that claim to merit summary judgment in his favor; in the alternative, he seeks a trial on the retaliation claim. Brownsburg asks the court to affirm the district court's judgment in all respects. We review the district court's grant of summary judgment *de novo*, and we examine the record in the light most favorable to the party opposing judgment, in this case Kluge, construing all reasonable inferences from the evidence in his favor. *Anderson*, 477 U.S. at 255; *Horne v. Electric Eel Mfg. Co.*, 987 F.3d 704, 713 (7th Cir. 2021). Summary judgment is appropriate when there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson*, 477 U.S. at 247–48; *Horne*, 987 F.3d at 713. "[S]ince the review of summary judgment is plenary, errors of analysis by the district court are immaterial; we ask whether we would have granted summary judgment on this record." *Thorn v. Sundstrand Aerospace Corp.*, 207 F.3d 383, 386 (7th Cir. 2000). *See also Tobey v. Extel/JWP, Inc.*, 985 F.2d 330, 332 (7th Cir. 1993) ("The question whether a movant is entitled to summary judgment is one of law—one therefore that we review *de novo*, which is to say without deference for the

---

matter of law: the school asserts with copious evidence from students, faculty and administrators that Kluge sometimes failed to follow the accommodation (a failure which he conceded through his lawyer during proceedings before the EEOC), treated transgender students differently than non-transgender students, and created what can be described at best as a difficult learning environment for the students in his class. He also alienated his colleagues in the Arts Department and offended parents. Construing the record in favor of Brownsburg, Kluge is not entitled to judgment. In considering Kluge's appeal of the grant of summary judgment in favor of Brownsburg, we must construe the record in Kluge's favor.

view of the district judge and hence almost as if the motion had been made to us directly.").

## A.

Title VII provides, in relevant part, that "It shall be an unlawful employment practice for an employer—(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]" 42 U.S.C. § 2000e-2(a)(1). After that provision was enacted, the EEOC issued a guideline that required "that an employer, short of 'undue hardship,' make 'reasonable accommodations' to the religious needs of its employees." *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 66 (1977); 29 C.F.R. § 1605.1(b) (1968). Congress later codified that "reasonable accommodation" regulation in its definition of the term "religion":

> The term "religion" includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business.

42 U.S.C. § 2000e(j). The Supreme Court said that "[t]he intent and effect of this definition was to make it an unlawful employment practice under [sec. 2000e-2(a)(1)] for an employer not to make reasonable accommodations, short of undue

hardship, for the religious practices of his employees and pro-spective employees." *Hardison*, 432 U.S. at 74.

The statute did not, however, provide guidance for deter-mining the degree of accommodation required of an em-ployer, and legislative history was not illuminating. *Hardison*, 432 U.S. at 74–75. In *Hardison*, the Supreme Court set out to determine the reach of the employer's statutory obligation to make reasonable accommodation for the religious obser-vances of its employees, which had not previously been spelled out by Congress or by EEOC guidelines. 432 U.S. at 75. The plaintiff, Hardison, worked at Trans World Airlines ("TWA") in an airplane maintenance department that oper-ated twenty-four hours a day, every day of the year. All em-ployees of the department were subject to the terms of a col-lective bargaining agreement that had a system of bidding for shift assignments based on seniority. Early in his employment at TWA, Hardison began following a religion that required its members to refrain from work from sunset on Friday until sunset on Saturday. But Hardison lacked the seniority to bid for a schedule that accommodated his religious beliefs and the union was unwilling to allow him to bypass the seniority sys-tem. TWA considered other possible solutions, but each had a cost to the employer such as breaching the seniority system, paying premium wages to hire someone to cover the Saturday shift, or leaving the shift uncovered. The company met sev-eral times with Hardison in attempts to find a solution, au-thorized the union steward to search for someone who would voluntarily swap shifts, and attempted without success to find Hardison another job within the company. TWA

eventually discharged Hardison on grounds of insubordina-
tion for refusing to work his assigned shift.

In a bench trial, the district court entered judgment in fa-
vor of TWA after concluding that the proposed accommoda-
tions presented an undue hardship for the company. The
court of appeals reversed and found in favor of Hardison,
concluding that TWA could have: (1) given Hardison a four-
day work-week and used a supervisor or other worker to
cover the fifth day; (2) filled Hardison's shift with another em-
ployee; or (3) arranged a swap between Hardison and another
employee for shifts in the sundown Friday to sundown Satur-
day period. The Supreme Court rejected all of these options
because each would have created "undue hardship" under
the statute. In particular, the first option would have caused
other shop functions to suffer; the second would have re-
quired the company to offer premium overtime pay to the
substitute employee; and the third would have violated the
seniority system. *Hardison*, 432 U.S. at 77–84.

In considering the "undue hardship" language of the stat-
ute, the Court decided that the duty to accommodate did not
require a company to take steps inconsistent with a valid col-
lective bargaining agreement or seniority system, noting:

> Title VII does not contemplate such unequal
> treatment. The repeated, unequivocal emphasis
> of both the language and the legislative history
> of Title VII is on eliminating discrimination in
> employment, and such discrimination is pro-
> scribed when it is directed against majorities as
> well as minorities. … Indeed, the foundation of

> Hardison's claim is that TWA and IAM engaged
> in religious discrimination in violation of [sec.
> 2000e-2(a)(1)] when they failed to arrange for
> him to have Saturdays off. It would be anoma-
> lous to conclude that by "reasonable accommo-
> dation" Congress meant that an employer must
> deny the shift and job preference of some em-
> ployees, as well as deprive them of their con-
> tractual rights, in order to accommodate or pre-
> fer the religious needs of others, and we con-
> clude that Title VII does not require an em-
> ployer to go that far.

*Hardison*, 432 U.S. at 81. The Court relied in part on the statu-
tory preference given to *bona fide* seniority systems, noting
that, under section 2000e-2(h), "absent a discriminatory pur-
pose, the operation of a seniority system cannot be an unlaw-
ful employment practice even if the system has some discrim-
inatory consequences." 432 U.S. at 82.

The Court then considered the other options open to TWA
to accommodate Hardison's religious practice, such as replac-
ing Hardison on those shifts with supervisory personnel or
personnel from other departments, or replacing him with
other available workers by paying premium overtime wages.
Both alternatives, the Court noted, involved costs to the com-
pany, "either in the form of lost efficiency in other jobs or
higher wages." 432 U.S. at 84. The Court found that the em-
ployer was not required by the statute to incur either cost, in-
stead holding that, "To require TWA to bear more than a *de
minimis* cost in order to give Hardison Saturdays off is an un-
due hardship." 432 U.S. at 84.

Like abandonment of the seniority system, to re-
quire TWA to bear additional costs when no
such costs are incurred to give other employees
the days off that they want would involve une-
qual treatment of employees on the basis of
their religion. By suggesting that TWA should
incur certain costs in order to give Hardison Sat-
urdays off the Court of Appeals would in effect
require TWA to finance an additional Saturday
off and then to choose the employee who will
enjoy it on the basis of his religious beliefs.
While incurring extra costs to secure a replace-
ment for Hardison might remove the necessity
of compelling another employee to work invol-
untarily in Hardison's place, it would not
change the fact that the privilege of having Sat-
urdays off would be allocated according to reli-
gious beliefs.

As we have seen, the paramount concern of
Congress in enacting Title VII was the elimina-
tion of discrimination in employment. In the ab-
sence of clear statutory language or legislative
history to the contrary, we will not readily con-
strue the statute to require an employer to dis-
criminate against some employees in order to
enable others to observe their Sabbath.

*Hardison*, 432 U.S. at 84–85.

The Supreme Court subsequently spoke on reasonable ac-
commodations for religious practice in the employment

context only two other times. In *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 68 (1986), the Court clarified that "where the employer has already reasonably accommodated the employee's religious needs, the statutory inquiry is at an end. The employer need not further show that each of the employee's alternative accommodations would result in undue hardship." The Court thus rejected the claim that the accommodation obligation includes a duty to accept the proposal the employee prefers unless that accommodation causes undue hardship on the employer's conduct of his business. 479 U.S. at 68. Instead, in situations where multiple accommodations are possible, the Court held that an employer has met its statutory obligation "when it demonstrates that it has offered a reasonable accommodation to the employee." 479 U.S. at 69.

In the Court's last and most recent foray into the reasonable accommodation provision of Title VII, the Court considered a case where an employer declined to hire a woman for a sales position in a clothing store because she wore a head scarf, which would violate the store's "Look Policy" that governed employees' dress. *E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768 (2015). At the time the store made the decision, the assistant manager who interviewed the woman found her otherwise qualified to be hired but was concerned that the scarf violated the Look Policy's prohibition on caps. The assistant manager sought guidance from a district manager, informing him that she believed that the prospective employee wore the scarf for religious reasons. The district manager directed the assistant manager not to hire the woman because the scarf would violate the Look Policy as would all other headwear, whether religious or otherwise.

42                                      No. 21-2475

The prospective employee prevailed on a Title VII reasonable
accommodation claim in the district court, but the court of ap-
peals reversed, finding that an employer cannot be liable for
failing to accommodate a religious practice until the applicant
or employee provides the employer with actual knowledge of
the need for an accommodation.

The Supreme Court noted that the statute prohibits em-
ployers from failing to hire an applicant "because of" her re-
ligious practice. The term "because of" imports at a minimum
the "but-for" standard of causation. *Abercrombie*, 575 U.S. at
772. Title VII relaxes that standard by providing that "an un-
lawful employment practice is established when the com-
plaining party demonstrates that race, color, religion, sex, or
national origin was a *motivating factor* for any employment
practice, even though other factors also motivated the prac-
tice." 42 U.S.C. § 2000e-2(m) (emphasis added); *Abercrombie*,
575 U.S. at 773. The statute also does not impose a knowledge
requirement, but instead "prohibits certain *motives*, regardless
of the state of the actor's knowledge." *Abercrombie* 575 U.S. at
773. Thus:

> An employer who has actual knowledge of the
> need for an accommodation does not violate Ti-
> tle VII by refusing to hire an applicant if avoid-
> ing that accommodation is not his *motive*. Con-
> versely, an employer who acts with the motive
> of avoiding accommodation may violate Title
> VII even if he has no more than an unsubstanti-
> ated suspicion that accommodation would be
> needed. … An employer may not make an

applicant's religious practice, confirmed or oth-
erwise, a factor in employment decisions.

*Abercrombie*, 575 U.S. at 773. Finally, the Court rejected the
premise that a neutral employment policy cannot constitute
intentional discrimination, finding:

> Title VII does not demand mere neutrality with
> regard to religious practices—that they be
> treated no worse than other practices. Rather, it
> gives them favored treatment, affirmatively ob-
> ligating employers not "to fail or refuse to hire
> or discharge any individual ... because of such
> individual's" "religious observance and prac-
> tice." An employer is surely entitled to have, for
> example, a no-headwear policy as an ordinary
> matter. But when an applicant requires an ac-
> commodation as an "aspec[t] of religious ...
> practice," it is no response that the subsequent
> "fail[ure] ... to hire" was due to an otherwise-
> neutral policy. Title VII requires otherwise-neu-
> tral policies to give way to the need for an ac-
> commodation.

*Abercrombie*, 575 U.S. at 775.

The Supreme Court did not address the undue hardship
standard in *Philbrook* or *Abercrombie*, leaving in place the
standard it set in *Hardison*, namely, that the employer need
not "bear more than a *de minimis* cost" in making an accom-
modation. *See also E.E.O.C. v. Walmart Stores East, L.P.*, 992
F.3d 656, 658 (7th Cir. 2021) (describing *Hardison*'s *de minimis*
cost as a "slight burden" to avoid the Latin). Our court

established a burden-shifting framework for proof of a Title VII claim for failure to accommodate religion in *E.E.O.C. v. Ilona of Hungary, Inc.*, 108 F.3d 1569 (7th Cir. 1997), which must be modified slightly to account for the Supreme Court's opinion in *Abercrombie*. To make out a *prima facie* case, an employee must demonstrate that: (1) an observance or practice that is religious in nature, and (2) that is based on a sincerely held religious belief, (3) conflicted with an employment requirement, and (4) the religious observance or practice was the basis or a motivating factor for the employee's discharge or other discriminatory treatment. *Abercrombie*, 575 U.S. at 772-73; *Adeyeye v. Heartland Sweeteners, LLC*, 721 F.3d 444, 449 (7th Cir. 2013); *Porter v. City of Chicago*, 700 F.3d 944, 951 (7th Cir. 2012); *Ilona of Hungary*, 108 F.3d at 1575. "If the employee shows these elements, the burden then shifts to the employer to show that it could not accommodate the employee's religious belief or practice without causing the employer undue hardship." *Adeyeye*, 721 F.3d at 449; *Baz v. Walters*, 782 F.2d 701, 706 (7th Cir. 1986).

The district court determined that Kluge established a *prima facie* case of failure to accommodate a religious practice. The court noted that there were issues of fact as to whether Kluge's religious beliefs were sincerely held, but taking the record in the light most favorable to Kluge for the purposes of summary judgment, there was enough evidence that his refusal to use the preferred names and pronouns of the transgender students was a religious practice based on a

sincerely held belief.[13] Kluge also presented adequate evidence that his practice conflicted with an employment requirement, in particular, the PowerSchool Name Policy. Brownsburg does not dispute that forcing Kluge to either comply with the Name Policy, resign, or be terminated was an adverse employment action, and the school generally concedes that, for the purposes of this appeal, Kluge has established a *prima facie* case of failure to accommodate.

## B.

The burden then shifts to Brownsburg to demonstrate that it could not reasonably accommodate Kluge "without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j). "Reasonableness is assessed in context, of course, and this evaluation will turn in part on whether or not the employer can in fact continue to function absent undue hardship if the employee is permitted" the requested accommodation. *Adeyeye*, 721 F.3d at 455. Accordingly, "[t]he issue of undue hardship will depend on close attention to the specific circumstances of the job[.]" *Id*. As a public school, Brownsburg's "business" is its constitutional and statutory charge to educate all students who enter its doors. We have noted that, "pupils are a captive audience. Education is

---

[13]      In his response opposing a motion for leave to file an *amicus* brief in the district court, Kluge described his sincerely held religious belief as "what is best for the eternal *spiritual* well-being of [the transgender students] is to avoid affirming them in a moral error." R. 145, at 7. As we mentioned earlier, Kluge also believed that it would be sinful for him to "promote gender dysphoria" by using the transgender student's PowerSchool names and pronouns. R. 120-3, at 6–10.

compulsory, and children must attend public schools unless
their parents are willing to incur the cost of private education
or the considerable time commitment of home schooling."
*Mayer v. Monroe Cty. Cmty. Sch. Corp.*, 474 F.3d 477, 479 (7th
Cir. 2007). Because of the compulsory nature of education, we
have noted in the First Amendment context:

> Children who attend school because they must
> ought not be subject to teachers' idiosyncratic
> perspectives. Majority rule about what subjects
> and viewpoints will be expressed in the class-
> room has the potential to turn into indoctrina-
> tion; elected school boards are tempted to sup-
> port majority positions about religious or patri-
> otic subjects especially. But if indoctrination is
> likely, the power should be reposed in someone
> the people can vote out of office, rather than ten-
> ured teachers. At least the board's views can be
> debated openly, and the people may choose to
> elect persons committed to neutrality on con-
> tentious issues. … The Constitution does not en-
> title teachers to present personal views to cap-
> tive audiences against the instructions of elected
> officials.

474 F.3d at 479–80.[14]

---

[14]    The dissent asserts that under the Indiana Constitution, schools
need only admit all children, and that the Constitution does not require or
prescribe any specific standard of educational quality. The dissent also
cites Indiana case law interpreting the State's education statutes as not re-
quiring "that Indiana school corporations affirm transgender identity."

(continued)

No. 21-2475                                                47

Brownsburg claims two undue hardships with Kluge's use of students' last names only: first, the school asserts that Kluge's last-names-only practice frustrated its efforts to educate all students because the accommodation negatively impacted students and the learning environment for transgender students and other students as well. Second, Kluge's practice exposed Brownsburg to the risk of Title IX litigation brought by transgender students who claim sex-based discrimination based upon a theory of sex-stereotyping. *See Whitaker*, 858 F.3d at 1047–48.

### 1.

We begin with Brownsburg's claim that the last-names-only practice frustrated the school's effort to educate all students by harming students and negatively affecting student learning. As we discuss below, the only relevant question at this point is whether the school could accommodate Kluge without working an undue hardship on the conduct of its business. We conclude that the undisputed evidence demonstrates that Brownsburg met its burden of establishing undue

---

But Brownsburg never made any claims that the State's Constitution or statutes required it to affirm transgender identity. The school instead consistently relied on its own policy choices about how to run its high school, and how to address the specific challenges faced by a particular group of students. We have cited to the State's Constitution and educational statutes only to provide context and to explain the differences between running schools and managing other kinds of businesses. In addition to the compulsory nature of education, the school stands in for parents and deals with the needs not of adult customers or coworkers (the categories into which the dissent attempts to shoehorn the analysis) but of children.

hardship as a matter of law, and none of the additional evidence cited by the dissent calls that conclusion into question.

It is undisputed that, prior to the start of the 2017–2018 school year, Brownsburg recognized an increase in enrollment of transgender students, and concluded that these students faced "significant challenges in the high school environment, including diminished self-esteem and heightened exposure to bullying." R. 120-1, at 3. It is also undisputed that Brownsburg administrators determined that "these challenges threaten transgender students' classroom experience, academic performance, and overall well-being." R. 120-1, at 3. They therefore began to develop policies and practices for addressing these challenges.

As Dr. Jessup averred, a "very practical but critical question that arose … is what names staff should use to address transgender students in class." R. 120-1, at 3. Obviously, "a high school classroom cannot function without teachers addressing students directly." R. 120-1, at 3. Brownsburg ultimately adopted the PowerSchool Name Policy as part of its larger plan to address the special needs of these students. The goal of the Name Policy was two-fold: to provide the faculty with a straightforward rule when addressing students; and to afford dignity and empathy towards transgender students because the administration considered it important "for transgender students to receive, like any other student, respect and affirmation of their preferred identity[.]" R. 120-1, at 4. The requirement that students could change their names and pronouns in PowerSchool only with the consent of a parent and the approval of a healthcare professional allayed the religious objections and concerns of three of the four teachers

who signed the seven-page letter and accompanied Kluge to the May 15, 2017 meeting with Dr. Daghe. Kluge alone continued to object. In response to Kluge's continued concerns, the school agreed to allow Kluge two accommodations: first, he would address all students by their last names only; and second, another adult would hand out gendered orchestra uniforms, relieving Kluge of that duty.

The school produced copious evidence that, once these accommodations were in place, Dr. Daghe, teacher Craig Lee, and Dr. Jessup soon began to receive reports and complaints about the harms caused by Kluge's last-names-only practice. In particular, Dr. Daghe received reports that transgender students in Kluge's class felt insulted and disrespected by Kluge's use of last names only. They also felt isolated and targeted. A non-transgender student in Kluge's class reported to Lee that the practice was "incredibly awkward." That student reported that the practice made the transgender students stand out, and that he and others in the school felt bad for the transgender students. Dr. Daghe also received reports that transgender students in Kluge's class felt dehumanized by the last-names-only practice, and Dr. Daghe concluded that the practice was "detrimental to kids."

Dr. Jessup personally attended an Equality Alliance meeting and heard complaints about Kluge's practice from four or five students at the meeting, complaints with which the other thirty-five students in attendance appeared to agree. Dr. Jessup heard from students and faculty that students felt singled out by the use of their last names, and that "not all students were called by their last name by Mr. Kluge." R. 120-6, at 7; R. 120-1, at 4.

Dr. Daghe also received reports that Kluge sometimes slipped up and used first names or gendered honorifics for non-transgender students. Although we credit Kluge's denial that he ever made such mistakes, Kluge has no evidence contradicting assertions by Drs. Daghe and Jessup that they received such reports and needed to address them. As Dr. Daghe testified, Kluge's practice also disrupted the learning environment more broadly because students who were uncomfortable in Kluge's classes brought their "discussions about the uncomfortableness, whether it was dealing with a transgender student and last names only or whether it was times when last names weren't used," to other classrooms.

Lee heard complaints about Kluge's practice from students regularly at Equality Alliance meetings, and personally witnessed the emotional pain suffered by the transgender students when they discussed the environment in Kluge's class. Other faculty in Kluge's own department reported tension among students and faculty created by Kluge's last-names-only practice.

All of this was reported to Kluge, mainly by Dr. Daghe, as Kluge himself acknowledged. *See* R. 15-3, at 3–6; R. 112-2, at 4; R. 112-5, at 7. *See also* R. 120-5, at 9 (where Dr. Daghe testified that he talked to Kluge about the transgender students but also about the entire class of students, "about the uncomfortableness of adults in my building around him with similar students in theater, in band, in choir, and orchestra that those teachers share and it was a concern that kids didn't know how to behave, didn't know how to address. And that was the temperament or the way I was addressing the meetings ahead of time and saying can you follow this second accommodation

because we're going to be changing that, as he heard in January, for the following year and I needed this to move forward as a high school principal in a way that he would follow the accommodations and that my conversation with him was not happening the way it was written."). In describing the January 17, 2018 meeting where Dr. Daghe told Kluge that he should resign at the end of the school year, Kluge told Dr. Daghe that "it was simply because he [Dr. Daghe] didn't like the tension and the conflict." R. 15-3, at 5. Kluge interpreted the tension and conflict that he had caused as a scriptural sign that he should stay at the school. R. 15-3, at 5.

Kluge has produced no evidence to the contrary. That is, he has produced no evidence tending to show that the transgender students were not emotionally harmed by his practice or that the learning environment was not disrupted. A practice that indisputably caused emotional harm to students and disruptions to the learning environment is an undue hardship to a school as a matter of law. As Kluge himself conceded, schools have a legitimate interest in the mental health of their students. R. 120-3, at 35. And as Dr. Daghe explained, his job as principal was to "make sure that education can move forward." R. 112-5, at 7. Education is, indeed, the business of every school. Thus, emotional harm to students and disruptions to the learning environment are objectively more than *de minimis* or slight burdens to schools.

Nor did Kluge produce any evidence that Dr. Daghe, Dr. Jessup, and Lee[15] all lied about receiving these reports and

---

[15]    The dissent points out that Lee described himself as "very biased" on the subject of how the school should handle issues related to
(continued)

lied about feeling a need to act on them in order to address the needs of transgender students and the tense educational environment. At most Kluge claims that he did not believe Dr. Daghe on occasion because Dr. Daghe did not give him the names of the students who reported that they were harmed by Kluge's use of last names only. But Kluge's metaphysical doubt about Dr. Daghe's credibility does not create a genuine issue of material fact. "[N]othing requires the district court to disbelieve defendants' proffered evidence simply because [the plaintiff]—without proof—asserts it is false." *Carroll v. Lynch*, 698 F.3d 561, 565 (7th Cir. 2012). *See also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."); *Barnes v. City of Centralia, IL*, 943 F.3d 826, 832 (7th Cir. 2019) (same). Instead, "the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita*, 475 U.S. at 587; Fed. R. Civ. P. 56(e). *See also Carroll*, 698 F.3d at 565 (plaintiff cannot rest on "metaphysical doubt" that defendant lied but must produce evidence so showing).

---

transgender students. To his credit, Lee candidly admitted that bias when he made his reports of harm and disruption to school administrators. Dr. Daghe and other administrators were thus aware of that bias when they were assessing the scope and severity of the problem. Although the dissent would have a jury reweigh whether the employer *should have* credited Lee's reports, that is not the relevant question, as we discuss below. *Infra*, at 53-55 (discussing undisputed evidence known to the school at the time of the decision).

No. 21-2475                                                    53

Similarly, Kluge testified that he felt no tension from other teachers, was unaware of any problems in his classroom, and felt that his students were not adversely affected by his practice. Kluge believed that his students were performing well and not experiencing any problems. But summary judgment is not defeated by Kluge's perception that all was well. A failure to notice that anything problematic was happening is not evidence that it did not happen; nor is it evidence that Brownsburg did not receive reports from students, teachers, and others that it was happening. Moreover, in employment discrimination cases, the employee's "own opinion about his work performance is irrelevant." *Sklyarsky v. Means-Knaus Partners, L.P.*, 777 F.3d 892, 897 (7th Cir. 2015). *See also Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 740 (7th Cir. 2006) (a plaintiff's conclusory statements do not create an issue of fact, and an employee's self-serving statements about his ability are insufficient to contradict an employer's negative assessment of that ability). Indeed, Kluge himself acknowledged that using last names only in some settings would be unreasonable, conspicuous, and potentially cause harm to his students, which is why he used the PowerSchool Names at the orchestra award ceremony. Kluge also acknowledged creating tension and conflict at the school. To the extent that Kluge draws a theological distinction between regular use of the first names in a classroom setting versus using them on a one-time basis at a more formal award ceremony, Brownsburg was within its rights to consider the daily harm of the last names practice in the classroom paramount.

Moreover, the evidence that the dissent cites from three students and a contract teacher is not relevant to the question

presented here. First, that these three children and a contract teacher did not experience or notice harm or disruption does not rebut the truth of the reports of harm and disruption experienced by others. It was not necessary for the school to find that Kluge's practice harmed all of the students before the school was justified in addressing the situation.

Second, none of the information from these four affiants is relevant to the question of whether the decision-makers received reports of emotional harm and disruption to the learning environment from other students, teachers and parents. We cannot emphasize strongly enough that Kluge has produced no evidence suggesting that the reported emotional harms to students and disruptions to the learning environment did not occur or that the reports were not made.

Third, to the extent that the dissent relies on this evidence to demonstrate that Kluge complied perfectly with the accommodation, we have already credited his claim of perfect compliance. The reports of emotional harm and disruption came in nevertheless.

Fourth, none of the information from these three students and the contract teacher was known to school administrators at the time they were making the decision to withdraw the accommodation. The dissent contends that evidence from these students and the contract teacher is relevant "whether or not this information was known by the School District at the time of the adverse employment decision." It is axiomatic that an employer can make decisions based only on the information known to it at the time of the decision. The dissent nevertheless poses the puzzling question, "If, by contextual

No. 21-2475                                                55

evidence obtained after discharge, an employee plaintiff is not
able to undermine the alleged presence of undue hardship,
when, if ever, can the employee prevail?" The answer is sim-
ple: by uncovering evidence that was before the employer at
the time of the decision, evidence that would contradict the
employer's claims that students were emotionally harmed
and the learning environment was disrupted. If no one was
harmed and there was no disruption, then the burden of al-
lowing the accommodation would be *de minimis*. But in the
absence of any evidence known to the employer contradicting
the existence of the harms, there is nothing for a jury to decide.
The evidence, of course, may be obtained after the discharge,
but it must be evidence that the employer knew at the time of
the decision to withdraw the accommodation. To suggest that
the employer may be held liable for a decision to withdraw
an accommodation based on information that did not exist at
the time of the decision holds employers to an impossible
"crystal ball" standard. The dissent asserts that applying a
test that depends on the employer's knowledge would create
a perverse incentive for employers to avoid investigating
whether hardship would arise from an accommodation. But
there is no claim of a faulty investigation here, and the em-
ployer actually granted the accommodation and then saw in
real time the harms that resulted. If an employer conducted
an inadequate investigation, that could be evidence that the
withdrawal of the accommodation was based on some dis-
criminatory reason rather than on the undue hardship, but
that is simply not the case here.

    The dissent would have a jury second guess whether the
reported harms occurred and whether the employer received

those reports even in the absence of evidence to the contrary.
In particular, the dissent would have a jury decide the credi-
bility of the students who were emotionally harmed and the
teachers who saw and reported disruptions to the learning
environment when there is no evidence contradicting the re-
ports of harm and educational disruption. Those assessments
were for the school to make based on the information availa-
ble to it at the time. The dissent would also have a jury second
guess whether emotional harm to students (in this case, par-
ticularly vulnerable students) and disruptions to the learning
environment were sufficient to overcome the *de minimis* un-
due hardship standard when Kluge himself conceded that the
school had a legitimate interest in the mental health of its stu-
dents, and even though learning is the primary purpose for
the existence of the school. These harms were far more than a
slight burden as a matter of law.

The dissent also contends that the transgender students
were offended not because of any discomfort with the last-
names practice itself but because of the students' "assump-
tions and intuitions about why Kluge was using only last
names." The dissent maintains that "[t]he alleged offense
arose from students' presumptions and guesses as to Kluge's
motives for using last names only." There are two problems
with this analysis. First, there is no dispute that the school re-
ceived reports describing emotional harm to students and dis-
ruption to the learning environment, not mere offense. These
were the very harms that the school sought to avoid when it
developed the Name Policy.

Second, Kluge's motives for his practice are irrelevant to
the Title VII analysis. The uncontested evidence demonstrates

that Kluge's *practice* caused the harms whether the students correctly understood his subjective *motives* or not. As we have discussed, the school was aware of the issues faced by this group of students and had identified the use of their Power-School names and pronouns as an important means of providing dignity, empathy, respect and affirmation for this group of children who faced significant challenges in the high school environment, including diminished self-esteem and heightened exposure to bullying. Although some of the students appear to have inferred that Kluge's practice was due to the presence of transgender students at the school, the students had no information regarding why Kluge would not use the students' PowerSchool names and pronouns. Whether his motive was religious, ideological, grammatical or otherwise was irrelevant because it was the *practice*, not the unknown *motive* that caused the reported harms. The school stretched to accommodate Kluge with a facially neutral accommodation of using last names only; nonetheless, the undisputed evidence showed that the practice resulted in genuine harm to students and real disruption to the learning environment.

Moreover, Kluge's practice was contrary to the preference of not only the school and the students, but also the students' parents and healthcare providers, who had decided that it was in the best interest of these children to be addressed in a particular manner, with their PowerSchool names and pronouns. Brownsburg's "business" for the purpose of analyzing undue hardship was to provide public education. Unlike a for-profit corporation, Brownsburg's mission of education for all students was mandated by the State's constitution and

legislature. In Indiana, public schools play a custodial and protective role in the compulsory education system, and public schools stand in the relation of parents and guardians to the students regarding all matters of discipline and conduct of students. *Linke v. Nw. Sch. Corp.*, 763 N.E.2d 972, 979 (Ind. 2002). After conducting its own research, the school reasonably deferred to the judgment of parents and healthcare providers regarding how to meet the specific needs of transgender students.

Although with corporate defendants, our cases analyze undue hardship by considering financial costs and business interests, the school's "business" here is more analogous to that of the Veterans Administration ("V.A.") in *Baz*. In that case, the V.A. hired a chaplain in a hospital where approximately two thirds of the patients were psychiatric patients. The V.A. saw the position of chaplain as a secular one where proselytizing was prohibited and chaplains were expected to serve as a "quiescent, passive listener and cautious counselor," as part of the hospital's philosophy of total patient care. Baz instead "saw himself as an active, evangelistic, charismatic preacher," and acted accordingly. 782 F.2d at 703–04. When he refused to change his approach, the hospital terminated his employment. After a bench trial, the district court ruled in favor of the hospital.

On appeal, Baz argued that the hospital had failed to prove that the health and welfare of the patients were harmed by his evangelism. We noted that he was confusing "the business necessity defense to a disparate impact cause of action with the 'undue hardship' standard used to measure an employer's duty to accommodate to an employee's religious

observances in a disparate treatment claim of religious dis-
crimination." 782 F.2d at 706. The latter type of case, the same
one that Kluge brings here, requires the defendant to provide
"evidence to show that accommodation would create a hard-
ship on his business. This hardship has been construed as an-
ything more than a *de minimis* cost to the employer." *Id*. (citing
*Hardison*, 432 U.S. at 84).

> The defendants are not required to show that
> their philosophy of total patient care is objec-
> tively better than that espoused by Reverend
> Baz; they need only show that it would be a
> hardship to accommodate his theology in view
> of their established theory and practice.

> The defendants here have met this burden. They
> have produced evidence tending to show that
> Reverend Baz's philosophy of the care of psy-
> chiatric patients is antithetical to that of the V.A.
> To accommodate Reverend Baz's religious prac-
> tices, they would have to either adopt his phi-
> losophy of patient care, expend resources on
> continually checking up on what Reverend Baz
> was doing or stand by while he practices his (in
> their view, damaging) ministry in their facility.
> None of these is an accommodation required by
> Title VII.

*Baz*, 782 F.2d at 706–07.

Kluge makes a similar mistake of law here. Brownsburg
need not show that its philosophy of treating transgender stu-
dents "like any other student, [with] respect and affirmation

of their preferred identity" was better than that espoused by
Kluge. They needed only to show "that it would be a hardship
to accommodate his theology in view of their established the-
ory and practice." *Baz*, 782 F.2d at 706. Brownsburg met this
burden by producing evidence tending to show that Kluge's
last-names-only practice was "antithetical to that of the"
school. 782 F.2d at 706–07. It is no answer that Kluge called all
students by their last names and was trying to be neutral on
the issue of transgenderism. The last-names-only practice
conflicted with the school's philosophy of affirming and re-
specting all students because the undisputed evidence
showed that the accommodation resulted in students feeling
disrespected, targeted, and dehumanized, and in disruptions
to the learning environment. Title VII does not require the
school to adopt an accommodation that, although facially
neutral, does not work that way in practice. Brownsburg al-
lowed Kluge to employ the practice for an entire school year,
counseling him along the way about the problems he was cre-
ating and encouraging him to either follow the practice that
every other teacher in the school followed or leave his job be-
cause he was harming students and the educational environ-
ment by failing to follow the school's philosophy of respect
and affirmation for all students. Title VII does not require an
employer to retain an employee who harms the employer's
mission. *Baz*, 782 F.2d at 706–07.

Nor was any other reasonable accommodation available.
Kluge was the school's only music teacher, and so students
could not, for example, be transferred to another classroom (if
we assume that transfer to another classroom would not be
equally stigmatizing). There was no other teacher to take

No. 21-2475                                                    61

Kluge's place in the orchestra class. Kluge himself has never suggested any other viable accommodation. *See Ryan v. U.S. Dep't of Justice*, 950 F.2d 458, 461 (7th Cir. 1991) (employers are not required to negotiate with employees about a religious accommodation but only to act on any accommodation that does not work an undue hardship; an employee who neglects multiple opportunities during a lengthy disciplinary process to propose a concrete accommodation makes his own choice). Because no reasonable jury could conclude that a practice that emotionally harms students and disrupts the learning environment is only a slight burden to a school, and because no other accommodations were available, under *Baz*, Brownsburg has proved undue hardship as a matter of law.[16] *See also Walmart Stores East, L.P.*, 992 F.3d at 658–60 (affirming summary judgment where the accommodation of the plaintiff's religious practice created more than a slight burden on the employer because it would have increased the burden on other workers, or resulted in a staffing shortage, or forced the employer to change its preferred rotation system designed to train all assistant managers in all departments); *Adams v.*

---

[16]     Kluge asserts that *Baz* is inapplicable because his religious beliefs did not preclude him from doing his job, as he claims was the case in *Baz*. But the issue in *Baz* was analogous: Baz was performing his job in a manner that conflicted with the hospital's requirement that the chaplain serve as a "quiescent, passive listener and cautious counselor," as part of the hospital's philosophy of total patient care. Kluge was performing his job in a manner that conflicted with the school's mission of educating all students, and its philosophy of treating all students with respect and affirmation for their identity in the service of that goal. Kluge's attempt to characterize the school's goal as somehow "illegitimate" lacks support in Title VII case law.

*Retail Ventures, Inc.*, 325 Fed. App'x 440, 443 (7th Cir. 2009) (affirming summary judgment in favor of employer on religious accommodation claim where accommodation would have increased cost, decreased efficiency, or created a scheduling strain); *Noesen v. Medical Staffing Network, Inc.*, 232 Fed. App'x 581, 584–85 (7th Cir. 2007) (affirming summary judgment in favor of employer when Catholic pharmacist's requested religious accommodation of relief from telephone and counter duties in order to avoid customers requesting birth control would have required other employees to assume a disproportionate share of work, or would have left data input work undone).

Kluge's attempt to characterize the emotional harm expressed by the transgender students as "third party grumblings" or a "heckler's veto" has no basis in the record and no support in Title VII law.[17] The dissent echoes this

---

[17]     The dissent also suggests that the question of whether the accommodation constituted an undue hardship "by way of the School District's clients—the students—should be an open question for the factfinder" because an adverse employment action based on the discriminatory preferences of others, including coworkers and customers, is unlawful. But there is no fact question for a jury here because Kluge presented no evidence that the students, teachers or parents harbored a discriminatory bias against Kluge or that Brownsburg terminated Kluge based on the discriminatory preferences of others. In fact, one of the parents reporting harm to her child from Kluge's practice told the school, "I really don't care what he thinks about transgender issues on a personal level. My child deserves to be treated with respect. His refusal to use [the child's] preferred name and pronouns is very disrespectful and hurtful." R. 120-13, at 2. Acting on such a report cannot reasonably be construed as giving effect to a discriminatory preference.

No. 21-2475                                                        63

mischaracterization, reducing the harms claimed to "taking offense," "disgruntlement," "grumblings," and "mere offense," rather than the harms that the school actually claimed to students, the learning environment, and to the school's mission to treat all students respectfully. Kluge's complaint of a "heckler's veto" sounds in the First Amendment. But the district court dismissed Kluge's First Amendment claims, and he has not appealed that dismissal. R. 70. The district court correctly held that when Kluge was addressing students in the classroom, his speech was not protected by the First Amendment. R. 70, at 13 (noting that Kluge conceded that his address of students in his classroom was part of his official duties as a teacher); *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006) ("when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."); *Mayer*, 474 F.3d at 479 (citing our well-settled precedent that "public-school teachers must hew to the approach prescribed by principals (and others higher up in the chain of authority)"). Title VII provides more protection for an employee's religious speech than the First Amendment but its protection is limited to accommodations that do not work an undue hardship on the employer. *Ryan*, 950 F.2d at 461. *Cf. Mayer*, 474 F.3d at 480 (noting that "the first amendment does not entitle primary and secondary teachers, when conducting the education of captive audiences, to cover topics, or advocate viewpoints, that depart from the curriculum adopted by the school system"). As we have just held, Kluge's practice resulted in an undue hardship on his employer as a matter of law.

As for "third party grumblings," the case law does not
support Kluge in what is essentially a repackaged First
Amendment claim of a heckler's veto. For example, in *Anderson v. U.S.F. Logistics (IMC), Inc.*, 274 F.3d 470 (7th Cir. 2001),
we considered a claim by Elizabeth Anderson, an employee
of a shipping company, U.S.F. Logistics, who wished to use
the phrase, "Have a Blessed Day," in correspondence with her
co-workers and the company's customers. Although her co-
workers did not object, an employee of Microsoft, U.S.F. Lo-
gistics' largest customer, received this religious greeting and
complained that it was unacceptable and must stop. Her em-
ployer directed her to stop using the phrase with customers,
and in particular with Microsoft. After her employer declined
to identify the particular Microsoft contact who had com-
plained, she continued to use the phrase with Microsoft em-
ployees and moved for a preliminary and permanent injunc-
tion allowing her to use the phrase in her work. 274 F.3d at
473–74.

The district court denied her motion for a preliminary in-
junction, finding that she did not have a likelihood of success
on the merits because her employer reasonably accommo-
dated her by allowing her to use the phrase with persons who
were not offended by it. We affirmed, noting first that Title
VII requires only reasonable accommodation, not the satisfac-
tion of an employee's every desire. *Anderson*, 274 F.3d at 475.
U.S.F. Logistics was legitimately concerned about its relation-
ship with its customers. The company required only that she
cease using the phrase with the objecting customer, and we
concluded that her employer reasonably accommodated her.
274 F.3d at 476. Because a Microsoft representative had

No. 21-2475                                                           65

complained that the use of the phrase was inappropriate, per-
mitting Anderson to continue to use the phrase would impose
her religious views on that customer. We concluded that the
evidence therefore suggested that Anderson's religious prac-
tice could damage her employer's relationship with Mi-
crosoft. 274 F.3d at 477. But even if her practice had not im-
posed her religious beliefs upon others, the employer was still
entitled to restrict it if it impaired the employer's legitimate
interests, so long as her belief was reasonably accommodated.
274 F.3d at 477.

The same applies here, albeit in the non-profit business
setting of a public school engaged in providing compulsory
education to high school students. Brownsburg was entitled
to require Kluge to use a form of address that did not offend
or injure its students or harm the classroom environment. The
school had a legitimate interest in its relationship with its stu-
dents, who together with their parents, are effectively the
school's customers. *See Smiley v. Columbia College Chicago*, 714
F.3d 998, 1002 (7th Cir. 2013) ("It is not unreasonable for [a
college] to expect that its instructors will teach classes in a
professional manner that does not distress students."). Be-
cause Kluge's practice harmed that relationship, and because
there was no other way to accommodate Kluge's beliefs with-
out harming the school's mission and philosophy for educat-
ing all students, his "third party grumblings" claim fails.[18]

---

[18]      In making his "third-party grumblings" argument, Kluge relied
on cases that have either been reversed or are factually distinguishable.
*See Cummins v. Parker Seal Co.*, 516 F.2d 544 (6th Cir. 1975), vacated by *Par-
ker Seal Co. v. Cummins*, 433 U.S. 903 (1977). The district court's judgment
(continued)

66                                                    No. 21-2475

in favor of the employer was eventually summarily affirmed by the Sixth Circuit on remand from the Supreme Court. *Cummins v. Parker Seal Co.*, 561 F.2d 658 (6th Cir. 1977). Kluge's lawyers failed to acknowledge that they were relying on a case that had been overturned, and even failed to acknowledge the error in his reply brief after opposing counsel pointed it out in the response brief. Appellee's Response Brief, at 36 n.4. "Lawyers are not entitled to ignore controlling, adverse precedent. We expect (and are entitled to) better performance by members of the bar." *Jackson v. City of Peoria, Illinois*, 825 F.3d 328, 331 (7th Cir. 2016). *See also* Practitioner's Handbook for Appeals, at 159 (available at www.ca7.uscourts.gov). Nor are the Ninth Circuit cases that Kluge cited applicable here. *Anderson v. Gen. Dynamics Convair Aerospace Div.*, 589 F.2d 397, 402 (9th Cir. 1978), merely found that the defendant's asserted basis for undue hardship had no factual basis in the record. The court also noted that, "Even proof that employees would grumble about a particular accommodation is not enough to establish undue hardship." But this is not a case of grumbling by co-workers; Brownsburg's undue burden is to its mission of educating all students and its philosophy of treating all students with respect and affirmation. The Ninth Circuit repeated this formulation the same day in another case, *Burns v. S. Pac. Transp. Co.*, 589 F.2d 403, 407 (9th Cir. 1978), stating that, "undue hardship requires more than proof of some fellow-worker's grumbling or unhappiness with a particular accommodation to a religious belief. … An employer or union would have to show, as in *Hardison*, actual imposition on co-workers or disruption of the work routine." In the context of a school, where the requested accommodation primarily affects students, disruption to the learning environment meets the *Hardison* standard. The teachers here were not "grumbling" but, as Dr. Daghe testified, were reporting disruptions to the learning environment because "students are uncomfortable in [Kluge's] class and that they are bringing the conversations that occur in his class to other classrooms and having discussions about the uncomfortableness, whether it was dealing with a transgender student and last names only or whether it was times when last names weren't used or it was times when, you know, kids just want it all to go away and act like everything is normal." R. 112-5, at 7. The teachers similarly reported that children did not know how to address each

(continued)

No. 21-2475                                                    67

   In sum, the school produced uncontradicted evidence that
Kluge's last-names-only practice stigmatized the transgender
students and caused them demonstrable emotional harm as
reported to the administration by Lee, who personally wit-
nessed it. Kluge was told that students reported feeling disre-
spected, targeted, isolated, and dehumanized. As Kluge con-
ceded, the school has a legitimate interest in the mental health
of its students, and an accommodation is not reasonable, as
Dr. Daghe told Kluge, "when it's detrimental to kids."
R. 113-4, at 28. Kluge's practice also adversely affected the
classroom environment which both transgender and non-
transgender students considered tense, awkward and uncom-
fortable. Dr. Daghe told Kluge, based on reports from stu-
dents and faculty, that his practice resulted in students being
uncertain about how to behave and how to address their
transgender classmates. Kluge's practice also disrupted other
classrooms when students brought their concerns and discus-
sions about the practice to other teachers in other classrooms.
It conflicted with the school's carefully constructed Name
Policy that sought to address the special challenges that
transgender students face in school, and balanced those con-
cerns with the preferences of the students' parents and
healthcare providers. Allowing Kluge to continue in the prac-
tice thus placed an undue hardship on Brownsburg's mission
to educate all of its students, and its desire to treat all students

---

other or how to behave around transgender students and similar students
because of Kluge's practice. R. 120-5, at 9. The teachers reports of harm to
students as well as classroom and school disruption are a far cry from
"third-party grumblings."

with respect and affirmation for their identity in the service of
that mission.

**2.**

Brownsburg claimed a second undue hardship, namely,
that Kluge's practice unreasonably exposed the school to lia-
bility under Title IX. Close in time to Brownsburg's adoption
of the Name Policy, our court issued its decision in *Whitaker*.
In *Whitaker*, we recognized that transgender students may
bring a sex discrimination claim under Title IX based on a the-
ory of sex-stereotyping. 858 F.3d at 1047–50. We have already
concluded that the district court correctly ordered summary
judgment in favor of Brownsburg because the uncontested
evidence demonstrated that Kluge's last-names-only practice
harmed students and disrupted the educational environment,
which constituted an undue hardship on Brownsburg's con-
duct of its business. Thus, we decline to reach the issue of
whether Kluge's accommodation created an additional un-
due hardship by exposing the school to liability under Title
IX. Our decision to decline to address liability under Title IX
should not be interpreted as agreement with the dissent's
analysis of this issue. It is simply unnecessary to reach this
issue in this case.

**C.**

Kluge also brought a claim for retaliation against Browns-
burg, alleging that Brownsburg "retaliated against Mr. Kluge
for engaging in protected conduct, when it agreed in writing
to the accommodation Mr. Kluge requested for his religious
beliefs, then removed the accommodation—without any
showing of undue hardship—and told Mr. Kluge he could

No. 21-2475                                                 69

use transgender names and pronouns, resign, or be terminated." R. 15, at 17–18. Kluge sought to prove his retaliation claim using the burden-shifting method outlined by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). In order make out a *prima face* case for retaliation under the burden-shifting method, Kluge must demonstrate that: (1) he engaged in statutorily protected activity; (2) he suffered a materially adverse action; and (3) there is a but-for causal connection between the two events. *Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 378 (7th Cir. 2020); *Contreras v. Suncast Corp.*, 237 F.3d 756, 765 (7th Cir. 2001). The causation standard in retaliation claims is more stringent than the standard in discrimination claims. *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 828 n.1 (7th Cir. 2014). Following *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338, 362 (2013), "the protected activity of an employee making a retaliation claim must have been 'a but-for cause of the alleged adverse action by the employer.'" In contrast, a "lessened causation standard" applies in Title VII discrimination cases. *Nassar*, 570 U.S. at 348. "The requirement of but-for causation in retaliation claims does not mean that the protected activity must have been the only cause of the adverse action. Rather, it means that the adverse action would not have happened without the activity." *Nassar*, 570 U.S. at 346–47. *See also Robertson*, 949 F.3d at 378 (describing the causation requirement as producing adequate evidence to establish that "there existed a but-for causal connection" between the protected activity and the adverse action). Once the *prima facie* case of retaliation is established:

> an employer may produce evidence which, if
> taken as true, would permit the conclusion that

> it had a legitimate non-discriminatory reason
> for taking the adverse employment action. … If
> the employer meets this burden, the plaintiff, to
> avoid summary judgment, then must produce
> evidence that would permit a trier of fact to es-
> tablish, by a preponderance of the evidence,
> that the legitimate reasons offered by the em-
> ployer were not its true reasons but were a pre-
> text for discrimination.

*Robertson* 949 F.3d at 378. *See also Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 564 (7th Cir. 2016) (where the employer demonstrates that the employee would have been fired absent his protected activity, then the alleged retaliatory motive, even if unchallenged, was not a but-for cause of the em-ployee's harm).

In the district court, Brownsburg sought summary judg-ment on this claim, contending that: (1) Kluge could not make out a *prima facie* case of retaliation because no reasonable jury could conclude on this record that there was a causal connec-tion between the protected activity of seeking a religious ac-commodation at the start of the school year, and the adverse employment action which occurred at the end of the school year after it became apparent that the accommodation was not working; and (2) even if Kluge was able to establish a *prima facie* case, Brownsburg had articulated legitimate, non-discriminatory reasons for its actions, and Kluge presented no evidence from which a reasonable jury could infer pretext.

Kluge responded to Brownsburg's motion by asserting that he had engaged in statutorily protected activity by

No. 21-2475                                                    71

identifying a sincerely held religious belief that he should
identify students by their "birth names, instead of their 'new'
transgender names," by asking for an accommodation in July
2017, and by asking in February 2018 for the school to confirm
that his accommodation was still valid. R. 153, at 27. For an
adverse employment action, he asserted that the school with-
drew the accommodation, demanded his compliance with the
Name Policy or his resignation, and then coerced him into
submitting a conditional resignation.[19] In his district court
briefing, Kluge then flatly stated, "there is a causal connection
between the protected conduct and the adverse employment
action." R. 153, at 27. The remainder of his argument on retal-
iation was simply a recitation of the same facts that he alleged
in support of his discrimination claim. Namely, he asserted
that the accommodation was implemented in July 2017, the
school indicated its intent to withdraw it in the January 2018
"Transgender Questions" document, he then asked in Febru-
ary for the school to confirm that his accommodation agree-
ment had no end date, and the school indicated that it did in-
tend to require compliance with the Name Policy from all fac-
ulty beginning in the next academic year as explained in the
"Transgender Questions" document. Kluge then asserted that
Gordon told him that he could submit a conditional resigna-
tion, that he did so in reliance of her promise that it would be
conditional, that he attempted to rescind the resignation on
May 28, 2018, but the school would not allow him to rescind

---

[19]      In the district court, Brownsburg did not contest for summary
judgment purposes that Kluge could produce evidence in support of pro-
tected activity and an adverse action, focusing instead on the causation
element of the *prima facie* case, and the lack of any evidence of pretext.

and instead terminated his employment.[20] Kluge did not address Brownsburg's stated nondiscriminatory reason for his termination, that his refusal to comply with the Name Policy was detrimental to students and to the learning environment. He made no attempt to show that this reason was a pretext to cover religious discrimination.

As we noted above, the district court found that Kluge waived his retaliation argument at summary judgment with meager briefing, simply reciting his version of the facts without discussing how those facts meet the legal requirements of a retaliation claim. The court also noted that Kluge failed to address Brownsburg's argument that there is no evidence in the record from which a reasonable fact finder could infer that its nondiscriminatory explanation for its action was a pretext. The court thus found that Kluge had waived his retaliation

---

[20]     The district court found that the record contained no factual basis for Kluge's claim that Gordon led him to believe that he could submit a conditional resignation that could later be withdrawn. Nor was there any factual basis supporting his contention that he did in fact submit a conditional resignation, according to the district court. On appeal, Kluge cites no evidence contradicting those findings. As the district court pointed out, Gordon told Kluge only that she would respect an employee's wish not to disclose his resignation to colleagues until the end of the school year. She never told him that he could withdraw a properly submitted resignation, and in fact it was not possible to withdraw a resignation made to the Superintendent or his agent (Gordon, in this instance). R. 112-4, at 11–12; R. 120-8; R. 120-9. Kluge himself recorded the meeting where he asserts that Gordon made the offer of a conditional resignation, and the transcript of that meeting does not support his claim. R. 112-4, at 20–55. Nor is there any language in his actual resignation suggesting that it was conditional. The issue of the purported breach of a promise to allow a conditional resignation has no merit and we will not give it further consideration.

claim. As an alternate basis for granting judgment in favor of
the defendant, the court also addressed the merits, noting that
Kluge failed to present any evidence from which a reasonable
fact finder could conclude that a causal connection exists be-
tween Kluge's protected activity and his resignation, any evi-
dence of pretext, or any evidence that Brownsburg's action
was motivated by discriminatory animus. The court therefore
granted summary judgment in favor of the school on the re-
taliation claim as well.

Although Kluge's briefing on retaliation in the district
court was thin, we find that the argument was not waived and
proceed to the merits. Kluge's claim fails on the causation el-
ement. That is, he failed to produce evidence that established
a but-for causal link between protected activity and the ad-
verse action, and so failed to make out a *prima facie* case of
retaliation.[21] Indeed, on appeal, Kluge relies on outdated prec-
edent to assert that, to establish a causal link, he must show

---

[21]      In his reply brief on appeal, Kluge suggests for the first time that
he meets the causation element with evidence that, in the July 27, 2017
meeting, Dr. Snapp became "very angry" with him the first time that
Kluge mentioned his religious objection to using the transgender students'
PowerSchool first names. Appellant's Reply Brief, at 20; R. 120-3, at 19. He
also asserts that Dr. Snapp engaged in a theological debate with him, and
told him that his beliefs were wrong. *Id.* Kluge waived this argument by
not raising it in the district court, and by not raising it on appeal until his
reply brief. *Accident Fund Ins. Co. of America v. Custom Mech. Constr., Inc.*,
49 F.4th 1100, 1108 (7th Cir. 2022) (arguments raised for the first time in a
reply brief are waived); *White v. United States*, 8 F.4th 547, 552 (7th Cir.
2021) (same); *DM Trans, LLC v. Scott*, 38 F.4th 608, 619 (7th Cir. 2022) (is-
sues and arguments raised for the first time on appeal are forfeited, as are
arguments that are not sufficiently developed).

only "that the protected activity and the adverse action were not wholly unrelated." *Hunt-Golliday v. Metropolitan Water Reclamation Dist. of Greater Chicago*, 104 F.3d 1004, 1014 (7th Cir. 1997). But as we explained above, after the Supreme Court's decision in *Nassar*, he must demonstrate that the protected activity of an employee making a retaliation claim was a but-for cause of the alleged adverse action by the employer. Kluge's evidence falls short of meeting this standard. He says only that he engaged in protected activity and that when he refused to either comply with the policy or resign, "his supervisors subjected him to a [sic] 'a pattern of criticism and animosity' and finally constructively discharged him." Appellant's Opening Brief, at 42 (quoting *Hunt-Golliday*, 104 F.3d at 1014). He cited no record evidence in the district court in support of this conclusory claim that anyone subjected him to a "pattern of criticism and animosity," failed to cite any such evidence on appeal until his reply brief, and makes no attempt to connect his protected activity to his resignation. Although he cites evidence of protected activity and an adverse action (both of which Brownsburg conceded for the purposes of summary judgment), he cites nothing supporting but-for causation.

Instead, the undisputed evidence demonstrates that Brownsburg worked with Kluge to create a workable accommodation during the 2017-2018 school year. Only after the last-names-only practice proved harmful to students and the learning environment did the school withdraw it, and even then Brownsburg allowed Kluge to continue the practice through the end of the school year. Further, Brownsburg did not disturb the additional accommodation relieving Kluge of

the task of handing out gender-specific uniforms. The length
of time between the protected activity (of Kluge requesting a
religious accommodation) and the adverse employment ac-
tion, together with the school's attempt to find a workable so-
lution defeat any inference that Brownsburg asked Kluge to
resign in retaliation for his protected activity.

Even if we assume that Kluge cleared the hurdle of the
*prima facie* case, he makes no effort to demonstrate any mate-
rial issue of fact on the question of pretext:

> "Pretext involves more than just faulty reason-
> ing or mistaken judgment on the part of the em-
> ployer; it is [a] 'lie, specifically a phony reason
> for some action.'" *Argyropoulos*, 539 F.3d at 736
> (quoting *Sublett v. John Wiley & Sons, Inc.*, 463
> F.3d 731, 737 (7th Cir. 2006)). We have repeat-
> edly emphasized that when "assessing a plain-
> tiff's claim that an employer's explanation is
> pretextual, we do not ... second-guess[ ] an em-
> ployer's facially legitimate business decisions."
> *Id*. (internal quotation marks omitted). An em-
> ployer's reasons for firing an employee can be
> "foolish or trivial or even baseless,'' as long as
> they are "honestly believed." *Culver*, 416 F.3d at
> 547 (quoting *Hartley v. Wis. Bell, Inc.*, 124 F.3d
> 887, 890 (7th Cir. 1997)).

*Lord*, 839 F.3d at 564. Instead of producing evidence of pretext,
Kluge simply ties the legitimacy of his retaliation claim to the
validity of his discrimination claim. That is, he asserts that he
need not present evidence of pretext because Brownsburg

never presented a legitimate, nondiscriminatory basis for ter-
minating his employment, and that his "whole argument was
that the district had *no legitimate basis* for revoking his accom-
modation and forcing him to resign." Appellant's Opening
Brief, at 40. In so arguing, Kluge is essentially conceding that
he has never provided evidence of pretext, apparently resting
entirely on his claim that Brownsburg never produced a legit-
imate, nondiscriminatory reason for his termination. That
was a risky strategy.

As we have just concluded, Brownsburg did in fact
demonstrate legitimate reasons for withdrawing the accom-
modation. Brownsburg was within its rights as an employer
facing an undue hardship to withdraw the requested accom-
modation when it became apparent that it was not working in
practice and was causing harm to students and to the educa-
tional environment. That was a legitimate, nondiscriminatory
reason for the termination. In the absence of any evidence that
it was a pretext for religious discrimination—i.e., that it was a
lie or a phony reason—we will not second-guess Browns-
burg's business decision. *Lord*, 839 F.3d at 564. *See also Boss v.
Castro*, 816 F.3d 910, 917 (7th Cir. 2016) ("[W]hen an employer
articulates a plausible, legal reason for its action, it is not our
province to decide whether that reason was wise, fair, or even
correct, ultimately, so long as it truly was the reason for its
action;" the "federal courts are not a super-personnel depart-
ment that second-guesses facially legitimate employer poli-
cies."). "We have said time and again (in more than one hun-
dred reported opinions, by our count) that we are not a super-
personnel department that will substitute our criteria for an
employer's for hiring, promoting, or disciplining employees."

No. 21-2475                                                    77

*Joll v. Valparaiso Cmty. Sch.*, 953 F.3d 923, 933 (7th Cir. 2020).
*See also Kariotis v. Navistar Int'l Transp. Corp.*, 131 F.3d 672, 677
(7th Cir. 1997) ("To successfully challenge the honesty of the
company's reasons [the plaintiff] must specifically rebut those
reasons. But an opportunity for rebuttal is not an invitation to
criticize the employer's evaluation process or simply to ques-
tion its conclusion about the quality of an employee's perfor-
mance. Rather, rebuttal must include facts tending to show
that the employer's reasons for some negative job action are
false, thereby implying (if not actually showing) that the real
reason is illegal discrimination. In other words, arguing about
the accuracy of the employer's assessment is a distraction …
because the question is not whether the employer's reasons
for a decision are '*right* but whether the employer's descrip-
tion of its reasons is *honest*.'"). Here, the employer conclu-
sively demonstrated that it withdrew the accommodation
solely because it worked an undue hardship on the school's
business of educating all students. There is no hint in this rec-
ord that this explanation was false and that the real reason for
the termination was discrimination.

Interestingly, the dissent acknowledges that Kluge's fail-
ure to demonstrate that Brownsburg's legitimate, nondis-
criminatory reason for his termination was a pretext dooms
his retaliation claim. Yet even though Kluge himself tied the
success of his two claims together, the dissent does not
acknowledge that Kluge's failure to rebut the school's uncon-
tested, nondiscriminatory explanation for withdrawing the
accommodation is also fatal to his discrimination claim.

Brownsburg began developing the Name Policy before it
ever knew that Kluge would have a religious objection to the

directive. In the face of his objection, the school made several efforts to accommodate his beliefs, meeting with him multiple times, agreeing to allow his use of last names only, and offering to have another person hand out gender-specific orchestra uniforms (an accommodation that Brownsburg never withdrew). The school's decision to allow students to change their names and gender markers in the PowerSchool database only with the approval of a parent and a healthcare provider assuaged the religious concerns of three of the four teachers lodging a religious objection. That the school decided to withdraw the last-names-only accommodation only when it was apparent that it was harming students and disrupting the learning environment was to the school's credit. *See Toledo v. Nobel-Sysco, Inc.*, 892 F.2d 1481, 1490 (10th Cir. 1989) ("The employer is on stronger ground when he has attempted various methods of accommodation and can point to hardships that actually resulted."); *Draper v. United States Pipe & Foundry Co.*, 527 F.2d 515, 520 (6th Cir. 1975) (same). For all of these reasons, we affirm the grant of summary judgment in favor of Brownsburg on the retaliation claim.

### III.

In sum, we affirm summary judgment against Kluge on his discrimination claim. Brownsburg has demonstrated as a matter of law that the requested accommodation worked an undue burden on the school's educational mission by harming transgender students and negatively impacting the learning environment for transgender students, for other students in Kluge's classes and in the school generally, and for faculty. Title VII does not require that employers accommodate religious practices that work an undue hardship on the conduct

No. 21-2475                                          79

of the employer's business; that sometimes means that a religious employee's practice cannot be accommodated. Moreover, Kluge's retaliation claim fails as a matter of law because he failed to produce any evidence supporting the causation element of the *prima facie* case, or any evidence that the school's explanation for its actions was a pretext for religious discrimination.

AFFIRMED.

BRENNAN, *Circuit Judge*, concurring in part and dissenting in part.

Brownsburg Community School Corporation required music teacher John Kluge to use the chosen first names and pronouns of transgender students. Kluge objected on religious grounds, and a gender-neutral accommodation was arrived at: He would address his students by their last names only. The School District received some complaints about this practice, so it revoked the accommodation and told Kluge he could comply, resign, or be terminated. He tendered his resignation.

Kluge sued the School District under Title VII for failure to reasonably accommodate his religious beliefs and for retaliation against his accommodation request. The majority opinion affirms summary judgment for the School District on both claims. On Kluge's retaliation claim, I disagree with my colleagues' conclusion as to causation but concur in the judgment for the School District. I respectfully dissent on the religious accommodation claim.

This case tests the limits of the Supreme Court's atextual but controlling interpretation of "undue hardship" in Title VII's religious accommodation provision as "more than a *de minimis* cost." *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977); 42 U.S.C. § 2000e(j). Do complaints of offense constitute more than a *de minimis* cost? Specifically, is being offended by an employee's religious practice enough to discharge the employer's duty to reasonably accommodate the employee's religious practice? The majority opinion answers in the affirmative. Under its reasoning, Title VII provides no protections for religious conscientious objectors who in good faith try to accommodate their employers' dictates. This court

has not ruled on whether taking offense can constitute more than a *de minimis* cost, so we should tread carefully.

I would reverse the district court in part and grant partial summary judgment for Kluge that his religious beliefs are sincerely held and that he has established a prima facie case for religious discrimination. Then Kluge's religious accommodation claim comes down to a fact-intensive inquiry: Did the School District demonstrate that Kluge's gender-neutral accommodation of calling all students by only their last names causes undue hardship—that is, more than a *de minimis* cost? The majority opinion says "yes," but it sidesteps Kluge's countervailing evidence, fails to construe the record in his favor, and overlooks credibility issues on both sides, which are reserved for resolution by the factfinder.

Courts uniformly review context-specific evidence to evaluate whether a religious accommodation in fact imposes an undue hardship. But without supporting authority, my colleagues hold that the undue hardship inquiry looks only to evidence within the employer's knowledge at the time of the adverse employment decision. The majority opinion thus resolves this case based on the School District's receipt of some allegations that the accommodation did not work and caused tension and discomfort. It deems irrelevant the testimony of Kluge, three students, and another teacher. Considering the entire record, there is a genuine issue of material fact on undue hardship, which we should remand for trial.

## I. Factual Background

The majority opinion downplays certain record evidence that in my view creates a genuine issue of material fact on undue hardship. This includes evidence about the School

District's Name Policy and Kluge's last-names-only accom-modation; complaints about that accommodation; counter-vailing evidence about Kluge's accommodation as practiced in his classroom; the School District's revocation of the accom-modation; and Kluge tendering his resignation.

## A. Name Policy & Accommodation

John Kluge is a Christian and a leader in his church. From 2014 to 2018, he taught orchestra at Brownsburg High School, part of the Brownsburg Community School Corporation (School District), west of Indianapolis. But he was not just any orchestra teacher; many students and former students said he was a great one. R. 52-5, at 2; R. 52-4, at 2; R. 120-18, at 11, 13.

In May 2017, discussions surrounding the needs of transgender students led the School District to adopt the Name Policy. R. 120-1, at 3–4. Kluge believes that based upon his religion, he cannot affirm the transgender identity of his students by calling them by their chosen names. R. 113-1, at 6–9. On July 27, 2017, Kluge objected to the Name Policy based on his religious convictions, and Principal Daghe and Superintendent Snapp gave Kluge three choices: comply, re-sign, or be suspended pending termination. R. 15-3, at 3; R. 120-3, at 14. At this meeting, Kluge says Snapp got "very an-gry," explained why Kluge's beliefs were "wrong," and ar-gued that his "beliefs aren't what's in the Bible." R. 120-3, at 19. Kluge responded with scripture that supported his beliefs. To the contrary, Snapp recalled that he had a "cordial conver-sation" on their respective religious beliefs. R. 113-6, at 6. In

the end, Kluge refused to comply, and Superintendent Snapp gave him the weekend to consider his options. R. 120-3, at 15.

On Monday July 31, 2017, Kluge met with Snapp and Human Resources Director Gordon. *Id.* at 17. Gordon presented Kluge with a form to indicate whether he would comply with the Name Policy. R. 15-1, at 1. Kluge proposed a compromise that he be allowed to refer to students by their last names only, "like a sports coach," and the school administrators agreed. R. 120-3, at 17.

### B. Complaints

During the 2017–2018 school year—the relevant time frame for evaluating undue hardship—Principal Daghe "first learned of concerns with Mr. Kluge and how he was addressing students in class via an email from Craig Lee … on August 29, 2017." R. 120-2, at 4. Lee served as the faculty advisor and host for the Equality Alliance, a student club that met weekly "to discuss issues that impact the LGBTQ community." R. 120-14, at 6.

*Staff.* In his email, Lee referenced a teacher who refused to call a transgender student by their new name, but he did not mention Kluge. R. 120-15. Still, Principal Daghe attested he believed and confirmed that the email referred to Kluge. R. 120-2, at 4. Among other things, Lee stated, "[T]here is confusion amongst some teachers and students that I think needs clarification and perhaps a teacher or two that needs to know that it is not ok to disobey the powerschool [sic] rule." R. 120-15. Lee said he was "not totally sure" of the best next step and that he was "very biased" on the topic. *Id*. Lee testified separately that several students in Equality Alliance meetings

found Kluge's last-names-only practice insulting and disrespectful. R. 58-2, at 2.

Assistant Superintendent Jessup also recounted visiting an Equality Alliance meeting where she heard four or five students complain about a teacher using last names only. R. 120-1, at 4. In her view, the other 35 or so students in attendance appeared to agree with the complaints.[1] *Id.* Again, while the students did not identify Kluge by name, "it was certainly implied that he was the teacher in question." *Id.* She had no doubt the teacher was Kluge because he was the only staff member who had been permitted the last-names-only accommodation. *Id.* Deposition testimony also revealed that some teachers had complained about Kluge's accommodation. R. 120-14, at 16–17; R. 113-5, at 8–9; *see also* R. 113-4, at 9.

*Students.* Two transgender students in Kluge's orchestra class during the 2017–2018 school year, Aidyn Sucec and Sam Willis, submitted declarations. The majority opinion addresses them at length, so I highlight only a few points. Aidyn said "Kluge's behavior was noticeable to other students in the class." R. 22-3, at 4. Aidyn recalled, "At one point, my stand partner asked me why Mr. Kluge wouldn't just say my name.

---

[1] The record does not reflect the total number of transgender students at Brownsburg High School in school year 2017–2018. The evidence shows three transgender students in Kluge's classes: Aidyn Sucec, Sam Willis, and an unnamed third student. R. 22-3; R. 58-1; R. 52-3 at 3. A student in Kluge's orchestra class, Lauren Bohrer, said the class averaged about 40 students. R. 52-3 at 2. According to the Indiana Department of Education Data Reports Archive, Attendance & Enrollment, in the 2017–2018 school year, Brownsburg High School had 2,646 students. IND. DEP'T OF EDUC., *School Enrollment by Grade Level*, https://www.in.gov/doe/it/data-center-and-reports/data-reports-archive/.

I felt forced to tell him that it was because I'm transgender."
*Id.* Similarly, Sam opined that "Kluge's use of last names in
class made the classroom environment very awkward." R. 58-
1, at 3. Sam said "[m]ost of the students knew why Mr. Kluge
had switched to using last names, which contributed to the
awkwardness and [his] sense that [he] was being targeted be-
cause of [his] transgender identity." *Id.* at 3–4.

*Parents.* In fall 2017, the high school received two com-
plaints about Kluge. The first was in a letter from the parents
of a transgender student, and the second in an email exchange
between a Brownsburg school counselor and a transgender
student's parent. R. 120-12; R. 120-13. In the email exchange,
the counselor advised that the administration "require[d] that
students role play" at home "to practice situations in which"
they are called by a name other than the one they prefer. R.
120-13, at 6. The counselor continued, "As a school, we will
certainly do our best to get the name/pronouns right, but we
are all human and there may [be] instances where we don't
get it quite right. In those moments, we do not want [the stu-
dent] to be offended, feel disrespected, or feel discouraged."
*Id.* at 6–7.

### C. Countervailing Evidence

These complaints are just one side of the story, however.
Three of Kluge's students and a fellow teacher, all of whom
observed his classes in the 2017–2018 school year, attested that
the last-names-only practice did not adversely affect the class-
room environment. This evidence, along with Kluge's

testimony, create a genuine issue of material fact on undue hardship.

*Lauren Bohrer Declaration.* Lauren Bohrer and Aidyn were students in Kluge's orchestra class. R. 52-3, at 2. Bohrer attested that she "did not hear Mr. Kluge ever call students by gendered prefixes." *Id.* She explained that orchestra is a larger class, so individual interactions were few. "It was rare that Mr. Kluge had occasion to call on any individual student directly unless they raised their hand to ask a question." *Id.* Bohrer remembered that after the first few weeks of class, Kluge stopped calling out last names to take attendance and instead took attendance by noting students that were absent.

According to Bohrer, "Mr. Kluge never once brought up the use of only last names or made known to our class his reason for using only last names. I did not find it odd and Mr. Kluge did not seem uncomfortable addressing us in this fashion. I never suspected that it was anything other than the easiest way for him to address us as our last names are listed first in PowerSchool." *Id.* at 3. Bohrer also said she had a transgender stand partner—not Aidyn—and that she "never saw Mr. Kluge treat [her] stand-mate any differently than cisgender students." *Id.* "[She] never saw or heard about any animosity between them." *Id.* "[Her] stand mate never told [her] that they disliked Mr. Kluge's behavior or that Mr. Kluge had been unfair to them." *Id.*

Bohrer did not know Aidyn personally, but she was hesitant to engage or interact with him "due to [his] reputation for confrontational and aggressive behavior toward people who did not strictly conform to [his] mindset." *Id.* In fall semester 2018—after Kluge's termination—Bohrer alleges that she was called to the principal's office based on Aidyn's false

accusations of her calling him a "f----t." *Id.* at 4. Per Bohrer, the principal conceded that it was unlikely that Aidyn's accusations were true. *Id.* at 5.

*Kennedy Roberts Declaration.* Kennedy Roberts, another orchestra student, said Kluge was a "favorite teacher[]." R. 52-4, at 1. Roberts recalled that "the energy [Kluge] put into conducting [their] orchestra and creating a fun classroom environment is incomparable to any teacher [he'd] had." *Id.* at 1. Roberts said, "During the school year, [Kluge] always called everyone by their last names, which I never knew the reason as to why, but I never really thought anything of it. It's just what he did." *Id.* at 2. Roberts corroborated Bohrer's testimony that Kluge called student last names for attendance "at first, maybe 5-8 times over the year." *Id.* From what Roberts could tell, Kluge "treated everyone this way, no one was singled out in front of the class or intentionally treated disrespectfully." *Id.*

*Mary Jacobson Declaration.* A third student, Mary Jacobson, was in both Kluge's Music Theory and Advanced Orchestra classes. R. 52-5, at 2. Jacobson attested that, between these two classes, "[she] never heard Mr. Kluge refer to students by their first name, or by any gendered prefix or pronouns." *Id.* at 2. She "never heard Mr. Kluge discuss his use of last names with any student or give any explanation for it. His use of last names was not unnatural sounding. I never heard any students question him about it, and I never brought up the topic to him myself." *Id.* at 2. And she "did not see or hear Mr. Kluge in conflict with any students nor did [she] witness any students receiving different treatment than the rest of the class received." *Id.* She also added that Kluge was a

"wonderful teacher" whose "kindness and fairness" made for an "open and honest classroom demeanor." *Id.* at 2–3.

*Natalie Gain Declaration.* In addition to these student declarations, Natalie Gain, a teacher who led private music lessons at the school during the day, submitted a declaration stating that she "never heard [Kluge] use gendered language in the classroom." R. 52-2, at 3. "[She] only heard him use last names with the students" and "never heard any of the students discussing the [sic] Mr. Kluge's use of last names, or any references to his agreement with the administration." *Id.* "[A]s far as [she] could tell, Mr. Kluge's accommodation was not common knowledge … ." *Id.* She also said Kluge "had mostly used last names … the previous school year anyway, with 'Mr./Ms.' for students to encourage a respectful teaching environment, like college classes." *Id.* at 2.

*Kluge's Testimony.* Kluge also attested there were no issues with the last-names-only accommodation. He said that in the 2017 fall semester leading up to a meeting with Principal Daghe on December 13, 2017, "there were no student protests, there were no written complaints about [his] use of last names for all students, there were no classroom disturbances, and there were no cancelled classes." R. 113-2, at 4. Kluge said he did not witness tension in the students and faculty. R. 120-3, at 23. He did not see animosity from the students toward him. *Id.* Instead, Kluge averred that "the accommodation worked as intended and [his] students excelled," some winning awards for their performances during the 2017–2018 school year. R. 113-2, at 4. He recounted, "We performed better than ever in our orchestra competitions. Students' grades on their AP [Music Theory] exam were great. There was a lot of participation in the extracurricular programs, a lot of students

performing in the voluntary extra stuff that you can do in orchestra." R. 120-3, at 23–24.

### D. Revocation of Kluge's Accommodation

On January 22, 2018, Assistant Superintendent Jessup presented faculty with a document entitled "Transgender Questions" accompanied by a presentation titled "Transgender Considerations." Both stated that the last-names-only accommodation would not be permitted the following school year. R. 15-4; R. 120-20. The majority opinion refers to excerpts from only the Transgender Questions document. Other portions of that document include:

> **Where is the line drawn on "pleasing" students and their beliefs?** It is our job to make all students feel welcome and accepted in the public school environment.
>
> …
>
> **How do we deal with a student exploding in anger with being called the wrong name or gender?** If it's the fifth time this week the staff member has messed up the pronoun, then the staff member needs to get on board. However, if the student explodes on one small mistake, we

would address the student behavior as we nor-
mally would.

R. 15-4, at 9–10.

The Transgender Considerations presentation stated in
relevant part:

> **Considerations**
> …
> - Replace gender specific language with inclusive
>   alternatives—instead of "ladies and gentleman"
>   [sic] or "boys and girls" try using "everyone,"
>   "people" or "folks"
> - If you are creating a form for students, consider
>   whether you really need to have a question
>   about sex or gender; if so, provide gender op-
>   tions
> - Try not to make assumptions about the genders
>   of students … .
> …
> - Avoid using boy/girl methods to divide stu-
>   dents—seating charts, lining up, groups, etc.
> - If possible, provide gender neutral uniforms
> …
> **Other Guidance**
> - Creating a safe and supportive environment for
>   all students is important
>   - Be respectful and nonjudgmental; do not
>     show skepticism and/or disapproval

R. 120-20, at 5–7.

On February 6, 2018, Kluge, Principal Daghe, and Human
Resources Director Gordon met, and the school administra-
tors confirmed that Kluge would not be allowed his

accommodation in the next school year. R. 113-2, at 6. In this meeting, the three discussed how Kluge might announce his departure if he resigned. Gordon said other staff had left and not told anybody—without "any fanfare." R. 113-4, at 39. She suggested that Kluge did not have to talk about his retirement with staff or students. But Gordon qualified, "that's kind of up to you." *Id.*

### E. Kluge Tenders Resignation

Kluge submitted his resignation letter on April 30, 2018, and continued to teach for the rest of the school year. In May, he presided over the school's orchestra awards ceremony, where he referred to all students by their PowerSchool first and last name. R. 120-3, at 32. On May 25, 2018, the School District locked Kluge out of its buildings, effectuating his resignation. R. 15-3, at 1; R. 113-2, at 7. Two weeks later at a School District Board meeting, Kluge asked the Board of Trustees not to accept his resignation and requested that he be reinstated. R. 113-2, at 7; R. 120-3, at 29–30; R. 120-18, at 10. The Board heard comments from Kluge and the community—some in support of termination and others against—and ultimately accepted Kluge's resignation, ending his employment. R. 113-2, at 7; R. 120-18, at 9–13. Both Aidyn and Sam offered comments at the Board meeting. R. 120-18, at 11.

After the meeting, Jeff Gracey, a parent of a School District student, recalled that Kluge addressed the Board with passion and wept when he found out that he would not retain his position. R. 52-6, at 3. Gracey opined that Aidyn's comments were "confrontational," and that he "seemed well coached" and "enthused about the prospect of Mr. Kluge losing his job." *Id.* Gracey said that Aidyn's comments before the Board

No. 21-2475

"seemed like a personal vendetta or a means to force others to use their voices to reinforce their ideology." *Id.* at 4.

## II. Legal Framework

Kluge's religious accommodation and retaliation claims and the record evidence are considered under the familiar law of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. Still, close review of the law on failure-to-accommodate claims is critical in this case because some of it is in flux and the law that is unclear bears directly upon the claims we decide.

### A. Title VII

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's … religion." 42 U.S.C. § 2000e-2(a)(1). The statute defines "religion" to include "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j).

To make a prima facie case based on an employer's failure to provide a religious accommodation, a plaintiff must show: (1) an observance or practice that is religious in nature; (2) that conflicts with an employment requirement; and (3) that the need for a religious accommodation was a motivating factor in the adverse employment decision or other discriminatory treatment. *EEOC v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1575 (7th Cir. 1997) (citations omitted); *EEOC v.*

*Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 772–73 (2015) (modifying the former third factor—the employer's actual notice of the employee's need for a religious accommodation). In addition, the employee must show his religious belief is sincerely held. *Adeyeye v. Heartland Sweeteners, LLC*, 721 F.3d 444, 448 (7th Cir. 2013) (citing *Redmond v. GAF Corp.*, 574 F.2d 897, 901 n.12 (7th Cir. 1978)).

Whether an accommodation is reasonable is necessarily linked to the question of undue hardship: "Once the plaintiff has established a prima facie case of discrimination, the burden shifts to the employer to make a reasonable accommodation of the religious practice or to show that any reasonable accommodation would result in undue hardship." *Porter v. City of Chicago*, 700 F.3d 944, 951 (7th Cir. 2012) (citing *Ilona*, 108 F.3d at 1575–76). "Reasonableness is assessed in context, of course, and this evaluation will turn in part on whether or not the employer can *in fact* continue to function absent undue hardship" with the accommodation in place. *Adeyeye*, 721 F.3d at 455 (emphasis added). Undue hardship is an objective inquiry that "will depend on close attention to the specific circumstances of the job" and the nature of the accommodation. *Id.*

## B. *Hardison*'s *De Minimis* Cost Test

The Supreme Court interpreted "undue hardship" to mean "more than a *de minimis* cost" in *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977). *Hardison* involved a Sabbatarian employee who refused to work on Saturdays on religious grounds. *Id.* at 66. In holding that accommodating Hardison's schedule would impose more than a *de minimis* cost, the Court observed that replacing him with other employees "would involve costs to TWA, either in the form of

94                                                    No. 21-2475

lost efficiency in other jobs or higher wages," and require TWA to "carve out a special exception to its seniority system" of giving senior employees priority in choosing their schedule. *Id.* at 83–84. Accordingly, this court has observed that *Hardison* is most instructive when there is an existing system that attempts to accommodate the religious and non-religious preferences of employes—such as by a seniority system or collective bargaining agreement. *Adeyeye*, 721 F.3d at 456; *see also EEOC v. Firestone Fibers & Textiles Co.*, 515 F.3d 307, 315 (4th Cir. 2008) (discussing pre-existing company policies to accommodate employees' work scheduling preferences). *Hardison*'s core is that "Title VII does not require an employer to offer an 'accommodation' that comes at the expense of other workers." *EEOC v. Walmart Stores E., L.P.*, 992 F.3d 656, 659 (7th Cir. 2021).

Since *Hardison*, the Supreme Court has reaffirmed the *de minimis* cost test in *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 67 (1986). In that case, the Court also clarified that the employer's duty to accommodate under § 2000e(j) ends "where the employer has already reasonably accommodated the employee's religious needs." *Id.* at 68. The Court, in its only other Title VII religious accommodation case post-*Hardison*, did not mention the *de minimis* cost test because the Court remanded for further proceedings under its holding that the need for a religious accommodation need only be a motivating factor for the employer's adverse employment decision. *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 772–73, 775 (2015). The case apparently settled on remand.

So the *de minimis* cost test remains controlling law absent a contrary indication from the Supreme Court. *See Bosse v. Oklahoma*, 580 U.S. 1, 3 (2016). But remember, *Hardison*'s test is

"*more* than a *de minimis* cost," and the Court has not defined how much more. 432 U.S. at 84 (emphasis added). The Court reaffirmed in *Abercrombie* that "Title VII does not demand mere neutrality with regard to religious practices—that they be treated no worse than other practices." 575 U.S at 775. "Rather, it gives them favored treatment, affirmatively obligating employers not 'to fail or refuse to hire or discharge any individual … because of such individual's' 'religious observance and practice.'" *Id.* (citing §§ 2000e-2(a)(1), 2000e(j)). "Title VII requires otherwise-neutral policies to give way to the need for an accommodation." *Id.* So the Court apparently reads the *de minimis* cost test to have some substance.

Since *Hardison*, the *de minimis* cost test has come under criticism.[2] Most importantly, the Supreme Court has recently

---

[2] *E.g., Patterson v. Walgreen Co.*, 140 S. Ct. 685 (2020) (Alito, Thomas, and Gorsuch, Js., concurring) ("*Hardison*'s reading does not represent the most likely interpretation of the statutory term 'undue hardship.'"); *Small v. Memphis Light, Gas & Water*, 141 S. Ct. 1227, 1229 (2021) (Gorsuch and Alito, JJ., dissenting) (referring to *Hardison* as a "mistake … of the Court's own making" and observing "it is past time for the Court to correct it"); *Small v. Memphis Light, Gas & Water*, 952 F.3d 821, 826–29 (6th Cir. 2020) (Thapar, J., concurring) (discussing how the *Hardison* test is contrary to ordinary, contemporary meaning and incongruent with the treatment of "undue hardship" in other federal statutory contexts); Debbie N. Kaminer, *Religious Accommodation in the Workplace: Why Federal Courts Fail to Provide Meaningful Protection of Religious Employees*, 20 Tex. Rev. L. & Pol. 107, 122 (2015) ("In relying on the de minimis standard, the Court essentially held that little more than virtual identical treatment of religious employees was required."); Matthew P. Mooney, *Between a Stone and a Hard Place: How the Hajj Can Restore the Spirit of Reasonable Accommodation to Title VII*, Note, 62 Duke L.J. 1029, 1040 (2013) ("Thus, the Court was left to fill in the gaps, which it did by severely limiting employers' duty to accommodate their employees.").

granted certiorari in *Groff v. DeJoy*, 143 S. Ct. 646 (2023) (mem.). That case presents a classic Sabbatarian scenario, as in *Hardison.* The Third Circuit held that the employee's requested accommodation to be exempted from work on Sunday caused more than a *de minimis* cost to the employer. *See Groff v. DeJoy*, 35 F.4th 162, 175 (3d Cir. 2022), *cert. granted*, 143 S. Ct. 646 (2023). The questions presented in *Groff* on which the Court has granted certiorari are squarely relevant here: "1. Whether this Court should disapprove the more-than-de-minimis-cost test for refusing Title VII religious accommodations stated in *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63 (1977)[;] 2. Whether an employer may demonstrate 'undue hardship on the conduct of the employer's business' under Title VII merely by showing that the requested accommodation burdens the employee's co-workers rather than the business itself." Petition for Writ of Certiorari, *Groff*, No. 22-174, at i; Questions Presented Report, *Groff*, No. 22-174.

## C. "Undue Hardship" & Offense

### 1. Statutory Text

The statutory text of 42 U.S.C. § 2000e(j) provides little help in answering whether offense constitutes undue hardship. At enactment, "hardship" generally meant "'adversity,' 'suffering' or 'a thing hard to bear.'" *Small*, 952 F.3d at 826–827 (quoting THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 601 (1969); BLACK'S LAW DICTIONARY 646 (5th ed. 1979); WEBSTER'S NEW TWENTIETH CENTURY DICTIONARY OF THE ENGLISH LANGUAGE 826 (2d ed. 1975)). The ordinary meaning of "hardship" does not exclude non-economic

difficulties such as hurt feelings, albeit connoting a degree of
severity given the adjective "undue."

*Hardison*'s controlling test uses the word "cost," 432 U.S.
at 84, which implies an economic or at least quantifiable loss
to the employer. As mentioned above, *Hardison* was focused
on "costs to [the employer]" by scheduling around the Sabba-
tarian employee's schedule—"either in the form of lost effi-
ciency in other jobs or higher wages." *Id.* at 84. So, from the
outset, the Supreme Court appears to have set an operational
or economic gloss on "hardship."

## 2. EEOC Regulation

While neither the statute's text nor *Hardison* provide an-
swers to whether offense is enough, the Equal Employment
Opportunity Commission has issued informative regulations
and guidance. For Title VII, the EEOC may issue procedural
but not substantive regulations to carry out the statutory pro-
visions. 42 U.S.C. § 2000e-12(a); *Edelman v. Lynchburg Coll.*,
535 U.S. 106, 113 (2002) (citations omitted). Nonetheless, the
regulations are persuasive (albeit nonbinding) guidance, mer-
iting lesser deference under *Skidmore* in light of the "special-
ized experience and broader investigations and information"
available to the agency. *United States v. Mead Corp.*, 533 U.S.
218, 234 (2001) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134,
139 (1944)); *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338,
360–61 (2013); *Fed. Exp. Corp. v. Holowecki*, 552 U.S. 389, 399
(2008) (explaining that the EEOC's interpretive statements are
entitled to a "measure of respect" (quoting *Alaska Dept. of
Env't Conservation v. EPA*, 540 U.S. 461, 487–88 (2004))).

In 29 C.F.R. § 1605.2(e), the EEOC states that it will deter-
mine "undue hardship" as "more than a *de minimis* cost" in

accordance with *Hardison*. In making the "undue hardship" determination, the EEOC gives "due regard [] to the identifiable cost in relation to the size and operating cost of the employer, and the number of individuals who will in fact need a particular accommodation." *Id.* "In general, the Commission interprets this phrase as it was used in the *Hardison* decision to mean that costs similar to the regular payment of premium wages of substitutes, which was at issue in *Hardison*, would constitute undue hardship." *Id.* But administrative costs for providing a religious accommodation, such as "costs involved in rearranging schedules and recording substitutions for payroll purposes" "will not constitute more than a *de minimis* cost." *Id.* Coworker or customer feelings, preferences, and complaints are not mentioned in § 1605.2.

### 3. EEOC Guidance

An EEOC Guidance addresses coworker complaints and customer preferences. U.S. EQUAL EMPLOYMENT OPPORTUNITY COMM'N, Section 12: Religious Discrimination (2021), https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination#h_255006745363916107498607%207844 (*EEOC Guidance*).

As to coworker complaints, the Guidance states, "Although infringing on coworkers' abilities to perform their duties or subjecting coworkers to a hostile work environment will generally constitute undue hardship, the general disgruntlement, resentment, or jealousy of coworkers will not." *Id.* (footnotes omitted). "Undue hardship requires more than proof that some coworkers complained or are offended by an unpopular religious belief or by alleged 'special treatment' afforded to the employee requesting religious accommodation; a showing of undue hardship based on coworker interests

No. 21-2475                                                        99

generally requires evidence that the accommodation would
actually infringe on the rights of coworkers or cause disrup-
tion of work." *Id.* (footnote omitted). "Applying this standard,
it would be an undue hardship for an employer to accommo-
date religious expression that is unwelcome potential harass-
ment based on race, color, sex, national origin, religion, age,
disability, or genetic information, or based on its own internal
anti-harassment policy." *Id.* So in general, the EEOC requires
more than coworker complaints or offense by an employee's
religious observance or practice to constitute an undue
hardship. The religious accommodation must cause some op-
erational disruption, or rise to such a level that it can be con-
sidered harassment or to cause a hostile work environment.
*Id.*

As to customer preference, the Guidance states, "An em-
ployer's action based on the discriminatory preferences of
others, including coworkers or customers, is unlawful." *Id.* It
provides an illustrative example:

> **Employment Decision Based on Customer**
> **Preference**
>
> Harinder, who wears a turban as part of his Sikh
> religion, is hired to work at the counter in a cof-
> fee shop. A few weeks after Harinder begins
> working, the manager notices that the work
> crew from the construction site near the shop no
> longer comes in for coffee in the mornings.
> When he inquires, the crew complains that Ha-
> rinder, whom they mistakenly believe is Mus-
> lim, makes them uncomfortable in light of the
> September 11th attacks. The manager tells Ha-
> rinder that he has to let him go because the

> customers' discomfort is understandable. The
> manager has subjected Harinder to unlawful re-
> ligious discrimination by taking an adverse ac-
> tion based on customers' preference not to have
> a cashier of Harinder's perceived religion. Ha-
> rinder's termination based on customer prefer-
> ence would violate Title VII regardless of
> whether he was – or was misperceived to be --
> Muslim, Sikh, or any other religion.

*Id.*

This example shows that the EEOC does not tolerate reli-
gious discrimination based on the preferences, opinions, and
feelings of customers about an employee's religious ob-
servance or practice.

It can be debated whether a public-school student is more
like a coworker or a customer. A customer gives voluntary
patronage to a business, while a public school requires stu-
dent attendance (unless alternative schooling is available). So
a public-school student may be more akin to a coworker than
a customer. If a student is seen as a coworker, the Guidance
suggests that the student's disgruntlement at employee con-
duct is not enough for undue hardship. But if the employee
conduct constitutes harassment of the student or causes a hos-
tile educational environment, then it would be enough. If a
public-school student is closer to a customer of a school, the
Guidance suggests that the student's disgruntlement is not
enough for undue hardship. The majority opinion situates the
student offense as closer to customer preference, which

categorically would not provide a basis for undue hardship
under the EEOC Guidance.

### 4. Caselaw

The post-*Hardison* caselaw is sparse on whether coworker
or customer offense is enough for more than a *de minimis* cost
to the employer. This court has not addressed the question,
but other circuits have and generally find that the grumblings
or offense of others are not enough to constitute undue hard-
ship.

*Customer Sentiments.* The majority opinion cites *Anderson
v. U.S.F. Logistics (IMC), Inc.*, 274 F.3d 470 (7th Cir. 2001), for
the proposition that customer complaints—and thus student
complaints—may suffice to constitute an undue hardship
upon the employer. *Anderson* involved a Christian employee
who sought to use the phrase "Have a Blessed Day" in signing
off on written correspondence or ending telephone conversa-
tions. *Id.* at 473. The employer became concerned when one of
its clients complained that the employee's use of the phrase
was "unacceptable" and "must stop." *Id.* The employee filed
suit for a preliminary injunction that allowed her to use the
phrase in communications with the employer's customers,
which the district court denied. *Id.* at 474.

In affirming the district court, this court observed that
"Anderson's religious practice did not require her to use the
'Blessed Day' phrase with everyone" and that the employer
was "concerned about its relationship with its customers." *Id.*
at 476. We also recognized that the employer had a "legitimate
interest[]" in protecting its relationship with clients. *Id.* at 477.
Ultimately, we concluded that the employer had reasonably
accommodated its employee by allowing Anderson to use the

phrase with co-workers but not clients. *Id.* at 474–76. Recall that the employer's Title VII duty to accommodate "is at an end" when "where the employer has already reasonably accommodated the employee's religious needs." *Ansonia*, 479 U.S. at 68. Therefore, in *Anderson* this court did not consider whether customer objections to an employee's religious belief or practice were enough to constitute more than a *de minimis* cost to the employer.

More importantly, *Anderson* is distinguishable from the facts in this case. Anderson sought to use a religious phrase, which the district court had found to impose her religious beliefs on the employer's clients or vendors. *Anderson*, 274 F.3d at 477–78. As the majority opinion recognizes, *Anderson* held that the employer could restrict the employee's religious speech with clients in providing the reasonable accommodation. *Id.* But here, an employer seeks to force an employee to engage in transgender-affirming speech contrary to his religious beliefs. Whether Kluge's gender-neutral accommodation constitutes an undue hardship by way of the School District's clients—the students—should be an open question for the factfinder. Recall that the EEOC opines that employers' adverse employment "action based on the discriminatory preferences of others, including coworkers or customers, is unlawful." *EEOC Guidance*.

*Coworker Sentiments.* Other courts have addressed whether coworker offense is enough to constitute undue hardship. In *Anderson v. Gen. Dynamics Convair Aerospace Div.*, 589 F.2d 397 (9th Cir. 1978), the Ninth Circuit held that coworkers' "general sentiment against" a "free rider[]" employee who refused to join an employer-mandated union on religious grounds was not an undue hardship. *Id.* at 402. The court stated,

"Undue hardship means something greater than hardship. Undue hardship cannot be proved by assumptions nor by opinions based on hypothetical facts. Even proof that employees would grumble about a particular accommodation is not enough to establish undue hardship." *Id.* And in a factually similar case, the Ninth Circuit reiterated that "undue hardship requires more than proof of some fellow-worker's grumbling or unhappiness with a particular accommodation to a religious belief." *Burns v. S. Pac. Transp. Co.*, 589 F.2d 403, 407 (9th Cir. 1978) (citing *General Dynamics*, 589 F.2d at 402). Though *General Dynamics* did not discuss *Hardison*'s *de minimis* cost test, the Ninth Circuit cited the case and operated under its regime. *Id.* at 400–01 (citing *Hardison*, 432 U.S. 63). *Burns* affirmed *General Dynamics*'s core principle that grumblings are not sufficient in an explicit analysis under *Hardison*. *Burns*, 589 F.2d at 406–07. Whether students are closer to coworkers or customers, *General Dynamics*, *Burns*, and the EEOC Guidance provide that grumblings are not enough for undue hardship.

In *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 607–08 (9th Cir. 2004), the Ninth Circuit explained that an employer "need not accept the burdens that would result from allowing actions that demean or degrade, or are designed to demean or degrade, members of its workforce." The relevant employee had publicly posted in the workplace Bible scriptures condemning sodomy in response to his employer's poster promoting inclusion of gay workers. *Id.* at 601–02. So the Ninth Circuit's law generally accords with the EEOC Guidance's

suggestion that, while coworker grumblings are not sufficient to establish undue hardship, coworker harassment is.[3]

*How much more than* de minimis? In *Burns* and *General Dynamics*, the courts entered a judgment in favor of the employee, reversing bench trial decisions and concluding that the employer had failed to demonstrate that no reasonable accommodation could be provided without undue hardship. *Burns*, 589 F.2d at 407–08; *General Dynamics*, 589 F.2d at 402–03. That these cases and numerous other court decisions on the *de minimis* cost issue have been resolved by trial—some in favor of the employer, others for the employee—shows that the test, even if more than a *de minimis* cost, has some teeth.[4]

---

[3] Kluge also cited a decision that was later vacated, *Cummins v. Parker Seal Co.*, 516 F.2d 544 (6th Cir. 1975), *aff'd, Parker Seal Co. v. Cummins*, 429 U.S. 65 (1976), *vacated on reh'g*, 433 U.S. 903 (1977). Another Sixth Circuit decision, *Draper v. U.S. Pipe & Foundry Co.*, 527 F.2d 515, 520–21 (6th Cir. 1975), stands for the principle for which Kluge cited it: that coworker grumblings are not enough for undue hardship. Whether *Draper*'s holding on coworker grumblings remains good law in the Sixth Circuit after *Hardison* is an open question.

[4] *See, e.g., Beadle v. City of Tampa*, 42 F.3d 633 (11th Cir. 1995) (judgment for employer); *Mann v. Frank*, 7 F.3d 1365 (8th Cir. 1993) (same); *Cook v. Chrysler Corp.*, 981 F.2d 336 (8th Cir. 1992) (same); *Ryan v. U.S. Dep't of Just.*, 950 F.2d 458 (7th Cir. 1991) (same); *United States v. Bd. of Educ. for Sch. Dist. of Phila.*, 911 F.2d 882 (3d Cir. 1990) (same); *Baz v. Walters*, 782 F.2d 701 (7th Cir. 1986) (same); *Turpen v. Missouri-Kansas-Texas R. Co.*, 736 F.2d 1022 (5th Cir. 1984) (same); *Wren v. T.I.M.E.-D.C., Inc.*, 595 F.2d 441 (8th Cir. 1979). *But see, e.g., Opuku-Boateng v. California.*, 95 F.3d 1461, 1469 (9th Cir. 1996) (Sabbatarian case in which the Ninth Circuit concluded that the district court clearly erred in finding undue hardship and granted judgment for employee); *Brown v. Polk County*, 61 F.3d 650, 656–57 (8th Cir. 1995) (partial reversal and remand for judgment and relief for employee because employer had not demonstrated that "occasional spontaneous prayers and

No. 21-2475                                                                 105

At least one circuit court has remanded for a new jury trial on the *de minimis* cost issue. *Heller v. EBB Auto Co.*, 8 F.3d 1433, 1439–41 (9th Cir. 1993). So, it follows that this fact-laden issue is often decided by trial.

Even when the *de minimis* cost issue is decided at summary judgment, our fellow circuits vary greatly in construing the test.[5] But religious accommodation caselaw confirms that the

---

isolated references to Christian belief" caused undue hardship); *Protos v. Volkswagen of Am., Inc.*, 797 F.2d 129, 134–35 (3d Cir. 1986) (upholding on clear error review the district court's finding of no undue hardship based on the lower court's familiarity with the evidence and witness credibility findings); *Nottelson v. Smith Steel Workers D.A.L.U. 19806, AFL-CIO*, 643 F.2d 445, 452 (7th Cir. 1981) (affirming judgment for plaintiff because the employer failed to present evidence of undue hardship).

[5] *See, e.g., Groff v. DeJoy*, 35 F.4th 162, 175 (3d Cir. 2022) (judgment for employer), *cert. granted*, 143 S. Ct. 646 (2023); *EEOC v. Walmart Stores E., L.P.*, 992 F.3d 656 (7th Cir. 2021) (judgment for employer); *EEOC v. GEO Grp., Inc.*, 616 F.3d 265 (3d Cir. 2010) (same); *Webb v. City of Philadelphia*, 562 F.3d 256 (3d Cir. 2009) (same); *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599 (9th Cir. 2004) (judgment for employer where there was harassment of coworkers); *Virts v. Consol. Freightways Corp. of Del.*, 285 F.3d 508 (6th Cir. 2002) (judgment for employer); *Bruff v. N. Miss. Health Servs., Inc.*, 244 F.3d 495 (5th Cir. 2001) (same); *Daniels v. City of Arlington*, 246 F.3d 500 (5th Cir. 2001) (same); *Seaworth v. Pearson*, 203 F.3d 1056 (8th Cir. 2000) (same); *Weber v. Roadway Exp., Inc.*, 199 F.3d 270 (5th Cir. 2000) (same); *Lee v. ABF Freight Sys., Inc.*, 22 F.3d 1019 (10th Cir. 1994) (same); *Cooper v. Oak Rubber Co.*, 15 F.3d 1375 (6th Cir. 1994) (same); *Eversley v. MBank Dallas*, 843 F.2d 172 (5th Cir. 1988) (same). *But see, e.g., Tabura v. Kellogg USA*, 880 F.3d 544, 557–58 (10th Cir. 2018) (remanded for trial because defendant did not move for summary judgment on undue hardship issue); *Davis v. Fort Bend County*, 765 F.3d 480 (5th Cir. 2014) (genuine issue of material fact on undue hardship issue); *Antoine v. First Student, Inc.*, 713 F.3d 824 (5th Cir. 2013) (same); *Adeyeye v. Heartland Sweeteners*, LLC, 721 F.3d 444, 455–56 (7th Cir. 2013) (same); *Balint v. Carson City*, 180 F.3d 1047 (9th Cir.

*de minimis* cost test has some weight. Application of that test to an accommodation is necessarily fact-intensive, and many cases are resolved by the factfinder. The majority opinion's reading of the *de minimis* cost test effectively eliminates the duty of the employer to provide reasonable religious accommodations where there are complaints of offense.

### III. Religious Accommodation Claim

At the heart of this appeal is the district court's grant of summary judgment to the School District on Kluge's religious accommodation claim. We review that decision de novo. *Markel Ins. Co. v. Rau*, 954 F.3d 1012, 1016 (7th Cir. 2020). When reviewing cross-motions for summary judgment, as here, we view the facts "in favor of the party against whom the motion under consideration is made," drawing all reasonable inferences in its favor. *Id.* (citation omitted); *Hess v. Bd. of Trs. of S. Ill. Univ.*, 839 F.3d 668, 673 (7th Cir. 2016) (citation omitted).

I conclude first that Kluge has demonstrated his religious beliefs are sincerely held and he has established a prima facie case for religious discrimination. In reaching this partial summary judgment for Kluge, I construe all facts in favor of the School District. Then the burden shifts to the School District to show that any reasonable accommodation would in fact result in undue hardship. *Porter*, 700 F.3d at 951; *Adeyeye*, 721 F.3d at 455. We do not have to postulate a reasonable accommodation as one is provided: Kluge's last-names-only accommodation as used in the 2017–2018 school year. The question then is whether, construing the evidence and reasonable inferences in favor of Kluge, the School District has carried its

1999) (same); *EEOC v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1577, 1583 (7th Cir. 1997) (affirming summary judgment for employee).

burden to prove that the accommodation caused more than a *de minimis* cost to it. In performing this analysis, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts" are reserved for the factfinder. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *McCottrell v. White*, 933 F.3d 651, 655 (7th Cir. 2019). To me, the School District has not satisfied its burden and a genuine issue of material fact remains for trial.

### A. Sincerity

The School District concedes for purposes of appeal that Kluge made his prima facie case, but it challenges the sincerity of Kluge's religious beliefs in the alternative.

To show sincerity, Kluge "must present evidence that would allow a reasonable jury to find that (1) 'the belief for which protection is sought [is] religious in [the] person's own scheme of things' and (2) that it is 'sincerely held.'" *Adeyeye*, 721 F.3d at 451 (quoting *Redmond*, 574 F.2d at 901 n.12). When reviewing a plaintiff's sincerity, courts do not review an individual's "motives or reasons for holding the belief." *Id.* at 452. Nor do courts "dissect religious beliefs because the believer admits that he is 'struggling' with his position or because his beliefs are not articulated with the clarity and precision that a more sophisticated person might employ." *Id.* at 452–53 (quoting *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 715 (1981)). "In such an intensely personal area, … the claim of the [practitioner] that his belief is an essential part of a religious faith must be given great weight." *United States v. Seeger*, 380 U.S. 163, 184 (1965). Title VII does not "require perfect consistency in observance, practice and interpretation when determining if a belief system qualifies as a religion or whether a person's belief is sincere." *Adeyeye*, 721 F.3d at 453.

"[A] sincere religious believer doesn't forfeit his religious rights merely because he is not scrupulous in his observance." *Grayson v. Schuler*, 666 F.3d 450, 454 (7th Cir. 2012) ("[F]or where would religion be without its backsliders, penitents, and prodigal sons?") (citing *Reed v. Faulkner*, 842 F.2d 960, 963 (7th Cir. 1988)). It is not within the court's "province to evaluate whether particular religious practices or observances are necessarily orthodox or even mandated by an organized religious hierarchy." *Adeyeye*, 721 F.3d at 452.

Kluge has proved the sincerity of his beliefs. He is an active leader at his local church and believes in the absolute truth of the Bible, a fact he repeatedly told the School District when voicing concerns over its new policies. R. 120-3, at 4–5, 7, 19; R. 113-1, at 6–9; R. 113-2, at 2. He believes that, per his religion, he cannot affirm transgender identity by calling his transgender students by their modified PowerSchool names. R. 120-3, at 14; R. 120-19, at 6. All of this is uncontested, and "[t]he validity of what he believes cannot be questioned." *Seeger*, 380 U.S. at 184; *see also Adeyeye*, 721 F.3d at 452.

Kluge and Superintendent Snapp recount discussing their contrasting Christian beliefs on July 27, 2017, and I credit Snapp's testimony that it was a "cordial" chat. R. 113-6, at 6–7; R. 120-3, at 19. During that conversation, Kluge said he explained his beliefs with scripture. R. 120-3, at 19. Nothing in Snapp's recollection of the discussion suggests this is untrue. R. 113-6, at 6–7. In that meeting, Kluge ultimately refused to comply with the School District's Name Policy because his religious beliefs would not permit it. R. 120-3, at 14; R. 120-19,

at 6. So when opposed, Kluge defended his religious beliefs and practices.

The School District's sole rejoinder to these undisputed facts is Kluge's deviation from the last-names-only accommodation during the May 2018 orchestra awards ceremony. Kluge testified he complied with the Name Policy on that occasion because he believed "it would have been unreasonable and conspicuous" to refer to his students by only their last names at the ceremony.[6] R. 120-3, at 33. Kluge said he was "making a good effort to work within the bounds of [his] accommodation," and believed an exception for this "special" and "formal" event complied with his religious beliefs because it was not "ordinary" or regular behavior. *Id.* at 33–34. On this point, his attorney's EEOC submission states, "Kluge's Christian faith required that he do no harm to his students, and this acquiescence to the administration's position was done solely out of sincerely-held beliefs." R. 120-19, at 7.

No evidence is presented to the contrary. The School District notes that Kluge testified there are instances where it is appropriate and consistent with his religious beliefs to address a transgender student by the student's first name, even if the first name differs from the student's biological sex. R. 120-3, at 8–9. This is consistent with Kluge balancing his Christian beliefs of not affirming transgender identity with doing no harm. The School District also cites evidence that Kluge's religious denomination does not take a hardline

---

[6] The majority opinion construes this statement as a legal concession that using last names only would potentially cause harm to his students, but Kluge did not concede this point in his briefs or at oral argument.

stance in requiring a transgender child to use the bathroom of her birth sex. R. 120-4, at 12. But even construing the record in the light most favorable to the School District, I do not see how this evidence impugns Kluge's otherwise regular religious belief and practice of not using the PowerSchool names.

The evidence shows Kluge balancing his Christian values of not "regularly calling students by transgender names" with his duty to "do no harm." R. 120-3, at 33; R. 120-19, at 7. In evaluating sincerity, we are not to criticize Kluge's balancing or take issue with a one-time exception. *Adeyeye*, 721 F.3d at 453–54 (rejecting employer's contention that the court should probe and disapprove of employee's religious beliefs); *Grayson*, 666 F.3d at 454 (overlooking that Nazirite believer followed certain biblical proscriptions but not others). At the ceremony, Kluge chose a path in accord with his balancing of his Christian values. This does not detract from his sincerity or create a genuine issue of material fact on the issue. Construing all facts in the School District's favor, I conclude that Kluge has established the sincerity of his religious beliefs and practices.

### B. Prima Facie Case

The majority opinion proceeds under the School District's concession on appeal that Kluge established a prima facie case for the religious accommodation claim. I conclude that Kluge is entitled to partial summary judgment on the prima facie case for his religious accommodation claim.

Recall that to make a prima facie case based on an employer's failure to provide a religious accommodation, a plaintiff must show: (1) an observance or practice that is religious in nature; (2) that conflicts with an employment

requirement; and (3) that the need for a religious accommo-
dation was a motivating factor in the adverse employment de-
cision or other discriminatory treatment. *Ilona*, 108 F.3d at
1575; *Abercrombie*, 575 U.S. at 772–73. There is no question that
Kluge's refusal to adhere to the Name Policy is a religiously
motivated practice. This refusal conflicts with the School Dis-
trict's Name Policy. Further, the School District does not dis-
pute that requiring Kluge to choose between Name Policy
compliance, resignation, or termination was an adverse em-
ployment action. So, the prima facie case turns on whether
Kluge's need for a religious accommodation was a motivating
factor for his forced resignation.

There is no doubt that it was, viewing the record in the
School District's favor. Its asserted reason for forcing Kluge to
resign was the "[c]omplaints from the high school commu-
nity" regarding the very last-names-only accommodation that
Kluge had requested in July 2017. R. 121, at 45. The School
District said it had "received complaints that the accommoda-
tion was not conducive to a well-run classroom and nega-
tively impacted students." *Id*. Thus, the reason for the adverse
employment action is the accommodation that Kluge re-
quested and received for the 2017–2018 school year. Kluge
had three choices at the end of that school year: comply with
the Name Policy, resign, or be terminated. R. 113-2, at 6; R. 15-
3, at 6.

If Kluge did not need a religious accommodation for the
Name Policy and complied with its terms, he could stay. So,
there is no genuine issue of material fact that Kluge's need for
a religious accommodation was a motivating factor behind
the School District's adverse employment decision. The Su-
preme Court clarified in *Abercrombie* that Title VII supplies a

"motivating factor" standard even lower than "the traditional standard of but-for causation." 575 U.S. at 773 (citing 42 U.S.C. § 2000e-2(m)). Under this lenient standard Kluge proved the motivating factor element and thus a prima facie case for his religious accommodation claim.

Having established the prima facie case, the burden shifts to the School District to show that any reasonable accommodation would result in undue hardship—that is, more than a *de minimis* cost. *Porter*, 700 F.3d at 951; *Hardison*, 432 U.S. at 84. Viewing the evidence and reasonable inferences in Kluge's favor, there is a genuine issue of material fact on the question of undue hardship. The School District points to two sources of hardship: fear of Title IX liability and interference with its ability to educate students. I consider these two grounds in the next two sections.

### C. Fear of Title IX Liability

The evidence is lacking that the School District considered and was concerned about Title IX liability. Under current caselaw, the alleged fear amounted to speculation.

Only a single piece of evidence might indicate that the School District contemplated Title IX liability: one sentence in the form presented to Kluge on July 31, 2017, which stated, "This directive is based on the status of a current court decision applicable to Indiana." R. 15-1, at 1. Nothing suggests what the School District meant by this sentence. Yet the majority opinion states, without record support, that "[t]he 'current court decision applicable to Indiana' was likely our decision in *Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034 (7th Cir. 2017), abrogated on other grounds by *Illinois Republican Party v. Pritzker*, 973 F.3d

No. 21-2475                                                   113

760 (7th Cir. 2020), which had been issued two months prior
to" the July 31 compromise meeting. Presumably the majority
opinion juxtaposes the timing of the School District's form
and *Whitaker* to conclude that the District was likely referring
to that case. But without record evidence, that inference
stretches too far. In addition, this speculation runs counter to
the requirement at this stage that facts and inferences be con-
strued in favor of Kluge. Properly viewed, the sentence on the
School District's form is an unclear statement of concern
about the implications of an unidentified court decision.

Even if we were to accept that the School District consid-
ered *Whitaker*, at best that case creates only a speculative risk
of Title IX liability based on Kluge's actions. First, *Whitaker*
concerned a district court's grant of preliminary injunction
based on a Title IX theory of transgender sex-stereotyping by
a school district. 858 F.3d at 1038–39. In that case this court
concluded only that the transgender students in question
were sufficiently likely to succeed on the merits of their Title
IX sex discrimination claim against the school district to war-
rant a preliminary injunction. *Id.* at 1046–50. That said, the Su-
preme Court has held that, under Title VII, an employer who
discriminates against an employee for being transgender dis-
criminates on the basis of sex. *Bostock v. Clayton County*, 140 S.
Ct. 1731, 1743 (2020). But the Court has not held that the same
construction of sex discrimination applies to Title IX.

Second, *Whitaker* concerned a transgender student who re-
quested preliminary injunctive relief to allow him to use the
boys' bathroom in violation of the school district's bathroom
policy. *Whitaker*, 858 F.3d at 1038–39. So, assuming that "on
the basis of sex" is interpreted in accordance with *Bostock*, the
school district's policy of excluding transgender students

from non-birth-sex restrooms only arguably violated Title IX's provision that no person "shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a); *see also* 34 C.F.R. § 106.31(a). Such legal assumptions, without the benefit of Supreme Court or Seventh Circuit authorities establishing Title IX liability for transgender discrimination, present merely speculative risk of Title IX liability for the School District.

Even more, it is unlikely that Kluge conforming with the Name Policy constitutes a benefit of a federally funded educational program. Further, Kluge's last-names-only practice is gender-neutral and generally applicable, so it is doubtful that the practice constitutes discrimination on the basis of sex. Even if we assume that the School District considered the implications of *Whitaker* and Title IX liability, any risk it faced was speculative. Construing the record in Kluge's favor, I conclude that the School District may not rely on fear of Title IX liability in the undue hardship equation.

**D. Interference with Educational Mission**

This leaves the School District with its other alleged basis for undue hardship—interference with its educational mission. The majority opinion agrees with the district court's conclusion that "Kluge's use of the last names only accommodation burdened [the School District's] ability to provide an education to all students and conflicted with its philosophy of creating a safe and supportive environment for all students." I evaluate this ground by examining: (1) the School District's educational mission; (2) the complaints of offense taken to Kluge's last-names-only accommodation and whether they

constitute more than a *de minimis* cost; and (3) other considerations, including caselaw and the practical impact of the majority opinion.

### 1. The School District's Educational Mission

Before assessing the evidence, it is important to understand what the School District's educational mission is for its students and its grounds for claiming this mission.

*Indiana Constitution.* The School District relies first on the Education Clause (Article 8, Section 1) of the Indiana Constitution to define its educational mission. That provision states in relevant part that it "shall be the duty of the General Assembly … to provide, by law, for a general and uniform system of Common Schools, wherein tuition shall be without charge, and equally open to all." IND. CONST. art. VIII, § 1. The district court suggests that this charge to provide public education "equally open to all" meant the School District has a constitutional mission to affirm transgender identities in public schools.

But the text and history of the Education Clause confirm that the phrase "equally open to all" refers only to the equal admission of students. The text of the Indiana Constitution expresses "a duty to *provide* for a general and uniform system of open common schools without tuition." *Bonner ex rel. Bonner v. Daniels*, 907 N.E.2d 516, 520 (Ind. 2009). The Education Clause "does not require the attainment of any standard of resulting educational quality." *Id.* at 521. "The phrases 'general and uniform,' 'tuition … without charge,' and 'equally open to all' do not require or prescribe any standard of educational achievement that must be attained by the system of common schools." *Id.* Contemporary dictionaries confirm this

reading. For example, "open" was defined as "[a]dmitting all persons without restraint; free to all comers." *Open*, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE 571 (1841). On its face, the text of the Education Clause "says nothing whatsoever about educational quality." *Bonner*, 907 N.E.2d at 521.

The historical context of the Education Clause supports this plain meaning interpretation. In the years preceding the Education Clause's ratification, the Indiana General Assembly had engaged in a series of constitutional and legislative efforts to provide for a "common school" education. *Nagy ex rel. Nagy v. Evansville-Vanderburgh Sch. Corp.*, 844 N.E.2d 481, 484–89 (Ind. 2006); 2 DONALD F. CARMONY, THE HISTORY OF INDIANA 381 (1998); DONALD F. CARMONY, THE INDIANA CONSTITUTIONAL CONVENTION OF 1850–1851 103–04 (1931). The phrase "common school" referenced schools that were "open to the children of all the inhabitants of a town or district." *Nagy ex rel. Nagy*, 844 N.E.2d at 489 (quoting AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE 988 (1856))

By the 1850–1851 Indiana Constitutional Convention—in which the Education Clause was drafted—the common school movement had garnered "considerable attention" and support for the idea that the state should be responsible for providing every child the opportunity for elementary education. *Embry v. O'Bannon*, 798 N.E.2d 157, 162–63 (Ind. 2003). The convention debates centered on the need to provide for the "education of every child in the State." 2 REPORT OF THE DEBATES AND PROCEEDINGS OF THE CONVENTION FOR THE REVISION OF THE CONSTITUTION OF THE STATE OF INDIANA 1858–61 (1851). The Convention also adopted a resolution to describe the relevant changes in the Indiana Constitution it had drafted, which stated: "It is also provided, that the Legislature

No. 21-2475                                                    117

shall establish a uniform system of common schools, wherein tuition shall be free." INDIANA HISTORICAL COMMISSION, CONSTITUTION MAKING IN INDIANA 410 (1916) (quoting *An Address to the Electors of the State* (Feb. 8, 1851)). The Education Clause was thereafter ratified as part of the Constitution of 1851. IND. CONST. art. VIII, § 1; WILLIAM P. MCLAUCHLAN, THE INDIANA STATE CONSTITUTION 16 (2011). Following ratification, in December 1851, Governor Joseph A. Wright addressed the General Assembly, stating that it was their "duty to husband this fund … to provide for the education of the youth of every county, township, and district." *Horner v. Curry*, 125 N.E.3d 584, 599 (Ind. 2019) (quoting *Indiana House Journal* at 20 (Dec. 2, 1852)).

This historical tour confirms that the text of the Indiana Constitution's Education Clause only charges the School District with admitting all children into its schools. It does not require or prescribe any specific standard of educational quality.

*Statutory Directive.* In identifying the School District's educational mission, the district court also relied on the fact that "[t]he Indiana Supreme Court has recognized that public schools play a 'custodial and protective role,' which has been codified by the legislature in passing compulsory education laws that mandate the availability of public education. *Linke v. Nw. Sch. Corp.*, 763 N.E.2d 972, 979 (Ind. 2002)." The majority opinion also relies on *Linke*. But the Indiana Supreme Court in *Linke* merely confirmed that the Indiana legislature had codified compulsory school attendance and Indiana school corporations' supervision over all pupils in accordance with the Education Clause. *Linke*, 763 N.E.2d 979, 983 (citing IND. CONST. art. VIII, § 1 and the then-effective IND. CODE

§ 20–8.1–5.1–3). That court did not read into the Education Clause a requirement that Indiana school corporations affirm transgender identity.

*The School District's Policy.* Without a purported constitutional or statutory obligation to affirm transgender identity, the School District is left with its own recent policy to inform its educational mission. The principles and mission underlying the Name Policy were outlined in the January 22, 2018 Transgender Questions document and accompanying Transgender Considerations presentation in the middle of the 2017–2018 school year. R. 15-4; R. 120-20. While styled as "Questions" and "Considerations" and couched in precatory language on gender-neutral practices, as applied to Kluge and in practice, they were more than suggestions.

For example, the Questions document said that staff should "make all students feel welcome and accepted in the public school environment." R. 15-4, at 9. And the Considerations presentation said, "Creating a safe and supportive environment for all students is important." R. 120-20, at 7. The Considerations presentation also had several gender-neutral best practices such as providing "gender neutral uniforms"; avoiding using "boy/girl methods to divide students"; and using gender-neutral indefinite pronouns/nouns such as "everyone" or "people" instead of "ladies and gentlemen." *Id*. at 5. It suffices to say that the School District adopted an educational mission to create a safe and supportive learning environment for all students and, more specifically, transgender students.

No. 21-2475                                                    119

## 2. Complaints of Offense

The question then becomes whether the complaints of of-
fense taken by school staff and students to Kluge's use of last
names are enough to constitute more than a *de minimis* cost to
the School District's mission of creating a transgender-sup-
portive learning environment. Considering Kluge's gender-
neutral accommodation, teacher and student complaints
about that accommodation, evidence in Kluge's favor, and
various credibility questions, I conclude that there is a genu-
ine issue of material fact on this evidentiary record.

### i. Gender-neutral Accommodation

The last-names-only accommodation was, obviously, gen-
der-neutral. Kluge called students by their last names in the
2017–2018 school year. The evidence conflicts as to whether
he was perfectly consistent in this practice. *See* R. 58-2, at 3; R.
120-19, at 7; R. 120-3, at 36; R. 52-3, at 2; R. 52-4, at 2; R. 52-5,
at 2. But Kluge, another teacher, and three of his students dur-
ing the 2017–2018 school year attested that he was consistent.
R. 120-3, at 36; R. 52-2, at 3; R. 52-3, at 2; R. 52-4, at 2; R. 52-5,
at 2. Construing the record in Kluge's favor and crediting his
testimony leads to the conclusion that he adhered to the ac-
commodation.

Even if Kluge's testimony is not credited, the school ad-
ministration acknowledged that mistakes could happen. A
Brownsburg High School counselor acknowledged that there
may be instances where school staff "don't get" a transgender
student's name or pronoun "quite right." R. 120-13, at 5. And
the Considerations presentation stated, "*Try* not to make as-
sumptions about the genders of students." R. 120-20, at 5 (em-
phasis added). The Questions document even addressed how

to handle a "student exploding in anger with being called the wrong name or gender." R. 15-4, at 10. For the most part, Kluge consistently referred to all students in a gender-neutral manner by their last names only, so undue hardship either did not arise or the record presents a factual dispute.

### ii. Teacher Complaints

Craig Lee and several teachers, including two fine arts department heads, complained about how Kluge was addressing students to the school administration. R. 120-2; R. 120-14, at 16–17; R. 113-5, at 8–9. Lee averred the complaints of three teachers arose out of concerns that Kluge's practice "was harming students." R. 120-14, at 17. Lee did not mention any harm or harassment of the teachers themselves. But he added that none of the three teachers told him that they had visited Kluge's class or witnessed the harm firsthand. *Id.* And Principal Daghe attested the complaints from the department heads mostly arose from "continued issues" relayed from students "that were in [Kluge's] classes." R. 113-5, at 8. Unlike in *Peterson*, where the employee posted scriptures demeaning or degrading gay coworkers, 358 F.3d at 601–02, 607, nothing in the record shows Kluge harassing his coworkers by adhering to the last-names-only accommodation.

Undue hardship requires more than coworker offense by a religious belief or practice. It requires actual infringement on the rights of coworkers—such as by harassment—or the disruption of work. *See EEOC Guidance*; *General Dynamics*, 589 F.2d at 402; *Burns*, 589 F.2d at 407. Viewing the record in favor of Kluge, the evidence does not show that his coworkers' complaints were more than mere complaints of offense. In fact, the teacher complaints relay student complaints, which

form the real core of the School District's case for undue hardship.

### iii. Student Complaints

Two transgender students and an unidentified number of other students complained that Kluge's use of last names only offended them. Teacher Craig Lee relayed that at Equality Alliance meetings, Aidyn and Sam said they found the practice "insulting and disrespectful." R. 120-14, at 7. He could not "recall any other students … who are transgendered [sic]" talking about the subject. *Id.* at 6–7. Lee's declaration said students in Kluge's class felt likewise. R. 58-2, at 2. Assistant Superintendent Jessup's recollection of an Equality Alliance meeting accords with this report. R. 120-1, at 4.

Aidyn and Sam also spoke on their own behalf. Aidyn said Kluge's practice "made [Aidyn] feel alienated, upset, and dehumanized." R. 22-3, at 4. Sam attested "Mr. Kluge's use of last names in class made the classroom environment very awkward" and that, even now, Kluge's actions hurt him and cause him anxiety. R. 58-1, at 3–4. Their complaints were consistent with one letter and one email chain from parents of transgender students, which were transmitted to the school administration in fall 2017. R. 120-12; R. 120-13. The parents of one transgender student, in reference to a teacher that "routinely refers to [our child] by his last name only," said the practice was "ok, but we do wonder if the teacher does this with other students or if it is only [our child]." R. 120-12. So at least one transgender student's parents thought Kluge's practice was fine if consistently applied.

The majority opinion repeatedly states that Kluge's last-names-only practice caused classroom "disruption," citing

portions of Principal Daghe's affidavit and deposition. R. 120-2, at 4; R. 112-5, at 7. Daghe does not mention disruption. Instead, he notes "tension," "uncomfortableness," and that the accommodation was "not going well." R. 120-2, at 4; R. 112-5, at 7–8. He asserts such "tension … was affecting the overall functioning of the performing arts department." R. 120-2, at 4. But neither Daghe nor the record reveals how Kluge's last-names-only practice hampered the department's operations, and there is much countervailing evidence. Besides, we are to draw all reasonable inferences in Kluge's favor.

My colleagues also infer that Kluge acknowledged creating tension and conflict at the school when he said Principal Daghe wanted him to resign "simply because [Daghe] didn't like the tension and conflict." R. 15-3, at 5. But the context of this quote demonstrates that Kluge was referring to *Daghe's* perception of tension and conflict—not his own. In the paragraph directly before this quote, Kluge recounted that Daghe said "he didn't like things being tense and didn't think things were working out." The majority opinion again fails to view the record in Kluge's favor.

There is a crucial distinction here: No evidence shows that Kluge revealed to students his motivations for calling them by their last names in the 2017–2018 school year. Lee's retelling of a student's complaint said that the student "was fairly certain that all the students knew why Mr. Kluge had switched to using last names." R. 58-2, at 3. Aidyn alleged that "Kluge's behavior was noticeable to other students in the class." R. 22-3, at 4. But Aidyn also recalled, "At one point, my stand partner asked me why Mr. Kluge wouldn't just say my name. I felt forced to tell him that it was because I'm transgender." *Id.* The record says nothing about Aidyn telling

the stand-mate about his intuitions of Kluge's motive. And importantly, Aidyn's recollection of his stand partner asking him about Kluge's last-names-only practice corroborates other testimony that students did not know Kluge's motives. Similarly, Sam said "[m]ost of the students knew why Mr. Kluge had switched to using last names." R. 58-1, at 3–4. But Sam did not explain how the students knew Kluge's motives for using last names only.

In contrast, the record is replete with evidence that Kluge never revealed his religious motives and that students did not know the reason why Kluge used last names only. Three students—Lauren Bohrer, Kennedy Roberts, and Mary Jacobson—attested that Kluge consistently called his students by their last names and did not explain his motives for doing so. R. 52-3, at 3; R. 52-4, at 2; R. 52-5, at 2. Roberts "never really thought anything of it. It's just what he did." R. 52-4, at 2. And fellow music teacher Natalie Gain averred that she "never heard [Kluge] use gendered language in the classroom"; "only heard him use last names with the students"; and "never heard any of the students discussing the [sic] Mr. Kluge's use of last names, or any references to his agreement with the administration." R. 52-2, at 3. "[A]s far as [she] could tell, Mr. Kluge's accommodation was not common knowledge … ." *Id.*

The evidence shows that student complaints of offense at Kluge's last-names-only practice came not from any discomfort with the practice itself but from students' assumptions and intuitions about why Kluge was using only last names. Neither this nor any other court has held that mere offense at an employee's religious observance or practice is enough for undue hardship. And the facts here are a step removed: The

alleged offense arose from students' presumptions and
guesses as to Kluge's motives for using last names only. The
majority opinion breaks new ground here. This distinction, as
well as the evidence in Kluge's favor, presents a genuine issue
of material fact on undue hardship.

### iv. Evidence for Kluge

The record also contains the testimony of Kluge, three stu-
dents, and a teacher, who contradict the complaints about
Kluge's last-names-only accommodation. The district court
failed to give due weight to this evidence. But the majority
opinion goes further, stating that Kluge's evidence is not
relevant to undue hardship. To my colleagues, the undue
hardship inquiry ended once the School District received
some reports that the accommodation did not work and
caused tension and discomfort.

Every court to consider undue hardship has framed the
inquiry as an objective one, dependent on the factual context
of the case. *See, e.g., Groff*, 35 F.4th at 174 ("The undue hard-
ship analysis is case-specific, requiring a court to look to 'both
the fact as well as the magnitude of the alleged undue hard-
ship' … ." (quoting *GEO Group*, 616 F.3d at 273)); *Tabura*, 880
F.3d at 558 (cleaned up and citations omitted) ("Whether an
employer will incur an undue hardship is a fact question that
turns on the particular factual context of each case."); *Adeyeye*,
721 F.3d at 455. In a similar vein, cases evaluating undue hard-
ship—including *Hardison*—address factors such as the need
to rearrange schedules or the additional work burden on
coworkers. *See, e.g., Hardison*, 432 U.S. at 83–84; *Adeyeye*, 721
F.3d at 455; *Ilona*, 108 F.3d at 1576–77. Because undue hard-
ship depends on the factual context, the reports of three stu-
dents and a teacher that contradict the alleged harms caused

by Kluge's last-names-only practice are relevant, whether or not this information was known by the School District at the time of the adverse employment decision.

The majority opinion holds that the undue hardship inquiry considers only evidence within the employer's knowledge when the adverse employment decision is made. But no authority is cited for this proposition. Under this reasoning, an employer's sole focus on allegations of difficulties arising from a religious accommodation would defeat any employee's failure-to-accommodate claim. Such an outcome creates a perverse incentive for employers to avoid investigating undue hardship. If, by contextual evidence obtained after discharge, an employee plaintiff is not able to undermine the alleged presence of undue hardship, when, if ever, can the employee prevail? Before his termination, the employee would have to bring to the employer's attention evidence contrary to the reports of undue hardship.

Consider the evidence for Kluge. Three students and a teacher submitted declarations that Kluge's practice did not diminish the classroom environment. Bohrer attested that because the orchestra class was large, Kluge rarely had occasion to call on any individual student directly. R. 52-3, at 2. Roberts corroborated that Kluge called last names for attendance "at first, maybe 5-8 times over the year." R. 52-4, at 2. This evidence tends to show that Kluge's last-names-only practice did not have more than a *de minimis* impact on classroom operations.

A number of students said Kluge's practice did not cause significant interruption with the classroom environment. Bohrer, Roberts, and Jacobson all testified similarly that Kluge's use of only last names was not unnatural, odd, or

uncomfortable. R. 52-3, at 3; R. 52-4, at 2; R. 52-5, at 2. Bohrer said she never saw Kluge treat her transgender stand partner differently and that the stand-mate "never told [her] that they disliked Mr. Kluge's behavior or that Mr. Kluge had been un-fair to them." R. 52-3, at 3. Fellow teacher Natalie Gain added that Kluge "had mostly used last names ... the previous school year anyway, with 'Mr./Ms.' for students to encourage a respectful teaching environment, like college classes." R. 52-2, at 2. As such, she "saw no reason as to why there would be issues with Mr. Kluge's compromise." *Id.*

Kluge also alleged that there were no issues with his use of last names—no protests, classroom disturbances, cancelled classes, student animosity, or tensions. R. 113-2, at 4; R. 120-3, at 23. Instead, Kluge says the accommodation worked with-out undue hardship. His students excelled, winning awards, scoring high on their AP Music Theory exams, and participat-ing in extracurricular music activities. R. 113-2, at 4; R. 120-3, at 23–24. The School District contests none of these objective measures of pedagogical success.

### v. Credibility Issues

The record also revealed potential biases and credibility issues with many of the witnesses. A few notable examples underscore the fact-intensive nature of the undue hardship decision. Weighing the evidence on undue hardship and mak-ing credibility determinations are reserved for the factfinder. *Liberty Lobby*, 477 U.S. at 255; *McCottrell*, 933 F.3d at 655. Only the factfinder "can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understand-ing of and belief in what is said." *Anderson v. Bessemer City*,

No. 21-2475                                                     127

470 U.S. 564, 575 (1985); *see also Kadia v. Gonzales*, 501 F.3d 817, 819–20 (7th Cir. 2007).

Kluge is biased to give testimony in his favor. His student Bohrer is a professed Christian, so her testimony may have been offered to favor Kluge. R. 52-3, at 3. Aidyn also has credibility issues. Bohrer alleged that Aidyn falsely accused her of calling him a "f----t." *Id.* at 4. A parent, Jeff Gracey, also opined that Aidyn seemed motivated to put Kluge out of a job. R. 52-6, at 3–4. And Craig Lee, the teacher who relayed student complaints about Kluge to the school administration, admitted he was "very biased." R. 120-15.

*                    *                    *

The evidence on undue hardship cuts for and against Kluge. Three students, a teacher, and Kluge all attest that the last-names-only accommodation worked without issue. But Aidyn and Sam, some students in secondhand accounts, and some teachers complained the accommodation did not work. Both sides have credibility issues. The witnesses conflict as to whether and to what degree Kluge's accommodation was offensive. Even more, the evidence shows that any alleged offense came from students' assumptions about Kluge's motives for the last-names-only practice—not from the practice itself. The record also shows that Kluge's practice was infrequent and not critical to how his music classes operated. Of course, at this posture, we must draw inferences from the facts in favor of Kluge, and reserve credibility issues and weighing of the evidence for the factfinder. This record demonstrates a genuine issue of material fact as to whether

128                                      No. 21-2475

the accommodation caused more than a *de minimis* cost to the
School District's educational mission.

### 3. Caselaw and Practical Impact

In examining the School District's alleged basis for undue
hardship—interference with its educational mission—there
are also other considerations, including consistency with
caselaw and the practical impact of the majority opinion's
analysis.

*Caselaw.* Concluding that a fact issue exists on this record
accords with this court's caselaw on the employer's duty to
provide reasonable religious accommodations under Title
VII. In *Walmart*, this court stated *Hardison*'s core is "that Title
VII does not require an employer to offer an 'accommodation'
that comes at the expense of other workers." *Walmart*, 992 F.3d
at 659 (citing *Hardison*, 432 U.S. at 78–79). As mentioned ear-
lier, there was no evidence that Kluge's accommodation bur-
dened other school staff.

The majority opinion cites *Smiley v. Columbia College Chi-
cago*, 714 F.3d 998, 1002 (7th Cir. 2013), for the proposition that
a school has a legitimate interest in ensuring that its "instruc-
tors will teach classes in a professional manner that does not
distress students." While correct, *Smiley* involved a teacher
who singled out and harassed a student for being Jewish. *Id.*
at 1000. The teacher was terminated for unprofessional con-
duct that "distress[ed] students." *Id.* at 1002. Kluge's last-
names-only practice is different in kind, not just degree.

The majority opinion also analogizes the facts here to
those in *Baz*, in which a V.A. hospital chaplain actively prose-
lytized and held "Christian evangelical service[s]" in contra-
vention of the hospital's purpose for his role that he serve as

a "quiescent, passive listener and cautious counselor." 782 F.2d at 703–04, 709. The V.A. had "instituted … an ecumenical approach to its chaplaincy with special attention to the sensitive needs of its patient population." *Id.* at 709. Reverend Baz's self-ascribed "active, evangelistic, charismatic" preaching and proselytization went against the hospital's mission and purpose for his role. *Id.* at 709. This court held that the V.A. had met its burden of producing evidence "tending to show that Reverend Baz's philosophy of the care of psychiatric patients is antithetical to that of the V.A." *Id.* at 706–07. "To accommodate Reverend Baz's religious practices, they would have to either adopt his philosophy of patient care, expend resources on continually checking up on what Reverend Baz was doing or stand by while he practices his (in their view, damaging) ministry in their facility." *Id.*

Here, of course, Kluge did not proselytize. He did not reveal to his students why he used only last names, and he never shared his religious beliefs with them. He used last names only with all his students, and Bohrer and Roberts suggested that even this last name usage was relatively infrequent. R. 53-3, at 2; R. 52-4, at 2. The question is whether this infrequent use of last names only when referring to students caused more than a *de minimis* cost as to render the practice unreasonable.

This court stated in *Adeyeye* that "[r]easonableness is assessed in context … and this evaluation will turn in part on whether or not the employer can in fact continue to function absent undue hardship" under the accommodation. 721 F.3d at 455. *Adeyeye* involved an employee who sought several weeks of unpaid leave to lead his father's religious burial rites. *Id.* at 447. This court held that the employer was not

entitled to summary judgment "that any reasonable jury would have to find that permitting Adeyeye to take three weeks of unpaid leave in conjunction with his week of vacation would have created an undue hardship." *Id.* at 455. Similarly in *Ilona*, this court upheld the district court's factual finding that the employer had not demonstrated that allowing two employees to take off a day for Yom Kippur resulted in more than a *de minimis* cost to the employer. 108 F.3d at 1572, 1576–77. If taking time off from work does not establish more than a *de minimis* cost, perhaps neither does allowing a teacher to use last names only.

In the district court, the School District argued that using a student's chosen first name is a "purely administrative" task or duty. R. 145, at 9-10; R. 121, at 24, 28. So it should come as no surprise that Kluge's accommodation required no adjustment to the School District's operation, scheduling, or curriculum. Our and other circuits' caselaw shows that the *de minimis* cost test has substance.

*Practical Impact.* Under the reasoning of the majority opinion, once an employer receives complaints of offense about an employee's religious observance or practice, undue hardship has been established as long as avoiding offense is its policy. But reviewing those complaints and the credibility of those complainants—including assessing any biases and motivations—are context-specific questions for the factfinder, which our caselaw requires. *See Adeyeye*, 721 F.3d at 455; *Kadia*, 501 F.3d at 819–20.

Consider a variation of the facts here. What if a teacher does not take issue with a transgender student's chosen first names, but that teacher does take issue—on religious grounds—with the use of chosen pronouns (they / them /

their). So, the teacher insists on calling students by their chosen first name. Say a transgender student feels uncomfortable with the teacher's efforts to refer to all students by their first name where a pronoun would suffice. Would the students' discomfort and complaints be sufficient to force the teacher to use the chosen pronouns where appropriate or be terminated? Under the majority opinion's reasoning, the answer is "yes." The facts here are close to this hypothetical.

Recall the EEOC Guidance's example of the Sikh coffee shop employee, Harinder, who sought to wear his religiously mandated turban at work. Is Harinder out of luck if the café decides that religious neutrality or avoiding customer offense by religious apparel is its official policy? The EEOC is concerned that the already lenient *de minimis* cost test may be read out of existence by customer preferences or opinions. The majority opinion realizes these fears.

Properly interpreted and applied, Title VII should provide protection for conscientious religious objectors who in good faith try to accommodate their employers' dictates. The undue hardship provision should not become "an exemption from the accommodation requirement altogether," whenever an employer receives some complaints of emotional hurt arising from protected religious activity. *Ilona*, 108 F.3d at 1577. More broadly, the purpose of Title VII is to protect minorities against those who disagree with their beliefs. *See* 42 U.S.C § 2000e–2. Under the majority opinion, if some people—on this record, at most a few transgender students in Kluge's classes—say they are offended, the protected religious adherent has no right to a reasonable accommodation.

On Kluge's religious accommodation claim, I conclude that a genuine issue of material fact exists about whether the

132                                                  No. 21-2475

last-names-only accommodation would result in more than a
*de minimis* cost. So I would reverse the district court's grant of
summary judgment to the School District on this claim and
remand the undue hardship issue for trial.

### IV. Retaliation Claim

Although at least a genuine issue of material fact exists as
to whether Kluge's protected activity was a but-for cause of
his forced resignation by the School District, I concur with my
colleagues to affirm the judgment for the School District on
his retaliation claim. The record does not contain sufficient ev-
idence from which a reasonable jury could infer that the
School District's nondiscriminatory explanation for its ad-
verse employment action was pretext for religious discrimi-
nation.[7]

Kluge's claimed protected activity was his July 2017 re-
quest for the last-names-only religious accommodation. R. 15,

---

[7] Kluge's failure to show that the School District's nondiscriminatory
explanation was pretext does not also doom his religious accommodation
claim. A different version of the *McDonnell Douglas Corp. v. Green*, 411 U.S.
792 (1973), burden-shifting framework applies to failure-to-accommodate
cases, as opposed to retaliation or disparate treatment cases. *See Tabura*,
880 F.3d at 549–50; *Porter*, 700 F.3d at 951; *Firestone Fibers & Textiles Co.*,
515 F.3d at 312. Neither discriminatory intent nor pretext are elements of
a failure-to-accommodate claim. *See Walmart Stores East*, 992 F.3d 656;
*Adeyeye*, 721 F.3d at 449; *Porter*, 700 F.3d at 951; *Anderson*, 274 F.3d at 475;
*Rodriguez v. City of Chicago*, 156 F.3d 771, 775 (7th Cir. 1998); *Ilona*, 108 F.3d
at 1574–75; *Ryan*, 950 F.2d 458; *Redmond*, 574 F.2d at 901. After Kluge es-
tablished a prima facie case, the burden was on the School District "to
show that any reasonable accommodation would result in undue hard-
ship." *Porter*, 700 F.3d at 951 (citing *Ilona*, 108 F.3d at 1575–76). Because a
genuine issue of material fact exists on undue hardship, that issue should

No. 21-2475                                                          133

at 17–18; R. 121, at 44–45. The School District does not contest
that forcing Kluge to comply with the Name Policy, resign, or
be terminated is an adverse employment action. The nondis-
criminatory reason for forcing Kluge to comply or resign was
the "[c]omplaints from the high school community" about the
accommodation that Kluge had requested in July 2017. R. 121,
at 45.

Recognizing the obvious tie between the School District's
claimed reason for terminating Kluge and the religious ac-
commodation requested, in my view Kluge has established
but-for causation. (The prima facie causation standard for Ti-
tle VII retaliation claims is but-for—not proximate—causa-
tion. *Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 378 (7th
Cir. 2020).) At a minimum, construing all the facts in his favor,
there is a genuine issue of material fact on this question. This
is not a case where the employer has a separate nondiscrimi-
natory reason—such as poor work performance—unrelated
to the protected accommodation activity. *See, e.g., Logan v.
City of Chicago*, 4 F.4th 529, 537 (7th Cir. 2021); *Igasaki v. Ill.
Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 954 (7th Cir. 2021). The
employer's asserted nondiscriminatory reason is the alleged
harm caused by the protected accommodation requested and
granted. So this case presents enough facts to establish but-for
cause. Ultimately though, I agree with my colleagues that

---

proceed to trial. A retaliation claim, however, is governed by the standard
*McDonnell Douglas* framework. *See Rozumalski v. W.F. Baird & Assocs., Ltd.*,
937 F.3d 919, 926 (7th Cir. 2019); *Miller v. Am. Fam. Mut. Ins. Co.*, 203 F.3d
997, 1007 (7th Cir. 2000). So once the School District supplied a nondis-
criminatory reason for forcing Kluge to resign, he had to come up with
enough evidence of pretext to raise a genuine issue of material fact, which
he did not.

134                                    No. 21-2475

Kluge has failed as a matter of proof to show pretext, so I concur that the judgment for the School District on Kluge's retaliation claim should be affirmed.

## V. Conclusion

Title VII's religious accommodation provisions do not apply only in a community accepting of the tenets of an employee's religion. "If relief under Title VII can be denied merely because the majority group … will be unhappy about it, there will be little hope of correcting the wrongs to which the Act is directed." *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 775 (1976) (quoting *United States v. Bethlehem Steel Corp.*, 446 F.2d 652, 663 (2d Cir. 1971)).

For the reasons explained above, I respectfully DISSENT on the religious accommodation claim, and I conclude that a genuine issue of material fact exists on undue hardship and would remand that issue for trial. I respectfully CONCUR in the judgment for the School District on Kluge's retaliation claim.