UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

JOHN M. KLUGE,

                                   *Plaintiff,*

                    v.

BROWNSBURG COMMUNITY SCHOOL
CORPORATION, *et al.,*

                                   *Defendants.*

Case No. 1:19-cv-2462-JMS-KMB

THE HONORABLE
JANE MAGNUS-STINSON

PLAINTIFF'S BRIEF IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

BACKGROUND .............................................................................................................. 2

I.     Mr. Kluge was an excellent teacher. ................................................................ 2

II.    Mr. Kluge is a committed Christian. ................................................................ 2

III.   The district introduced transgender terminology rules. ............................... 3

IV.    Mr. Kluge proposed a religious accommodation the district accepted. ....... 5

V.     Mr. Kluge's religious accommodation worked. .............................................. 7

VI.    After some grumblings from teachers and students, the district pressured Mr. Kluge to resign. ........................................................................ 8

VII.   The district overhauled its transgender terminology rules and proclaimed: "No accommodations allowed." ..................................................... 9

VIII.  Mr. Kluge followed both the accommodation and his convictions at the orchestra awards ceremony .............................................................................. 12

IX.    Mr. Kluge submitted a conditional resignation and tried to revoke it, but the district pushed it through. ......................................................................... 13

STATEMENT OF MATERIAL FACTS NOT IN DISPUTE .................................................. 14

ARGUMENT .................................................................................................................. 19

I.     Mr. Kluge is entitled to summary judgment on his religious discrimination claim because the district revoked a reasonable accommodation without showing undue hardship. ....................................... 19

       A.  Mr. Kluge established a *prima facie* case of discrimination ................. 20

           1.  Mr. Kluge's beliefs are religious. ...................................................... 20

           2.  Mr. Kluge's beliefs are sincere. ......................................................... 21

           3.  Mr. Kluge's beliefs conflicted with an employment requirement and led to his forced resignation. ...................................................... 23

       B.  The district withdrew the reasonable accommodation it extended to Mr. Kluge without the undue hardship Title VII requires. ................... 24

           1.  The district cannot show any increased costs that are substantial in the overall context of its business. .............................................. 25

           2.  A few third-party grumblings do not create undue hardship. ........ 26

ii

3. A few third-party grumblings—based on illegitimate expectations of universal affirmation—do not create undue hardship. ............... 27

4. Evidence not relied on by the district when it forced Mr. Kluge to resign cannot show undue hardship. ............................................... 28

5. Hypothetical litigation does not show undue hardship. .................. 30

6. *Baz v. Walters* is inapposite and no longer good law. ...................... 31

II. Mr. Kluge is entitled to summary judgment on his retaliation claim because his protected activities caused the district's adverse actions. ..... 32

A. Mr. Kluge engaged in statutorily protected activities. ......................... 32

B. Mr. Kluge suffered an adverse action. ................................................... 32

C. Mr. Kluge showed a but-for causal link between his protected activity and the district's adverse actions. ....................................................... 33

D. Mr. Kluge need not prove pretext because he relied on direct proof and the district had no legitimate reason for forcing him to resign. ... 34

CONCLUSION ............................................................................................................ 35

CERTIFICATE OF SERVICE ............................................................................................... 37

TABLE OF AUTHORITIES

**Cases**

*Adeyeye v. Heartland Sweeteners, LLC,*
    721 F.3d 444 (7th Cir. 2013) ........................................................ 21, 22, 23, 24

*Ansonia Board of Education v. Philbrook,*
    479 U.S. 60 (1986) ............................................................................ 20, 22, 24

*Baz v. Walters,*
    782 F.2d 701 (7th Cir. 1986) ......................................................................... 31

*Boston v. U.S. Steel Corp.,*
    816 F.3d 455 (7th Cir. 2016) ......................................................................... 35

*Comcast Corp. v. National Association of African American-Owned Media,*
    140 S. Ct. 1009 (2020) .................................................................................. 34

*Cullen v. Olin Corp.,*
    195 F.3d 317 (7th Cir. 1999) ......................................................................... 29

*EEOC v. Abercrombie & Fitch Stores, Inc.,*
    575 U.S. 768 (2015) .......................................................... 20, 24, 28, 29, 31

*EEOC v. Ilona of Hungary, Inc.,*
    108 F.3d 1569 (7th Cir. 1997) ....................................................................... 22

*EEOC v. North Memorial Health Care,*
    908 F.3d 1098 (8th Cir. 2018) ....................................................................... 34

*EEOC v. Walmart Stores East, L.P.,*
    992 F.3d 656 (7th Cir. 2021) ........................................................................... 1

*Franks v. Bowman Transportation Co.,*
    424 U.S. 747 (1976) ....................................................................................... 27

*Giese v. City of Kankakee,*
    71 F.4th 582 (7th Cir. 2023) ......................................................................... 32

*Grayson v. Schuler,*
    666 F.3d 450 (7th Cir. 2012) ......................................................................... 22

*Groff v. DeJoy,*
    35 F.4th 162 (3d Cir. 2022) ........................................................................... 26

*Groff v. DeJoy,*
    600 U.S. 447 (2023) ...................................................... 1, 25, 26, 27, 28, 34, 35

*Hebrew v. Texas Department of Criminal Justice,*
    80 F.4th 717 (5th Cir. 2023) ............................................................... 26, 27, 32

*Hedges v. Wauconda Community Unit School District Number 118*,
    9 F.3d 1295 (7th Cir. 1993) .................................................................. 27

*Hunt-Golliday v. Metropolitan Water Reclamation District of Greater Chicago*,
    104 F.3d 1004 (7th Cir. 1997) .......................................................... 32, 34

*Igasaki v. Illinois Department of Financial & Professional Regulation*,
    988 F.3d 948 (7th Cir. 2021) ................................................................ 34

*Kennedy v. Bremerton School District*,
    142 S. Ct. 2407 (2022) ............................................................... 27, 29, 30

*Kluge v. Brownsburg Commmunity School Corp.*,
    548 F. Supp. 3d 814 (S.D. Ind. 2021) ........... 1, 19, 20, 21, 23, 24, 31, 32, 33, 34

*Kluge v. Brownsburg Community School Corp.*,
    2023 WL 4842324 (7th Cir. Jul. 28, 2023) ...................................... 20

*Kluge v. Brownsburg Community School Corp.*,
    64 F.4th 861 (7th Cir. 2023) .............................................. 20, 21, 24, 32, 33, 34

*Logan v. City of Chicago*,
    4 F.4th 529 (7th Cir. 2021) ................................................................. 34

*Loyd v. Philip Brothers, Inc.*,
    25 F.3d 518 (7th Cir. 1994) ................................................................. 35

*Matthews v. Wal-Mart Stores, Inc.*,
    417 F. App'x 552 (7th Cir. 2011) ....................................................... 30

*McKennon v. Nashville Banner Publishing Co.*,
    513 U.S. 352 (1995) ............................................................................. 29

*Meriwether v. Hartop*,
    992 F.3d 492 (6th Cir. 201) ......................................................... 27, 30

*Osler Institute, Inc. v. Forde*,
    333 F.3d 832 (7th Cir. 2003) .............................................................. 34

*Porter v. City of Chicago*,
    700 F.3d 944 (7th Cir. 2012) ...................................................... 22, 24, 32, 33

*Robertson v. Department of Health Services*,
    949 F.3d 371 (7th Cir. 2020) ...................................................... 33, 35

*Rodriguez v. City of Chicago*,
    156 F.3d 771 (7th Cir. 1998) .............................................................. 32

*Thomas v. Review Board of Indiana Employment Security Division*,
    450 U.S. 707 (1981) ............................................................................. 23

*Tinker v. Des Moines Independent Community School District*,
    393 U.S. 503 (1969) ............................................................................. 28

*Trans World Airlines, Inc. v. Thurston*,
    469 U.S. 111 (1985) .................................................................... 34

*Turner Broadcasting System, Inc. v. FCC*,
    512 U.S. 622 (1994) .................................................................... 28

*United States v. Bethlehem Steel Corp.*,
    446 F.2d 652 (2d Cir. 1971) ...................................................... 28

*United States v. Seeger*,
    380 U.S. 163 (1965) .................................................................... 23

*United States v. Varner*,
    948 F.3d 250 (5th Cir. 2020) ..................................................... 27

*Venters v. City of Delphi*,
    123 F.3d 956 (7th Cir. 1997) ..................................................... 29

*Veprinsky v. Fluor Daniel, Inc.*,
    87 F.3d 881 (7th Cir. 1996) ....................................................... 35

*Walker v. Glickman*,
    241 F.3d 884 (7th Cir. 2001) ..................................................... 35

*Whitaker by Whitaker v. Kenosha Unified School District Number 1*,
    858 F.3d 1034 (7th Cir. 2017) ................................................... 30

*Zamecnik v. Indian Prairie School District Number 204*,
    636 F.3d 874 (7th Cir. 2011) ................................................ 1, 28

**Statutes**

42 U.S.C. § 2000e(j) ...................................................................... 20

**Other Authorities**

*Brownsburg High School*,
    Pub. Sch. Rev., https://bit.ly/3FNz54F ...................................... 26

*Brownsburg High School*,
    U.S. News & World Reps., https://bit.ly/49gzs5r ....................... 26

Riittakerttu Kaltiala,
    *Gender-Affirming Care Is Dangerous. I Know Because I Helped Pioneer It*,
    Free Press (Oct. 30, 2023), https://bit.ly/49whhcj. ........................ 3

## INTRODUCTION

John Kluge served as Brownsburg High School's orchestra teacher for four years. He earned a reputation as a fun, engaging teacher who genuinely cared about his students, and the orchestra performed better than ever. But these results were not the school district's highest priority. It cared more about ensuring he endorsed students' declared transgender identities by using their preferred names and pronouns. But Mr. Kluge is a devout man who believes district policies required him to tell a lie dangerous to his students and perilous to his soul. So he asked for, and received, a modest accommodation: calling all students by their last names, allowing him to stay neutral on transgender issues and focus on teaching music.

After a few people grumbled about this, the district pressured Mr. Kluge to resign and—when he refused—revoked the accommodation, brooked no exceptions to its transgender terminology rules, and forced him to resign or be fired. But no one—in school or out—can demand affirmation "of their beliefs or even their way of life," *Zamecnik v. Indian Prairie Sch. Dist. No. 204*, 636 F.3d 874, 876 (7th Cir. 2011), and employers who act with or acquiesce to religious hostility violate Title VII.

This Court ruled these reactions posed "more than a *de minimis* cost" and "more than a 'slight burden'" *Kluge v. Brownsburg Cmty. Sch. Corp. (Kluge I)*, 548 F. Supp. 3d 814, 843 (S.D. Ind. 2021) (quoting *EEOC v. Walmart Stores E., L.P.*, 992 F.3d 656, 658 (7th Cir. 2021)). But the Supreme Court discarded the "*de minimis*" or "slight burden" standard, *Groff v. DeJoy*, 600 U.S. 447, 468 (2023); abrogated *Walmart, id.* at 466 n.12, 470; and ruled complaints from coworkers or constituents based on hostility to a religious practice or to accommodating it do not show undue hardship, *id.* at 472. Nor do they provide legitimate reasons for adverse actions.

So the Supreme Court raised the bar for showing undue hardship and ruled the district's evidence—third-party complaints—off-limits. Thus, Mr. Kluge should receive summary judgment on his religious discrimination and retaliation claims.

BACKGROUND

## I.   Mr. Kluge was an excellent teacher.

Mr. Kluge earned a bachelor's degree in music education and a master's degree in music theory before teaching at Brownsburg High School from 2014 to 2018. [Filing No. 120-2 at 3 ¶ 6.] He taught beginning and advanced placement music theory, taught the high school's three orchestra classes, assisted with middle school orchestra rehearsals, and taught piano lessons. [Filing No. 120-3 at 19–20 (Kluge Dep. at p. 73, line 13 to p. 74, line 4).] The district always gave him positive written performance evaluations; he always met or exceeded its expectations. [Filing No. 113-2 at 2 ¶ 4.]

Community members lauded Mr. Kluge as a "wonderful teacher" with a style characterized by "kindness and fairness" [Filing No. 52-5 at 2 ¶ 8], who really "cares about his students" [Filing No. 52-4 at 2 ¶ 4], and made a "positive influence" on them [Filing No. 120-18 at 11]. They praised "the energy he put into conducting [the] orchestra and creating a fun classroom environment." [Filing No. 52-4 at 1 ¶ 1.]

Mr. Kluge was also a student mentor. He encouraged students "to make friends and wanted [them] to be included" in extracurricular orchestra trips. [Filing No. 52-4 at 2 ¶ 4.] He inspired at least one student—who considered him her "most influential" orchestra teacher and admired how his efforts really "helped the orchestra program excel"—to pursue a music-education degree in college. [Filing No. 120-18 at 9.]

Parents, grandparents, and graduates shared this high view of Mr. Kluge's ability, regarding him as an "excellent teacher," "who sparks an interest [in] music and the arts" in students. [*Id.* at 9, 13.] As he "truly cares about kids and wants them to be successful," he was "a huge influence in" some students' lives. [*Id.* at 9–10.]

## II.   Mr. Kluge is a committed Christian.

Mr. Kluge is more than an inspiring teacher and mentor. He is also a man of deep Christian faith, an ordained elder, who served as his church's worship leader, led its youth ministries, and directed its children's Bible memory program (AWANA).

2

[Filing No. 120-3 at 4–5 (Kluge Dep. at p. 10, line 6 to p. 15, line 3).]

The Bible shapes Mr. Kluge's worldview. [Filing Nos. 113-1 at 6; 113-2 at 2; 120-3 at 7 (Kluge Dep. at p. 22, line 1 to p. 24, line 18).] Before teaching in the district, he developed sincerely held religious beliefs about gender dysphoria. [Filing No. 113-2 at 2 ¶ 5.] Based on his study of Scripture, he believes (1) God "created us as a man or a woman," (2) it is wrong "to act or dress in the manner of the opposite sex," (3) it would be sinful for him to "encourage[ ] students in transgenderism," and (4) causing children to stumble in this way would subject him to "special punishment" from God. [Filing No. 113-1 at 6–9.] He also believes God ordains "[g]enetic sex," it "cannot be separated" from gender identity, and the two "remain bound together throughout one's life." [Filing No. 120-3 at 11 (Kluge Dep. at p. 38, line 8 to page 39, line 4).]

These sincerely held religious beliefs prevent Mr. Kluge from using first names and pronouns that conflict with a student's biological sex "during the [regular] course of … teaching a class," as doing so "encourages gender dysphoria." [*Id.* at 9 (Kluge Dep. at p. 30, lines 1–30); *accord id.* at 12–13 (Kluge Dep. at p. 42, lines 9–11; p. 43, lines 18–22; p. 44, lines 18–23; p. 45 line 20 to p. 46, line 1).] (Even pioneers of "gender-affirming care" note the danger of such encouragement.[1]) In other circumstances, his faith would not preclude him from using a student's transgender name (*e.g.*, briefly at a formal awards ceremony). [Filing No. 120-3 at 8, 33–34 (Kluge Dep. at p. 28, line 23 to p. 29, line 24; p. 126, line 7 to p. 130, line 9).]

## III.   The district introduced transgender terminology rules.

Mr. Kluge remained a valued teacher until the district initiated transgender terminology rules in early 2017. This process began when it invited Mr. Lee (a government teacher and the Equality Alliance Club's faculty advisor) and Ms. Mehrtens (a school counselor) to speak at faculty meetings about endorsing transgender-

---

[1]   Riittakerttu Kaltiala, *Gender-Affirming Care Is Dangerous. I Know Because I Helped Pioneer It*, FREE PRESS (Oct. 30, 2023), https://bit.ly/49whhcj.

identifying students' gender identities. [Filing No. 15-3 at 2.] Alarmed by their suggestion that referring "to a transgender student by their biological sex and not us[ing] the student's preferred pronoun" would be punishable as "harassment," Mr. Kluge drafted a letter (1) expressing concern for transgender students' health and well-being, (2) describing such a policy's adverse effects on Christian students, (3) citing Scripture and explaining the policy's burden on the "consciences of Christian students and faculty members," and (4) urging the district to take a different course. [Filing Nos. 113-1 at 19–25; 120-3 at 11 (Kluge Dep. at p. 39, line 21 to p. 40, line 17).]

Mr. Kluge and three other teachers signed the letter and met with Principal Daghe at the end of the school year, where Mr. Kluge read the letter aloud. [Filing Nos. 113-1 at 31; 120-3 at 11–12 (Kluge Dep. at p. 41, line19 to p. 42, line 18).] Registering students' transgender names in the district's database (PowerSchool) resolved the three teachers' concerns. But after the meeting, Mr. Kluge returned, urging the principal to keep using students' legal (*i.e.*, biology-reflecting) names in PowerSchool. [Filing Nos. 15-3 at 2–3; 120-3 at 12 (Kluge Dep. at p. 42, line 19 to p. 44, line 23).]

Yet starting the next school year, the district let transgender-identifying students change their names in PowerSchool with parental permission and a healthcare provider's note. [Filing Nos. 113-5 at 4 (Daghe Dep. at p. 28, lines 4–14); 120-19 at 5.][2] Counselor Mehrtens informed Mr. Kluge and other teachers of this new rule and told them to "feel free" to use these students' new names and pronouns. [Filing Nos. 120-10 at 2; 15-3 at 3; 120-3 at 13–14 (Kluge Dep. at p. 48, line 5 to p. 49 line 22; p. 52, lines 3–13).] Recognizing this as an invitation (not a command), Mr. Kluge understood he could continue using students' biology-reflecting names and pronouns. Before classes began, he told Principal Daghe of his plans based on his religious beliefs and the district's permissive guidance. The principal sent Mr. Kluge to his office and

---

[2]   Filing No. 120-19 is a letter Mr. Kluge's counsel sent the EEOC. Mr. Kluge testified to its accuracy. [Filing No. 120-3 at 32 (Kluge Dep. at p. 122, lines 5–8).]

contacted Superintendent Snapp. [Filing Nos. 15-3 at 3; 113-5 at 6 (Daghe Dep. at p. 34, lines 3–7; p. 36, lines 15–21); 120-3 at 14 (Kluge Dep. at p. 52, lines 14–16).]

Later that day, the superintendent and principal told Mr. Kluge for the first time that he was barred from using students' legal names. [Filing No. 120-3 at 14 (Kluge Dep. at p. 52, lines 17–21).] The district required teachers to use students' transgender names and pronouns once this information was in PowerSchool. [Filing No. 113-5 at 5 (Daghe Dep. at p 30, lines 5–23).] When Mr. Kluge expressed his religious objection to this and cited Scripture, the superintendent became "very angry," telling Mr. Kluge that his "beliefs aren't what's in the Bible." [Filing No. 120-3 at 19 (Kluge Dep. at p. 71, line 7; p. 72, line 12).] A theological debate ensued, where the superintendent pronounced Mr. Kluge's beliefs "wrong," and Mr. Kluge responded with Scripture supporting his beliefs. [Filing Nos. 120-3 at 19 (Kluge Dep. at p. 72, line 21 to p. 73, line 8); 113-6 at 6 (Snapp Dep. at p. 20, line 22 to p. 21, line 21).]

In the end, the superintendent said Mr. Kluge could comply with the policy, say he was forced to resign, or be terminated. [Filing Nos. 15-3 at 3; 120-3 at 14–15 (Kluge Dep. at p. 52, line 17 to p. 54, line 8); 120-19 at 6.] Mr. Kluge's religious beliefs would not allow him to follow the policy, and he refused to resign so as not to "quit on the students." [Filing Nos. 120-3 at 14 (Kluge Dep. at p. 52, line 22 to p. 53, line 22); 120-19 at 6; 15-3 at 3.] So the superintendent suspended him pending termination. [Filing Nos. 120-3 at 14–15 (Kluge Dep. at p. 53, line 23 to p. 54, line 8); 15-3 at 3.]

## IV.   Mr. Kluge proposed a religious accommodation the district accepted.

After this suspension, Mr. Kluge's pastor and Superintendent Snapp spoke by phone, and the superintendent agreed to give Mr. Kluge the weekend to think about matters before terminating his employment. [Filing Nos. 120-3 at 15–16 (Kluge Dep. at p. 56, line 24 to p. 58, line 16); 120-19 at 6.] The following Monday, Mr. Kluge met with Superintendent Snapp and Ms. Jodi Gordon, the district's Human Resources Director. [Filing Nos. 120-3 at 17 (Kluge Dep. at p. 63, lines 19–24); 120-19 at 6.]

At this meeting, the superintendent and HR director presented Mr. Kluge a form stating: "You are directed to recognize and treat students in a manner using the identity indicated in PowerSchool." [Filing No. 15-1 at 1.] Below were two check boxes where they expected Mr. Kluge to indicate "Yes" (*i.e.*, he would follow the transgender terminology rules) or "No" (*i.e.*, he would not). [*Id.*] They again said Mr. Kluge could (1) comply with these policies and keep his job or (2) refuse and be fired. [Filing No. 120-3 at 17 (Kluge Dep. at p. 63, line 25 to p. 64, line 7).]

Mr. Kluge suggested a third option: an accommodation where he referred to all students in class by their last names—like a coach does. [Filing Nos. 15-3 at 4; 113-4 at 7 (Gordon Dep. at p. 22, line 6 to p. 24, line 22); 113-6 at 7 (Snapp Dep. at p. 24, line 23 to p. 25, line 9); 120-3 at 17 (Kluge Dep. at p. 64, lines 8–13); 120-19 at 6.] Thus, he could avoid transgender issues altogether and focus on music, explaining it would be "as if we're the orchestra team." [Filing No. 120-3 at 17 (Kluge Dep. at p. 64, line 13).] His ongoing students would notice little change as he previously referred to students by their last names—preceded by honorifics (*e.g.*, "Mr.," "Ms.")—to foster a "teaching environment similar to a college level class." [Filing No. 52-1 at 3 ¶ 12.]

The superintendent agreed to this reasonable accommodation after Mr. Kluge promised to answer any student questions about his practice by referring to the "orchestra team" and a "sports coach" analogy, not his religious beliefs. [Filing No. 120-3 at 17 (Kluge Dep. at p. 64, line 14 to p. 65 line 7).] He understood Mr. Kluge "was making a sincere effort to offer up an accommodation that he was [going to] fulfill." [Filing No. 113-6 at 7 (Snapp Dep. at p. 22, lines 18–20).]

On the form presented at the meeting's outset, the HR director wrote and initialed two edits to memorialize this religious accommodation: (1) "We agree that John may use last name only to address students," and (2) "Angie Boyer will be responsible for distributing uniforms to students." Mr. Kluge checked the "Yes" box and signed and dated the form. [Filing Nos. 15-1 at 1; 120-3 at 18 (Kluge Dep. at p. 66, line 24 to

p. 67, line 22).] Under the accommodation, Mr. Kluge and the district understood he would address *all* students by their last names in *all* his classes with no honorifics. [Filing Nos. 120-2 at 3–4 ¶ 10; 120-3 at 18 (Kluge Dep. at p. 68, lines 14–25).]

## V.   Mr. Kluge's religious accommodation worked.

Mr. Kluge returned to teaching and referred to students by their last names without explaining why or drawing attention to himself. [Filing No. 120-3 at 20 (Kluge Dep. at p. 77, lines 15–24).] He "was consistent in using last names only and using it for all students." [*Id.* at 36 (Kluge Dep. at p. 140, lines 13–15); *accord* Filing Nos. 52-1 at 3–4 ¶¶ 17–19; 52-2 at 3 ¶¶ 7–8; 52-3 at 2–3 ¶¶ 6–9, 52-4 at 2 ¶ 3; 52-5 at 2 ¶¶ 5–7.] Only one student asked about it, and he responded: "[W]e're all a team and a sports coach calls their team members by last name only. I wanted to foster that community and we're all working towards one goal." [Filing No. 120-3 at 34 (Kluge Dep. at p. 130, line 20 to p. 131, line 7).] For an entire semester, there were no disturbances, canceled classes, student protests, or written complaints about him using students' last names. [Filing No. 113-2 at 4 ¶ 15.] He "remain[ed] neutral" and taught music without imposing on others' beliefs or violating his own. [Filing No. 120-3 at 8, 24 (Kluge Dep. at p. 29, lines 1–10; p. 91, lines 7–8; p. 92, lines 8–16).]

Through Mr. Kluge's final schoolyear, his classes "perform[ed] very well," and students "respond[ed] well to [his] teaching." [*Id.* at 23 (Kluge Dep. at p. 89, lines 16–18).] His orchestras performed "better than ever" in competitions, students excelled on their AP music-theory exams, several students received performance awards, and student participation in the orchestras remained high. [Filing Nos. 113-2 at 4 ¶ 15; 120-3 at 23–24 (Kluge Dep. at p. 89, line 15 to p. 90, line 4).] No official ever suggested the accommodation was not working or reviewed his classroom performance. [Filing No. 120-14 at 12, 17 (Lee Dep. at p. 55, lines 2–4; p. 56, lines 11–12; p. 86, lines 12–15).] The accommodation had worked for the district, Mr. Kluge, and the students.

## VI.    After some grumblings from teachers and students, the district pressured Mr. Kluge to resign.

In December 2017, Principal Daghe met with Mr. Kluge to discuss the accommodation. According to the principal, there were reports "students [were] uncomfortable in [Mr. Kluge's] class and … having discussions about the uncomfortableness." [Filing No. 113-5 at 7 (Daghe Dep. at p. 51, lines 4–7).] He alleged transgender-identifying students said they felt "dehumanized" (though all students were treated the same), other students "feel bad for" them, Mr. Kluge was the "topic of much discussion in the Equality Alliance Club meetings," and some teachers avoided Mr. Kluge due to his religious beliefs. [Filing No. 15-3 at 4.] Most complaints came from Mr. Lee, the club's advisor, who spearheaded the transgender terminology rules and was "very biased" on these issues. [Filing Nos. 120-2 at 4 ¶¶ 11–12; 120-14 at 4, 15–17 (Lee Dep. at p. 22, line 20 to p. 23, line 25; p. 81, line 15 to p. 86, line 15); 120-15 at 3.]

Principal Daghe was also unhappy that a parent complained about Mr. Kluge regarding a concert-hair-color policy all teachers in the department shared. He recognized Mr. Kluge's religious beliefs were the only reason that the parent complained, but that made no difference. [Filing Nos. 15-3 at 4–5; 113-5 at 7 (Daghe Dep. at p. 51, lines 13–24); 120-3 at 22 (Kluge Dep. at p. 84, line 21 to p. 85, line 10).] Accommodating Mr. Kluge's religious beliefs "creat[ed] tension" [Filing No. 120-3 at 23 (Kluge Dep. at p. 89, lines 14–15)], and the principal "didn't like things being tense and didn't think things were working out." [Filing No. 15-3 at 5.] Based on these limited, biased complaints, Principal Daghe urged Mr. Kluge to resign at the end of the school year. [Filing Nos. 15-3 at 5; 113-5 at 7–8 (Daghe Dep. at p. 50, line 14 to p. 54, line 9).]

This was the first time Mr. Kluge heard any complaints about his use of last names. [Filing No. 120-3 at 22 (Kluge Dep. at p. 84, lines 9–18).] He suspected they were "a heckler's veto," not genuine. [*Id.* at 24–25 (Kluge Dep. at p. 92, line 25 to p. 94, line 15).] Principal Daghe never told him which students or teachers were upset, and Mr. Kluge experienced no "animosity" from students or peers. [*Id.* at 23 (Kluge

Dep. at p. 88, lines 9–18).] As to students, his "classes were performing very well." [*Id.* (Kluge Dep. at p. 89, lines 14–25).] As to faculty, he rarely interacted with teachers outside his department, continued eating lunch with his music colleagues, and understood everyone to be "get[ting] along great." [*Id.* (Kluge Dep. at p. 88, lines 9–18).]

Principal Daghe saw the "persecution and unfair treatment" of Mr. Kluge as a reason for him to resign, but these things encouraged Mr. Kluge to stay and "keep on endeavoring to be neutral" on transgender issues at school. [*Id.* at 24 (Kluge Dep. at p. 90, line 10 to p. 92, line 7).] Mr. Kluge viewed being "singled out" or "attacked" by a parent for applying a universal concert-hair-color policy as "a sign that [he] shouldn't give up pursuing neutrality with last names only." [*Id.*]

In January 2018, Principal Daghe met with Mr. Kluge again because he had not been "direct enough" before, and he instructed Mr. Kluge "plainly that he really wanted to see [Mr. Kluge] resign at the end of this school year." [Filing No. 15-3 at 5; *accord* Filing No. 120-5 at 9 (Daghe Dep. at p. 54, lines 5–9).] He offered to give Mr. Kluge a good reference. [Filing No. 15-3 at 5.] Mr. Kluge found it "distressing to hear" the principal indicate he wanted Mr. Kluge to leave the school [Filing No. 120-3 at 25 (Kluge Dep. at p. 97, lines 9–18)], and observed that Principal Daghe did not like the "tension and conflict" caused by others' hostility to his religious beliefs. [Filing No. 15-3 at 5; *accord* Filing No. 120-5 at 9 (Daghe Dep. at p. 56, line 13 to p. 57, line 14).] When pressed again to resign, Mr. Kluge indicated he would not decide until the district announced its revamped transgender terminology rules. [Filing No. 15-3 at 5.]

## VII.   The district overhauled its transgender terminology rules and proclaimed: "No accommodations allowed."

In August 2017, the district said new transgender terminology rules were coming. [*Id.* at 4.] Unveiled in January 2018 and entitled *Transgender Questions* [Filing Nos. 15-3 at 5; 113-2 at 4 ¶ 17], the rules said transgender-identifying students *must* "receive ... affirmation of their preferred identity" [Filing No. 120-1 at 4 ¶ 8], no

matter the religious beliefs of teachers or harm to students. *See supra* n. 1.

*Transgender Questions* established that students could change their names in PowerSchool "with a letter from the student's parent(s) and a letter from a health care professional." [Filing No. 15-4 at 1.] After this, "the name/gender in PowerSchool should be used," including "the pronoun associated with the gender … in PowerSchool." [*Id.* at 2, 4.] If a student requested "they/them," teachers had to use those pronouns instead, ostensibly for "transfluid" students, who allegedly feel "more male at times and at other times more female." [*Id.* at 4.]

The district could punish teachers for "calling the student the wrong name/pronoun" depending on whether that language was repeated and the teacher's "intent." [*Id.* at 2.] It announced—in response to a question about a teacher using last names only—that Mr. Kluge's accommodation was effective only for the 2017–18 school year and that "*moving forward it is our expectation the student will be called by the first name listed in PowerSchool.*" [*Id.* at 9 (emphasis added).] No longer could teachers "refuse to call [a transgender-identifying] student by his/her preferred name"; rather they "would need to call students by [the] name listed in PowerSchool." [*Id.*]

The district left no room for Title VII religious accommodations, announcing: "[W]hen you work in a public school, you sign up to follow the law and the policies/practices of that organization and that might mean *following practices that are different than your own beliefs.*" [*Id.* at 10 (emphasis added).] It praised "teachers who are accepting and supporting of" students' efforts to present as the opposite sex, while condemning teachers (*i.e.*, Mr. Kluge) "who continue to use the wrong pronouns or names" or call "students by their last name." [*Id.*]

Concerned, Mr. Kluge emailed the superintendent and principal, quoting *Transgender Questions'* language about his accommodation, noting the agreement "signed in July 2017 does not limit itself to the 2017–2018 school year," and reflecting his understanding that he "would be allowed to continue to use last-names-only when

addressing students next school year and beyond." [Filing No. 120-16 at 2.]

In February, the principal and HR director told Mr. Kluge that next school year, he would be treated "just as everybody else." [Filing No. 113-4 at 24 (Gordon Dep. Ex. 29 at p. 5, lines 16–19).] If he did not use transgender names and pronouns, the district would fire him. [*Id.* at 43 (Gordon Dep. Ex. 29 at p. 24, lines 5–8).] The only reason for rescinding the accommodation was some students were "offended by being called by their last name." [*Id.* at 26 (Gordon Dep. Ex. 29 at p. 7, lines 16–19).]

HR Director Gordon clarified that if Mr. Kluge resigned at the end of the school year, he would still be "paid through the summer" [*id.* at 33 (Gordon Dep. Ex. 29 at p. 14, lines 18–25)], the clear implication being that if the district terminated Mr. Kluge, he would lose his regular summer pay [Filing No. 15-3 at 2]. After claiming that the district was not the "right environment" for Mr. Kluge, Principal Daghe again urged him to resign, promising that in a search for different employment, Mr. Kluge would have the principal's "recommendation" and "word that you will do a good job." [Filing No. 113-4 at 41 (Gordon Dep. Ex. 29 at p. 22, lines 2–14).]

Mr. Kluge (1) reiterated he could not, in good conscience, normally refer to transgender students using biologically inaccurate names and pronouns; (2) pointed out his last-names accommodation had "[a] religious reason" based on "a conviction of [his] faith"; (3) asked how it was "not religious discrimination" for the district to refuse to accommodate his "religious convictions in the workplace"; (4) contended his accommodation was "reasonable"; and (5) observed "it seems illegal … to not allow that accommodation" next year. [*Id.* at 25, 27, 28–32, 43 (Gordon Dep. Ex. 29 at p. 6, lines 7–16; p. 8, lines 11–12; p. 9, line 18 to p. 13, line 5; p. 24, lines 11–14).]

HR Director Gordon responded that "calling kids by their last names" is "just not what we do." [*Id.* at 27 (Gordon Dep. Ex. 29 at p. 8, lines 18–20).] Principal Daghe was only "willing to accommodate people who follow the policies" and said if using transgender names and pronouns is "what the policy is, we will all follow that policy."

11

[*Id.* at 29 (Gordon Dep. Ex. 29 at p. 10, lines 6–8).] There was "no[ ] question of religious accommodation" [*id.* at 47 (Gordon Dep. Ex. 29 at 28, lines 8–9)], in their minds, because using students' last names would be "a policy violation. It's a [district] policy." [*Id.* at 43 (Gordon Dep. Ex. 29 at 24, line 17).]

Though Mr. Kluge maintained that rescinding his accommodation was unlawful and discriminatory, no one triggered the district's equal-employment-opportunity policy, which required a "formal investigation." [*Id.* at 17.] Though she was the compliance officer for staff, HR Director Gordon never considered her duties under that policy triggered. [*Id.* at 10 (Gordon Dep. at p. 36, lines 15–22); *id.* at 14.] The district simply wanted Mr. Kluge to resign or "follow the guidelines." [*Id.* at 12 (Gordon Dep. at p. 42, lines 16–20).] HR Director Gordon insisted on a "commitment" from Mr. Kluge to follow the transgender terminology rules "by the end of the school year," or the district would begin the "termination process." [*Id.* at 45 (Gordon Dep. Ex. 29 at p. 26, lines 1–14).] In March, she again insisted that he submit his resignation letter by May 1 or the district would start termination proceedings. [Filing No. 15-3 at 6.]

## VIII.  Mr. Kluge followed both the accommodation and his convictions at the orchestra awards ceremony.

Near the school year's end, Mr. Kluge presided at an awards ceremony. [Filing No. 120-3 at 32 (Kluge Dep. at p. 125, lines 12–17).] For two reasons, he briefly recognized all students by the names in PowerSchool. [*Id.* at 33 (Kluge Dep. at p. 126, lines 7–17).] First, his accommodation entitled him to use students' last names like a coach. But he did not think a coach would "address students in such an informal manner at such a formal event as opposed to the classroom setting where teachers [normally] refer to students by last names." [*Id.* (Kluge Dep. at p. 126, lines 19–24).] It would be "conspicuous" and "unreasonable" to use last names at "a formal event," and so he made "a good faith effort to work within the bounds of [his] accommodation." [*Id.* (Kluge Dep. at p. 126, line 19 to p. 128, line 17); *accord* Filing No. 120-19 at 7.]

12

Second, Mr. Kluge did not believe briefly using these names at an awards ceremony violated Scripture or promoted transgenderism. It was a "special event" that did not reflect his "ordinary behavior," unlike "regularly … using transgender names in the classroom." [Filing No. 120-3 at 33–34 (Kluge Dep. at p. 129, line 18 to p. 130, line 9).] His religious beliefs do not simply bar him from "regularly calling students by transgender names." [*Id.* at 33 (Kluge Dep. at p. 129, lines 18–21).] They also inspire him to love and seek to "do no harm." [Filing Nos. 120-19 at 7; 15-3 at 6–7.] By using these names briefly at a formal event, he was exercising his "sincerely-held beliefs," not "agree[ing] with [district] policy." [Filing No. 120-19 at 7.]

## IX.   Mr. Kluge submitted a conditional resignation and tried to revoke it, but the district pushed it through.

Concerned about preserving his summer pay because he had "a family to feed" [Filing No. 113-4 at 51 (Gordon Dep. Ex. 29 at p. 32, line 5)], Mr. Kluge conditionally resigned via email on April 30, 2018 [Filing No. 120-17 at 2], unaware he could not rescind it. He did so because the district withdrew his religious accommodation and required him "to refer to transgender students by their 'preferred' name as well as by their 'preferred' pronoun that does not match their legal name and sex," something his "Christian conscience [would] not allow." [*Id.* at 2.] He requested that HR Director Gordon "not process this letter nor notify anyone … about its contents before May 29, 2018." [*Id.*] She agreed to honor this request. [*Id.*]

On May 25, Mr. Kluge scheduled a meeting with HR Director Gordon and Principal Daghe, but the principal intercepted him before it, saying: "We have everything we need. We don't need to meet. Go back to the high school." [Filing No. 15-3 at 1.] So Mr. Kluge gave the HR director a letter, rescinding his conditional resignation and imploring the district to let him keep his religious accommodation and his job. [*Id.* at 1, 7.] But the district locked Mr. Kluge out of school buildings and online services and posted his job as "vacant" a few hours later. [Filing No. 113-2 at 7 ¶ 29.]

13

Before the school board accepted his resignation, Mr. Kluge asked for time to speak at its regular meeting. This request was ignored. Mr. Kluge had just a brief period during the public-comment section to address the board, in which he explained what had happened and pleaded with it to let him withdraw his conditional resignation email and to reinstate him. [Filing Nos. 120-3 at 29 (Kluge Dep. at p. 111, line 14 to p. 112, line 25); 120-18 at 10.] But the board simply accepted his forced resignation without comment. [Filing No. 120-18 at 2, 8–9, 18.]

### STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

1.   Mr. Kluge became employed at the district in August 2014 as a music and orchestra teacher. [Filing Nos. 71 at 8 ¶ 21; 120-2 at 3 ¶ 6.]

2.   Mr. Kluge's performance met and exceeded the district's legitimate expectations at all times, and his written performance evaluations were positive. [Filing No. 113-2 at 2 ¶ 4.] Students, parents, grandparents, and graduates held him in high regard. [Filing Nos. 52-4 at 1–2 ¶¶ 1–6; 52-5 at 2–3 ¶ 8; 120-18 at 9–11, 13.]

3.   Before becoming a teacher, Mr. Kluge formed sincere religious beliefs, based on the Bible, against promoting gender dysphoria by regularly using names and pronouns that reflect transgender identities. [Filing Nos. 113-2 at 2 ¶ 5; 113-1 at 6–9; 120-3 at 7, 11 (Kluge Dep. at p. 23, line 6 to p. 24, line 18; p. 38, line 8 to p. 39, line 4).]

4.   Mr. Kluge's sincerely held religious beliefs prevent him from regularly referring to transgender-identifying students by names and pronouns that reflect their gender identities, such as during a class, because doing so "encourages gender dysphoria." [Filing Nos. 120-3 at 8–9, 12–13 (Kluge Dep. at p. 29 line 20 to p. 30, line 11; p. 42, lines 1–11; p. 45, line 18 to p. 46, line 1); 113-2 at 2 ¶ 6.] But they allow him to use a transgender first name briefly on some formal occasions. [Filing No. 120-3 at 8, 33–34 (Kluge Dep. at p. 28, line 18 to p. 29 line 24; p. 126, line 18 to p. 130, line 9).]

5.   In April 2017, Mr. Kluge informed the district of his sincerely held religious beliefs against promoting gender dysphoria by drafting a letter to the district

outlining his convictions and his concern for students, a letter that he and three other teachers signed. [Filing No. 113-1 at 19–25, 31.] Mr. Kluge and his colleagues met with Principal Daghe in May 2017 when he read this document aloud. [Filing Nos. 120-3 at 11–12 (Kluge Dep. at p. 39, line 24 to p. 42, line 18); 113-2 at 3 ¶ 7.]

6.   The three other teachers agreed to use the names listed in the school's database (*i.e.*, PowerSchool), but Mr. Kluge maintained his position, encouraged Principal Daghe to continue using students' legal (*i.e.*, biology-reflecting) names, and left the meeting believing that he and the principal agreed. [Filing Nos. 15-3 at 2–3; 120-3 at 12 (Kluge Dep. at p. 42, line 19 to p. 44, line 23); 113-2 at 3 ¶ 8.]

7.   Starting in the 2017–18 school year, the district allowed transgender-identifying students to change their names in PowerSchool with parental permission and a healthcare provider's note. [Filing Nos. 113-5 at 4 (Daghe Dep. at p. 28, lines 8–14); 120-19 at 5.] Counselor Mehrtens informed Mr. Kluge and others of this rule, telling them to "feel free" to use these students' new names and pronouns. [Filing Nos. 120-10 at 2; 15-3 at 3; 120-3 at 13–14 (Kluge Dep. at p. 47, line 24 to p. 52, line 13).]

8.   Before classes began, Mr. Kluge informed Principal Daghe he intended to use students' legal names due to his religious beliefs and the fact that Counselor Mehrtens merely invited use of other names. The principal consulted Superintendent Snapp. [Filing Nos. 15-3 at 3; 113-5 at 6 (Daghe Dep. at p. 34, lines 3–7; p. 36, lines 15–21); 120-3 at 14 (Kluge Dep. at p. 52, lines 3–16); 120-19 at 6.]

9.   Later that day, July 27, Superintendent Snapp and Principal Daghe informed Mr. Kluge for the first time that he was prohibited from using students' legal names. [Filing Nos. 120-3 at 14 (Kluge Dep. at p. 52, lines 17–21); 120-19 at 6.] When Mr. Kluge reiterated his religious objections, the superintendent became "very angry," pronounced his beliefs "wrong," and said he could (1) comply with the policy, (2) say he was forced to resign, or (3) be fired. [Filing Nos. 15-3 at 3; 120-3 at 14–15, 19 (Kluge Dep. at p. 52, line 17 to p. 54, line 8; p. 71 line 7 to p. 72, line 21); 120-19 at 6.]

15

10. When Mr. Kluge, Superintendent Snapp, and HR Director Gordon met to discuss this ultimatum on July 31, he proposed a reasonable accommodation: addressing all students by their last names, like a coach. [Filing Nos. 15-3 at 4; 113-4 at 7 (Gordon Dep. at p. 22, line 6 to p. 24, line 22); 113-6 at 7 (Snapp Dep. at  p. 24 line 23 to p. 25 line 9); 120-3 at 17 (Kluge Dep. at p. 64 lines 8–13); 120-19 at 6; 113-2 at 2 ¶ 12.]

11. Superintendent Snapp and HR Director Gordon agreed to Mr. Kluge's accommodation; inserted handwritten language in the communication dated July 28 from Principal Daghe approving the last-names-only accommodation and indicating Mr. Kluge would not be required to distribute student uniforms; and HR Director Gordon initialed the accommodation, while Mr. Kluge signed and dated that document. [Filing Nos. 15-1 at 1; 120-3 at 18 (Kluge Dep. at p. 68, lines 14–25); 113-2 at 3–4 ¶ 13.]

12. Six people—Mr. Kluge, a contract teacher, three students in Mr. Kluge's classes that year, and a student's parent—provided sworn declarations attesting to Mr. Kluge's adherence in his classes to the last-names-only accommodation and no adverse behavior toward transgender-identifying students. [Filing Nos. 52-1 at 3–4 ¶¶ 13–22; 52-2 at 2–3 ¶¶ 6–8; 52-3 at 2–3 ¶¶ 3–11; 52-4 at 2 ¶¶ 3, 7; 52-5 at 2 ¶¶ 3–7; 52-6 at 3–4 ¶¶ 9, 14; 120-3 at 36 (Kluge Dep. at p. 140, lines 13–15).]

13. Only one student ever asked Mr. Kluge why he referred to all students by their last names, and he responded by likening his class to a sports team. [Filing No. 120-3 at 34 (Kluge Dep. at p. 130, line 20 to p. 131, line 7).]

14. Between July 31 and December 31, 2017, there were no student protests, no written complaints, no classroom disturbances, and no canceled classes related to Mr. Kluge's use of last names for all students. [Filing No. 113-2 at 4 ¶ 15.] Instead, the accommodation worked as intended and Mr. Kluge's students excelled, to the point that the district admits some of his students received awards for their performances during the 2017–18 school year. [Filing No. 71 at 14 ¶ 47; *accord* Filing Nos. 120-3 at 23–24 (Kluge Dep. at p. 89, line 15 to p. 90, line 4); 120-19 at 8.]

15. For the fall 2017 semester, the district did not claim undue hardship due to Mr. Kluge's accommodation. [Filing No. 113-5 at 8 (Daghe Dep. at p. 57, lines 8–14).]

16. On December 13, Principal Daghe met with Mr. Kluge, telling him that people reported "students [were] uncomfortable in his class" [Filing No. 113-5 at 7 (Daghe Dep. at p. 51, lines 4–7)]; that accommodating his religious beliefs "create[d] tension" that Principal Daghe did not like [Filing Nos. 120-3 at 23 (Kluge Dep. at p. 89, lines 14–15); 15-3 at 5]; and that Mr. Kluge should resign by year-end [Filing Nos. 15-3 at 5; 113-5 at 7–8 (Daghe Dep. at p. 50, line 14 to p. 54, line 9); 113-2 at 4 ¶ 16].

17. In January 2017, Principal Daghe again met with Mr. Kluge, instructing him "plainly that he really wanted to see [Mr. Kluge] resign at the end of this school year." [Filing No. 15-3 at 5; 120-19 at 9, 113-5 at 8 (Daghe Dep. at p. 54, lines 5–9).]

18. At a January 2018 faculty meeting, the district distributed an 11-page document entitled *Transgender Questions*, which identifies the district's practices and procedures regarding childhood gender dysphoria. [Filing Nos. 15-3 at 5; 113-2 at 4 ¶ 17; 15-4 at 1–11; 120-1 at 4 ¶ 8.]

19. *Transgender Questions* details how transgender-identifying students could change their names in PowerSchool and indicated that once this change was complete, "the name/gender in PowerSchool should be used," including "the pronoun associated with the gender as it appears in PowerSchool." [Filing No. 15-4 at 2, 4, 9.]

20. *Transgender Questions* also indicated that the district could punish teachers for "calling the student the wrong name/pronoun," that it expected that "students will be called by the first name listed in PowerSchool," and that teachers could not decline to use these "preferred name[s]." [Filing No. 15-4 at 2, 9.]

21. *Transgender Questions* does not claim addressing students by their last names only created any "undue hardship" or disrupted the learning environment; it simply outlined the district's new practices. [Filing Nos. 113-2 at 5 ¶ 19; 15-4 at 1–11.]

22. *Transgender Questions* left no room for accommodating teachers' religious

17

beliefs, specifying that "when you work in a public school, you sign up to follow the law and [its] policies/practices ... and that might mean following practices that are different than your beliefs." [Filing No. 15-4 at 10.]

23. After the faculty meeting, Mr. Kluge emailed Superintendent Snapp and Principal Daghe, reminding them that he had a signed accommodation agreement with no end date and asking them to confirm that his last-names-only accommodation was still valid. [Filing Nos. 120-16 at 2; 113-2 at 5 ¶ 22.]

24. In response, HR Director Gordon and Principal Daghe met with Mr. Kluge in February, where they told him that starting in the next school year, he would be treated "just as everybody else" and that if he refused to use transgender names and pronouns, he would be fired. [Filing No. 113-4 at 24, 43 (Gordon Dep. Ex. 29 at p. 5, lines 16–19; p. 24, lines 5–8).] The only reason they gave for rescinding his accommodation was that some students were "offended by being called by their last name." [Filing Nos. 113-4 at 26 (Gordon Dep. Ex. 29 at p. 7, lines 16–19); 113-2 at 5–6 ¶ 23.]

25. Neither HR Director Gordon nor Principal Daghe told Mr. Kluge that his accommodation created an undue hardship, increased the district's cost of doing business, or disrupted the learning environment. [Filing Nos. 113-2 at 6 ¶ 24; 113-4 at 20–54 (Gordon Dep. Ex. 29 at pp. 1–35).]

26. HR Director Gordon told Mr. Kluge that his accommodation was no longer valid because "calling kids by their last names" is "just not what we do" and constituted a "policy violation." [Filing No. 113-4 at 27, 43 (Gordon Dep. Ex. 29 at p. 8, lines 18–20; p. 24, line 17).] Principal Daghe agreed, saying that if calling students by transgender names and pronouns is "what the policy is, we will all follow that policy," and that he was only "willing to accommodate people who follow the policies." [*Id.* at 29 (Gordon Dep. Ex. 29 at p. 19, lines 6–8); *accord* Filing Nos. 113-2 at 6 ¶ 25; 113-4 at 45–47 (Gordon Dep. Ex. 29 at p. 26, line 10 to p. 28, line 8).]

27. At this meeting and in March, HR Director Gordon and Principal Daghe told

Mr. Kluge to follow the "policy," resign and receive summer pay, or be terminated in early May. [Filing Nos. 113-4 at 33, 41, 43, 45 (Gordon Dep. Ex. 29 at p. 14, lines 18–25; p. 22, lines 2–14; p. 24, lines 5–8; p. 26, lines 4–14); 15-3 at 2; 113-2 at 6 ¶ 26.]

28. On April 30, Mr. Kluge submitted and HR Director Gordon accepted a "conditional" resignation after HR Director Gordon agreed (1) she would not process or show anyone Mr. Kluge's resignation until May 29, and (2) Mr. Kluge could withdraw his resignation before then. [Filing Nos. 120-17 at 2; 113-2 at 6 ¶ 27; 15-2 at 1.]

29. After evaluating what HR Director Gordon and Principal Daghe told him about his accommodation and disagreeing with it, Mr. Kluge delivered to HR Director Gordon's office a time-stamped letter rescinding his resignation. This letter was received at 2:33 p.m. on May 25, 2018. [Filing Nos. 15-3 at 1, 7; 113-2 at 6 ¶ 28.]

30. Despite her assurances to Mr. Kluge, HR Director Gordon shared Mr. Kluge's resignation with Principal Daghe on May 25. They made it effective the same day, and approximately two hours after receiving his rescission, the district locked Mr. Kluge out of district buildings, terminated his access to its internet database, and posted his job as vacant. [Filing Nos. 15-3 at 1, 7; 113-2 at 7 ¶ 29; 71 at 17 ¶ 63.]

31. The district's board accepted Mr. Kluge's resignation at its meeting on June 11, though he asked them not to. [Filing Nos. 120-3 at 29 (Kluge Dep. at p. 111, line 14 to p. 112, line 25); 120-18 at 2, 8, 10, 18; 113-2 at 7 ¶ 30; 71 at 16 ¶ 58.]

ARGUMENT

Mr. Kluge should receive summary judgment on his religious discrimination and retaliation claims as there is no genuine dispute over any outcome-determinative facts and the governing law—*Groff*—prevents the district from showing undue hardship. *Kluge I*, 548 F. Supp. 3d at 819–20 (summary judgment standards).

**I.   Mr. Kluge is entitled to summary judgment on his religious discrimination claim because the district revoked a reasonable accommodation without showing undue hardship.**

For over 50 years, Title VII has required most employers to "reasonably

accommodate … an employee's … religious observance or practice" unless they prove an accommodation would result in "undue hardship." 42 U.S.C. § 2000e(j). A reasonable accommodation "eliminates the conflict between employment requirements and religious practices." *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 70 (1986).

Mr. Kluge sought and received a reasonable accommodation that allowed him to teach music, abide by his religious beliefs, and remain neutral on transgender issues. But the district revoked it based on complaints from a few teachers and students hostile to Mr. Kluge's religious beliefs, complaints that—as a matter of law—cannot serve as an undue hardship. Thus, he is entitled to summary judgment.

### A. Mr. Kluge established a *prima facie* case of discrimination.

This Court ruled Mr. Kluge "established a prima facie case of discrimination based on failure to accommodate." *Kluge I*, 548 F. Supp. 3d at 843. He has provided undisputed evidence establishing that "(1) an observance or practice that is religious in nature, and (2) that is based on a sincerely held religious belief, (3) conflicted with an employment requirement, and (4) the religious observance or practice was the basis or motivating factor for the employee's discharge or other discriminatory treatment." *Kluge v. Brownsburg Cmty. Sch. Corp. (Kluge II)*, 64 F.4th 861, 883 (7th Cir. 2023), *vacated on other grounds* 2023 WL 4842324 (7th Cir. Jul. 28, 2023) (citing, *inter alia, EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 772–73 (2015)).[3]

### 1. Mr. Kluge's beliefs are religious.

No one questions that Mr. Kluge's objection to regularly using transgender names and pronouns is religious in nature. He repeatedly explained that the Bible dictates his stance on these issues, citing specific Scripture verses supporting his beliefs. [Filing Nos. 113-1 at 6–9, 22–23; 113-2 at 2 ¶¶ 5–6; 120-3 at 7, 19 (Kluge Dep.

---

[3]   *Abercrombie* modified the *prima facie* case, removing an employee's duty to call the religious practice to his employer's attention. *Kluge I*, 548 F. Supp. 3d at 832 & n.5; *Kluge II*, 64 F.4th at 883. But "it is undisputed that [the district] was aware of Mr. Kluge's religion-based objections" to its policies. *Kluge I*, 548 F. Supp. 3d at 832 n.5.

at p. 23, line 11 to p. 24, line 18).] He testified that complying with the district's transgender terminology rules would cause him to sin and subject him to enhanced divine punishment. [Filing No. 113-1 at 5–9.] Thus, his practices and convictions on this issue are plainly religious. *Adeyeye v. Heartland Sweeteners, LLC*, 721 F.3d 444, 448 (7th Cir. 2013) (noting religion commonly "involves matters of the afterlife, spirituality, or the soul"); *id.* at 454 (finding employee's beliefs were religious in part because failure to follow them threatened him with "spiritual death" and lack of "spiritual peace"). This is so clear that neither this Court nor the Seventh Circuit questioned the religiosity of his objection. *Kluge I*, 548 F. Supp. 3d at 841; *Kluge II*, 64 F.4th at 883–84. On appeal, even the district conceded it. *Kluge II*, 64 F.4th at 884 (conceding *prima facie* case). So Mr. Kluge's objections satisfy Title VII's "broad statutory definition" of "religious." *Adeyeye*, 721 F.3d at 448.

### 2. Mr. Kluge's beliefs are sincere.

No factfinder could reasonably doubt Mr. Kluge's sincerity. He is a devout man who served as an ordained elder, worship leader, head of youth ministries, and director of the AWANA Bible memory program at Clearnote Church—a Protestant, reformed, evangelical Christian congregation. [Filing No. 120-3 at 4–5 (Kluge Dep. at p. 10, lines 18–21; p. 14, line 2 to p. 15, line 7).] He believes God ordained "[g]enetic sex," it "cannot be separated" from gender identity, and the two "remain bound together throughout one's life." [*Id.* at 11 (Kluge Dep. at p. 38, lines 8–16).] He formed these beliefs before becoming a teacher. [Filing No. 113-2 at 2 ¶ 6.] He consistently explained and defended them to the district. [Filing Nos. 15-3 at 3–4; 113-4 at 28–32 (Gordon Dep. Ex. 29 at p. 9, line 18 to p. 13, line 5); 120-3 at 14–15, 19 (Kluge Dep. at p. 52, line 6 to p. 57, line 2; p. 72, line 11 to p. 72, line 8); 120-17 at 2.] And he withstood pressure from the district to violate those beliefs. [Filing Nos. 15-3 at 4–6; 113-4 at 24, 43 (Gordon Dep. Ex. 29 at p. 5, lines 16–18; p. 24, lines 5–8); 120-3 at 14–15, 19 (Kluge Dep. at p. 52, line 6 to p. 57, line 2; p. 72, line 11 to p. 72, line 8).]

21

Courts find sincerity under far less compelling facts. *E.g.*, *Grayson v. Schuler*, 666 F.3d 450, 454–55 (7th Cir. 2012) (rejecting insincerity though plaintiff followed only one rite associated with his claimed beliefs); *EEOC v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1575 (7th Cir. 1997) (finding sincerity despite admission plaintiff was "not a particularly religious person"). Being "willing to risk [one's] job" to follow one's beliefs shows sincerity. *Adeyeye*, 721 F.3d at 454. Mr. Kluge did more than that. He remained faithful to his convictions even though his faithfulness cost him the teaching career he labored for years (and obtained two degrees) to achieve.

At this "'put up or shut up' moment," *Porter v. City of Chi.*, 700 F.3d 944, 956 (7th Cir. 2012) (quotation omitted), the district has no evidence for doubting Mr. Kluge's sincerity except second-guessing his decision to refer briefly to *all* students by their names listed in PowerSchool during one awards ceremony. But he was endeavoring to comply with his *obligation* to abide by his religious accommodation and act in a spirit of "bilateral cooperation" with the district, *Philbrook*, 479 U.S. at 69, and this out-of-the-ordinary behavior at a formal ceremony did not violate—but rather *furthered*—his sincerely held religious beliefs. [Filing Nos. 15-3 at 6–7; 120-3 at 33–34 (Kluge Dep. at p. 126, line 18 to p. 131, line 23); 120-19 at 7.] To the district, nuanced religious beliefs or application of them merit no protection, and skeptics dictate what a religious person must believe and do.

Title VII begs to differ. It "do[es] not require perfect consistency in observance, practice, and interpretation." *Adeyeye*, 721 F.3d at 453; *Grayson*, 666 F.3d at 454–55 ("[A] sincere religious believer doesn't forfeit his religious rights merely because he is not scrupulous [or scrupulous enough for the district] in his observance; for where would religion be without its backsliders, penitents, and prodigal sons?"). The Seventh Circuit "tread[s] lightly" in this "sensitive area" of sincerity and "does not require a deep analysis of [Mr. Kluge's] conscious and/or subconscious reasons or motives for holding his beliefs." *Adeyeye*, 721 F.3d at 452–53. It gives "great weight" to plaintiffs'

explanations of their convictions. *Id.* at 448 (quoting *United States v. Seeger*, 380 U.S. 163, 184 (1965). It is beyond "the judicial function and judicial competence to inquire whether the petitioner *or his fellow worker* more correctly perceived the commands of their *common faith*." *Thomas v. Review Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 716 (1981) (emphasis added). So district officials—who do not share Mr. Kluge's convictions—cannot dictate what Mr. Kluge must do to demonstrate his sincerity.

### 3. Mr. Kluge's beliefs conflicted with an employment requirement and led to his forced resignation.

This Court ruled "Mr. Kluge's religious beliefs objectively conflict with [district policies and] other requirements concerning how faculty and staff address and refer to transgender students." *Kluge I*, 548 F. Supp. 3d at 842. Nothing has changed. Mr. Kluge's written performance evaluations were positive, and he always met or exceeded the school district's legitimate teacher expectations. [Filing No. 113-2 at 2 ¶ 4.] That's why Principal Daghe promised to give him a good recommendation if he resigned. [Filing Nos. 15-3 at 5; 113-4 at 41 (Gordon Dep. Ex. 29 at p. 22, lines 2–14).]

The district's *only* reason for forcing Mr. Kluge to resign was his (1) religious objection to complying with transgender terminology rules, and (2) insistence that Title VII entitled him to a reasonable accommodation despite a few third-party grumblings. [Filing Nos. 15-3 at 4–5; 113-4 at 26–27, 29 (Gordon Dep. Ex. 29 at p. 7, lines 16–19, p. 8 lines 18–20, p. 10 lines 6–8); 113-5 at 7 (Daghe Dep. at p. 50, line 14 to p. 53 , line 5).] The conflict between Mr. Kluge's beliefs and district policies prompted the comply, resign, or be fired ultimatum. [Filing Nos. 15-3 at 3; 120-3 at 14–15 (Kluge Dep. at p. 52, line 17 to p. 54, line 8); 120-19 at 6.] The few grumblings about the accommodation led Principal Daghe to pressure him to resign. [Filing Nos. 15-3 at 5; 113-5 at 7–8 (Daghe Dep. at p. 50, line 14 to p. 54, line 9).] The district then adopted accommodation-withdrawing policies. [Filing No. 15-4 at 2, 4, 9–10.] The resulting conflict prompted district officials to repeat—and ultimately enforce—the

superintendent's ultimatum. [Filing Nos. 113-4 at 43 (Gordon Dep. Ex. 29 at p. 24, lines 5–8); 113-2 at 7 ¶ 29.] Thus, no doubt exists that Mr. Kluge's "'religious … practice was the basis for [his] discharge or other discriminatory treatment.'" *Adeyeye*, 721 F.3d at 454 (quoting *Porter*, 700 F.3d at 951). He easily clears Title VII's relaxed "motivating factor" causation standard. *Abercrombie*, 575 U.S. at 773.

In sum, as this Court found, *Kluge I*, 548 F. Supp. 3d at 843, and the district conceded on appeal, *Kluge II*, 64 F.4th at 884, Mr. Kluge established his *prima facie* case. Now, the district must accommodate his religious beliefs or prove that doing so would cause undue hardship. *Adeyeye*, 721 F.3d at 455. It did not do the former, and it cannot do the latter. Thus, Mr. Kluge is entitled to summary judgment.

### B. The district withdrew the reasonable accommodation it extended to Mr. Kluge without the undue hardship Title VII requires.

The district agreed on an accommodation that allowed Mr. Kluge to call students by their last names. [Filing No. 15-1 at 1.] This was reasonable because it "eliminate[d] the conflict between employment requirements and religious practices," *Philbrook*, 479 U.S. at 70, and let Mr. Kluge take a "middle ground" position, *Kluge I*, 548 F. Supp. 3d at 844, remaining neutral on transgenderism at school [Filing No. 120-3 at 8, 24 (Kluge Dep. at p. 29, lines 1–10; p. 91, lines 7–8; p. 92, lines 8–16)]. Mr. Kluge's classes did not just perform well under this accommodation, they excelled. [*Id.* at 23–24 (Kluge Dep. at p. 89, line 15 to p. 90, line 4).] Title VII achieved its purpose of ensuring Mr. Kluge "would *not* have to sacrifice [his] job[ ] to observe [his] religious practices[ ]," *Adeyeye*, 721 F.3d at 456, with no substantial effect on the district.

This was a Title-VII success story—until a few third parties hostile to Mr. Kluge's religious beliefs scuttled the accommodation. [Filing Nos. 15-3 at 4; 113-4 at 26 (Gordon Dep. Ex. 29 at p. 7, lines 16–19).] A few students grumbled at Equality Alliance meetings about Mr. Kluge's accommodation. [Filing Nos. 15-3 at 4; 120-14 at 7–8, 13 (Lee Dep. at p. 36, line 4 to p. 38, line 12; p. 71, line 25 to p. 73, line 23).] They

did so though he never explained why he used last names, except to liken himself to a sports coach. [Filing No. 120-3 at 34 (Kluge Dep. at p. 130, line 21 to p. p. 131, line 6).] But Equality Alliance's advisor lobbied against accommodating Mr. Kluge, citing these complaints and a few teachers outside Mr. Kluge's department snubbing him based on his religious beliefs. [Filing Nos. 120-2 at 4 ¶¶ 11–13; 120-14 at 4, 7–8, 16 (Lee Dep. at p. 22, lines 6–19; p. 36, line 4 to p. 38, line 12; p. 85, lines 4–23).] A parent targeted Mr. Kluge for a baseless grievance about a neutral, department-wide concert-hair-color policy. [Filing Nos. 15-3 at 4–5; 113-5 at 7 (Daghe Dep. at p. 51, lines 13–24); 120-3 at 22 (Kluge Dep. at p. 84, line 21 to p. 85, line 10).] And a few teachers complained about "uncomfortableness … around him" as his accommodation called into question how other students should "behave" towards or "address" their transgender-identifying peers. [Filing No. 113-5 at 8 (Daghe Dep. at p. 56, lines 13–23).]

Especially after the Supreme Court clarified Title VII's religious-accommodation requirement for the first time "in nearly 50 years," the district cannot prove an undue hardship. *Groff*, 600 U.S. at 456. So Mr. Kluge deserves summary judgment.

## 1. The district cannot show any increased costs that are substantial in the overall context of its business.

*Groff* held that "showing 'more than a *de minimis* cost' … does not suffice to establish 'undue hardship' under Title VII." *Id.* at 468. This formerly "favored synonym for 'undue hardship,'" *id.* at 470, means "something that is 'very small or trifling,'" *id.* at 469 (citation omitted), and falls well short of what Title VII requires. Instead, "hardship" means "something hard to bear," *id.* at 468, and "undue" means it must "rise to an excessive or unjustifiable level," *id.* at 469 (cleaned up). So the district must show Mr. Kluge's last-names accommodation "result[ed] in substantial increased costs in relation to the conduct of its particular business," *id.* at 470, meaning "substantial in the *overall context* of [its] business" (including its "nature, size[,] and operating cost"), not divided in parts, considered in vignettes, or viewed in

isolation, *id.* at 468, 470–71 (emphasis added).

The district provided no such evidence. The high school has around 3,000 students and over 160 teachers.[4] A few complained because *one teacher* simply declined to use transgender terminology they prefer. That's a tempest in a teacup. And the district *disclaimed* reliance on administrative costs to show undue hardship. [Filing No. 182-1 at 2.] So Mr. Kluge's accommodation had no impact on the district writ large.

The district pointed to a few teachers and students who complained, but it never showed any increased costs related to these complaints, let alone substantial ones. *Hebrew v. Tex. Dep't of Crim. Just.*, 80 F.4th 717, 722 (5th Cir. 2023). Courts cannot "equate[] undue hardship on business with an impact—no matter how small—on coworkers," clients, or students. *Groff v. DeJoy*, 35 F.4th 162, 177 (3d Cir. 2022) (Hardiman, J., dissenting), *approved by Groff*, 600 U.S. at 472. A disaffected few among thousands of students and scores of teachers, *cf. id.* at 177–78, cannot show undue hardship on the district's business "overall," *Groff*, 600 U.S. at 468.

### 2. A few third-party grumblings do not create undue hardship.

The district insisted it could revoke Mr. Kluge's accommodation based on a few complaints of offense, discomfort, awkwardness, or emotional harm—all because he declined to use transgender terminology. [Filing Nos. 121 at 13–16, 35–36, 39–41; 150 at 11–14.] All of this is now unequivocally "off the table." *Groff*, 600 U.S. at 472.

"[B]ias or hostility to a religious practice or a religious accommodation" is no "defense to a religious accommodation claim," *id.*, sweeping away grumblings about offense, discomfort, or awkwardness due to Mr. Kluge's accommodation. Costs from students' "discomfort in dealing with" certain religious people don't count. *Id.* at 473. Nor does "employee animosity to a particular" religious practice or "to the very notion of accommodating religious practice." *Id.* at 472. The district cannot "giv[e] effect to

---

[4]    *Brownsburg High School*, PUB. SCH. REV., https://bit.ly/3FNz54F; *Brownsburg High School*, U.S. NEWS & WORLD REPS., https://bit.ly/49gzs5r (2,983 students; 164 teachers).

religious hostility" or bias—even if it has a general policy of making students feel supported—lest "Title VII … be at war with itself." *Id*.[5] It must teach that "tolerance is a two-way street." *Meriwether v. Hartop*, 992 F.3d 492, 511 (6th Cir. 201) (cleaned up); *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2430 (2022) ("[L]earning how to tolerate speech or prayer of all kinds is part of learning how to live in a pluralistic society, a trait … essential to a tolerant citizenry." (cleaned up)). If it can't, "one wonders whether [it] can teach anything at all." *Hedges v. Wauconda Cmty. Unit Sch. Dist. No. 118*, 9 F.3d 1295, 1300 (7th Cir. 1993). And here, Mr. Kluge never expressed his views. [Filing No. 120-3 at 34 (Kluge Dep. at p. 130, line 20 to p. 131, line 7).]

It would be no different if an Orthodox Jewish teacher requested a religious accommodation to a "no head coverings" policy, and a few Palestinian teachers and students objected that a yarmulke made them feel uncomfortable or caused them emotional harm. The district would still have to grant the accommodation. The same would be true if a Muslim teacher requested an accommodation for a prayer break, and some teachers and students said this caused them discomfort. Animosity towards or discomfort with someone's religious beliefs or accommodating those beliefs are legally irrelevant to an undue-hardship analysis after *Groff*. *Hebrew*, 80 F.4th at 722.

### 3. A few third-party grumblings—based on illegitimate expectations of universal affirmation—do not create undue hardship.

The few grumblings against Mr. Kluge's accommodation shared the illegitimate expectation that students can require others to signal agreement with their beliefs. The district may desire this, but it cannot force religious objectors to comply.

"[N]o authority supports the proposition that [the district] may require … anyone … to refer to gender-dysphoric [students] with pronouns matching their subjective gender identity." *United States v. Varner*, 948 F.3d 250, 254–55 (5th Cir. 2020).

---

5   *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 775 (1976) ("If relief under Title VII can be denied merely because the majority … will be unhappy about it, there will be little hope of correcting the wrongs to which the Act is directed.") (quotation omitted).

For "state-operated schools may not be enclaves of totalitarianism." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 511 (1969). Teachers and students decide for themselves what "ideas and beliefs [are] deserving of expression, consideration, and adherence." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994).

That is equally true on divisive issues. When a school sought to ban speech "tepidly negative" of homosexuality to "protect[ ] the 'rights' of [LGBT] students," the Seventh Circuit made clear that "people in our society do not have a legal right to prevent criticism of their beliefs or even their way of life." *Zamecnik*, 636 F.3d at 876.

Some may disagree and urge the district to enforce uniformity on transgenderism. But the district cannot give effect to "bias or hostility to a religious practice or a religious accommodation"—either in the form of employee complaints or "customer [*i.e.*, students, parents] reaction." *Groff*, 600 U.S. at 472–73.[6]

Title VII no more allows ideological opponents to drum Mr. Kluge out of the district based on his Christian beliefs than it allows Palestinians to expel Jews who wear yarmulkes or conspiracy theorists to ban Muslims who pray five times a day. Congress banned religious discrimination in employment to prevent such results.

### 4. Evidence not relied on by the district when it forced Mr. Kluge to resign cannot show undue hardship.

The district gave just one contemporaneous reason for nixing Mr. Kluge's accommodation and forcing him to resign: transgender-identifying students were "offended by being called by their last name." [Filing No. 113-4 at 26 (Gordon Dep. Ex. 29 at p. 7, lines 16–19).] To show this, it cited *after-created evidence*. But this is off-limits under Title VII. In a failure-to-accommodate claim, what matters is the employer's "motivating factor." *Abercrombie*, 575 U.S. at 774; *id.* at 773 ("intentional

---

[6]   *Accord United States v. Bethlehem Steel Corp.*, 446 F.2d 652, 663 (2d Cir. 1971) ("[T]he morale of employees [and students] who did not suffer discrimination" cannot establish undue hardship when "their hopes arise from an illegal system" of denying reasonable accommodations.).

discrimination provision prohibits certain *motives*"); *id.* at 774 (same for disparate treatment). The district "could not have been motivated by knowledge it did not have and it cannot now claim that" it was justified in forcing Mr. Kluge to resign on that basis. *McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352, 360 (1995).

But the district tries. It cites two affidavits from transgender-identifying students that it did not even proffer. Rather, an LGBT organization trying to intervene filed them. [Filing Nos. 22-3, 58-1.] They concern events that *postdated Mr. Kluge's forced resignation*, like one student leaving the orchestra and ultimately the high school during the 2018–19 school year. [Filing No. 22-3 at 4–5 ¶¶ 15–16.] The district also claimed accommodating Mr. Kluge *might* result in a Title IX suit. [Filing No. 121 at 41–43.] But the district never cited litigation concerns when it revoked Mr. Kluge's accommodation and forced him to resign. With no contemporary evidence, the district cannot show that it was motivated at the time by the risk of hypothetical litigation.

Under Title VII, the rule is simple and firm: "evidence … gathered after [Mr. Kluge's constructive] discharge … does not bear on the validity of" his termination. *Venters v. City of Delphi*, 123 F.3d 956, 974 (7th Cir. 1997) (citing *McKennon*, 513 U.S. at 358–63). What matters is what the district knew and relied on "*at the time [Mr. Kluge] was terminated.*" *Cullen v. Olin Corp.*, 195 F.3d 317, 324 (7th Cir. 1999) (discussing *McKennon*). Other "evidence is totally irrelevant." *Id.*

Nor is this rule an outlier, for the Supreme Court affirmed it in another case about a religious teacher. It dismissed several of the school's justifications for disciplining the teacher for lack of relevant evidence. *Kennedy*, 142 S. Ct. at 2430 ("There is no indication in the record that anyone expressed any coercion concerns to the District…. Nor is there any record evidence that students felt pressured to participate in these prayers."). It faulted the school for not raising particular "concerns … in its contemporaneous correspondence with Mr. Kennedy," confirming that a district's rationale for denying a religious accommodation "must be genuine, not hypothesized or

invented *post hoc* in response to litigation." *Id.* at 2432 n.8. (quotation omitted).

In short, the district has the burden to show that Mr. Kluge's accommodation caused undue hardship. This Court should ignore any hypothetical litigation concerns for lack of contemporaneous evidence. If it considers the now legally irrelevant third-party grumblings, *see supra* Argument I.B.2–3, it should ignore the affidavits submitted by third parties 14–15 months after the district forced Mr. Kluge to resign.

### 5. Hypothetical litigation does not show undue hardship.

The district's hypothetical litigation defense also fails on the merits. Of course, employers need not make accommodations that would "place [them] on the '*razor's edge' of liability*" by, for instance, "exposing [them] to claims of permitting workplace harassment." *Matthews v. Wal-Mart Stores, Inc.*, 417 F. App'x 552, 554 (7th Cir. 2011) (emphasis added). But *Matthews* involved an employee who "'scream[ed] over [her coworker]' that God does not accept gays," *id.* at 553—classic workplace harassment.

Mr. Kluge did not berate or harass anyone. He said nothing about transgenderism at school. [Filing No. 120-3 at 24 (Kluge Dep. at p. 91, lines 7–8; p. 92, lines 8–16).] He (1) promised to use *all* students' last names and not explain his religious rationale [*id.* at 17–18 (Kluge Dep. at p. 64, line 17 to p. 68, line 13)]; (2) said "Christians can and should be able to peacefully work and interact with those who assert a gender identity different from their biological sex" [Filing No. 15-3 at 7]; and (3) lived out both [Filing No. 120-3 at 36 (Kluge Dep. at p. 140, line 12 to p. 141, line 14)].

Nothing even suggests accommodating Mr. Kluge would place the district on— or anywhere near—the "razor's edge of liability." On these facts, any lawsuit would border on the frivolous. Transgender students might bring Title IX "sex-*discrimination* claims based upon a theory of sex-*stereotyping*." *Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1*, 858 F.3d 1034, 1047 (7th Cir. 2017) (emphasis added). But calling all students (of both sexes) by their last names is not discriminatory or stereotyping: it is equal treatment for all. *Meriwether*, 992 F.3d at 510–11 (describing last-

names-only as a "win-win" for religious professor and transgender student).

*Matthews'* "razor's edge" rule does not encompass any hypothetical legal theory a creative defense attorney can concoct after his clients have already taken adverse action against an employee, lest rank speculation would nullify Title VII's protections. The district failed to produce any evidence of litigation-based undue hardship.

### 6. *Baz v. Walters* is inapposite and no longer good law.

The district and this Court analogized this case to *Baz v. Walters*, 782 F.2d 701 (7th Cir. 1986). [Filing No. 121 at 32–35, 38, 40 n.3.] *Kluge I*, 548 F. Supp. 3d at 843. But this case is totally different. Reverend Baz took a chaplaincy at a Veterans Administration medical center. *Baz*, 782 F.2d at 703. His job was "*not* [to] proselytize" or "impose his ministry on those who do not desire it," *id.* at 705 n.4 (emphasis added), but he did, *id.* at 703–04. Instead of serving "as a quiescent, passive listener and cautious counselor," he acted "as an active, evangelistic, charismatic preacher." *Id.* at 704. Predictably, Title VII did not require the VA to rewrite his job description or adopt his "philosophy of the care of psychiatric patients." *Id.* at 707.

But *Baz* used the "more than a *de minimis* cost" standard, *Baz*, 782 F.2d at 706, that *Groff* discarded. *See supra* Argument I.B.1. Unlike *Baz*, Mr. Kluge never imposed or even explained his views to students. [Filing No. 120-3 at 34, 36 (Kluge Dep. at p. 130, line 20 to p. 131, line 7; p. 140, lines 13–15).] The district never argued that his religious beliefs precluded him from doing his job. Nor could it, as his students excelled. [*Id.* at 23–24 (Kluge Dep. at p. 89, line 15, to p. 90, line 4).] That's why the district offered him a good reference if he sought other employment. [Filing No. 15-3 at 5.] If the district's "philosophy of" public education entails endorsing transgenderism [Filing No. 121 at 38], "Title VII requires otherwise-neutral policies to give way to [Mr. Kluge's] need for an accommodation," *Abercrombie*, 575 U.S. at 775.

In sum, as the district failed to prove undue hardship, Mr. Kluge's forced resignation is illegal discrimination. He is entitled to summary judgment.

**II.   Mr. Kluge is entitled to summary judgment on his retaliation claim because his protected activities caused the district's adverse actions.**

Mr. Kluge is also entitled to summary judgment on his retaliation claim because he proved "(1) [he] engaged in an activity protected by the statute; (2) [he] suffered an adverse employment action; and (3) there is a causal link between the [two]." *Giese v. City of Kankakee*, 71 F.4th 582, 590 (7th Cir. 2023) (quotation omitted).[7]

### A. Mr. Kluge engaged in statutorily protected activities.

Title VII forbids retaliation against those opposing a practice it makes unlawful. *Porter*, 700 F.3d at 956. As Title VII imposes a "duty of reasonable accommodation" on employers, *Rodriguez v. City of Chi.*, 156 F.3d 771, 775 (7th Cir. 1998); *Hebrew*, 80 F.4th at 721, Mr. Kluge's statutorily protected activities included opposing the district's no-accommodation transgender terminology rules and requesting accommodation of his beliefs. *Cf. Porter*, 700 F.3d at 957. The record leaves no doubt he had "a sincere and reasonable belief that [he was] challenging conduct that violates Title VII." *Hunt-Golliday v. Metro. Water Reclamation Dist. of Greater Chi.*, 104 F.3d 1004, 1014 (7th Cir. 1997). [Filing No. 113-4 at 25, 43 (Gordon Dep. Ex. 29 at p. 6, lines 11–16; p. 24, lines 11–19).] No one challenged him on this point. [Filing No. 121 at 43–47.] *Kluge I*, 548 F. Supp. 3d at 847–49; *Kluge II*, 64 F.4th at 897–99.

### B. Mr. Kluge suffered an adverse action.

The district repeatedly forced Mr. Kluge to choose between his beliefs and his job. [Filing Nos. 15-3 at 3–6; 113-4 at 43 (Gordon Dep. Ex. 29 at p. 24, lines 5–8).] After granting an accommodation, it pressured him to resign because a few third parties disapproved. [Filing No. 15-3 at 5.] It adopted a "no exceptions" policy, revoked his accommodation, and demanded he follow the transgender terminology rules and violate his beliefs, resign and keep his summer pay, or face termination and lose that pay. [Filing No. 113-4 at 33, 43 (Gordon Dep. Ex. 29 at p. 14, lines 18–25; p. 24, lines

---

[7]   This Court ruled that Mr. Kluge waived this claim, *Kluge I*, 548 F. Supp. 3d at 848, but the Seventh Circuit disagreed, *Kluge II*, 64 F.4th at 897.

5–8).] From then on, it ignored his religious-discrimination claims and its own policy that required a formal investigation. [*Id.* at 10 (Gordon Dep. at p. 36, lines 15–22); *id.* at, 14, 17.] It forced him to resign conditionally to support his family. [Filing Nos. 15-3 at 1–2; 113-4 at 51 (Gordon Dep. Ex. 29 at p. 32, lines 7–9).] Then it pushed his coerced resignation through, ignoring his pleas to keep his job. [Filing Nos. 15-3 at 1, 7; 120-3 at 29 (Kluge Dep. at p. 111, line 14 top. 112, line 25); 120-18 at 2, 8, 10, 18.]

These are adverse actions as they might "dissuade[ ] a reasonable worker from making or supporting" accommodation requests. *Porter*, 700 F.3d at 957 (cleaned up); *Kluge I*, 548 F. Supp. 3d at 841 (finding "withdrawal of the … accommodation," "forced resignation," and "end of his employment" to be an adverse action). Employees aware of the district's mistreatment of Mr. Kluge could not help but be deterred from "complaining to" district officials about religious discrimination. *Porter*, 700 F.3d at 956 (quotation omitted). Again, no one challenged Mr. Kluge on this point. [Filing No. 121 at 43–47.] *Kluge I*, 548 F. Supp. 3d at 847–49; *Kluge II*, 64 F.4th at 897–99.

### C. Mr. Kluge showed a but-for causal link between his protected activity and the district's adverse actions.

Last, Mr. Kluge showed "a but-for causal connection" between his protected activity and forced resignation. *Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 378 (7th Cir. 2020); *Kluge II*, 64 F.4th at 895, 897. After *Groff*, he easily clears this hurdle.

After all, the district's *only* reason for forcing Mr. Kluge to resign was his religious objection to its transgender terminology rules and his insistence that Title VII entitled him to an accommodation, despite grumblings from third parties hostile to his beliefs. [Filing Nos. 15-3 at 4–5; 113-4 at 26–27, 29 (Gordon Dep. Ex. 29 at p. 7, lines 16–19, p. 8 lines 18–20, p. 10 lines 6–8); 113-5 at 7 (Daghe Dep. at p. 50, line 14 to p. 53, line 5).] It wanted him to forfeit his religious-accommodation right by complying with the transgender terminology rules and violating his beliefs or resigning his teaching career and getting out of the way. [Filing No. 113-4 at 12 (Gordon Dep.

at p. 42, lines 16–20).] When he refused to do either, district officials subjected him to "a pattern of criticism and animosity" and constructively discharged him. *Hunt-Golliday*, 104 F.3d at 1014. When the conflict between his beliefs and district policies first crystalized, Superintendent Snapp became "very angry," declared Mr. Kluge's religious beliefs "wrong," and issued the ultimatum of comply, resign, or be fired. [Filing Nos. 15-3 at 3; 120-3 at 14–15, 19 (Kluge Dep. at p. 52, line 17 to p. 54, line 8, p. 71, line 7 to p. 73, line 8); 120-19 at 6.] When a few people grumbled, Principal Daghe pressured Mr. Kluge to resign. [Filing Nos. 15-3 at 5; 113-5 at 7–8 (Daghe Dep. at p. 50, line 14 to p. 54, line 9).] When the district "foolish[ly]" adopted a "no accommodations" policy, *EEOC v. N. Mem'l Health Care*, 908 F.3d 1098, 1103 (8th Cir. 2018), district officials repeated and enforced the original ultimatum. [Filing Nos. 15-4 at 2, 4, 9–10; 113-4 at 43 (Gordon Dep. Ex. 29 at p. 24, lines 5–8); 113-2 at 7 ¶ 29.]

In short, although the district has had the motive and opportunity to "come forward with its evidence," *Osler Inst., Inc. v. Forde*, 333 F.3d 832, 836 (7th Cir. 2003), it has failed to produce any evidence of a separate reason for forcing Mr. Kluge to resign, one unrelated to his accommodation. *See, e.g.*, *Logan v. City of Chi.*, 4 F.4th 529, 537 (7th Cir. 2021); *Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 954 (7th Cir. 2021). The best it can do is cite a few grumblings that are now "off the table." *Groff*, 600 U.S. at 472. Thus, Mr. Kluge has demonstrated but-for causation.

### D. Mr. Kluge need not prove pretext because he relied on direct proof and the district had no legitimate reason for forcing him to resign.

This Court and the Seventh Circuit faulted Mr. Kluge for not showing pretext. *Kluge I*, 548 F. Supp. 3d at 847–49; *Kluge II*, 64 F.4th at 898. But pretext is part of the *McDonnell Douglas* test, which applies only "when the plaintiff relies on *indirect proof* of discrimination" or retaliation. *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020) (emphasis added); *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985) ("[T]he *McDonnell Douglas* test is inapplicable

where the plaintiff presents direct evidence."). Mr. Kluge used "the direct method of proof … on [his] retaliation claim," and only the *indirect* method requires showing "pretext[ ]." *Boston v. U.S. Steel Corp.*, 816 F.3d 455, 464 (7th Cir. 2016); *Walker v. Glickman*, 241 F.3d 884, 888–89 (7th Cir. 2001); *Veprinsky v. Fluor Daniel, Inc.*, 87 F.3d 881, 892–93 (7th Cir. 1996); *Loyd v. Philip Bros., Inc.*, 25 F.3d 518, 522 (7th Cir. 1994).

Moreover, only "[i]f the [district] meets [its] burden" of showing it "had a legitimate, non-discriminatory reason for taking the adverse employment action" must Mr. Kluge demonstrate pretext. *Robertson*, 949 F.3d at 378. If the district fails, no evidence of pretext is needed. *Groff* makes clear the district cannot meet its burden.

The only reason the district gave for its actions is the reaction a few people had to Mr. Kluge's accommodation, based on their dislike for his views and that they were accommodated. [Filing Nos. 15-3 at 4–5; 113-4 at 26–27, 29 (Gordon Dep. Ex. 29 at p. 7, lines 16–19, p. 8 lines 18–20, p. 10 lines 6–8); 113-5 at 7 (Daghe Dep. at p. 50, line 14 to p. 53, line 5).] This is not a "legitimate, non-discriminatory reason," *Robertson*, 949 F.3d at 378. It is repackaged religious hostility and animosity. Thus, it is "off the table" because "dislike of religious practice … or the mere fact of an accommodation is not cognizable." *Groff*, 600 U.S. at 472 (cleaned up).

Mr. Kluge demonstrated a *prima facie* case for Title VII retaliation, and the district flunked its burden. Thus, he is entitled to summary judgment on this claim.

## CONCLUSION

Under *Groff*, the district cannot show that accommodating Mr. Kluge's religious beliefs caused undue hardship in the overall context of its business. For a few third-party grumblings neither demonstrate "undue hardship" in accommodating his beliefs nor justify forcing his resignation. Thus, Mr. Kluge respectfully asks this Court to enter summary judgment for him on his Title VII religious discrimination and retaliation claims.

Respectfully submitted this 3rd day of November, 2023.

                                        /s/ Travis C. Barham

MICHAEL J. CORK                         TRAVIS C. BARHAM*
**MICHAEL J. CORK, ESQ.**               **ALLIANCE DEFENDING FREEDOM**
5754 North Delaware Street              1000 Hurricane Shoals Road N.E., Ste. D-1100
Indianapolis, Indiana 4620-2528         Lawrenceville, Georgia 30043
Telephone: (317) 517–4217               Telephone: (770) 339–0774
cork0@icloud.com                        Facsimile: (770) 339–6744
                                        tbarham@ADFlegal.org

                                        TYSON C. LANGHOFER*
                                        **ALLIANCE DEFENDING FREEDOM**
                                        44180 Riverside Parkway
                                        Lansdowne, Virginia 20176
                                        Telephone: (571) 707–4655
                                        Facsimile: (571) 707–4656
* Admitted *pro hac vice*.              tlanghofer@ADFlegal.org

                                        *Attorneys for Plaintiff*

36

## CERTIFICATE OF SERVICE

I hereby certify that on November 3, 2023, a digital copy of the foregoing document was filed electronically with the Court using its electronic filing system, which automatically sends an electronic notification to all attorneys of record.

Respectfully submitted this the 3rd day of November, 2023.

/s/ Travis C. Barham
TRAVIS C. BARHAM
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Road N.E., Ste. D-1100
Lawrenceville, Georgia 30043
Telephone: (770) 339–0774
Facsimile: (770) 339–6744
tbarham@ADFlegal.org

*Attorney for Plaintiff*