IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JOHN M. KLUGE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:19-cv-02462-JMS-KMB |
| | ) | |
| BROWNSBURG COMMUNITY | ) | |
| SCHOOL CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S BRIEF IN SUPPORT OF
CROSS-MOTION FOR SUMMARY JUDGMENTAND RESPONSE
<u>TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT</u>**

**Table of Contents**

**Introduction** ...................................................................................................4

**Statement of Material Facts Not in Dispute** ...........................................5

*I.      The parties and procedural background.* ...........................................5

*II.     The nature of Kluge's alleged sincerely-held religious belief.* ..................7

*III.    Brownsburg's organizational structure, policies, and practices.* ...............9

       *a.      Board-level policies.* ..........................................................9

       *b.      Practices related to transgender high school students* ..................10

*IV.     Kluge disapproves of the administration's approach
to transgender students and, in response, Brownsburg works
with him, resulting in two agreed-upon accommodations* .........................11

*V.      Students, parents, and teachers complain about the
last-name-only accommodation.* ....................................................15

*VI.     Brownsburg meets with Kluge to discuss complaints about the last-name-only
accommodation and, in response, Kluge characterizes the complaints
as a "heckler's veto" and announces he intends to continue using
the accommodation, complaints notwithstanding.* ..................................20

*VII.    In response to Kluge's refusal to stop using the last-name-only
accommodation, Brownsburg gives Kluge three options, and
Kluge chooses the option to resign effective at the end of the school year.* .......21

*VIII.   Despite Brownsburg allowing the last-name-only accommodation
to continue until the end of the 2017-2018 school year,
Kluge abandons it during an orchestra awards ceremony.* ..........................23

*IX.     Brownsburg's board accepts Kluge's resignation at
its regular monthly board meeting in June 2018.* ..................................25

**Statement of Material Facts in Dispute** ...............................................25

**Summary of Argument** ................................................................................31

**Standard of Review** ..................................................................................32

**Argument** ..................................................................................................33

I.   *Kluge's unlawful discrimination claim is foreclosed
     as a matter of law because Brownsburg established
     two separate and independent bases for undue hardship.* ..............................33

     a.   *Unlawful discrimination for failure to accommodate generally.* ....................33

     b.   *Undue hardship analysis in light of* Groff v. DeJoy
          *and the Seventh Circuit's instructions on remand.* .................................34

     c.   *Brownsburg demonstrated undue hardship
          under* Groff*'s clarified standard based on harm to students
          and disruption to the learning environment, both of which
          go to the heart of Brownsburg's "business" of educating all students.* ..............37

     d.   *The last-name-only accommodation imposed
          an undue hardship on Brownsburg because it exposed
          Brownsburg to an unreasonable risk of liability.* ..................................40

     e.   *Kluge's remaining arguments against undue hardship are unavailing.* ............42

II.  *Kluge cannot establish a prima facie case of retaliation and,
     even if he could, he cannot demonstrate pretext.* .........................................48

III. *If the Court denies summary judgment in Brownsburg's favor on Kluge's
     unlawful discrimination claim, it should also deny summary judgment
     in Kluge's favor regarding the sincerity of his religious belief.* .....................51

**Conclusion** ................................................................................................53

**Certificate of Service** ...............................................................................54

**Introduction**

Defendant Brownsburg Community School Corporation required its high school faculty to address students by the first and last names listed in its student database. On the first day of classes for the 2017-2018 school year, Plaintiff John Kluge, a member of the high school faculty, told administrators that he would not address students in this manner because some of his students had "transgender" first names, and doing so would violate his alleged sincerely-held religious belief that prohibited him from promoting gender dysphoria.

Brownsburg and Kluge reached an accommodation that let Kluge address students by last name only. But the accommodation made members of the high school community complain, including most prominently Kluge's students, some of whom reported that his use of last names harmed them and was disrupting the learning environment. When Brownsburg told Kluge about the complaints, he did not think anything was wrong and told the administration that he intended to continue using the last-name-only accommodation. When Brownsburg told Kluge that it would not continue the accommodation past the 2017-2018 school year, Kluge resigned.

Kluge claims that Brownsburg unlawfully discriminated and retaliated against him based on his religious belief and seeks summary judgment for liability on his unlawful discrimination, on Brownsburg's affirmative defense of undue hardship, and for liability on his retaliation claim.

For reasons discussed in much more detail below, the designated evidence establishes as a matter of law that summary judgment is appropriate in Brownsburg's favor on Kluge's two remaining claims. Although this Court has already granted such relief, it remains appropriate in particular for Kluge's unlawful discrimination claim because the affirmative defense of undue hardship—whose standard has been clarified by a recent Supreme Court case, *Groff v. DeJoy*, 600 U.S. 447 (2023)—still applies as a matter of law and forecloses that claim.

Accordingly, the Court should again grant summary judgment Brownsburg's and enter final judgment in its favor.

## Statement of Material Facts Not in Dispute

I.    *The parties and procedural background.*

1.    Brownsburg is a school corporation under Indiana Code section 20-18-2-16 and is governed by a five-member elected board. [Filing No. 71 at 6, ¶16]; [Filing No. 120-1 at 2 (Exhibit 1 – Affidavit of Dr. Kathryn Jessup, ¶2)].

2.    Kluge is a former employee of Brownsburg, having worked in the performing arts department at Brownsburg High School from August 2014 to June 2018. [Filing No. 71 p. 8, ¶21]; [Filing No. 120-2 at 3 (Exhibit 2 – Affidavit of Bret E. Daghe, ¶¶6, 7)]. During his tenure, Kluge taught orchestra, beginning music theory, and advanced music theory and was the only teacher at Brownsburg High School who taught any sections of these classes. [Filing No. 120-2 at 3 (Exhibit 2 – Affidavit of Bret E. Daghe, ¶7)].

3.    Kluge originally sought relief on thirteen claims. [Filing No. 15 at 17-31, ¶¶91-173]. Brownsburg moved to dismiss. [Filing No. 44]. Kluge conceded one claim warranted dismissal, and the Court dismissed ten of the remaining twelve. [Filing No. 56 at 31]; [Filing No. 70 at 50-51].

4.    The two claims that remained for discovery were unlawful discrimination and retaliation, which both arose under Title VII. [Filing No. 70 at 50-51]. Following discovery, Kluge sought partial summary judgment as to Brownsburg's liability for his unlawful discrimination claim [Filing No. 112 at 3-4], and Brownsburg filed a cross-motion for summary judgment, seeking final judgment in its favor on Kluge's two remaining claims. [Filing No. 120]. Brownsburg also argued that if the Court declined to grant summary judgment in its favor on

Kluge's unlawful discrimination claim, then it should decline summary judgment in Kluge's favor regarding the sincerity of his religious belief. [Filing No. 121 at 47-49].

5.      The Court denied Kluge partial summary judgment and granted summary judgment in Brownsburg's favor on Kluge's remaining claims. [Filing No. 70 at 51-52].

6.      Regarding the unlawful discrimination claim, the Court concluded that Kluge had established a prima facie case, emphasizing that although Brownsburg "has shown that there are issues of fact as to whether Mr. Kluge's religious beliefs are sincerely held," it nevertheless assumed without deciding that Kluge's "religious beliefs against referring to transgender students by their preferred names and pronouns are sincerely held." [Filing No. 159 at 38-39]. However, the Court concluded that as a matter of law, Brownsburg had established two separate bases for undue hardship, specifically that continuing the last-name-only accommodation would have unduly interfered with Brownsburg's ability to educate students and that it would have unreasonably exposed Brownsburg to legal liability. [Filing No. 159 at 41-47].

7.      Regarding the retaliation claim, the Court concluded that Kluge had waived it on two separate grounds. [Filing No. 159 at 49-50]. First, the Court reasoned that Kluge's "briefing on his retaliation claim is meager, totaling less than three pages and merely reiterating his version of the facts he believes to be relevant without discussion of how those facts meet the requirements of a retaliation claim." [Filing No. 159 at 49-50 (footnote omitted)]. Second, the Court noted that Kluge failed to address Brownsburg's lack-of-pretext argument. [Filing No. 159 at 50]. Kluge's waivers aside, the Court further concluded that the retaliation claim failed on the merits because there was no causal connection between Kluge's protected activity and his resignation and, even if there was, there was no evidence from which a reasonable factfinder could infer pretext. [Filing No. 159 at 50-51].

8.      Based on its summary judgment rulings, the Court entered final judgment in Brownsburg's favor. [Filing No. 159].

9.      Kluge appealed [Filing No. 164], and the Seventh Circuit affirmed this Court's summary judgment rulings and its entry of final judgment in Brownsburg's favor. [Filing No. 168 at 4-82].

10.     Several months later, however, the Seventh Circuit issued an order vacating its decision and remanding based on the Supreme Court's decision in *Groff v. DeJoy*, 143 S. Ct. 2279 (2023). [Filing No. 168 at 2]. The Seventh Circuit explained in its order that *Groff* had clarified "the standard to be applied in Title VII cases for religious accommodation" and, in light of that clarification, it instructed this Court "to apply the clarified standard to the religious accommodation claim in the first instance." [Filing No. 168 at 2].

11.     As a result of the Seventh Circuit's order, the claims that remain on remand and that are subject to this Motion are the same claims for which Brownsburg sought summary judgment previously—unlawful discrimination and retaliation under Title VII. [Filing No. 184]. In addition, Kluge seeks summary judgment for liability on his unlawful discrimination claim, on Brownsburg's affirmative defense of undue hardship, and for liability on his retaliation claim. [Filing No. 182 at 1, 5].

II.     *The nature of Kluge's alleged sincerely-held religious belief.*

12.     Kluge is a Christian and a member of an Indianapolis church that is under the Evangel Presbytery denomination. [Filing No. 120-3 at 3 (Exhibit 3 – Kluge Dep. at p. 9, lines 11-15; p. 15, lines 4-12)]. In addition to the Bible, the Evangel Presbytery Book of Church Order governs how Kluge and other members of his church conduct themselves on many aspects of

life, including discipline, church participation, and sexuality. [Filing No. 120-3 at 4 (Exhibit 3 –
Kluge Dep. at p. 13, lines 7-23; p. 24, line 19 to p. 25, line 25)].

13.     Kluge asserts that his sincerely-held religious beliefs include a belief that it is
sinful to promote gender dysphoria and that this belief is the basis for his unlawful
discrimination and retaliation claims. [Filing No. 15 at 15, ¶¶23, 92, 95]; [Filing No. 120-3 at 6-7
(Exhibit 3 – Kluge Dep. at p.21, line 12 to p. 23, line 5)]. According to Kluge, gender dysphoria
"is what scripture refers to as effeminacy which is for a man to play the part of a woman or a
woman to play the part of a man and so that would include acting like/dressing like the opposite
sex." [Filing No. 120-3 at 6 (Exhibit 3 – Kluge Dep. at p. 18, lines 2-10)]. Kluge believes it is
sinful for a person to act effeminate and also sinful to encourage someone to act effeminate.
[Filing No. 120-3 at 10 (Exhibit 3 – Kluge Dep. at p. 35, line 11 to p. 37, line 12)].

14.     Kluge's denomination recognizes that there are circumstances where effeminacy
might warrant tolerance, notwithstanding its sinful nature. [Filing No. 120-3 at 8-9 (Exhibit 3 –
Kluge Dep. at p. 26, line 11 to p. 30, line 11)]. For example, the Evangel Presbytery Book of
Church Order instructs that

> if a female has transitioned to a male in appearance, *it may be best that she not use
> the bathroom of her birth sex* until she has been presented with pastoral counsel
> concerning God's calling of manhood and womanhood and she begins to learn of
> Jesus' Lordship over her sexuality and the implications it has for her sexual identity
> and its public expression. In this case, the female would be asked not to use the
> men's restroom, but instead a single-stall restroom available to either sex.

[Filing No. 120-4 at 12 (Exhibit 4 – Evangel Presbytery Book of Church Order ¶17) (emphasis
added)].

15.     Consistent with this instruction, according to Kluge there are instances where it is
appropriate and consistent with his religious beliefs to address a transgender student by the

student's first name, even if the first name differs from the student's biological sex. [Filing No. 120-3 at 8-9 (Exhibit 3 – Kluge Dep. at p. 29, line 11 to p. 30, line 11)].

III.    *Brownsburg's organizational structure, policies, and practices.*

16.     The facts relevant to Kluge's claims are limited to the 2017-2018 school year and preceding months. [Filing No. 15, at 6-16, ¶¶28-82].  During that time, Dr. Bret Daghe was Brownsburg High School's principal and Kluge's supervisor. [Filing No. 120-5 at 4 (Exhibit 5 – Daghe Dep. at p. 11, line 22 to p. 13, line 7)]. Dr. Daghe reported to the Superintendent, Dr. Jim Snapp. [Filing No. 120-5 at 4 (Exhibit 5 – Daghe Dep. at p. 12, lines 7-14)]. Dr. Kathryn Jessup served as the Assistant Superintendent, and Jodi Gordon was the Human Resources Director. [Filing No. 120-6 at 4 (Exhibit 6 – Jessup Dep. at p. 15, lines 8-15); [Filing No. 120-7 at 4 (Exhibit 7 – Gordon Dep. at p. 10, lines 13-18)].

        a.     *Board-level policies.*

17.     During the 2017-2018 school year, Brownsburg maintained a board-level policy, 3122—Nondiscrimination and Equal Employment Opportunity, that prohibited discrimination in employment based on religion. [Filing No. 113-4 at 14].  The policy also prohibited retaliation against any "person in the exercise or enjoyment of any right granted or protected by" certain antidiscrimination laws, including Title VII. [Filing No. 113-4 at 16-17].  The policy included informal and formal complaint processes, which allowed employees to make such complaints according to the procedures specified in the policy. [Filing No. 113-4 at 16-18].

18.     During the 2017-2018 school year, Brownsburg maintained a board-level policy, 3140—Resignation, that applied to teacher resignations and stated in relevant part that "[p]ursuant to State law, following submission of a resignation to the Superintendent, the employee may not withdraw or otherwise rescind that resignation" and "[a] resignation, once

submitted, may not then be rescinded unless the Board agrees." [Filing No. 120-8 at 2 (Exhibit 8 – Brownsburg's policy "3140—Resignation")]. Another board-level policy, 0100—Definitions, defines "Superintendent" to include "a delegate unless the law, policy or guideline specifically prohibits the delegation." [Filing No. 120-9 at 4 (Exhibit 9 – Brownsburg's policy "0100—Definitions")].

       *b.*    *Practices related to transgender high school students.*

    19.    Before the start of 2017-2018 school year, Brownsburg's high school community was experiencing a growing awareness of and attentiveness to the needs of transgender students. [Filing No. 120-1 at 3 (Exhibit 1 – Affidavit of Dr. Kathryn Jessup, ¶6)]. In the opinion of Brownsburg's administration, transgender students face significant challenges at school, including diminished self-esteem and heightened exposure to bullying. (*Id.*) Brownsburg's administration also thought that these challenges threaten transgender students' classroom experience, academic performance, and overall well-being. (*Id.*) Brownsburg's administration had heightened attention to these issues before the start of the 2017-2018 school year because several transgender students had enrolled as high school freshmen. (*Id.*) For his part, Kluge conceded that a school has an interest in being concerned with the mental health of its students. [Filing No. 120-3 at 35 (Exhibit 3 – Kluge Dep. at p. 134, lines 13-16)].

    20.    A very practical and important question that arose for the Brownsburg administration was how staff should address transgender students in class. [Filing No. 120-1 at 3 (Exhibit 1 – Affidavit of Dr. Kathryn Jessup, ¶7)]. A high school classroom cannot function without teachers addressing students directly. (*Id.*) The practice Brownsburg's administration developed to help transgender students, teachers, and other members of the high school community was to allow any student to change the name listed in the high school's

"PowerSchool" database, but only if the student provided letters from a parent and a healthcare professional regarding the need for the name change. (*Id.*) Staff were then required to use the name in PowerSchool. (*Id.*)

21.     Brownsburg's administration thought that this practice furthered two primary goals. First, it provided high school faculty with a straightforward, easy-to-follow rule when addressing students—that is, faculty need only "call students by the name listed in PowerSchool." [Filing No. 120-1 at 4 (Exhibit 1 – Affidavit of Dr. Kathryn Jessup, ¶8)]; [Filing No. 15-4 at 6]. Second, and more important in the administration's view, the practice afforded dignity and showed empathy toward transgender students, as well as those who were considering or in the process of gender transition. (*Id.*) Stated differently, Brownsburg's administration considered it important for transgender students to receive, like any other student, respect and "official" affirmation of their preferred identity, provided they go through reasonable channels such as receiving parent permission and a healthcare professional's approval. (*Id.*)

IV.     *Kluge disapproves of the administration's approach to transgender students and, in response, Brownsburg works with him, resulting in two agreed-upon accommodations.*

22.     In a letter he read and provided to Dr. Daghe in May 2017 that was signed by three other teachers, Kluge expressed concern over his perception of the administration's approach to transgender students at recent high school faculty meetings. [Filing No. 120-3 at 11-12 (Exhibit 3 – Kluge Dep. at p. 39, line 7 to p. 42, line 18)]. Kluge stated in the letter that "encouraging gender dysphoria is harmful to the individual" and "dangerous to the rest of the community." [Filing No. 113-1 at 28].  Kluge cited "research documents" that he claimed demonstrated the "devastating effects of transgenderism" and quoted several Bible passages. [Filing No. 113-1 at 26-30].  Kluge concluded the letter with twelve requests, including that the administration not "suggest that teachers encourage transgender students in their folly by playing

11

along with their psychiatric disorder in referring to them by their preferred pronoun." [Filing No. 113-1 at 30-31]; [Filing No. 120-3 at 12-13 (Exhibit 3 – Kluge Dep. at p. 44, line 24 to p. 46, line 1)].

23.      When Dr. Daghe met with Kluge and the three other teachers who signed the letter, he perceived that their main concern was they wanted an easy-to-follow rule when addressing students. [Filing No. 120-5 at 7 (Exhibit 5 –  Daghe Dep. at p. 34, line 8 to p. 35, line 4); at p. 36, lines 7-14)]. Dr. Daghe proposed that the teachers use the name listed in PowerSchool, and the other three teachers agreed. [Filing No. 120-3 at 12 (Exhibit 3 – Kluge Dep. at p. 42, line 12 to p. 43, line 22)]. Kluge said nothing in response, but was "shocked" the other teachers agreed to Dr. Daghe's proposal and concluded they had done an "about-face." [Filing No. 120-3 at 12 (Exhibit 3 – Kluge Dep. at Plaintiff Dep. at p. 42, line 19 to p. 43, line 22)].

24.      Minutes after the meeting concluded, Kluge spoke one-on-one with Dr. Daghe and encouraged him to resist changing the PowerSchool database from "legal names" to "transgender names."[1] [Filing No. 120-3 at 12 (Exhibit 3 – Kluge Dep. at p. 42, line 19 to p. 43, line 22), 15 (Exhibit 3 – Kluge Dep. at p. 54, line 24 to p. 55, line 6)]. Based on this conversation, Kluge thought that the administration "would continue to use legal names and that we would not be promoting transgenderism in our schools, we would stop teaching it in our

---

[1] Kluge explained that by "legal names," he meant "[t]he name that's on their birth certificate, the one that was stored on their birth records." [Filing No. 120-3 at 15 (Exhibit 3 – Kluge Dep. at p. 54, line 24 to p. 55, line 2)]. By "transgender names," Kluge meant "[t]he opposite sex name that they had switched to that was not their legal name." [Filing No. 120-3 at 15 (Exhibit 3 – Kluge Dep. at p. 55, lines 3-6)]. At least two transgender students in Kluge's classes legally changed their birth name to their "transgender name." [Filing No. 22-3 at 2, ¶6]; [Filing No. 58-1 at 2, ¶3].

faculty meetings, and that [Dr. Daghe] had heeded our urging." [Filing No. 120-3 at 12 (Exhibit 3 – Kluge Dep. at p. 44 lines 14-23), 14 (Exhibit 3 – Kluge Dep. at p. 50, lines 4-23)].

25.     Nine days before the start of the 2017-2018 school year, a guidance counselor emailed Kluge to inform him that two transgender students had enrolled in his class and that those students' first names had been changed in PowerSchool. [Filing No. 120-3 at 13 (Exhibit 3 – Kluge Dep. at p. 47, line 24 to p. 49, line 22]; [Filing No. 120-10 at 2 (Exhibit 10 – Lori Mehrtens email to Plaintiff dated 7.18.27 at 758am)]; [Filing No. 120-11 at 2 (Exhibit 11 – Lori Mehrtens email to Plaintiff dated 7.18.27 at 755am)]. Because the guidance counselor stated that Kluge should "feel free" to use the students' preferred first name and pronoun, Kluge did not consider this a directive. [Filing No.120-3 at 13 (Exhibit 3 – Kluge Dep. at p. 48, line 17 to p. 49, line 22)].

26.     On the first day of classes for the 2017-2018 school year, Kluge met with Dr. Daghe and told him that because the guidance counselor's email was not a directive, his plan was to use "legal names when I start teaching later in the day." [Filing No. 120-3 at 14 (Exhibit 3 – Kluge Dep. at p. 51, line 23 to p. 52, line 13)]. Dr. Daghe contacted Dr. Snapp and, in a meeting later that day, Kluge told them that his sincerely-held religious belief prohibited him from using a "transgender" first name when addressing students. [Filing No. 120-3 at 14 (Exhibit 3 – Kluge Dep. at p. 52, line 14 to p. 53, line 2)]. Dr. Snapp provided three options—address students by the name in PowerSchool, resign, or face suspension pending termination. [Filing No.120-3 at 14 (Exhibit 3 – Kluge Dep. at p. 53, lines 3-8)]. After a separate telephone conversation between Dr. Snapp and Kluge's pastor, the administration agreed to the pastor's request that Kluge have the weekend to consider his options. [Filing No. 120-3 at 15-16 (Exhibit 3 – Kluge Dep. at p. 56, line 20 to p. 57, line 18; p. 58, lines 2-16)].

13

27.     The following Monday, Kluge met with Dr. Snapp and Gordon and proposed that Brownsburg allow him to address students by the last name listed in PowerSchool. [Filing No. 120-3 at 17 (Exhibit 3 – Kluge Dep. at p. 63, line 11 to p. 65, line 10)]. The administration agreed to Kluge's proposal as an accommodation, as well as another accommodation that Kluge proposed. [Filing No. 120-3 at 17-18 (Exhibit 3 – Kluge Dep. at p. 65, line 11 to p. 66, line 23)].

28.     Both accommodations are memorialized in a memorandum from Dr. Daghe to Kluge dated July 28, 2017:

- First, the administration agreed that Kluge "may use last name only to address students."

- Second, the administration relieved Kluge from passing out orchestra uniforms to students.

[Filing No. 15-1].

29.     Kluge signed the memorandum on July 31, 2017, agreeing to comply with these accommodations. [Filing No. 15-1].

30.     Regarding the first accommodation, Kluge understood that he would address all of his students by last name, as opposed to only transgender students. [Filing No. 120-3 at 18 (Exhibit 3 – Kluge Dep. at p. 68, line 14 to p. 69, line 18)]. To illustrate, Kluge would address Heather Williams as "Williams" or Lucas Jones as "Jones." [Filing No. 120-2 at 4 (Exhibit 2 – Affidavit of Bret E. Daghe, ¶10)]. In addition, Kluge understood that he would not use honorifics when addressing students. [Filing No. 120-3 at 18 (Exhibit 3 – Kluge Dep. at p. 68, line 14 to p. 69, line 18)].

31.     After his meeting with Dr. Snapp and Gordon, Kluge began teaching. [Filing No. 120-3 at 18-19 (Exhibit 3 – Kluge Dep. at p. 69, line 19 to p.70, line 2)].

V.      *Students, parents, and teachers complain about the last-name-only accommodation.*

32.     During the Fall 2017 semester, Brownsburg's administration received complaints about Kluge's use of last names. *See infra*, Statement of Material Facts Not in Dispute ("SMF") ¶¶32-34, 39-41. In a letter to the administration dated September 1, 2017, the parents of a transgender student wrote that "[o]ur medical providers agree that it is in our child's best interest to socially transition as a male. We fully support and love our child, and want to help him live the best life that he can live." [Filing No. 120-12 at 2 (Exhibit 12 – Letter to Brownsburg Administration dated 9.1.17)]. Although the parents noted that "most of the staff at Brownsburg High School have been very supportive and have willingly made the transition to using [our child's] male name and pronouns," they were concerned about a teacher who called their child "Miss." routinely. (*Id.*) In the parents' view, this "causes understandable confusion for other students, and leads to students reverting to using female pronouns." (*Id.*) Subsequently, the mother sent an email to the school counselor stating that Kluge was continuing to call her child "Miss [    ]," that it was causing her child "a lot of distress," and that in her opinion Kluge's conduct was "very disrespectful and hurtful." [Filing No. 120-13 at 2 (Exhibit 13 – Email to Brownsburg Administration dated 9.21.17)].

33.     Another source of complaints about Kluge's use of last names was the Equality Alliance Club, a high school extracurricular club that met weekly to discuss issues impacting the LGBTQ community. [Filing No. 120-14 at 32 (Exhibit 14 – Lee Dep. at p. 32, line 18 to p. 33, line 9)]; [Filing No. 58-2 at 2, ¶4]. Craig Lee, a teacher at the high school, was the club's faculty advisor. [Filing No. 120-14 at 4 (Exhibit 14 – Lee Dep. at p. 22, line 20 to p. 23, line 3)]; [Filing No. 58-2 at 1-2, ¶¶2-3]. Lee's duties as faculty advisor included serving as a resource for the students and supervising the meetings. [Filing No. 120-14 at 4 (Exhibit 14 – Lee Dep. at p. 23,

lines 17-25)]. Attendance at the club's weekly meetings ranged from twelve to forty students, and at least four of its regular participants were transgender. [Filing No. 120-14 at 6-7 (Exhibit 14 – Lee Dep. at p. 33, line 19 to p. 35, line 1)]; [Filing No. 58-2 at 2, ¶ 4].

34.     Students who attended the meetings complained weekly about Kluge's use of last names. [Filing No. 120-14 at 7-8 (Exhibit 14 – Lee Dep. at p. 36, line 20 to p. 38, line 3)]; [Filing No. 120-14 at 13 (Exhibit 14 – Lee Dep. at p. 73, lines 9-23)]; [Filing No. 120-14 at 14 (Exhibit 14 – Lee Dep. at p.76, line 19 to p.77, line 10)]; [Filing No. 58-2 at 7-8, ¶7]. Sam Willis and Aidyn Sucec, two transgender students in Kluge's orchestra class during the 2017-2018 school year, were among the students who complained. [Filing No. 22-3 at 3-4, ¶¶7, 11, 14]; [Filing No. 58-1, at 2-3, 7-10]. Based on Lee's observations, "It was just very, very clear at the meetings to see how much emotional harm was being caused towards Sam and Aidyn. It was clear for everyone at the meetings just to see how much of an impact it was having on them." [Filing No. 120-14 at 8 (Exhibit 14 – Lee Dep. at p. 39, lines 2-6)]; [Filing No. 120-14 at 11 (Exhibit 14 – Lee Dep. at p. 51, line 12 to 52, line 6)]. According to Lee, students felt hurt because Kluge would not use their preferred first names. [Filing No. 58-2 at 2-3, ¶7]. Lee also reported that transgender students felt "isolated and targeted" because they understood that their presence in class was the reason Kluge changed the way he addressed students. (*Id.*)

35.     Sucec was diagnosed with gender dysphoria in Spring of 2017 and received treatment from medical providers to help alleviate it. [Filing No. 22-3 at 2, ¶5]. Sucec also took steps to socially transition around that time, changing his name to Aidyn and asking others to use masculine pronouns when addressing him. [Filing No. 22-3 at 2, ¶6]. Sucec explained that "[b]eing addressed and recognized as Aidyn was critical to helping alleviate my gender dysphoria. My emotional and mental health significantly improved once my family and friends

began to recognize me as who I am." [Filing No. 22-3 at 3, ¶7]. To further this progress, in the

Summer of 2017 and before his freshman year at Brownsburg High School, Sucec's mother

spoke to his guidance counselor "about me being transgender, and discussed steps the school

could take to ensure [his] safety and well-being, including use of my name and pronouns. [Filing

No. 22-3 at 3, ¶8]. That meeting resulted in Sucec's mother and therapist submitting letters to

change his name to Aidyn and his gender to male in PowerSchool. [Filing No. 22-3 at 3, ¶8].

According to Sucec, all of his teachers except Kluge used his correct name and pronouns. [Filing

No. 22-3 at 3, ¶9].

36.     Sucec explained that "Kluge's behavior made me feel alienated, upset, and

dehumanized. It made me dread going to orchestra class each day, and I felt uncomfortable every

time I had to talk to him one-on-one." [Filing No. 22-3 at 4, ¶¶13-14].  Sucec also explained that

Kluge's behavior was noticeable to his classmates, including an incident where Sucec's stand

partner "asked me why Mr. Kluge wouldn't just say my name," and Sucec felt forced to tell him

that it was because he was transgender. [Filing No. 22-3 at 4, ¶13]. By December 2017, Sucec's

experience in Kluge's class made him decide not to enroll in orchestra after the 2017-2018

school year. [Filing No. 22-3 at 4, ¶15]. Sucec later decided to stop attending Brownsburg High

School. [Filing No. 22-3 at 5, ¶¶15-16].

37.     Willis knew Kluge before enrolling at Brownsburg High School, having played

the violin for the middle school orchestra program since sixth grade. [Filing No. 58-1 at 2, ¶6]. In

eighth grade, Willis realized he was transgender and decided to publicly transition during his

sophomore year (the 2017-2018 school year), which included using the name "Samuel" or

"Sam" and masculine pronouns. [Filing No. 58-1 at 2, ¶7]. Willis' mother emailed Kluge about

her son's name change because Kluge had known Willis previously and anticipated that Kluge

17

might have difficulty with the change. (*Id.*) In the early Fall of Willis' sophomore year, his parents and healthcare provider submitted a letter to Brownsburg requesting the name and gender marker change. [Filing No. 58-1 at 3, ¶9]. Brownsburg made this change in PowerSchool in October 2017. (*Id.*)

38.     Willis observed that "Kluge's use of last names in class made the classroom environment very awkward" and led him to conclude "that I was being targeted because of my transgender identity." [Filing No. 58-1 at 3-4, ¶11]. Willis further explained, "Even now, it hurts to think about how Mr. Kluge treated me that year." [Filing No. 58-1 at 4, ¶14]. Willis opined that "if everyone in my life had refused, like Mr. Kluge, to use my corrected name, I would not be here today." [Filing No. 58-1 at 5, ¶16].

39.     In the Fall of 2017, Jessup attended an Equality Alliance Club meeting based on concerns she received from counselors. [Filing No. 120-6 at 7 (Exhibit 6 – Jessup Dep. at p. 44, lines 9-24)]. Approximately forty students attended. [Filing No. 120-1 of 4 (Exhibit 1 – Affidavit of Dr. Kathryn Jessup, ¶9)]. Approximately four or five students complained specifically about a teacher using last names only to address students and, in Jessup's view, the other students in attendance appeared to agree. (*Id.*) While students did not identify Kluge by name, Jessup had no doubt he was the teacher in question, for he was the only teacher employed by Brownsburg who had been permitted to use last names only instead of using the names stated in PowerSchool. (*Id.*)

40.     Lee shared the Equality Alliance Club's student complaints with Dr. Daghe and Jessup. [Filing No. 58-2 at 2-3, ¶7]. For example, in an email to Dr. Daghe dated August 29, 2017, Lee reported that there was a teacher who refused to call a student by the student's new name in PowerSchool and that "this is a serious issue and the student/parents are not exactly

18

happy about it." [Filing No. 120-15 at 2 (Exhibit 15 – Craig Lee email to Dr. Bret Daghe dated

8.29.17)]. While Lee did not identify Kluge by name in this email, Dr. Daghe knew it was Kluge,

as Kluge was the only teacher who had received such an accommodation and, in any event, Lee

later confirmed to Daghe that the teacher was Kluge. [Filing No. 120-2 at 4 (Exhibit 2 – Daghe

Affidavit, ¶11)]. At faculty advisory meetings that occurred twice per month during the Fall 2017

semester, Lee continued to share with Dr. Daghe the complaints and concerns he was hearing.

[Filing No. 120-2 at 4 (Exhibit 2 – Daghe Affidavit, ¶12)]. Lee also shared the complaints with

Jessup during a mid-Spring 2018 meeting. [Filing No. 120-14 at 14-15 (Exhibit 14 – Lee Dep. at

p. 74, line 22 to p. 79, line 17)].

     41.     Beyond students in the Equality Alliance Club, others in the high school

community complained about Kluge using last names:

- One of Lee's students, who was also in one of Kluge's classes but did not attend Equality Alliance Club meetings, complained to Lee that Kluge's use of last names made the student feel "very uncomfortable" and that the student "felt really bad for those transgender students because of how [Kluge] . . . was conducting himself in class." [Filing No. 120-14 at 15-16 (Exhibit 14 – Lee Dep. at p. 79, line 4 to p. 84, line 12)]. The student also told Lee that Kluge's use of last names was "very awkward because he was fairly certain that all the students know why Mr. Kluge had switched to using last names, and that it made the transgender students in Mr. Kluge's class stand out." [Filing No. 58-2 at 3, ¶9].

- Three of Lee's teaching colleagues told Lee that they had received complaints from students and that based on those complaints, they thought Kluge's use of last names was harming students. [Filing No. 120-14 at 16-17 (Exhibit 14 – Lee Dep. at p. 85, line 4 to p. 86, line 15)].

- The two performing arts department heads told Dr. Daghe during regular meetings in Fall 2017 that they had received complaints about Kluge's use of last names. [Filing No. 120-2 at 4 (Exhibit 2 – Daghe Affidavit, ¶13)]. The department heads also shared with Dr. Daghe they perceived that Kluge was making students uncomfortable by using last names and that the tension this was causing was affecting the overall functioning of the department. [Filing No. 120-5 at 9-10 (Exhibit 5 – Daghe Dep. at p. 57, line 15 to p. 58, line 8)]; [Filing No. 120-2 at 4 (Exhibit 2 – Daghe Affidavit, ¶13)]. Dr. Daghe received more

complaints from these department heads than the complaints Lee shared from students at the Equality Alliance Club meetings. [Filing No. 120-5 at 9 (Exhibit 5 – Daghe Dep. at p. 57, lines 18-24)].

VI.   *Brownsburg meets with Kluge to discuss complaints about the last-name-only accommodation and, in response, Kluge characterizes the complaints as a "heckler's veto" and announces he intends to continue using the accommodation, complaints notwithstanding.*

42.   As Dr. Daghe heard these concerns throughout the Fall of 2017, he wanted to be fair to Kluge, give the situation some time, and determine if the problems and student concerns resolved themselves. [Filing No. 120-2 at 4 (Exhibit 2 – Daghe Affidavit, ¶14)]. When they did not, by December 2017, Dr. Daghe realized he needed to address these issues directly with Kluge. (*Id.*) On December 13, 2017, Dr. Daghe met with Kluge to tell him about the complaints he received regarding Kluge's use of last names. [Filing No. 120-3 at 22 (Exhibit 3 – Kluge Dep. at p. 83, line 6 to p. 84, line 8)]. Kluge claims this was the first time he heard such complaints. [Filing No. 120-3 at 22 (Exhibit 3 – Kluge Dep. at p. 84, lines 9-18)]. According to Kluge,

> Daghe scheduled a meeting with me to ask how the year was going and to tell me that my last-name-only [a]ccommodation was creating tension in the students and faculty. He said the transgender students reported feeling "dehumanized" by my calling all students last-name-only. He said that the transgender students' friends feel bad for the transgender students when I call the transgender students, along with everyone else, by their last-name-only. He said that I am a topic of much discussion in the Equality Alliance Club meetings. He said that a number of faculty avoid me and don't hang out with me or include me as much because of my stance on the issue.

[Filing No. 120-3 at 22 (Exhibit 3 – Kluge Dep. at p. 83, line 20 to p. 84, line 3)]; [Filing No. 15-3 at 4].

43.   Kluge responded to the complaints as follows:

> I explained to Daghe that this persecution and unfair treatment I was undergoing was a sign that my faith as witnessed by my using last-names-only to remain neutral was not coming back void, but was being effective. He didn't seem to understand why I was encouraged. He told me he didn't like things being tense and didn't think

> things were working out. He said he thought it might be good for me to resign at
> the end of the year. I told Daghe that I was now encouraged all the more to stay.

[Filing No. 120-3 at 24 (Exhibit 3 – Kluge Dep. at p. 90, lines 5-22)]; [Filing No. 15-3 at 5].

44.     According to Kluge, after learning about the student complaints from Dr. Daghe

at the December 13, 2017, meeting, Kluge still believed that the last-name-only accommodation

should continue and there was no reason to consider an alternative. [Filing No. 120-3 at 24

(Exhibit 3 – Kluge Dep. at p. 92, line 5 to p. 93, line 24)]. Kluge also thought the complaints did

not demonstrate undue hardship and instead were a "heckler's veto." [Filing No. 120-3 at 24-25

(Exhibit 3 – Kluge Dep. at p. 93, line 25 to p. 94, line 6)]. As Kluge put it, "[W]hy would I

change?" [Filing No. 120-3 at 25 (Exhibit 3 – Kluge Dep. at p. 94, line 4 to p. 95, line 15)].

Further, Kluge suspected that Dr. Daghe was lying about student and faculty complaints because

Kluge had not experienced animosity with faculty, Dr. Daghe did not identify by name any

students or faculty who complained, Kluge did not perceive any tension in his classes, and his

students performed "better than ever" at orchestra competitions. [Filing No. 120-3 at 23 (Exhibit

3 – Kluge Dep. at p. 88, line 5 to p. 90, line 4)].

*VII.   In response to Kluge's refusal to stop using the last-name-only accommodation,
Brownsburg gives Kluge three options, and Kluge chooses the option to resign effective
at the end of the school year.*

45.     During their next meeting on January 17, 2018, Dr. Daghe told Kluge that he

wanted him to resign at the end of the school year. [Filing No. 120-3 at 25 (Exhibit 3 – Kluge

Dep. at p. 95, line 8-12)]; [Filing No. 15-3 at 5]. Dr. Daghe cited the student and faculty

complaints about the last-name-only accommodation as the reason for his request. [Filing No.

120-3 at 25 (Exhibit 3 – Kluge Dep. at p. 95, lines 13-17)]. Kluge responded that "if there is

tension and conflict, well, that's encouragement that I shouldn't quit but I should continue to

pursue neutrality," by which he meant using last names when addressing students. [Filing No. 120-3 at 25 (Exhibit 3 – Kluge Dep. at p. 95, line 18 to p. 96 at line 5)].

46.     In an email to Dr. Snapp and Dr. Daghe dated February 4, 2018, Kluge referenced an FAQ from a recent faculty meeting indicating that next school year, Brownsburg expected faculty to address students by the first name listed in PowerSchool. [Filing No. 120-16 at 2 (Exhibit 16 – Plaintiff's email to Snapp and Daghe 2.4.18)]. Kluge concluded the email by asking if it was "correct that I would be allowed to continue to use last-names-only when addressing students next school year and beyond?" (*Id.*)

47.     Dr. Daghe and Gordon met with Kluge on February 6, 2018, to respond to Kluge's question. [Filing No. 120-3 at 25 (Exhibit 3 – Kluge Dep. at p. 96, lines 10-21)]; [Filing No. 15-3 at 6]. They told Kluge that although Brownsburg would continue the last-name-only accommodation for the remainder of the 2017-2018 school year, it would not be available for the next school year. [Filing No. 120-3 at 26 (Exhibit 3 – Kluge Dep. at p. 99, lines 9-24)]; [Filing No. 113-4 at 24, lines 4-12]. They reiterated to Kluge that students were offended by being called by their last names only. [Filing No. 113-4 at 26, lines 16-19]. Kluge acknowledged in this conversation that he understood that an employer is not obligated to accommodate all religious beliefs. [Filing No. 113-4 at 27, lines 9-11]. Dr. Daghe also stated that the last-name-only accommodation was not reasonable because it was detrimental to students. [Filing No. 113-4 at 28, lines 8-13]. They gave Kluge three options: resign, continue to use the last-name-only accommodation and face termination procedures, or stop using the last-name-only accommodation. [Filing No. 120-3 at 26-27 (Exhibit 3 – Kluge Dep. at p. 100, line 3 to p. 102, line 12)].

48.     On April 30, 2018, Kluge tendered his resignation, effective at the end of the

2017-2018 school year. [Filing No. 120-17 at 2 (Exhibit 17 – Emails between Plaintiff and

Gordon dated April 30, 2018)]. Kluge concluded his resignation with the following requests:

"Please do not process this letter nor notify anyone, including any administration, about its

contents before May 29, 2018. Please email me to acknowledge that you have received this

message and that you will grant this request." (*Id.*) In response, Gordon stated, "I will honor your

request and not process this letter or share with the BHS administration until May 29." (*Id.*)

Kluge did not follow up with Gordon to clarify what she meant by the term "BHS

administration." [Filing No. 120-3 at 28 (Exhibit 3 – Kluge Dep. at p. 108, line 9 to p. 109, line

4)].

VIII.   *Despite Brownsburg allowing the last-name-only accommodation to continue until the*
        *end of the 2017-2018 school year, Kluge abandons it during an orchestra awards*
        *ceremony.*

49.     In May 2018, Kluge participated in an orchestra awards ceremony that honored

graduating students and others for their achievements during the school year. [Filing No. 120-3

at 32 (Exhibit 3 – Kluge Dep. at p. 125, lines 2-17)]. The ceremony was part of the curriculum,

and Kluge was participating as a Brownsburg employee. [Filing No. 120-3 at 32-33 (Exhibit 3 –

Kluge Dep. at p. 125, line 22 to p. 126, line 6)].

50.     According to Kluge, the following is an accurate report of the ceremony:

During classes, Kluge addressed students by last names, as a reasonable
accommodation for his sincerely held Christian beliefs. But during the orchestra
awards ceremony, because of its formal nature, he used the full names for students
as listed in PowerSchool to address all students as they were receiving their
awards—including transgender students—because he was trying to work with the
school in only requesting what was reasonable. Kluge thought it unreasonable and
conspicuous to address students in such an informal manner at such a formal event,
as opposed to the classroom setting where teachers refer to students by last names
as a normal form of address. Kluge's Christian faith required that he do no harm to
his students, and this acquiescence to the administration's position was done solely

23

out of sincerely-held beliefs, and not in agreement with the policy. Otherwise, Kluge would have created a scene that would bring into doubt his stated rationale for usage of last names only.

[Filing No. 120-3 at 32 (Exhibit 3 – Kluge Dep. at p. 125, lines 18-21)]; [Filing No. 120-19 at 7 (Exhibit 19 – Plaintiff's Response to RPD No. 6)].

51.    Kluge did not tell Brownsburg before the ceremony that he intended to address all students by the first and last names listed in PowerSchool. [Filing No. 120-3 at 34 (Exhibit 3 – Kluge Dep. at p. 130, line 10 to p. 131, line 4)]. Kluge thought that he was promoting a transgender lifestyle when he addressed students by their "transgender names" during class, but not when he did so during the ceremony. [Filing No. 120-3 at 33-34 (Exhibit 3 – Kluge Dep. at p. 128, line 6 to p. 130, line 9)].

52.    Kluge justified a different approach in each setting because addressing students in the classroom occurs more frequently and is less formal. [Filing No. 120-3 at 33-34 (Exhibit 3 – Kluge Dep. at p. 128, line 6 to p. 130, line 9)]. Further, Kluge analogized the classroom setting to a high school coach's habit of addressing student-athletes by last names, but he lacked personal knowledge whether this actually occurred at the high school during the 2017-2018 school year or whether any student-athlete complained about such a habit. [Filing No. 120-3 at 33 (Exhibit 3 – Kluge Dep. at p. 127, line 7-12; p. 129, lines 2-12), 35-36 (Exhibit 3 – Kluge Dep. at p. 137, line 7 to p. 138, line 12)]. Other than his classroom experience, the only instance where Kluge claims that he observed teachers addressing students by last name was during work on the school musical. [Filing No. 120-3 at 35 (Exhibit 3 – Kluge Dep. at p. 134, line 17 to p. 136, line 25)]. Kluge did not know whether any musical student complained about being addressed by last name. [Filing No. 120-3 at 35 (Exhibit 3 – Kluge Dep. at p. 137, lines 1-6)].

24

IX.    *Brownsburg's board accepts Kluge's resignation at its regular monthly board meeting in June 2018.*

53.    At its regular monthly meeting on June 11, 2018, Brownsburg's board unanimously approved Kluge's resignation, effective at the end of the 2017-2018 school year. [Filing No.120-18 at 2, 8 (Exhibit 18 – June 2018 Regular Board Meeting Minutes)]. Kluge's resignation was one of ten teacher resignations that the board approved during that meeting. (*Id.*) Several dozen people spoke about Kluge's resignation during the public comment session. [Filing No.120-18 at 8-13 (Exhibit 18 – June 2018 Regular Board Meeting Minutes)]. The comments included statements that supported Kluge, statements that were critical of Kluge's use of last names, and citizens' opinions on transgender issues more generally. (*Id.*)

**Statement of Material Facts in Dispute**

Brownsburg submits that the foregoing Statement of Material Facts Not in Dispute establishes all material facts for the Court to enter summary judgment in its favor on Kluge's two remaining claims.

Nevertheless, this section addresses the overlapping "Background" [Filing No. 183 at 2-14], and "Statement of Material Facts Not in Dispute" sections of Kluge's Brief. [Filing No. 183 at 14-19]. As demonstrated below, many of Kluge's assertions in these sections are misstated, immaterial, not supported by the designated evidence, or, for purposes of responding to Kluge's summary judgment motion, disputed by the designated evidence.

> *"Alarmed by [Lee and Mehrtens'] suggestion that referring 'to a transgender student by their biological sex and not us[ing] the student's preferred pronoun' would be punishable as 'harassment,' . . . ."* [Filing No. 183 at 4].

The cited evidence does not support Kluge's assertion that Lee and Mehrtens said this. Instead, all it shows is Kluge's subjective interpretation of what was communicated during the faculty meetings in question.

25

*"Mr. Kluge's religious accommodation worked."* [Filing No. 183 at 7; 16, ¶14].

It did not. In making this assertion, Kluge ignores substantial undisputed evidence that the last-name-only accommodation harmed students, disrupted the learning environment, and actively interfered with Brownsburg's mission of educating all students. *See supra*, SMF ¶¶32-41.

*Kluge's allusion to the last-name-only accommodation as a "sports coach" addressing his "team." See, e.g.*, [Filing No. 183 at 6; 7; 12; 16, ¶¶10, 13].

Kluge makes this assertion throughout his Brief to support his argument that the last-name-only accommodation was no different than how coaches address their players—as Kluge explained to one of his students, "[W]e're all a team and a sports coach calls their team members by last name only. I wanted to foster that community and we're all working towards one goal." [Filing No. 183 at 7 (citing Kluge's deposition testimony)]. Kluge makes this assertion to advance his overall point that the accommodation was not unusual and harmless.

But that analogy breaks down when one considers that a team is dysfunctional when the coach persists in calling certain players harmful names to the point that they dread participating in the sport. Certainly that is not a coach who fosters community, is attentive to his players' well-being, or is concerned with the team as a whole. That coach's supervisor might reasonably view such conduct as an indication that he is not advancing his team's or his players' legitimate interests.

*Kluge's assertion that he was "neutral" in that he applied the last-name-only accommodation to all students in all classes. See, e.g.*, [Filing No. 183 at 7, 9, 16].

For purposes of responding to Kluge's summary judgment motion, this assertion is disputed. There is ample designated evidence demonstrating that Kluge deviated from the last-

26

name-only accommodation regularly. *See, e.g.*, [Filing No. 22-3 at 4, ¶12]; [Filing No. 58-1 at 3-4, ¶¶10-12].

*Kluge's characterization of complaints from teachers and students as mere "grumblings" and a "heckler's veto."* [Filing No. 183 at 8-9].

They were not. In making these assertions, Kluge ignores substantial undisputed evidence that the last-name-only accommodation harmed students, disrupted the learning environment, and actively interfered with Brownsburg's mission of educating all students. *See supra*, SMF ¶¶32-41. Kluge also states that he "suspected" the complaints "were 'heckler's veto,' not genuine" [Filing No. 183 at 8], but his suspicions about these complaints are immaterial and, at any rate, they ignore substantial undisputed evidence to the contrary. *See supra*, SMF ¶¶32-41.

Kluge also suggests in this section of his Brief that Lee's testimony should be discounted based on Lee's acknowledgement that he was "very biased" regarding how Brownsburg should handle issues related to transgender students. [Filing No. 183 at 8]. But it is difficult to see how this helps Kluge. Lee acknowledged his bias when notifying Principal Daghe about student and parent concerns related to Kluge's last-name-only accommodation. If anything, that helped Principal Daghe gauge the severity of the complaints and the overall impact of the last-name-accommodation on the high school community and, at any rate, Lee was not the only source of information that Brownsburg's administration considered. *See supra*, SMF ¶¶39, 41.

Finally, Kluge claims in this section that "Principal Daghe saw the 'persecution and unfair treatment' of Mr. Kluge as a reason for him to resign . . . ." [Filing No. 183 at 9]. No reasonable person could conclude this from the evidence. Rather, Principal Daghe stated in one of his meetings with Kluge that the last-name-only accommodation was "detrimental to kids" and thus not reasonable. [Filing No. 113-4 at 28, lines 8-13]. That concern was among the

27

reasons Principal Daghe urged Kluge to resign, not Kluge's perception that he was being persecuted and subjected to unfair treatment. Kluge's claim has no support in the record.

> *Kluge's assertion that Brownsburg's "transgender terminology rules . . . proclaimed: 'no accommodation allowed."* [Filing No. 183 at 9-12; 17, ¶22].

Kluge makes several assertions in this section of his Brief that are either not supported by the designated evidence or immaterial.

First, Kluge states, "Unveiled in January 2018 and entitled *Transgender Questions* [Filing Nos. 15-3 at 5; 113-2 at 4 ¶ 17], the rules said transgender-identifying students *must* 'receive . . . affirmation of their preferred identity.' [Filing No. 120-1 at 4 ¶ 8] . . . ." [Filing No. 183 at 9 (emphasis in original)]. The latter quote is from Dr. Jessup's affidavit—specifically, she states that "the administration considered it important for transgender students to receive, like any other student, respect and affirmation of their preferred identity, provided they go through the required and reasonable channels of receiving and providing proof of parental permission and a healthcare professional's approval." [Filing No. 120-1 at 3, ¶8]. In that paragraph, she makes no mention of the "Transgender Questions" document whatsoever. Kluge statement improperly engrafts Dr. Jessup's statement onto the "Transgender Questions" document and omits important context regarding the process for obtaining a name change in PowerSchool.

Second, Kluge claims that Brownsburg's administration "left no room for Title VII religious accommodations" and quotes as support from the "Transgender Questions" document: "[W]hen you work in a public school, you sign up to follow the law and the policies/practices of that organization and that might mean *following practices that are different than your own beliefs.*" [Filing No. 183 at 10 (emphasis added)]. But "might mean" is not the same as "shall," and one need look no further than Kluge's own situation to see that his "left no room" assertion is unfounded—Brownsburg allowed the last-name-only accommodation for some time and

28

attempted to work with Kluge even when it became apparent that it was harming students and disrupting the learning environment. *See supra*, SMF ¶¶32-41. Moreover, Kluge ignores that Brownsburg allowed the uniform accommodation to continue throughout the 2017-2018 school year, which—critically—did not harm students or disrupt the learning environment. These are not the hallmarks of an employer who "left no room" for Title VII religious accommodations.

Third, Kluge contends that "[t]he only reason for rescinding the accommodation was some students were 'offended by being called by their last name.'" [Filing No. 183 at 11 (citing a statement from Gordon during her recorded meeting with Kluge and Principal Daghe)]; *see also* [Filing No. 183 at 18, ¶25 (noting that during their recorded meeting, Gordon and Principal Daghe did not mention undue hardship, increased cost, or disruption to the learning environment as a basis for rescinding the accommodation)]. That is not what Gordon said in the cited evidence and, more to the point, Kluge ignores substantial undisputed evidence that Brownsburg's administration had concerns with the last-name-only accommodation not only because it harmed students, but also because it disrupted the learning environment and actively interfered with Brownsburg's mission of educating all students. *See supra*, SMF ¶¶32-41.

Finally, Kluge suggests that his February 6, 2018, meeting with Gordon and Principal Daghe should have triggered a "formal investigation" because he indicated to them that rescinding the last-name-only accommodation was unlawful and discriminatory. [Filing No. 183 at 18]. Whether Brownsburg should have conducted a formal investigation based on Kluge's comment is immaterial in light of the undisputed evidence that the last-name-only accommodation harmed students and disrupted the learning environment, particularly since Kluge has not designated any evidence, or even alleged, that the complaints were made up.

*Kluge's assertion that his resignation was "conditional."* [Filing No. 183 at 13-14; 19, ¶28].

Kluge uses the term "conditional" to mean that he could withdraw his resignation at any time, and he further claims that Gordon agreed to this. [Filing No. 183 at 19, ¶¶28, 30]. The designated evidence and the law, however, are to the contrary.[2]

The only condition Kluge placed on his April 30, 2018, resignation was its effective date, which is the only condition that was legally valid under Indiana law and Brownsburg's policy. *See* Ind. Code § 5-8-4-1 (stating that a public employee who submits a written resignation effective at a future fixed date has no right to withdraw it); [Filing No. 120-8 at 2 (Exhibit 8 – Brownsburg's policy "3140—Resignation")]. This Court recognized as much when it dismissed Kluge's fraud claim: "Notably, however, Mr. Kluge's written resignation, which he attached to his Amended Complaint, was not expressly conditioned on anything, did not contain any language concerning his ability to withdraw it, and instead merely requested that the letter not be 'processed' and that no one be notified until a certain date." [Filing No. 70 at 40].

The only facts that are material to Kluge's resignation are that he submitted his resignation on April 30, 2018, with an effective date at the end of the 2017-2018 school year and

_____

[2] In previous briefing to this Court, Kluge claimed that Gordon "suggested" that he could submit a conditional resignation, and cites as support excerpts from the transcript of his meeting with Dr. Daghe and Gordon on February 6, 2018. [Filing No. 114 at 17-18]. The gravamen of Gordon's statements in the cited excerpt is that she references past instances where teachers did not want their resignation announced publicly until the end of the school year. [Filing No. 113-4 at 36-37 (p. 17, lines 6-24, page 18, lines 6-8)]. Nowhere does Gordon state that Kluge could withdraw his resignation, nor can one reasonably infer from her statements that she "suggested" it. Lest there be any doubt, Gordon goes on to explain her preference that she have a reasonable amount of time to find a replacement when a teacher submits a resignation. [Filing No. 113-4 at 36-37 (p. 18, lines 13-24)]. If Gordon had told Kluge that he could withdraw his resignation (or "agreed" to it, as Kluge now claims in his most recent brief), then it seems odd that she would mention needing to find a replacement, for a withdrawal could result in the administration having two teachers for one position. In short, this is but one piece of additional evidence demonstrating that Gordon never told Kluge he could withdraw his resignation in the first place, or that she "agreed" to it.

that the board unanimously accepted this resignation. *See supra*, SMF ¶¶48, 53. Kluge's characterization of his resignation as "conditional" and "forced" have no support in the designated evidence beyond his subjective perception.

### Summary of Argument

Summary judgment in favor of Brownsburg is appropriate on Kluge's two remaining claims. Moreover, assuming for argument's sake that Kluge's unlawful discrimination claim survives, genuine issues of material fact preclude summary judgment in Kluge's favor regarding the sincerity of his religious belief.

Regarding Kluge's unlawful discrimination claim, Brownsburg is entitled to summary judgment in its favor under *Groff*'s clarified standard for undue hardship on two separate and independent grounds. First, the designated evidence establishes as a matter of law that the last-name-only accommodation resulted in student harm, disruption to the learning environment, and interference with Brownsburg's educational mission as creating a substantial increase in costs, which establishes undue hardship as a matter of law under *Groff*. Second, the designated evidence establishes as a matter of law that continuing the last-name-only accommodation would have subjected Brownsburg to an unreasonable risk of a student Title IX lawsuit. Kluge's arguments against undue hardship, such as his attempt to downplay the numerous complaints Brownsburg was receiving about the accommodation as mere "third-party grumblings," fails to appreciate their nature and quality and has no support in the record.

Regarding Kluge's retaliation claim, Brownsburg is entitled to summary judgment in its favor for all the same reasons and based on the same undisputed evidence that this Court relied on in its earlier summary judgment ruling. *Groff* has no application to Title VII retaliation claims, and allowing Kluge to make additional arguments at this late stage would be prejudicial

to Brownsburg. Regardless, all the arguments that Kluge now makes in support of his retaliation claims fail on their merits.

Finally, even if Kluge could establish a prima facie case of unlawful discrimination and the Court were to deny Brownsburg summary judgment on Kluge's unlawful discrimination claim, Kluge is not entitled to summary judgment regarding the sincerity of his religious belief. The designated evidence demonstrates that Kluge's use of the last-name-only accommodation was inconsistent, and that alone precludes summary judgment on this fact-sensitive issue.

### Standard of Review

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party need not positively disprove the opponent's case; rather, it may prevail by "showing—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "A party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007), *overruled on other grounds by Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).

The Seventh Circuit has described summary judgment as the "'put up or shut up' moment in litigation," which means "the non-moving party is required to marshal and present the court with the evidence she contends will prove her case. And by evidence, we mean evidence on which a reasonable jury could rely." *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010) (internal citations omitted). In conducting this review, the court construes all relevant

facts and reasonable inferences in the non-moving party's favor. *Porter v. City of Chicago*, 700 F.3d 944, 950 (7th Cir. 2013).

In cases such as this one that involve cross-motions for summary judgment, the "usual Rule 56 standard of review applies . . . ." *Int'l Brotherhood of Elec. Workers v. Balmoral Racing Club, Inc.*, 293 F.3d 404, 404 (7th Cir. 2002). "Cross-motions must be evaluated together, and the court may not grant summary judgment for either side unless the admissible evidence as a whole—from both motions—establishes that no material facts are in dispute." *Bloodworth v. Village of Greendale*, 475 Fed.Appx. 92, 94-95 (7th Cir. 2012).

## Argument

I.   *Kluge's unlawful discrimination claim is foreclosed as a matter of law because Brownsburg established two separate and independent bases for undue hardship.*

Kluge alleges in Count I of his Amended Complaint that Brownsburg discriminated against him in violation of Title VII by withdrawing the last-name-only accommodation and allegedly coercing him to resign. [Filing No. 15 at 17].

For reasons explained below, summary judgment is appropriate in Brownsburg's favor on this claim because it established two separate and independent bases for undue hardship— namely, (i) that the accommodation harmed students and disrupted the learning environment and (ii) that the accommodation exposed Brownsburg to an unreasonable risk of liability. Both of these constitute substantial burdens in the context of Brownsburg's "business" of public education. *See Groff*, 600 U.S. at 468.

a.   *Unlawful discrimination for failure to accommodate generally.*

Title VII prohibits an employer from discriminating in the terms, conditions, or privileges of employment because of an employee's religion. 42 U.S.C. § 2000e-2(a). Title VII also

requires an employer to provide reasonable accommodation for an employee's religious belief unless it would cause undue hardship to the employer's business. 42 U.S.C. § 2000e(j).

Before *E.E.O.C. v. Abercrombie & Fitch, Inc.*, 135 S.Ct. 2028 (2015), the Seventh Circuit required the following proof to sustain a prima facie case based on failure to accommodate: (1) the employee's sincerely-held religious belief conflicted with an employment requirement; (2) the employer knew of the employee's religious belief; and (3) the need for an accommodation of that religious belief was the basis for the employer's adverse employment action. *Porter v. City of Chicago*, 700 F.3d 944, 951 (7th Cir. 2012). District courts within the Seventh Circuit have concluded that the Supreme Court's decision in *Abercrombie & Fitch* reduced the employee's prima facie case to the first and third elements. *See Summers v. Whitis*, 2016 WL 7242483, at *4 (S.D. Ind. Dec. 15, 2016); *Schwinger v. Elite Prot. & Sec., Ltd.*, 2015 WL 7753064, at *5 (N.D. Ill. Dec. 2, 2015). If the employee establishes a prima facie case, the burden shifts to the employer to show that the reasonable accommodation would have resulted in undue hardship. *Porter*, 700 F.3d at 951.

Except for the alleged sincerity of Kluge's religious belief, which is addressed in Part III below, for purposes of this summary judgment motion only, Brownsburg stipulates that Kluge has established a prima facie case. As such, resolution of this claim first turns to whether Brownsburg can establish undue hardship. For reasons explained below, Brownsburg submits that the answer to that question is "Yes" as a matter of law.

b.      *Undue hardship analysis in light of* Groff v. DeJoy *and the Seventh Circuit's instructions on remand.*

Title VII relieves an employer of the obligation to provide reasonable religious accommodation if the employer cannot do so "without undue hardship on the conduct of the employer's business." 42 U.S.C. 2000e(j).

Based on a line from the Supreme Court's decision in *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977), for fifty-plus years numerous courts interpreted "undue hardship" as any effort or cost that is "more than . . . *de minimis*." Observing that this interpretation was a "mistake," in *Groff v. DeJoy*, 600 U.S. 447 (2023), the Court sought to "explain the contours of *Hardison*" and provide "clarifications" on its undue hardship standard.

Regarding *Hardison*'s contours, the Court noted that "showing 'more than a *de minimis*' cost, as that phrase is used in common parlance, does not suffice to establish 'undue hardship' under Title VII" because "*Hardison* cannot be reduced to that one phrase." *Groff*, 600 U.S. at 468. The Court characterized *Hardison*'s reference to "*de minimis*" as "fleeting," *id.* at 465, emphasizing instead that the opinion "referred repeatedly to 'substantial' burdens, and that formulation better explains the decision." *Id.* at 468.

With these contours in mind, the Court clarified the standard for undue hardship: "it is enough to say that an employer must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business." *Groff*, 660 U.S. at 470 (citing *Hardison*, 432 U.S. at 83 n.14). In so clarifying, the Court emphasized that "courts must . . . take[] into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, size and operating cost" of an employer. *Id.* (internal quotations and citation omitted). Put another way, "courts should resolve whether a hardship would be substantial in the context of an employer's business in the common-sense manner that it would use in applying any such test." *Id.* Of note, the Supreme Court intended to "clarify"—not significantly overturn or revise—the relevant body of law related to undue hardship. *Id.* at 471 ("We have no reservation in saying that a good deal

of the EEOC's guidance in this area is sensible and will, in all likelihood, be unaffected by our clarifying decision today.").

The Court concluded its opinion with two observations that elaborate on "several recurring issues," *Groff*, 660 U.S. at 471-72, that commonly arise in undue hardship cases:

First, regarding an accommodation's impact on coworkers, the relevant ones are those that "go on to affect the conduct of the business." *Groff*, 660 U.S. at 472 (internal quotations and citation omitted). But that does not include coworker "animosity to a particular religion, to religion in general, or to the very notion of accommodating religious practice," because if such animosity "provided a defense to a reasonable accommodation claim," then "Title VII would be at war with itself." *Id.*

Second, the Court observed that "Title VII requires that an employer reasonably accommodate an employee's practice of religion, not merely that it assess the reasonableness of a particular possible accommodation." *Groff*, 660 U.S. at 473. That means that if an employer concludes that an accommodation causes undue hardship, then the employer must consider other options for a potential accommodation and not simply throw in the towel. *Id.*

In the Seventh Circuit's order vacating its decision and remanding to this Court, the court explained that *Groff* had clarified "the standard to be applied in Title VII cases for religious accommodation" and, in light of that clarification, it instructed this Court "to apply the clarified standard to the religious accommodation claim in the first instance." [Filing No. 168 at 2]. Again, *Groff*'s clarification is that "an employer must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business." 660 U.S. at 470 (citing *Hardison*, 432 U.S. at 83 n.14).

When this clarification is applied to the undisputed facts of this case in the "common-sense manner" that *Groff* requires, 660 U.S. at 471, it becomes apparent that Brownsburg has demonstrated undue hardship as a matter of law on two separate and independent bases.

    c.    *Brownsburg demonstrated undue hardship under* Groff*'s clarified standard based on harm to students and disruption to the learning environment, both of which go to the heart of Brownsburg's "business" of educating all students.*

The undisputed material facts set forth above demonstrate that the last-name-only-accommodation resulted in substantial student harm. *See supra*, SMF ¶¶32-41. In its previous summary judgment ruling, this Court highlighted some of that evidence, noting that Sucec "dreaded" going to orchestra class and that "[o]ther students and teachers complained that Mr. Kluge's behavior was insulting or offensive and made his classroom environment unwelcoming and uncomfortable." [Filing No. 159 at 43]. This Court also noted that "Mr. Kluge does not dispute that refusing to affirm transgender students in their identity can cause emotional harm." [Filing No. 159 at 45]. As such, this Court reasoned that "this harm is likely to be repeated each time a new transgender student joins Mr. Kluge's class (or, as the case may be, chooses not to enroll in music or orchestra classes solely because of Mr. Kluge's behavior)." (*Id.*)

In his Brief, other than offering his subjective interpretation that the various complaints amount to mere "grumblings" (which is addressed below), Kluge makes no effort to refute this evidence or the Court's reasoning. Moreover, the evidence of student harm and its relevance under *Groff*'s "substantial cost" requirement becomes more acute in light of Kluge's concession that Brownsburg has an interest in the mental health of its students. *See supra*, SMF ¶19.

The designated evidence also establishes that the last-name-only accommodation disrupted the learning environment. *See supra*, SMF ¶¶32-41. In its previous summary judgment ruling, this Court credited that evidence, noting that "Mr. Kluge's use of the last names only

accommodation burdened [Brownsburg's] ability to provide an education to all students and conflicted with its philosophy of creating a safe and supportive environment for all students." [Filing No. 159 at 44]. None of this evidence has changed, and therefore this Court should apply the same reasoning.

Kluge's sole objection to this evidence and this Court's reasoning is to describe the disruptions as a "tempest in a teacup," emphasizing that Brownsburg high school educates approximately 3,000 students and employs over 160 teachers. [Filing No. 183 at 26]. *Groff* instructs that a reviewing court consider an accommodation's "practical impact" in light of the employer's "size" and "operating cost," but it also requires "common-sense" and attention to the employer's "nature." 600 U.S. at 470-71. Brownsburg's "nature" is educating all students, which it accomplishes in part by fostering a learning environment of respect and affirmation.

That is a marked contrast to the "business" of most employers. Many if not most undue hardship cases involve employers that are corporations or non-profits, and the analysis tends to focus on costs common to those enterprises, whether monetary, operational, or otherwise. But Brownsburg's interest is different. It does not exist to maximize shareholder investment or raise money for a cause. Brownsburg exists to educate students and, unlike a corporation or non-profit, that *raison d'être* has constitutional and statutory dimensions. [Filing No. 159 at 42 (this Court recognizing that Brownsburg provides public education "as required by Indiana statutory and constitutional law" and that public schools play a "custodial and protective role" over students as part of their role in the public education system) (citation omitted)]. The value of any single student's safety and ability to learn at school is not minimized within larger school districts. In other words, the level of undue hardship caused by putting the safety and education of several students at risk is the same whether the school has 100 students or 10,000 students.

Thus, as required by *Groff*, the student harm and disruptions to the learning environment articulated above must be addressed in relation to Brownsburg's "particular business" of educating all students and fostering a safe, inclusive learning environment for *all* the children it serves. There cannot be a stronger nexus between the undisputed, substantial student harm and disruption to the learning environment caused by the last-name-only accommodation and Brownsburg's particular business—the accommodation struck right its heart. Just as in *Baz v. Walters*, which is discussed at length in Brownsburg's original summary judgment brief [Filing No. 121 at 34-35, 38]—where Reverend Baz's desired accommodation would have required his employer to upend its philosophy of patient care—Kluge's last-name-only accommodation became "antithetical" to Brownsburg's particular business and core mission. 782 F.2d 701 at 706-07. Indeed, as this Court observed in its first summary judgment ruling, the accommodation was not a mere tangential interference with some aspect of Brownsburg's business—rather, it "*actively interfered* with [Brownsburg's] *mission* to provide a safe and supportive educational environment." [Filing No. 159 at 45 n.11 (emphasis added)]. There is no legitimate reason that this Court should not apply the same reasoning it did before in concluding that Brownsburg has met *Groff*'s clarified standard as a matter of law.

A final point in closing this section furthers shows why Brownsburg has met this clarified standard. Note that *Groff* uses the future tense: "[A]n employer must show that the burden of granting an accommodation *would result* in substantial increased costs in relation to the conduct of its particular business." 2023 WL 4239256, at *11 (emphasis added). Here, it is undisputed that Brownsburg tried the last-name-only accommodation and attempted to work with Kluge when complaints mounted, though Kluge's general response was that everything was fine and that nothing should change. *See supra*, SMF ¶¶42-44. As such, Brownsburg's efforts went well

past showing that the last-name-only accommodation "would result" in "substantial increased costs." *Accord Draper v. U.S. Pipe & Foundry Co.*, 527 F.2d 515, 520 (6th Cir. 1975) ("The employer is on stronger ground when he has attempted various methods of accommodation and can point to hardships that actually resulted.")

High school students—and, as Brownsburg determined, particularly its transgender students, *see supra*, SMF ¶19—have it hard enough through the normal maturation process and moving from childhood to early adulthood. Title VII should not require a public school to continue with an adult teacher's religious accommodation when the harm to its students, who are children, and the interference to its mission, is as substantial as what the evidence showed here. *See, e.g., Beickert v. New York City Dep't of Educ.*, No. 22-CV-5265(DLI)(VMS), 2023 WL 6214236, at *6 (E.D.N.Y. Sept. 25, 2023) (NYC Department of Education would face a "significant burden and undue hardship" by allowing unvaccinated special education teacher to work remotely because the particularized educational needs of her students would be neglected).

> d.   *The last-name-only accommodation imposed an undue hardship on Brownsburg because it exposed Brownsburg to an unreasonable risk of liability.*

The undisputed material facts set forth above demonstrate that continuing the last-name-only accommodation would have exposed Brownsburg to an unreasonable risk of liability, thus resulting in undue hardship as a matter of law. *See supra*, SMF ¶¶32-41. In its previous summary judgment ruling, this Court observed that *Whitaker ex rel. Whitaker v. Kenosha Unified School District No. 1 Board of Education*, 858 F.3d 1034, 1038-39 (7th Cir. 2017), "recognized that discrimination on the basis of transgender status is actionable under Title IX." [Filing No. 159 at 46]. That case involved a transgender student's request for a preliminary injunction based on a claim that the school was discriminating against him for not allowing him to use the boys' restroom. This Court concluded that "allowing Mr. Kluge an accommodation that resulted in

complaints that transgender students felt targeted and dehumanized could potentially have subjected [Brownsburg] to a Title IX discrimination lawsuit brought by a transgender student" and thus created undue hardship. [Filing No. 159 at 46]. The Court also noted that "it is sufficient that the state of the law during Mr. Kluge's employment created a risk of liability, and [Brownsburg] considered that risk in determining how to resolve Mr. Kluge's objections to the policies concerning transgender students." [Filing No. 159 at 47].

The evidence has not changed, and therefore this Court should apply the same reasoning and conclude that Brownsburg has established this second and independent basis for undue hardship as a matter of law.

Kluge's two arguments to the contrary are meritless:

First, Kluge suggests that because he did not "berate or harass anyone" that the exposure-to-litigation defense is not available, and cites *Matthews v. Wal-Mart Stores, Inc.*, 417 F. App'x 552, 554 (7th Cir. 2011), in support, which applied the defense to a case where the plaintiff-employee committed workplace harassment. [Filing No. 183 at 30]. However, there is no indication from the *Matthews* opinion or elsewhere that the Seventh Circuit applies the defense only to workplace harassment cases. If anything, the authority is to the contrary. *See, e.g.*, *Bhatia v. Chevron U.S.A., Inc.*, 734 F.2d 1382, 1384 (9th Cir. 1984) (concluding undue hardship existed as a matter of law where accommodation "would risk liability for violating California Occupational Safety and Health Administration standards"); *D'Cunha v. Northwell Health Sys.*, No. 23-476-CV, 2023 WL 7986441, at *3 (2d Cir. Nov. 17, 2023) (burden placed on employer from violating state law is both "excessive" and "unjustifiable").

Second, Kluge contends that because he was calling all students by their last names, he was not "sex-stereotyping" and any Title IX lawsuit would have been frivolous—*i.e.*, no undue

hardship. [Filing No. 183 at 30]. According to Kluge, his conduct promoted "equal treatment for all." [Filing No. 183 at 30]. As an initial matter, for Kluge's summary judgment motion, the designated evidence demonstrates that he deviated from the last-name-only accommodation regularly and that deviation caused confusion in his classroom. *See, e.g.*, [Filing No. 22-3 at 4, ¶12]; [Filing No. 58-1 at 3-4, ¶¶10-12]. Moreover, the *Whitaker* court rejected a similar "equal treatment" or "neutrality" argument in the context of providing a gender-neutral bathroom for a transgender student: "Providing a gender-neutral alternative is not sufficient to relieve the School District from liability, as it is the policy itself which violates [Title IX]." 858 F.3d at 1050. The same logic should apply here, for even if it were the case that Kluge called all students in a class with a transgender student by their last names, it was obvious that he was doing so because of the transgender student's presence. [Filing No. 58-1 at 3-4].  And that in turn caused the hostile atmosphere that could have led to Title IX litigation.

In sum, courts analyzing undue hardship have sensibly recognized that Title VII does not require an employer to accommodate an employee's sincerely held religious belief where doing so creates an unreasonable risk of liability. This Court has already appropriately recognized that doing so here would have subjected Brownsburg to such a risk, and Kluge's attempt to categorize a Title IX lawsuit as frivolous is unconvincing given the state of the law during his accommodation.

> e.   *Kluge's remaining arguments against undue hardship are unavailing.*

Kluge makes several arguments against undue hardship. [Filing No. 183 at 24-31]. Most of them are addressed above, and Brownsburg addresses those that remain as follows:

First, Kluge claims that the last-name-only accommodation was "a Title-VII success story—until a few third parties hostile to Mr. Kluge's religious beliefs scuttled the

accommodation." [Filing No. 183 at 24]. Putting to the side that the designated evidence Kluge cites does not support these assertions, the designated evidence demonstrates that the accommodation was the opposite of a success story. *See supra*, SMF ¶¶32-41. Likewise deficient is Kluge's baseless claim that those who complained were hostile to his religious beliefs. There is no evidence in the record to support this contention. Brownsburg of course acknowledges that student or employee religious animosity cannot serve as the basis for denying an accommodation. As *Groff* instructed, "a hardship that is attributable to employee animosity to a particular religion, to religion in general, or to the very notion of accommodating religious practice cannot be considered 'undue.'" 660 U.S. at 472. But that is not why Brownsburg considered the last-name-only accommodation an undue hardship. Kluge's motive (whether religious or otherwise) was not relevant because it was his last-name-only practice, and not his unknown motive, that caused substantial harm to the students and disrupted the learning environment.

Moreover, Brownsburg's approach to Kluge's request for an accommodation regarding student uniforms is further indication that religious animosity was lacking. It is undisputed that Brownsburg's administrators allowed the uniform accommodation—which, critically, did not involve evidence of student harm—to continue, *see supra*, SMF ¶28, whereas it withdrew the last-name-only accommodation because of the undisputed, significant evidence that it was causing student harm and disrupting the learning environment. Thus, Brownsburg rightfully considered the impact (or lack thereof) of each accommodation on its students and reacted accordingly. That approach is consistent with *Groff*'s instruction that an employer take the "further logical step" of assessing the accommodation's impact "on the conduct of the employer's business." 660 U.S. at 472 (citation omitted).

Second, Kluge's allusion to the complaints as mere "third-party grumblings" [Filing No. 183 at 26-27] disregards the designated evidence. *See supra*, SMF ¶¶32-41. Moreover, the cases he cites in support are not Title VII failure-to-accommodate cases and therefore should be disregarded. [Filing No. 183 at 27 (citing *Meriwether v. Hartop*, *Kennedy v. Bremerton*, and *Hedges v. Wauconda*—all First Amendment cases)]. Kluge closes this section by claiming that a ruling in Brownsburg's favor will require an employer to prohibit an Orthodox Jew from wearing a yarmulke or deny a Muslim a prayer break, all because such practices might make co-workers uncomfortable. [Filing No. 183 at 27]. These extreme hypotheticals only expose the weakness of Kluge's arguments, for in neither is the employee's conduct actively harming students or disrupting the learning environment. They do, however, raise an important point—so-called third-party grumblings in and of themselves do not create undue hardship. Rather, a reviewing court should look at the ends to which those complaints are directed. Here, the complaints established that the last-name-only accommodation *harmed* students, *disrupted* the learning environment, and *interfered* with Brownsburg's philosophy of creating a safe and supportive environment for all students. As a matter of law, that constitutes "substantial increased costs" under *Groff*'s clarified standard.

Third, perhaps as an extension of his "third-party grumblings" argument, Kluge writes, "The few grumblings against Mr. Kluge's accommodation shared the illegitimate expectation that students can require others to signal agreement with their beliefs. [Brownsburg] may desire this, but it cannot force religious objectors to comply." [Filing No. 183 at 27-28]. To support this argument, Kluge cites several cases that do not apply to Title VII undue hardship analysis at all. [Filing No. 183 at 28 (citing *Tinker v. Des Moines*, *Turner v. FCC*, and *Zamecnik v. Indian Prairie*—all First Amendment cases)].

Particularly odd is Kluge's reliance on *United States v. Varner*, 948 F.3d 250 (5th Cir. 2020). [Filing No. 183 at 27]. He quotes from that opinion as follows: "[N]o authority supports the proposition that [the district] may require . . . anyone . . . to refer to gender-dysphoric [students] with pronouns matching their subjective gender identity." [Filing No. 183 at 27 (quoting *Varner*)]. At first glance, this quote seems damaging to Brownsburg. However, as suggested by Kluge's liberal use of brackets, it is stripped of its context. The appeal in *Varner* concerned a convicted sex offender's request to have the offender's name changed on the judgment of committal, as well as a request by separate motion that the Court "use female pronouns when addressing Appellant." 948 F.3d at 252-53. The court concluded that it lacked jurisdiction to change the judgment of committal because no federal rule or statute authorized such a change. *Id.* at 253. Regarding the separate motion, the panel reasoned that although "[f]ederal courts sometimes choose to refer to gender-dysphoric parties by their preferred pronouns," no binding precedent or other authority obligated the court to do so. *Id.* at 255. Nowhere did the *Varner* court remotely suggest that its decision applied to Title VII undue hardship analysis—and particularly not to a case concerning a public school—and there is no legitimate reason for this Court to apply *Varner* here.

Fourth, Kluge asserts that Brownsburg has cited "after-created" evidence related to student complaints and that such evidence cannot support its actions. [Filing No. 183 at 28-30]. It did not. Most of the evidence that Kluge characterizes as "after-created" is no such thing. Kluge claims, for example, that affidavits from Sucec and Willis "concern events that *postdated Mr. Kluge's forced resignation*." [Filing No. 183 at 29 (emphasis in original)]. Those affidavits describe the students' concerns, the details of which are stated above. *See supra*, SMF ¶¶34-38. Critically, both students reported their concerns during Equality Alliance Club meetings, *see*

*supra*, SMF ¶34, and the adult sponsor for those meetings, Craig Lee, reported their concerns and those of other students to Dr. Daghe for eventual discussion with Kluge. *See supra*, SMF ¶¶40, 42-44. Far from serving as an after-the-fact justification for Brownsburg's action or having "no contemporary evidence" as Kluge claims [Filing No. 183 at 35], the students' affidavits instead recap their negative experiences in Kluge's classroom and their efforts to make teachers and administrators aware of those negative experiences. There is nothing untoward or improper about considering this evidence.[3]

Finally, Kluge argues that *Baz v. Walters*, 782 F.2d 701 (7th Cir. 1986), is "totally different" because the employee's conduct in that case was the opposite of Kluge's. [Filing No. 183 at 31]. Kluge also argues that *Baz* is no longer good law because it applied the "more than a *de minimis* cost" standard to undue hardship, which *Groff* has now discarded. [Filing No. 183 at 31]. Kluge is wrong on both counts.

Given the constitutional and statutory mandate for Brownsburg's educational mission, this Court thought it prudent to analogize that mission to the employer's mission in *Baz*. [Filing No. 159 at 42-43]. *Baz* involved a Veterans Administration chaplain whose proselytizing contradicted the employer's view of a chaplain's role "as a quiescent, passive listener and cautious counselor." [Filing No. 159 at 42 (quoting *Baz*, 782 F.2d at 704)]. This Court reasoned that *Baz* provided an appropriate comparison for analyzing how an employee's accommodation request might conflict with an employer's overall mission: "Just as the chaplain's philosophy of

---

[3] Granted, Sucec withdrew from Brownsburg after Kluge resigned. But putting to the side that Brownsburg does not rely on that undisputed fact exclusively, it is hard to see how it helps Kluge, for it further demonstrates that Brownsburg's administration had valid concerns about how the last-name-only accommodation was affecting his students. *Groff* does not require an employer to incur the burdens of an accommodation before there is undue hardship; rather, an employer need only show that it "would result." 660 U.S. at 470.

patient care was directly at odds with the philosophy of his employer, Mr. Kluge's religious opposition to transgenderism is directly at odds with [Brownsburg's] policy of respect for transgender students." [Filing No. 159 at 42].

In contrast, many other garden-variety religious accommodations are not directly at odds with an employer's mission. It is hard to see a contradiction with an employer's overall mission, for example, when an employee seeks time off for religious reasons, for employers commonly provide some amount of time off as a benefit to employees. But *Baz* underscores that an employer's mission is vitally important to undue hardship analysis, and in this case the last-name-only accommodation plainly imposed upon Brownsburg's mission to educate all students.

Kluge's argument thus completely misses the point on how this Court treated *Baz* and why it remains good law. Again, the relevant constitutional and statutory obligations require Brownsburg to educate all students who come through its doors. Brownsburg cannot discharge those obligations if, as this Court noted, it accommodates an employee whose religious views are "directly at odds with [Brownsburg's] policy of respect for transgender students" or, to paraphrase Dr. Jessup, it failed to fulfill a goal of allowing "transgender students to receive, like any other student, respect and affirmation of their preferred identity, provided they go through reasonable channels such as receiving parent permission and a healthcare professional's approval." [Doc. 120-1 at 4]. As such, the common thread running through the accommodation in *Baz* and the one here is not that Kluge's conduct may have differed from Reverend Baz' conduct, or that the *Baz* court applied a *de minimis* standard that *Groff* has since clarified, but rather that an employer's mission is an important part of undue hardship analysis. *Groff*'s instruction that a reviewing court apply "common-sense" and consider an employer's "nature" is consistent with *Baz*, not at odds with it.

In summary, none of Kluge's arguments rebut that as a matter of law, Brownsburg has established two separate and independent bases for undue hardship under *Groff*'s clarified standard. Accordingly, the Court should enter summary judgment in Brownsburg's favor on Kluge's unlawful discrimination claim.

II.     *Kluge cannot establish a prima facie case of retaliation and, even if he could, he cannot demonstrate pretext.*

Kluge alleges in Count II of his Amended Complaint that Brownsburg retaliated against him in violation of Title VII for engaging in protected conduct by (1) agreeing to the last-names only accommodation then withdrawing it without demonstrating undue hardship; and (2) telling him that he could either "use transgender names and pronouns, resign, or be terminated." [Filing No. 15 at 17-18].  Neither assertion has merit and the Court should grant summary judgment in Brownsburg's favor on this claim.

Retaliation based on a reasonable accommodation request requires the employee to establish the following: (1) he engaged in statutorily protected activity; (2) he suffered an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse employment action. *Contreras v. Suncast Corp.*, 237 F.3d 756, 765 (7th Cir. 2001). If the employee establishes a prima facie case, the burden shifts to the employer to articulate a legitimate nondiscriminatory reason for its actions, which the employee must show to be a pretext for unlawful retaliation. *Id.*

As an initial matter, this Court should not revisit its previous conclusion that Kluge's retaliation claim was foreclosed as a matter of law. [Filing No. 159 at 47-51]. The Seventh Circuit's remand instruction was to apply *Groff*'s "clarified standard to the religious accommodation claim in the first instance." [Filing No. 168 at 2]. It did not instruct this Court to reconsider Kluge's retaliation claim because *Groff* does not apply to such claims at all.

Moreover, because this Court concluded that Kluge had waived his retaliation claim [Filing No. 159 at 49-50], Brownsburg will experience unfair prejudice if Kluge receives a second bite at the apple. Such unfair prejudice includes Brownsburg responding now to arguments that Kluge could have made over two years ago but did not, all on the mere happenstance that the Supreme Court handed down an opinion that impacted his other claim. That is an unwarranted reason to revisit Kluge's retaliation claim. This Court should summarily conclude that Kluge's retaliation claim fails for all the reasons stated in its original summary judgment ruling.

Nevertheless, Kluge's claim still fails for all the reasons Brownsburg advanced in its original brief [Filing No. 121 at 43-47], most prominently that there is no reasonable inference for a causal connection due to the undisputed fact that Brownsburg's withdrawal of the accommodation was due to the nature and quality of the complaints it was receiving from the high school community. This Court noted as much in its previous summary judgment ruling: "the evidence is undisputed that [Brownsburg] and [its] administrators were acting because of complaints received from the school community . . ." [Filing No. 159 at 51]. Two additional pieces of evidence further undermine the lack of any causal connection, first that Brownsburg never withdrew Kluge's uniform accommodation—the common thread being that no one complained about it—and second that Brownsburg allowed the last-name-only accommodation for some time, going so far as addressing the matter with Kluge and, even though it became apparent he was not open to discussion, deciding that it would not withdraw the accommodation until the beginning of the following school year. And even if one were to brush all of this aside for argument's sake, Kluge's claim still fails for lack of pretext. As this Court noted, "there is nothing in the record to suggest that the complaints were fabricated or that another motive was possible." [Filing No. 159 at 51].

Kluge attempts to revive his retaliation claim through several arguments, but none has merit:

First, regarding a causal connection, Kluge makes the remarkable contention that Brownsburg's "*only* reason for forcing Mr. Kluge to resign was his religious objection to its transgender terminology rules and his insistence that Title VII entitled him to an accommodation, despite grumblings from third parties hostile to his beliefs." [Filing No. 183 at 33]. The designated evidence that Kluge cites does not support this contention at all.

Second, Kluge claims that he need not show pretext because he relied on the direct method of proof. [Filing No. 183 at 34-35]. Direct proof in the context of a Title VII retaliation claim includes "suspicious timing, ambiguous statements, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn," *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007), but one strains to see where Kluge has provided any. If anything, the designated evidence is to the contrary. To address but one of these, there is nothing suspicious about Brownsburg allowing the last-name-only accommodation for some time when there are no complaints and then later withdrawing it when the complaints become substantial. The inference a reasonable factfinder would draw from such evidence is not retaliatory animus, but rather that the complaints influenced Brownsburg's decision. Kluge's claim that he has provided direct proof of retaliation is baseless.

Finally, Kluge argues that Brownsburg failed to show any legitimate, non-retaliatory reason for withdrawing the accommodation. [Filing No. 183 at 35]. To support this argument, Kluge claims that "*Groff* makes clear that [Brownsburg] cannot meet its burden" and that Brownsburg's purported reason—in a nutshell, complaints from the community—is merely

50

evidence of "repackaged religious hostility and animosity" and thus is "off the table" per *Groff*. [Filing No. 183 at 35]. Kluge's argument is misplaced entirely—he offers no evidence to support a reasonable inference that those who complained were motivated by hostility or animus to his religion, and again, *Groff* has no application at all to Title VII retaliation claims.

III.    *If the Court denies summary judgment in Brownsburg's favor on Kluge's unlawful discrimination claim, it should also deny summary judgment in Kluge's favor regarding the sincerity of his religious belief.*

If the Court grants summary judgment in Brownsburg's favor on Kluge's unlawful discrimination claim, it need not address Kluge's argument that he has established the sincerity of his religious belief as a matter of law. [Filing No. 183 at 21-23]. Nevertheless, this Brief concludes by noting that genuine issues of material fact preclude such a determination.

Kluge cannot legitimately reconcile his use of last names in class with his decision to abandon that accommodation during the May 2018 orchestra awards ceremony. Kluge used the full names for students as listed in PowerSchool to address all students as they received their awards, including transgender students. *See supra*, SMF ¶50. Kluge thought that addressing students by their "transgender names" promoted a transgender lifestyle and was therefore sinful. Yet he somehow thought it was appropriate to use such names during the ceremony because it was more infrequent and formal. *See supra*, SMF ¶50.

Ironically, Kluge acknowledged that by addressing students by their "transgender names" during the ceremony, he was seeking to avoid the same type of negative consequences that resulted from his use of last names only in class. *See supra*, SMF ¶50. Kluge stated his "Christian faith required that he do no harm to students," *see supra*, SMF ¶50, yet Sucec "dread[ed] going to orchestra class each day," and Willis felt "very awkward" and "targeted" in Kluge's class, among other complaints. *See supra*, SMF ¶¶36, 38. Kluge also sought to avoid

appearing "unreasonable and conspicuous" and "creat[ing] a scene" during the ceremony, *see supra*, SMF ¶50, but at the same time, according to Sucec, his classroom "behavior was noticeable to other students in the class." *See supra*, SMF ¶36. Moreover, as Kluge acknowledged when he first learned of the complaints from Dr. Daghe, by December 2017 he had become "a topic of much discussion in the Equality Alliance Club meetings." [Filing No. 15-3 at 4].  In short, everything Kluge was trying to avoid by using "transgender names" during the ceremony *actually resulted* when he did the opposite in class.

Reasonable religious accommodation should not be based on an employee's inconsistent and unilateral say-so regarding when the accommodation applies. To that end, "[I]f the religious beliefs that apparently prompted a request are not sincerely held, there has been no showing of a religious observance or practice that conflicts with an employment requirement." *E.E.O.C. v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1575 (7th Cir. 1997). Likewise, "Evidence tending to show that an employee acted in a manner inconsistent with his professed religious belief is, of course, relevant to the factfinder's evaluation of sincerity." *EEOC v. Union Independiente de la Autoridad de Acueductos y Alcantarilladoes de Puerto Rico*, 279 F.3d 49, 57 (1st Cir. 2002).

There is more. Kluge testified at his deposition that there are instances where it is appropriate and consistent with his religious beliefs to address a transgender student by the student's first name, even if the first name differs from the student's biological sex. [Filing No. 120-3 at 8-9 (Exhibit 3 – Kluge Dep. at p. 29, line 11 to p. 30, line 11)]. Although he did not provide an example, the orchestra awards ceremony was one such instance. Moreover, Kluge's denomination does not take a hardline approach when it comes to restroom use for a transgender child, instructing instead that "it may be best that she not use the bathroom of her birth sex until she has been presented with pastoral counsel concerning God's calling of manhood and

womanhood . . . ." *See supra*, SMF ¶14. It would seem, then, that the same principle that allows a child to deviate from her biological sex when using a bathroom might also apply to the child's name. And that in turn calls into question the sincerity of Kluge's belief, or at least a reasonable juror could so conclude.

In the section of his Brief addressing his alleged sincerity, Kluge suggests his actions above represent a "nuanced religious belief" and cites case law indicating that a court should be deferential to an employee's explanation of his religious convictions. [Filing No. 183 at 22-23]. More revealing is Kluge's citation to *Adeyeye v. Heartland Sweeteners, LLC* and *Grayson v. Schuler*, including *Adeyeye*'s observation that an employee's alleged sincere belief "do[es] not require perfect consistency in observance, practice, and interpretation." [Filing No. 183 at 22 (*quoting Adeyeye*)]. That is true enough, and of course religion must make room for "backsliders, penitents, and prodigal sons" [Filing No. 183 at 22 (quoting *Grayson*)], but it necessarily follows from these observations that there is room to doubt the sincerity of an employee's belief if his actions are contradictory. Brownsburg has designated evidence that would allow a reasonable juror to reach such a conclusion, even if that juror should afford deference to Kluge's explanation.

The Court should conclude that Kluge's inconsistent use of addressing students by last names creates a genuine issue of material fact regarding the sincerity of his religious belief.

## Conclusion

For reasons stated, the Court should grant summary judgment in favor of Brownsburg and against Kluge on his remaining claims of unlawful discrimination and retaliation. The Court should also deny Kluge's partial motion for summary judgment and enter final judgment in Brownsburg's favor and against Kluge.

Respectfully submitted,

/s/ Brent R. Borg
Alexander P. Pinegar, Attorney No. 26543-49
Brent R. Borg, Attorney No. 27415-29
Church Church Hittle + Antrim
10765 Lantern Road, Suite 201
Fishers, IN  46038
317-773-2190

Attorneys for Defendant
Brownsburg Community School Corporation

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of December, 2023, a true and exact copy of the foregoing was filed electronically via the Court's Electronic filing system. Notice of this filing was sent to the following persons by operation of the Court's Electronic filing system:

Travis C. Barham
Alliance Defending Freedom
1000 Hurricane Shoals Road, N.E., Ste D-1100
Lawrenceville, GA 30043
tbarham@ADFlegal.org

Michael J. Cork
Michael J. Cork, Esq.
5754 N. Delaware St.
Indianapolis, IN  46220-2528
cork0@icloud.com

Tyson C. Langhofer
Alliance Defending Freedom
44180 Riverside Parkway
Lansdowne, VA 20176
tlanghofer@ADFlegal.org

Kevin E. Green
Kevin Green Associates
456 N. Meridian Street, #1517
Indianapolis, IN  46204
keglegal@aol.com

Roscoe Stovall, Jr.
Roscoe Stovall, Jr. & Associates
2 West Main Street
Mooresville, IN 46158
rstovall@roscoelaw.com

/s/ Brent R. Borg
Brent R. Borg, Attorney No. 27415-29