UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

JOHN M. KLUGE,

                              *Plaintiff,*

                    v.

BROWNSBURG COMMUNITY SCHOOL
CORPORATION, *et al.*,

                              *Defendants.*

Case No. 1:19-cv-2462-JMS-KMB

THE HONORABLE
JANE MAGNUS-STINSON

PLAINTIFF'S REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT AND
RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... iv

INTRODUCTION ............................................................................................ 1

MR. KLUGE'S STATEMENT OF MATERIAL FACTS IN DISPUTE ......................................... 2

MR. KLUGE'S RESPONSE TO THE DISTRICT'S STATEMENT OF MATERIAL FACTS IN DISPUTE .................................................................................................... 9

ARGUMENT .................................................................................................. 13

    I.    Mr. Kluge is entitled to summary judgment on his religious discrimination claim (and the district is not) because the district revoked a reasonable accommodation without showing undue hardship. .............. 13

        A.  Mr. Kluge established a *prima facie* case of discrimination ................ 13

           1.  The district largely concedes Mr. Kluge's *prima facie* case. ........... 13

           2.  No reasonable factfinder could doubt Mr. Kluge's sincerity. .......... 14

               a.  The district wrongly attempts to hijack the sincerity analysis to second-guess the contours of Mr. Kluge's beliefs. ................. 14

               b.  The district misrepresents the teachings of Mr. Kluge's presbytery, teachings Mr. Kluge modeled. ................................. 15

               c.  Mr. Kluge consistently lived out his religious beliefs. .............. 16

        B.  The district withdrew the reasonable accommodation it extended to Mr. Kluge without the undue hardship Title VII requires ................. 17

           1.  The district cannot show any increased costs that are substantial in the overall context of its business. ............................... 17

           2.  A few third-party grumblings do not create undue hardship. ........ 19

               a.  No amount of relabeling changes the fact that the district rescinded Mr. Kluge's accommodation due to complaints. ........ 19

               b.  A few third-party grumblings do not create an undue burden for the district as a whole. .......................................... 22

               c.  A few grumblings from those with an illegitimate expectation of universal affirmation do not create undue hardship. ............ 22

           3.  It is the district's policy that poses the real harm to students. ...... 23

           4.  Redefined educational interests do not create undue hardship ...... 26

               a.  The district ignores the scope of its educational mission ........... 26

b. By redefining its educational mission, the district runs afoul of the First Amendment. ........................................... 27

c. Even under the guise of "educational philosophy," *Baz v. Walters* is no longer good law and does not control. ................... 29

5. Evidence not relied on by the district when it forced Mr. Kluge to resign cannot show undue hardship. ............................... 30

6. Hypothetical litigation does not show undue hardship. ................. 30

II. Mr. Kluge is entitled to summary judgment on his retaliation claim (and the district is not) because his statutorily protected activities caused the district's adverse actions. .......................................................... 32

A. Mr. Kluge never waived his retaliation claim ...................................... 32

B. Mr. Kluge established a prima facie case for retaliation ..................... 32

1. The district does not contest that Mr. Kluge engaged in statutorily protected activities and suffered an adverse action. ...... 32

2. Mr. Kluge showed a but-for causal link between his protected activity and the district's adverse actions. ...................................... 32

C. Mr. Kluge need not prove pretext because he relied on direct proof and the district had no legitimate reason for forcing him to resign. ... 34

CONCLUSION ............................................................................................. 35

CERTIFICATE OF SERVICE ........................................................................ 37

TABLE OF AUTHORITIES

**Constitutional Provisions**

IND. CONST. art. VIII, § 1 ................................................................ 26

U.S. CONST. art. VI, ¶ 2 ................................................................. 29

**Cases**

*Adeyeye v. Heartland Sweeteners, LLC*,
    721 F.3d 444 (7th Cir. 2013) ............................................... 1, 15, 17

*Ansonia Board of Education v. Philbrook*,
    479 U.S. 60 (1986) ...................................................................... 8

*Baz v. Walters*,
    782 F.2d 701 (7th Cir. 1986) .................................................... 29

*Bonner ex rel. Bonner v. Daniels*,
    907 N.E.2d 516 (Ind. 2009) ...................................................... 26

*Boumehdi v. Plastag Holdings, LLC*,
    489 F.3d 781 (7th Cir. 2007) ..................................................... 34

*Cullin v. Olin Corp.*,
    195 F.3d 317 (7th Cir. 1999) ..................................................... 30

*Davila v. Gladden*,
    777 F.3d 1198 (11th Cir. 2015) ................................................. 14

*Draper v. United States Pipe & Foundry Co.*,
    527 F.2d 515 (6th Cir. 1975) ..................................................... 21

*EEOC v. Abercrombie & Fitch Stores, Inc.*,
    575 U.S. 768 (2015) ............................................................. 28, 29

*EEOC v. Ilona of Hungary, Inc.*,
    108 F.3d 1569 (7th Cir. 1997) ................................................... 17

*EEOC v. Walmart Stores East, L.P.*,
    992 F.3d 656 (7th Cir. 2021) ................................................. 1, 18

*Franks v. Bowman Transportation Co.*,
    424 U.S. 747 (1976) ................................................................. 21

*Genas v. New York Department of Correctional Services*,
    75 F.3d 825 (2d Cir. 1996) ........................................................ 23

*Giese v. City of Kankakee*,
    71 F.4th 582 (7th Cir. 2023) ..................................................... 32

*Gillette v. United States*,
    401 U.S. 437 (1971) ............................................................. 14, 17

*Gregoire v. Centennial School District,*
  907 F.2d 1366 (3d Cir. 1990) ........................................................................ 27

*Groff v. DeJoy,*
  35 F.4th 162 (3d Cir. 2022) .......................................................................... 18

*Groff v. DeJoy,*
  600 U.S. 447 (2023) ..........1, 17, 18, 19, 20, 21, 22, 23, 26, 28, 29, 31, 32, 33, 35

*Hedges v. Wauconda Community Unit School District Number 118,*
  9 F.3d 1295 (7th Cir. 1993) .................................................................... 10, 28

*Horner v. Curry,*
  125 N.E.3d 584 (Ind. 2019) .......................................................................... 27

*Hunt-Golliday v. Metropolitan Water Reclamation District of Greater Chicago,*
  104 F.3d 1004 (7th Cir. 1997) ....................................................................... 33

*Kennedy v. Bremerton School District,*
  597 U.S. 507 (2022) .......................................................................... 23, 28, 30

*Kluge v. Brownsburg Community School Corp.,*
  2023 WL 4842324 (7th Cir. July 28, 2023) ...................................................... 1

*Kluge v. Brownsburg Community School Corp.,*
  548 F. Supp. 3d 814 (S.D. Ind. 2021) ...................................... 1, 13, 15, 19, 32

*Kluge v. Brownsburg Community School Corp.,*
  64 F.4th 861 (7th Cir. 2023) ............................................................ 2, 14, 32

*Korte v. Sebelius,*
  735 F.3d 654 (7th Cir. 2013) ......................................................................... 14

*Linke v. Northwestern School Corp.,*
  763 N.E.2d 972 (Ind. 2002) ........................................................................... 27

*Littlefield v. Forney Independent School District,*
  268 F.3d 275 (5th Cir. 2001) ......................................................................... 14

*Matthews v. Wal-Mart Stores, Inc.,*
  417 F. App'x 552 (7th Cir. 2011) ................................................................... 31

*McKennon v. Nashville Banner Publishing Co.,*
  513 U.S. 352 (1995) ....................................................................................... 30

*Meriwether v. Hartop,*
  992 F.3d 492 (6th Cir. 2021) ......................................................................... 28

*Minkus v. Metropolitan Sanitary District of Greater Chicago,*
  600 F.2d 80 (7th Cir. 1979) ........................................................................... 31

*Morse v. Frederick,*
  551 U.S. 393 (2007) ....................................................................................... 28

*Nagy ex rel. Nagy v. Evansville-Vanderburgh School Corp.*,
    844 N.E.2d 481 (Ind. 2006) .............................................................. 27

*Nichols v. Southern Illinois University-Edwardsville*,
    510 F.3d 772 (7th Cir. 2007) ............................................................ 34

*Ovadal v. City of Madison*,
    416 F.3d 531 (7th Cir. 2005) ............................................................ 10

*Patrick v. LeFevre*,
    745 F.2d 153 (2d Cir. 1984) ............................................................. 14

*Robertson v. Department of Health Services*,
    949 F.3d 371 (7th Cir. 2020) ............................................................ 35

*Rodriguez v. City of Chicago*,
    156 F.3d 771 (7th Cir. 1998) .............................................................. 8

*Thomas v. Review Board of Indiana Employment Security Division*,
    450 U.S. 707 (1981) ................................................................... 14, 16

*Tinker v. Des Moines Independent Community School District*,
    393 U.S. 503 (1969) ......................................................................... 28

*Venters v. City of Delphi*,
    123 F.3d 956 (7th Cir. 1997) ............................................................ 30

*Whitaker ex rel. Whitaker v. Kenosha Unified School District Number 1 Board of Education*,
    858 F.3d 1034 (7th Cir. 2017) .......................................................... 31

*Yellowbear v. Lampert*,
    741 F.3d 48 (10th Cir. 2014) .................................................. 14, 15, 16

*Zamecnik v. Indian Prairie School District Number 204*,
    636 F.3d 874 (7th Cir. 2011) ............................................................ 22

**Statutes**

42 U.S.C. § 2000e(j) ............................................................................ 23

**Rules**

FED. R. EVID. 106 ................................................................................... 3

FED. R. EVID. 602 ................................................................................... 5

**Historical Documents**

NOAH WEBSTER, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1856) ....... 27

**Journal Articles**

AM. PSYCHOL. ASS'N, APA HANDBOOK ON SEXUALITY AND PSYCHOLOGY (2014) .......... 23

Annette L. Cantu, *et al.*, *Changes in Anxiety & Depression from Intake to First Follow-Up Among Transgender Youth in a Pediatric Endocrinology Clinic*, 5:3 TRANSGENDER HEALTH 196 (2020)..............................................................25

C.M. Wiepjes, *et al.*, *The Amsterdam Cohort of Gender Dysphoria Study (1972–2015): Trends in Prevalence, Treatment, and Regrets*, 15 J. SEX. MED. 582 (Apr. 2018)........................................................................24

C.M. Wiepjes, *et al.*, *Trends in Suicide Death Risk in Transgender People: Results from the Amsterdam Cohort of Gender Dysphoria Study (1972–2017)*, 141 ACTA PSYCHIATRICA SCANDINAVICA 486 (2020)........................................24

Cecilia Dhejne, *et al.*, *Long-Term Follow-Up of Transsexual Persons Undergoing Sex Reassignment Surgery: Cohort Study in Sweden*, 6:2 PLOS ONE 1 (2011) ...........................................................................24, 26

Devita Singh, *et al.*, *A Follow-Up Study of Boys With Gender Identity Disorder*, FRONTIERS IN PSYCHIATRY (Mar. 29, 2021), https://bit.ly/3Fr55vy.................23

Diane Chen, *et al.*, *Consensus Parameter: Research Methodologies to Evaluate Neurodevelopmental Effects of Pubertal Suppression in Transgender Youth*, 5:4 TRANSGENDER HEALTH 246 (2020)..............................................................25

Elizabeth Hisle-Gorman, *et al.*, *Mental Healthcare Utilization of Transgender Youth Before & After Affirming Treatment*, 18 J. SEXUAL MED. 1444 (2021) ........................................................................25

*Evidence Review: Gender-Affirming Hormones for Children & Adolescents with Gender Dysphoria*, NICE (2020)....................................................................................................25, 26

*Evidence Review: Gonadotrophin Releasing Hormone Analogues for Children & Adolescents with Gender Dysphoria*, NICE (2020)..........................................................................................................25

Henk Asscheman, *et al.*, *A Long-Term Follow-Up Study of Mortality in Transsexuals Receiving Treatment with Cross-Sex Hormones*, 164:4 EUR. J. ENDOCRINOLOGY 635 (2011) ........................................................26

James M. Cantor, *Do Trans Kids Stay Trans When They Grow Up?*, SEXOLOGY TODAY! (Jan. 11, 2016), https://bit.ly/3FoWtp1 ...............................24

Jay McNeil, *et al.*, *Suicide in Trans Populations: A Systematic Review of Prevalence and Correlates*, 4:3 PSYCH. OF SEXUAL ORIENTATION & GENDER DIVERSITY 341 (2017) ..........24

Kellan E. Baker, *et al.*, *Hormone Therapy, Mental Health, & Quality of Life Among Transgender People: A Systematic Review*, 5:4 J. ENDOCRINE SOC'Y 1 (2021), https://bit.ly/42dOINf.................................24

L.E. Kuper, *et al.*, *Body Dissatisfaction and Mental Health Outcomes of Youth on Gender-Affirming Hormone Therapy*, PEDIATRICS (2020), https://bit.ly/4b5XlxD .......................................................... 24

Laura E. Kuper, *et al.*, *Body Dissatisfaction & Mental Health Outcomes of Youth on Gender-Affirming Hormone Therapy*, 145:4 PEDIATRICS 1 (2020) ............................................................................... 24

Michael Biggs, *The Dutch Protocol for Juvenile Transsexuals: Origins & Evidence*, 49 J. SEX & MARITAL THERAPY 348 (2022), https://bit.ly/3SyYjtV .................. 25

Polly Carmichael, *et al.*, *Short-Term Outcomes of Pubertal Suppression in a Selected Cohort of 12 to 15 Year Old Young People with Persistent Gender Dysphoria in the UK*, 16:2 PLOS ONE 1 (Feb. 2, 2021), https://bit.ly/3FrBXnQ .......................... 24, 25

Riittakerttu Kaltiala, *et al.*, *Adolescent Development and Psychosocial Functioning after Starting Cross-Sex Hormones for Gender Dysphoria*, 74:3 NORDIC J. PSYCHIATRY 213 (2020) ............................................................ 25

T. Brik, *et al.*, *Trajectories of Adolescents Treated with Gonadotropin Releasing Hormone Analogues for Gender Dysphoria*, 49 ARCH. SEX BEHAV. 7, doi:10.1007/s10508-020-01660-8, https://bit.ly/3OhdXsp ............................................................................... 24

Thomas D. Steensma, *et al.*, *Factors Associated With Desistence and Persistence of Childhood Gender Dysphoria: A Quantitative Follow-Up Study*, 52 J. OF AM. ACAD. OF CHILD & ADOLESCENT PSYCH. 6 (June 2013), https://bit.ly/3FoXkpJ ................................................................................ 24

W. BOCKTING, TRANSGENDER IDENTITY DEVELOPMENT ......................................... 23, 24

Wylie C. Hembree, *et al.*, *Endocrine Treatment of Gender-Dysphoric / Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102:11 J. CLINICAL ENDOCRINAL METAB. 3869 (2017)......................................... 25

**Litigation Documents**

Submission of Evidentiary Material, Ex. 27, *K.C. v. Individual Members of the Medical Licensing Board of Indiana*, No. 1:23-cv-00595-JPH-KMB (June 1, 2023), ECF No. 49-10........................ 25

**Other Authorities**

*Brownsburg High School*, PUB. SCH. REV., https://bit.ly/3FNz54F ...................................................... 19, 22

*Brownsburg High School*, U.S. NEWS & WORLD REPS., https://bit.ly/49gzs5r ....................................... 19, 22

*Grumble*, DICTIONARY.COM, https://bit.ly/47z764p ......................................................... 10

*Grumble*,
MERRIAM WEBSTER, https://bit.ly/3tNPaFn.....................................................10

## INTRODUCTION

Brownsburg has not yet grappled with how Title VII religious discrimination law has changed after *Groff v. DeJoy*, 600 U.S. 447 (2023). Yet that's why we are here. *Kluge v. Brownsburg Cmty. Sch. Corp.*, 2023 WL 4842324, *1 (7th Cir. July 28, 2023).

The district repeatedly urges this Court to repeat its findings and legal conclusions, citing its prior decision 22 times. But this Court cannot merely rinse and repeat that ruling for the underlying law has fundamentally changed. This Court previously relied on the "more than a *de minimis* cost" and "more than a 'slight burden'" standard. *Kluge v. Brownsburg Cmty. Sch. Corp. (Kluge I)*, 548 F. Supp. 3d 814, 843 (S.D. Ind. 2021) (quoting *EEOC v. Walmart Stores E., L.P.*, 992 F.3d 656, 658 (7th Cir. 2021)). But the Supreme Court discarded it and abrogated *Walmart*. *Groff*, 600 U.S. at 466 n.12, 468, 470. It also ruled that complaints from coworkers or constituents about a religious practice or about accommodating it are "off the table" for showing an undue hardship (or a legitimate reason for adverse action). *Id.* at 472–73.

Yet the district points to nothing else to justify its decision to force Mr. Kluge, a talented and dedicated teacher, to resign. To be sure, it relabels these few complaints as lofty interests, but the only evidence it provides to validate these interests is the few complaints. That's not good enough under *Groff*. *Id.*

Congress passed Title VII to "ensure that employees would *not* have to sacrifice their jobs to observe their religious practices." *Adeyeye v. Heartland Sweeteners, LLC*, 721 F.3d 444, 456 (7th Cir. 2013). Here, one teacher of over 160 (*i.e.*, 0.625% of the faculty) requested a religious accommodation that simply allowed him to remain silent on transgender issues and focus on his job of teaching music. One teacher silently stepping off of an ideological bandwagon cannot pose an undue hardship to the district as a whole, as Title VII now requires. *Groff*, 600 U.S. at 468. And the complaints change nothing. For Title VII does not protect only those religious practices or accommodations that everyone likes, as those need little (if any) legal protection.

1

MR. KLUGE'S STATEMENT OF MATERIAL FACTS IN DISPUTE

1. Mr. Kluge disputes that this Court ruled on summary judgment in Filing No. 70. [Filing No. 185 at 6 ¶ 5.] It did so in Filing No. 159.

2. Mr. Kluge disputes that he waived his retaliation claim. [Filing No. 185 at 6 ¶ 7.] *Kluge v. Brownsburg Cmty. Sch. Corp. (Kluge II)*, 64 F.4th 861, 897 (7th Cir. 2023).

3. Mr. Kluge disputes that he seeks summary judgment on the affirmative defense of undue hardship. [Filing No. 185 at 7 ¶ 11.] He seeks it on his discrimination and retaliation claims. [Filing No. 182 at 1, 5.] Undue hardship is part of the former.

4. Mr. Kluge disputes any use of his church's or presbytery's teachings to undermine his claims. [Filing No. 185 at 7–8 ¶¶ 12, 14.] The issue is his religious beliefs.

5. Mr. Kluge disputes that *The Book of Church Order of Evangel Presbytery* prescribes rules "[i]n addition to Scripture." [Filing No. 185 at 7 ¶ 12.] It states that the "Bible … is the sole and final source of authority for all that we believe and do" and that it is merely "the Presbytery's final interpretive authority on the Bible's meaning and application." [Filing No. 120-4 at 16 ¶ 27.] The district quotes a section that explains it represents the presbytery's attempt "to declare our Scriptural convictions and commitments concerning sexuality" due to new cultural trends. [*Id.* at 8.]

6. Mr. Kluge disputes the district's summary of his beliefs. [Filing No. 185 at 8 ¶ 13.] He believes (1) God "created us as a man or a woman," (2) it is wrong "to act or dress in the manner of the opposite sex," (3) it would be sinful for him to "encourage[ ] students in transgenderism," and (4) causing children to stumble in this way would subject him to "special punishment" from God. [Filing No. 113-1 at 6–9.] He believes God-ordained "[g]enetic sex" "cannot be separated" from gender identity. [Filing No. 120-3 at 11 (Kluge Dep. at p. 38, line 8 to p. 39, line 4).] These beliefs prevent him from using transgender terms "during the [regular] course of … teaching a class," as doing so "encourages gender dysphoria." [*Id.* at 8–9 (Kluge Dep. at p. 29, line 20 to p. 30, line 3).] In other situations (*e.g.*, an awards ceremony), they do not as using those

terms there does not have the same effect. [*Id.* at 8, 33–34 (Kluge Dep. at p. 28, line 23 to p. 29, line 24; p. 126, line 7 to p. 130, line 9).]

7.   Mr. Kluge disputes that his presbytery permits "tolerance" for "effeminacy." [Filing No. 185 at 8 ¶ 14.] His testimony does not change the presbytery's written beliefs. Neither "tolerance" nor a variant appears in the presbytery's *Book of Church Order*. [Filing No. 120-4 at 12.] Nor does it let transgender-identifying persons use their chosen restroom; it directs them to use a "single-stall" restroom until church leaders can present "pastoral counseling concerning God's call for manhood and womanhood and … Jesus's Lordship over her sexuality and the implications it has for her sexual identity and its public expression." [*Id.*] It also notes (1) God created "two and only two sexes, male and female"; (2) "[g]enetic sex and sexual identity cannot be separated"; and (3) it is sinful to "reject … one's sex and to adopt characteristics of the opposite sex." [*Id.* at 9–10.] It does not condone the use of transgender terms. [*Id.* at 8–16.] The entire book must be considered if any of it is. FED. R. EVID. 106.

8.   Mr. Kluge never testified "there are instances where it is appropriate and consistent with his religious beliefs to address a transgender student by the student's first name," even if it is a transgender name. [Filing No. 185 at 8–9 ¶ 15.] When asked if such circumstances might exist, he answered: "There might be. None come to mind right now." [Filing No. 120-3 at 8 (Kluge Dep. at p. 29, lines 20–24).] He explained that using transgender names "during the course of teaching a class of students" is "not appropriate" as "it encourages gender dysphoria." [*Id.* at 8–9 (Kluge Dep. at p. 29, line 25 to page 30, line 3).] When asked if he "promot[ed] a transgender lifestyle" by briefly using them at the awards ceremony, he replied: "I don't believe I was[.]" [*Id.* at 33–34 (Kluge Dep. at p. 129, line 13 to p. 130, line 9).]

9.   Mr. Kluge disputes that, in the 2017–18 school year, "[s]taff were … required to use the name in PowerSchool," even transgender ones. [Filing No. 185 at 11 ¶ 20.] At the start of that year, after explaining the new name-change rules, Counselor

3

Mehrtens told Mr. Kluge and others to "feel free" to use students' transgender names and pronouns. [Filing Nos. 120-10 at 2; 15-3 at 3; 120-3 at 13–14 (Kluge Dep. at p. 48, line 5 to p. 49, line 22; p. 52, lines 3–13).] Only after Mr. Kluge raised his religious objection did officials convert this invitation into a requirement. [Filing Nos. 15-3 at 3; 120-3 at 14 (Kluge Dep. at p. 52, lines 14–21); 113-5 at 5–6 (Daghe Dep. at p. 30, lines 5–23; p. 34, lines 3–7; p. 36, lines 15–21).]

10. Mr. Kluge disputes that "[a]t least two transgender students in [his] classes legally changed their birth names to their 'transgender name.'" [Filing No. 185 at 12 ¶ 24 n.1.] This wrongly suggests they did so while in his classes. Sucec, one of the two, submitted a sworn statement in August 2019, saying: "I also recently corrected my legal name on my birth certificate and my social security card." [Filing No. 22-3 at 2 ¶ 6.] There is no evidence Sucec did this while attending Mr. Kluge's class, which would not have been "recent" given Mr. Kluge's May 2018 forced resignation. [Filing No. 120-18 at 2, 8–9, 18.] Willis, the other, submitted a sworn statement in October 2019, saying: "I legally changed my name to 'Samuel' … on June 11 of this year." [Filing No. 58-1 at 2 ¶ 3.] That was long after Willis had attended Mr. Kluge's class.

11. Mr. Kluge disputes that he referred to a student as "Miss," rather than by last name. [Filing No. 185 at 15 ¶ 32.] The cited email represents the parent's request to change the student's name in PowerSchool, and so the district's transgender terminology practice and Mr. Kluge's accommodation did not yet apply. Mr. Kluge, a contract teacher who worked with him during the 2017–18 school year, and three students in his classes that year all provided sworn declarations attesting that he adhered to the last-names accommodation and displayed no adverse behavior towards any transgender students. [Filing Nos. 52-1 at 3–4 ¶¶ 13–22; 52-2 at 3 ¶¶ 6–8; 52-3 at 2–3 ¶¶ 3–11; 52-4 at 2 ¶¶ 3, 7; 52-5 at 2 ¶¶ 3–7; 52-6 at 3–4 ¶¶ 9, 14.]

12. Mr. Kluge disputes the allegations from complaints attributed to (1) unnamed persons who attended Equality Alliance Club meetings and (2) teachers who did not

submit sworn statements. [Filing No. 185 at 15–20 ¶¶ 33–41.] None of these were disclosed to Mr. Kluge until after his termination. None were investigated. People who were not in Mr. Kluge's classes had no personal knowledge of what occurred there. FED. R. EVID. 602. There is no evidence that (1) Mr. Lee fully and accurately relayed these complaints to district administrators or (2) the district rescinded Mr. Kluge's accommodation based on these club-meeting comments, which Principal Daghe, HR Director Gordon, and Superintendent Snapp never even obliquely referenced. Undisputed evidence shows the accommodation worked and did not affect "the overall functioning of the department." [Filing No. 185 at 19 ¶ 41.] Mr. Kluge, a contract teacher who worked with him during the 2017–18 school year, three students in his classes that year, and a student's parent provided sworn statements about how he treated all students the same. *See supra* Disputed Facts ¶ 11. Only one student asked him about the accommodation, and he answered with the coach analogy. [Filing No. 120-3 at 34 (Kluge Dep. at p. 130, line 20 to p. 131, line 7).] There were no disturbances, canceled classes, student protests, or written complaints. [Filing No. 113-2 at 4 ¶ 15.] His classes "perform[ed] very well" that year. [Filing No. 120-3 at 23 (Kluge Dep. at p. 89, lines 16–18).] His orchestras performed "better than ever" in competitions, students excelled on their AP music-theory exams, several students received performance awards, and participation in the orchestras remained high. [Filing Nos. 113-2 at 4 ¶ 15; 120-3 at 23–24 (Kluge Dep. at p. 89, line 15 to p. 90, line 4).]

13. Mr. Kluge disputes the allegations in Sucec's sworn statement. [Filing No. 185 at 16–17 ¶¶ 35–36 (citing Filing No. 22-3).] Mr. Kluge previously identified credibility issues with it [Filing No. 53 at 17–25], including that Sucec admitted to the media and the school board that Mr. Kluge "treat[ed] all of his students the same" by "calling all of us by our last names." [*Id.* at 18–19; *id.* at 25 (citing Filing No. 52-6 at 4 ¶ 14).]

14. Mr. Kluge disputes the district's claim that he treated Sucec different than any other student. [Filing No. 185 at 17 ¶ 36.] Mr. Kluge, a contract teacher who worked

with him during the 2017–18 school year, three students in his classes that year, and a student's parent all provided sworn declarations contradicting this. *See supra* Disputed Facts ¶ 11. Sucec contradicted it too. *See supra* Disputed Facts ¶ 13. Nor is there evidence Superintendent Snapp, Principal Daghe, or HR Director Gordon knew of the details of Sucec's allegations or relied on them in terminating Mr. Kluge.

15. Mr. Kluge disputes that he prompted Sucec's decision to leave the orchestra and the high school. [Filing No. 185 at 17 ¶ 36.] Whatever Sucec may have told family members, there is no evidence that Sucec informed school officials of this decision, that district officials were aware of it before terminating Mr. Kluge, or that they relied on it when doing so. [Filing No. 22-3 at 4 ¶ 14 ("I told my mother….").] Sucec notes that health issues and events after Mr. Kluge's termination—not any acts of Mr. Kluge—prompted the decision to leave the high school. [*Id.* at 4–5 ¶¶ 15–16.]

16. Mr. Kluge disputes that he targeted or mistreated Willis. [Filing No. 185 ¶ 38.] Mr. Kluge, a contract teacher who worked with him during the 2017–18 school year, three students in his classes that year, and a student's parent contradicted this. *See supra* Disputed Facts ¶ 11. Sucec contradicted it too. *See supra* Disputed Facts ¶ 13. Willis also did. [Filing No. 58-1 at 3 ¶ 10 ("During the 2017–2018 school year, Mr. Kluge used last names to refer to the students in my orchestra class.").] Nor is there any evidence Superintendent Snapp, Principal Daghe, or HR Director Gordon knew the details of Willis' allegations or relied on them in terminating Mr. Kluge.

17. Mr. Kluge disputes that Mr. Lee's August 29, 2017, email is evidence Mr. Kluge discriminated. [Filing No. 185 at 18–19 ¶ 40 (quoting Filing No. 120-15).] Mr. Kluge's accommodation was effective then. [Filing No. 148-2 at 9–10 (Daghe Dep. at p. 73, line 1 to p. 75, line 5).] As he was following it, Principal Daghe did not address the issue with him or communicate further with Mr. Lee, the students, or their parents about this issue. [*Id.* at 10 (Daghe Dep. at p. 75, lines 6–15).]

18. Mr. Kluge disputes the district's accounts of his December 2017 and January

2018 meetings with Principal Daghe. [Filing No. 185 at 20–21 ¶¶ 42–44.] The district omits how Principal Daghe repeatedly pressured Mr. Kluge to resign because of the complaints and the tension they created. [Filing Nos. 15-3 at 5; 113-5 at 7–8 (Daghe Dep. at p. 51, line 13 to p. 57, line 14).]

19. Mr. Kluge disputes that *Transgender Questions* was "an FAQ from a recent faculty meeting." [Filing No. 185 at 22 ¶ 46.] It represented the first written district policy on transgender terminology, as prior communiques on the subject were invitations, not commands. [Filing No. 120-10 at 2 ("Feel free to use 'he'….").] The district adopted this policy only after Mr. Kluge objected to these terms, Superintendent Snapp engaged him in a theological debate over whose religious views were correct and issued a comply-resign-or-get-fired ultimatum, before the district acceded to the last-names accommodation. [Filing No. 183 at 10–13, 15–16 ¶¶ 8–11.] *Transgender Questions* states that once a transgender-identifying student changed his name in PowerSchool, the "name/gender in PowerSchool should be used," including the "pronoun associated with the gender … in PowerSchool." [Filing No. 15-4 at 2, 4.] It also states the district could punish teachers for 'calling the student the wrong name/pronoun." [*Id.* at 2.] It announces that Mr. Kluge's accommodation would end as "moving forward it is our expectation that the student will be called by the first name listed in PowerSchool." [*Id.* at 9.] This new policy sparked Mr. Kluge's email.

20. Mr. Kluge disputes the allegations about his February 2018 meeting with Principal Daghe and HR Director Gordon. [Filing No. 185 at 22 ¶ 47.] In this meeting, they told Mr. Kluge that if he did not use transgender terms the next school year, the district would fire him. [Filing No. 113-4 at 43 (Gordon Dep. Ex. 29 at p. 24, lines 5–8).] The only reason given for rescinding the accommodation was that some students were "offended by being called by their last name." [*Id.* at 26 (Gordon Dep. Ex. 29 at p. 7, lines 16–19).] HR Director Gordon said "calling kids by their last name" is "just not what we do." [*Id.* at 27 (Gordon Dep. Ex. 29 at p. 8, lines 18–20).] Principal Daghe

7

was only "willing to accommodate people who follow the policies" and said if using transgender terms is "what the policy is, we will all follow that policy." [*Id.* at 29 (Gordon Dep. Ex. 29 at p. 10, lines 6–8).] There was "no[ ] question of religious accommodation" to them [*id.* at 47 (Gordon Dep. Ex. 29 at p. 28, lines 8–9)], as using last names would be "a policy violation. It's a policy." [*Id.* at 43 (Gordon Dep Ex. 29 at p. 24, line 17).] Also, HR Director Gordon faced a conflict because Mr. Kluge alleged discrimination [*id.* at 25 (Gordon Dep. Ex. 29 at p. 6, lines 7–16)], but she never considered her compliance officer duties triggered, as the district's goal was for Mr. Kluge to resign or "follow the guidelines." [*Id.* at 10, 12 (Gordon Dep. at p. 36, lines 15–22; p. 42, lines 1–20).] She suggested Mr. Kluge could submit a conditional resignation. [*Id.* at 36–37 (Gordon Dep. Ex. 29 at p. 17, line 6 to p. 18, line 8).] But she never told him that she and Superintendent Snapp were both administrators, so submitting his resignation to her was the same as submitting it to Superintendent Snapp. [*Id.* at 11 (Gordon Dep. at p. 40, line 16 to p. 41, line 3).]

21. Mr. Kluge disputes the district's reliance on his response to HR Director Gordon's understanding of Title VII's requirements. [Filing No. 185 at 22 ¶ 47.] An employee's understanding of the law—particularly one formed before *Groff*—does not change the district's legal obligations. Plus, HR Director Gordon wrongly implied that Title VII requires employers to adopt only accommodations they deem reasonable. [Filing No. 113-4 at 27 (Gordon Dep. Ex. 29 at p. 8, lines 9–20).] Instead, a "reasonable accommodation is "one that 'eliminates the conflict between employment requirements and religious practices.'" *Rodriguez v. City of Chi.*, 156 F.3d 771, 775 (7th Cir. 1998) (quoting *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 70 (1986)).

22. Mr. Kluge disputes the district's account of why he used the names listed in PowerSchool at the awards ceremony. [Filing No. 185 at 23–24 ¶¶ 49–52.] He testified his reasons were: (1) his accommodation entitled him to use students' last names like a coach, but he did not think a coach would "address students in such an informal

8

manner at such a formal event" (unlike teachers in class), and he wanted to make "a good faith effort to work within the bounds of his accommodation"; and (2) he did not believe briefly using these terms promoted transgenderism, which his religious beliefs prohibit, unlike "regularly … using transgender names" in the classroom. [Filing No. 120-3 at 33–34 (Kluge Dep. at p. 126, line 7 to p. 128 line 17; p. 129, line 13 to p. 130, line 9).] While the district impugns the coach analogy [Filing No. 185 at 24 ¶ 52], HR Director Gordon, Principal Daghe, and Superintendent Snapp understood and accepted it. [Filing Nos. 120-3 at 17 (Kluge Dep. at p. 64, line 8 to p. 65, line 7); 148-1 at 5 (Snapp Dep. at p. 24, line 23 to p. 25, line 19).] No matter how the district's coaches speak, everyone knew Mr. Kluge referred to coaches' stereotypical behavior. Nor has the district provided any evidence that it has ever reprimanded or punished coaches, teachers, or other staff who refer to students by last names for other reasons.

## MR. KLUGE'S RESPONSE TO
## THE DISTRICT'S STATEMENT OF MATERIAL FACTS IN DISPUTE

1.  The district disputes that Mr. Kluge drafted a letter in response to Mr. Lee's and Ms. Mehrtens' remarks. [Filing No. 185 at 25.] The district does not dispute that they spoke at faculty meetings about transgenderism in the spring of 2017 or to Mr. Kluge's summary of them. [Filing No. 113-1 at 19.] Mr. Kluge's letter references these faculty meetings, his "alarm[ ]" at their content, and their "very clear" message. [*Id*.]

2.  The district disputes that Mr. Kluge's accommodation worked, citing only complaints. [Filing No. 185 at 26.] These complaints cannot constitute an undue hardship after *Groff*, and they suffer from various evidentiary and credibility flaws. *See supra* Disputed Facts ¶¶ 10–17. The undisputed evidence shows that Mr. Kluge treated all students the same (as even Sucec and Willis admit), that his classes experienced no disruptions while his accommodation was in effect, and his students and orchestras excelled during that time. *See supra* Disputed Facts ¶¶ 11–16.

3.  The district impugns (but does not dispute) Mr. Kluge's coach analogy. [Filing

No. 185 at 26.] When he used it, district officials accepted it. *See supra* Disputed Facts ¶ 22. There is no evidence he "call[ed] certain players harmful names." [Filing No. 185 at 26.] He called all students by their last names, as many (even Sucec and Willis) confirmed. *See supra* Disputed Facts ¶¶ 11–16. Using last names is not harmful, as the district provides no evidence it punishes staff who use them for other reasons. Nor is there any evidence district officials knew of Sucec's alleged dread of orchestra or relied on it when terminating Mr. Kluge. *See supra* Disputed Facts ¶ 15.

4.   The district disputes that Mr. Kluge was "neutral" by referring to all students by last names. [Filing No. 185 at 13 ¶ 26.] Yet, Sucec and Willis, whom the district cites, admitted this, as did other students, teachers, and parents. *See supra* Disputed Facts ¶¶ 11–16. As Mr. Kluge explained, by "neutral," he meant he was "not pushing [his] religion on people and … not encouraging the sinful behavior." [Filing No. 120-3 at 24 (Kluge Dep. at p. 92, lines 8–16).] He said nothing about transgenderism and focused on teaching. [*Id.* at 8 (Kluge Dep. at p. 8, lines 1–10).] There is no evidence he deviated from his accommodation, let alone "regularly." Nor is the awards ceremony a "deviation," as (1) the accommodation said he "may" (not must) use students' last names [Filing No. 15-1 at 1]; and (2) his speech there did not do what he believes is sinful (*i.e.*, "promoting and encouraging transgenderism"). [Filing No. 120-3 at 33–34 (Kluge Dep. at p. 128, line 6 to p. 130, line 9).] *See supra* Disputed Facts ¶ 22.

5.   The district disputes Mr. Kluge's description of the few complaints as grumblings and a heckler's veto. [Filing No. 185 at 27.] Yet "grumble" means "to … complain sullenly." *Grumble*, DICTIONARY.COM, https://bit.ly/47z764p. Its synonym is "complain." *Grumble*, MERRIAM WEBSTER, https://bit.ly/3tNPaFn. A heckler's veto occurs when government officials use listener complaints (or worse) to silence a speaker. *E.g.*, *Ovadal v. City of Madison*, 416 F.3d 531, 537 (7th Cir. 2005); *Hedges v. Wauconda Cmty. Unit Sch. Dist. No. 118*, 9 F.3d 1295, 1299 (7th Cir. 1993). The district admits Principal Daghe "cited the student and faculty complaints about the …

10

accommodation as the reason" for asking Mr. Kluge to resign. [Filing No. 185 at 21 ¶ 45.] HR Director Gordon mentioned them again in February 2018 when she and Principal Daghe gave Mr. Kluge the comply-resign-or-get-fired ultimatum. [Filing No. 113-4 at 26 (Gordon Dep. Ex. 29 at p. 7, lines 16–19).] So the descriptors are apt.

6. The district disputes Mr. Kluge's reference to the complaints, claiming he ignores evidence of harm to students, a disrupted learning environment, and interference with the district's mission. [Filing No. 185 at 27.] The district presented no such evidence, citing only the few complaints, which do not represent an undue hardship after *Groff*. The latest research indicates the district's policies harm students, not Mr. Kluge's accommodation. *See infra* Argument I.B.3. The undisputed evidence is that Mr. Kluge's classes experienced no disruption and that his students and his orchestras excelled while his accommodation was in effect. *See supra* Disputed Facts ¶ 12.

7. The district disputes Mr. Kluge's quote from Mr. Lee's email [Filing No. 185 at 27], where Mr. Lee admits he is "very biased." [Filing No. 120-15 at 2.] Biased observers are more likely to convey facts inaccurately or exaggerate them to favor their bias.

8. The district disputes that "Principal Daghe saw the 'persecution and unfair treatment' of Mr. Kluge as a reason for him to resign[.]" [Filing No. 185 at 27–28.] This summarizes Mr. Kluge's undisputed testimony as to what Principal Daghe said in December 2017. The district points to what the principal said two months later, after it unveiled *Transgender Questions* and said it would rescind the accommodation. The district provided no evidence beyond complaints and officials' opinions that the accommodation (where Mr. Kluge said nothing about transgenderism) "harmed" students. The latest science contradicts those opinions. *See infra* Argument I.B.3.

9. The district disputes Mr. Kluge's quotation of Dr. Jessup's affidavit. [Filing No. 185 at 28.] The quote summarizes the district's reasons for requiring "[s]taff … to use the name in PowerSchool," even transgender ones. [Filing No. 120-1 at 2 ¶¶ 7–8.] *Transgender Questions* mandated teachers use "the name/gender in PowerSchool,"

including "the pronoun associated with [that] gender." [Filing 15-4 at 2, 4, 6, 9.] And it gave the reason, condemning teachers like Mr. Kluge as "not being accepting." [*Id.* at 10.] So Dr. Jessup summarizes the objectives and effects of *Transgender Questions*.

10. The district disputes that it "left no rule for Title VII religious accommodations." [Filing No. 185 at 28.] *Transgender Questions* requires teachers to follow district policies without exception: "[W]hen you work in a public school you sign up to follow the law and the policies/practices of that organization[.]" [Filing No. 15-4 at 10.] The "might" refers to how teachers' "biases and beliefs" might differ from the policies. Plus, *Transgender Questions* says Mr. Kluge's accommodation would end: "We have agreed to [last names only] for the 2017–2018 school year, but moving forward it is our expectation the student will be called by the first name in PowerSchool." [*Id.* at 9.] It declares teachers cannot refuse to use a student's transgender name once listed in PowerSchool. [*Id.*] Principal Daghe said he would only "accommodate people who follow the policies." [Filing No. 113-4 at 29 (Gordon Dep. Ex. 29 at p. 10, lines 6–8).] To HR Director Gordon, there was "no[ ] question of religious accommodation." [*Id.* at 47 (Gordon Dep. Ex. 29 at p. 28, lines 8–9).]

11. The district disputes that the only reason given for rescinding Mr. Kluge's accommodation was that students were offended and that the district never mentioned undue hardship, increased cost, or disruption to the learning environment as its reasons. [Filing No. 185 at 29.] The February 2018 meeting's transcript bears this out. HR Director Gordon justified rescinding the accommodation, saying: "[S]tudents … [a]re offended by being called by their last name." [Filing No. 113-4 at 26 (Gordon Dep. Ex. 29 at p. 7, lines 16–19).] Neither official mentioned undue hardship, increased cost, or a disrupted learning environment. The district's only evidence for these interests is the few complaints that do not show undue hardship after *Groff*.

12. The district disputes that HR Director Gordon had to investigate Mr. Kluge's religious discrimination claims. [Filing No. 185 at 29.] Nothing in its policy even

suggests she could ignore them. Instead, it details how she could receive claims directly, could conduct an informal process only at Mr. Kluge's request (which he never made), and had to "contact [him] within two (2) business days to advise him[ ] of the [district's] intent to investigate." [Filing No. 113-4 at 14–15.]

13. The district objects to Mr. Kluge describing his resignation as conditional, claiming the only condition was the date. [Filing No. 185 at 29–31.] HR Director Gordon suggested Mr. Kluge could submit a conditional resignation. [Filing No. 113-4 at 36–37 (Gordon Dep. Ex. 29 at p. 17, line 6 to p. 18, line 8).] She never told him that she and Superintendent Snapp were both administrators, so submitting his resignation to her was the same as submitting it to him. *See supra* Disputed Facts ¶ 20. Mr. Kluge believed he could rescind a letter submitted under the duress of trying to preserve his summer pay because he asked her "not [to] process this letter … before May 29." [Filing No. 120-17 at 2.] When she agreed [*id.*], he believed he could rescind it because he tried to meet with district officials and gave her a letter to this effect. [Filing No. 15-3 at 1, 7.] All of this stemmed from their February and March demands that, by May 1, he either comply, resign, or face termination. [Filing Nos. 113-4 at 45 (Gordon Dep. Ex. 29 at p. 26, lines 1–14); 15-3 at 6.] So "forced resignation" is an apt description. *Kluge I*, 548 F. Supp. 3d at 841 ("Mr. Kluge's forced resignation").

### ARGUMENT

The district, far from advancing its case, confirms Mr. Kluge deserves summary judgment. For it rescinded his accommodation solely due to a few complaints that do not qualify as undue hardship or a legitimate reason for adverse action.

**I.    Mr. Kluge is entitled to summary judgment on his religious discrimination claim (and the district is not) because the district revoked a reasonable accommodation without showing undue hardship.**

**A. Mr. Kluge established a *prima facie* case of discrimination.**

**1.  The district largely concedes Mr. Kluge's *prima facie* case.**

For its motion, the district concedes Mr. Kluge established his *prima facie* case.

[Filing No. 185 at 34.] So for this motion, this Court must conclude (1) that Mr. Kluge's objections to using transgender terminology are "religious in nature," (2) that his beliefs are sincere, (3) that they conflicted with an employment requirement, and (4) that his objections caused his termination. *Kluge II*, 64 F.4th at 883.

For Mr. Kluge's motion, the district challenges only his sincerity. [Filing No. 185 at 51–54.] Thus, it concedes the other three elements.

### 2. No reasonable factfinder could doubt Mr. Kluge's sincerity.

#### a. The district wrongly attempts to hijack the sincerity analysis to second-guess the contours of Mr. Kluge's beliefs.

Though the district styles its critique of Mr. Kluge as questioning his sincerity [*id.*], it really seeks to second-guess his beliefs and hold him to how it thinks someone with his beliefs should act. But as it is beyond "the judicial function and judicial competence to inquire whether petitioner or *his fellow worker* more correctly perceived the commands of *their common faith*," then district officials, who do not share Mr. Kluge's convictions, cannot dictate what a sincere believer would do. *Thomas v. Review Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 716 (1981) (emphasis added).

The sincerity analysis looks "to weed out sham claims." *Korte v. Sebelius*, 735 F.3d 654, 683 (7th Cir. 2013). It asks "whether [Mr. Kluge] is (in essence) seeking to perpetrate a fraud on the court—whether he actually holds the beliefs he claims to hold." *Yellowbear v. Lampert*, 741 F.3d 48, 54 (10th Cir. 2014); *Davila v. Gladden*, 777 F.3d 1198, 1204 (11th Cir. 2015) (same); *Gillette v. United States*, 401 U.S. 437, 457 (1971) (letting courts assess if a belief is "truly held").[1] It "can bear only so much adjudicative weight." *Gillette*, 401 U.S. at 457. So the Seventh Circuit "tread[s] lightly" in this "sensitive area," "does not require a deep analysis of [Mr. Kluge's]

---

[1]   *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 293 (5th Cir. 2001) (noting sincerity "separate[s] sincere beliefs from fraudulent beliefs"); *Patrick v. LeFevre,* 745 F.2d 153, 157 (2d Cir. 1984) ("Sincerity analysis … provides a rational means of differentiating between those beliefs that are held as a matter of conscience and those that are animated by motives of deception and fraud.").

conscious and/or subconscious reasons or motives for holding his beliefs," and gives "great weight" to his explanation of his beliefs. *Adeyeye*, 721 F.3d at 448, 452–53.

The district presented no evidence Mr. Kluge is "perpetrat[ing] a fraud on the court" by saying he believes things he really does not. *Yellowbear*, 741 F.3d at 54. Nor did it point to anything suggesting he had another, non-religious motive for objecting to the mandated transgender terminology. Nor does it dispute his devout faith, his consistent objection to using these terms, or his resolve in sticking to and defending his beliefs despite real pressure. [Filing No. 183 at 21.] *Kluge I*, 548 F. Supp. 3d at 832 n.5 ("[I]t is undisputed that BCSC was aware of [his] religion-based objections[.]").

Just being "willing to risk [one's] job" to follow one's beliefs shows sincerity. *Adeyeye*, 721 F.3d at 454. Mr. Kluge, who faced multiple comply-resign-or-get-fired ultimatums, went further. He remained faithful to his religious beliefs even when doing so cost him his teaching career. That more than amply demonstrates sincerity.

### b. The district misrepresents the teachings of Mr. Kluge's presbytery, teachings Mr. Kluge modeled.

To sidestep this precedent and evidence, the district points to a few lines from the *Book of Church Order* of Mr. Kluge's presbytery. [Filing No. 185 at 52–53.] Yet the presbytery does not endorse a person's declared transgender identity. So it does not let transgender-identifying people use the restroom of their choice, directing them instead to a "single-stall" restroom only until "pastoral counseling" can occur. [Filing No. 120-4 at 12.] Nor does it condone the use of transgender terms. [*Id.* at 8–16.]

These beliefs parallel Mr. Kluge's. Just as the presbytery does not instantly insist that transgender-identifying people use restrooms matching their biology, Mr. Kluge does not insist on using students' birth names or biological pronouns. Just as the presbytery does not endorse a person's declared transgender identity by letting him use any restroom, Mr. Kluge does not promote transgenderism by using its terms. If anything, Mr. Kluge is more accommodating as he feels no duty to counsel

students on transgenderism. [Filing No. 120-3 at 8 (Kluge Dep. p. 29, lines 1–10).]

Not only is there no tension between Mr. Kluge's beliefs and his presbytery's, but friction cannot show he is insincere (*i.e.*, trying to "perpetrate a fraud on the court"). *Yellowbear*, 741 F.3d at 54. It would just show he and his presbytery differ on a few points, something true of countless sincere religious people (*e.g.*, pro-abortion Catholics). Any reasonable juror would see that the parallels between Mr. Kluge's beliefs and those of his presbytery confirm his career-sacrificing sincerity.

### c. Mr. Kluge consistently lived out his religious beliefs.

The district primarily alleges hypocrisy: that Mr. Kluge "thought that addressing students by their 'transgender names' promoted a transgender lifestyle and was therefore sinful," but that he still used them during the awards ceremony. [Filing No. 185 at 51.] Here, the district tilts at its own strawman, not Mr. Kluge's sincerity.

Mr. Kluge repeatedly explained how the Bible prohibits him from "promoting and encouraging transgenderism." [Filing No. 120-3 at 33 (Kluge Dep. at p. 128, lines 11–13); *accord id.* at 7 (Kluge Dep. at p. 22, lines 7–9); Filing No. 113-1 at 21–23.] He believes using transgender terms while "teaching a class … encourages gender dysphoria." [*Id.* at 8–9 (Kluge Dep. at p. 29, line 20 to p. 30, line 3.] When asked if he "promot[ed] a transgender lifestyle" at the awards ceremony by using transgender names, he replied: "I don't believe I was as this wasn't my habit[.]" [*Id.* at 33–34 (Kluge Dep. at p. 129, line 13 to p. 130, line 9).] Those are his beliefs. Only by distorting them can the district create a mirage of inconsistency. But this the law forbids. *Thomas*, 450 U.S. at 715 ("Thomas drew a line, and it is not for us to say that the line he drew was an unreasonable one.").

The district claims Mr. Kluge violated his "do no harm" belief by using students' last names. [Filing No. 185 at 51–52.] But he does not believe this inflicts harm. [Filing No. 113-4 at 28 (Gordon Dep. Ex. 29 at p. 9, line 12) ("I don't think [the accommodation is] detrimental to [students.]").] So this shows no insincerity.

16

The district claims Mr. Kluge admitted "there are instances where it is appropriate and consistent with his religious beliefs" to use transgender terms. [Filing No. 185 at 52.] He did not. [Filing No. 120-3 at 8 (Kluge Dep. at p. 29, line 24) ("There might be. None come to mind right now.").] Nor does this call his sincerity into question. *Gillette*, 401 U.S. at 448 ("Unwillingness to deny the possibility of a change of mind, in some hypothetical future circumstances, may be no more than humble good sense, casting no doubt on the claimant's present sincerity of belief.").

No reasonable factfinder could question Mr. Kluge's sincerity. His devout faith and clear convictions surpass Seventh Circuit standards. *EEOC v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1575 (7th Cir. 1997) (finding sincerity despite plaintiff admitting she was "not a particularly religious person"). As he was "willing to risk [his] job," and to lose it, to live out his beliefs, he proved his sincerity. *Adeyeye*, 721 F.3d at 454.

## B. The district withdrew the reasonable accommodation it extended to Mr. Kluge without the undue hardship Title VII requires.

As Mr. Kluge established his *prima facie* case, the district must prove that accommodating him would cause undue hardship. *Adeyeye*, 721 F.3d at 455. [Filing Nos. 185 at 34; 183 at 24.] As it failed to do so, he is entitled to summary judgment.

### 1. The district cannot show any increased costs that are substantial in the overall context of its business.

The district begins its undue hardship analysis by mischaracterizing *Groff*, and then it fails to provide any evidence Mr. Kluge's accommodation imposed the substantial overall costs or expenditures *Groff* requires. [Filing No. 185 at 34–37.]

The district claims *Groff* "characterized *Hardison's* reference to '*de minimis*' as 'fleeting,' … emphasizing instead that the opinion 'referred repeatedly to "substantial" burdens.'" [Filing No. 185 at 35 (quoting *Groff*, 600 U.S. at 465, 468).] But "substantial burdens" was just a shorthand for what *Hardison* referenced "three times": "substantial costs or expenditures." *Groff*, 600 U.S. at 464 (cleaned up). Not just any burden, even a substantial one, suffices. It must impose substantial costs or expend-

itures. *Id.* at 470 ("[W]e are pointed toward something closer to *Hardison's* references to 'substantial additional costs' or 'substantial expenditures.'" (cleaned up)). Thus, "an employer must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business," *id.* at 470, meaning "substantial in the overall context of the employer's business," *id.* at 468. Yet the district is not relying on administrative costs. [Filing No. 182-1 at 2.]

To the district, *Groff* "intended to 'clarify'—not significantly overturn or re-vise—the relevant body of law related to undue hardship." [Filing No. 185 at 35–36.] Not so. *Groff* clarified "undue hardship" by jettisoning the "*de minimis* burden" stand-ard utilized in most rulings, including one on which this Court relied. *Groff*, 600 U.S. at 466–68 & n.12 (discussing rulings and abrogating *Walmart*, 992 F.3d 656). The sentence from *Groff* the district quotes refers not to "the relevant body of law" but to "the EEOC's guidance." *Id.* at 471. And *Groff* refused to "ratify *in toto* a body of EEOC interpretation that has not had the benefit of the clarification we adopt today." *Id.*

Ultimately, the district must prove Mr. Kluge's accommodation "result[ed] in substantial increased costs in relation to the conduct of its particular business." *Id.* at 470. They must be "substantial in the overall context of [its] business" (including its "nature, size[,] and operating cost"). *Id.* at 468, 470–71. The district failed. Its argument refers to "costs" 11 times [File No. 185 at 35–40, 44], but its only evidence for them is complaints. [*E.g.*, *id.* at 44.] Courts cannot "equate[ ] undue hardship on business with an impact—no matter how small—on coworkers," parents, or students. *Groff v. DeJoy*, 35 F.4th 162, 177 (3d Cir. 2022) (Hardiman, J., dissenting), *approved by Groff*, 600 U.S. at 472. Nowhere does the district identify any concrete global costs (let alone substantial ones) for letting Mr. Kluge use last names for all students.

The district admits only Mr. Kluge got this accommodation. [Filing No. 185 at 15 ¶ 32 (noting parents complained about "a teacher"); *id.* at 17 ¶ 35 (noting "all of [Sucec's] teachers except Kluge" used transgender terms); *id.* at 18 ¶ 39 (noting Mr.

18

Kluge "was the only teacher ... permitted to use last names only"); *id.* at 19 ¶ 40 ("Kluge was the only teacher who had received such an accommodation").] So one teacher out of 160 declined to use transgender terms.[2] He merely used last names, just like staff working on the district's musicals. [Filing No. 185 at 24 ¶ 52.] Even if a few people did not like this, his silence imposed no costs on the district overall.

In short, the district must prove Mr. Kluge's accommodation caused "substantial increased costs" "in the overall context of [its] business." *Groff*, 600 U.S. at 468, 470. It failed to identify any. So Mr. Kluge should receive summary judgment.

### 2. A few third-party grumblings do not create undue hardship.

When proving undue hardship, any interests based on a few complaints of offense, discomfort, awkwardness, or emotional harm are "off the table." *Id.* at 472. This includes (1) "a coworker's[, parent's, or student's] dislike of religious practice and expression in the workplace or the mere fact of an accommodation"; (2) "animosity to a particular religion, to religion in general, or to the very notion of accommodating religious practice"; (3) "bias or hostility to a religious practice or a religious accommodation"; and (4) "simple aversion to, or discomfort in dealing with" religious people. *Id.* at 472–73 (cleaned up). Yet this is all the district offers.

### a. No amount of relabeling changes the fact that the district rescinded Mr. Kluge's accommodation due to complaints.

The district says Mr. Kluge's accommodation harmed students, disrupted the learning environment, and interfered with its educational mission. [Filing No. 185 at 31, 37–38.] Yet its only evidence is the complaints from a few students, parents, and teachers. [*Id.* at 37–38 (citing *id.* at 15–20 ¶¶ 32–41).] Indeed, "complain" and its variants appear in its brief 66 times. It reminds this Court that "'the evidence is undisputed that [it] and [its] administrators were acting because of complaints received from the school community.'" [*Id.* at 49 (quoting *Kluge I*, 548 F. Supp. 3d at 848).]

---

[2]   *Brownsburg High School*, PUB. SCH. REV., https://bit.ly/3FNz54F; *Brownsburg High School*, U.S. NEWS & WORLD REPS., https://bit.ly/49gzs5r (164 teachers).

Yet these complaints are precisely what *Groff* rules "off the table." *Groff*, 600 U.S. at 472. The parental complaints both came before they changed their children's names in PowerSchool—when no district policy or practice even applied. [Filing Nos. 120-12 at 2; 120-13 at 2.] The second dubs Mr. Kluge's approach "disrespectful and hurtful" [Filing No. 120-13 at 2], which just shows this parent disliked, was biased against, or was hostile to his practice or the accommodation. *Groff*, 600 U.S. at 472.

A few teachers and students objected to Mr. Kluge using last names for all students. Even if they "felt hurt," "upset," "awkward," or "uncomfortable" [Filing No. 185 at 16–19 ¶¶ 34, 36, 38, 41], this just shows they disliked his religious practice, were uncomfortable dealing with him, and resented the way the district accommodated him. None of this shows undue hardship. *Groff*, 600 U.S. at 472–73.

The district faults Mr. Kluge for "mak[ing] no effort to refute this evidence or the Court's reasoning." [Filing No. 185 at 37.] But he highlighted factual flaws in these complaints. *See supra* Disputed Facts ¶¶ 10–17. The latest scientific research confirms his belief that promoting transgenderism harms students. *See infra* Argument I.B.3. Most importantly, *Groff* requires that this Court's reasoning change, as the complaints the district cites simply do not suffice. *Groff*, 600 U.S. at 472–73.

The district says these complaints show Mr. Kluge's accommodation "disrupted the learning environment." [Filing No. 185 at 37–38.] Not so. The undisputed evidence is that his classes experienced no disruptions and that his students and orchestras excelled. *See supra* Disputed Facts ¶¶ 11–16. [*Accord* Filing No. 183 at 7, 16 ¶¶ 12–14.] Every teacher has a few unhappy students. Yet learning continues.

Next, the district focuses on *Groff's* use of the "future tense" and in the process reiterates that complaints drove it to rescind Mr. Kluge's accommodation. [Filing No. 185 at 39 ("[I]t is undisputed that Brownsburg tried the … accommodation … [until] complaints mounted[.]").] The district did not try "to work with" Mr. Kluge; it first almost fired him and later pressured him to resign. *See supra* Disputed Facts ¶¶ 18–

19. So *Draper v. U.S. Pipe & Foundry Co.*, 527 F.2d 515 (6th Cir. 1975)—the case the district cites [Filing No. 185 at 40]—offers it no support. For district officials did not try "various methods of accommodation." *Draper*, 527 F.2d at 520. They acceded to Mr. Kluge's accommodation only until complaints arose, and then they pressured him to resign, rescinded the accommodation in *Transgender Questions*, and announced they would only "accommodate people who follow the policies." [Filing No. 183 at 8–12.] Also, *Draper* holds: "The objections and complaints of fellow employees, in and of themselves, do not constitute undue hardship…. If employees are disgruntled because an employer accommodates its work rules to the religious needs of one employee, … such grumbling must yield to the single employee's right to practice his religion." *Draper*, 527 F.2d at 520 (quotation omitted). *Groff* says the same.

Later, the district notes it retained the uniform accommodation. [Filing No. 185 at 43, 49.] So it keeps accommodations that spark no complaints. *Groff* rejects this approach because if "bias or hostility to a religious practice or a religious accommodation provided a defense to a reasonable accommodation claim, Title VII would be at war with itself." *Groff*, 600 U.S. at 472. Title VII does not protect only popular beliefs. *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 775 (1976) ("If relief under Title VII can be denied merely because the majority … will be unhappy about it, there will be little hope of correcting the wrongs to which the Act is directed.") (cleaned up).

The district claims Mr. Kluge must prove that it or those who complained objected to his religious rationale. [Filing No. 185 at 43.] *Groff*, including the sentence the district quotes, contradicts this. For "a coworker's dislike of religious practice … or the mere fact of an accommodation is not cognizable to factor into the undue hardship inquiry." *Groff*, 600 U.S. at 472 (cleaned up). The complaints targeted Mr. Kluge's religious practice (*i.e.*, using last names) and the district's accommodation of it.

But there is also evidence that those who complained knew the motive behind Mr. Kluge's religious practice. After all, Willis' mother emailed Mr. Kluge because

she "anticipated that [he] might have difficulty with the change." [Filing No. 185 at 17–18 ¶ 37; *accord* Filing No. 58-1 at 2 ¶ 7.] And as the district claims students divined Mr. Kluge's motives for using last names (despite him treating all students the same and using the coach analogy) [Filing No. 185 at 16–19 ¶¶ 34, 36, 38, 41], it is unreasonable to think they were unaware of his Christian convictions.

In short, no matter how the district tries to relabel its interests, they all rest on the foundation of grumblings from parents, teachers, and students. And under *Groff*, all of this is now definitively "off the table." *Groff*, 600 U.S. at 472.

### b. A few third-party grumblings do not create an undue burden for the district as a whole.

The district admits only a few students, parents, and teachers complained because it argues numbers don't matter. [Filing No. 185 at 38.] Under *Groff*, they do. For to be an undue hardship, any increased costs must be "substantial in the overall context of [the district's] business," including its "nature, size[,] and operating cost." *Groff*, 600 U.S. at 468, 470–71. Brownsburg High School has over 3,000 students and 160 teachers.[3] A few complaints about one teacher does not rise to this level, especially when the district cannot identify any concrete costs from the accommodation.

### c. A few grumblings from those with an illegitimate expectation of universal affirmation do not create undue hardship.

The district says Mr. Kluge harmed students, citing the few complaints. [*E.g.*, Filing No. 185 at 26–27, 29, 33, 37, 39, 43.] It says "students felt hurt" when he avoided their "preferred first names." [*Id.* at 16 ¶ 34; *id.* at 17 ¶ 35 ("correct name and pronouns"); *id.* at 18 ¶ 38 ("corrected name").] It wanted transgender-identifying students to receive "'official' affirmation of their preferred identity." [*Id.* at 11 ¶ 21.]

All of this presumes students can demand that teachers signal agreement with their beliefs. That's wrong. *Zamecnik v. Indian Prairie Sch. Dist. No. 204*, 636 F.3d 874, 876 (7th Cir. 2011) ("[P]eople in our society do not have a legal right to prevent

---

3    *See supra* note 2.

criticism of their beliefs or even their way of life."). Mr. Kluge was not trying to cri-tique students' beliefs; he simply declined to endorse them through his own words.

Rather than disputing this principle, the district pretends—with no legal sup-port—First Amendment cases do not apply. [Filing No. 185 at 44–45.] Yet the district often cites "its particular business." [*Id.* at 35–36, 39 (quoting *Groff*, 600 U.S. at 470).] As a public school, it is subject to the First Amendment. It also invokes Title IX. [*Id.* at 40–42.] If Title IX is relevant, why isn't the First Amendment? If the First Amend-ment invalidates an endorsement-based interest, then Mr. Kluge's accommodation imposes no hardship, let alone an undue one. 42 U.S.C. § 2000e(j). Plus, courts "have often looked to Title VII law for help in delineating plaintiffs' rights under" the First Amendment. *Genas v. N.Y. Dep't of Corr. Servs.*, 75 F.3d 825, 832 (2d Cir. 1996); *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 571 n.5 (2022) (Sotomayor, J., dissenting) (explaining "[t]he notion that integration of religious practice into the workplace may require compromise and accommodation is not unique to" either public employers or the Establishment Clause and briefly conducting a Title VII analysis). So it makes sense to consider First Amendment principles in defining Title VII's boundaries.

### 3. It is the district's policy that poses the real harm to students.

The district oft invokes its interest in avoiding student harm. [Filing No. 185 at 26–27, 29, 33, 37, 39–40, 43.] Mr. Kluge shares this desire, though he believes "encouraging gender dysphoria is harmful to the individual." [Filing No. 113-1 at 21.] Recent research shows his accommodation poses no danger the district's interest.

The scientific evidence shows gender dysphoria generally subsides in time if allowed to do so. Over 80% (and as high as nearly 88%[4]) of minors experiencing gen-der confusion desist (*i.e.*, naturally align their minds with their biological sex) if left to themselves.[5] But those pushed further into gender confusion by trusted adults

---

[4]   Devita Singh, *et al.*, *A Follow-Up Study of Boys With Gender Identity Disorder*, FRONTIERS IN PSYCHIATRY (Mar. 29, 2021), https://bit.ly/3Fr55vy.
[5]   AM. PSYCHOL. ASS'N, APA HANDBOOK ON SEXUALITY AND PSYCHOLOGY (2014), W.

continue down that path. One study of adolescent boys with gender dysphoria found that "98% elected to start cross-sex hormones" after six months on puberty blockers.[6] Other studies have consistently confirmed this detrimental result.[7]

The medical treatments for gender dysphoria (social transition, puberty blockers, cross-sex hormones) have not been proven effective but pose grave risks. No reliable evidence suggests that drug intervention supporting gender transition reduces suicide risk. The World Professional Association for Transgender Health (WPATH)'s own review shows no link between the use of cross-sex hormones and decreased suicide rates in gender-dysphoric individuals.[8] Multiple studies have found high suicide rates before, during, and after attempted gender transition.[9] A recent study found that rates of suicidal ideation, suicide attempts, and non-suicidal self-harm *increased* after minors began using puberty blockers and cross-sex hormones.[10]

BOCKTING, TRANSGENDER IDENTITY DEVELOPMENT at 744; James M. Cantor, *Do Trans Kids Stay Trans When They Grow Up?*, SEXOLOGY TODAY! (Jan. 11, 2016), https://bit.ly/3FoWtp1; Thomas D. Steensma, *et al.*, *Factors Associated With Desistence and Persistence of Childhood Gender Dysphoria: A Quantitative Follow-Up Study*, 52 J. OF AM. ACAD. OF CHILD & ADOLESCENT PSYCH. 6 (June 2013), https://bit.ly/3FoXkpJ.
[6]   Polly Carmichael, *et al.*, *Short-Term Outcomes of Pubertal Suppression in a Selected Cohort of 12 to 15 Year Old Young People with Persistent Gender Dysphoria in the UK*, 16:2 PLOS ONE 1 (Feb. 2, 2021), https://bit.ly/3FrBXnQ.
[7]   C.M. Wiepjes, *et al.*, *The Amsterdam Cohort of Gender Dysphoria Study (1972–2015): Trends in Prevalence, Treatment, and Regrets*, 15 J. SEX. MED. 582 (Apr. 2018); T. Brik, *et al.*, *Trajectories of Adolescents Treated with Gonadotropin Releasing Hormone Analogues for Gender Dysphoria*, 49 ARCH. SEX BEHAV. 7, doi:10.1007/ s10508-020-01660-8, https://bit.ly/3OhdXsp; L.E. Kuper, *et al.*, *Body Dissatisfaction and Mental Health Outcomes of Youth on Gender-Affirming Hormone Therapy*, PEDIATRICS (2020), https://bit.ly/4b5XlxD; Carmichael, *et al.*, *supra* note 6.
[8]   Kellan E. Baker, *et al.*, *Hormone Therapy, Mental Health, & Quality of Life Among Transgender People: A Systematic Review*, 5:4 J. ENDOCRINE SOC'Y 1, 12 (2021), https://bit.ly/42dOINf.
[9]   C.M. Wiepjes, *et al.*, *Trends in Suicide Death Risk in Transgender People: Results from the Amsterdam Cohort of Gender Dysphoria Study (1972–2017)*, 141 ACTA PSYCHIATRICA SCANDINAVICA 486, 490 (2020); Jay McNeil, *et al.*, *Suicide in Trans Populations: A Systematic Review of Prevalence and Correlates*, 4:3 PSYCH. OF SEXUAL ORIENTATION & GENDER DIVERSITY 341, 348 (2017); Cecilia Dhejne, *et al.*, *Long-Term Follow-Up of Transsexual Persons Undergoing Sex Reassignment Surgery: Cohort Study in Sweden*, 6:2 PLOS ONE 1, 5 (2011).
[10]   Laura E. Kuper, *et al.*, *Body Dissatisfaction & Mental Health Outcomes of Youth on Gender-Affirming Hormone Therapy*, 145:4 PEDIATRICS 1, 8 (2020).

Likewise, no reliable evidence shows that drug intervention improves psychosocial outcomes. Studies showing puberty blockers' and cross-sex hormones' effects on mental health outcomes trigger "very low certainty" and suggest little or no change.[11] Indeed, many studies report *no* mental health improvement after such intervention.[12]

These drug interventions also pose grave risks to children and teens, including:

- Impaired cognitive development, "prevent[ing] key aspects of development during a sensitive period of brain organization";[13]

- Infertility risk, as the Endocrine Society admits;[14]

- Reduced bone density, as children who undergo puberty suppression never experience the full bone density increase associated with puberty, and evidence suggests they never catch up;[15]

- Cardiovascular decline, as the Endocrine Society admits[16] and the National Institute for Health and Care Exellence's (NICE) systematic review confirms;[17] and

- Limited sexual function, with WPATH's president reporting "about zero" natal males can achieve orgasm after undergoing early puberty suppression followed by cross-sex hormones and vaginoplasty.[18]

Plus, the long-term safety of "treatments in children and adolescents with

---

[11]  *Evidence Review: Gonadotrophin Releasing Hormone Analogues for Children & Adolescents with Gender Dysphoria*, NICE (2020) (NICE I), at 13; *Evidence Review: Gender-Affirming Hormones for Children & Adolescents with Gender Dysphoria*, NICE (2020) (NICE II), at 50.

[12]  Riittakerttu Kaltiala, *et al.*, *Adolescent Development and Psychosocial Functioning after Starting Cross-Sex Hormones for Gender Dysphoria*, 74:3 NORDIC J. PSYCHIATRY 213, 217 (2020); Annette L. Cantu, *et al.*, *Changes in Anxiety & Depression from Intake to First Follow-Up Among Transgender Youth in a Pediatric Endocrinology Clinic*, 5:3 TRANSGENDER HEALTH 196, 198 (2020); Carmichael, *et al.*, *supra* note 6; Elizabeth Hisle-Gorman, *et al.*, *Mental Healthcare Utilization of Transgender Youth Before & After Affirming Treatment*, 18 J. SEXUAL MED. 1444, 1447 (2021).

[13]  Diane Chen, *et al.*, *Consensus Parameter: Research Methodologies to Evaluate Neurodevelopmental Effects of Pubertal Suppression in Transgender Youth*, 5:4 TRANSGENDER HEALTH 246, 248–49 (2020).

[14]  Wylie C. Hembree, *et al.*, *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102:11 J. CLINICAL ENDOCRINAL METAB. 3869, 3878 (2017).

[15]  Hembree, *et al.*, *supra* note 14, at 3882; Submission of Evidentiary Material, Ex. 27, *K.C. v. Indiv. Members of the Med. Licensing Bd. of Ind.*, No. 1:23-cv-00595-JPH-KMB (June 1, 2023), ECF No. 49-10; NICE II, *supra* note 11, at 14.

[16]  Hembree, *et al.*, *supra* note 14, at 3891.

[17]  NICE II, *supra* note 11, at 14.

[18]  Michael Biggs, *The Dutch Protocol for Juvenile Transsexuals: Origins & Evidence*, 49 J. SEX & MARITAL THERAPY 348, 360 (2022), https://bit.ly/3SyYjtV.

gender dysphoria" is "largely unknown" as many risks manifest years later.[19] Early studies report substantial mortality *increases* from suicide, cardiovascular events, and other issues 10 or more years after drug and surgical intervention. One found suicide rates surged *over 19 times* the rate of controls in this population, and mortality rates from cardiovascular disease more than doubled.[20] Another found likewise.[21]

Thus, the district has not proven that Mr. Kluge's silence on transgenderism poses any genuine risk to students or any undue hardship to the district.

### 4.  Redefined educational interests do not create undue hardship.

The district tries to sidestep *Groff's* focus on substantial overall costs and dismissal of complaints, *Groff*, 600 U.S. at 468, 472–73, by insisting its educational mission makes it different than "most employers." [Filing No. 185 at 38–39.] In the process, it (a) misconstrues its constitutional and statutory mandate, (b) ignores the First Amendment, and (c) invokes non-controlling precedent.

### a.  The district ignores the scope of its educational mission.

The district insists that its educational mission is to "educat[e] all students and foster[ ] a safe, inclusive learning environment for *all* the children it serves" and that this mission has "constitutional and statutory dimensions." [*Id.*] But missing entirely is any legal support for this claimed mission—because none exists.

Under the Indiana Constitution, the legislature must "provide, by law, for a general and uniform system of Common Schools, wherein tuition shall be without charge, and equally open to all." IND. CONST. art. VIII, § 1. None of these terms "require or prescribe any standard of educational achievement that must be attained by the system of common schools." *Bonner ex rel. Bonner v. Daniels*, 907 N.E.2d 516, 520 (Ind. 2009). "Common school" merely means schools "open to the children of all

---

[19]  NICE II, *supra* note 11, at 14.
[20]  Dhejne, *et al.*, *supra* note 9, at 5.
[21]  Henk Asscheman, *et al.*, *A Long-Term Follow-Up Study of Mortality in Transsexuals Receiving Treatment with Cross-Sex Hormones*, 164:4 EUR. J. ENDOCRINOLOGY 635, 635–42 (2011).

inhabitants of a town or district." *Nagy ex rel. Nagy v. Evansville-Vanderburgh Sch. Corp.*, 844 N.E.2d 481, 489 (Ind. 2006) (quoting NOAH WEBSTER, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE 988 (1856)); *Horner v. Curry*, 125 N.E.3d 584, 599 (Ind. 2019). Nothing requires the district to make all students or parents happy. Letting Mr. Kluge call all students by last names prevents nobody from attending school.

The district cites its "custodial and protective role." [Filing No. 185 at 38.] But by "passing compulsory attendance laws that mandate the availability of public elementary education for its citizenry," Indiana "has recognized that public schools stand in the relation of parents and guardians to students …. regarding all matters of discipline and conduct of students." *Linke v. Nw. Sch. Corp.*, 763 N.E.2d 972, 979 (Ind. 2002). Nothing about this mandates that all district employees endorse students' beliefs or allows complaints to scuttle a Title VII religious accommodation.

In short, the district points to no legal authority that defines its educational mission as "fostering a safe, inclusive learning environment for *all*" students. [Filing No. 185 at 39.] That may be the district's preference. [Filing No. 15-4 at 9.] But that is not its legal mandate, and that preference does not cancel Title VII's requirements.

### b. By redefining its educational mission, the district runs afoul of the First Amendment.

Public schools' propensity to manipulate educational missions causes courts to suspect such arguments. One refused to rent to a religious group, citing its "educational mission." *Gregoire v. Centennial Sch. Dist.*, 907 F.2d 1366, 1374 (3d Cir. 1990). This failed because the "definition of the groups falling within the educational mission … is so vague that [the district] has virtually unlimited discretion in deciding which groups qualify." *Id.* (cleaned up). If the district can define its educational mission to prohibit an accommodation for one teacher because it sparks a few complaints, it also has unbridled discretion to decide what Title VII protects and what it does not.

Justice Alito warned against the "broad argument" that lets school officials

"censor any student speech that interferes with a 'school's educational mission.'" *Morse v. Frederick*, 551 U.S. 393, 423 (2007) (Alito, J., concurring). It "can easily be manipulated in dangerous ways," including by officials who "define[ ] their educational missions as including the inculcation of whatever political and social views" they hold. *Id.* Here, district officials—as *Transgender Questions* illustrates—defined their educational mission as requiring all staff to endorse transgenderism, so that they would not tolerate even one teacher's silence. What's worse, they announced they would only "accommodate people who follow the policies" [Filing No. 113-4 at 29 (Gordon Dep. Ex. 29 at p. 10, lines 6–8)], as if Title VII did not exist. *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 775 (2015) ("Title VII requires otherwise-neutral policies to give way to [Mr. Kluge's] need for an accommodation.").

It is the district's refusal to accommodate Mr. Kluge that undermines its educational mission. For "students may not be regarded as closed-circuit recipients of only that which the State chooses to communicate" or "those sentiments that are officially approved." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 511 (1969). Rather, the district must teach that "tolerance is a two-way street." *Meriwether v. Hartop*, 992 F.3d 492, 511 (6th Cir. 2021) (cleaned up); *Kennedy*, 597 U.S. at 538 (noting "learning how to tolerate speech … of all kinds is part of learning how to live in a pluralistic society, a trait … essential to a tolerant citizenry"). Of course, it can tell students it does "not endorse speech [or here, silence] by permitting it." *Hedges*, 9 F.3d at 1300. "If pupils do not comprehend so simple a lesson, then one wonders whether [the district] can teach anything at all." *Id.*

The district's only answer is that these are First Amendment cases. [Filing No. 185 at 44.] But the cited portions outline the constitutional limits of a public school's mission (and thus its interests). And operating a public school is the district's "particular business." *Groff*, 600 U.S. at 470. An interest or mission that the First Amendment invalidates cannot serve as the basis for an undue hardship.

28

### c. Even under the guise of "educational philosophy," *Baz v. Walters* is no longer good law and does not control.

Under the guise of "educational philosophy," the district continues to rely on *Baz v. Walters*, 782 F.2d 701 (7th Cir. 1986). [Filing No. 185 at 39, 46–47.] But it never refutes Mr. Kluge's points about how *Groff* undermines that ruling.

The district likens the Veterans Administration's philosophy of patient care to its "mission to provide a safe and supportive" environment, citing its "constitutional and statutory mandate." [*Id.* at 39, 46–47.] No such mandate exists. *See supra* Argument I.B.4.a. So its "mission" must bow to Title VII. U.S. Const. art. VI, ¶ 2.

The district claims Mr. Kluge is "wrong" to say (1) *Baz* relied on the "more than a *de minimis* cost" standard for undue hardship and (2) *Groff* discarded it. [Filing No. 183 at 46.] But *Baz* explicitly applied it. *Baz*, 782 F.2d at 706 (undue "hardship has been construed as anything more than a *de minimis* cost to the employer"); *id.* at 707 (noting transfer "would also create more than *de minimis* administrative cost"). And *Groff* discarded it. *Groff*, 600 U.S. at 468 ("hold[ing] that showing 'more than a *de minimis* cost' … does not suffice to establish 'undue burden' under Title VII").

The district likens this case to *Baz* by pitting its educational mission against "Mr. Kluge's religious opposition to transgenderism." [Filing No. 185 at 46–47.] But he never sought to oppose it. He just declined to endorse it. That's why, when asked, he explained his use of last names to students with the coach analogy. [Filing No. 120-3 at 34 (Kluge Dep. at p. 130, line 20 to p. 131, line 7).] He remained neutral on the subject, saying nothing, focusing on his teaching [*id.* at 8 (Kluge Dep. at p. 8, lines 1–10)]—similar to the VA's philosophy of care. *Baz*, 782 F.2d at 704 ("a quiescent, passive listener"). The district was forcing him to proselytize for transgenderism.

The district cannot define its mission to suit its ideological preferences. "Title VII requires otherwise-neutral policies [*e.g.*, 'philosophies of education'] to give way to [Mr. Kluge's] need for an accommodation. *Abercrombie*, 575 U.S. at 775.

### 5.  Evidence not relied on by the district when it forced Mr. Kluge to resign cannot show undue hardship.

When assessing Mr. Kluge's Title VII claim, the only thing that matters is what the district knew and relied on "*at the time [Mr. Kluge] was terminated." Cullin v. Olin Corp.*, 195 F.3d 317, 324 (7th Cir. 1999). Anything it did not know or rely on then "is totally irrelevant." *Id.* [*Accord* Filing No. 183 at 28–30.]

The district first admits the evidence it touts often—Sucec's departure—occurred after Mr. Kluge's termination. [Filing No. 185 at 46 n.3.] Sucec also changed his name and left the orchestra after that. *See supra* Disputed Facts ¶¶ 10, 15. This "evidence … gathered after [Mr. Kluge's constructive] discharge … does not bear on the validity of" his termination. *Venters v. City of Delphi*, 123 F.3d 956, 974 (7th Cir. 1997) (citing *McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352, 358–63 (1995)).

The district tries to evade this rule with its "telephone" theory of evidence, where students complained at club meetings Mr. Lee attended, and Mr. Lee relayed them to Principal Daghe, who presumably discussed them with HR Director Gordon, before using them to force Mr. Kluge to resign. [Filing No. 185 at 45–46.] What's missing is *any evidence* that (1) the two students made the same comments in club meetings that they made *over a year later* in affidavits filed after Mr. Kluge was forced to resign, after he filed this case, and after a transgender advocacy group tried to intervene; (2) Mr. Lee accurately relayed the details in those affidavits to district officials; and (3) district officials rescinded the accommodation based on club-meeting comments they never even obliquely referenced. It is the district's duty to prove that it raised its "concerns … in its contemporaneous correspondence with Mr. [Kluge]." *Kennedy*, 597 U.S. at 543 n.8. As it did not, the student affidavits are irrelevant.

### 6.  Hypothetical litigation does not show undue hardship.

Citing only the few complaints, the district insists Mr. Kluge's accommodation created "an unreasonable risk of liability." [Filing No. 185 at 40.] But after *Groff*, those complaints are "off the table," do not prove undue hardship, and thus do not set

aside Title VII's mandate to accommodate. *Groff*, 600 U.S. at 472.

Next, the district points to a Title IX case where a school treated students differently based on gender identity. [Filing No. 185 at 40 (citing *Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1038–39 (7th Cir. 2017)).] But Mr. Kluge treated all students the same. How a few students felt about this no longer matters. *Groff*, 600 U.S. at 472–73. And despite the district's claims, "confusion in [the] classroom" does not violate Title IX. [Filing No. 185 at 42.]

The district likens Mr. Kluge's accommodation to "a gender-neutral bathroom for a transgender student." [Filing No. 185 at 42 (citing *Whitaker*, 858 F.3d at 1050).] But *Whitaker* found disparate treatment because the transgender-identifying student "was the only student given access." *Whitaker*, 858 F.3d at 1050; *id.* at 1040. Mr. Kluge never called only transgender-identifying students by their last names; he did this for everyone, in all of his classes, regardless of who was present. *See supra* Disputed Facts ¶¶ 11–16. The district provides no cases even suggesting that treating everyone the same could create a hostile environment or a genuine risk of liability.

Previously, the district argued it need not permit accommodations that would "place [it] on the 'razor's edge' of liability." [Filing No. 121 at 41–42 (quoting *Matthews v. Wal-Mart Stores, Inc.*, 417 F. App'x 552, 554 (7th Cir. 2011)). Now it distances itself from that case. [Filing No. 185 at 41.] Mr. Kluge never suggested its rule was limited to "workplace harassment cases." [*Id.*] He merely observed that *Matthews* provides no support for concluding his accommodation—remaining silent on transgenderism—posed any real liability risk. [Filing No. 183 at 30.] The district cites two cases where employees sought to violate state regulations or state law. [Filing No. 185 at 41.] As Mr. Kluge's accommodation did not violate either, they have no applicability.

The district's hypothetical litigation interest fails for it identified no "prior litigation involv[ing] circumstances similar to this case." *Minkus v. Metro. Sanitary Dist. of Greater Chi.*, 600 F.2d 80, 83 (7th Cir. 1979). As this last try to show an undue

31

burden fails, terminating Mr. Kluge violated Title VII. Thus, he is entitled to summary judgment on his religious discrimination claim.

## II.   Mr. Kluge is entitled to summary judgment on his retaliation claim (and the district is not) because his statutorily protected activities caused the district's adverse actions.

### A. Mr. Kluge never waived his retaliation claim.

The district insists that Mr. Kluge waived his retaliation claim. [Filing No. 185 at 48–49.] Not so. *Kluge II*, 64 F.4th at 861 ("[W]e find the [retaliation] argument was not waived[.]"). And due to *Groff*, this Court must reassess this claim. For it previously relied on "undisputed" evidence that district officials "were acting because of complaints." [Filing No. 185 at 49 (quoting *Kluge I*, 548 F. Supp. 3d at 848).] Those complaints are "off the table." *Groff*, 600 U.S. at 472; *see supra* Argument I.B.2.

### B. Mr. Kluge established a prima facie case for retaliation.

#### 1. The district does not contest that Mr. Kluge engaged in statutorily protected activities and suffered an adverse action.

While the district claims Mr. Kluge "cannot establish a *prima facie* case of retaliation," its challenge is much narrower. [Filing No. 185 at 48.] That's because it only challenges the last of the three elements: causation. [*Id.* at 49 (arguing lack of "causal connection"); Filing No. 121 at 44–45 (same).] So it admits he established the other two. *Giese v. City of Kankakee*, 71 F.4th 582, 590 (7th Cir. 2023).

#### 2. Mr. Kluge showed a but-for causal link between his protected activity and the district's adverse actions.

The district argues Mr. Kluge provided "no reasonable inference for a causal connection" [Filing No. 185 at 49] between his statutorily protected activities (*i.e.*, seeking an accommodation, opposing the district's no-accommodation transgender terminology rules) and the adverse actions he experienced. [Filing No. 183 at 32–33.] Not so. He showed the required "but-for causal connection." *Kluge II*, 64 F.4th at 895.

When Mr. Kluge first mentioned his religious objection to lying about sex and gender, Superintendent Snapp grew "very angry," engaged him in theological debate,

and told him that his beliefs were "wrong." When he held to his beliefs, the Superintendent sent him home pending termination, which only pastoral intervention prevented. [Filing No. 183 at 4–5, 15 ¶¶ 8–9.]

When a few people complained about Mr. Kluge's religious practice and the accommodation, Principal Daghe faulted him for "creating tension" and pressured him to resign. The upshot was that if he did not leave on his own, he could lose his job and future employability. [*Id.* at 8–9, 17 ¶¶ 16–17.] *See supra* Disputed Facts ¶ 18. The district criticized him for sticking to his beliefs. [Filing Nos. 15-3 at 5; 120-3 at 24 (Kluge Dep. at p. 90, line 5 to p. 92, line 7).]

The district next rescinded Mr. Kluge's accommodation without warning, left no room for future accommodations, and openly criticized any teacher who called "students by their last name" and did not use transgender terms (to the district, "correct pronouns"), though only one had this accommodation. Officials ignored his discrimination claims and their own policy, and demanded he follow the transgender terminology policy, resign, or be fired. When he resisted, officials threatened his summer pay, which forced his hand, as he needed that pay to support his family. [Filing No. 183 at 9–12, 17–19 ¶¶ 18–27.] *See supra* Disputed Facts ¶¶ 19–21.

The district contests none of these facts. So it is undisputed that the district subjected Mr. Kluge to a "pattern of criticism and animosity" and finally constructively discharged him. *Hunt-Golliday v. Metro. Water Reclamation Dist. of Greater Chi.*, 104 F.3d 1004, 1014 (7th Cir. 1997). Mr. Kluge showed a causal connection.

The district notes it left the uniform accommodation in place and allowed the last name accommodation "for some time." [Filing No. 185 at 49.] But this just shows the district will accommodate religious beliefs until they spark complaints. As Title VII is not "at war with itself," it requires much more. *Groff*, 600 U.S. at 472.

The district claims Mr. Kluge never substantiated his claim that its "*only* reason for forcing [him] to resign was his religious objection to its transgender

terminology rules and his insistence that Title VII entitled him to an accommodation, despite grumblings from third parties." [Filing No. 185 at 50.] Not only do the facts mentioned above and in prior briefing validate this claim [Filing No. 183 at 33–34], but so does the district's brief. For it repeatedly faults Mr. Kluge for not giving up his Title VII accommodation once people complained. [Filing No. 185 at 4, 21 ¶ 44, 39, 49.] The district criticized Mr. Kluge for sticking to his convictions then, and it still does now. This amply shows the required causal connection for retaliation.

### C. Mr. Kluge need not prove pretext because he relied on direct proof and the district had no legitimate reason for forcing him to resign.

Mr. Kluge previously pointed out that only retaliation claims relying on the indirect method of proof require evidence of pretext. [Filing No. 183 at 35–35.] The district does not contest this, but it faults him for failing to provide direct proof, which it contends includes "'suspicious timing, ambiguous statements, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn.'" [Filing No. 185 at 50 (quoting *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007)).] But that's not what *Boumehdi* says. Rather, that quote lists examples of "circumstantial evidence." *Boumehdi*, 489 F.3d at 792. The direct method of proof requires "direct evidence of" the three elements of the retaliation analysis. *Id.*

Mr. Kluge did provide direct evidence, including "what the employer said or did in the specific employment decision in question" and statements from those who "exercised a significant degree of influence over the contested decision." *Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 781–82 (7th Cir. 2007) (quotations omitted). This evidence includes Superintendent Snapp's angry theological debate; Principal Daghe pressuring him to resign; the district adopting a policy that criticized the only teacher who declined to use transgender terms; and Principal Daghe and HR Director Gordon demanding that Mr. Kluge comply, resign, or get fired, even threatening his

34

summer pay. *See supra* Argument II.B.2. [Filing No. 183 at 9–25.] And it includes Principal Daghe telling him that he would only "accommodate people who follow the policies." [Filing No. 113-4 at 29 (Gordon Dep. Ex. 29 at p. 10, lines 6–8).]

Mr. Kluge also presented circumstantial evidence. Despite the district's claims [Filing No. 185 at 50], it is highly suspicious that the district would rescind an accommodation granted only to one teacher (which just allowed him to remain silent on transgenderism) because a few people complained and then adopt a no-accommodations policy. This, in conjunction with the efforts of district officials to pressure Mr. Kluge to resign and to give him repeated resign-comply-or-get-fired ultimatums, shows that the district was upset that he would not abandon his religious beliefs.

This also highlights how the district failed to provide a legitimate reason for rescinding the accommodation. The district admits "complaints influenced [its] decision." [Filing No. 185 at 50.] Its 66 references to them underscore this. Yet *Groff* could not be clearer that these complaints are "off the table," *Groff*, 600 U.S. at 472–73. The district's only response is to try to focus on the motives of the complainants. But *Groff* forecloses this by sweeping aside complaints about "a particular religion," "religion in general," a "religious practice," the "mere fact of an accommodation," or the "very notion of accommodating religious practice." *Id.* (cleaned up). None of these provide a legitimate basis for an employment decision. And as this is all the district provides, Mr. Kluge need not demonstrate pretext, *Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 378 (7th Cir. 2020), and he is entitled to summary judgment on retaliation.

## CONCLUSION

The district failed to prove that accommodating Mr. Kluge caused an undue hardship or that it had a legitimate reason for forcing him to resign. All it offers is a few third-party grumblings cloaked in pedagogical rhetoric. The rhetoric has no support; the grumblings are now "off the table." *Groff*, 600 U.S. at 472. Mr. Kluge is entitled to summary judgment on his religious discrimination and retaliation claims.

Respectfully submitted this 26th day of January, 2024.

/s/ Travis C. Barham

MICHAEL J. CORK
**MICHAEL J. CORK, ESQ.**
5754 North Delaware Street
Indianapolis, Indiana 4620-2528
Telephone: (317) 517–4217
cork0@icloud.com

TRAVIS C. BARHAM*
**ALLIANCE DEFENDING FREEDOM**
1000 Hurricane Shoals Road N.E., Ste. D-1100
Lawrenceville, Georgia 30043
Telephone: (770) 339–0774
Facsimile: (770) 339–6744
tbarham@ADFlegal.org

TYSON C. LANGHOFER*
**ALLIANCE DEFENDING FREEDOM**
44180 Riverside Parkway
Lansdowne, Virginia 20176
Telephone: (571) 707–4655
Facsimile: (571) 707–4656
tlanghofer@ADFlegal.org

* Admitted *pro hac vice.*

*Attorneys for Plaintiff*

36

CERTIFICATE OF SERVICE

I hereby certify that on January 26, 2024, a digital copy of the foregoing document was filed electronically with the Court using its electronic filing system, which automatically sends an electronic notification to all attorneys of record.

Respectfully submitted this the 26th day of January, 2024.

/s/ Travis C. Barham
TRAVIS C. BARHAM
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Road N.E., Ste. D-1100
Lawrenceville, Georgia 30043
Telephone: (770) 339–0774
Facsimile: (770) 339–6744
tbarham@ADFlegal.org

Attorney for Plaintiff