IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JOHN M. KLUGE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:19-cv-02462-JMS-KMB |
| | ) | |
| BROWNSBURG COMMUNITY | ) | |
| SCHOOL CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S REPLY BRIEF IN SUPPORT OF
CROSS-MOTION FOR SUMMARY JUDGMENT**

**Introduction**

In his Response and Reply Brief, Kluge challenges some of Brownsburg's arguments in

favor of summary judgment but not all of them, and he also waives his retaliation claim.

Waiver aside, the following explains in much more detail why the response arguments in

Kluge's Response and Reply Brief lack merit. Moreover, because the designated evidence

establishes that Brownsburg remains entitled to judgment as a matter of law, this Court should

grant Brownsburg's motion, deny Kluge's, and enter final judgment accordingly.

**Argument**

I.   *The "Statement of Material Facts in Dispute" section of Kluge's Response and Reply
     Brief fails to establish any material factual dispute.*

Kluge's assertions fail to rebut Brownsburg's entitlement to summary judgment on his

remaining claims. Kluge's assertions that are material are addressed in the context of his claims

in Section II below or as follows:

First, Kluge claims there is "no evidence" that Craig Lee "fully and accurately" relayed

the complaints he was receiving from Equality Alliance Club meetings or that Brownsburg's

1

administration rescinded the last-name-only accommodation based on those complaints. [Filing No. 186 at 13-14, ¶13]. Kluge is wrong. Lee relayed these complaints and others during twice-monthly faculty advisory meetings in the Fall of 2017. [Filing No. 185 at 18-19, ¶40]. In addition, Jessup, a Brownsburg administrator, attended an Equality Alliance Club meeting in the Fall of 2017 and received some of the students' complaints firsthand. [Filing No. 185 at 18, ¶39].

Second, Kluge contends Brownsburg omitted that Principal Daghe "repeatedly pressured [him] to resign because of the complaints and the tension they created." [Filing No. 186 at 15-16, ¶18]. Kluge, however, overlooks that Daghe brought up resignation in response to Kluge's refusal to consider anything other than continuing the last-name-only accommodation, even in the face of complaints from students and others. [Filing No. 185 at 20-21, ¶¶43-44].

Third, Kluge asserts the "only reason" Brownsburg's administration cited for withdrawing the last-name-only accommodation "was that some students were 'offended by being called by their last name.'" [Filing No. 186 at 16, ¶20 (citing the transcript of Kluge's February 2018 meeting with Principal Daghe and Gordon)]. Not so. Principal Daghe told Kluge during the same meeting that the last-name-only accommodation was detrimental to students, not merely that some of them were offended by it. [Filing No. 185 at 22, ¶47].

Again, Kluge's additional assertions are discussed below in the specific context of his claims.

II.    *Summary judgment remains appropriate in Brownsburg's favor on Kluge's unlawful discrimination claim.*

In its Initial Brief, Brownsburg established that summary judgment was appropriate in its favor on Kluge's unlawful discrimination claim because, under *Groff*'s clarified standard, the designated evidence established two separate and independent bases for undue hardship as a matter of law. [Filing No. 185 at 33-42].

Kluge's challenges to these bases are meritless and therefore summary judgment in Brownsburg's favor remains appropriate. Each basis is discussed in turn below.

> a.    *Brownsburg has demonstrated as a matter of law that the harm to students and disruption to the learning environment constitute undue hardship under* Groff*'s clarified standard, and Kluge's arguments to the contrary are meritless.*

Brownsburg argued that it demonstrated undue hardship based on harm to students and disruption to the learning environment. [Filing No. 185 at 37-40]. Brownsburg noted that the harm and disruption were untenable in light of its "particular business" of "educating all students and fostering a safe, inclusive learning environment for *all* the children it serves." [Filing No. 185 at 39 (emphasis in original)]. Brownsburg also observed that it acted consistently with *Groff*'s instruction of "showing that the burden of granting an accommodation *would result* in substantial increased costs in relation to the conduct of its particular business," [Filing No. 185 at 39 (quoting *Groff* (emphasis added))], noting it was undisputed that it "tried the last-name-only accommodation and attempted to work with Kluge when complaints mounted . . . ." [Filing No. 185 at 39]. These points paved the way for Brownsburg's overall argument that, consistent with *Groff*, "Title VII should not require a public school to continue with an adult teacher's religious accommodation when the harm to its students, who are children, and the interference to its mission, is as substantial as what the evidence showed here." [Filing No. 185 at 40].

Brownsburg also noted that Kluge's arguments to the contrary lacked merit, including that his characterizations of the last-name-only accommodation as a "Title VII success story" and of the complaints as mere "third-party grumblings" disregarded the designated evidence.

[Filing No. 185 at 42-48]. In his Response and Reply Brief, Kluge reiterates some of these arguments and makes several new ones [Filing No. 186 at 26-39], but none has merit.[1]

First, Kluge contends that "grumblings from parents, teachers, and students" are "now definitively 'off the table'" in light of *Groff*." [Filing No. 186 at 31]. But that is not what *Groff* says—rather, the Court endorsed the Solicitor General's observation that "an accommodation's effect on co-workers may have ramifications for the conduct of the employer's business," but impacts that are based on "a co-worker's dislike of 'religious practice and expression in the workplace' or 'the mere fact [of] an accommodation' are "'off the table' for consideration." *Groff*, 600 U.S. at 472 (citations omitted). In other words, a reviewing court may consider the impacts on co-workers and others so long as they go to the conduct of the employer's particular business and are not based on co-workers' religious animus or other untoward motivations. But as Brownsburg established, the complaints it received from students and others in the high school community evidenced harm to students and disrupted the learning environment. [Filing No. 185 at 42-43]. No evidence has been designated that would allow a reasonable factfinder to conclude those complaints were motivated by religious animosity. Kluge strains the record to suggest otherwise, but all he cites in support is a single passage from one parent's letter that the parent "anticipated that [Kluge] might have difficulty with the change." [Filing No. 186 at 31 (quoting the parent's letter)]. That is not evidence of religious animosity.

---

[1] As an initial matter, Kluge begins this section of his Response and Reply Brief claiming that Brownsburg has "mischaracterize[ed] *Groff*" [Filing No. 186 at 26], but arrives at the same holding that Brownsburg advanced—that is, "In short, the district must prove Mr. Kluge's accommodation caused 'substantial increased costs' 'in the overall context of [its] business.'" [Filing No. 186 at 28 (quoting *Groff*, 600 U.S. at 468, 470)]; *accord* [Filing no. 185 at 36 ("Again, *Groff*'s clarification is that 'an employer must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business." (quoting *Groff*, 600 U.S. at 470))].

Second, Kluge claims that evidence of disruption to the learning environment is unfounded because "[t]he undisputed evidence is that his classes experienced no disruptions and that his students and orchestras excelled . . . . Every student has a few unhappy students. Yet learning continues." [Filing 186 at 29]. Kluge ignores the evidence to the contrary and Brownsburg's particular business of educating all students. This Court recognized as much in its previous summary judgment ruling, reasoning that other students' successes are "neither dispositive of nor relevant to the undue hardship question." [Filing No. 159 at 44]. This Court should apply the same reasoning here, as the evidence has not changed and nothing in *Groff* instructs otherwise.

Third, Kluge challenges Brownsburg's reliance on *Draper v. U.S. Pipe & Foundry Company*, 527 F.2d 515, 520 (6th Cir. 1975), particularly the observation that "[t]he employer is on stronger ground when he has attempted various methods of accommodation and can point to hardships that actually resulted." [Filing No. 186 at 30]. Kluge claims that the opinion "offers no support" because Brownsburg "did not try 'various methods of accommodation.'" [Filing No. 186 at 30]. Kluge asserts that Brownsburg instead "acceded to Mr. Kluge's accommodation only until complaints arose, and then they pressured him to resign . . . ." [Filing No. 186 at 30]. What Kluge omits, however, is the undisputed fact that when Principal Daghe brought the complaints to his attention, he thought the last-name-only accommodation should continue and saw no reason to consider an alternative. [Filing No. 185 at 20-21, ¶¶43-44]. As such, the prospect of resignation came into play when Kluge made it clear that he would not change, and that distinction makes Brownsburg's actions consistent with *Draper*. Moreover, Brownsburg agrees with Kluge's reliance on *Draper*'s observation that "The objections and complaints of fellow employees, in and of themselves, do not cause undue hardship . . . ." [Filing No. 186 at 30

(quoting *Draper*, 527 F.2d at 520)]. Brownsburg made this point in its Initial Brief, noting that "a reviewing court should look at the ends to which those complaints are directed." [Filing No. 185 at 44]. Here, the designated evidence demonstrates that those ends were student harm and disruption to the learning environment, both of which interfered with Brownsburg's particular business of creating a safe and supportive environment for all students. In addition, the concerns of students, who are children, should weigh heavier than those of co-workers, who are adults, for purposes of Title VII undue hardship analysis, particularly when one considers that a business does not exist to employ workers, whereas a school exists to educate students.

Fourth, Kluge reiterates his argument that Brownsburg's "nature, size[,] and operating cost" demonstrate the lack of undue hardship. [Filing No. 186 at 31-32]. Kluge also asserts that Brownsburg "cannot identify any concrete costs from the accommodation," but that ignores the designated evidence regarding harm to students, disruption to the learning environment, and interference with Brownsburg's mission. Moreover, nothing in *Groff* suggests that "costs" are monetary only. As a public school, Brownsburg does not exist to turn a profit, but rather to educate all of its students in a safe and nurturing environment. As stated in Brownsburg's Initial Brief, "the level of undue hardship caused by putting the safety and education of several students at risk is the same whether the school has 100 students or 10,000 students." [Filing No. 185 at 38]. Size and operating cost serve as appropriate measures for undue hardship when, for example, the accommodation request concerns time off to attend a religious observance, for in that example (and assuming all else is equal) the impact of one employee's absence is far greater for a business with fifteen employees than it is for a business with 1,000 employees. But Brownsburg's nature and the impact of Kluge's last-name-only accommodation on students and others in the high school community differs greatly from this garden-variety example. Taken to

its logical conclusion, Kluge's "size and operating cost" argument means that a large public school must countenance all sorts of accommodations at the expense of students merely because it is large. That is not the "common-sense" analysis that *Groff* requires.

Fifth, Kluge reiterates that Brownsburg's argument for undue hardship is flawed because it is based on the "illegitimate expectation of universal affirmation." [Filing No. 186 at 31-32]. Brownsburg addressed this in its Initial Brief, noting that Kluge supported his argument with cases that had no application to Title VII undue hardship, including his particularly odd reliance on *United States v. Varner*, 948 F.3d 250 (5th Cir. 2020), a prisoner appeal that was stripped of its context. [Filing No. 185 at 44-45]. Kluge's rejoinder is that Brownsburg offers "no legal support" for its dismissal of the First Amendment cases that he relies on. [Filing No. 186 at 32]. But it should be obvious that "legal support" is not required—rather, one can read the cases and realize that they concern First Amendment principles that have no application to Title VII. Next, Kluge asks rhetorically, "If Title IX is relevant, why isn't the First Amendment?", alluding to Brownsburg's argument that the risk of a Title IX violation serves as a separate and independent basis for undue hardship (more on that below). [Filing No. 186 at 32]. But that distinction also should be obvious—analogizing to First Amendment case law is different than saying that Brownsburg experienced undue hardship because continuing the last-name-only accommodation would have subjected it to an unreasonable risk of a Title IX lawsuit. Finally, Kluge quotes *Genas v. New York Department of Correctional Services*, 75 F.3d 825, 832 (2d Cir. 1996), for the proposition that "courts 'have often looked to Title VII law for help in delineating plaintiffs' rights under' the First Amendment." [Filing no. 186 at 32]. But like so many of Kluge's other assertions supporting his "universal affirmation" argument, this one also is stripped of its context. *Genas* concerned a First Amendment failure-to-accommodate claim, 75 F.3d at 830-33,

so it makes sense the court would analogize Title VII failure-to-accommodate principles to that

type of claim. In contrast, Kluge is asking this Court to analogize First Amendment free speech

principles to his Title VII unlawful discrimination (i.e., failure to accommodate) claim. *See, e.g.*,

[Filing No. 183 at 28 (citing *Tinker v. Des Moines*, *Turner v. FCC*, and *Zamecnik v. Indiana*

*Prairie*—all First Amendment free speech cases)]. Kluge has failed to provide any authority

indicating that these cases provide a roadmap for Title VII undue hardship analysis. The Court

recognized as much in its previous summary judgment decision [Filing No. 159 at 45 n.11], and

there is no reason to revisit that reasoning, particularly when one considers the arguments that

Kluge has presented here.

Sixth, Kluge provides this Court with "[r]ecent research" that he claims "shows his

accommodation poses no danger [to] the district's interest." [Filing No. 186 at 32-35]. Putting to

the side that *Amici* has provided research to the contrary [App. Doc. 33 at 25-31 (Brief of *Amici*

*Curiae* American Academy of Pediatrics and others) (filed Nov. 8, 2021)], implicit in Kluge's

argument is that Brownsburg should endorse his research and thereby disregard the judgment of

transgender students' parents and healthcare professionals, both of whom must provide written

approval for a student's name-change request. [Filing No. 185 at 10-11, ¶¶20-21]. There is no

legitimate reason for Brownsburg to do this and, in fact, doing so might expose it to further

unreasonable risk of litigation, this time from a parent. *See Troxel v. Granville*, 530 U.S. 57, 66

(2000) (listing cases that recognize "the fundamental rights of parents to make decisions

concerning the care, custody, and control of their children," which include the right "to direct the

education and upbringing of one's children").

Seventh, Kluge argues that Brownsburg exceeded the scope of its educational mission.

[Filing No. 186 at 35-36]. He claims there is no legal support to "educat[e] all students and

8

foster[] a safe, inclusive learning environment for *all* the children [Brownsburg] serves." [Filing

No. 186 at 35]. Kluge is wrong. Indiana Code section 20-26-5-1(a) mandates that a "school

corporation shall conduct an educational program for all children who reside within the school

corporation in kindergarten and in grades 1 through 12." Although it is difficult to see how

fostering a safe, inclusive learning environment for such students does not further that statutory

purpose, Indiana Code section 20-26-5-4(a) gives a school corporation's board the power to

"conduct the educational affairs of the school corporation," and more recently the General

Assembly enacted a law requiring teachers to receive training on how "to use evidence based

trauma informed classroom instruction, including instruction in evidence based social emotional

learning classroom practices that are conducive to supporting students who have experienced

trauma that may interfere with a student's academic functioning." Ind. Code § 20-28-5-26(a)(1).

Moreover, Indiana Code chapter 20-26-3 explains that "the policy of the state is to grant to each

school corporation all the powers needed for the effective operation of the school corporation,"

Ind. Code § 20-26-3-1, and provides an interpretive rule of thumb that "a school corporation has

. . . all other powers necessary or desirable in the conduct of the school corporation's affairs,

*even if the power is not granted by statute or rule*." Ind. Code § 20-26-3-3(b)(2) (emphasis

added). In short, Indiana Code article 20-26 makes it apparent that fostering a safe and inclusive

learning environment for all students is consistent with a school corporation's mission. If

anything, the burden should be on Kluge to demonstrate why such a goal is *not* consistent with a

school corporation's mission and the broad powers that the General Assembly has extended to

school corporations. Tellingly, Kluge is silent on this point.

      Kluge's eighth argument is a bootstrap that this Court should summarily reject. [Filing

No. 186 at 36-37]. He begins by citing a case where a school corporation ran afoul of the First

Amendment by refusing to rent to a religious group, coupling that case with a cautionary observation from Justice Alito about school officials and censoring. [Filing No. 186 at 35-36]. He then cites several First Amendment free speech cases relied on previously and ultimately reveals that his entire argument is a First Amendment claim masquerading as a Title VII claim: "An interest or mission that the First Amendment invalidates cannot serve as the basis for an undue hardship." [Filing No. 186 at 37]. But that argument puts the cart before the horse, for even if it is true, this Court has dismissed all of Kluge's First Amendment claims and— critically—he has declined to pursue any of them on appeal. This Court should decline to revisit those claims in the context of Brownsburg's Title VII undue hardship defense.

Ninth, Kluge continues to misunderstand *Baz* and its relevance post-*Groff*. [Filing No. 186 at 38]. Brownsburg argued in its Initial Brief that *Baz* remained good law notwithstanding its application of *Hardison*'s *de minimis* standard that *Groff* has now clarified. [Filing No. 185 at 46]. That is what Brownsburg meant when it countered Kluge's assertion that *Baz* was no longer good law. [Filing No. 185 at 46]. Of course *Baz* applied the *de minimis* standard and *Groff* clarified that standard, but it does not follow that such clarification nullifies *Baz*. To the contrary, *Baz* remains good law for its analysis of how an employer's mission or "philosophy" informs undue hardship analysis. Indeed, *Groff* endorsed as much based on its instruction that a reviewing court apply "common-sense" and consider an employer's "nature." Title VII should not require an employer to accommodate an employee's proselytizing when such conduct conflicts with its philosophy of patient care, nor should it require Brownsburg to continue the last-name-only accommodation when, as this Court explained, it "actively interfered with [Brownsburg's] mission to provide a safe and supportive educational environment." [Filing No.

159 at 45 n.11]. That is the common thread running through *Baz* and this case, and *Baz* remains

good law on this point.

Tenth and finally, Kluge appears to argue that the bulk of the designated evidence

regarding student complaints was "after-acquired" and thus not relevant to the undue hardship

analysis. [Filing No. 186 at 39]. Brownsburg acknowledged in its Initial Brief that Sucec's

withdrawal from Brownsburg High School occurred after Kluge resigned, but also explained

why that did not help Kluge. [Filing No. 185 at 46 n.1]. Kluge now seems to argue that many

other student harms, and not merely Sucec's withdrawal, occurred after the fact. [Filing No. 186

at 39]. To support this argument, Kluge accuses Brownsburg of constructing a "telephone"

theory of evidence, arguing that such a theory is deficient because Brownsburg failed to connect

particular pieces of evidence in the record. [Filing No. 186 at 39]. But this falls apart when one

considers the many instances where Brownsburg administrators made Kluge aware of the student

complaints and the harm the last-name-only accommodation was causing. [Filing No. 185 at 18-

22, ¶¶39-47]. Kluge acknowledged in his own written statement that Principal Daghe reported to

him that the accommodation "was creating tension in the students and faculty;" that "transgender

students reported feeling 'dehumanized' by my calling all students last-name-only;" that

"transgender students' friends feel bad for the transgender students, along with everyone else, by

their last-name-only;" that "I am the topic of much discussion in the Equality Alliance Club

meetings;" and that "a number of faculty avoid me and don't hang out with me or include me as

much because of my stance on the issue." [Filing No. 185 at 20, ¶42]. There is of course much

more evidence supporting Brownsburg's awareness of the many problems that the last-name-

only accommodation had caused [Filing No. 185 at 18-20, ¶¶40-41], but by now it should be

obvious that Kluge's objections concerning a deficient "telephone" theory of evidence are

meritless. It is undisputed that Kluge himself was contemporaneously aware of the reasons for

Brownsburg's concerns with the last-name-only accommodation.

In sum, Kluge has failed to rebut that the evidence of student harm and disruption to the

learning environment constitutes undue hardship as a matter of law under *Groff*'s clarified

standard.

> b.  *Brownsburg has demonstrated as a matter of law that continuing the last-name-only accommodation would have exposed it to an unreasonable risk of litigation, which, as a matter of law, also constitutes undue hardship, and Kluge's arguments to the contrary are meritless.*

Brownsburg also argued that it demonstrated undue hardship because continuing the last-

name-only accommodation would have subjected it to an unreasonable risk of a Title IX lawsuit.

[Filing No. 185 at 40-42]. Brownsburg urged this Court to follow the reasoning from its previous

summary judgment ruling, particularly its reliance on *Whitaker* and its observation that "it is

sufficient that the state of the law during Mr. Kluge's employment created a risk of liability, and

[Brownsburg] considered that risk in determining how to resolve Mr. Kluge's objections to the

policies concerning transgender students." [Filing No. 185 at 41 (quoting this Court's summary

judgment ruling)]. Brownsburg also countered Kluge's "equal treatment" argument by noting

that *Whitaker* rejected a similar argument in the context of providing a gender-neutral bathroom

for the transgender student: "Providing a gender-neutral alternative is not sufficient to relieve the

School District from liability, as it is the policy itself which violates [Title IX]." [Filing No. 185

at 42 (quoting *Whitaker*, 858 F.3d at 1050)].

Kluge's attempts to create a disputed factual issue are unavailing:

First, Kluge claims that *Whitaker* is distinguishable because the school in that case

provided the transgender student with a gender-neutral bathroom for that student only. [Filing

No. 186 at 40]. Kluge asserts that his situation is different because he "never called only

transgender-identifying students by their last names; he did this for everyone." [Filing No. 186 at 40]. Putting to the side that the evidence is disputed regarding whether Kluge called all students by last name only consistently (and this Court should consider that factual dispute in addressing Kluge's summary judgment motion), the common thread between this case and *Whitaker* is that if Brownsburg let the last-name-only accommodation continue, it would condone a teacher's refusal to call students by their preferred names because they are transgender—that is, because of their sex. Whether or not such a claim would succeed is beside the point, for it should be sufficient to say that Title VII does not require an employer to expose itself to a colorable, non-frivolous claim.

Second, Kluge contends that Brownsburg's "hypothetical litigation" defense fails because it did not identify any "prior litigation involve[ing] circumstances similar to this case," and quotes *Minkus v. Metropolitan Sanitary District of Greater Chicago*, 600 F.2d 80, 83 (7th Cir. 1979). [Filing No. 186 at 40]. But the foregoing establishes that is not the case. It should be enough for this Court to conclude that continuing the last-name-only accommodation would have placed Brownsburg, as the Seventh Circuit phrased it, on the "'razor's edge' of liability," *Matthews v. Wal-Mart Stores, Inc.*, 417 F. App'x 552, 554 (7th Cir. 2011), which is a Hobson's Choice that Title VII does not require.

In sum, the evidence has not changed since this Court's last summary judgment ruling where it concluded that as a matter of law, continuing the last-name-only accommodation would have subjected Brownsburg to an unreasonable risk of a Title IX lawsuit. Kluge's arguments to the contrary are meritless, and therefore the Court should conclude that Brownsburg has again established undue hardship as a matter of law under *Groff*'s clarified standard.

III.    *There is no legitimate reason to revisit Kluge's retaliation claim, but if this Court does, then summary judgment in Brownsburg's favor remains appropriate, and Kluge's arguments to the contrary are meritless.*

In its Initial Brief, the School argued that this Court should decline to revisit Kluge's retaliation claim because the Seventh Circuit's remand instruction was to apply *Groff*'s "clarified standard to the religious accommodation in the first instance." [Filing No. 185 at 48 (quoting the Seventh Circuit's order)]. In addition, because *Groff* had no relevance to a Title VII retaliation claim, Brownsburg observed that it was prejudicial to let Kluge re-argue a claim he had waived. [Filing No. 185 at 48-49]. Procedural deficiencies aside, Brownsburg also argued that Kluge's retaliation claim failed on the merits, specifically because there was no causal connection between his protected activity and the adverse employment action, as well as no evidence suggesting pretext. [Filing No. 185 at 49]. Finally, Brownsburg demonstrated that Kluge's arguments in favor of his retaliation claim were meritless. [Filing No. 185 at 50-51].

In his Response and Reply Brief, Kluge makes several additional attempts to revive his retaliation claim, but none has merit:

As a threshold matter, Kluge is silent in response to Brownsburg's argument that the Seventh Circuit's remand instruction only required this Court to address Kluge's failure-to-accommodate claim and that giving him a second bite at the apple would be prejudicial. The closest Kluge comes to addressing this argument is that he did not waive his retaliation claim because the Seventh Circuit said so. [Filing No. 186 at 41]. But the Seventh Circuit vacated that opinion [Filing No. 168 at 2], and, regardless, the Court should conclude that Kluge's serial failures to address Brownsburg's arguments constitutes waiver: "When a party fails to address an argument in his summary judgment brief, it is deemed a waiver." *McCready v. Title Services of Illinois, Inc.*, No. 06 C 6280, 2008 WL 2435933, at *3 (N.D. Ill. June 16, 2008). At any rate,

14

there is no reason to revisit Kluge's retaliation claim because *Groff* has no impact on it

whatsoever, and the Seventh Circuit's remand instruction does not require this Court to address

the claim either.

Procedural deficiencies aside, Kluge's arguments on the merits fail to rebut summary

judgment in Brownsburg's favor:

First, Kluge claims that Dr. Snapp's interaction with him on the first day of classes for

the 2017-2018 school year creates a causal connection. [Filing No. 186 at 41-42]. But that

interaction occurred many months before Brownsburg's administration decided to withdraw the

last-name-only accommodation and, in those intervening months, complaints from students and

others, as well as Kluge's recalcitrance when made aware of those complaints—"Why would I

change?" [Filing No. 185 at 21, ¶44]—foreclose any causal connection under the Seventh

Circuit's standards. Regarding the former point, "intervals shorter than four months are unlikely,

standing alone, to establish the causation element of a retaliation claim," and Kluge's interval

was longer than that. *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 828 (7th Cir. 2014). Regarding

the latter point, the causal chain breaks when "a significant intervening event separates an

employee's protected activity from her discharge." *Parker v. Brooks Life Sci., Inc.*, 39 F.4th 931,

937 (7th Cir. 2022). Kluge's interaction with Dr. Snapp suffers from both of these deficiencies—

too much time elapsed between the interaction and the adverse employment action, and there

were significant intervening events in the interim. Either is sufficient to foreclose any reasonable

inference of retaliation based on Dr. Snapp's interaction with Kluge.

Second, Kluge asserts that Brownsburg subjected him to a "pattern of criticism and

animosity" based on Principal Daghe allegedly pressuring him to resign, rescinded his

accommodation with warning, "left no room for future accommodations, and openly criticized

any teacher who 'called students by their last name.'" [Filing No. 186 at 42]. The designated

evidence supports none of these assertions and, as explained above, Kluge overlooks the

undisputed fact that Principal Daghe thought resignation was appropriate when it became

apparent that Kluge would agree to nothing short of continuing the last-name-only

accommodation, complaints notwithstanding. *See supra*, Part I at 2.

Third, Kluge's response to Brownsburg's argument that its decision to continue with the

uniform accommodation is that it "just shows the district will accommodate religious beliefs

until they spark complaints." [Filing No. 186 at 42]. That provides no response to Brownsburg's

overall point that if an employer provides two religious accommodations and later rescinds one

but not the other, then it becomes difficult, if not impossible, to reasonably infer retaliatory

animus. Kluge's silence here is revealing.

Fourth, Kluge argues that the evidence cited in his Initial Brief and Brownsburg's Initial

Brief substantiate his claim that the "*only* reason for forcing [him] to resign was his religious

objection to [its] transgender terminology rules and his insistence that Title VII entitled him to an

accommodation despite grumblings from third parties." [Filing No. at 186 at 42-43 (emphasis in

original)]. But that has the analysis backwards, for if it were as Kluge claims, an employer never

could rebut a prima facie case by articulating a legitimate, non-retaliatory reason for its actions.

Here, in a nutshell, that reason was the complaints from students and others about the last-name-

only accommodation and, as this Court noted, it was incumbent on Kluge to designate evidence

that would allow a reasonable factfinder to doubt that Brownsburg honestly believed that reason.

[Filing No. 159 at 51]. But as this Court also noted, Kluge failed to do this: "the evidence is

undisputed that [Brownsburg] and [its] administrators were acting because of complaints

received from the school community" and "there is nothing in the record to suggest that the

16

complaints were fabricated or that another motive was possible." [Filing No. 159 at 51]. Kluge's

argument provides no legitimate reason for this Court to revisit those observations or its

conclusion that his retaliation claim failed as a matter of law.

Fifth, Kluge's arguments for pretext begin with a rehash of the points discussed above,

including his interaction with Dr. Snapp at the start of the 2017-2018 school year and his

allegation that Principal Daghe forced him to resign. [Filing No. 186 at 43-44]. However, for all

the reasons these points do not permit a reasonable inference of retaliation, neither do they show

pretext. Likewise deficient is Kluge's contention that it is "highly suspicious" that Brownsburg

would discontinue the last-name-only accommodation "because a few people complained and

then adopt a no-reasonable accommodations policy." [Filing No. 186 at 44]. Once again, Kluge

simply discounts the nature and quality of the complaints, how they disrupted the learning

environment, and how they interfered with Brownsburg's educational mission. It should not be

suspicious or surprising for Brownsburg's administration to first meet with Kluge as those

complaints mounted and later conclude that the accommodation was no longer tenable when the

complaints did not subside and Kluge thought the only path forward was to maintain the status

quo, the concerns of students and others notwithstanding. That is not evidence of retaliation—

rather, it is a school administration attempting to reconcile competing interests and ultimately

deciding what is best for the students it serves when the situation reaches an impasse. Finally,

Kluge's refrain that *Groff* renders these complaints "off the table" ignores, once again, that *Groff*

has no application to Title VII retaliation claims whatsoever. [Filing No. 186 at 44]. It is telling

that Kluge has failed to address this argument at any point in his summary judgment briefing.

In sum, this Court should not revisit Kluge's retaliation claim because *Groff* does not

affect it and the Seventh Circuit's remand instruction did not direct this Court to do so. But if this

Court decides otherwise, it should conclude that summary judgment remains appropriate in Brownsburg's favor because there is no causal connection between his protected activity and the adverse employment action, and even if there was Kluge cannot demonstrate pretext. Moreover, Kluge's arguments to the contrary are unavailing.

IV.    *If this Court denies Brownsburg summary judgment on Kluge's unlawful discrimination claim, then it should also conclude that disputed issues of fact remain regarding the sincerity of his religious belief.*

In its Initial Brief, Brownsburg cited undisputed evidence that Kluge departed from the last-name-only accommodation during the May 2018 orchestra awards ceremony. [Filing No. 185 at 51-52]. Brownsburg argued that Kluge could not legitimately reconcile this departure—that is, he acknowledged that using last names only during the ceremony would have been "unreasonable" and "conspicuous" and he implied that it went against his mantra of "do no harm to his students," but he failed to see that these same things actually resulted when he used last names only in class. [Filing No. 185 at 51-52]. Brownsburg observed that "[r]easonable religious accommodation should not be based on an employee's inconsistent and unilateral say-so regarding when the accommodation applies," and quoted First Circuit case law for the proposition that "[e]vidence tending to show that an employee acted in a manner inconsistent with his professed religious belief is, of course, relevant to the factfinder's evaluation of sincerity." [Filing No. 185 at 52 (quoting *EEOC v. Union Independiente de la Autoridad de Acueductos y Alcantarilladoes de Puerto Rico*, 279 F.3d 49, 57 (1st Cir. 2002))]. Brownsburg urged this Court to conclude, as it did before, that these discrepancies precluded summary judgment in Kluge's favor on his unlawful discrimination claim because a reasonable factfinder could conclude that his behavior was irreconcilable and thus insincere.

Kluge's response boils down to an argument that ultimately it is his subjective say-so regarding the sincerity of his belief, immune from any judicial scrutiny except in cases of fraud. [Filing No. 186 at 14-17]. He cites no Seventh Circuit case to support this contention, however. Instead, he cites *Adeyeye v. Heartland Sweeteners, LLC*, 721 F.3d 444, 454 (7th Cir. 2013), for the proposition that "[j]ust being 'willing to risk [one's] job' to follow one's beliefs shows sincerity." [Filing No. 186 at 24]. But *Adeyeye* makes clear that sincerity remains a jury question: "The record provides sufficient evidence for a reasonable jury to find that Adeyeye was acting on the basis of his own sincere religious beliefs." *Id.* The same result should obtain here. Moreover, Kluge's arguments that "there [is] no tension between [his] beliefs and his presbytery's" and that Brownsburg "tilts at its own strawman" when it pointed to Kluge's irreconcilable behavior can be made to a jury. [Filing No. 186 at 25]. The same is true of Kluge's "do no harm" mantra "by using students' last names"—if he "does not believe this inflicts harm" and that it "shows no insincerity" [Filing No. 186 at 25], then he is free to argue that to a jury, and Brownsburg can counter with evidence of his contradictory behavior in substantially similar settings.

The Court should conclude, as it did previously, that there are issues of fact regarding the sincerity of Kluge's belief and therefore summary judgment in his favor is inappropriate on his unlawful discrimination claim.

## Conclusion

For reasons stated, the Court should grant summary judgment in favor of Brownsburg and against Kluge on his remaining claims of unlawful discrimination and retaliation. The Court should also deny Kluge's partial motion for summary judgment and enter final judgment in Brownsburg's favor and against Kluge.

Respectfully submitted,

/s/ Brent R. Borg_____

Alexander P. Pinegar, Attorney No. 26543-49
Brent R. Borg, Attorney No. 27415-29
Church Church Hittle + Antrim
10765 Lantern Road, Suite 201
Fishers, IN  46038
317-773-2190

Attorneys for Defendant
Brownsburg Community School Corporation

## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of February 2024, a true and exact copy of the

foregoing was filed electronically via the Court's Electronic filing system. Notice of this filing

was sent to the following persons by operation of the Court's Electronic filing system:

Travis C. Barham
Alliance Defending Freedom
1000 Hurricane Shoals Road, N.E., Ste D-1100
Lawrenceville, GA 30043
tbarham@ADFlegal.org

Tyson C. Langhofer
Alliance Defending Freedom
15100 N. 90th Street
Scottsdale, AZ 85260
tlanghofer@ADFlegal.org

Roscoe Stovall, Jr.
Roscoe Stovall, Jr. & Associates
2 West Main Street
Mooresville, IN 46158
rstovall@roscoelaw.com

Michael J. Cork
Michael J. Cork, Esq.
5754 N. Delaware St.
Indianapolis, IN  46220-2528
cork0@icloud.com

Kevin E. Green
Kevin Green Associates
456 N. Meridian Street, #1517
Indianapolis, IN  46204
keglegal@aol.com

/s/ Brent R. Borg_____
Brent R. Borg, Attorney No. 27415-29

20