UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JOHN M. KLUGE, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | No. 1:19-cv-02462-JMS-KMB |
| | ) | |
| BROWNSBURG COMMUNITY SCHOOL | ) | |
| CORPORATION, | ) | |
| | ) | |
| *Defendant.* | ) | |

## <u>ORDER</u>

In pursuit of its goal to respect and support all students, including transgender students, Brownsburg Community School Corporation ("<u>BCSC</u>"), a public-school corporation, determined that if a student, the student's parents, and a health care provider requested that the student be called by a preferred name, that name would be entered in PowerSchool, the school's official student database.  Teachers were then required to call the student by that name.  One teacher, John Kluge, objected to that policy on religious grounds, and requested an accommodation so that he could refer to students by last name only.  While it initially granted the accommodation, BCSC withdrew it for the ensuing school year, finding that the practice was detrimental not only to transgender students' well-being, but also to the learning environment for other students and faculty.  This burden undermined BCSC's business of "fostering a safe, inclusive learning environment for all students."

Transgender issues recently came before the Seventh Circuit in *Parents Protecting our Children, UA v. Eau Claire Area Sch. Dist.*, 95 F.4th 501 (7th Cir. 2024), a case regarding issues

surrounding public school policies and transgender children.  The Seventh Circuit emphasized the sensitivity of this area of law and of life:

> Everyone reading this opinion will recognize the sensitivity, delicacy, and difficulty of the subject matter addressed by the Administrative Guidance. . . .  Today's decision affords [the school district] the opportunity to devise responses in each individual circumstance as it arises—informed by balanced, inclusive, and respectful dialogue.  Will those answers always come easy and satisfy everyone?  Hardly.  Life often deals challenging, frustrating, and messy hands.  Allowing solutions to be sought—or perhaps at times impasses to be reached—student by student and circumstance by circumstance most respects the role and position of [the school district] and the interests of all involved in and affected by implementation of the Administrative Guidance.

*Parents Protecting Our Children*, 95 F.4th at 506.

Unlike that recent case where parents were opposing the school's policy, this case concerns policies about transgender students which were the result of a collaborative effort between school officials, students, students' parents, and medical professionals.  It is against this backdrop that, following the Court's grant of summary judgment in favor of BCSC and a subsequent affirmance by the Seventh Circuit, then a vacation of its decision, a remand, and a mandate to this Court to apply new Supreme Court precedent, the Court considers a second round of Cross-Motions for Summary Judgment, which are ripe for the Court's review.  [Filing No. 182; Filing No. 184.]

# I.
## FACTUAL BACKGROUND[1]

### A.     The Parties

BCSC is a public-school corporation in Brownsburg, Indiana, and is governed by an elected Board of Trustees ("the Board").  [Filing No. 120-1 at 2.]  At all relevant times, Dr. Jim Snapp was the Superintendent, [Filing No. 120-1 at 3]; Dr. Kathryn Jessup was the Assistant Superintendent,

---

[1] As neither party sought additional discovery following remand, [Filing No. 178] much of the factual background is unchanged from the Court's first determination.

[Filing No. 120-1 at 2]; Jodi Gordon was the Human Resources Director, [Filing No. 113-4 at 5]; and Phil Utterback was the President of the Board, [Filing No. 113-3 at 5]. Brownsburg High School ("BHS") is the sole high school within BCSC. [Filing No. 120-2 at 2.] At all relevant times, Dr. Bret Daghe was the principal of BHS. [Filing No. 120-5 at 4.]

Plaintiff John Kluge was hired by BCSC in August 2014 to serve as a Music and Orchestra Teacher at BHS. [Filing No. 113-2 at 2; Filing No. 120-2 at 3.] He was employed in that capacity until the end of the 2017-2018 academic year. [Filing No. 120-2 at 3.] Mr. Kluge taught beginning, intermediate, and advanced orchestra, beginning music theory, and advanced placement music theory, and was the only teacher who taught any sections of those classes during his time at BHS. [Filing No. 120-2 at 3; Filing No. 120-3 at 19-20.] Mr. Kluge also assisted the middle school orchestra teacher in teaching classes at the middle school. [Filing No. 120-3 at 19-20.]

**B.      Mr. Kluge's Religious Beliefs**

Mr. Kluge identifies as a Christian and is a member of Clearnote Church, which is part of the Evangel Presbytery. [Filing No. 113-1 at 4.] Mr. Kluge serves as head of his church's youth group ministries, head of a discipleship program for children, and leader of a worship group. [Filing No. 120-3 at 5.] He further serves as a member of his church's board of elders, which is "part of the government of [the] church," over which they "exercise spiritual oversight." [Filing No. 120-3 at 3-4.]

Mr. Kluge's religious beliefs "are drawn from the Bible," and his "Christian faith governs the way he thinks about human nature, marriage, gender, sexuality, morality, politics, and social issues." [Filing No. 15 at 6.] "Mr. Kluge believes that God created mankind as either male or female, that this gender is fixed in each person from the moment of conception, and that it cannot be changed, regardless of an individual's feelings or desires." [Filing No. 15 at 6.] He also believes that "he cannot affirm as true ideas and concepts that he deems untrue and sinful." [Filing No. 15

at 7.] As a result of these principles, Mr. Kluge believes that "it is sinful to promote gender dysphoria." [Filing No. 15 at 5; Filing No. 120-3 at 5.] Transgenderism, according to Mr. Kluge, "is a boringly old sin that has been repented for thousands of years," and because being transgender is a sin, it is sinful for him to "encourage[] students in transgenderism." [Filing No. 113-1 at 8-9; *see also* Filing No. 120-3 at 10.]

### C.    BCSC's Policies and Practices Regarding Transgender Students

According to Dr. Jessup, BCSC's Assistant Superintendent, prior to the start of the 2017-2018 academic year, "several transgender students were enrolled as high school freshman for that school year," so "the high school community at BCSC began to become more and more aware of the needs of transgender students." [Filing No. 120-1 at 3.] "Several discussions were held by and between school leadership at both the high school level and the corporation level about addressing these needs." [Filing No. 120-1 at 3.]

BHS Principal Dr. Daghe testified that during the second semester of the 2016-2017 academic year, BHS faculty and staff members approached him seeking direction about how to address transgender students. [Filing No. 113-5 at 4.] In January 2017, administrators invited Craig Lee, a BHS teacher and faculty advisor of the Equality Alliance Club, to speak about transgenderism at a faculty meeting. [Filing No. 15-3 at 2; Filing No. 58-2 at 1-2.] At another faculty meeting in February 2017, Mr. Lee and a BHS guidance counselor, Lori Mehrtens, gave a presentation on what it means to be transgender and how teachers can encourage and support transgender students. [Filing No. 15-3 at 2.] At one of these meetings, Mr. Kluge "asked the question out loud about how the school will handle . . . those who believe transgenderism is sin/sexual immorality." [Filing No. 15-3 at 2.]

In May 2017, Mr. Kluge and three other teachers called a meeting with Dr. Daghe, during which they presented a signed letter expressing their religious objections to transgenderism and

4

other information supporting their position that BHS should not "promote transgenderism." [Filing No. 113-1 at 19-32; Filing No. 113-5 at 6; Filing No. 120-3 at 11.]  Reading the letter aloud, Mr. Kluge specifically asked that BCSC faculty and staff not be required to refer to transgender students using their preferred pronouns and that transgender students not be permitted to use the restrooms and locker rooms of their choice.  [Filing No. 15-3 at 3; Filing No. 113-1 at 30-31.] Explaining their perspective, Mr. Kluge urged BCSC not to revise its student anti-discrimination and harassment policies to include "transgender, gender identity, and sexual orientation as protected classes." [Filing No. 112-1 at 21.]  Mr. Kluge worried that it would prevent students from talking to friends with gender dysphoria "about their need for repentance." [Filing No. 112-1 at 21-22.]  Otherwise, Mr. Kluge claimed, religious observers would shirk their obligation "to discourage the harmful and dangerous lie that transgender students are giving themselves regarding their very existence," would "perpetuat[e] [transgender students'] sexual confusion," and would "push[] them down a harmful and dangerous path." [Filing No. 112-1 at 22-24.]  Mr. Kluge expressed his belief that requiring teachers to "refer to transgender students by their 'preferred pronoun'" instead of their "sexually correct birthnames" would only be "playing along with their psychiatric disorder" and thereby "encourage transgender students in their folly." [Filing No. 112-1 at 22-24; Filing No. 15-3 at 3.]  In Mr. Kluge's own words, he "pleaded . . . to not pursue the transgenderism path." [Filing No. 15-3 at 3.]

In response to these various competing concerns, BCSC implemented a policy ("the Name Policy"), which took effect in May 2017 and required all staff to address students by the name that appears in PowerSchool, a database that BCSC uses to record and store student information, including grades, attendance, and discipline.  [Filing No. 113-3 at 6; Filing No. 113-5 at 4; Filing No. 113-6 at 7.]  Transgender students could change their first names in PowerSchool if they

presented a letter from a parent and a letter from a healthcare professional regarding the need for a name change.  [Filing No. 113-5 at 4-5; Filing No. 120-1 at 4-5.]  Through the same process, students could also change their gender marker and the pronouns used to refer to them.  [Filing No. 113-5 at 5.]  In addition to the Name Policy, transgender students were permitted to use the restrooms of their choice and dress according to the gender with which they identified, including wearing school-related uniforms associated with the gender with which they identified.  [Filing No. 113-5 at 5.]  The three other teachers who initially expressed objections to "promot[ing] transgenderism" accepted the Name Policy, while Mr. Kluge did not.  [Filing No. 120-3 at 12.]

BCSC's practices regarding transgender students were based on BCSC's administrators' ultimate conclusion that "transgender students face significant challenges in the high school environment, including diminished self-esteem and heightened exposure to bullying" and that "these challenges threaten transgender students' classroom experience, academic performance, and overall well-being."  [Filing No. 120-1 at 3.]  Regarding the Name Policy specifically, Dr. Jessup explained:

> The high school and BCSC leadership thought that this practice furthered two primary goals.  First, the practice provided the high school faculty a straightforward rule when addressing students; that is, faculty need and should only call students by the name listed in PowerSchool.  Second, it afforded dignity and showed empathy toward transgender students who were considering or in the process of gender transition.  Stated differently, the administration considered it important for transgender students to receive, like any other student, respect and affirmation of their preferred identity, provided they go through the required and reasonable channels of receiving and providing proof of parental permission and a healthcare professional's approval.

[Filing No. 120-1 at 4.]

### D.    Mr. Kluge's Religious Objections to BCSC Policies and His Initial Accommodations

In July 2017, Mr. Kluge informed Dr. Daghe that he could not follow the Name Policy because he had a religious objection to referring to students using names and pronouns

corresponding to the gender with which they identify, rather than the biological sex that they were assigned at birth.  [Filing No. 113-2 at 3; Filing No. 113-5 at 5-6.]  Dr. Daghe called a meeting with Mr. Kluge and Dr. Snapp to discuss the situation.  [Filing No. 120-3 at 14-17; Filing No. 120-5 at 6.]  At the meeting, Dr. Daghe gave Mr. Kluge three options: (1) comply with the Name Policy; (2) resign; or (3) be suspended pending termination.  [Filing No. 120-3 at 14.]  Mr. Kluge refused to either follow the Name Policy or resign, so he was suspended pending termination.  [Filing No. 120-3 at 14-17.]  During his suspension, Mr. Kluge met with Dr. Daghe and Dr. Snapp, during which time Mr. Kluge requested "the ability to talk directly to students about their eternal destination," which Dr. Snapp told him was not allowed.  [Filing No. 112-6 at 6].

The following week, on July 31, 2017, another meeting was held between Dr. Snapp, Ms. Gordon, and Mr. Kluge.  [Filing No. 120-3 at 17.]  At the July 31 meeting, Mr. Kluge proposed that he be permitted to address all students by their last names only, similar to a sports coach ("the Last Names Only Accommodation"), and the administrators agreed.  [Filing No. 113-2 at 3-4; Filing No. 113-6 at 7; Filing No. 120-3 at 17.]  Mr. Kluge signed a document that stated the following, including a handwritten notation initialed by Ms. Gordon:

> You are directed to recognize and treat students in a manner using the identity indicated in PowerSchool.  This directive is based on the status of a current court decision applicable to Indiana.
>
> We agree that John may use last name only to address students.
>
> You are also directed not to attempt to counsel or advise students on his/her lifestyle choices.

[Filing No. 15-1 at 1.]  Another handwritten note, also initialed by Ms. Gordon, further stated: "In addition, Angie Boyer will be responsible for distributing uniforms to students."  [Filing No. 15-1 at 1.]

Mr. Kluge understood the Last Names Only Accommodation to mean that he would refer to all students—not just transgender students—by their last names only, not use any honorifics such as "Mr." or "Ms." to refer to any student, and if any student were to directly ask why he used last names only, he would respond that he views the orchestra class like a sports team and was trying to foster a sense of community. [Filing No. 120-3 at 18.] He also understood that he would not be required to distribute gender-specific orchestra uniforms to students. [Filing No. 120-3 at 17-18.]

### E.   BCSC Receives Complaints About Mr. Kluge's Use of Last Names Only

Dr. Daghe "first learned of concerns with Mr. Kluge and how he was addressing students in class" in an August 29, 2017, email from another teacher, Craig Lee, less than one month later. [Filing No. 120-2 at 4.] In addition to teaching classes at BHS, Mr. Lee was one of three teachers on the BHS Faculty Advisory Committee and the faculty advisor of the Equality Alliance, a student club that meets on a weekly basis to discuss issues that impact the LGBTQ community and provides a safe space for students who identify as LGBTQ. [Filing No. 120-2 at 4; Filing No. 120-14 at 6.] In relevant part, the email stated:

> I wanted to follow up regarding the powerschool/students changed name discussion at the Faculty Advisory [meeting] as some issues have arisen in the last few days that need to be addressed.... There is a student who has had their name changed in powerschool. They are a freshman who this teacher knew from 8th grade. The teacher refuses to call the student by their new name. I see this is a serious issue and the student/parents are not exactly happy about it.

[Filing No. 120-15 at 2.] Although the email did not mention Mr. Kluge by name, Dr. Daghe believed and was later able to confirm that the teacher discussed in the email was Mr. Kluge. [Filing No. 120-2 at 4.]

Regarding the Equality Alliance, between twelve and forty students generally attend each meeting, and in 2019 there were at least four transgender students who regularly attended

meetings.  [Filing No. 120-14 at 6-7; *see also* Filing No. 58-1 at 2 (estimating that there are "approximately five to ten transgender students currently in the Equality Alliance").]  Aidyn Sucec and Sam Willis were two transgender students who regularly attended Equality Alliance meetings during the relevant time.  [Filing No. 120-14 at 7.]  According to Mr. Lee, both Aidyn and Sam discussed during Equality Alliance meetings how Mr. Kluge was referring to them by their last names only, and they found that practice to be insulting and disrespectful.  [Filing No. 120-14 at 7.]  Mr. Lee testified that: "It was clearly visible the emotional distress and the harm that was being caused towards them.  It was very, very clear, and, so, that was clear for everyone to see but that is also what they described as well."  [Filing No. 120-14 at 7-8; *see also* Filing No. 120-14 at 8 ("Q: Was it your interpretation that Aidyn and Sam ... felt as if they were being discriminated against by Mr. Kluge? A: I wouldn't describe it so much as an interpretation.  It was just very, very clear at the meetings to see how much emotional harm was being caused towards Sam and Aidyn. It was clear for everyone at the meetings just to see how much of an impact it was having on them. So, when I say like I wouldn't call it an interpretation, I mean, it was so clearly visible that I don't feel like there was anything to necessarily interpret.").]

In his declaration, Mr. Lee stated the following:

During Equality Alliance meetings, we have a policy of not using names when discussing offensive or insensitive behavior of other students and faculty.  During the 2017-2018 school year, I heard students discuss how they were being treated "in orchestra class," or "by the orchestra teacher." I understood these to be references to John Kluge, the orchestra teacher at [BHS].

Mr. Kluge's behavior was a frequent topic of conversation during Equality Alliance meetings.  Students in Mr. Kluge's class said that they found not being called by their first names to be insulting and disrespectful.  Transgender students felt strongly that they wanted others to acknowledge their corrected names, and Mr. Kluge's refusal to do so hurt them.  These students also felt like it was their presence that caused Mr. Kluge's behavior, which made them feel isolated and targeted.  I relayed the students' concerns to the principal of [BHS] and the assistant superintendent of [BCSC].

Multiple times, Equality Alliance members mentioned that Mr. Kluge would occasionally "slip-up," and use first names or gendered honorifics (e.g., "Mr." or "Miss") rather than last names.  Some students also expressed that they felt that Mr. Kluge avoided acknowledging transgender students who raised their hands in class.

Mr. Kluge's behavior was also the subject of discussion outside of the Equality Alliance.  One student who was not a member of the Equality Alliance, but was in Mr. Kluge's orchestra class, approached me to tell me that Mr. Kluge's use of last names made him feel incredibly uncomfortable, even though he did not identify as LGBTQ.  The student said that he found Mr. Kluge's use of last names very awkward because he was fairly certain that all the students knew why Mr. Kluge had switched to using last names, and that it made the transgender students in Mr. Kluge's orchestra class stand out. This student told me that he felt bad for his transgender classmates.  He also mentioned that there were other students who felt this way as well.

[Filing No. 58-2 at 2-3.]

Dr. Jessup confirmed that Mr. Kluge's use of last names only was a topic of discussion at

Equality Alliance meetings, stating:

I attended a meeting of the [BHS] Equality Alliance Club in Fall 2017.  The purpose for my attending that meeting was concerns that had been shared from counselors of students feeling uncomfortable.  Approximately 40 students attended this meeting.  During the meeting, approximately four or five students complained specifically about a teacher using last names only to address students and, in my view, the other students in attendance appeared to agree with these complaints.  While the students did not identify John Kluge by name in making these complaints, it was certainly implied that he was the teacher in question, and I had no doubt that it was him they were speaking of since he was the only teacher employed by BCSC who had been permitted the accommodation of using last names only instead of using the names stated in PowerSchool.

[Filing No. 120-1 at 4.]

Mr. Lee also testified that three other teachers—Jason Gill, Melinda Lawrie, and Justin

Bretz—approached him during the 2017-2018 school year with concerns that Mr. Kluge's use of

last names only was causing harm to students.  [Filing No. 120-14 at 16-17.]  In addition, the

Faculty Advisory Committee met with Dr. Daghe approximately twice per month, and during those

meetings, "Mr. Lee continued to relate to [Dr. Daghe] the complaints and concerns he was hearing,

primarily in Equality Alliance Club meetings, ... about Mr. Kluge's use of last-names-only with students." [Filing No. 120-2 at 4.]  Dr. Daghe testified that in addition to receiving information from Mr. Lee, he received complaints from students and teachers, including teachers Tracy Runyon and Melissa Stainbrook, regarding Mr. Kluge referring to his students by last name only.  [Filing No. 113-5 at 8-9; *see also* Filing No. 113-4 at 9 (Ms. Gordon testifying that she "was made aware that there had been complaints made to Dr. Daghe from students and staff that Mr. Kluge wasn't following th[e] guidelines that he had agreed to at the start of the year").]

Aidyn Sucec was a transgender student in Mr. Kluge's orchestra class during the 2017-2018 academic year.  [Filing No. 22-3 at 1.]  Aidyn submitted a declaration in which he stated that after coming out as transgender, "[b]eing addressed and recognized as Aidyn was critical to helping alleviate [his] gender dysphoria," and his "emotional and mental health significantly improved once his family and friends began to recognize [him] as who [he is]."  [Filing No. 22-3 at 3.]  Pursuant to the Name Policy, Aidyn's mother and his therapist submitted letters requesting that his name and gender be updated in PowerSchool.  [Filing No. 22-3 at 3.]  According to Aidyn, Mr. Kluge referred to him by last name only or avoided referring to him by any name, instead simply nodding or waving in Aidyn's direction.  [Filing No. 22-3 at 4.]  However, Aidyn states that Mr. Kluge would sometimes refer to other students using the honorifics "Mr." or "Ms.," or by their first names.  [Filing No. 22-3 at 4.]  Aidyn believes that Mr. Kluge "avoided" him and other transgender students, and stated:

> Mr. Kluge's behavior made me feel alienated, upset, and dehumanized. It made me dread going to orchestra class each day, and I felt uncomfortable every time I had to talk to him one-on-one.  In addition, Mr. Kluge's behavior was noticeable to other students in the class.  At one point, my stand partner asked me why Mr. Kluge wouldn't just say my name.  I felt forced to tell him that it was because I'm transgender....  By the end of the first semester, in December of 2017, I told my mother that I did not want to continue taking orchestra during my sophomore year.

[Filing No. 22-3 at 4.]

Aidyn explains that "[t]he controversy around Mr. Kluge's resignation during the summer of 2018 is why [he] no longer attend[s] Brownsburg High School." [Filing No. 22-3 at 4.] Several students made negative and derogatory remarks to Aidyn, suggesting that he had been responsible for Mr. Kluge leaving the school, and "[t]hese incidents, in combination with [his] ongoing health struggles, made [him] feel that [he] could not return to school" after August 2018. [Filing No. 22-3 at 4-5.]

Sam Willis was another transgender student in one of Mr. Kluge's orchestra classes during the 2017-2018 academic year. [Filing No. 58-1 at 2.] Prior to the start of that year, he decided to publicly transition and use the name "Samuel" or "Sam" and masculine pronouns going forward. [Filing No. 58-1 at 2.] Although Sam's parents emailed the school counselor and Mr. Kluge directly to notify them of this change, Sam did not initially change his information in PowerSchool, because he was not aware of the Name Policy permitting him to do so. [Filing No. 58-1 at 2-3.] According to Sam, before he changed his information in PowerSchool, Mr. Kluge referred to him on several occasions as "Miss Willis," which led to confusion among other students and was "very upsetting" to Sam. [Filing No. 58-1 at 2-3.] Once Sam changed his first name and gender marker in PowerSchool, however, Mr. Kluge stopped referring to him as "Miss Willis," and Sam was permitted to wear the boys' tuxedo uniform for the fall orchestra concert. [Filing No. 58-1 at 3.] Sam states that Mr. Kluge generally used last names only to refer to students, but would occasionally use gendered honorifics or gendered pronouns with non-transgender students. [Filing No. 58-1 at 3.] Sam opines that "Mr. Kluge's use of last names in class made the classroom environment very awkward," and "[m]ost of the students knew why Mr. Kluge had switched to using last names, which contributed to the awkwardness and [Sam's] sense that [he] was being targeted because of [his] transgender identity." [Filing No. 58-1 at 3-4.] Sam states that Mr.

Kluge's actions upset him and his family, and exposed him and other transgender students to "widespread public scrutiny."  [Filing No. 58-1 at 5.]  His declaration ends with the following statement: "I truly believe that if everyone in my life had refused, like Mr. Kluge, to use my corrected name, I would not be here today."  [Filing No. 58-1 at 5.]

Mr. Kluge expressly disputes the allegations in Aidyn's declaration and the other allegations that he did not strictly comply with the Last Names Only Accommodation.  [*See* Filing No. 52-1.]  Natalie Gain, a teacher who led private music lessons for students during the school day, submitted a declaration stating that she never heard Mr. Kluge use gendered language in the classroom and "only heard him use last names with the students."  [Filing No. 52-2 at 3.]  She further stated that she "never heard any of the students discussing the ... use of last names" and "as far as [she] could tell, Mr. Kluge's accommodation was not common knowledge" among students. [Filing No. 52-2 at 3.]  Three students who were in Mr. Kluge's orchestra class during the 2017-2018 school year also submitted declarations stating that they never heard Mr. Kluge used gendered language, that they observed him using last names only to refer to all students, and that they did not witness him treating transgender students differently than other students.  [Filing No. 52-3; Filing No. 52-4; Filing No. 52-5.]

Dr. Daghe continued to hear complaints about Mr. Kluge throughout the fall 2017 semester, but was hopeful that the issue would resolve itself.  [Filing No. 120-2 at 4.]  It was not until December 2017 that Dr. Daghe determined it was appropriate to address these issues with Mr. Kluge directly.  [Filing No. 120-2 at 4.]  Mr. Kluge testified that he was not aware of any complaints until December 2017, and when Mr. Daghe informed him that complaints had been made, Dr. Daghe did not provide any specific information or disclose the names of people who had allegedly complained.  [Filing No. 120-3 at 21-23.]  Mr. Kluge further testified that he did not personally

13

witness or experience any tension with his students or other faculty members.  [Filing No. 120-3 at 23-24.]

### F.       Mr. Kluge's Discussions with Administration and Ultimate Resignation

On December 13, 2017, Mr. Kluge met with Dr. Daghe.  [Filing No. 113-2 at 4; Filing No. 120-3 at 22.]  Mr. Kluge's account of this meeting, in relevant part is as follows:

> [Dr.] Daghe scheduled a meeting with me to ask me how the year was going and to tell me that my last-name-only Accommodation was creating tension in the students and faculty.  He said the transgender students reported feeling "dehumanized" by my calling all students last-name-only.  He said that the transgender students' friends feel bad for the transgender students when I call the transgender students, along with everyone else, by their last-name-only.  He said that I am a topic of much discussion in the Equality Alliance Club meetings.  He said that a number of faculty avoid me and don't hang out with me or include me as much because of my stance on the issue.
>
> ***
>
> I explained to [Dr.] Daghe that this persecution and unfair treatment I was undergoing was a sign that my faith as witnessed by my using last-names-only to remain neutral was not coming back void, but was being effective. He didn't seem to understand why I was encouraged.  He told me he didn't like things being tense and didn't think things were working out.  He said he thought it might be good for me to resign at the end of the year.  I told [Dr.] Daghe that I was now encouraged all the more to stay.

[Filing No. 15-3 at 4-5.]  Mr. Kluge later testified that although Dr. Daghe stated during the meeting that the use of last names only was "creating complaints among many students," he would not provide the names of the students who complained.  [Filing No. 120-3 at 23.]  Mr. Kluge further testified that he did not witness any tension or experience any animosity from students or other faculty, and that his students were performing better than ever in their competitions, receiving high scores on their AP exams, and participating voluntarily in extra programs.  [Filing No. 120-3 at 23-24.]

On January 17, 2018, Dr. Daghe scheduled another meeting with Mr. Kluge, because he "didn't think he was direct enough in [the] December 13 meeting."  [Filing No. 15-3 at 5.]  At the

January 17 meeting, Dr. Daghe expressed that, because of complaints about the use of last names only, Mr. Kluge should resign at the end of the school year.  [Filing No. 15-3 at 5; Filing No. 120-3 at 25.]  Dr. Daghe offered to write Mr. Kluge letters of recommendation to help him find a new job.  [Filing No. 15-3 at 5.]

At the BHS faculty meeting on January 22, 2018, Dr. Jessup presented the faculty with a document titled "Transgender Questions." [Filing No. 15-3 at 5.]  The document contained a series of questions and answers concerning BCSC policies regarding transgender students and how faculty and staff should handle matters related to transgender students.  [*See* Filing No. 15-4.]  In addition to reiterating that the staff and faculty should address students by the names and genders listed in PowerSchool, [Filing No. 15-4 at 6; Filing No. 15-4 at 9], the document contained the following relevant questions and answers:

> **Are we allowed to use the student's last name only?**  We have agreed to this for the 2017-2018 school year, but moving forward it is our expectation the student will be called by the first name listed in PowerSchool.
>
> ***
>
> **How do teachers break from their personal biases and beliefs so that we can best serve our students?**  We know this is a difficult topic for some staff members, however, when you work in a public school, you sign up to follow the law and the policies/practices of that organization and that might mean following practices that are different than your beliefs.
>
> ***
>
> **What feedback and information has been received from transgender students?**  They appreciate teachers who are accepting and supporting of them. They feel dehumanized by teachers they perceive as not being accepting or who continue to use the wrong pronouns or names.  Non-transgender students in classrooms with transgender students have stated they feel uncomfortable in classrooms where teachers are not accepting.  For example, teachers that call students by their last name, don't use correct pronouns, don't speak to the student or acknowledge them, etc.

[Filing No. 15-4 at 9-10 (numbering omitted).]

Following the faculty meeting, Mr. Kluge sent an email to Dr. Snapp and Dr. Daghe, referring to the "Transgender Questions" document and asking whether he was correct in believing that he would continue to be permitted to follow the Last Names Only Accommodation after the 2017-2018 school year.  [Filing No. 120-16 at 2.]  In response to the email, Ms. Gordon and Dr. Daghe scheduled a meeting with Mr. Kluge to take place on February 6, 2018.  [Filing No. 15-3 at 6.]

Unbeknownst to the other attendees, Mr. Kluge secretly recorded audio of the February 6 meeting.  [Filing No. 113-4 at 20-55; Filing No. 120-3 at 25]  During the meeting, Mr. Kluge was informed that he would not be permitted to continue using last names only after the 2017-2018 school year.  [Filing No. 113-4 at 24.]  Ms. Gordon stated that employers are not obligated to accommodate all of their employees' religious beliefs, but instead need only provide reasonable accommodations, and the last names only accommodation was not reasonable.  [Filing No. 113-4 at 27.]  Mr. Daghe agreed.  [See Filing No. 113-4 at 28 ("Not when it's detrimental to kids it's not reasonable.").]  Ms. Gordon also discussed how Mr. Kluge's pay and other logistical matters would be handled, depending on whether he finished the current school year or resigned mid-year.  [Filing No. 113-4 at 33-35.]  Regarding "processing" of a resignation, Ms. Gordon explained the following to Mr. Kluge:

> [S]ometimes people are very sensitive about letting their students know[ ] or even their colleagues knowing ....
>
> ***
>
> If someone – I've had one for a year now, um, that we – someone submitted a resignation or retirement letter and asked "I'd rather you just hold onto this.  I'm not – I don't want it communicated.  I'd rather, you know, it just wait until the school year is over and then you process it." We honor requests like that.
>
> ***

16

> How long we hold that can hold us up a little bit on being able to search for a replacement. And obviously a replacement for your position ... is not going to be an easy one. So, you know, if that were to happen, it kind of depends on the position.
>
> ***
>
> So while we like to honor those, we also like to – to talk about, like, okay, a reasonable amount of time for us to be able to – in order to be able to find – put a – get a posting out and do a good search for someone.

[Filing No. 113-4 at 36-37.] According to Mr. Kluge, this explanation from Ms. Gordon led him to believe that he was entitled to submit a "conditional resignation." [*See* Filing No. 120-3 at 26 ("[Dr. Daghe and Ms. Gordon] said the option was I could give Jodi a conditional resignation that wouldn't be processed until a date I specified, that she had done that in the past, that she had held onto resignations and not processed them before and she would honor any such requests.").]

In March 2018, Ms. Gordon scheduled another meeting with Mr. Kluge. [Filing No. 15-3 at 6; Filing No. 113-2 at 6.] At that meeting, she informed Mr. Kluge that he could either follow the Name Policy and continue his employment, resign, or be terminated. [Filing No. 113-2 at 6.] She told him that, if he intended to resign, he would need to submit his resignation to her by May 1, 2018, otherwise the termination process would begin on that date. [Filing No. 15-3 at 6.]

On April 30, 2018, Mr. Kluge sent an email to Ms. Gordon with the subject "Request." [Filing No. 15-2 at 1.] The email stated:

> I'm writing you to formally resign from my position as a teacher, effective at the end of the 2017-2018 school year when my contract is finished, i.e., early August 2018.
>
> I'm resigning my position because [BCSC] has directed its employees to call transgender students by a name and sex not matching their legal name and sex. BCSC has directed employees to call these students by a name that encourages the destructive lifestyle and psychological disorder known as gender dysphoria. BCSC has allowed me the accommodation of referring to students by last name only starting in August 2017 so I could maintain a "neutral" position on the issue.
>
> Per our conversation on 3/15/18, [BCSC] is no longer allowing this accommodation. BCSC will require me to refer to transgender students by their

"preferred" name as well as by their "preferred" pronoun that does not match their legal name and sex.  BCSC will require this beginning in the 2018-2019 school year.  Because my Christian conscience does not allow me to call transgender students by their "preferred" name and pronoun, you have said I am required to send you a resignation letter by May 1, 2018 or I will be terminated at that time.

Please do not process this letter nor notify anyone, including any administration, about its contents before May 29, 2018.  Please email me to acknowledge that you have received this message and that you will grant this request.

[Filing No. 15-2 at 1.]

On the same day, Ms. Gordon replied to Mr. Kluge's email with the following:

I appreciate hearing from you.

I will honor your request and not process this letter or share with the BHS administration until May 29.

Let me know if you have any questions at all.

[Filing No. 15-2 at 1.]

Ms. Gordon believed that she was honoring Mr. Kluge's request not to "process" his resignation before May 29 by not presenting the resignation to the Board or sharing it with his colleagues and students until after that date.  [Filing No. 113-4 at 12.]  According to Ms. Gordon, submitting a resignation to her is equivalent to submitting a resignation to the superintendent, and the only permissible condition for an employee to include in a resignation is the end date of employment.  [Filing No. 113-4 at 11-12; Filing No. 113-6 at 6.]  However, in his deposition, Mr. Kluge characterized his resignation as a "conditional resignation, the condition being I could take it off [Ms. Gordon's] desk before May 29."  [Filing No. 120-3 at 27.]

Relevant to the issue of resignation, BCSC's Bylaws provide that:

> Pursuant to State law, following submission of a resignation to the Superintendent, the employee may not withdraw or otherwise rescind that resignation.... The Superintendent shall inform the Board of the submission of that resignation at its next meeting. The Board may choose to accept that resignation, deny that resignation or take any other appropriate action relating to the termination, suspension or cancellation or employment of the person submitting the resignation. A resignation, once submitted, may not then be rescinded unless the Board agrees.

[Filing No. 113-6 at 8.] The Bylaws cite Indiana Code § 5-8-4-1, which in turn provides that:

> Whenever any officer, servant or employee of ... any ... school corporation[ ] ... shall submit in writing his or her resignation, whether to take effect at once, when accepted, or at some future fixed date, with the proper officer, person or persons or authority of government to receive such resignation, the person so submitting such written resignation shall have no right to withdraw, rescind, annul or amend such resignation without the consent of the officer, person or persons or authority of government having power by law to fill such vacancy.

In May 2018, Mr. Kluge attended an orchestra awards ceremony. [Filing No. 120-3 at 32.] At the ceremony, he addressed all students by their first and last names, including transgender students, whom Mr. Kluge addressed by their preferred first names. [Filing No. 120-3 at 33.] Mr. Kluge explained that he used first and last names because "it would have been unreasonable and conspicuous" to refer to students by last names only at a formal event. [Filing No. 120-3 at 33.] Mr. Kluge also opined that referring to students by last name only at the awards ceremony would be inconsistent with the Last Names Only Accommodation, because the accommodation was based on the understanding that he would address students like a sports coach would, and a sports coach would likely use first and last names at a formal event. [Filing No. 120-3 at 33.]

On May 25, 2018, Mr. Kluge was scheduled to meet with Ms. Gordon and Dr. Daghe, but when he arrived for the meeting, Mr. Daghe told him that the meeting was cancelled because "We have everything we need." [Filing No. 15-3 at 1.] That same afternoon, Mr. Kluge submitted to Ms. Gordon a document titled "Withdrawal of Intention to Resign and Request for Continuation of Accommodation." [Filing No. 15-3 at 1-7.] In that document, Mr. Kluge explained that he was "confused" as to why Dr. Daghe cancelled the meeting, and asserted that at the meeting he planned

to withdraw his "emailed intention to resign," which he had sent to Ms. Gordon on April 30 along with a request that the email not be processed.  [Filing No. 15-3 at 1.]  He outlined his version of events leading up to his forced resignation, accused BCSC of discriminating against him based on his religious beliefs, and ultimately asked that he be permitted to continue his employment using the last names only accommodation.  [Filing No. 15-3 at 1-7.]  Approximately two hours after Mr. Kluge submitted the purported rescission to Ms. Gordon, BCSC "locked [Mr. Kluge] out of the BCSC buildings and internet database, and posted [his] job as vacant."  [Filing No. 113-2 at 7.]

At a Board meeting on June 11, 2018, Mr. Kluge asked the Board not to accept his resignation and to reinstate his employment.  [Filing No. 113-2 at 7; Filing No. 120-18 at 10.] Various members of the community also spoke at the meeting, some in support of Mr. Kluge's resignation, and others against it.  [See Filing No. 120-18 at 9-13.]  The Board accepted Mr. Kluge's resignation, thereby ending his employment with BCSC.  [Filing No. 113-2 at 7; Filing No. 120-18 at 2.]

## II.
### RELEVANT PROCEDURAL BACKGROUND AND SCOPE OF REMAND

Mr. Kluge later filed this lawsuit, in which his Amended Complaint asserted thirteen claims against BCSC and several of its employees.  [Filing No. 15.]  Upon Defendants' Motion to Dismiss, [Filing No. 44], the Court dismissed several claims and Defendants, leaving only Mr. Kluge's claims against BCSC for failure to accommodate and retaliation under Title VII, [Filing No. 70]. Mr. Kluge then filed his Motion for Partial Summary Judgment seeking judgment in his favor on his failure to accommodate claim.  [Filing No. 112.]  In response, BCSC filed its Cross-Motion for Summary Judgment seeking judgment in its favor on the failure to accommodate claim and the retaliation claim.  [Filing No. 120.]  In addition, the National Association of Social Workers and its Indiana Chapter, the American Academy of Pediatrics and its Indiana Chapter, the American

Medical Association, and Indiana Youth Group (collectively, "Movants") filed a Motion for Leave to File Brief of Amici Curiae, seeking "to offer additional insight regarding the harm of [Mr. Kluge's] proposed accommodation on the health and wellbeing of transgender students that is not discussed in the briefs submitted by the parties to this case." [Filing No. 131 at 1.] Originally, the Court denied Mr. Kluge's Partial Motion for Summary Judgment, [Filing No. 112,] and granted BCSC's First Motion for Summary Judgment, [Filing No. 120.] *Kluge v. Brownsburg Cmty. Sch. Corp.*, 548 F. Supp. 3d 814, 846-49 (S.D. Ind. 2021).

Mr. Kluge appealed, and the Seventh Circuit "affirm[ed] the grant of summary judgment in favor of Brownsburg," including the claim for retaliation. *Kluge v. Brownsburg Cmty. Sch. Corp.*, 64 F.4th 861, 899 (7th Cir. 2023) (*Kluge I*), *vacated by Kluge v. Brownsburg Cmty. Sch. Corp.*, No. 21-2475, 2023 WL 4842324 (7th Cir. July 28, 2023) (*Kluge II*). Judge Brennan "concur[red in] the judgment" in favor of BCSC's claim for retaliation. *Id.* at 926 (Brennan, J., concurring in part and dissenting in part).

Before the mandate in *Kluge I* issued, the Supreme Court decided *Groff v. DeJoy*, 143 S. Ct. 2279 (2023), in which it clarified the standard for undue hardship in Title VII religious accommodation cases. Formerly, it was an undue hardship to require an employer to accommodate an employee's religion, resulting in anything beyond a "de minimis cost." *See Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977). After *Groff*, the standard was clarified; now, it would be an undue hardship if granting the accommodation would result in "substantial increased costs in relation to the conduct of its particular business." *Groff*, 143 S. Ct. at 2295.

After the Supreme Court's decision, the Seventh Circuit vacated its prior opinion and "remanded for [the Court] to apply the clarified standard to the religious accommodation claim." *Kluge II*, 2023 WL 4842324, at * 1. Based on *Kluge II*, the parties filed a second round of Cross-

Motions for Summary Judgment in which they analyze this case under the standard set forth in *Groff*.

At the outset, the Court notes that it will not reevaluate Mr. Kluge's retaliation claim. The Supreme Court's opinion in *Groff* does not even mention the word "retaliation." Likewise, the Seventh Circuit specifically "remanded for [the Court] to apply the clarified standard to the religious accommodation claim." *Kluge II*, 2023 WL 4842324, at *1. To avoid exceeding the scope of remand, but in the interest of completeness, the Court incorporates by reference its discussion and ruling regarding retaliation. *See generally Kluge*, 548 F. Supp. 3d at 846-49 (observing that "Mr. Kluge's briefing on his retaliation claim is meager, totaling less than three pages"). As before, the Court **DENIES** Mr. Kluge's Motion for Summary Judgment, [Filing No. 182], as to his retaliation claim, and **GRANTS** BCSC's Cross-Motion for Summary Judgment, [Filing No. 184], as to Mr. Kluge's retaliation claim.

As ordered by the Seventh Circuit, the Court considers here how the clarified standard in *Groff* applies to the Last Names Only Accommodation.[2]

## III.
### STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the

---

[2] The Court notes that its discussion will at times cite to *Kluge I*, 64 F.4th 861 (7th Cir. 2023). The Court does not seek to inappropriately cite to a vacated opinion. Rather, such citations reflect only convenient references to the record or to lines of reasoning that align with what the Court would already have determined or is now determining in any event. The parties have taken no new discovery and their factual focus has remained largely the same, as reflected in the Court's narration of the factual background.

asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits.  Fed. R. Civ. P. 56(c)(1)(A).   A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1)(B).  Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated.  Fed. R. Civ. P. 56(c)(4).  Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment.  Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision.  A disputed fact is material if it might affect the outcome of the suit under the governing law.  Hampton v. Ford Motor Co., 561 F.3d 709, 713 (7th Cir. 2009).  In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative.  Harper v. Vigilant Ins. Co., 433 F.3d 521, 525 (7th Cir. 2005).  Fact disputes that are irrelevant to the legal question will not be considered.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

"On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events.  Johnson v. Cambridge Indus., 325 F.3d 892, 901 (7th Cir. 2003).  The moving party is entitled to summary judgment if no reasonable factfinder could return a verdict for the nonmoving party.  Nelson v. Miller, 570 F.3d 868, 875 (7th Cir. 2009).  The court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor.  Darst v. Interstate Brands Corp., 512 F.3d 903, 907 (7th Cir. 2008).  It cannot weigh evidence or make credibility determinations on summary

judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).  The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them." *Johnson*, 325 F.3d at 898.  Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).  "To determine whether genuine issues of material fact exist, we ask if 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Adeyeye v. Heartland Sweeteners, LLC*, 721 F.3d 444, 449 (7th Cir. 2013).

"The existence of cross-motions for summary judgment does not, however, imply that there are no genuine issues of material fact." *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Engineers*, 335 F.3d 643, 647 (7th Cir. 2003).  Specifically, "[p]arties have different burdens of proof with respect to particular facts; different legal theories will have an effect on which facts are material; and the process of taking the facts in light most favorable to the non-movant, first for one side and then for the other, may highlight the point that neither side has enough to prevail" on summary judgment. *Id.* at 648.

## IV.
### MR. KLUGE'S MOTION FOR SUMMARY JUDGMENT

Mr. Kluge seeks summary judgment in his favor on his religious accommodation claim.  In reviewing his motion, the Court must consider the evidence in the light most favorable to BCSC. In order to prevail, Mr. Kluge must establish either that the evidence viewed through that lens – or evidence that is undisputed – entitles him to judgment.

In support of his motion, Mr. Kluge emphasizes that "he is a devout man who served as an ordained elder, worship leader, head of youth ministries," and more as part of his evangelical Christian congregation.  [Filing No. 183 at 27 (citing Filing No. 120-3 at 4-5.)]  He believes that "God ordained '[g]enetic sex,'" and it "'cannot be separated' from gender identity, and the two 'remain bound together throughout one's life.'"  [Filing No. 183 at 21 (citing Filing No. 120-3 at 38).]  Mr. Kluge explains that his beliefs correspond with his church's teachings, which admonish adherents that "[a]ny attempt of a man to play the woman or a woman to play the man violates God's decree, attacks His created order, and constitutes sin so serious that God Himself pronounces it an 'abomination.'"  [Filing No. 120-4 at 10.]  These beliefs, Mr. Kluge maintains, inform his desire to avoid referring to students by their preferred names when not in line with their gender assigned at birth.  According to Mr. Kluge, were he to use preferred names, he would be encouraging sin.

In its response, BCSC questions Mr. Kluge's religious sincerity.  BCSC notes that during the orchestra awards ceremony, Mr. Kluge "used the full names for students as listed in PowerSchool to address all students as they received their awards, including transgender students." [Filing No. 185 at 51.]  Consequently, BCSC argues that Mr. Kluge "cannot legitimately reconcile" his in-class use of last names with the awards-ceremony use of full names.  [Filing No. 185 at 51.] BCSC argues that "[Mr.] Kluge acknowledged that by addressing students by their 'transgender names' during the ceremony, he was seeking to avoid the same type of negative consequences that resulted" from using only last names in class.  [Filing No. 185 at 51.]  BCSC also points to Mr. Kluge's Book of Church Order, which explains that "if a female has transitioned to a male in appearance" "until she has been presented with pastoral counsel," "it may be best that she not use the bathroom of her birth sex."  [Filing No. 120-4 at 12.]

Mr. Kluge argues in reply that BCSC "has no evidence for doubting Mr. Kluge's sincerity except second-guessing his decision to refer briefly to all students by their names listed in PowerSchool during one awards ceremony. . . . [H]e was endeavoring to comply with his obligation to abide by his religious accommodation and act in a spirit of bilateral cooperation with the district, . . . and this out-of-the-ordinary behavior at a formal ceremony did not violate—but rather furthered—his sincerely held religious beliefs." [Filing No. 183 at 28 (internal citations and emphasis omitted).]  According to Mr. Kluge, to decide otherwise would forgo protection to "nuanced religious beliefs" and allow "skeptics [to] dictate what a religious person must believe and do." [Filing No. 183 at 22.]

Title VII "prohibits employers from discriminating against employees and job applicants based on their religion." *Adeyeye v. Heartland Sweeteners, LLC*, 721 F.3d 444, 448 (7th Cir. 2013). To be entitled to protection under Title VII, the employee's religious belief must be sincere.  *Id.* One way to evaluate sincerity is to answer whether "a jury could find that for [the employee] to observe his religion appropriately, it was necessary for him to participate" in his religiously motivated conduct.  *See Id.* at 452.  In determining "whether a belief is in fact religious for purposes of Title VII," the "belief necessitating the accommodation must actually be religious," and "that religious belief must be sincerely held." *Id.* at 448.  Whether a religious belief is "sincerely held," is a "question of credibility." *Nottelson v. Smith Steel Workers D.A.L.U. 19806*, 643 F.2d 445, 455 (7th Cir. 1981).  Because "assessments of credibility are left to the trier" of fact, *Baz v. Walters*, 782 F.2d 701, 707 (7th Cir. 1986), "credibility assessments are inappropriate at summary judgment," *EEOC v. United Parcel Serv.*, 94 F.3d 314, 419 (7th Cir. 1996).

As the Seventh Circuit has held, religious sincerity is a matter "where the law must tread lightly. . . . 'Courts are not arbiters of scriptural interpretation.'" *Adeyeye*, 721 F.3d at 453 (quoting

*Thomas v. Review Bd. of Indiana Employment Sec. Division*, 450 U.S. 707, 716 (1981)).  It is also true that "an employee is not permitted to redefine a purely personal preference or aversion as a religious belief." *Reed v. Great Lakes Companies, Inc.*, 330 F.3d 931, 935 (7th Cir. 2003), *abrogated on other grounds by E.E.O.C. v. Abercrombie & Fitch Stores, Inc.,* 135 S. Ct. 2028 (2015).  "Otherwise he could announce without warning that white walls or venetian blinds offended his 'spirituality,' and the employer would have to scramble to see whether it was feasible to accommodate him by repainting the walls or substituting curtains for venetian blinds." *Id.*

On one hand, Mr. Kluge has put forth evidence that his religious beliefs prohibit him from addressing a transgender student by their preferred name.  On the other hand, BCSC has put forth evidence undermining the issue of whether "to observe his religion appropriately, it was necessary for him to participate" in his religiously motivated conduct, such as when at the orchestra awards ceremony, Mr. Kluge did indeed refer to transgender students by their preferred names, during an event in which using last names would expose him to more scrutiny than in his classroom.  Further, it is not clear that in order to "observe his religion appropriately, it was necessary for him" to avoid addressing transgender students consistent with their identified gender.  And it appears Mr. Kluge's Book of Church Order would not require as much.  As the Seventh Circuit has observed once before, "[i]n order to consider [Mr.] Kluge's request" to grant "summary judgment in his favor, [the Court] would be required to review the facts in the light most favorable to the defendant," BCSC.  *Kluge I*, 64 F.4th at 879 n.12 (citing *Hess v. Reg-Ellen Machine Tool Corp.*, 423 F.3d 653, 658 (7th Cir. 2005)).  In this case, that means viewing the facts in the light most favorable to BCSC.  A reasonable jury could find that Mr. Kluge's religious beliefs were sincere in that he was religiously prohibited from addressing transgender students by their preferred names; alternatively, a reasonable jury could find that Mr. Kluge's religious beliefs were insincere in that avoiding

addressing transgender student by their preferred names was a "purely personal preference." *Great Lakes Companies, Inc.*, 330 F.3d at 934-35. Because there is a genuine dispute of material fact over whether Mr. Kluge's religious beliefs were sincere, Mr. Kluge is not entitled to summary judgment on his failure-to-accommodate claim and the Court need not consider whether BCSC has shown that the accommodation would be an undue hardship. Accordingly, Mr. Kluge's Motion for Summary Judgment, [Filing No. 182], on his failure-to-accommodate claim is **DENIED**.

## V.
### BCSC's CROSS-MOTION FOR SUMMARY JUDGMENT

The Court now turns to BCSC's Cross-Motion for Summary Judgment. For Mr. Kluge's Cross-Motion, the Court viewed the facts in the light most favorable to the non-movant, BCSC. For BCSC's Cross-Motion, the Court extends that same favorable lens of review to Mr. Kluge, as the non-movant. For this reason, the Court assumes that Mr. Kluge's religious beliefs are sincere. The parties do not dispute that Mr. Kluge has otherwise made his prima facie case of religious discrimination regarding the revocation of the Last Names Only Accommodation. The Court thus focuses primarily on whether there is a genuine dispute over whether BCSC has demonstrated that extending to Mr. Kluge the Last Names Only Accommodation would amount to an undue hardship. Before engaging in that inquiry, the Court recounts the newly clarified "substantial cost" standard for undue hardship, recently established by the Supreme Court in *Groff v. DeJoy*, 143 S. Ct. 2279 (2023).

### A.      Failure-to-Accommodate under *Groff*

*Groff v. DeJoy* concerned a religious employee who "believe[d] for religious reasons that Sunday should be devoted for worship and rest." 143 S. Ct. at 2281. Consequently, the employee refused to work on Sundays, conduct for which he was progressively disciplined and ultimately resigned. *Id.* at 2282. The employee sued under Title VII, and on appeal the Supreme Court

vacated and remanded, clarifying the standard an employer must meet to prove undue hardship. Before *Groff*, it was considered an undue hardship to require an employer to accommodate an employee's religion if it resulted in any cost beyond a "de minimis cost." *See Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977). In *Groff*, the Supreme Court explained that now, "an employer must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business." *Groff*, 143 S. Ct. at 2295. In evaluating whether certain facts meet that clarified standard, the Supreme Court stated that, "courts must apply the test in a manner that takes into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, 'size and operating cost of [an] employer.'" *Id.*

In clarifying the standard, the Supreme Court emphasized that certain kinds of costs are irrelevant in evaluating undue hardship. For example, the Supreme Court explained that "not all impacts on coworkers are relevant," but only "worker impacts" that go on to "affec[t] the conduct of the business." *Id.* at 2296. And "it would not be enough for an employer to conclude that forcing other employees to work overtime would constitute an undue hardship. Consideration of other options, such as voluntary shift swapping, would also be necessary." *Id.* at 2297.[3] "[N]o undue hardship is imposed by temporary costs of voluntary shift swapping, occasional shift swapping, or administrative costs." *Id.* at 2296. The Supreme Court noted that employers might be required to consider other accommodations, "including those involving the cost of incentive pay, or the administrative costs of coordination with other nearby stations with a broader set of

---

[3] In a concurrence, Justice Sotomayor observed that some costs to employees would be indirectly relevant, *Id.* at 2298 (Sotomayor, J., concurring) (stating that "[b]ecause the 'conduct of [a] business' plainly includes the management and performance of the business's employees, undue hardship on the conduct of a business may include undue hardship on the business's employees.").

employees." *Id.* at 2297.  Although the Supreme Court removed some costs from consideration, it left others untouched, including non-economic costs.  *See Id.* at 2290 (citing *Trans World Airlines,* 432 U.S. at 83 n.14 (considering violation of seniority rights, which are non-economic costs and cited favorably by *Groff*)); *see also V. v. Vilsack*, 2024 WL 1155256 at *9 (E.E.O.C. Mar. 7, 2024) (applying *Groff* to state that "[u]ndue hardship, however, is not limited to considerations of financial cost.  Indeed, Title VII does not refer to 'cost' at all.").

The Supreme Court ultimately shunned bright-line rules in evaluating what amounts to a "substantial cost" under Title VII.  Instead, the Court held that it is "appropriate to leave it to the lower courts to apply [its] clarified context-specific standard, . . . ."  *Groff*, 143 S. Ct. at 2297.  The Supreme Court stated that "courts should resolve whether a hardship would be substantial in the context of an employer's business" as a matter of "common sense."  *Id.* at 2296.  The Court therefore proceeds to analyze the nature of BCSC's business before continuing to discuss the dispute over undue hardship.

### B.    Undue Hardship and the Nature of a School's Business

BCSC states that the nature of its business is "educating all students," which it achieves by "fostering a learning environment of respect and affirmation."  [Filing No. 185 at 38.]  BCSC states that "[t]he value of any student's safety and ability to learn at school is not minimized within larger school districts."  [Filing No. 185 at 38.]  It states further that because educating students "has constitutional and statutory dimension," "whether the school has 100 students or 10,000 students," when risking "the safety and education of . . . students," the "level of undue hardship . . . is the same."  [Filing No. 185 at 38.]  BCSC, a public high school, contrasts its "business" to that of "most employers," which it states are typically for-profit "corporations or non-profits," whose costs are commonly "operational" or "monetary."  [Filing No. 185 at 38.]  Unlike those kinds of enterprises, BCSC states that "[i]t does not exist to maximize shareholder investment or raise

money for a cause," but rather to "educat[e] all students and foster[] a safe, inclusive environment

for *all* the children it serves." [Filing No. 185 at 38-39 (emphasis in original).]

Mr. Kluge argues that BCSC "ignores the scope of its educational mission." [Filing No.

186 at 35.] Mr. Kluge argues that "missing entirely is any legal support" that BCSC's mission is

to "educat[e] all students and foster[] a safe, inclusive learning environment for all the children it

serves." [Filing No. 186 at 35.] On the contrary, Mr. Kluge insists that under the Indiana

Constitution, BCSC is not held to "any standard of educational achievement that must be attained

by the system of common schools." [Filing No. 186 at 35.] Mr. Kluge argues that BCSC need

merely make its school "open to the children of all inhabitants of a town or district." [Filing No.

186 at 36.] Such a mandate, Mr. Kluge argues, does not "requir[e] the district to make all students

or parents happy," or "mandate[] that all district employees endorse students' beliefs or allow

complaints to scuttle a Title VII religious accommodation." [Filing No. 186 at 36.] Mr. Kluge

asserts that "[l]etting [him] call all students by last names prevents nobody from attending school."

[Filing No. 186 at 36.] Mr. Kluge asserts that "fostering a safe, inclusive learning environment"

for all students is not a "legal mandate" but is simply BCSC's "preference." [Filing No. 186 at 27.]

BCSC replies that its mission to "foster[] a safe, inclusive learning environment" is

supported by Indiana state law. [Filing No. 187 at 9.] BCSC states that the Indiana Code grants a

school corporation "all the powers needed for the effective operation of the school corporation,"

"even if the power is not granted by statute or rule." [Filing No. 187 at 9.] Among these powers,

BCSC states that the Indiana Code "gives a school corporation's board the power to 'conduct the

educational affairs of the school corporation.'" [Filing No. 187 at 9.] And specifically, BCSC

states that the Indiana Code requires teachers to "receive training on . . . 'instruction in evidence

based social emotional learning classroom practices that are conducive to supporting students who

have experienced trauma that may interfere with a student's academic functioning.'" [Filing No. 187 at 9.] BCSC states that the Indiana Code "makes it apparent that fostering a safe and inclusive learning environment for all students is consistent with a school corporation's mission." [Filing No. 187 at 9.]

Indiana state law provides BCSC the power to set its policy, and Seventh Circuit authority determines to what extent that policy complies with Title VII. Even if the Indiana Constitution may well specify only that schools must be "open," Indiana law also grants a school corporation "all . . . powers necessary or desirable in the conduct of the school corporation's affairs, even if the power is not granted by statute or rule," Ind. Code § 20-26-3-3(b)(2), including BCSC's decision to pursue its mission to affirm the well-being of all students. Even as the Supreme Court undid the *de minimis* standard, it left untouched the long line of Seventh Circuit authority squarely holding that an employer can define its own legitimate mission, and that contradictions to its legitimate mission are relevant to analyzing undue hardship. *See, e.g.*, *Anderson v. U.S.F. Logistics (IMC), Inc.*, 274 F.3d 470, 477 (7th Cir. 2001) (holding that "[a] religious practice that does not actually impose religious beliefs upon others can still be restricted if it impairs an employer's legitimate interests"); *EEOC v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1575 (7th Cir. 1997) (analyzing undue hardship with respect to employer's "legitimate concerns for its business" and "legitimate business reasons"); *Seshadri v. Kasraian*, 130 F.3d 798, 800 (7th Cir. 1997) (analyzing religious accommodation claim with respect to employer's "legitimate expectations"); *Ryan v. Dep't of Just.*, 950 F.2d 458, 426 (7th Cir. 1991) (observing that "[l]egal institutions lack the sense of nuance that will tell . . . how far the rules may be bent without injur[ing]" employer's "mission"); *Baz*, 782 F.2d at 706 (analyzing undue hardship with respect to employer's "established theory and

practice"); *Minkus v. Metro. Sanitary Dist. of Greater Chicago (MSD)*, 600 F.2d 80, 84 (7th Cir. 1979) (analyzing undue hardship with respect to employer's "legitimate purpose").

> As the Seventh Circuit earlier observed in *Kluge I*:
>
> Brownsburg's "business" for the purpose of analyzing undue hardship was to provide public education.  Unlike a for-profit corporation, Brownsburg's mission of education for all students was mandated by the State's constitution and legislature.  In Indiana, public schools play a custodial and protective role in the compulsory education system, and public schools stand in the relation of parents and guardians to the students regarding all matters of discipline and conduct of students. *Linke v. Nw. Sch. Corp.*, 763 N.E.2d 972, 979 (Ind. 2002).  After conducting its own research, the school reasonably deferred to the judgment of parents and healthcare providers regarding how to meet the specific needs of transgender students.

*Kluge I*, 64 F.4th at 889.  All consistent with the Supreme Court's decision in *Groff*, this is simply "common sense":  a public school is not a typical business; a public-school student is not a typical customer.  Far from maximizing shareholder value, the stated nature of BCSC's business is providing a supportive environment for students and respecting the legitimate expectations of their parents and medical providers.  Ultimately, BCSC is entitled to determine that its legitimate mission does not stop at whether some students are literally blocked from entering the schoolhouse gates; rather, that mission can legitimately extend to fostering a safe, inclusive learning environment for all students and evaluating whether that mission is threatened by substantial student harm and the potential for liability.

### 1.  *Substantial Student Harm*

In support of its Cross-Motion for Summary Judgment, BCSC states that "the last-name-only accommodation resulted in 'substantial student harm.'"  [Filing No. 185 at 37.]  BCSC observes that students and teachers alike "complained that Mr. Kluge's behavior was insulting[,] offensive and made his classroom environment unwelcoming and uncomfortable."  [Filing No. 185 at 37.]  BCSC states that Aidyn was among these students, who "dreaded" attending Mr. Kluge's orchestra class.  [Filing No. 185 at 37.]  BCSC notes the Court's prior summary judgment

ruling, which stated "Mr. Kluge does not dispute that refusing to affirm transgender students in their identity can cause emotional harm," "harm [that is] likely to be repeated each time a new transgender student joins Mr. Kluge's class (or, as the case may be, chooses not to enroll . . . solely because of Mr. Kluge's behavior)." [Filing No. 185 at 37.] BCSC states that all of these events memorialized by the designated evidence "establish[] that the last-name-only accommodation disrupted the learning environment." [Filing No. 185 at 37.] BCSC refers to the Court's first summary judgment ruling to say that the accommodation did not merely "tangential[ly] interfere[]" with "some aspect" of its business; rather, it "'actively interfered with BCSC's mission,'" which is "to provide a safe and supportive educational environment." [Filing No. 185 at 39.] BCSC observes that "transgender students . . . have it hard enough . . . moving from childhood to . . . adulthood"; stating that the school should not be compelled to continue the accommodation of a teacher, who is an adult, over the well-being of students, who are children. [Filing No. 185 at 40.]

In his response, Mr. Kluge argues that BCSC "cannot show any increased costs that are substantial in the overall context of its business." [Filing No. 186 at 26.] Mr. Kluge asserts that BCSC "rescinded [his] accommodation due to complaints," but "[a] few third-party grumblings do not create undue hardship." [Filing No. 186 at 28.] Pointing to *Groff*, Mr. Kluge states that "all [BCSC] offers" are complaints from coworkers, animosity to religion, bias against religion, and aversion to dealing with religious people. [Filing No. 186 at 28.] Parents, according to Mr. Kluge, complained both before and after "they changed their children's names in PowerSchool—when no district policy or practice even applied." [Filing No. 186 at 29.] Teachers, according to Mr. Kluge, "felt hurt," "upset," "awkward," or "uncomfortable," but "[n]one of this shows undue hardship." [Filing No. 186 at 29.] Students, according to Mr. Kluge, "experienced no disruptions . . . and . . . excelled. . . . Every teacher has a few unhappy students." [Filing No. 186 at 29.] Mr. Kluge argues

that "no matter how [BCSC] tries to relabel its interests, they all rest on" complaints from parents, teachers, and students, which amount to "grumblings," or hostility to religious practice, all of which are "now definitively 'off the table.'" [Filing No. 186 at 31]

BCSC replies that "the complaints it received from students and others in the high school community evidenced harm to students and disrupted the learning environment. . . . No evidence . . . would allow a reasonable factfinder to conclude those complaints were motivated by religious animosity." [Filing No. 187 at 4.] BCSC refers to the Court's prior summary judgment ruling and argues that "[Mr.] Kluge ignores . . . [BCSC's] particular business of educating all students. This Court recognized as much in its previous summary judgment ruling, reasoning that other students' successes are 'neither dispositive of nor relevant to the undue hardship question.'" [Filing No. 187 at 5.] BCSC states that "the concerns of students, who are children, should weigh heavier than those of co-workers, who are adults, for purposes of Title VII undue hardship analysis, particularly when one considers that a business does not exist to employ workers, whereas a school exists to educate students." [Filing No. 187 at 6.] BCSC states further that "the level of undue hardship caused by putting the safety and education of several students at risk is the same whether the school has 100 students or 10,000 students." [Filing No. 185 at 38.]

As the Supreme Court held in *Groff*, analyzing undue hardship must be done in the context of an employer's particular business. And as the Court has explained, that context is BCSC's mission to foster a supportive learning environment for all students. The Court thus analyzes to what extent the Last Names Only Accommodation so undermined BCSC's legitimate mission as to create a substantial increased cost, and hence an undue hardship.

BCSC's business is "educating all students," which it achieves by "fostering a learning environment of respect and affirmation." [Filing No. 185 at 38.] Part of that is BCSC's mission

to "afford[] dignity and empathy toward transgender students." [Filing No. 120-1 at 4.]  Parents, medical professionals, administrators, and many students all agree that pursuing that mission would require transgender students to be addressed by their preferred names and pronouns.  For example, one student's parents sent a letter to BCSC stating that their child "is a transgender male. He is currently receiving medical treatment . . . and mental health treatment." [Filing No. 120-12 at 2.]  They stated further that "medical providers agree[d] that it is in [their] child's best interest to socially transition as a male," including being referred to by male pronouns.  [Filing No. 120-12 at 2.]  Aidyn's and Sam's declarations show that Mr. Kluge's use of last names only—assuming only for purposes of this Order that Mr. Kluge strictly complied with the rules of the Last Names Only Accommodation—made them feel targeted and uncomfortable.  Aidyn dreaded going to orchestra class and did not feel comfortable speaking to Mr. Kluge directly.  Other students and teachers complained that Mr. Kluge's behavior was insulting or offensive and made his classroom environment unwelcoming and uncomfortable.  Aidyn quit orchestra entirely.  Certainly, this evidence shows that Mr. Kluge's use of the Last Names Only Accommodation burdened BCSC's ability to provide an education to all students and conflicted with its philosophy of creating a safe and supportive environment for all students.  BCSC is not required to allow an accommodation that unduly burdened its "business" in this manner.  *See Erlach v. New York City Bd. of Educ.*, 1996 WL 705282, at *11 (E.D.N.Y. Nov. 26, 1996), *aff'd*, 129 F.3d 113 (2d Cir. 1997) (holding that "interference with students' learning need not be undertaken because it constitutes 'undue hardship' for the employer").

Mr. Kluge repeatedly emphasizes that many of his orchestra students were successful during the 2017-2018 school year in that they participated in extracurricular activities and won awards for their musical performances.  He also submitted declarations from students and another

teacher stating that they did not perceive any problems in Mr. Kluge's classes resulting from the use of last names only.  These facts may well be true, and are accepted as such, but they are neither dispositive of nor relevant to the undue hardship question.  BCSC is a public-school corporation and as such has an obligation to meet the needs of *all* of its students, not just a majority of students or the students that were unaware of or unbothered by Mr. Kluge's practice of using last names only.  BCSC has presented evidence that two specific students were affected by Mr. Kluge's conduct and that other students and teachers complained.  And, given that Mr. Kluge does not dispute that refusing to affirm transgender students in their identity can cause emotional harm, this harm is likely to be repeated each time a new transgender student joins Mr. Kluge's class (or, as the case may be, chooses not to enroll in music or orchestra classes solely because of Mr. Kluge's behavior).  As a matter of law, this is sufficient to demonstrate undue hardship, because if BCSC is not able to meet the needs of all of its students, it is incurring substantially increased cost to its mission to provide adequate public education that is equally open to all.[4]

   Mr. Kluge argues that revoking his accommodation was a result of complaints, in the form of mere "grumblings" or religious animosity.  Yet ample evidence shows that far from mere grumblings, the Last Names Only Accommodation resulted in significant disruption to the learning environment.  BCSC received "reports from students," "reports from parents," and "reports by

---

[4] It is disappointing that Mr. Kluge has set forth several pages of irrelevant argument in his reply regarding the supposed ills of transgenderism.  [Filing No. 186 at 23-26.]  Despite the focus of the mandate and the analysis directed, Mr. Kluge improperly seeks to promote his own views and challenges BCSC and the students, parents and treating physicians with his own beliefs on what is best for the students.  Likewise, arguments rooted in the First Amendment are inapt and beyond the scope of the mandate on remand.  In any event, Mr. Kluge's statements as a public-school teacher are not protected by the First Amendment. *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006) (holding that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline").

teachers in [Mr. Kluge's] own department that students are uncomfortable in his class and that they are bringing the conversations that occur in his class to other classrooms." [Filing No. 113-5 at 7.] Instead of focusing on learning, BCSC's educators, parents, and students alike were thrust into an otherwise unnecessary controversy.  Far from religious animus, all evidence indicates that BCSC responded to concerns rooted in the merits of inclusion.  As BCSC heard from at least one parent, "My child deserves to be treated with respect"; "I really don't care what [Mr. Kluge] thinks about transgender issues on a personal level." [Filing No. 120-13 at 2.]  Even if Mr. Kluge did not personally hear every complaint, it does not mean that they did not exist.  [*See* Filing No. 120-18 at 9-13 (BCSC's Board meeting public testimony surrounding the accommodation and concerns about the Last Names Only Accommodation, including Mr. Kluge's own)]; *see also Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 575 (7th Cir. 2021) (observing that although plaintiff "wasn't informed of each complaint . . . [,] it does not mean they were fictitious.").  Rather, complaints represented key indicators to BCSC that the Last Names Only Accommodation produced substantial student harm.  Put another way, any other business would be entitled to consider complaints of its customers pointing to a problem that undermined its legitimate interests.  As revealed by Aidyn's withdrawal from school, complaints "accurately predicted the fallout" of difficulties surrounding the Last Names Only Accommodation.  *Kluge I*, 64 F.4th at 872 n.8.

And while Mr. Kluge chides BCSC for not identifying an alternative accommodation, ultimately, students must be addressed by some name, and it was clear that Mr. Kluge would agree to nothing short of using only last names.  Just as in *Baz v. Walters*, where an employer denied an employee a religious accommodation to push his religious ministry, so too has BCSC shown that Mr. Kluge's "philosophy of care . . . is antithetical to that of [BCSC,]" and that "[t]o accommodate [Mr. Kluge's] religious practices, [BCSC] would have to either adopt his philosophy, . . . expend

resources on continually checking up on what [Mr. Kluge] was doing or stand by while he practices his (in their view, damaging)" accommodation in the school. *Baz*, 782 F.2d at 706-07.

Lest there be any doubt about disruption, Mr. Kluge himself believed that the Last Names Only Accommodation would result in disruption and indeed was encouraged by it. He explained to Dr. Daghe that far from resigning, he was "encouraged all the more to stay." [Filing No. 15-3 at 5.] After all, he believed, his "persecution" was "a sign that [his] faith as witnessed by using last-names-only . . . was being effective." [Filing No. 15-3 at 5.] Quoting from scripture, Mr. Kluge said, "a wide door for effective service has opened to [him], and there are many adversaries." [Filing No. 15-3 at 5.] Faced with Mr. Kluge's own statements—"pleading" with the school to avoid going down the "transgender path," seeking to discuss with students their "eternal destination," and hoping to stay because his "persecution" surrounding the Last Names Only Accommodation was being "effective"—complaints from others were hardly necessary. While the Last Names Only Accommodation might have been intended as neutral, it ultimately was perceived as intentional. *See Whitaker ex rel. Whitaker v. Kenosha No. 1 Board of Education*, 858 F.3d 1034, 1050 (7th Cir. 2017) (holding that "gender-neutral alternatives are not true alternatives because of . . . the increased stigmatization."). Amid the disruption, BCSC was legally entitled to prioritize "trying to make sure that education can move forward" and to pursue its mission to foster an inclusive environment for all students. [Filing No. 113-5 at 7.] Because of the substantial harm to students, the Last Names Only Accommodation imposed on BCSC substantially increased costs, amounting to an undue hardship as a matter of law.

## 2.    *The Potential for Liability*

In addition to arguing that the Last Names Only Accommodation resulted in substantial student harm, BCSC tenders an additional, separate reason that the Accommodation imposed an undue hardship, the potential for liability. BCSC argues that "continuing the last-name-only

accommodation would have exposed Brownsburg to an unreasonable risk of liability, thus resulting in undue hardship as a matter of law." [Filing No. 185 at 40.] BCSC points to the Seventh Circuit case of *Whitaker ex rel. Whitaker v. Kenosha No. 1 Board of Education*, 858 F.3d 1034, 1038-39 (7th Cir. 2017), which "recognized that discrimination on the basis of transgender status is actionable under Title IX." [Filing No. 185 at 40.] Because "[t]he evidence has not changed," BCSC argues that the Court "should apply the same reasoning and conclude that Brownsburg has established" an "independent basis for undue hardship." [Filing No. 185 at 41.]

Mr. Kluge responds that "[h]ypothetical litigation does not show undue hardship." [Filing No. 186 at 39.] Mr. Kluge argues that he did not "treat[] students differently based on gender identity"; rather, "[he] treated all students the same.  How a few students felt about this no longer matters. . . . And despite the district's claims, 'confusion in [the] classroom' does not violate Title IX." [Filing No. 186 at 40.] Mr. Kluge distinguishes this case from *Whitaker* because *Whitaker* "found disparate treatment because the transgender-identifying student 'was the only student given access'" to a specific bathroom. [Filing No. 186 at 40.] Mr. Kluge argues that BCSC has failed to identify any "prior litigation involv[ing] circumstances similar to this case." [Filing No. 186 at 40 (citation omitted).]

BCSC counters in its reply that "[p]roviding a gender-neutral alternative is not sufficient to relieve the School District from liability, as it is the policy itself which violates [Title IX.]" [Filing No. 187 at 12 (quoting *Whitaker*, 858 F.3d at 1050.)]  BCSC argues that "the common thread between this case and *Whitaker* is that if BCSC let the last-name-only accommodation continue, it would condone a teacher's refusal to call students by their preferred names because they are transgender—that is, because of their sex." [Filing No. 187 at 13.] Additionally, BCSC argues that "[i]t should be enough for this Court to conclude that continuing the last-name-only

40

accommodation would have placed Brownsburg, as the Seventh Circuit phrased it, on the 'razor's edge' of liability."  [Filing No. 187 at 13 (internal quotation marks omitted).]

On the law, BCSC is correct:  Title VII does not require an employer to grant a religious accommodation that would place it on the "razor's edge" of liability. *Matthews v. Wal-Mart Stores, Inc.*, 417 F. App'x 552, 554 (7th Cir. 2011).  Rather, "the threat of . . . disrupting litigation may in some circumstances constitute undue hardship." *Minkus*, 600 F.2d at 83 (7th Cir. 1979).[5]  As the Seventh Circuit earlier observed:

> [BCSC] asserts with copious evidence from students, faculty and administrators that Kluge sometimes failed to follow the accommodation (a failure which he conceded through his lawyer during proceedings before the EEOC), treated transgender students differently than non-transgender students, and created what can be described at best as a difficult learning environment for the students in his class.

*Kluge I*, 64 F.4th at 879 n.12.  Instances of relevant litigation abound.  For example, in *Whitaker*, the Seventh Circuit considered whether the district court erred in granting preliminary injunctive relief to a transgender student who brought claims under Title IX of the Education Amendments Act of 1972 and the Fourteenth Amendment's Equal Protection Clause, alleging that his school district discriminated against him by not permitting him to use the boys' restroom.  In affirming the district court's decision, the Seventh Circuit concluded that the student was likely to succeed on his discrimination claims, recognizing that discrimination on the basis of transgender status is actionable under Title IX. *Whitaker*, 858 F.3d at 1047-50.  In this case, continuing to provide Mr. Kluge with an accommodation that resulted in complaints that transgender students felt targeted

---

[5] At least once Circuit Court of Appeals has held that even under *Groff*, exposure to legal penalties can be an undue burden.  *See D'Cunha v. Northwell Health Sys.*, 2023 WL 7986441 at *2-3 (2d Cir. Nov. 17, 2023) (affirming denial of religious accommodation in form of exemption from COVID vaccine job requirement because "it would have required [the employer] to violate the New York State Department of Health's State Mandate," "exposing itself to potential penalties, and thereby suffering an undue hardship," which would be "excessive" and "unjustifiable" under *Groff*).

and dehumanized could potentially have subjected BCSC to a Title IX discrimination lawsuit brought by a transgender student.

Since the date of decision in *Whitaker*, it has become clear that treating transgender students differently than other students invites litigation under a variety of theories beyond Title IX, many of which have been successfully litigated. *See, e.g.*, *A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760 (7th Cir. 2023), *cert. denied sub nom. Metro. Sch. Dist. of Martinsville v. A. C.*, 144 S. Ct. 683 (2024) (equal protection); *Equal Emp. Opportunity Comm'n v. R.G. &. G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 575 (6th Cir. 2018), *aff'd sub nom. Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731 (2020) (holding that the "EEOC . . . [had] the better argument" that "discrimination because of an individual's transgender status is always based on gender-stereotypes . . . that individuals will conform their appearance and behavior," including "the name they use"); s*ee also Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1782 (2020) (Alito, J., dissenting) (stating that "[a]fter today's decision, plaintiffs may claim that the failure to use their preferred pronoun violates one of the federal laws prohibiting sex discrimination."); *Williams v. Kincaid*, 45 F.4th 759, 770 (4th Cir. 2022) (holding that gender dysphoria is a disability covered by the ADA); *A. C. by M.C. v. Metro. Sch. Dist. of Martinsville*, 601 F. Supp. 3d 345, 348 n.1 (S.D. Ind. 2022), *aff'd*, 75 F.4th 760 (7th Cir. 2023) (observing that student "also brought claims based on staff members and substitutes referring to A.C. with his previous name and using feminine pronouns"); *B.E. v. Vigo Cnty. Sch. Corp.*, 608 F. Supp. 3d 725, 727 n.1 (S.D. Ind. 2022), *aff'd*, 75 F.4th 760 (7th Cir. 2023) (stating that school ultimately "agreed to refer to [transgender students] by their male names and male pronouns"); *EEOC v. Apple-Metro, Inc., and Hawthorne Apple, LLC* (S.D.N.Y., No. 1:17-cv-04333) ($100,000 settlement: employees referred to Charging Party with male pronouns and called her by her birth name rather than her preferred name); *EEOC v.*

*Deluxe Financial Services Corp.*, (D. Minn., No. 15-cv-02646) (defendant supervisors and coworkers intentionally used the wrong pronoun when referring to Charging Party and made derogatory statements about her female appearance); *cf. Baz*, 782 F.2d at 709 (expressing concern about Establishment Clause issues when "unleashing a government-paid chaplain who sees his primary role as proselytizing upon a captive audience").[6]

The Court finds that the existence of the Last Names Only Accommodation placed BCSC at risk of substantial and disruptive litigation, all the more serious given that Title IX violations place the entire school's funding at risk. The Court finds that the Last Names Only Accommodation, because of its unreasonable risk for substantial and disruptive litigation, imposed substantial increased costs on BCSC and was hence an undue burden as a matter of law, both independently and when viewed in combination with the harm and disruption to the school's business.

**VI.**
**CONCLUSION**

The Court understands that Mr. Kluge and BCSC have different visions for the school's mission: BCSC espouses a mission of "fostering a safe, inclusive learning environment," intentionally affirming students; Mr. Kluge argues that "call[ing] . . . students by last names prevents nobody from attending school," merely avoiding opposing students. [Filing No. 185 at 39; Filing No. 186 at 36.] BCSC supports a mission of "afford[ing] dignity and . . . empathy towards transgender students"; Mr. Kluge is concerned about "lying to [transgender students] about

---

[6] *Cf. generally* U.S. Equal Employment Opportunity Commission, *Sex Discrimination*, (stating that "[g]ender identity harassment may include repeated, deliberate use of the wrong name or gender pronouns"), https://www.eeoc.gov/laws/guidance/sex-discrimination; *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 830 (9th Cir. 1999) ("[C]ourts agree that an employer is not liable under Title VII when accommodating an employee's religious beliefs would require the employer to violate federal or state law.").

their sex"; BCSC endorses a mission of "fostering a safe, inclusive learning environment for *all* the children it serves," which would include transgender students like Aidyn and Sam; Mr. Kluge emphasizes that BCSC educates roughly 3,000 children, and overall "[h]is orchestras performed 'better than ever'" — even if a student like Aidyn stopped taking orchestra and dropped out of school. [Filing No. 112-1 at 30; Filing No. 120-1 at 4; Filing No. 120-20 at 3; Filing No. 183 at 13; Filing No. 22-3 at 4; Filing No. 22-2 at 4.]  But between Mr. Kluge's and BCSC's visions for its mission, the law leaves that decision to the school.  *Baz*, 782 F.2d at 707 (affirming denial of religious accommodation where employee's "philosophy of care" was "antithetical" to that of the employer).  As the Supreme Court held in *Groff*, undue hardship is to be viewed within the context of a particular business, not a particular employee.  The Court compares the cost to BCSC's mission, not Mr. Kluge's.  BCSC could either support its transgender students in pursuit of its mission and comply with the law, or accede to Mr. Kluge's accommodation and risk harm to students and the learning environment and/or substantial and disruptive litigation.  As BCSC explained to its teachers, its "goal is not to change your personal beliefs"; rather, "when you work in a public school, you sign up to follow the law."  [Filing No. 120-20 at 4; Filing No. 120-20 at 10.]  The law of Title VII does not require BCSC to continue an accommodation that actually resulted in substantial student harm, and an unreasonable risk of liability, each sharply contradicting the school's legally entitled mission to foster a supportive environment for *all*.  The Last Names Only Accommodation was an undue burden to BCSC as a matter of law.  Accordingly, the Court makes the following rulings:

- **DENIES** Mr. Kluge's Motion for Summary Judgment, [182]; and

- **GRANTS** BCSC's Cross-Motion for Summary Judgment, [184].

The Court's previous Judgment is **VACATED**, [160], and a new Final Judgment shall enter accordingly.

Date: 4/30/2024

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

Distribution:

Travis Christopher Barham
Alliance Defending Freedom
tbarham@adflegal.org

Brent R. Borg
CHURCH CHURCH HITTLE & ANTRIM (Fishers)
bborg@cchalaw.com

Paul D. Castillo
LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.
pcastillo@lambdalegal.org

Michael J. Cork
MICHAEL J. CORK, ESQ.
cork0@icloud.com

Kevin Edward Green
KEVIN GREEN ASSOCIATES
keglegal@aol.com

Christopher Edward Kozak
PLEWS SHADLEY RACHER & BRAUN LLP
ckozak@psrb.com

Tyson Langhofer
Alliance Defending Freedom
tlanghofer@adflegal.org

Henry Liu
COVINGTON & BURLING LLP
hliu@cov.com

Alexander Phillip Pinegar
CHURCH CHURCH HITTLE & ANTRIM
apinegar@cchalaw.com

Komal Shah
COVINGTON & BURLING, LLP
One CityCenter - 850 Tenth St., N.W.
Washington, DC 20001

Roscoe Stovall, Jr.
ROSCOE STOVALL, JR. & ASSOCIATES
rosstovall@gmail.com

Camilla B. Taylor
LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.
ctaylor@lambdalegal.org

Kevin Morris Toner
Plews Shadley Racher & Braun LLP
ktoner@psrb.com

D. Jean Veta
COVINGTON & BURLING LLP
jveta@cov.com